UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BENSLEY CONSTRUCTION, INC., on its own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MARSH & MCLENNAN COMPANIES, INC., MARSH, INC., ACE USA, ACE INA, AMERICAN INTERNATIONAL GROUP, AMERICAN REINSURANCE COMPANY, ARTHUR J. GALLAGHER & CO., HILB ROGAL & HOBBS, COMPANY, WILLIS GROUP HOLDINGS, LTD., WILLIS NORTH AMERICA INC., WILLIS GROUP LTD., UNIVERSAL LIFE RESOURCES, UNIVERSAL LIFE RESOURCES, INC. (d/b/a ULR INSURANCE SERVICES, INC.), THE CHUBB CORPORATION, USI HOLDINGS, INC., METLIFE, INC., PRUDENTIAL FINANCIAL, INC., UNUMPROVIDENT CORPORATION, THE ST. PAUL TRAVELERS COMPANIES, INC., ZURICH AMERICAN INSURANCE COMPANY, LIBERTY MUTUAL GROUP INC., LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, EMPLOYERS INSURANCE COMPANY OF WAUSAU, and ST. JAMES INSURANCE COMPANY LTD.,<br><br>Defendants. | Civil Action No. 05 11249 GAO |

**MEMORANDUM IN SUPPORT OF MOTION TO STAY THIS ACTION
PENDING A DETERMINATION ON TRANSFER BY
THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

Defendants Marsh & McLennan Companies, Inc., Marsh, Inc., ACE USA, ACE

INA, American International Group, Inc., American Reinsurance Company, Arthur J.

Gallagher & Co., Hilb Rogal & Hobbs Company, Willis Group Holdings, Ltd., Willis

North America Inc., Willis Group Ltd., Universal Life Resources, Universal Life

Resources, Inc. (d/b/a ULR Insurance Services, Inc.), USI Holdings, Inc., MetLife, Inc.,

Prudential Financial, Inc., UnumProvident Corporation, The St. Paul Travelers

Companies, Inc., and Zurich American Insurance Company (collectively, "Movants")

respectfully submit this Memorandum in support of their motion to stay this action until

the Judicial Panel on Multidistrict Litigation (the "JPML") either transfers this action to

the District of New Jersey or denies transfer. [1]

## PRELIMINARY STATEMENT

This action is one of over twenty cases filed in or removed to various federal

courts across the country against insurers and insurance brokers claiming deceptive and

anticompetitive conduct in the insurance industry.  The actions were filed on the heels of

an investigation by the New York Attorney General, which resulted in two widely

publicized civil suits against two insurance brokers regarding their sales practices.  Each

of these actions, like Plaintiff's action here, is based on the allegations contained in the

New York Attorney General complaints and purports to allege industry-wide

anticompetitive practices.  In light of the similarity of the underlying allegations, the

JPML in February 2005 transferred the cases that had been brought to its attention to the

---

[1]    The Complaint names as a Defendant "American International Group" and not
"American International Group, Inc."  In filing this motion, the Movants reserve any
and all rights and defenses available under Rule 12 of the Federal Rules of Civil
Procedure, including but not limited to, arguments concerning ineffective service of
process, personal jurisdiction, and that any defendant is not a proper party to this
action.

2

United States District Court for the District of New Jersey, where they have been assigned to Judge Faith S. Hochberg as *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663.

On June 17, 2005, the JPML clerk was notified that this action raises issues of fact and law in common with the previously transferred actions. This action is based on the same alleged conduct and seeks certification of a class that is a subset of the putative classes in the cases that have been consolidated and transferred to Judge Hochberg. Movants thus anticipate that the JPML will also transfer the present action to Judge Hochberg. As a result, Movants respectfully request that the Court stay all proceedings in this action until after the JPML either transfers the action to Judge Hochberg or denies transfer.

A stay is in the interest of justice and efficiency because this action and the consolidated actions are based on the same factual allegations, raise the same legal issues, and involve nearly identical claims. Allowing Judge Hochberg to resolve all issues— including any objections that Plaintiff may raise to the appropriateness of removal—will promote judicial economy and prevent inconsistent rulings. A single judge, rather than several, should decide the relevant questions.

Permitting this action to go forward without a stay, particularly into discovery, would defeat the purpose of the JPML's transfer of the other cases to Judge Hochberg for coordinated and consolidated pretrial proceedings. Although plaintiff in the instant action has failed to allege that it had any nexus with nearly all of the Defendants, nineteen of the Defendants in this action (all but The Chubb Corporation and the Liberty

3

Defendants) are defendants in the proceedings before Judge Hochberg, and each is already litigating the same issues and allegations in the District of New Jersey. Judge Hochberg has consolidated the cases into two groups, has entered a scheduling order, and has established procedures for the parties to confer on the establishment of a document depository and a confidentiality order. The efficiencies of this approach would be lost if Defendants here were forced to proceed simultaneously in this district.

In contrast to the prejudice and cost that would result to Defendants from denying a stay, Plaintiff—who delayed service of the summons and complaint for nearly three months—will not be prejudiced by a brief stay until the issue of where this case will be litigated is resolved. The paramount goals of the multidistrict litigation statute, to promote judicial economy and avoid inconsistent adjudications, are best served in this case if this action is stayed in its entirety pending a decision on transfer by the JPML.

<strong>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</strong>

On February 17, 2005—one day before the President signed the Class Action Fairness Act of 2005 into law, and four months after the New York Attorney General filed the Complaint on which this Action is based—Plaintiff's counsel filed this purported statewide class action on behalf of a Middlesex County plaintiff in Massachusetts Superior Court for Essex County. The day before, Plaintiff's counsel had filed a purported nationwide class action, *Palm Tree Computers, Inc. v. Ace USA, Inc. et al.*, in a state court in Sanford, Florida, raising nearly the same allegations asserted here. Ex. A (*Palm Tree* complaint).

4

The same day as Plaintiff filed this action, the JPML transferred three putative class actions, alleging conduct identical to that described in this action, to the Honorable Faith S. Hochberg in the United States District Court for the District of New Jersey for coordinated or consolidated pre-trial proceedings in conjunction with a case that was already pending before Judge Hochberg. *See In re Insurance Brokerage Antitrust Litigation*, 360 F. Supp. 2d 1371 (J.P.M.L. 2005). In transferring these actions to Judge Hochberg, the JPML concluded that "[c]entralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to class certification matters), and conserve the resources of the parties, their counsel and the judiciary." *Id.* at 1372. The transferred actions were "purported class actions involving allegations that common defendants and/or their alleged co-conspirators have engaged in a combination and conspiracy to affect the sale of insurance sold in the United States by rigging bids and allocating customers." *Id.* The JPML issued a conditional transfer order with respect to ten other cases in March 2005, four more cases in April 2005, and three cases in June 2005. Additional related cases have also been filed directly in the District of New Jersey and assigned to Judge Hochberg.

Judge Hochberg has consolidated the actions in the MDL proceeding into two groups (one involving commercial insurance and the other involving employee benefit insurance) and has established a schedule for filing amended complaints and dispositive motions. *See* Ex. B (Judge Hochberg's Order No. 4). She also has ordered the establishment of a document depository to coordinate discovery and has directed the

5

parties to confer on discovery and confidentiality procedures. *See id.* This process is underway.

The First Amended Class Action Complaint in this action is closely similar to many of the complaints in the MDL. The First Amended Complaint, like the complaints in the MDL actions, alleges that insurance brokers and underwriters failed to disclose that the underwriters paid "contingent commissions" to the brokers based on, among other things, the volume of business the broker delivered. *Compare* First Amended Complaint ("FAC") ¶¶ 65-76 *with, e.g.,* Ex. C (*Opticare* Complaint) ¶¶ 70-106 (one of the cases transferred to MDL 1663).[2] Further, the First Amended Complaint alleges that brokers and insurers engaged in certain instances of "bid-rigging" to ensure that brokers meet their targets under the contingent commission agreements. *Compare* FAC ¶¶ 63 & 75-76 *with, e.g.,* Ex. C, ¶¶ 107-120. Like the plaintiffs in the MDL, plaintiffs in this action seek certification of a class of insurance purchasers, although the First Amended Complaint seeks to limit the proposed class to Massachusetts residents, a proposed class that is entirely included (except for a small difference in the proposed class period) within the proposed nationwide classes in the MDL complaints. *Compare* FAC ¶ 115 *with, e.g.,* Ex. C, ¶ 174.

On June 15, 2005, Defendant Marsh & McLennan Companies, Inc. removed this action to this Court. On June 17, 2005, Defendant MetLife, Inc. notified the JPML Clerk

---

[2]     As noted above and in the Notice of Removal filed on June 15, 2005, while Plaintiff makes such allegations, allegations of a nexus between the Plaintiff and most of the Defendants is entirely lacking.

by letter of the status of this case as a potential tag-along to the pending proceedings in the District of New Jersey. Ex. D. Movants expect that the JPML will in the near future issue a Conditional Transfer Order in accordance with its procedures, which will transfer the action to the District of New Jersey if no objections are filed, and which will allow an opportunity for briefing the issue of transfer if any party objects. *See* JPML Rule 7.4.

## ARGUMENT

## I.   THIS COURT HAS AUTHORITY TO ISSUE THE REQUESTED STAY

This Court has broad discretion to issue a stay based on its inherent power to control its docket. *See Landis v. North American Co.*, 299 U.S. 248, 254 (1936); *see also Clinton v. Jones*, 520 U.S. 681, 706 (1997). In particular, a District Court has discretion to decide whether, in the circumstances of the particular case, justice would be best served by a stay of proceedings in the putative transferor court when an MDL transfer is pending. *See, e.g., Portnoy v. Zenith Laboratories,* No. 86-3512, 1987 WL 10236, at *1 (D.D.C. Apr. 21, 1987).

As the *Manual for Complex Litigation* notes, "the objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save time and effort on the part of the parties, the attorneys, the witnesses and the courts." *Manual for Complex Litigation (Fourth)* § 20.131 at 220 (1995). As a result, District Courts may stay proceedings pending transfer in order to further these goals.

## II.  ALL FACTORS SUPPORT STAYING THIS ACTION.

In determining whether a stay of the proceedings is appropriate, courts consider (1) judicial economy; (2) the hardship and inequity on the moving party without a stay; (3) and prejudice the non-moving party will suffer if a stay is granted.  *See, e.g., Falgoust v. Microsoft Corp.*, No. 00-0779, 2000 WL 462919, at *2 (E.D. La. Apr. 19, 2000); *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).  Because all three of these factors weigh strongly in favor of a stay, a stay should be granted.

### A.  A Stay Is Necessary To Promote Judicial Economy And Avoid Inconsistent Rulings.

Judicial efficiency results from a stay because if a case is later transferred to an MDL proceeding, the transferor court will have "needlessly expended its energies familiarizing itself with the intricacies of a case that would be heard by another judge, [and] any efforts on behalf of the [transferor] court concerning case management will most likely have to be replicated by the judge that is assigned to handle the consolidated litigation. . . ."  *Rivers*, 980 F. Supp. at 1360-61.  Consequently, a majority of courts have concluded that staying preliminary pretrial proceedings pending a ruling on a motion to transfer and consolidate by the JPML is appropriate to conserve judicial resources.  *Id*. at 1361.  The factors that courts have considered in granting stays—uniformity, consistency, and predictability—all favor staying this action.

Transfer of this action to MDL 1663 is a virtual certainty, as there are numerous common issues of law and fact.  As discussed above, this action is based on the same allegations of fact as the cases consolidated before Judge Hochberg.  The First Amended

8

Complaint in this action, like the complaints in MDL 1663, seeks class certification and sets forth virtually the same set of allegations against insurance brokers and insurance companies.  In fact, nineteen of the Defendants in this case are defendants in MDL 1663 and thus are litigating the identical issues in that forum.  Because of these similarities, the same issues will arise in this action and the consolidated cases—including the grounds for motions to dismiss, whether any basis for challenging federal jurisdiction exists, whether or to what extent class certification is appropriate, and the scope of discovery, liability, and damages.

Allowing this to go forward without a stay, particularly into discovery, would put the possibility of efficient and coordinated proceedings at risk and would defeat the purpose of the JPML's transfer of the other cases to Judge Hochberg.  Pursuant to a pretrial order issued by Judge Hochberg, a schedule for amended pleadings and motion practice has been set, and the parties in the MDL are in the process of developing a plan for consolidated and coordinated discovery and other pretrial proceedings.  In the absence of a stay, the efficiencies of this coordinated approach—for the judiciary as well as the parties—would be diminished or lost.

Any motion to remand this case to Massachusetts Superior Court on jurisdictional grounds would only provide a further reason for staying this action pending transfer to MDL 1663.  The questions raised in any remand motion are likely to include some of the same issues that have arisen in the *Palm Tree* case filed by Plaintiff's counsel in Florida state court, and may well arise in additional actions during the course of the MDL proceeding.  The *Palm Tree* remand motions involve, among other things, issues

concerning the interpretation of the effective-date provision of the Class Action Fairness Act of 2005 and the effect of the failure of Defendant The Chubb Corporation ("Chubb") to join the notice of removal. *See, e.g.,* Exs. E & F. We expect that, if Plaintiff or Chubb moves to remand this case, it will raise the same issues here. In order to promote consistency and efficiency and conserve judicial resources, a single court should resolve these jurisdictional issues, including any attendant factual issues. *See, e.g., Falgoust*, 2000 WL 462919, at *2 ("[C]onsistency and economy would be served by resolution of these [jurisdictional remand] issues by a single court after transfer by the JPML."); *Weinke v. Microsoft Corp.*, 84 F. Supp. 2d 989, 990 (E.D. Wis. 2000) (exercising discretion to stay case pending transfer by JPML "in the interest of judicial economy and to avoid inconsistent results" after plaintiff had moved to remand for lack of subject-matter jurisdiction); *Tench v. Jackson Nat'l Life Ins. Co.*, No. 99 C 5182, 1999 WL 1044923, at *2 (N.D. Ill. Nov. 12, 1999) (stay appropriate because the issue of calculation of the amount in controversy "may arise again in other actions" so that "resolution in a single [MDL] forum will ensure consistency and avoid duplicative efforts"); *Johnson v. AMR Corp.*, No. 95-7659, 1996 WL 164415, at *3 (N.D. Ill. Apr. 3, 1996) (staying case where a jurisdictional objection to removal was pending because "[o]nce transferred [to the MDL], the jurisdictional objections can be heard and resolved by a single court") (citation omitted); *Boudreaux v. Metropolitan Life Ins. Co.*, No. 95-138, 1995 WL 83788, at *2 (E.D. La. Feb. 24, 1995) ("the policies of efficiency and

21969391v5

consistency of pre-trial rulings are furthered by a stay" where "the issue involved in this remand motion is likely to be common to other transferred cases [in the MDL]").[3]

### B.   Movants Would Suffer Hardship And Inequity Without A Stay

Movants would face substantial hardship in the absence of a stay.  Movants are already defending nearly identical allegations in claims now consolidated before Judge Hochberg.  Without a stay, Movants would be forced to litigate on multiple fronts, facing inconsistent rulings and expending unnecessary costs. Because the costs of discovery in these actions are likely to be considerable, the latter is a particularly significant risk. Courts recognize that such risks constitute a hardship and inequity justifying a stay.  *See, e.g., Falgoust*, 2002 WL 462919, at \*2 (defendant would suffer "considerable hardship and inequity" if forced to simultaneously litigate multiple suits in multiple courts and could potentially suffer conflicting rulings by different judges in multiple suits); *Weinke*, 84 F. Supp. 2d at 990 (noting "disadvantages of litigating identical claims in multiple venues").

In addition, denying a stay would defeat the purpose of the JPML's consolidation and transfer of the other cases to Judge Hochberg.  The JPML transferred substantially similar cases to Judge Hochberg in order to *eliminate* duplicative discovery, prevent

---

[3]  This case is therefore unlike *In re Massachusetts Diet Drug Litigation*, 338 F. Supp. 2d 198 (D. Mass. 2004), in which the remand motion raised issues unique to the case.  And even if for some reason the case were ultimately to be remanded to state court (though there are no grounds to do so), a stay at this time will allow for improved coordination between Judge Hochberg and the state court.  A stay would help Judge Hochberg achieve the goal of avoiding duplicative discovery between state and federal court actions, regardless of where this action ultimately proceeds.

11

inconsistent pretrial rulings, and conserve the resources of the parties.  *See In re*

*Insurance Brokerage Antitrust Litigation*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005).

Without a stay, Defendants may be subject to each of the very harms that the JPML

intended to eliminate.

### C.   A Brief Stay Will Not Prejudice the Non-Moving Parties in Any Way

Neither Plaintiff nor the non-moving Defendants will suffer any prejudice from a

stay in these circumstances.  The stay is likely to be brief.  The JPML will likely meet

soon to consider the transfer request, and, in keeping with its past practice, will likely

issue a decision promptly.  *See, e.g., Falgoust*, 2000 WL 462919, at * 2 (considering

delay likely to be short).  A slight delay is not prejudicial. *See id.*; *see also Weinke*, 84 F.

Supp. 2d at 990 (plaintiffs' "cursory assertions of prejudice" based on delay and

geographic disruption "[did] not outweigh the disadvantages of litigating identical claims

in a multitude of venues").  Particularly since Plaintiff delayed nearly three months after

filing the complaint before serving the Defendants, Plaintiff should not be heard to

complain that a brief additional delay will somehow cause it prejudice.

Moreover, though the merits of transfer is an issue for the JPML and not for this

Court, no party will be prejudiced by litigating this proposed class in New Jersey rather

than Massachusetts.  Plaintiff's counsel is also prosecuting a similar proposed class

action brought in Florida on behalf of a putative nationwide class and now awaiting

consideration of transfer by the JPML.  *See* Ex. A.  Nothing in the First Amended

Complaint's factual allegations, beyond Plaintiff's domicile and principal place of

business, is specific to Massachusetts.  Given that Plaintiff's own counsel and others are

already seeking to litigate the same matter on behalf of a proposed nationwide class that includes the Plaintiff, no hardship will be caused by litigating these issues in a single forum, rather than in multiple forums across the country. Transfer will also serve the interests of the members of the proposed plaintiff class, by preventing the confusion that could result from the possibility of communications from two different sets of attorneys and courts if a class or classes were to be certified (though defendants deny that certification is appropriate). And Defendant Chubb, which is a New Jersey corporation having its principal place of business in Warren, New Jersey, surely will not suffer any hardship by litigating in New Jersey rather than Massachusetts.

**CONCLUSION**

For the foregoing reasons, this action should be stayed until the JPML either transfers this action to the District of New Jersey or denies transfer.

Dated: June 20, 2005

13

Marsh & McLennan Companies, Inc., and
Marsh Inc., on their own behalf and on
behalf of and with the consent of ACE USA;
ACE INA; Zurich American Insurance
Company; American International Group,
Inc.; American Re-Insurance Company;
Arthur J. Gallagher & Co.; Hilb Rogal &
Hobbs, Company; Willis Group Holdings,
Ltd.; Willis North America Inc.; Willis
Group Ltd.; Universal Life Resources;
Universal Life Resources, Inc. (d/b/a ULR
Insurance Services, Inc.); USI Holdings
Corp.; MetLife, Inc.; Prudential Financial,
Inc.; UnumProvident Corporation; The St.
Paul Travelers Companies, Inc.,


By: _____

Daniel S. Savrin  BBO #555434
Joshua Vitullo  BBO #654310
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
617-951-8000
*Attorneys for Defendants Marsh &
McLennan Companies, Inc., and Marsh Inc.*

Mitchell J. Auslander, Esq.
John R. Oller, Esq.
Christopher J. St. Jeanos, Esq.
Kristin Branson, Esq.
Wilkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8000
*Of Counsel for Defendants Marsh &
McLennan Companies, Inc., and Marsh Inc.*

14

Philip T. Newbury BBO #370070
Mark J. Claflin BBO #657175
Howd & Ludorf, LLC
65 Wethersfield Ave.
Hartford, CT 06114
860-249-1361
*Attorneys for Defendants*
*ACE USA and ACE INA*

H. Lee Godfrey, Esq.
Neal S. Manne, Esq.
Johnny W. Carter, Esq.
Jeffrey R. Seely, Esq.
Susman Godfrey LLP
1000 Louisiana St., Ste. 5100
Houston, TX 77002
713-651-9366
*Of Counsel for Defendants*
*ACE USA and ACE INA*

Bruce W. Edmands, BBO #151360
Eckert Seamans Cherin & Mellott, LLC
One International Place
Boston, MA 02110
617-342-6886
*Attorneys for Defendant*
*Zurich American Insurance Company*

Brien T. O'Connor, BBO #546767
Timothy J. Casey, BBO #650913
Ropes & Gray LLP
One International Place
Boston, MA  02110
617-951-7000
*Attorneys for Defendant*
*American International Group, Inc.*

Roberta A. Kaplan, Esq., BBO #559570
Paul, Weiss, Rifkind, Wharton &
    Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
*Attorneys for Defendant*
*American International Group, Inc.*

John F. Collins, Esq.
Molly Lehr, Esq.
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY  10019
212-259-8000
*Attorneys for Defendant*
*American Re-Insurance Company*

Edwin M. Larkin, Esq.
Lina M. Viviano, Esq.
200 Park Avenue
New York, NY  10166-4193
212-294-6700
*Of Counsel for Defendant*
*Arthur J. Gallagher & Co.*

Terry M. Grimm, Esq.
Stephen C. Schulte, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL  60601312-558-5890
*Of Counsel for Defendant*
*Arthur J. Gallagher & Co.*

Juliane Balliro, BBO #028010
Perkins Smith & Cohen LLP
One Beacon Street, 30th Floor
Boston, MA 02108-3106
617-854-4000
*Attorneys for Defendant*
*Hilb Rogal & Hobbs, Company*

16

James V. Masella III, BBO #562882
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
212-558-4000
*Attorneys for Defendant Willis Group*
*Holdings, Ltd., Willis North America Inc.,*
*and Willis Group Ltd.*

Richard C. Pepperman II, Esq.
Anastasia A. Angelova, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
212-558-4000
*Of Counsel for Defendant Willis Group*
*Holdings, Ltd., Willis North America Inc.,*
*and Willis Group Ltd.*

David Gabianelli, Esq.
Ray L. Wong, Esq.
Ned M. Gelhaar, Esq.
Hancock Rothert and Bunshoft LLP
Four Embarcadero Center, Ste. 300
San Francisco, CA  94111
415-981-5550
*Of Counsel for Defendants Universal Life*
*and Resources, Universal Life Resources,*
*Inc. (d/b/a ULR Insurance Services, Inc.)*

Ian Crawford BBO #544475
Todd & Weld LLP
28 State Street, 31st Fl.
Boston, MA  02109
617-720-2626
*Attorneys for Defendant USI Holdings Corp.*

17

Robert H. Pees, Esq.
Vadim Sarma, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY  10022-2524
212-872-1000
*Of Counsel for Defendant*
*USI Holdings Corp.*

Daniel B. Winslow, BBO #541972
Patricia R. Rich, BBO #640578
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA  02210
617-289-9200
*Attorneys for Defendant MetLife, Inc.*

James W. Carbin
Eric Breslin
Duane Morris LLP
744 Broad St.
Newark, NJ 07102
973-424-2000
*Of Counsel for Defendant MetLife, Inc.*

Barry Y. Weiner BBO #519700
Maureen Mulligan BBO #556482
Ruberto, Israel & Weiner
100 North Washington Street
Boston, MA 02114
617-742-4200
*Attorneys for Defendant*
*Prudential Financial, Inc.*

John R. Middleton, Jr., Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ  07068
973-597-2582
*Of Counsel for Defendant*
*Prudential Financial, Inc.*

Joseph Hamilton, BBO #546394
Mirick, O'Connell, DeMallie &
   Lougee, LLP
100 Front Street
Worcester, MA  01608-1477
*Attorneys for Defendant*
*UnumProvident Corporation*

Deborah E. Hryb, Esq.
Patrick W. Shea, Esq.
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Blvd., 9th Floor
Stamford, CT  06901
203-961-7400
*Of Counsel for Defendant*
*UnumProvident Corporation*

David H. LaRocca, Esq.
Michael J. Garvey, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017
212-455-2377
*Of Counsel for Defendant The St. Paul*
*Travelers Companies, Inc.*

21969391v5

**EXHIBIT LIST**

Exhibit A    Class Action Complaint and Jury Demand, *Palm Tree Computers Systems et al. v. ACE USA et al.*, No. 05-CA-373-16-W (Fla. Cir. Ct., 18th Cir., Seminole County).

Exhibit B    Order No. 4, *In re Insurance Brokerage Antitrust Litigation*, No. 04-5184 (FSH) (D.N.J.).

Exhibit C    Amended Class Action Complaint, *Opticare Health Systems, Inc. v. Marsh & McLennan Companies, Inc. et al.*, No. 04 CV 06954 (DC) (S.D.N.Y.).

Exhibit D    June 17, 2005 Letter to JPML Clerk.

Exhibit E    The Hartford Defendants' Memorandum of Law in Opposition to the Chubb Corporation's Motion to Remand, *Palm Tree Computers Systems et al. v. ACE USA et al.*, 6:05-cv-422-ORL-22KRS (M.D. Fla.).

Exhibit F    Defendant MetLife, Inc.'s Memorandum in Opposition to Defendant the Chubb Corporation's Motion to Remand, *Palm Tree Computers Systems et al. v. ACE USA et al.*, 6:05-cv-422-ORL-22KRS (M.D. Fla.).

21969391v5

# EXHIBIT A

# IN THE CIRCUIT COURT FOR THE EIGHTEENTH JUDICIAL CIRCUIT
## IN AND FOR SEMINOLE COUNTY, FLORIDA
### CIVIL DIVISION

PALM TREE COMPUTERS SYSTEMS,
INC., DELTA RESEARCH INSTITUTE, INC.,
on their own behalf and on behalf
of all others similarly situated

       Plaintiff,

       v.

ACE USA, ACE INA, AMERICAN
INTERNATIONAL GROUP, AON
CORPORATION, AMERICAN
RE-INSURANCE COMPANY, AON
BROKERS SERVICES, INC.,
AON RISK SERVICES COMPANIES, INC.,
AON RISK SERVICES INC. U.S.,
AON GROUP, INC.,
AON SERVICES GROUP, INC.,
ARTHUR J. GALLAGHER & CO.,
WILLIS GROUP HOLDINGS, LTD.,
WILLIS NORTH AMERICA, INC.,
WILLIS GROUP, LTD.,
UNIVERSAL LIFE RESOURCES,
UNIVERSAL LIFE RESOURCES, INC. d/b/a
 ULR INSURANCE SERVICES, INC.,
THE CHUBB CORPORATION, THE
HARTFORD FINANCIAL SERVICES GROUP, INC.
HARTFORD FIRE INSURANCE COMPANY,
HARTFORD INSURANCE CO. OF THE SOUTHEAST,
HARTFORD UNDERWRITERS INS. CO.,
USI HOLDINGS, INC., METLIFE, INC.
PRUDENTIAL FINANCIAL, INC., FIRST
MARKET INTERNATIONAL, INC., and
UNUMPROVIDENT CORPORATION,

       Defendants.

CLASS REPRESENTATION

NO. 05- CA- 373-16- W

6:05-CV-422-ORL-22KRS

---

## CLASS ACTION COMPLAINT
## & JURY TRIAL DEMAND

Plaintiffs, PALM TREE COMPUTERS SYSTEMS, INC., and DELTA RESEARCH

INSTITUTE, INC., by and through their undersigned attorneys, brings this class action

on behalf of themselves and all others similarly situated for compensatory and statutory

damages under applicable State law against the above-named Defendants.

## NATURE OF THE ACTION

1.  This is an action for damages and injunctive relief brought under the laws of the

    various States that prohibit unfair and/or deceptive trade practices and for

    breaches of fiduciary duty.

2.  Plaintiffs allege that the Insurance Broker Defendants (as that term is defined

    below) conspired with each other and with the Insurer Defendants (as that term

    is defined below) to allocate brokerage customers and rig bids for Insurance

    Products (as that term is defined below) offered to those customers. These

    practices violate the laws of the Several States (as that term is defined below).

3.  Because brokerage clients were misled and deceived about these practices, as

    well as the use of kickback schemes between the Insurance Broker Defendants

    and Insurer Defendants, both sets of defendants also engaged in conduct that

    violates various States' laws prohibiting unfair and/or deceptive trade practices.

4.  Plaintiff PALM TREE purchased Insurance products through Defendant FIRST

    MARKET and issued and/or underwritten by other named Defendants,

    including HARTFORD.

5.  Upon information and belief, Plaintiff DELTA RESEARCH purchased Insurance

    Products through one or more of these Defendants, including AIG.

2

6.   Plaintiffs bring this lawsuit as a class action on behalf of all clients of the

Insurance Broker Defendants who bought Insurance Products, where the sales of

those products were subject to the commission, bid-rigging, and customer

allocation agreements described herein from at least January 1, 1994 to the

present.

## PARTIES

7.   Plaintiff and proposed class representative, PALM TREE COMPUTERS

SYSTEMS, INC., a Florida corporation with principal place of business in Florida,

purchased insurance products from one or more of the Defendants.

8.   Plaintiff and proposed class representative, DELTA RESEARCH INSTITUTE,

INC., a Florida corporation with principal place of business in Florida, purchased

insurance products from one or more of the Defendants.

9.   Defendant AON CORPORATION, (f/k/a Combined International Corp.)

("AON") is a Delaware corporation with principal place of business at 200 East

Randolph Street, Chicago, Illinois, 60601.  According to AON'S Internet web site,

it is the world's largest reinsurance broker, largest captive insurance company

manager, and second largest insurance brokerage firm.  AON has extensive

operations throughout the United States and the world.  Throughout the Class

Period, AON engaged in illegal and unethical contingent commission

agreements with various insurers.  The Office of the Attorney General of the

State of New York, as have other state attorneys general, has issued a subpoena

upon AON pursuant to an investigation into its practices, including, *inter alia*, its contingent commission practices.

10. Defendant HILB ROGAL & HOBBS COMPANY ("HRH") is a Virginia corporation with principal place of business at 4951 Lake Brook Drive, Suite 500, Glen Allen, Virginia 23060. According to HRH's Internet web site, it is the seventh largest insurance brokerage firm in the United States, with over 120 offices throughout the nation. Throughout the Class Period, HRH engaged in illegal and unethical contingent commission agreements with various insurers. In October 2004, HRH received a subpoena from the Office of the Attorney General of the State of Connecticut, as part of that department's investigation of possible legal violations, requesting information concerning contingent commissions. In November 2004, HRH was also notified that it would receive a subpoena from the Office of the Attorney General of the State of Florida requesting information regarding its business practices, including collection of contingent commissions. Additionally, HRH has received requests for information regarding contingent commissions from various state insurance departments.

11. Defendant, FIRST MARKET INTERNATIONAL, INC. ("FIRSTMARKET") is a Florida corporation having a principal place of business in Winter Park, Florida. This Defendant is the agent through whom Plaintiff PALM TREE purchased insurance issued by, among others, co-defendants PRUDENTIAL and HARTFORD.

12.    Defendant WILLIS GROUP HOLDINGS LIMITED (f/k/a Willis Corroon Group)

("WILLIS") is a Bermuda corporation with principal place of business at Ten

Trinity Square, London EC3P 3AX, England. WILLIS maintains offices

throughout the United States. According to its filings with the SEC, WILLIS and

its subsidiaries provide management consulting and insurance brokerage

services, both directly and indirectly through its associates. Throughout the

Class Period, WILLIS engaged in illegal and unethical contingent commission

agreements with various insurers. WILLIS has received subpoenas from several

state attorneys general inquiring about its business practices, including

arrangements pursuant to which insurers compensated insurance brokers for

distribution and other services provided to insurers. In addition, in August 2004,

a state court proceeding was commenced against WILLIS in California alleging

that the compensation arrangements between the WILLIS and insurance carriers

constitute deceptive trade practices.

13.    Defendant ARTHUR J. GALLAGHER & CO. ("AJG") is a Delaware corporation

with principal place of business at Two Pierce Place, Itasca, Illinois 60143.

According to its Internet web site, AJG is the world's fourth largest insurance

brokerage and risk management services firm. AJG's principal activity is the

negotiation and placement of insurance for its clients. AJG operates through a

network of more than 250 sales and service offices located throughout the United

States. Throughout the Class Period, AJG engaged in illegal and unethical

contingent commission agreements with various insurers. AJG is currently a

named defendant in several actions pending nationwide regarding the propriety

of undisclosed contingent commissions paid pursuant to certain compensation

arrangements between AJG and various insurance carriers. In addition, fifteen

state attorneys general and other state departments of insurance, including the

Attorney General of the State of Illinois and the Illinois Department of Insurance,

have also issued subpoenas to AJG or initiated investigations relating to ALG

concerning contingent commissions and other business practices.

14.    Defendant USI HOLDINGS, INC. ("USI") is a Delaware corporation with

principal place of business at 555 Pleasantville Road, Suite 160 South Briarcliff

Manor, NY 10510. According to its Internet web site, USI is the 9th largest

insurance brokerage firm in the United States, with operations in 19 states.

Throughout the Class Period, USI engaged in illegal and unethical contingent

commission agreements with various insurers. USI has received a subpoena

from the Offices of both Attorneys General of the States of New York and

Connecticut requesting documents and seeking information as part of an

industry-wide investigation relating to pricing and placement of insurance. USI

has also been advised by a representative of the Florida Attorney General's

Office that it will receive a request for information in connection with a similar

investigation in the State of Florida. The investigations center upon allegations

of bid-rigging, tying arrangements and other fraudulent or unlawful business

practices. According to its report on SEC form 10-Q for the quarter ending

September 30, 2004, USI's revenues from contingent commissions were

approximately $17.0 million and $16.1 million for the nine months ended

September 30, 2004 and 2003, respectively.

15.    Defendant HARTFORD FINANCIAL SERVICES GROUP INC. ("HARTFORD")

is a Delaware corporation with principal place of business at Hartford Plaza,

Hartford, Connecticut. This Defendant also includes its subsidiaries and

affiliates, Hartford Fire Insurance Company, Hartford Insurance Company of the

Southeast, and Hartford Underwriters Insurance Company. Collectivley, these

defendants are referred to as "HARTFORD." According to its Internet web site,

HARTFORD is one of the nation's largest insurance and financial services

companies, and is a leading provider of investment products, life insurance and

employee benefits; automobile and homeowners products; and commercial

property and casualty insurance. Throughout the Class Period, HARTFORD

entered into illegal and unethical contingent commission agreements with

various insurance brokers. HARTFORD admitted in its report on SEC form 10-Q

for the period ended September 30, 2004 that it "pays brokers and independent

agents commissions and other forms of incentive compensation in connection

with the sale of many of the Company's insurance products." At all material

times, acts and omissions set forth herein by any of HARTFORD'S subsidiaries or

affiliates were done with the actual and/or constructive knowledge of

HARTFORD.

16.    Defendant Universal Life Resources ("ULR") is a California Limited Partnership

with its principal place of business in California. It is located at 12264 El Camino

7



Real, Suite 303, San Diego, California. Universal Life Resources promotes itself

as a national group life, accident and disability consulting company that

provides broker services to its clients, the insured. Universal Life Resources

purports to help "employers develop and implement improved plans that reduce

costs for both the employer and its employees."

17.    Defendant ULR INSURANCE SERVICES, INC. ("ULR Insurance") is a California

corporation with its principal place of business at 12264 El Camino Real, Suite

303, San Diego, California. ULR Insurance is the general partner of Universal

Life Resources and it is the successor-in-interest of Universal Life Resources

Insurance Services, Inc. and Universal Life Resources, Inc. ULR Insurance is

authorized to sell insurance on behalf of Metropolitan Life Insurance Company,

Prudential Insurance Company of America, Life Insurance Company of North

America, Connecticut General Life Insurance Company, Provident Life and

Accident Insurance Company, and UnumProvident Life Insurance Company of

America.

18.    Throughout the Class Period, the ULR defendants engaged in illegal and

unethical contingent commission agreements with various insurers. In

November 2004, the New York State Insurance Department issued citations to

ULR Insurance, ULR and other related entities as part of the Department's

ongoing investigation with New York State Attorney General Eliot Spitzer's

office into contingent commission fee arrangements. The ULR entities were



charged with steering business illegally to insurers who paid fees that were not disclosed to the corporations that retained them.

19.    Defendant METLIFE, INC. ("METLIFE") is a publicly-held company, incorporated in the State of Delaware and headquartered in the State of New York.  MetLife designs, develops, markets and sells insurance products for individuals and business clients throughout the United States.  For purposes of this Complaint, MetLife includes it subsidiary, Metropolitan Life Insurance Company ("Metropolitan Life"), as well as other subsidiaries, affiliates, partnerships, joint ventures, divisions, business units and affiliated entities that are authorized to sell insurance in the United States. During the Class Period, METLIFE, along with its subsidiaries and affiliates, engaged in illegal and unethical "contingent commission," arrangements whereby it would pay brokerages substantial commissions to steer business in its direction.  In 2003 alone, METLIFE paid approximately $25 million in contingent commissions.

20.    Defendant Prudential Financial, Inc. ("PRUDENTIAL") is a publicly-held company incorporated in the State of New Jersey and which conducts substantial business throughout the United States.  PRUDENTIAL designs, develops, markets and sells insurance products for individuals and business clients.  For purposes of this Complaint, Prudential includes its subsidiary, The Prudential Insurance Company of America ("Prudential Insurance"), as well as its other subsidiaries, affiliates, partnerships, joint ventures, divisions, business units and affiliated entities that are authorized to sell insurance in the United States.

9

During the Class Period, PRUDENTIAL, along with its subsidiaries and affiliates, engaged in illegal and unethical "contingent commission," arrangements whereby it would pay brokerages substantial commissions to steer business in its direction.

21.  Defendant UNUMPROVIDENT CORPORATION ("UNUMPROVIDENT") is a publicly-traded company incorporated in Delaware and headquartered in Tennessee which, through its subsidiaries, is the leading provider of a group long-term, short-term and individual disability income products in the world. For purposes of this Complaint, UnumProvident includes its subsidiaries, UnumProvident Life Insurance Company of America and Provident Life and Accident Insurance Company, as well as other subsidiaries, affiliates, partnerships, joint ventures, divisions, business units and affiliated entities that are authorized to sell insurance and conduct business in the United States. During the Class Period, UNUMPROVIDENT, along with its subsidiaries and affiliates, engaged in illegal and unethical "contingent commission," arrangements whereby it would pay brokerages substantial commissions to steer business in its direction.  In June 2004, UNUMPROVIDENT received a subpoena from the Office of the New York Attorney General requesting documents and information relating to compensation agreements between insurance brokers and the Company and its subsidiaries. In addition, on October 26, 2004, UNUMPROVIDENT received a subpoena from the Office of the Attorney General of the State of Connecticut requesting, *inter alia*, information regarding



compensation agreements with brokers. On October 25, 2004,

UNUMPROVIDENT also received a letter from the Massachusetts Division of

Insurance seeking similar information.

22.    Defendant ACE USA, ("ACE") is a subsidiary of ACE INA, the U.S.-based

division of the ACE Group of Companies which provides insurance and

reinsurance for a diverse group of clients around the world.  ACE Limited, which

has over $49 billion in assets, is the Bermuda-based holding company of the ACE

Group of Companies which had a written $14.6 billion in 2003 gross premiums.

ACE, which includes ACE's operations in Canada, is organized into the

following business units: ACE Accident & Health, ACE Casualty Risk, ACE

Professional Risk, ACE Risk Management, ACE Select Markets, ACE Specialty

Products, ACE US International, and ESIS, Inc.  During the Class Period, ACE,

along with its subsidiaries and affiliates, engaged in illegal and unethical

"contingent commission," arrangements whereby it would pay brokerages

substantial commissions to steer business in its direction.

23.    Defendant AMERICAN INTERNATIONAL GROUP ("AIG") is a Delaware

corporation with its principal place of business located at 70 Pine Street, New

York, New York, 10270.  AIG is the world's leading international insurance and

financial services organization, with operations in more than 130 countries and

jurisdictions.  AIG member companies serve commercial, institutional and

individual customers through the most extensive worldwide property-casualty

and life insurance networks of any insurer.  In the United States, AIG companies

are the largest underwriters of commercial and industrial insurance and AIG
American General is a top-ranked life insurer. AIG's global businesses also
include retirement services, financial services and asset management. During the
Class Period, AIG, along with its subsidiaries and affiliates, engaged in illegal
and unethical "contingent commission," arrangements whereby it would pay
brokerages substantial commissions to steer business in its direction.

24.     Defendant THE CHUBB CORPORATION ("CHUBB") is a New Jersey
corporation with its principal place of business located at 15 Mountain View
Road, Warren, New Jersey 07059. Chubb is a holding company for a family of
property and casualty insurance companies known informally as the Chubb
Group of Insurance Companies (the P&C Group). The P&C Group is divided
into three business units. Chubb Commercial Insurance offers a range of
commercial customer insurance products, including coverage for multiple peril,
casualty, workers' compensation and property and marine. Chubb Specialty
Insurance offers specialized executive protection and professional liability
products for privately and publicly owned companies, financial institutions,
professional firms and healthcare organizations. Chubb Specialty Insurance also
includes the Company's surety and accident businesses, as well as its reinsurance
assumed business. Chubb Personal Insurance offers products for individuals
with fine homes and possessions who require more coverage choices and higher
limits than standard insurance policies. Chubb serves property and casualty
customers from more than 130 offices in 29 countries and 32 states. During the



Class Period, CHUBB, along with its subsidiaries and affiliates, engaged in illegal and unethical "contingent commission," arrangements whereby it would pay brokerages substantial commissions to steer business in its direction.

25.  Defendant AMERICAN RE-INSURANCE COMPANY ("ARC") is a wholly owned subsidiary of the German-based MUNICH REINSURANCE COMPANY, and does business through its MUNICH-AMERICAN RISK PARTNERS division ("MUNICH-AMERICAN"). MUNICH-AMERICAN'S principal place of business is located at 685 College Road East, Princeton, New Jersey, 08543. ARC is licensed in all 51 U.S. jurisdictions and operates in the U.S. and elsewhere to provide reinsurance capacity to a wide variety of clients. MUNICH-AMERICAN offers a broad range of insurance and reinsurance products including but not limited to: casualty, property, workers' compensation, professional liability, management and corporate liability, and healthcare.

26.  At all material times, upon information and belief, each Defendant authorized and/or acted by and through its officers, employees, agents, servants, and/or representatives, including those actively engaged in the management of Defendants' business or affairs.

27.  At all material times, every reference is made in this Complaint to any corporate Defendant includes predecessors, successors, parents, subsidiary, affiliates, and divisions of the corporation for the corresponding time period.



## DEFINITIONS

28.     For the purposes of this Complaint, AON, AJG, WILLIS, USI, HRH, FIRST

MARKET, and ULR are referred to collectively as "Insurance Broker

Defendants."

29.     HARTFORD, AIG, ACE, ARC, METLIFE, CHUBB and UNUMPROVIDENT are

referred to collectively as "Insurer Defendants."

30.     For the purposes of this Complaint, the Insurer Defendants and the Insurer

Broker Defendants will be referred to collectively as, "Defendants."

31.     For the purposes of this Complaint, the term "Insurance Products" consists of

commercial general liability insurance, property and casualty insurance, excess

property and casualty or liability insurance, health insurance, surplus lines

reinsurance, personal life and accident insurance, and reinsurance.

32.     For purposes of this agreement, "Contingent Commission Agreement" ("CCA")

refers to an agreement whereby insurers pay sums to insurance brokerage

companies to obtain business from the latter.  The precise terms of these

agreements vary, but they commonly require the insurance company to pay the

broker based on one or more of the following:  (a) how much business a broker's

clients pace with the insurance; (b) how many brokers' clients renew policies

with the insurance company; and (c) the profitability of the business placed by

the broker.

33.     During the 1990s, Defendants designed and executed a business plan under

which the Insurer Defendants agreed to pay the Insurance Broker Defendants

"contingent commissions" to steer them business and shield them from competition.

34.    These CCAs created improper incentives for Defendants, as the size of the contingent commission payments to the Insurance Broker Defendants determined to whom business would be directed.

35.    At times, the Insurance Broker Defendants' plans to maximize the profits they received from CCAs went even further: they designated winners. The Insurance Broker Defendants solicited, and obtained, fictitious high quotes from insurance companies in order to deceive its clients into believing that true competition had taken place. The Insurance Broker Defendants promised to protect insurance companies from competition, and did so. The Insurance Broker Defendants also threatened to hurt the business of those who thought of truly competing for particular pieces of business.

36.    This business plan, as practiced by Defendants, was phenomenally profitable for both the Insurance Broker Defendants and the Insurer Defendants. This profit margin, however, comes at the expense of Defendants' clients and the marketplace for insurance, which Defendants have corrupted by distorting and elevating the price of insurance for every policyholder. Other victims here are Defendants' own shareholders, who have never been told that hundreds of millions of dollars of the Insurance Broker Defendants profits derive from illegal activities, and that the Insurer Defendants must pay these commissions to sustain their sales.



## JURISDICTION & VENUE

37.    Jurisdiction over each Defendant exists and is proper in the State of Florida.

38.    At all material times, without limiting the generality of the foregoing, jurisdiction

exists over each Defendant (directly or through agents who at the time were

acting with actual and/or apparent authority and within the scope of such

authority) in each of the following respects.  Defendants:

a.    Transacted business in the State of Florida;

b.    Contracted to supply and/or obtain services and/or goods in the State of
Florida;

c.    Intentionally availed themselves of the benefits of doing business in the
State of Florida;

d.    Produced, promoted, sold, marketed and/or distributed their products
and/or services in this State and, thereby, have purposefully profited
from their access to this State's markets;

e.    Caused tortious damage by acts or omissions in the State of Florida;

f.    Caused tortious damage in the State of Florida by acts or omissions
committed outside Florida while: (i) regularly doing or soliciting business
in this State; and/or, (ii) engaging in other persistent courses of conduct
within Florida; and/or, (iii) deriving substantial revenue from goods used
or services rendered in Florida;

g.    Committed acts and omissions which Defendants knew would cause
injury (and, in fact, did cause injury) in the State of Florida to Plaintiff and
members of the Class (as defined herein) while:  (i) regularly doing or
soliciting business in Florida; and/or, (ii) engaging in other persistent
courses of conduct within Florida; and/or (iii) deriving substantial
revenue from goods used or services rendered in Florida;

h.    Conspired with others who did have the requisite minimum contacts with
Florida; and/or

16



i.      Otherwise had the requisite minimum contacts with Florida, such that
        under the circumstances it is fair and reasonable to require Defendants to
        come to this Court to defend this action.

39.    Neither the Plaintiff nor any member of the Class has suffered damages

        exceeding $74,999.00 each, even when trebled. In no event will Plaintiff or any

        member of the Class accept damages in excess of $74,999.00. Further, attorneys'

        fees on a pro-rata basis will not exceed $74,999.00 for each class member.

40.    Plaintiff states, and intends to state, a cause of action solely under the laws of the

        Several States, and specifically denies any attempt to state a cause of action

        under the laws of the United States of America, including, without limitation, the

        Sherman Antitrust Act, 15 U.S.C. § 1.

41.    Venue is proper in Seminole County because Plaintiffs are located in Seminole

        County; Defendants regularly transact business in Seminole County, including

        the sales and service of Insurance Products therein; and Defendants maintain

        offices or authorized agents in Seminole County.

## BACKGROUND

### THE STRUCTURE OF THE INSURANCE INDUSTRY

42.    There are basically three types of entities in the insurance market:

        a.      Clients:  companies and individuals seeking to purchase insurance for

                their businesses, employees or themselves.

        b.      Brokers and independent agents (collectively "brokers"):  hired by clients

                to advise them as to needed coverage and to find insurance companies

                offering that coverage. Brokers represent the client, obtain price quotes,

present the quotes to the client, and make recommendations to the client

that include factors other than price, such as differences in coverage, an

insurance company's financial security, or an insurance company's

reputation for service or claims payment.

c.    Insurance companies:  these entities submit quotes to the brokers and, if

selected by the client, enter into a contract to provide insurance for that

client's risk.

43.    In this structure, the client makes two types of payments:  (1) it pays its broker an

advisory fee or a commission for locating the best insurer; and (2) it pays the

chosen insurance company premiums for the coverage itself.

44.    When the client pays a commission, this is usually accomplished in one check to

the broker, with the broker deducting the commission and forwarding the

premium to the insurance company.  Sometimes clients, particularly large

commercial clients, break out the broker's fee and pay it directly to the broker.

45.    In addition to the first commission payment described above, brokers sometimes

receive another kind of payment, but not one from the clients.  These are called

contingent commissions and come from insurance companies pursuant to

arrangements generally known as CCAs.  Although the precise terms of these

agreements may vary, they commonly require the insurance company to pay the

broker based on one or more of the following:  (1) how much business the

broker's clients place with the insurance company; (2) how many of the broker's

clients renew policies with the insurance company; and (3) the profitability of the

business placed by the broker.

46.    Unbeknownst to Defendants' clients, these "services" include steering business

to complicit and profiting insurance companies by, among other things, rigging

bids and fixing prices.

### INSURANCE BROKER DEFENDANTS FALSELY AND DECEPTIVELY PROMOTE A NON-EXISTENT "FIDUCIARY RELATIONSHIP" BETWEEN BROKERS AND CLIENTS

47.    Almost uniformly, each of the Insurance Broker Defendants emphasizes that it

works for its client, not for the insurance companies.  Each has provided its

clients with sales and/or marketing materials stressing the fiduciary relationship

between the Insurance Broker and the client.

48.    In fact, a central part of each Insurance Broker Defendants' business plan has

been to promote the interests of insurance companies with whom they have

CCAs over the interests of its clients.

49.    The incentives created by CCA's create perverse incentives for the Insurance

Broker Defendants.  When Insurance Broker Defendants steer business to the

favored insurance companies, i.e. the Insurer Defendants, those insurance

companies, in turn, pay the Insurance Broker Defendants higher fees.  In

addition, when Insurance Broker Defendants help favored insurance companies

(Insurer Defendants) retain their existing business at renewal time, those

insurance companies pay Insurance Broker Defendants higher fees.  When

Insurance Broker Defendants steer more profitable business (policies with low

claims ratios) to favored Insurer Defendants, those insurance companies pay



Insurance Broker Defendants higher fees.

50.     Most importantly, when the clients pay higher premiums, volume and

profitability rise — again increasing the Insurance Broker Defendants' fees.

Insurance Broker Defendants, therefore, do not, as they routinely contend,

always put their client's best interests first, nor are these Insurance Broker

Defendants truly their clients' disinterested advocate.  To the contrary, Insurance

Broker Defendants primarily represent their own interests and those of their

favored Insurer Defendants.  Both the Insurer Defendants and Insurance Broker

Defendants profit because of their common interest to maximize premiums,

which is created by the CCA.

51.     Upon information and belief, Insurance Broker Defendants further instruct their

employees to describe the company as an advisor and honest conduit for

information, but one that leaves the final decision to the client.  In many

instances, however, the client is making a misinformed "final decision" on

insurance coverage.  As set forth below, Insurance Broker Defendants have

repeatedly provided clients with false and inflated quotes.  They frequently

designate a winner, and then solicit inflated bids from other insurance

companies, who provide such bids, knowing that later they themselves will have

a turn to get business without meaningful competition.  A choice made by a

client under these circumstances has been made under false pretenses created by

both Insurance Broker Defendants and the complicit Insurer Defendants.

52.     As further set forth below, steering business to contingent commission-paying



insurance companies is fundamental to the Insurance Broker Defendants'
business plan.

### THE INSURER DEFENDANTS PARTICIPATED IN KICKBACK SCHEMES WITH INSURANCE BROKER DEFENDANTS

53.   The world's largest insurance companies have participated in the illegal and
massive conspiracy, price-fixing, steering, and kickback scheme.  These Insurer
Defendants have paid hundreds of millions of dollars for Insurance Broker
Defendants to steer business their way.

54.   At times, the Insurer Defendants have gone even further, colluding with
Insurance Broker Defendants to rig bids and submit false quotes to unwitting
clients throughout the United States.

55.   At all material times, these Insurer Defendants had opportunities to refrain from
engaging in the massive conspiracy of fraud, kickbacks, and price-fixing.  At no
time did they report the Insurance Broker Defendants to federal, state, or local
law enforcement agencies or financial services and insurance regulatory
agencies.  Instead, the Insurer Defendants engaged in the collusion described
herein, costing their clients hundreds of millions, if not billions, of dollars.

### ALLEGATIONS OF WRONGDOING

#### ALL BROKER AND INSURER DEFENDANTS ENGAGED IN UNLAWFUL USE OF CONTINGENT COMMISSION AGREEMENTS

56.   The practice of using CCAs was widespread throughout the insurance industry
and has been ongoing for years.  The practice was the product of an unlawful
conspiracy.  Any single insurance broker could not continue to utilize these

arrangements unless it knew and had the understanding that its competing brokers were likewise using them and that insurers were acquiescing in and cooperating with their use. Individual insurers likewise agreed to these arrangements with the knowledge and understanding that other competing insurers agreed to them as well.

57.    Though ongoing for many years, the practice reached a new level beginning in the mid 1990s, due partly to the efforts of William Gilman ("Gilman"), a Managing Director at Marsh and the Executive Marketing Director of Marsh Global Broking ("MGB"). According to an October 22, 2004 report in the Wall Street Journal, "Mr. Gilman helped to orchestrate the system at the heart of the scandal—channeling business to insurance companies that paid the biggest commissions to Marsh, rather than to insurers willing to provide the lowest quotes, according to more than two dozen current and past employees of Marsh & McLennan Companies ("MMC") (the world's largest insurance broker) and insurance firms." In the early 1990s, in order to satisfy MMC's demand for greater profits, Marsh developed CCAs (later known as PSAs or MSAs) that required insurers to pay Marsh fees based on volume of business alone. This system gave the incentive to brokers like Marsh to direct clients to insurers that would not necessarily offer the best price.

58.    In order to maximize profits from CCAs, they were imposed on business throughout Marsh, and were centralized under MGB. According to the Wall Street Journal article cited above, "this unit directed the CCA fee plan and served

22



as the clearinghouse of dealings between Marsh and its insurance clients in several practice areas, including midsize companies that buy property and casualty insurance." Through MGB, hundreds of contracts were channeled to insurers who provided the most lucrative remuneration to Marsh. According to the same article," Robert Newhouse, Marsh's former chairman of U.S. operations, said MGB's purpose was to maximize revenues and that all Marsh employees and field agents were to abide by the MGB system.

59.   As this system was implemented, the pressure to produce more profits each year became unrelenting. "'We had to do our very best to hit our numbers,' says Robert Amoroso, former manager of Marsh's Philadelphia branch. 'Each year, our goals were more aggressive.'" Roger Egen, President and Chief Operating Officer of the Marsh brokerage unit has been quoted as telling his management team that "each time I see Jeffrey Greenberg [CEO of MMC], I feel like I have a bull's eye on my forehead."

60.   This internal pressure for higher profits was pursued at the expense of Marsh's clients, who were deprived of fair price competition for insurance products. As part of the effort to steer business to insurers who paid the most in CCA fees to Marsh, the fictitious "A, B, C" quotation system described below was utilized.  In the United States alone, Marsh has identified 61 insurers (including all of the Insurer Defendants herein) with whom it used MSAs.  It has conceded that it uses MSAs "with most of its principal insurance markets."  It claims that MSAs

"are commonplace in the industry and Marsh has them with almost all major

insurers."

61.    None of these practices were fully and accurately described to clients; many

(such as the use of rigged bids) were never disclosed at all, even though

Marsh/MMC, like other brokers, had a fiduciary obligation to its clients.

62.    In 2004, New York Attorney General ("A.G.") Elliott Spitzer (" Spitzer") began an

investigation into the use of contingent commission arrangements.  Marsh

subsequently posted a website (<http://www.msa marsh.com>), finally

revealing these agreements to the public.  However, that website was itself

misleading.  It did not disclose the use of bid-rigging or fictitious quotes for

Insurance Products.  It did not disclose that the true purpose of MSAs was to

steer clients to those insurers who paid Marsh the most money.  Moreover, the

website asserted that MSAs compensate Marsh for services provided to insurers,

allegedly including "streamlined access to clients," "intellectual capital,"

"product development," "development and provision of technology" and

"administrative and information services."  All of these "services," however, are

services Marsh and MMC were already obligated to provide to clients.

Moreover, any assertion that CCAs compensate Marsh and MMC for the costs of

providing these services is false and misleading.  A 2004 report by J.P. Morgan

Securities, Inc. ("Morgan") states that the profit margin for brokers on revenues

from CCAs is at least 70% and may be as high as 100%.  The report concluded



that "[w]e are hard-pressed to describe any material cost directly associated with these revenues."

63.    Marsh and MMC also made no systematic effort to disaggregate the revenues from these agreements, something Jeffrey Greenberg, its former CEO, admitted as late as July 28, 2004 on a conference call with market analysts.  Only on October 18, 2004, after being sued by Spitzer in the lawsuit described below, was it disclosed that MMC's revenues from contingent commission arrangements were $845 million in 2003 (12% of MMC's risk and insurance revenue and 7% of total consolidated revenue) and $420 million for the first six months of 2004 (11% of MMC's risk and insurance revenue and 7% of its total consolidated revenue).

64.    Thus, while Marsh and MMC portrayed themselves as "advocates" for their clients who acted in "our client's best interest," by virtue of the practices described herein, they repeatedly and consistently acted against the best interests of their clients in order to maximize their own profits through unfair and unlawful competitive acts.

65.    This type of conduct, however, was not confined to Marsh and MMC.  The New York A.G.'s office has confirmed that the practices complained of in its complaint against MMC and Marsh described below are widespread and extend throughout the insurance industry.  In a press release issued by that office on October 14, 2004, it was stated:

> [t]he actions against the brokerage firm, Marsh & McLennan
> Companies, and the two executives stem from a widening
> investigation of fraud and anti-competitive practices in the

insurance industry. Evidence revealed in today's lawsuit also implicates other major insurance carriers. 'The insurance industry needs to take a long, hard look at itself,' Spitzer said. 'If the practices identified in our suit are as widespread as they appear to be, then the industry's fundamental business model needs major corrective action and reform.' 'There is simply no responsible argument for a system that rigs bids, stifles competition and cheats customers,' he added."

66.  In testimony given before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, Spitzer further confirmed that "contingent commissions have affected practically every line of insurance business" including reinsurance.

67.  The 2004 Morgan report cited earlier likewise concluded that "contingent commissions comprise 5 percent of revenues and 15 percent of earnings for publicly traded brokers." In testimony given before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, it was estimated that in 2003, industry-wide property/casualty contingent commissions totaled $4.2 billion.

68.  The New York Times reported on October 25, 2004 that a six-month probe of Defendant AON uncovered "deceptive and coercive practices" and that the New York A.G.'s office may commence a civil lawsuit against AON during the next few weeks, according to a source close to the inquiry. The article goes on to state:

At Aon, the person close to the case said, investigators have found documentation of brokers steering business to insurers that paid the company incentives ... They also found another anticompetitive practice known as tying, a kind of pay-to-play arrangement in which brokers threaten to curtail sales for an insurance company unless the insurer lets the broker also arrange its own coverage needs or reinsurance.

> Fees on reinsurance, which insurers buy to reduce their risk,
> can run into the tens of millions of dollars."

69. An October 31, 2004 New York Times article further indicated that Michael O'
Hollering, AON's President and head of its reinsurance unit, may have required
insurers to buy reinsurance from that unit in exchange for placing their own
coverage with AON'S customers.

70. AON has admitted the widespread use of what it called CSUs, identifying 82
insurers with whom it has such agreements, including many of the Insurer
Defendants here.  AON, in response to the New York A.G.'s office's
investigation, has posted a website on the topic, but, like Marsh's website, it is
misleading because it does not explain how CSUs are used to allocate customers
to those insurers who provide greater payments to AON.[1]  AON's website also
falsely states that CSUs compensate it for the costs of services supplied to
insurers, 58. In an October 28, 2004 press release, AON admitted that it had
received payments of contingent commissions totaling $117 million for the nine
months ended in September of 2004.  It also admitted that it received an
additional $91 million during the same period for "other compensation for
services to underwriters." AON announced on October 22, 2004 that it was
ceasing to accept contingent commissions, an action brought about by the Spitzer
lawsuit described below.  It has not indicated any intention to cease accepting the
"other compensation" described in its October 28 press release.



71.    Likewise, AJG, according to the 2004 Morgan report cited above, received $22

million in contingent commissions in 2002 and at least $24 million in contingent

commissions in 2003. AJG does not disaggregate its earnings on such

commissions in its financial statements and does not disclose fully and fairly

such commissions to its clients.  In its mission statement, AJG claims that it

places the needs of its clients first, but these practices belie that claim.

72.    Similarly, WILLIS announced for the first time, on October 21, 2004, that it

obtained an estimated total of $160 million in 2004 from the use, inter alia, of

contingent commission agreements.  It also announced its intention to cease

accepting them as of the date.  As the Morgan 2004 report noted, WILLIS, along

with AON and MMC, had a practice of not disclosing such arrangements.

Indeed, the Morgan report noted that under its CEO, Joe Plumeri, WILLIS was

attempting to aggressively pursue such arrangements with insurers.

THE INVESTIGATIONS AND PROSECUTIONS BY THE STATE ATTORNEYS GENERAL

73.    On October 14, 2004, Spitzer filed a lawsuit against MMC and Marsh in New

York state court, alleging that " [s]ince at least the late 1990s, Marsh has designed

and executed a business plan under which insurance companies have agreed to

pay Marsh more than a billion dollars in so-called 'contingent commissions' to

steer them business and shield them from competition."  One of the documents

attached to Spitzer's complaint is a statement by Marsh indicating that "

[a]assignments of this type are commonplace in the industry and Marsh has

---

[1] www.aon.com/about/csu/default.asp

them with almost all major insurers." As Spitzer's complaint further stated, [t]he losers in all of this, of course, are Marsh's clients and the marketplace for insurance, which Marsh corrupted by distorting and elevating the price of insurance for every policy holder." Spitzer's complaint alleged, inter alia, violations of New York's laws prohibiting antitrust violations and fraudulent business practices.

74.  Spitzer's complaint provided extensive documentary materials obtained from Marsh and others that showed how this corrupt system worked. Among the ways in which it worked was bid-rigging, whereby Marsh would collude with insurance companies to have the latter submit false quotations, so that Marsh could steer the business for its customers to the insurance company that submitted the ostensibly "lowest" bid. The insurance companies identified in Spitzer's complaint that participated in such bid-rigging included ACE, Hartford, Munich-American, and AIG. Examples of such bid-rigging and customer allocation, drawn from Spitzer's complaint against Marsh and MMC and the documents described therein, are set forth in detail below.

75.  In announcing his lawsuit on October 14, Spitzer said that the New York A.G.'s office had been misled in its investigation " at the highest levels of the company." MMC has responded to the filing of this complaint by:

a.    promising, in a press release dated October 14, 2004, to conduct an "independent review" of the accusations against Marsh;

29

b.  having Jeffery W. Greenberg, its former Chairman and CEO, announce on October 15, 2004 that Ray Groves (" Groves"), Chairman and CEO of MMC, would be replaced by Michael Cherlasky ("Cherlasky"), formerly head of Marsh Kroll, MMC's risk consulting subsidiary;

c.  announcing, on October 15, 2004, that, pending the completion of the New York Attorney General's (" AG.") investigation, it was suspending the use of MSAs;

d.  making public on October 18, 2004, for the first time, MMC's revenues from contingent commission agreements, as described above;

e.  Announcing on October 25, 2004, that Jeffrey Greenberg had abruptly resigned as Chairman and CEO of MMC and would be replaced by Cherlasky;

f.  Announcing on October 26, 2004, that it was instituting institutional reforms, including transparency to clients, and the permanent abolition of MSAs;

g.  According to a November 4, 2004 Wall Street Journal article, dismissing Oilman and three other Marsh executives—Edward McNenney, Gregory Doherty and Glenn Bosshardt. A fifth executive—Oilman's daughter, Samantha Gilman—has been suspended but is still in Marsh's employ.

h.  Announcing on November 8, 2004 that Roger E. Egan, President and Chief Operating Officer of Marsh, Christopher M. Treanor, Marsh's Chairman and Chief Executive Officer of Global Placement, and William L. Rossoff,

Senior Vice-President and General Counsel of MMC, were resigning, thus confirming that the wrongdoing in Marsh and MMC was pervasive and occurred at the highest levels of both companies.

i. Announcing on November 18, 2004 that five members of Marsh's Board of Directors — Ivlathis Cabiallavetta, Peter Coster, Groves, Charles A. Davis, and A.J.C. Smith — were stepping down so that the company could thereafter adhere to best corporate governance practices.

j. Announced on January 7, 2005 that a new position of" Chief Compliance Officer" would be created, to be filled by Senior Vice- President E. Scott Gilbert.

76. On February 6, 2005, the New York A.G.'s office announced that Robert Stearns (" Stearns"), a Vice-President at Marsh, had pleaded guilty to criminal charges of fraud in connection with the rigging of bids for insurance business. AIG, ACE, and Zurich were among the insurers identified in the felony plea that had participated in these activities.

77. The lawsuit against MMC and Marsh was not the only action undertaken by the New York A.G.'s office. Spitzer also announced on October 14, 2004 that two employees of the Excess Casualty unit of American Home Assurance Company, a subsidiary of AIG that provides excess liability insurance to businesses, pled guilty to charges of bid-rigging in connection with their dealings with Marsh. In published reports on the internet, the two are identified as Karen Radke, a Senior Vice-President, and Jean-Baptiste Tateossian, a manager.

78.   AIG's involvement in bid-rigging is consistent with its corporate philosophy. According to testimony before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, during an industry conference held in late 2003, Maurice Greenberg, its Chairman and CEO, said" [w]e absolutely need to hold the line on pricing and not give in to excessive competition."

79.   In addition, the New York A.G.'s office announced that Patricia Abrams (" Abrams"), an Assistant Vice-President at ACE Ltd., pled guilty to committing improper practices. It has been reported that between 2002 and 2004 she had conspired with Marsh to submit false bids.

80.   As a result of these prosecutions, AIG, through Maurice Greenberg, announced on October 15, 2004 that it has suspended, at least for the moment, the payment of incentive fees to insurance brokers. Similarly, on October 17, 2004, Evan Greenberg, ACE Ltd.'s President and CEO, announced that the use of CCAs was being discontinued.

81.   ACE further announced on November 4, 2004, that it was dismissing two employees— Abrams and Geoffrey Gregory, President of ACE Casualty Risk— for their involvement in improper activities relating to bids submitted to MGB. Three other employees who worked in ACE Casualty Risk on a team that did business with MGB were suspended. Also, on November 12, 2004. the Wall Street Journal reported that Hartford had fired two underwriters in its Los Angeles office for "not fully cooperating" with the investigation being conducted by the New York A.G.'s office.

82.     On November 12, 2004, the New York A.G.'s office filed a lawsuit against ULR,

Douglas P. Cox (" Cox") (President and CEO of ULR) and a company (Benefits

Commerce) of which Cox is the sole shareholder.  In his press release

announcing the filing of this lawsuit, Spitzer stated that "today's case

demonstrates that the corrupt practices first laid bare in the Marsh suit are

present in additional sectors of the industry Secret payoffs and conflicts of

interest that infected the market for property and casualty insurance have taken

root in the employee benefits market as well.

83.     METLIFE admitted publicly on October 15, 2004 that it had received initially a

subpoena from the New York A.G.'s office "seeking information regarding

certain compensation agreements between insurance brokers and MetLife."

METLIFE has since received a second subpoena broadening the scope of that

inquiry.  More recently, METLIFE received two subpoenas, which included a set

of interrogatories, seeking information regarding whether METLIFE has

provided or is aware of the provisions of 'fictitious' or 'inflated' bids."

Subsequently, on October 19, 2004, METLIFE stated publicly for the first time

that it earned $25 million on contingent commission arrangements in 2003.

MetLife's unlawful conduct was further detailed in the New York A.G.'s

November 12, 2004 complaint against ULR.

84.     Similarly, on October 19, 2004, UnumProvident announced that the New York

A.G.'s office had served subpoenas upon it, seeking information as to both its use

of contingent commission agreements and "information regarding its quoting



process." UNUMPROVIDENT'S unlawful conduct was further detailed in the New York A.G.'s office's November 12, 2004 complaint against ULR.

85.    AJG has been sued by the Village of Orland Hills in Illinois state court for its practices of exacting hidden contingent commissions from clients. AJG has admitted in a Form 10-K filed on February 9, 2004 that "AJG may also receive contingent commissions which are based on the estimated profit the underwriting insurance company earns and/or the overall volume of business placed by AJG in a given period of time. Occasionally, AJG shares commissions with other brokers who have participated with AJG." Thus, AJG has publicly conceded that it has horizontal agreements with other brokers to share contingent commissions.

86.    It has further been reported that Connecticut A.G. Richard Blumenthal is conducting his own investigation of the industry and is considering filing lawsuits of his own. On November 12, 2004 it was reported in the Wall Street Journal that the Connecticut A.G.'s office had issued subpoenas to 42 of the nation's largest insurers and insurance brokers requiring those firms to identify any instances of fake bids since the beginning of 1998. HARTFORD has also reported receiving a subpoena from the Florida A.G.'s office. Similarly, on November 18, 2004, California's Department of Insurance initiated a lawsuit in state court under California's insurance laws against ULR, Cox, METLIFE, UNUMPROVIDENT and others for fraudulent practices as described herein.

THE PRACTICES OF MMC, MARSH, MG, ACE, MUNICH-AMERICAN, HARTFORD AND
OTHERS REVEALED IN THE NEW YORK A.G.'S COMPLAINT AGAINST MARSH AND MMC.

**Marsh Steered Clients To Insurers Who Paid It Favorable Contingent Commissions.**

87.     In the late 1990s, Marsh began internally rating the insurance companies with

whom it dealt based on how much they paid Marsh pursuant to their contingent

commission agreements.  In February of 2002, a managing director of the

Healthcare group of MGB (which, oversaw policy placement decisions in

Marsh's major business lines) provided nine of his colleagues with a list of the

insurance companies that were paying Marsh pursuant to contingent

commission agreements.  He cautioned, however, that "[some [contingent

commission agreements] are better than others," and said that soon, Marsh

would formally "tier" the insurance companies.  He went on to state that "I will

give you clear direction on who we are steering business to and who we are

steering business from."

88.     A "tiering report" was later circulated to MGB executives, which listed insurance

companies in tiers depending on how advantageous their agreed-upon

contingent commissions were to Marsh. The instructions to the managers who

received the list included a direction that they were to "monitor premium

placements" to assure that Marsh obtained "maximum concentration with Tier A

& B" insurance companies, those with contingent commission agreements most

favorable to Marsh.  In a September 2003 e-mail, an MGB executive was even



more direct: "We need to place our business in 2004 with those that have superior financials, broad coverage and pay us the most."

89.  Marsh executives have issued directions about specific companies as well.  For example, in April of 2001, an MGB managing director in the Excess Casualty group in New York wrote to the heads of regional centers, asking for "twenty accounts that you can move from an incumbent [insurance company]" to a company that had just extended its contingent commission agreement.  She warned, however, "You must make sure that you are not moving business from key [contingent commission companies]."  Carrying out this directive, she concluded, "could mean a fantastic increase in our revenue."

90.  The benefit of the steering system to the paying insurance companies was clear.  In July of 2000, an MGB executive wrote to four of her colleagues to discuss "BUSINESS DEVELOPMENT STRATEGIES" with a particular "preferred" insurance company that had signed a contingent commission agreement with Marsh.  In describing what Marsh had done for that company, she wrote, "they have gotten the 'lions [sic] share' of our Environmental business PLUS they get an unfair 'competitive advantage[' as our preferred [sic] [insurance company]."

91.  Marsh has been explicit with insurance companies about how contingent commission agreements more favorable to Marsh would result in Marsh selling more of their policies. For example, an MGB executive recounted in an e-mail dated November 7, 2003 about how he told the president of ACE USA that she could meet her firm's sales goals by agreeing to a larger contingent commission

agreement: "I made it clear that if ACE wants us to meet significant premium growth targets then ACE will have to pay 'above market' for such [a] stretch ..." Marsh also threatened to "kill" the company if it did not 'get to their right number" on the contingent commission agreement.

92.   Marsh has recognized and rewarded employees who "moved" clients to insurance companies with contingent commission agreements. For example, in February of 2003, a Marsh Senior Vice-President in the MGB's Healthcare Group nominated a subordinate to become a Vice-President. On the nomination form, under the heading "Financial Success," he noted that the nominee had increased Marsh's revenue "by moving" a renewing client to an insurance company with a contingent commission agreement. He concluded, "[n]eighborhood Health Partnership Estimated Revenue - $390,000." That nominee's 2002 performance review similarly noted that the nominee "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [contingent commission insurance company — increased revenue from $120,000 to $360,000 (estimated)." A 2003 self-appraisal form by that same nominee, now a Vice-President, stated that he "[r]renewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship. Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership." Other employees were similarly praised in performance evaluations for increasing Marsh's contingent

commission income from insurance companies "by achieving budgeted tiering goals."

93.    Conversely, Marsh employees have been criticized for bucking the system. Initially, when Marsh began signing national contingent commission agreements, MGB not only negotiated all of the agreements, but also kept all of the revenue. Many of Marsh's local and regional offices, which had previously had their own contingent commission agreements with insurance carriers, resented the loss of revenue to the central MGB office and refused to have MGB pass on all of their placements.  Eventually, MGB initiated a "revenue repatriation" program under which some of MGB's national contingent commissions were shared with local and regional offices.  In June of 2003, the head of MGB's Excess Casualty group wrote to an employee in Marsh's Seattle office to chastise her for placing insurance directly with a carrier on behalf of a client, thus denying a contingent commission to MGB: " [t]he GB repatriation dollars are no small component of your office's budget. You have lowered that amount with this placement. You may want to consider this in the future."

94.    Marsh also has entered into contingent commission agreements that create incentives to favor the incumbent carrier when a policy came up for renewal.  At the time of a renewal, Marsh's clients expect it to give unbiased advice on whether to stay with the incumbent or sign with a new carrier.  Meanwhile, incumbent insurance companies have paid Marsh to recommend their own renewals. For example, a 2003 contingent commission agreement with AIG Risk

Management, Inc. ("AIGRMI") provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIGRMI at a rate of 85% or higher. If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%. Marsh even negotiated (though it ultimately did not enter into) a $1 million "no shopping" agreement whereby Marsh would have recommended to its top individual clients who had bought personal insurance policies from Chubb Insurance that they renew those policies.

### Examples of Marsh's Bid-Rigging Practices With Insurers

95. On many occasions, insurance companies colluded with Marsh to rig bids and submit false quotes to unwitting clients throughout the United States. The following are examples only and are not meant to be all-inclusive. All of the conduct described below was undertaken in furtherance of the conspiracy by the Insurance Broker Defendants and Insurer Defendants to allocate customers and utilize CCAs/PSAs/MSAs on an industry-wide basis.

96. Among AIG's lines is excess insurance that covers losses over and above the amounts covered by the insured's primary insurance policies. Beginning in or around 2001 until at least the summer of 2004, MGB's Excess Casualty Group and AIG's American Home Excess Casualty Division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) engaged in systematic bid manipulation.

97.  When AIG was the incumbent carrier and a policy was up for renewal, Marsh

solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG

with a target premium and the policy terms for the quote.  If AIG agreed to quote

the target provided by Marsh, AIG kept the business, regardless of whether it

could have quoted more favorable terms or premium.

98.  In situations where another carrier was the incumbent, Marsh asked AIG for

what was variously referred to as a "backup quote," "protective quote" or "B

Quote," telling AIG that it would not get the business.  In many instances, Marsh

provided AIG with a target premium and the policy terms for these quotes.  In

these cases, it was understood that the target premium set by Marsh was higher

than the quote provided by the incumbent, and that AIG should not bid below

the Marsh-supplied target.  For example, in October of 2003, an underwriter at

AIG described a particular quote that he had provided as follows: "[t]his was not

a real opportunity.  Incumbent Zurich did what they needed to do at renewal.

We were just there in case they defaulted.  Broker ... said Zurich came in around

$750K & wanted us to quote around $900K."  Even when AIG could have quoted

a premium lower than the target, it rarely did so.  Instead AIG provided a quote

consistent with the target premium set by Marsh, thereby throwing the bid.

99.  In other instances, Marsh asked AIG to provide B Quotes where AIG was not

supposed to get the business, but Marsh did not set a particular premium target.

In these instances, AIG looked at the expiring policy terms and premium and

provided a quote high enough to ensure that:  (a) the quote would not prevail,



and (b) in the rare case where AIG did get the business, it would make a comfortable profit. One example was reflected in a communication by Stearns to a colleague, William McBurnie, where it was stated: "Chubb have quoted lead renewal at … $135,000. Would you please have AIG provide a B." The same executive said in a related e-mail: "[a] 'B' would be a quote from AIG which is higher in premium and more restrictive in coverage, thus supporting the Chubb quote."

100.    In B Quote situations, AIG did not do a complete underwriting analysis. In those few situations when AIG inadvertently won B Quote business (because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file—that is, prepare the necessary analysis after the fact.

101.    Finally, Marsh came to AIG for a "C Quote" when there was no incumbent carrier to protect. Although Marsh often provided premium targets in these situations, it was understood that there was the possibility of real competition.

102.    On October 29, 2003, Stearns sent an informational e-mail to five of his colleagues at MGB, attaching a document that outlined some of the "very specific protocols on how we place business…." The document states; "request 'B' quotes early b/c last week of every month markets only focus on 'live' opportunities vs. quoting B's (careful that alternative 'B' doesn't beat incumbents quote—it's not always price, it could be attachment point or coverage)."

41

103.   The "A, B, C" quote system was strictly enforced by Marsh through Gilman, the Executive Director of Marketing at MGB mentioned earlier.  Gilman refused to allow AIG to put in competitive quotes in B Quote situations, and, on more than one occasion, warned that AIG would lose its entire book of business with Marsh if it did not provide B Quotes.  Gilman likewise advised AIG of the benefits of the system.  As he put it, Marsh "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh "protect" other incumbents by providing B Quotes.

104.   ACE USA is part of a group of subsidiaries under ACE.  In 2002, ACE USA decided to enter the excess casualty market by creating a separate division, called the Casualty Risk Department.  ACE USA signed a contingent commission agreement in order to gain access to the business Marsh controlled.  ACE USA also repeatedly provided the same type of B Quotes that AIG provided.

105.   The 13 Quotes given to Marsh were often in amounts requested by Marsh, even though a lower quote would have been justified by an underwriting analysis.  As ACE USA's President of Casualty Risk summarized:  "Marsh is consistently asking us to provide what they refer to as 'B' quotes for a risk.  They openly acknowledge we will not bind these 'B' quotes in the layers we are be [sic] asked to quote but that they will work us into the program' at another attachment point.  So for example if we are asked for a 'B' quote for a lead umbrella then they provide us with pricing targets for that 'B' quote.  It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do

anything stupid' as respects pricing." In this same e-mail, ACE USA's executive wrote that he "support[ed]" Marsh's business model, which he described as "unique."

106.   An example of the operation of this system is evident in the bidding for the excess casualty insurance business of Formne Brands, Inc., a holding company engaged in the manufacture and sale of home products, office products, golf products, and distilled spirits and wine. On December 17, 2002, an ACE USA Assistant Vice-President of underwriting sent a fax to Greg Doherty ("Doherty"), a Senior Vice-President in MGB's Excess Casualty Division, quoting an annual premium of $990,000 for the policy. Later that day, ACE USA revised its bid upward to $1,100,000. On the fax cover sheet with the revised bid, ACE USA's Assistant Vice-President wrote; "[per our conversation attached is revised confirmation. All terms & conditions remain unchanged." In an e-mail the next day, the Assistant Vice-President to an ACE USA Vice-President of Underwriting explained the revision as follows: " [o]riginal quote $990,000 ... We were more competitive than AIG in price and terms. MGB requested we increase premium to $1.1 M to be less competitive, so AIG does not loose [sic] the business. ..."

107.   As another example, in a March 5, 2003 e-mail, Josh Bewlay, head of MGB, directed Stearns to "get the quote from Pete. AIG was to hit 25 percent increase. Then we need B quotes at the expiring attachments." Further e-mails reflect that ACE and other insurers subsequently offered losing quotations on the account. In one, Doherty sent ACE underwriter James Williams on March 17, 2003 an e-

43




mail instructing him as follows: "need a 'B' for shits and giggles." The client
renewed the insurance policy with AIG.

108.    This arrangement benefited both to Marsh and ACE USA. As Doherty wrote in a
June 20, 2003 e-mail to the same ACE Vice-President: "Currently, we have about
$6M in new business [with ACE USA] which is the best in Marsh Global Broking
so I do not want to hear that you are not doing 'B' quotes or we will not bind
anything."

109.    The bidding process for excess casualty insurance for Brambles, USA, a
manufacturer of commercial industrial pallets and containers (among other
products), further demonstrates the bid-rigging scheme. In June of 2003, ACE
USA learned that Brambles was unhappy with the incumbent carrier. Despite
this, Marsh asked ACE USA to refrain from submitting a competitive bid because
Marsh wanted the incumbent, AIG, to keep the business. An ACE USA Vice-
President of Underwriting wrote to the ACE USA President of Risk and
Casualty: "Our rating has a risk at $890,000 and I advised MMGB NY that we
could get to $850,000 if needed. Doherty gave me a song & dance that game plan
is for AIG at $850,000 and to not commit our ability in writing." ACE USA
continued to provide Marsh with inflated quotes in 2004.

110.    Marsh also engaged in bid-rigging conduct with HARTFORD with respect to
Marsh's "Middle Market" and small business clients.

111.    Middle Market insurance provides coverage for companies where the annual
premium ranges from tens of thousands of dollars to around $1 million.

HARTFORD became a "partner market" — meaning it agreed to pay contingent commissions — with Marsh's so-called Advantage America program in July of 2003. The Advantage America program was developed by Marsh to fold its small commercial property/casualty business into its Middle Market group. With annual premiums in the range of $25,000 to $200,000 dollars, this program provided coverage to small businesses. Marsh centralized all of this small business insurance placement in an office in Lake Mary, Florida, near Tampa.

112.    HARTFORD was given the advantage of office space in Marsh's Lake Mary facilities. On numerous occasions during 2003 and 2004, Marsh employees asked the two HARTFORD underwriters assigned to this facility, either in person or by telephone, to provide an inflated quote or "indication" (non-binding proposed price) for insurance coverage for a small business. Typically, HARTFORD'S underwriters were told to price the quote or indication 25% above a particular number, and that by doing so HARTFORD need not worry that it would get the business. HARTFORD colluded in the scheme.

113.    Marsh did not restrict its bid rigging in the Middle Market to small businesses. Marsh's Los Angeles area MGB office handled larger Middle Market risks with annual premiums reaching $1 million. The Marsh Los Angeles office is in the same office building as HARTFORD'S. Starting as far back as 2000, Marsh employees, on virtually a daily basis, asked HARTFORD for inflated quotes or indications in a manner similar to the process described above for the Florida facility. In Los Angeles, however, Marsh often provided HARTFORD with a

spreadsheet showing the accounts for which it wanted Hartford to provide a

losing quote or indication, along with other insurers' quotes. It instructed

Hartford to quote some percentage, typically 25%, above the other insurers'

quotes on the spreadsheet to ensure that Hanford would not get the business.

These were referred to as "Throwaway Quotes." Hartford provided the inflated

quotes.

114.    On even larger risks in Southern California, those of over $1 million of annual

premium, Marsh similarly asked for inflated quotes or indications, also

providing spreadsheets containing other insurers' quotes to Hartford. Hartford

provided these quotes as well. Hartford provided these quotes and indications

because Marsh was its biggest broker, and it felt that Marsh would limit its

business opportunities if it refused.

### THE PRACTICES OF ULR, UNUMPROVIDENT, METLIFE, AND OTHERS REVEALED IN THE NEW YORK A.G.'S COMPLAINT AGAINST ULR

#### ULR Enters Into Lucrative Side Arrangements With Insurers and Receives Undisclosed Override Payments.

115.    ULR has entered into secret override payment arrangements that have created

potential and actual conflicts with the interests of its clients. The arrangements

create extraordinary incentives for ULR to drive business to particular insurers: if

a single ULR client moves from one insurer to another, ULR could lose millions

of dollars in compensation. For example, under ULR's 2003 "special producer

agreement" with UNUMPROVIDENT, ULR would obtain "[e]xtra

[c]compensation" only if, among other things, it maintained 90 percent of the

book of business it had the previous year with UnumProvident.  ULR's

persistency rate for the year was 91.48 percent.  Had it dropped a mere 1.5

percent, ULR would have lost its entire annual override payment for persistency

from UMUMPROVIDENT in the amount of $1.27 million.

116.    The incentives are equally compelling for the insurers.  It is understood that ULR

will only direct business to insurers if they participate in override arrangements.

In the words of a UNUMPROVIDENT underwriter: "[u]unfortunately, to play

with [ULR], we need the over-rides."  As another UnumProvident employee

elaborated, UNUMPROVIDENT enters into override agreements with ULR

because it represents one of the "biggest premium opportunities" and

UnumProvident would get "0" of that business if it did not join ULR's club.

117.    Given this perception, METLIFE, the nation's largest life insurer, paid ULR $9

million, or over 36 percent of its $25 million override budget in 2003—a

remarkable figure given that METLIFE had override agreements with at least 60

brokers.

118.    ULR's clients, however, never know that the placement or renewal of their

employees' insurance coverage might mean the difference between a substantial

payday for ULR or no payday at all.  To the extent ULR even mentions overrides

to its clients, it fails to meaningfully disclose the substance of the agreements, or

how ULR generates substantial income from them.  ULR has never explained to

clients how overrides and other undisclosed payments might influence its

professional advice so that clients could make informed decisions about their interaction with ULR.

119.   On the rare occasions that ULR has made disclosures, such disclosures have been misleading. For example, in a March 2004 agreement for consulting services with Sun Healthcare Group, Inc. ULR disclosed that it could receive an override payment, but the agreement does not explain that ULR's receipt of override payments are based on whether business is placed with a particular carrier. Furthermore, ULR incorrectly states that its compensation will not exceed one percent of premium, when in fact, ULR's agreements allow for greater compensation.

**ULR Receives "Communication Fees" From Unsuspecting Employees**

120.   In addition to receiving undisclosed payments from overrides, starting at least as early as 1998, ULR devised ways to generate additional revenues: it began charging fees for vague and ill-defined services. For example, ULR began charging fees such as "RFP fees," "enrollment fees" and "finders fees," among others. While the REP fee is a one time fee that the insurer pays during the REP preparation process, the other fees remained undefined and were demanded on an ad hoc basis. ULR's receipt of these fees remained largely undisclosed to the clients and often lacked documentation of the services rendered. As one UNUMPROVIDENT executive noted, "In the past year, we have paid Doug Cox/ULR several million dollars and we don't have a lot of formal documentation other than email messages & invoices." A PRUDENTIAL

48

executive likewise questioned: "I can't believe that we would pay anybody $513,000 ... on a handshake."  In or about 1999, ULR began to aggressively promote its "communication services," specifically the "writing, designing and printing" of informational material about benefits plans.  The fees for this service and the distribution of such materials to plan participants were typically charged at the rate of $10 per employee and $5 per employee for supplemental life and disability benefits, respectively.

121.    The communication fees have become highly lucrative for ULR.  In 2003, the $5.6 million ULR received for "communication" services represented over 20 percent of its total revenues for the year.

122.    Given the lucrative nature of these fees, it is not surprising that ULR often conditions the placement of employers' insurance business only with those insurers who are prepared to use ULR's communications services.  Although UNUMPROVIDENT, PRUDENTIAL and METLIFE regularly provide such services at a lower cost themselves or can obtain them more cheaply from other vendors, each has regularly advanced communication fees to ULR for such services based on the above rates.  A former ULR employee analogized ULR's pricing for communication fees to "paying $300,000 for a Mercedes." UNUMPROVIDENT paid ULR $3.5 million in communication fees from 2000 to 2003, which it has admitted were "excessive" and "outrageous."

123.    But the insurers themselves do not absorb these "outrageous" costs.  Rather, ULR agrees with insurers that ULR's fees will be built into the premiums charged to

employees who purchase supplemental insurance.  Indeed, MetLife's 2002-03

compensation agreement with ULR explicitly required METLIFE to pay such

fees, and mandated that they "be included in [MetLife's] rates charged to

employees." ULR's clients — whose employees ultimately paid the costs — were

never consulted or notified about this hidden charge or its origin.

### ULR Conceals the Communication, Fees and Override Payments it Receives From Insurers

124.     ULR (and Cox) not only failed to disclose to their clients the additional

compensation they receive from insurers; they have actively concealed and

misrepresented it.

125.     ULR instructs insurers not to disclose its override compensation or other fees.

Thus, in February 2003, while soliciting a bid from PRUDENTIAL to place a

group life policy for Brinker International, Inc., a restaurant chain of 1,400 stores

and 90,000 employees, ULR expressly cautioned PRUDENTIAL that

"[c]communications fees ... should not be communicated to the client with ULR's

prior consent."

126.     The documentation that ULR provided to clients often has misrepresented the

nature of the compensation ULR is to receive.  For example, in 2002, Safeway,

Inc. ("Safeway"), which operates a chain of over 1,800 grocery stores in North

America and has nearly 200,000 employees, retained ULR.  ULR's agreement

with Safeway — like certain other ULR agreements — states that the insurer will

pay a $50,000 fee for RFP, and that the costs of ULR "implementing and

communicating the new plan" are "included in the RFP cost." In fact, for this

plan, ULR levied a communication fee of $10 per employee for supplemental life

insurance and $5 per employee for supplemental disability insurance, which was

passed to employees through higher premiums. Altogether, ULR has received a

total of $500,000 in undisclosed communication fees on this account,

notwithstanding its prior representation to Safeway.

127.   ULR makes similar misrepresentations about its override agreements. Despite

the fact that ULR had overrides agreements with a number of insurers in 2003,

the Language in its form contracts with clients stated: "ULR shall accept no

compensation of any kind whatsoever from any insurance company, underwriter

or brokerage firm relating to the services ULR is providing to [the client]." Even

when clients specifically request fee information, ULR endeavors to conceal and

misrepresent relevant facts. When, in 2004, United Parcel Service, Inc. ("UPS")

asked PRUDENTIAL about the details of overrides it had paid to ULR, Cox

approved the following response: "Prudential has an insurance producer

incentive compensation program for group products and ULR participates in the

program. The program costs are absorbed by Prudential as overhead and not

allocated on a case-specific basis."

128.   The letter did not disclose: 1) that ULR also received communications and other

fees from PRUDENTIAL on the UPS account; and 2) that the insurer could

calculate the precise amount of the override compensation to be paid to ULR that

was attributable to its contract providing insurance coverage to UPS employees.

129.    ULR also conceals these secret compensation arrangements by mandating that they not be reported by insurers.  Until 2004, for example, ULR had a written agreement with UNUMPROVIDENT providing that ULR's override compensation" would not be reflected on [Schedule A] reports."  ULR has insisted that its communication fees also not be disclosed on these forms, and has told insurers that it will cease to do business with them should they disclose these fees.

**ULR Steers Business to Insurers That Go Along, And Cuts Out Those That Do Not**

130.    ULR entered into "pay to play" arrangements with various insurers, and would not refer business to insurers who would not play along.

131.    In one agreement, ULR dropped all pretense of objective selection.  Under a " Preferred Broker Compensation Plan II" agreement between ULR and MetLife, in effect in 2002 and 2003, ULR could secure a 50 percent increase in its overrides, ostensibly in exchange for certain ill-defined " administrative services" if ULR met a " New Business threshold."  In order to meet such a threshold, ULR would have to give MetLife one of every three cases that MetLife priced " competitively."

132.    The pay-to-play arrangements also had other anti-competitive effects. Even when certain favored insurers could not compete on price, they could still obtain business.  ULR was explicit about this trade-off, telling UNUMPROVIDENT that because its new pricing was not competitive, UNUMPROVIDENT would "need to compensate] them [ULRI not to stop in force accounts]."  In other words,

52

UNUMPROVIDENT would have to meet ULR's demands for an override payment if it wanted to retain the insurance policies placed by ULR's clients. Indeed, a UNUMPROVIDENT underwriter advised his supervisors that it would be worth "paying a slightly higher % [of override to ULR for retaining profitable life cases—since] this may be a less expensive way to maintain some of these accounts (vs. going head-to-head with Met & Pru on price right now)."

133.    While favoring certain insurers, ULR simultaneously will not deal with those that will not agree to the club's membership terms.  In 2002, ULR and Minnesota Life Insurance Company ("Minnesota Life") reached an agreement on override payments, but Minnesota Life insisted that all of ULR's compensation be disclosed to the client. ULR refused to enter into the agreement and declined to engage in further business with Minnesota Life.

134.    Aetna, Inc. ("Aetna"), one of the nation's largest life insurers, has not had an override agreement with ULR since February 2001.  Since that time, Aetna has had virtually no success in securing new business where ULR is the broker. Ultimately, Aetna stopped providing quotes to ULR, in part because of what it deemed a "lack of objectivity in the bid process."  The only solution, recommended by one Aetna employee who was familiar with ULR's business model, was: "to put a competitive bonus program together for ULR.  In addition, we need to have underwriting on board with pricing business including (heir RFP and marketing fees."

53



135.   ULR has even gone so far, as set forth in more detail below, to solicit a fictitious

bid from another insurer in order to keep Aetna out of the final stage of

competition on an account.

**Four Examples of ULR Cheating Clients Through Bid-Rigging And Other Practices**

136.   ULR's practices have had a detrimental impact on its clients and their employees,

as set forth below.

### Viacom: ULR Conspires to Falsify Pricing Documents.

137.   Viacom Inc. ("Viacom"), is an international media company based in New York

City, with over 122,000 employees, in 2004, Viacom retained ULR in connection

with renewing its group life and accident employee insurance coverage with

PRUDENTIAL.  Through ULR, Viacom requested PRUDENTIAL to provide a

renewal quote.  In conjunction with creating its presentation of PRUDENTIAL'S

renewal quote, ULR asked Prudential to create exhibits which misrepresented

that PRUDENTIAL'S cost for communication services would be the same as

ULR's costs. As previously stated, ULR generally charges $10.00 per employee

for communication services.  In contrast, when PRUDENTIAL charges for the

same services, it charges $3.45 per employee, although it ordinarily absorbs the

cost in its overhead.  PRUDENTIAL employees resisted ULR at first, but ULR

insisted that PRUDENTIAL provide it with the false exhibits.

138.   Prudential provided ULR with the false exhibits, knowing that ULR intended to

pass them on to Viacom.  ULR then knowingly incorporated the information

contained in the exhibits into a "Group Life and Accident Insurance Renewal

Summary" which it provided to Viacom. The summary was misleading in that it represented that the cost of communications services would be the same whether performed by ULR or Prudential. Relying on this false and misleading information, Viacom accepted Prudential's offer and agreed to permit ULR to perform the communications.

**Marriott: ULR Solicits A Fictitious Quote To Squeeze Aetna Out Of The Bidding Process**

139. In December of 2002, Marriott International, Inc. ("Marriott") the hotel chain, contracted with ULR to obtain both life and disability insurance for its employees. ULR first requested quotes for life insurance. Under the customary procedure, the insurers submitting the lowest three quotes—the "finalists"—each get the opportunity to make more detailed presentations to Marriott, in which they can revise their proposals, and the client can consider non-price factors, such as service.

140. UNUMPROVIDENT submitted a proposal for group life insurance coverage and was accepted as one of the three finalists. Marriott then added new conditions that UnumProvident believed would make it unprofitable for it to continue with its original bid. When UNUMPROVIDENT informed ULR of its intention to withdraw, ULR protested. If UNUMPROVIDENT were to withdraw, ULR told UnumProvident, the incumbent carrier Aetna—which had no override agreement with ULR—would become one of the three finalists. ULR had override agreements with the two other insurers and asked UnumProvident to maintain its bid to prevent the possibility that an insurer without an override

would win the contract. UnumProvident agreed, but only after it obtained a commitment from ULR that it need not take on the business unless an undisclosed and unlikely contingency was met—that the amount of income covered under the policy would increase by one billion dollars. In other words, ULR, in order to guarantee its continuing stream from overrides, solicited a bid from UNUMPROVIDENT solely to block a real competitor, Aetna, from the competition.

141.    A UnumProvident employee memorialized ULR's agreement to UNUMPROVIDENT'S contingency: "I did speak with [ULR] ... and confirmed ... that we would meet their request of the rate ... under the condition that we could not sell the case at this rate based on our concern about the expected lower volume creating a shortfall for us. He reiterated and assured me that we would not win this business at these rates due to the significant disparity between our offer and Prudential's. He understands that we are doing him a favor and is suggesting that he will reciprocate." (Emphasis added).

142.    The fact that ULR would owe UNUMPROVIDENT a "favor" was significant. Less than a month later, on February 19, 2003—three weeks after UnumProvident agreed to leave its bid in place—ULR presided over the selection of UnumProvident as Marriott's insurer for its employees' disability insurance coverage.

**Dell: ULR and UnumProvident Agree to Falsify a Schedule A In Furtherance of Their Override Agreement**

143.    Dell, Inc. ("Dell") is a manufacturer of personal computers with over 23,000 employees.  In 2001, Dell retained ULR to assist it in selecting an insurer for its employees' life insurance coverage.  ULR issued an RFP that indicated that its sole compensation would be a $120,000 payment from the selected insurer.

144.    After receiving proposals on Dell's behalf, ULR sought final offers from PRUDENTIAL, METLIFE and UNUMPROVIDENT.  ULR informed UNUMPROVIDENT that it wanted to give UNUMPROVIDENT the business — as UNUMPROVIDENT was already Dell's disability insurer.

UNUMPROVIDENT told ULR that it could only submit the lowest bid if it did not pay ULR the $120,000 that was specified in the RFP.  ULR agreed to exempt UNUMPROVIDENT from paying the $120,000 because ULR's compensation for the deal under the UNUMPROVIDENT override agreement would be higher than $120,000, more than offsetting that loss.

145.    ULR, however, imposed one condition on its agreement:  UNUMPROVIDENT had to report a "commission" of $120,000 on Dell's Schedule A — even though no such payment would be made. ULR made this request — in the words of one UNUMPROVIDENT employee — because UNUMPROVIDENT'S failure to make a Schedule A report would start "red flags flying" for Dell, which had specifically authorized a payment from the insurer to ULR of $120,000.

UNUMPROVIDENT agreed: "I am not sure we have a choice here [ULR] was our biggest producer last year with $33 million of new premium."



146.   As one UNUMPROVIDENT employee explained: "We removed the commissions so that we could get to the pricing of one of our competitors, but the client, probably not aware of broker override programs, would find it fishy if there were no commissions paid to ULR for the marketing. So we are making this arrangement so we can facilitate the [Schedule A] expectations from the client. We do not, however, wish to involve Dell in these discussion [sic] at all."

### Ashland: ULR Breaches Its Anti-Override Agreement

147.   Ashland, Inc. (" Ashland") is a Kentucky-based transportation, construction, chemical and petroleum company. It employs over 22,000 persons. In May 2002, Ashland retained ULR as an independent broker in connection with placing group life, accident and business travel insurance benefits for Ashland's employees. Ashland and ULR executed an agreement under which ULR was to provide Ashland with consulting services for a flat fee of $47,000. ULR was also required to "forgo any override arrangements that may apply ["in the placing of business.

148.   Notwithstanding this agreement, ULR solicited bids from insurers with whom it had override arrangements; all three finalists fell into this category. Prudential, which won the business, was fully aware that Ashland did not want ULR to receive any additional compensation from it. Nonetheless, ULR's estimated override payment from Prudential was $66,478. 162. When Ashland learned of the payment to ULR, it demanded an explanation from both Prudential and

ULR. In a September 8, 2004 letter to ULR, Ashland's Director of Compensation

and Benefits wrote:

> We required an unbiased consultant to perform the work
> that had no financial incentive on who was selected ... It has
> now come to our attention that you may have incentive
> compensation agreements with Metropolitan, Prudential
> and CIGNA on new business brought to these companies.  I
> must question whether we received an unbiased review of
> the proposals from the companies that bid on this business.
> It is interesting that the three finalists you presented were
> Metropolitan, Prudential and CIGNA.  We have a difficult
> time in believing that this was a coincidence. For example,
> Mutual of Omaha, the company that was selected for
> [accident insurance], was not a finalist and not included in
> your summary until we specifically requested that they be
> included.  We believe you misled us and did not follow the
> terms of the agreement.

149.    Ashland also wrote to PRUDENTIAL, "the fee for ULR's consulting services

under the [Ashland] agreement with ULR was completely described in

paragraph two of the agreement."  The agreement did not designate ULR as

Ashland's broker and we expressly advised ULR that the only compensation

from this work was their consulting fee. "One of the reasons we selected ULR as

a consultant was to receive an unbiased perspective of the market.  If they are

now receiving any additional compensation because of an agreement with

Prudential, that would be contrary to our agreement and we would question

their motive for placing the business with Prudential."

150.    Notwithstanding that ULR and PRUDENTIAL had already agreed to ULR's

override payment terms, PRUDENTIAL represented to Ashland, as it had

previously to UPS in language approved by Cox, that the costs of the override

paid to ULR "are absorbed by Prudential as overhead and not allocated on a

case-specific basis."

## EFFECTS OF DEFENDANTS' COLLUSION

151.    Defendants' conduct had the purpose or effect, or the tendency or capacity,

unreasonably to restrain trade and to injure competition and purchasers,

throughout the United States, by, among other things:

    a.    Limiting the number of insurers competing to sell insurance to persons
seeking such insurance;

    b.    Allocating the market for the sale of insurance; and

    c.    Using inflated bids, prices and other terms of sale with respect to
insurance to mask the absence of free and open competition by insurers
for the sale of such insurance.

152.    The entire insurance market, from local agents and brokers to policy issuers and

underwriters, was infected by price-fixing, bid rigging, kickbacks, and

customer/insured allocation.

153.    As a direct result of this illegal conduct, competition in the sale of insurance from

or in Florida and elsewhere was substantially reduced and otherwise unlawfully

restrained.

154.    In addition, Defendants, by failing to disclose material information about their

business conduct and activities to purchasers, sellers and holders of Defendants'

stock, violated the States' respective unfair and/or deceptive trade practices

statutes and common law.

155. Further, Defendants' actions as set forth above were gross, wanton, and willful; were aimed at the public generally; and involved a high degree of moral culpability.

## FRAUDULENT CONCEALMENT

156. Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct from Plaintiff and the Class.

157. Plaintiff and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating State unfair and/or deceptive acts and practices statutes and common law as alleged herein until shortly before this litigation was commenced.

158. As a result of Defendants' fraudulent concealment, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

159. Plaintiff exercised due diligence to learn of its legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the antitrust violations alleged above until after October 14, 2004, when New York Attorney General's Office filed a Complaint outlining these allegations in the Supreme Court of New York.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

160. During the period covered by this Complaint, Plaintiffs and members of the Class purchased substantial amounts of insurance products from the Defendants.

161. As a direct result of the Defendants' misconduct set forth herein, Plaintiff and



members of the Class paid substantially more for Insurance Products than they

would have paid in the absence of Defendants' unfair and deceptive trade

practices and breaches of fiduciary duties.

162.    By reason of the alleged violations of the States' respective unfair and/or

deceptive trade practices statutes, insurance statutes, and common law fiduciary

obligations, Plaintiff and members of the Class have been injured in their

business and property and have suffered damages in an amount to be

determined.

163.    The Defendants' unfair and/or deceptive trade practices statutes, violation of

insurance statutes, and breach of common law fiduciary obligations will continue

absent an injunction.  Plaintiff and members of the Class are likely to but

Insurance Products in the future and will be repeatedly injured unless the

continuation of this misconduct is enjoined.

## CLASS ACTION ALLEGATIONS

164.    Plaintiff brings this action pursuant to Rule 1.220(b)(2) and/or alternatively Rule

1.220(b)(3) of the Florida Rules of Civil Procedure, on behalf of all members of

the following Class:

> All persons or entities that purchased insurance products
> and services from Defendants during the period from
> January 1, 1994 through the present.

165.    Excluded from the Class are all Defendants, their officers, subsidiaries and

affiliates, and all government entities.

### Numerosity



166.   Plaintiff does not know the exact number of class members, because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the class members are sufficiently numerous and geographically dispersed throughout the United States.

## Common Questions of Law & Fact

167.   Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members including legal and factual issues relating to liability and damages.

168.   Among the questions of law and fact common to the Class are the following:

a.   Whether Defendants and their co-conspirators combined, conspired, or contracted to do anti-competitive acts, including price-fixing, rigging bids, and customer allocation;

b.   When and how this conspiracy, combination, or contract was formed;

c.   The identity of any other parties not named in this Complaint who participated in the conspiracy;

d.   Whether legal, pro-competitive reasons exist for Defendants' actions;

e.   Whether the Class suffered and continues to suffer damages from the Defendants' unfair and deceptive acts and practices;

f.   Whether the Class suffered and continues to suffer damages from the Defendants' breach(es) of fiduciary duties;

g.   The appropriate measure of damages sustained by Plaintiff and other members of the class;

h.   Whether Defendants fraudulently concealed the existence of the violations alleged herein; and

i.      Whether Defendants were and continue to be unjustly enriched to the
detriment of the Class.

### Typicality

169.   The alleged combination and conspiracy consisted of an agreement,

understanding, and concert of action among Defendants and co-conspirators to

fix prices for insurance products and services and to coordinate bid prices for

sales and services related to insurance products and services in the United States

and elsewhere.

170.   Plaintiff's claims are typical of the claims of other Class members because it was

injured in the same manner by Defendants' unlawful, anticompetitive and

inequitable methods, acts and practices, and wrongful conduct complained of

herein.

### Adequacy of Representation

171.   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has

retained counsel who are competent and experienced in the prosecution of

antitrust and class action litigation. Plaintiff has no interests that are adverse to,

or in conflict with, other members of the Class.

### Superiority of Class Action

172.   The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications, establishing incompatible

standards of conduct for Defendants.

173.   Class action treatment is superior to other methods available for the fair and

efficient adjudication of this controversy, in that, among other things, such

treatment will permit a large number of similarly situated persons to prosecute

their common claims in a single forum simultaneously, efficiently, and without

the unnecessary duplication of effort and expense that numerous individual

actions would engender.  Class treatment will also permit the adjudication of

claims by many class members who could not afford individually to litigate an

antitrust claim such as is asserted in this Complaint.

174.    Plaintiff knows of no difficulty to be encountered by litigating this action that

would preclude its maintenance as a class action.

## COUNT ONE
### DECEPTIVE AND UNFAIR TRADE PRACTICES ACTS
### FLORIDA (FLA. STAT. § 501.201, *et seq.*) AND
### THE SEVERAL STATES

175.    Individual and Representative Plaintiff, on behalf of himself and the Class,

repeats and realleges all prior paragraphs herein.

176.    The acts and practices of Defendants, as set forth hereinabove, constitute unfair

methods of competition and unfair or deceptive acts or practices in the conducts

of Defendants' business in violation of Fla. Stat. § 501.201, *et seq.* and the unfair

and deceptive trade practices statutes and consumer protection statutes of the

respective Several States, including the following:

A.    Alabama:  Ala. Code § 8-19-5;

B.    Alaska:  Alaska Stat. § 45.50.4711;

C.    Arizona:  Ariz. Rev. Stat. Ann. § 44-1522.A;

D.      Arkansas:  Ark. Code Ann. § 4-88-107(a)(1);

E.      California:  Cal. Civ. Code § 1770: Bus. & Prof. Code §17200;

F.      Colorado:  Colo. Rev. Stat. § 6-1-105(1);

G.      Connecticut:  Conn. Gen. Stat. § 42-1 10b(a);

H.      Delaware:  Del. Code Ann. Tit. 6, § 2513(a);

I.      District of Columbia:  D.C. Code Ann. § 28-3904;

J.      Georgia:  Ga. Code Ann. § 10-1-393(a);

K.      Hawaii:  Haw. Rev. Stat. § 480-2(a);

L.      Idaho:  Idaho Code § 48-603;

M.      Illinois:  815 ILCS 505/2;

N.      Indiana:  Ind. Code § 24-5-0.5.3(a), 0.5-4;

O.      Iowa:  Iowa Code § 714.16.2(a);

P.      Kansas:  Kan. Stat. Ann. § 50-626(b);

Q.      Kentucky:  Ky. Rev. Stat. Ann. § 367.170(1);

R.      Louisiana:  La, Rev. Stat. Ann. § 51:1405;

S.      Maine:  Me. Rev. Stat. Ann. Tit. 5 § 207;

T.      Massachusetts:  M.G.L. c. 93A §§ 2, 9;

U.      Maryland:  Md. Com. Law Code Ann. § 13-301;

V.      Michigan:  Mich. Stat. Ann. § 19.418(3);

W.      Minnesota:  Minn. Stat. § 325D.44;

X.      Mississippi:  Miss. Code Ann. § 75-24-5;

Y.      Missouri:  Mo. Rev. Stat. § 407.020.1;

66

Z.      Montana: Mont. Code Ann. § 30-14-103;

AA.     Nebraska: Neb. Rev. Stat. § 59-1602;

BB.     Nevada: Nev. Rev. Stat. § 598.410;

CC.     New Jersey: N.J.S.A. § 56:8-2;

DD.     New Hampshire: N.H. Rev. Stat. Ann. § 358-A: 2;

EE.     New Mexico: N.M. Stat. Ann. § 57-12-3;

FF.     New York: N.Y. Gen. Bus. Law § 349(a);

GG.     North Dakota: N.D. Cent. Code § 51-15-02;

HH.     North Carolina: N.C. Gen. Stat. § 57-1.1;

II.     Ohio: Ohio Rev. Code Ann. § 1345.02(a);

JJ.     Oklahoma: Okla. Stat. Tit. 15, § 753;

KK.     Oregon: Ore. Rev. Stat. § 646.608(1);

LL.     Pennsylvania: 73 Pa.C.S.A. § 201-2(4);

MM.     Rhode Island: R.I. Gen. Laws § 16-13. 1 - 1 (e);

NN.     South Carolina: S.C. Code Ann. § 39-5-20;

OO.     South Dakota: S.D. Codified Laws Ann. § 37-26-6;

PP.     Tennessee: Tenn. Code Ann. § 47-18-104;

QQ.     Texas: Tex. Bus. & Com. Code Ann. § 1746(a);

RR.     Utah: Utah Code Ann. § 13-11-4;

SS.     Vermont: Vt. Stat. Ann. Tit. 9, § 2453;

TT.     Virginia: Va. Code Ann. § 59.1-200;

UU.     Washington: Wash. Rev. Code § 19.86.020;

67

VV.    West Virginia:  W. Va. Code § 46A-6-104;

WW.    Wisconsin:  Wis. Stats. Ann. § 100. 18(1);

XX.    Wyoming:  Wyo. Stat. § 40-12-105(a).

177.    By reason of the Defendants' violations of law, Plaintiff and members of the
Class have been injured and suffered actual damages, as aforesaid.

178.    As persons injured by Defendants' unlawful conduct, Plaintiff and the Class are
also entitled to recover damages, including actual damages, interest on damages,
attorneys' fees, and costs, pursuant to Fla. Stat. §§ 501.211 and 501.2105, and
pursuant to the respective States' consumer protection and deceptive and unfair
trade practices statutes.

179.    Defendants, *inter alia*, it marketed, sold, purchased, or provided insurance
products and services to thousands of individuals and businesses throughout the
United States.

180.    Defendants have asserted direct control over the information, products, services,
fees, and commissions provided to insurance brokers and agents and the public
through the United States.

181.    Further, Defendants have asserted direct control over the creation and
distribution of insurance products and services throughout the United States.

182.    In implementing their fraudulent scheme, Defendants were acutely aware that
Plaintiff and members of the Class depended on the honesty of Defendants in
providing insurance products and services at a fair and legitimate market price.

183.    As detailed above, Defendants' fraudulent scheme consisted of, *inter alia*:

68



a.  Selecting preferred carriers, e.g. those who provided kickbacks per policy and also based on percentage(s) of the annual premium pools;

b.  Fixing prices for insurance products and services;

c.  Directly allocating markets for insurance products and services among themselves and to the exclusion of other providers;

d.  Inflating their own profit margins through a series of price-fixing schemes and market allocation;

e.  Causing insurance brokers to misrepresent the lowest bids on insurance products and services so that Plaintiff and members of the Class were unaware that they were purchasing such products and services at inflated prices;

f.  Deliberately misrepresenting insurance information, products, services, and prices, in an effort to consolidate and control the insurance market;

g.  Actively concealing, and causing others to conceal, information regarding all of the above.

184.  Defendants' scheme was calculated to ensure the Plaintiff and the Class would pay higher prices for insurance products and services, which Defendants knew were overpriced and gouging the consuming public.

185.  Each of Defendants' acts involved in the control, sales, distribution, or otherwise dealing of insurance products and services the unfair and/or deceptive manners set forth herein.

186.  Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have paid hundreds of millions, if not billions, of dollars in payments for insurance products and services that they would not have made had Defendants not engaged in their pattern of racketeering activity.

69



187.    Through Defendants' deceptive and unfair trade practices and racketeering activities, Plaintiff and members of the Class were bilked for hundreds of millions, if not billions, of dollars.

188.    In furtherance of the unlawful conspiracy, each of the defendants and their coconspirators has committed overt acts, including, *inter alia*:

a.    Participating in meetings and conversations in the United States to discuss the prices of insurance products and services sold in the United States, including in Florida;

b.    Agreeing, during those meetings and conversations, to charge prices at certain levels and otherwise increase or maintain prices of insurance products and services sold in the United States, including in the State of Florida;

c.    Agreeing in advance on bid prices and bid winners for insurance products and services; and

d.    Discussing and exchanging price quotations to certain customers so as not to undercut the price of a competitor.

189.    As a direct and proximate result of the conspiracy, Defendants have restrained competition and injured Plaintiff and each Class member in their business and property in that each has paid a higher price for insurance products and services than they would have paid absent the concerted unlawful activity.

**COUNT TWO**
**BREACH OF FIDUCIARY DUTY**
**INSURER DEFENDANTS**

70

190.  Plaintiff on behalf of himself and al others similarly situated incorporates the

above paragraphs herein.

191.  Because Insurer Defendants were fiduciaries of Plaintiff and members of the

Class, Plaintiffs and members of the Class placed confidence and trust in Insurer

Defendants, authorized Insurer Defendants to exercise discretionary functions

for their benefit, and relied upon Defendants' superior expertise in risk

management and insurance.

192.  Insurer Defendants accepted and solicited that confidence described above.

193.  As fiduciaries of Plaintiff and members of the Class, Insurer Defendants were

obligated to discharge their duties solely in the interests of Plaintiff and members

of the Class, and specifically to provide insurance through a fair bidding process,

exercising good faith and fair dealing, full and fair disclosure, and care and

loyalty to the interests of Plaintiff and members of the Class.

194.  Insurer Defendants have breached those duties by acting in their own pecuniary

interests in disregard of the interests of the Plaintiff and members of the Class as

set forth herein.

195.  As a result of Insurer Defendants' conduct, Plaintiff and members of the Class

have suffered damages.

196.  Insurer Defendants are accordingly liable for breach of fiduciary duty to Plaintiff

and members of the Class for the damages suffered in an amount to be proven at

trial.



197.  Nevertheless, neither Plaintiff nor any member of the Class has suffered

damages exceeding $74,999.00 each, even when trebled.  In no event will Plaintiff

or any member of the Class accept damages in excess of $74,999.00.  Further,

attorneys' fees on a pro-rata basis will not exceed $74,999.00 for each class

member.

## COUNT THREE
### BREACH OF FIDUCIARY DUTY
### INSURANCE BROKER DEFENDANTS

198.  Plaintiff on behalf of himself and al others similarly situated incorporates the

above paragraphs herein.

199.  The Insurance Broker Defendants knowingly and willingly assumed a fiduciary

responsibility to their clients, including Plaintiff and Class members.  As brokers

for Plaintiff and Class members, the Insurance Broker Defendants acted as

representatives, agents, and fiduciaries.  Plaintiff and Class members reasonably

relied on the Insurance Broker Defendants to inform them of any compensation

the Insurance Broker Defendants would receive for their services and what

expenses Plaintiff and Class members would incur.  Plaintiff and Class members

placed trust and confidence in the Insurance Broker Defendants to deal fairly and

employ due diligence in obtaining Insurance Products for Plaintiffs and Class

members.

200.  The States' unfair and deceptive trade practices statutes and common law

required the Insurance Broker Defendants to deal fairly with Plaintiff and Class

members in the procurement of Insurance Products; Plaintiff and Class members

had a legal expectation that the Insurance Broker Defendants would not place their own financial gain above the interests of Plaintiff and the Class members.

201.     As brokers for Plaintiff and Class members, acting as their representative, agent, and fiduciary, the Insurance Broker Defendants had a duty to disclose material facts to Plaintiff and Class members that were relevant to the parties' relationships. The Insurance Broker Defendants were obligated to disclose to Plaintiff and Class members the existence of Contingent Fees, CCAs, or other payments made by insurance companies (e.g. Insurer Defendants) which were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

202.     As brokers for Plaintiff and Class members, acting as their representative, agent, and fiduciary, the Insurance Broker Defendants had a duty to remit to Plaintiff and Class members any undisclosed profit the Insurance Broker Defendants collected in connection with or because of the procurement of Insurance Products on behalf of Plaintiff and Class members.

203.     The Insurance Broker Defendants breached their fiduciary duties owed to Plaintiff and Class members, including the duties of good faith, loyalty, and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia,* the following:

   a.     Entering into undisclosed agreements with Insurer Defendants/insurance companies for Contingent Fees, CCAs, or other payments, thereby knowingly creating an obvious conflict of interest;

   b.     Secretly profiting at the expense of Plaintiff and Class members;

73



c.    Failing to disclose to Plaintiff and Class members the existence of the Contingent Fee, CCAs, and/or agreements with insurance companies/Insurer Defendants; and

d.    Failing to remit to Plaintiff and Class members the undisclosed profits collection in connection with or because of the procurement of Insurance Products on behalf of Plaintiff and Class members.

204.    As a result of the breach of fiduciary duties owed to them by the Insurance Broker Defendants, Plaintiff and Class members are entitle to actual and/or compensatory damages, including interest, costs, and attorneys' fees.

205.    Nevertheless, neither Plaintiff nor any member of the Class has suffered damages exceeding $74,999.00 each, even when trebled. In no event will Plaintiff or any member of the Class accept damages in excess of $74,999.00. Further, attorneys' fees on a pro-rata basis will not exceed $74,999.00 for each class member.

## COUNT FOUR
### UNJUST ENRICHMENT

206.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs.

207.    Defendants have knowingly accepted and benefited from the overcharges they have been able to levy for insurance products and services resulting from the acts alleged herein and the overpayments by Plaintiff and the Class.

208.    As a direct and proximate result of the Defendants' acts and practices, Defendants have been and are continuing to be unjustly enriched at the expense of and to the detriment of the Plaintiff and members of the Class.

74



209.  Plaintiff and the Class have conferred upon the defendants an economic benefit
in the nature of revenues resulting from unlawful overcharges, to the economic
detriment of Plaintiff and the Class.

210.  The economic benefit of overcharges obtained by bid rigging, price-fixing,
market allocation, and supra-competitive prices is a direct and proximate cause
of Defendants' anticompetitive behavior restricting competition as set forth
below.

211.  The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as
Plaintiff and the Class have paid supra-competitive sums during the Class
Period.

212.  It would be inequitable for Defendants to be permitted to retain any of the
proceeds of the conspiracy.

213.  Defendants' profits from the illegal actions described herein warrant
disgorgement and refunding it to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

A.  Certifying the Class pursuant to Florida Rules of Civil Procedure 1.220, certifying
Plaintiffs as the representatives of the Class, and designating their undersigned
counsel as counsel for the Class;

B.  Granting Plaintiff and the Class all damages as permitted by law;

C.  Granting Plaintiff's and the Class' costs of prosecuting this action, together with
interest and reasonable attorneys' fees, experts' fees and costs; and

75

 

D.    Granting such other relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable as a matter of right.

DATED: February 16, 2005

GILMAN AND PASTOR, LLP

Kenneth G. Gilman, Esquire
FBN: 340758
Newgate Tower, Suite 602
5150 North Tamiami Trail
Naples, Florida 34103
(239) 213-9960

**GOLDSTEIN, BUCKLEY, CECHMAN,
RICE & PURTZ, P.A.**
David Hughes Harris, Esquire
FBN: 118850
1515 Broadway
Fort Myers, Florida 33902-2366
(239) 334-1146

Attorneys for Plaintiff and Proposed Class
Representatives
PALM TREE COMPUTER SYSTEMS, INC,
DELTA RESEARCH INSTITUTE, INC.

EXHIBIT B

NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
|  | : |
|  | : Hon. Faith S. Hochberg |
|  | : |
| IN RE:  INSURANCE BROKERAGE | : Civil Nos. 04-5184 (FSH), et al. |
| ANTITRUST LITIGATION | : MDL No. 1663 |
|  | : |
|  | : **ORDER NO. 4** |
| **APPLIES TO ALL ACTIONS** | : |
|  | : Date: June 1, 2005 |
|  | : |

**HOCHBERG, District Judge:**

The Court having reviewed the parties' briefs regarding discovery and scheduling, and in an effort to balance the efficient progress of this case against any undue burdens of producing discovery;

**IT IS** on this 1st day of June 2005,

**ORDERED** that the parties shall meet and confer and jointly submit by June 20, 2005 (1) a proposed form of order establishing a document depository (along with all rules of, *inter alia*, usage and payment of fees) and (2) a proposed confidentiality order in compliance with the recently enacted Local Rule 5.3 (February 24, 2005) and Third Circuit law; and it is further;

**ORDERED** that upon Court entry of the document depository order and the confidentiality order, Defendants shall within 20 days place into the depository all materials (in electronic form to the degree possible) that were submitted to the state attorneys general or regulatory agencies in the settled cases of *People of the State of New York v. Marsh & McLennan*

(filed 10/14/04), *People of the State of New York v. Aon Corporation* (filed 3/3/05), and *People ex rel. Madigan v. Aon Corp.* (filed 3/4/05) identified in Tab 1 (pgs. 8 - 9) of the parties' joint submission dated March 25, 2005.  Defendants shall not be sanctioned (in consideration of Federal Rule 26) for possible immateriality of some of these documents.  The confidentiality order to be submitted by June 20, 2005 shall be drafted to address any issues regarding proprietary or sensitive information; and it is further,

**ORDERED** that Plaintiffs' Executive Committee and appropriate Defense Counsel shall meet and confer and file a joint discovery plan no later than July 1, 2005 that incorporates all time limits set forth in this Order, the Federal Rules, and the Local Rules of this District.  The joint discovery plan shall also include all issues not thus far addressed by both parties, including but not limited to (a) a rolling document production schedule, (b) a deposition schedule, (c) the number of witnesses to be deposed,[1] (d) the number of interrogatory questions to be served (including sub-part questions), and (e) the deadline for any motions to amend.  The parties shall also jointly submit a brief of no more than 5 double-spaced pages stating the parties' positions as to whether a special discovery master would be useful to expedite this litigation.  If, after the "meet and confer," reasonable negotiation fails to reach a reasonable fair compromise on any of these issues, the parties shall immediately advise the Court in a joint writing, so the Court may resolve the differences;[2] and it is further,

---

[1] The parties are directed to balance the interest of timely discovery with the concern of unduly burdening Defendants with an unmanageable number of depositions.

[2] The parties are also directed to Local Rule 26.1(d) which addresses "discovery of digital information including computer based-information" and requires that parties "confer and attempt to agree on computer-based and other digital discovery matters."

**ORDERED** that Plaintiffs' Consolidated Amended Complaints and Rico Case Statements shall be filed no later than August 1, 2005; and it is further,

**ORDERED** that discovery pertaining to class certification and the merits shall commence 30 days after the filing of the Consolidated Amended Complaints and RICO Statements as follows:

(a) the parties shall forthwith exchange the information described in Federal Rule 26(a)(1)(A)-(D) without awaiting a discovery request,

(b) the first document requests shall be propounded,

(c) third-party depositions shall commence pursuant to an orderly schedule,

(d) depositions of Plaintiffs and Defendants shall be agreed upon in the schedule to be jointly submitted, as Ordered above, which should be set to occur after a reasonable period of time for document inspection, and

(e) the parties shall meet and confer immediately after any discovery disputes arise and shall in good faith attempt to resolve any discovery disputes before seeking the Court's intervention. If Court intervention is needed, the dispute shall not be "deferred," but rather the parties shall forthwith draw it to the attention of the Honorable Patty Shwartz, U.S.M.J;[3] and it is further,

**ORDERED** that Defendants shall file their responsive pleading within 60 days of Plaintiffs' filing of their Consolidated Amended Complaints and RICO Statements. Plaintiffs shall have 60 days to file their opposition. Defendants shall have 14 days to reply; and it is further,

---

[3] If the Court appoints a special discovery master, then the dispute will be directed to such individual.

**ORDERED** that Plaintiffs shall file their motion(s) for class certification within 90 days after filing their Consolidated Amended Complaints and RICO Statements. Defendants shall have 60 days to file their opposition. Plaintiffs shall have 14 days to reply; and it is further,

**ORDERED** that there shall be no joinder of parties later than 90 days after filing of the Consolidated Amended Complaints and RICO statement without leave of Court and upon a showing of good cause as to why it was not possible to effect timely joinder; and it is further,

**ORDERED** that fact discovery shall close on August 31, 2006; and it is further,

**ORDERED** that Plaintiffs' expert reports shall be delivered by October 31, 2006. Defendants' expert report shall be delivered within 60 days thereafter, Plaintiffs' rebuttal reports within 30 days thereafter, and expert discovery shall conclude 60 days thereafter; and it is further,

**ORDERED** that motions for summary judgment shall be filed within 60 days after the completion of expert discovery. Opposition shall be filed within 60 days thereafter. Replies shall be filed within 30 days thereafter; and it is further,

**ORDERED** that there shall be no sur-replies to any motions; and it is further,

**ORDERED** all applications to the Court for any action shall be made in the form of a motion, electronically filed with courtesy copy, and not by way of letter.

/s/ **Faith S. Hochberg**
_____
Hon. Faith S. Hochberg, U.S.D.J.

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x
                                          :
OPTICARE HEALTH SYSTEMS, INC., On         :   Civil Action No.  04 CV 06954 (DC)
Behalf Of Itself And All Others Similarly :
Situated,                                 :   AMENDED CLASS ACTION COMPLAINT
                                          :
                        Plaintiff(s),     :   <u>JURY TRIAL DEMANDED</u>
                                          :
        vs.                               :
                                          :
MARSH & MCLENNAN COMPANIES,               :
INC., MARSH INC., MARSH USA INC.          :
(CONNECTICUT), AON CORPORATION,           :
AON BROKERS SERVICES, INC., AON           :
RISK SERVICES COMPANIES, INC., AON        :
RISK SERVICES INC. U.S., AON GROUP,       :
INC., AON SERVICES GROUP, INC.,           :
WILLIS GROUP HOLDINGS LIMITED,            :
WILLIS GROUP LIMITED, WILLIS NORTH        :
AMERICA, INC., ARTHUR J. GALLAGHER        :
& CO., WELLS FARGO & CO., ACORDIA,        :
INC., BROWN & BROWN, INC., HILB,          :
ROGAL & HAMILTON CO., BB&T CORP.,         :
BRANCH BANKING & TRUST CO., BB&T          :
INSURANCE SERVICES, INC., U.S.I.          :
HOLDINGS CORP., HUB                       :
INTERNATIONAL LTD., AMERICAN              :
INTERNATIONAL GROUP, INC.,                :
LEXINGTON INSURANCE CO.,                  :
AMERICAN INTERNATIONAL                    :
SPECIALTY LINES INSURANCE CO., ACE        :
LIMITED, ACE INA HOLDINGS, INC., ACE      :
USA, THE HARTFORD FINANCIAL               :
SERVICES GROUP, INC., HARTFORD            :
FIRE INSURANCE CO., TWIN CITY FIRE        :
INSURANCE CO., THE MUNICH RE              :
GROUP, AMERICAN RE CORP.,                 :
AMERICAN RE-INSURANCE CO.,                :
MUNICH-AMERICAN RISK PARTNERS,            :
INC.,                                     :
                                          :
                        Defendant(s).     :
—————————————————— x

# TABLE OF CONTENTS

Page

CLASS ACTION COMPLAINT ................................................................................ 1

NATURE OF THE CASE ....................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 4

PARTIES ............................................................................................................... 5

FACTUAL ALLEGATIONS .................................................................................. 14

    A.    DUTIES OWED BY AN INSURANCE BROKER .............................. 14

    B.    GLOBAL BROKING, PLACEMENT SERVICE AGREEMENTS AND
           THE ROOTS OF CONSPIRACY ...................................................... 17

    C.    BROKER DEFENDANTS STEER THEIR CLIENTS TO PROCURE
           INSURANCE WITH DEFENDANT INSURERS ............................... 27

    D.    BROKER DEFENDANTS AND DEFENDANT INSURERS
           COLLUDED IN A BID-RIGGING SCHEME TO ALLOCATE
           CUSTOMERS AND CREATE THE ILLUSION OF COMPETITION .............. 29

    E.    EFFECT OF DEFENDANTS' UNLAWFUL CONDUCT ..................... 33

DEFENDANTS' FIDUCIARY DUTIES AND RELATIONSHIP OF TRUST AND
    CONFIDENCE WITH PLAINTIFF AND CLASS MEMBERS ....................... 34

RICO CONSPIRACY ............................................................................................ 36

RACKETEERING ALLEGATIONS ....................................................................... 38

    A.    THE ENTERPRISE ........................................................................... 38

    B.    PREDICATE ACTS .......................................................................... 39

    C.    PATTERN OF RACKETEERING ACTIVITY .................................. 42

    D.    RICO VIOLATIONS ......................................................................... 43

FRAUDULENT CONCEALMENT ........................................................................ 43

THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF ........................... 44

CLASS ACTION ALLEGATIONS ........................................................................ 45

FIRST CLAIM FOR RELIEF (Conspiracy to Violate 18 U.S.C. § 1962(d)) .............. 51

- i -

SECOND CLAIM FOR RELIEF (Violation of 18 U.S.C.§1962(c))............................................52

THIRD CLAIM FOR RELIEF (Aiding and Abetting)...................................................................52

FOURTH CLAIM FOR RELIEF (Injunctive and Declaratory Relief) ........................................53

FIFTH CLAIM FOR RELIEF (Agreements in Restraint of Trade) ..............................................54

SIXTH CLAIM FOR RELIEF (Breach of Contract – as to the Marsh defendants only) .............56

SEVENTH CLAIM FOR RELIEF (Breach of Fiduciary Duty) ...................................................56

EIGHTH CLAIM FOR RELIEF (Misrepresentation)...................................................................57

NINTH CLAIM FOR RELIEF (Donnelly Act).............................................................................58

TENTH CLAIM FOR RELIEF (Other State Antitrust Laws)........................................................59

ELEVENTH CLAIM FOR RELIEF (Deceptive Trade Practices)................................................64

TWELVTH CLAIM FOR RELIEF (Other Unfair and Deceptive Practices Statutes).................64

THIRTEENTH CLAIM FOR RELIEF (Unjust Enrichment) .......................................................69

JURY DEMAND .........................................................................................................................71

## CLASS ACTION COMPLAINT

Plaintiff OptiCare Health Systems, Inc., by and through its attorneys, as and for its Amended Complaint, alleges on information and belief:

### NATURE OF THE CASE

1.     This action challenges defendants' massive scheme to manipulate the market for commercial insurance.  Defendants, including the largest commercial insurance brokers ("Broker Defendants") and many of the largest commercial insurance companies ("Defendant Insurers"), are engaged in a scheme, common course of conduct and conspiracy to *steer* insurance from the Defendant Insurers to the Broker Defendants' clients, through agreements between these brokers and insurers which provide contingent commission and other undisclosed revenue to the Broker Defendants.  These undisclosed agreements are known as "placement service agreements" or "market service agreements."  In connection with these agreements, defendants have manipulated the market for insurance by creating an elaborate *bid-rigging* scheme.  Defendants have created the illusion of a competitive market for insurance when, in fact, the insurance products are selected, priced and placed through defendants' collusion.  Broker Defendants benefit from the scheme by reaping increased commission revenue; Defendant Insurers benefit by placing their products with the Broker Defendants' clients at *above-market* rates, without having to face competition and with the guarantee of the renewal of that business.

2.     The Broker and Insurer Defendants have conspired to deprive plaintiff and the other members of the Class of the benefits of independent and unbiased insurance brokerage services, as well as free and open competition in the market for insurance.  The Defendant Insurers have paid hundreds of millions of dollars in commissions to Broker Defendants for insurance placement, creating an undisclosed conflict of interest that destroys the Broker Defendants' objectivity and breaches the fiduciary relationship between the Broker Defendants and their clients.  The Broker

Defendants and Defendant Insurers have also conspired to fix, raise, maintain or stabilize the price of insurance paid by plaintiff and other members of the Class at an artificially high level, by allocating insurance customers through a pervasive bid-rigging scheme.

3.     Broker Defendants are insurance brokers who engage in a common course of conduct in which they purport to provide independent and unbiased brokerage services to their clients, yet fraudulently conceal from their clients that they have entered into separate placement service agreements with third-party insurance companies, the Defendant Insurers, which provide additional compensation to Broker Defendants based on such factors as the *volume* of insurance Broker Defendants place with a particular insurer, the *renewal* of that business, and its *profitability*, *i.e.*, claims ratio, all of which the Broker Defendants control by manipulating the market for insurance placed with their client. Such agreements are akin to a profit-sharing arrangement between Broker Defendants and Defendant Insurers, and create a conflict of interest since Broker Defendants have a direct financial interest in recommending to their customers only the insurance products offered by those companies with which defendants have agreements, in breach of Broker Defendants' fiduciary duty to their clients. As recently reported in *The Wall Street Journal* on August 25, 2004, the Risk and Insurance Management Society recently announced that "brokers should disclose the details" about all payments they get from insurers, "even if clients don't ask" and "[u]ndisclosed contingency fees have the potential to compromise the relationship [between broker and client]."

4.     Under Broker Defendants' marketing and brokerage scheme, Broker Defendants hold themselves out to the public as experts in the analysis, procurement and renewal of insurance to meet a customer's insurance needs. As brokers, they have a fiduciary duty to find for their customers the best coverage at the lowest cost and the utmost duty of candor and full disclosure, including the duty to disclose the sources and amounts of *all* income received from any transactions involving their

clients. Indeed, a broker works for its client and acts on its behalf. As a result, the broker owes its client the duty of loyalty and to always put its clients' interests ahead of its own. It is with this expertise and promise of fiduciary brokerage advice that Broker Defendants' clients engage their services, unaware that these brokers have agreements with Defendant Insurers and intend to induce or *steer* them to purchase or renew coverage with Defendant Insurers. This allows Broker Defendants to reach the specified volume, renewal and profitability targets, and to collect the additional undisclosed fees under their secret agreements. Broker Defendants fail to adequately disclose to their clients such agreements or the contingency fees received pursuant thereto. These undisclosed agreements destroy any objectivity that Broker Defendants have in advising their clients and constitute a breach of Broker Defendants' fiduciary duties.

5.    In addition to steering customers to procure insurance from Defendant Insurers, the Broker Defendants and Defendant Insurers are engaged in an elaborate bid-rigging scheme to allocate customers and create the illusion of an open and competitive insurance bid selection process. After first agreeing among themselves which Defendant Insurer will obtain a particular customer's business, defendants submit false bids or bids with an inflated price to customers. This bid-rigging and customer allocation scheme ensures that a specific Defendant Insurer will be selected as the winning bid and obtain the clients' business, and that Defendant Insurer will not compete on price and other terms. By manipulating the bidding process, Broker Defendants can maximize their revenues under the agreements by ensuring that the policies are placed with only those insurers with which the Broker Defendants have agreements and further ensuring that policies are renewed with those insurers. Therefore, Broker Defendants are able to meet the agreements' volume and renewal targets.

- 3 -

6.    The Broker Defendants have also entered into unlawful tying agreements, under which Broker Defendants steer primary insurance contracts to insurers on the condition that those insurers also use the Broker Defendants for all their reinsurance needs. This unlawful tie has the effect of increasing the price of reinsurance, which increased costs are passed on to the insurers' customers, including plaintiff and other members of the Class.

7.    By steering customers, engaging in bid-rigging and customer allocation, and engaging in unlawful tying, all defendants are able to increase their profits at the expense of their customers. Broker Defendants are able to reap substantial amounts of additional undisclosed fees, while purporting to provide independent and unbiased brokerage advice to their customers, and Defendant Insurers are able to fix, maintain or stabilize at an artificially high level the price paid by plaintiff and Class members for insurance. Defendants' concerted actions and practices are undertaken as part of a scheme, common course of conduct, and conspiracy with other insurance brokerage firms, insurers and their affiliates, industry trade associations and other entities. Furthermore, defendants conducted or participated in the conduct of an enterprise through a pattern of racketeering activity.

8.    Plaintiff filed this action on August 26, 2004, alleging defendants' participation in these unlawful practices. Based on its subpoena power and the ability to conduct pre-filing discovery, the New York Attorney General's office has obtained evidence and on October 14, 2004, filed a complaint ("AG Complaint") supporting these very allegations.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, 1964, 28 U.S.C. §§1331 and 1367, and 15 U.S.C. §15. This Court has personal jurisdiction over the defendants pursuant to 18 U.S.C. §§1965(b) and (d). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

10.    Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C. §1391(b), §12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391.

11.    The defendants are found, do business or transact business within this district, and conduct the interstate trade and commerce described below in substantial part within this district.

12.    The trade and interstate commerce relevant to this action is the sale of insurance.

13.    During all or part of the period in which the events described in this Amended Class Action Complaint occurred, each of the defendants sold insurance or provided advice regarding the procurement or renewal of insurance to plaintiff and other members of the Class in a continuous and uninterrupted flow of interstate commerce.

14.    The activities of defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

15.    Plaintiff OptiCare Health Systems, Inc. ("OptiCare") is a corporation incorporated under the laws of Delaware and has its principal place of business in Waterbury, Connecticut. OptiCare is an integrated eye care services company that, among other things, provides managed vision and professional eye care products and services. At all material times herein, Opticare was a party to agreements with defendant Marsh USA Inc. (Connecticut) for the provision of insurance brokerage services covering a variety of insurance needs. Under these agreements, Marsh USA Inc. (Connecticut) placed insurance coverage on OptiCare's behalf with a number of insurance companies, including (i) Hartford Fire Insurance Company (a subsidiary of The Hartford Financial Services Group, Inc.), for builder's risk insurance, (ii) Twin City Fire Insurance Co. (a subsidiary of The Hartford Financial Services Group, Inc.), for directors and officers liability insurance, (iii) American International Specialty Lines Insurance Co. (a subsidiary of American International Group, Inc.), for employment practices liability insurance; and (iv) Lexington Insurance Company

- 5 -

(owned by National Union Fire Insurance Company of Pittsburgh, PA, The Insurance Company of the State of Pennsylvania and Birmingham Fire Insurance Company of Pennsylvania – which are all subsidiaries of American International Group, Inc.), for managed care professional liability insurance.

16.    Defendant Marsh & McLennan Companies, Inc. ("Marsh & McLennan") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in New York, New York. Marsh & McLennan is a global corporation and the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement of insurance, as well as investment management and consulting. In 1997 Marsh & McLennan purchased Johnson & Higgins to strengthen Marsh & McLennan's foundation in risk and insurance services, creating a new subsidiary known as J&H Marsh & McLennan, Inc.

17.    Defendant Marsh Inc. ("Marsh Inc.") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New York. Marsh Inc. is a primary subsidiary of Marsh & McLennan and an entity through which risk and insurance services, such as insurance and reinsurance brokerage, are provided. Marsh Inc. is considered a Marsh & McLennan operating unit and provides insurance brokerage through various subsidiaries of its own.

18.    Defendant Marsh USA Inc. (Connecticut) ("Marsh Connecticut") is a corporation incorporated under the laws of Connecticut and has its corporate headquarters in New York, New York, and is one of a number of corporations under the name "Marsh USA Inc." incorporated in various states. Marsh Connecticut is a subsidiary of Marsh & McLennan and provides insurance brokerage services.

- 6 -

19.    Defendants Marsh & McLennan, Marsh Inc., and Marsh Connecticut shall be referred to collectively herein as "Marsh."

20.    Defendant Aon Corporation ("Aon Corp.") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois. Aon Corp. is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

21.    Defendant Aon Broker Services, Inc. ("Aon Broker") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois. Aon Broker is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

22.    Defendant Aon Risk Services Companies, Inc. ("Aon Risk") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Risk is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

23.    Defendant Aon Risk Services Inc. U.S. ("Aon Risk U.S.") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Risk U.S. is a subsidiary of and/or affiliated with Aon Corp. and Aon Risk, and provides customers with risk management and insurance brokering services.

24.    Aon Group, Inc. ("Aon Group") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Group is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

25.     Aon Services Group, Inc. ("Aon Services") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Aon Services is a subsidiary of and/or affiliated with Aon Corp. and Aon Group, and provides customers with risk management and insurance brokering services.

26.     Defendants Aon Corp., Aon Broker, Aon Risk, Aon Risk U.S., Aon Group, and Aon Services, shall be referred to collectively herein as "Aon."

27.     Defendant Willis Group Holdings Limited ("Willis Group") is a corporation incorporated under the laws of Bermuda whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in London, England.  Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

28.     Defendant Willis Group Limited ("Willis Ltd.") is a private limited company registered in England and Wales with corporate headquarters in London, England.  Willis Ltd. is a subsidiary of Willis Group and provides insurance services through subsidiaries of its own.

29.     Defendant Willis North America, Inc. ("Willis NA") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New York.  Willis NA is a subsidiary of Willis Ltd., and provides customers with risk management and insurance brokering services.  Willis Ltd. and, in turn, Willis NA provide their insurance brokering services and operate principally through the offices of their subsidiaries and affiliates.

30.     Defendants Willis Group, Willis Ltd., and Willis NA, shall be referred to collectively herein as "Willis."

31.     Defendant Arthur J. Gallagher & Co. ("Gallagher") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock

Exchange and has its corporate headquarters in Itasca, Illinois.  Gallagher provides customers with risk management and insurance brokerage services.

32.    Defendant Wells Fargo & Company is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in San Francisco, California.  Wells Fargo & Company provides customers with risk management and insurance brokerage services through two separate insurance operations: (i) Wells Fargo Insurance Services, and (ii) Acordia, Inc., a Wells Fargo subsidiary.

33.    Defendant Acordia, Inc. ("Acordia") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Acordia provides customers with risk management and insurance brokerage services.

34.    Defendants Wells Fargo & Company and Acordia shall be referred to collectively as "Wells Fargo."

35.    Defendant Brown & Brown, Inc. ("Brown") is a corporation incorporated under the laws of Florida whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Daytona Beach, Florida.  Brown provides customers with risk management and insurance brokerage services.

36.    Defendant Hilb, Rogal & Hamilton Company ("Hilb") is a corporation incorporated under the laws of Virginia whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Glen Allen, Virginia.  Hilb provides customers with risk management and insurance brokerage services.

37.    Defendant BB&T Corporation ("BB&T Corp.") is a corporation incorporated under the laws of North Carolina whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Winston-Salem, North Carolina.  BB&T Corp. is a

financial holding company that conducts its business operations primarily through its commercial banking subsidiaries, including Branch Banking and Trust Company. Through its subsidiaries and affiliates, BB&T Corp. provides customers with risk management and insurance brokerage services.

38.     Defendant Branch Banking and Trust Company ("Branch Bank") is a corporation incorporated under the laws of North Carolina and has its corporate headquarters in Winston-Salem, North Carolina. Branch Bank is BB&T Corp.'s largest subsidiary, which, through one of its own principal operating subsidiaries, BB&T Insurance Services, Inc., provides customers with risk management and insurance brokering services.

39.     Defendant BB&T Insurance Services, Inc., ("BB&T Insurance") is a corporation incorporated under the laws of North Carolina and has its corporate headquarters in Raleigh, North Carolina. BB&T Insurance provides customers with risk management and insurance brokerage services.

40.     Defendants BB&T Corp., Branch Bank and BB&T Insurance shall be referred to collectively as "BB&T."

41.     Defendant U.S.I. Holdings Corporation ("USI") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the NASDAQ National Market and has its corporate headquarters in Briarcliff Manor, New York. USI provides customers with risk management and insurance brokerage services.

42.     Defendant HUB International Limited ("HUB") is a corporation incorporated under the laws of Ontario, Canada, whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in Chicago, Illinois. HUB provides customers with risk management and insurance brokerage services.

43.    Defendant American International Group, Inc. ("AIG Inc.") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in New York, New York. As described by AIG itself, "AIG member companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer." AIG and its related companies are the largest underwriters of commercial and industrial insurance in the United States.

44.    Defendant Lexington Insurance Company ("Lexington") is owned by National Union Fire Insurance Company of Pittsburgh, PA, The Insurance Company of the State of Pennsylvania and Birmingham Fire Insurance Company of Pennsylvania, which companies are all subsidiaries of AIG Inc., and is incorporated under the laws of Delaware with headquarters in Boston, Massachusetts. Lexington operates as an underwriter of managed care professional liability insurance.

45.    Defendant American International Specialty Lines Insurance Co. ("AISPLIC") is a subsidiary of AIG Inc. and is incorporated under the laws of Alaska with headquarters in Jersey City, New Jersey. AISPLIC operates as an underwriter of liability, property, casualty and marine insurance.

46.    Defendants AIG Inc., Lexington and AISPLIC shall be referred to collectively as "AIG."

47.    Defendant ACE Limited ("ACE Ltd") is a corporation incorporated under the laws of the Cayman Islands whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in Hamilton, Bermuda. ACE Ltd owns ACE INA Holdings, Inc. As

described by ACE Ltd itself, the "ACE Group of Companies is one of the world's largest providers of insurance and reinsurance."

48.    Defendant ACE INA Holdings, Inc. ("ACE INA"), is a U.S. based insurance organization incorporated under the laws of Delaware and is headquartered in Philadelphia, Pennsylvania. ACE INA oversees insurance operations that span the globe and, though its operating companies, including ACE USA, is a leading provider of insurance and reinsurance.

49.    Defendant ACE USA is an operating company of ACE INA and is a corporation incorporated under the laws of Delaware and is headquartered in Philadelphia, Pennsylvania. ACE USA operates through several insurance companies using a network of offices throughout the United States. ACE USA's operations "provide a broad range of P&C insurance and reinsurance products to a diverse group of commercial and non-commercial enterprises and consumers. These products include excess liability, excess property, workers' compensation, general liability, automobile liability, professional lines, aerospace, accident and health (A&H) coverages and claim and risk management products and services."

50.    Defendants ACE Ltd, ACE INA and ACE USA, shall be referred to collectively herein as "ACE."

51.    Defendant The Hartford Financial Services Group, Inc. ("Hartford Financial") is one of the largest investment and insurance companies in the United States. Hartford is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Hartford, Connecticut. Hartford represents that it "is a leading provider of investment products, life insurance and group and employee benefits; automobile and homeowners products; and business insurance."

52.     Defendant Hartford Fire Insurance Co. ("Hartford Fire") is a subsidiary of Hartford and is an incorporated under the laws of Connecticut with headquarters in Hartford, Connecticut. Hartford Fire operates as an underwriter of property and casualty insurance.

53.     Defendant Twin City Fire Insurance Co. ("Twin City") is a subsidiary of Hartford and is incorporated under the laws of Indiana with headquarters in Hartford, Connecticut. Twin City operates as an underwriter of property and casualty insurance.

54.     Defendants Hartford Financial, Hartford Fire, and Twin City shall be referred to collectively as "Hartford."

55.     Defendant The Munich Re Group ("Munich Re") is a provider of reinsurance, primary insurance and asset management services. Munich Re is a German corporation with headquarters in Munich, Germany. Munich Re's shares are traded on several German stock exchanges. Munich Re describes itself as "one of the world's largest reinsurers."

56.     Defendant American Re Corporation ("American Re") is a member of the Munich Re Group and is incorporated in the State of Delaware and headquartered in Princeton, New Jersey. American Re is one of the leading providers of reinsurance in the United States. Through its subsidiaries, American Re writes treaty and facultative reinsurance, insurance, and provides related services to insurance companies, other large businesses, government agencies, pools and other self-insurers.

57.     Defendant American Re-Insurance Co. ("American Re-Insurance") is a wholly owned subsidiary of American Re Corporation and is incorporated under the laws of Delaware and headquartered in Princeton, New Jersey. American Re-Insurance is a provider of treaty and facultative reinsurance, insurance and related services to insurance companies, large businesses and government agencies.

58.    Defendant Munich-American Risk Partners, Inc. ("Munich-American") is a division of American Re-Insurance Co. and is incorporated under the laws of Delaware and headquartered in Princeton, New Jersey.  Munich American develops custom risk transfer, risk sharing and risk managing solutions that preserve and enhance the assets and operations of its clients.

59.    Defendants Munich Re, American Re, American Re-Insurance and Munich-American, shall be referred to collectively herein as "Munich."

## FACTUAL ALLEGATIONS

### A.    DUTIES OWED BY AN INSURANCE BROKER

60.    Broker Defendants hold themselves out as providing, and do in fact provide, insurance brokerage services for businesses, public entities, associations, professional services organizations and private clients.  Broker Defendants are leaders in the insurance brokerage industry and comprise a significant portion of the insurance brokerage market worldwide.

61.    The services which the Broker Defendants provide to their clients include, *inter alia*, analysis of risk and insurance options, procurement and renewal of insurance, interpretation of insurance policies, monitoring the insurance industry on the client's behalf, keeping clients informed as to developments in the insurance marketplace, and assisting clients with the filing of claims against the policies they place.  It is because they offer these services that customers, like plaintiff and members of the Class, seek out Broker Defendants for their expertise.

62.    In this capacity, Broker Defendants broker a wide range of insurance lines, including traditional property-liability insurance, business entity liability insurance, casualty insurance in various forms and workers compensation, which their customers ultimately purchase.

63.    Broker Defendants represent that they are highly skilled and independent insurance brokerage experts and possess the special knowledge and expertise necessary to interpret and

understand the complex and sophisticated business risks faced by their clients and to determine which corresponding insurance products and insurance companies best fit their clients' needs.

64.    Broker Defendants encourage their clients to rely on this proffered special knowledge and expertise in procuring insurance coverage, and counsel their clients concerning the complex and specialized insurance they are purchasing, such as plaintiff and members of the Class it seeks to represent, who all have risk-management needs inherent in their businesses or personal situations that make it both prudent and necessary for them to purchase various lines of liability, casualty and other forms of insurance. As such, Broker Defendants are fiduciaries to their customers and in fact create a confidential and/or fiduciary relationship with their customers based on their role as brokers and their common, uniform representations to their clients, like plaintiff, that they will provide unbiased, independent expert insurance brokering advice on the most efficient and cost effective insurance products available.

65.    Without the assistance of Broker Defendants, Class members, including plaintiff, would lack the sophistication and expertise – derived from Broker Defendants' familiarity with the insurance marketplace and the customs and practices of the insurance industry – to make informed and advantageous decisions and formulate strategies concerning their insurance needs. Plaintiff and members of the Class have therefore engaged the services of Broker Defendants in order to assist them in meeting many different aspects of their insurance needs, including but not limited to risk assessment, insurance procurement and/or renewal and the filing of claims on existing insurance policies.

66.    In their standard contracts with clients, including plaintiff, Broker Defendants agree: (i) that they will represent the interests of their clients in transactions with insurers; (ii) that they will act on behalf of their clients in the placement of insurance and negotiation of terms; (iii) that they

- 15 -

will act on behalf of their clients in connection with the filing and processing of claims; and (iv) that they will act as the exclusive insurance broker for their clients.

67.     Broker Defendants represent themselves to their clients as fiduciaries and in fact have created a fiduciary relationship with their clients based on the trust imparted on them by their clients and the perceived ability to provide unbiased, independent, and expert insurance brokerage advice. Such representations are made through advertisements, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mails and interstate wires.

68.     The New York Attorney General's Complaint cites a Marsh document created to assist its employees in responding to client questions.  It reads: "***Our guiding principle is to consider our client's best interest in all placements.  We are our clients' advocates and we represent them in negotiations.  We don't represent the [insurance companies]***."

69.     Based on the conduct described above, Broker Defendants owe their clients, including plaintiff: (i) a duty of loyalty to act in the best interests of their clients and to always put their clients' interests ahead of their own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Broker Defendants, including the duty to disclose the source and amounts of all income they receive in or as a result of any transaction involving their clients; (iii) a duty of care in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (v) a duty to use their best business judgment in connection with any insurance-related products purchased by their clients – in other words to find the best

coverage at the lowest price – or services rendered by Broker Defendants; and, (vi) a duty of good faith and fair dealing.

## B.    GLOBAL BROKING, PLACEMENT SERVICE AGREEMENTS AND THE ROOTS OF CONSPIRACY

70.    To effectuate their revenue maximization, Broker Defendants created contingent fee arrangements under which certain insurance companies, including Defendant Insurers, pay fees to Broker Defendants based on (i) the *volume* of premiums generated by Broker Defendants' sales of Defendant Insurers' products, (ii) the growth of business and *renewal* of existing business, and (iii) the profitability of the book of business purchased by Broker Defendants' clients, *i.e.*, claims ratios with a particular insurer ("Contingent Fees"). These Contingent Fees are often memorialized in "placement service agreements" or "market service agreements" (collectively "PSAs") between Broker Defendants and Defendant Insurers and other insurance companies.

71.    The Contingent Fees were, and continue to be, imposed on all product lines of insurance for which the Broker Defendants provide insurance brokering services, including, *inter alia*, Professional Liability (such as Directors and Officers Liability and Errors and Omissions Liability); Workers Compensation; Health; Property and Casualty; Life; and Accidental Death and Disability. For example, at Marsh the "Fin/Pro" services group (Financial and Professional Services Group) within Global Broking markets Directors and Officers Liability; Malpractice; Errors and Omissions Liability, and other forms of professional liability insurance to individuals and entities in the financial and professional services arena.

72.    In the early 1990s, defendant Marsh developed a "global broking" concept designed to bring the marketing of its insurance brokering services under one, centralized department – the Global Broking Division ("Global Broking"). Global Broking determined the placement of all of Marsh's major business lines, which includes Excess Casualty, Healthcare, FinPro (Financial

Products) and Middle Market (businesses paying less than $1 million in annual insurance premiums). The Global Broking Division was based out of Marsh's Manhattan office, with regional centers set up around the country to ensure that field agents and brokers were placing their clients' insurance business with Global Broking's preferred carriers, including defendants AIG, Hartford, ACE and Munich. The Global Broking Division negotiated its own contingent commission agreements, which replaced separate agreements previously negotiated by Marsh's regional and local offices and other undisclosed fees paid by Defendant Insurers. In fact, in a video presentation prepared and disseminated to Marsh's employees by its former Chairman of U.S. Operations, Robert Newhouse, Newhouse stated that Global Broking's purpose was to maximize revenues and that all Marsh employees and field agents were to abide by the Global Broking system.

73.    Global Broking took control of marketing and business development from field brokers and agents and imposed stringent control over the placement of all insurance business with Marsh's clients. Global Broking internally rated the Defendant Insurers based on the contingent commission and other undisclosed fee agreements. Global Broking provided its brokers a "tiering report" in order to provide "**clear direction on who [we] are steering business to and who we are steering business from.**" By no longer allowing the field agents and brokers to deal directly with the insurance carriers, Marsh was able to conceal its conduct, including the fraudulent agreements and bid-rigging (described below) with its preferred insurance companies, including Defendant Insurers. After initially attempting to compete with "Global Broking," both Aon and Willis eventually adopted Marsh's Global Broking concept, with the same goal of maximizing revenue through undisclosed fees, although Aon and Willis have been unable to achieve the same level of centralization and structure that Marsh accomplished with Global Broking.

74.    Plaintiff, on information and belief, alleges that all of the other remaining broker defendants have instituted practices similar to those of Marsh's Global Broking Division.

75.    The Contingent Fees paid to Marsh, in addition to commissions, are typically a flat percentage of up to 5% of the total premiums written with an insurance carrier and paid directly to Marsh. In addition, defendants Marsh, Aon and Willis also received Contingent Fees based on the rate at which their clients renew their policies with the insurance carriers. For example, this was confirmed by the AG Complaint which alleges that defendant AIG's 2003 Agreement with Marsh provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIG at a rate of 85% or higher. If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%. Therefore, if the Broker Defendants could get their clients to renew their policies, they would increase their contingent fee revenue. The Broker Defendants were also compensated by the profitability of the policies, *i.e.*, the lower the claims the more fees that were earned.

76.    The Contingent Fees are maximized by *steering* Broker Defendants' clients, including plaintiff and members of the Class, to purchase only policies issued by the Defendant Insurers, which is precisely what the Broker Defendants do. The Broker Defendants place their clients' business predominantly with the Defendant Insurers in order to maximize the Contingent Fees they receive at the expense of their clients. Contrary to the expectations of their clients, Broker Defendants' financial interests are in direct conflict with their clients' interests. The Broker Defendants' duties owed to their clients have been co-opted by the contingent fee agreements, and the steering and bid-rigging resulting therefrom.

77.    Until recently, Marsh directed its employees not to discuss Global Broking with its clients and not to disclose the compensation Global Broking received from the clients' business. To

the extent the client has any knowledge of the compensation Marsh receives, it is only the amount of the commission paid to the retail broker or field office that worked with the client and not the compensation paid to Marsh and its Global Broking Division.

78.    So pervasive is Marsh's efforts to hide from its clients the amount of any compensation Marsh receives from its clients' business that it directs employees to redact and "white-out" the commission income identified in the insurance "binders," *i.e.* the temporary insurance contracts, prepared by the insurance carrier and sent to Marsh for transmittal to the client/ insured.

79.    As a result of Marsh's deceptive and fraudulent practices concerning the Contingent Fees and Wholesale Payments, after its deceptive practices were recently made public, large corporate clients have fired Marsh as their insurance broker due to placement improprieties, including failing to disclose its steering and bid-rigging practices as well as the Contingent Fees, Wholesale Payments and other revenue generated pursuant thereto.

80.    The volume of Contingent Fees (together with the Wholesale Payments described in detail below) that are received by Broker Defendants have a material impact on their overall profitability.  The Contingent Fees payable under the PSAs have resulted in improper conduct, including steering, bid-rigging and illegal tying arrangements, because the PSAs are intended to and do create an incentive for Broker Defendants to:

(a)    maximize the volume of insurance placed with the Defendant Insurers, parties to the PSAs;

(b)    maximize the volume of renewal business placed with the Defendant Insurers;

(c)    fail to seek, on behalf of their clients, the most advantageous terms on the insurance coverage;

(d)    fail to advise their clients to negotiate reductions of premiums payable through adjustments of terms, such as deductibles, in order to maximize the profitability of those policies for purposes of calculating the Contingent Fees payable under the applicable PSAs; and

(e)    Discourage clients from filing certain claims under their policies in order to maximize the profitability of those policies for purposes of calculating the Contingent Fees payable under the applicable PSAs.

81.    By seeking to maximize the Contingent Fees, Broker Defendants further their own interests and the interests of the insurers paying the Contingent Fees at the expense of their clients' interests, including those of plaintiff and members of the Class.

82.    Moreover, Broker Defendants have sought to minimize the number and value of claims made by their clients against policies written by the Defendant Insurers in order to maximize Contingent Fees which are based, in part, on the overall profitability of the policies.

83.    Defendants' undisclosed fee agreements, steering, bid-rigging, tying arrangements, and other improper conduct alleged herein directly breaches Broker Defendants' duties as brokers to act on behalf of their clients, including plaintiff and members of the Class, and duty of candor and full disclosure and duty to put their clients' interests ahead of their own, and is contrary to the representations made by Broker Defendants to their clients.

84.    Broker Defendants have further failed to negotiate discounts or adjustments or more favorable terms on insurance policies on behalf of their clients, including plaintiff and members of the Class, which would decrease the overall volume of premiums paid by the purchaser for the same product because such discounts, adjustments or more favorable terms would tend to reduce the Contingent Fees received from the Defendant Insurers.

85.     That conduct directly breaches Broker Defendants' duties to act on behalf of their clients, including plaintiff and members of the Class, in connection with the procurement of insurance and is contrary to the representations made by Broker Defendants to their clients. This conduct also violates the Insurance Defendants' duty to its insureds.

86.     Defendants either fail entirely to disclose the Contingent Fee Agreements or fail to adequately disclose them. As a result, plaintiff and members of the Class are not aware of their existence, operation or effect. Thus, in addition to defendants' blatant illegal conduct in the form of steering, bid-rigging and tying arrangements, defendants breach the duties owed to their clients/insureds by failing to disclose the following:

(a)     the source and amount of their Contingent Fees;

(b)     the material impact of the Contingent Fees on their overall profitability;

(c)     that the Contingent Fees have created economic incentives for defendants to act contrary to their fiduciary duties to plaintiff and members of the Class;

(d)     that the Contingent Fees have created economic incentives for defendants to act contrary to their duty of care to plaintiff and members of the Class;

(e)     that the Contingent Fees have created economic incentives for defendants to act contrary to their duty of loyalty to plaintiff and members of the Class;

(f)     that the Contingent Fees have created economic incentives for defendants to act contrary to their duty to provide impartial advice to plaintiff and members of the Class;

(g)     that the Contingent Fees have created economic incentives for defendants to act contrary to their duty to exercise their best business judgment on behalf of plaintiff and members of the Class;

(h)    that the Contingent Fees have created economic incentives for defendants to act contrary to their duty of candor and full disclosure to plaintiff and the members of Class; and

(i)    that the Contingent Fees have created economic disincentives for defendants to carry out their contractual obligations to plaintiff and members of the Class.

87.    As a result of the Contingent Fees, plaintiff and members of the Class have paid insurance premiums in excess of what they would have paid had Broker Defendants acted in accordance with (i) the terms of their contracts, (ii) their fiduciary and other duties, and (iii) their representations to their clients.

88.    Through defendants' fraudulent misrepresentations and failure to make adequate disclosure of the Contingent Fees as set forth above, defendants have knowingly misled and continue to mislead and deceive their clients, including plaintiff and members of the Class, into believing that they provide independent, unbiased and expert brokerage services tailored to the needs of their clients.

89.    In the absence of proper disclosure of the Contingent Fees, plaintiff and members of the Class justifiably relied on Broker Defendants' representations that they were providing independent expertise to their clients and representing their clients' interests in accordance with their contractual, fiduciary and other duties as alleged above.  Plaintiff and members of the class also unjustifiably relied upon defendants' representations in connection with the insurance policies they purchased.

90.    The Contingent Fee Agreements, and the "Global Broking" business model used to implement such agreements and maximize the revenues received pursuant thereto have resulted in: (i) an environment that is economically hostile to the interests of plaintiff and the members of the Class, and the contractual, fiduciary and other duties owed by defendants as described above;

- 23 -

(ii) steering (the placement of Broker Defendants clients' business with the Defendant Insurers based on the PSAs); and (iii) bid-rigging (the manipulation of the purportedly competitive bidding process whereby defendants utilize phony bids to ensure that a particular insurer will get the business at *above market* rates).

91.    For Marsh, Contingent Fees received from the insurance carriers are aggregated over the entire "book of business" placed with a specific insurance carrier and typically not collected in an account-specific manner, *e.g.*, Contingent Fees received from defendant AIG are paid based on the total amount of business Marsh steers to AIG, not broken-out and identified for each Marsh individual client account steered to AIG. This was confirmed by Marsh CEO Jeffrey Greenberg:

> We don't break out contingent commissions. That is not separately enumerated because it is part of our business model and so I can't really help you there.

92.    As a result of the adverse effect of Marsh's Global Broking on the revenues received by Marsh field agents and brokers, Marsh initiated a "revenue repatriation" program under which certain of Global Broking's national contingent commissions were shared with local and regional offices. Nevertheless, when certain field agents, brokers and employees did not follow Global Broking's directives, they were reprimanded. The head of Global Broking's Excess Casualty group responded in June 2003 to an employee in Marsh's Seattle office, criticizing her for placing insurance directly with a carrier on behalf of a client, thus denying a contingent commission to Global Broking: "[T]he GB repatriation dollars are no small component of your office's budget. You have lowered that amount with this placement. You may want to consider that in the future."

93.    In addition to the Contingent Fees, defendants have received additional income from insurers writing policies for defendants' clients (including plaintiff and members of the Class) from related wholesale entities through which defendants steer the business of their clients. These wholesale entities purport to act as intermediaries between broker and insurer, and receive

- 24 -

commissions ("Wholesale Payments") from the insurers for placing the business of the clients of the brokers.

94.    Some of these wholesale entities are subsidiaries or affiliates of defendants, while others are financially related to defendants by other means, with the result that the Wholesale Payments are channeled to defendants in whole or in part.

95.    While serving the interests of defendants, the wholesale entities do not serve the interest of defendants' clients.  Specifically, the Wholesale Payments create the same economic disincentives for Broker Defendants to fulfill their legal and contractual duties to their clients, including plaintiff and members of the Class, as the Contingent Fees as alleged above.

96.    Like the Contingent Fees, defendants fail to disclose or inadequately disclose the Wholesale Payments to plaintiff and members of the Class such that plaintiff and members of the Class are not aware of their existence, operation, or effect.  Specifically, Broker Defendants fail to disclose:

(a)    the source and amount of their Wholesale Payments;

(b)    the material impact of the Wholesale Payments on their overall profitability;

(c)    that the Wholesale Payments have created economic incentives for Broker Defendants to act contrary to their fiduciary and other duties to plaintiff and members of the Class;

(d)    that the Wholesale Payments have created economic incentives for Broker Defendants to act contrary to their duty of care to plaintiff and members of the Class;

(e)    that the Wholesale Payments have created economic incentives for Broker Defendants to act contrary to their duty of loyalty to plaintiff and members of the Class;

(f)    that the Wholesale Payments have created economic incentives for Broker Defendants to act contrary to their duty to provide impartial advice to plaintiff and members of the Class;

(g)    that the Wholesale Payments have created economic incentives for Broker Defendants to act contrary to their duty to exercise their best business judgment on behalf of plaintiff and members of the Class;

(h)    that the Wholesale Payments have created economic incentives for Broker Defendants to act contrary to their duty of candor and full disclosure to plaintiff and members of the Class; and

(i)    that the Wholesale Payments have created economic disincentives for Broker Defendants to carry out their contractual obligations to plaintiff and members of the Class.

97.    As a result of the Wholesale Payments, plaintiff and members of the Class have paid insurance premiums in excess of what they would have paid had Broker Defendants acted in accordance with (i) the terms of their contracts, (ii) their fiduciary and other duties, and (iii) their representations to their clients.

98.    Through defendants' fraudulent misrepresentations and failure to make adequate disclosure of the Wholesale Payments as set forth above, Broker Defendants have knowingly misled and continue to mislead and deceive their clients, including plaintiff and members of the Class, into believing that they provide independent, unbiased and expert brokerage services tailored to the needs of their clients.

99.    In the absence of proper disclosure of the Wholesale Payments, plaintiff and members of the Class justifiably relied on Broker Defendants' representations that they were providing

independent expertise to their clients and representing their clients' interests in accordance with their contractual, fiduciary and legal duties as alleged above.

100.    Broker Defendants have collected the Wholesale Payments as part of the same fraudulent scheme, course of conduct and conspiracy described above under which Broker Defendants encourage reliance on their purported independent expertise while failing to disclose the inherent conflicts of interests they have created through the Contingent Fees and the Wholesale Payments and acting to serve their own interests at the expense of those of their clients.

## C.    BROKER DEFENDANTS STEER THEIR CLIENTS TO PROCURE INSURANCE WITH DEFENDANT INSURERS

101.    In order to maximize the undisclosed revenue the Broker Defendants receive from the PSAs, these defendants steer their clients, including plaintiff and members of the Class, to purchase policies with Defendant Insurers that offer Contingent Fees and Wholesale Payments and by specifically recommending those policies and terms that they believe are most likely to generate the highest Contingent Fees and Wholesale Payments.

102.    Based entirely on maximizing contingent commissions, Marsh dictated to its brokers which insurance companies' policies they were to sell. This was confirmed by allegations in the New York Attorney General's Complaint and documents attached thereto, wherein a managing director within Marsh advised colleagues that "Some [contingent commission agreements] are better than others .... *I will give you clear direction on who [we] are steering business to and who we are steering business from*."

103.    Marsh's Global Broking executives also used a "tiering report" that segregated insurance companies by how favorable their Agreements were to Marsh. The tiering report instructed recipients to "monitor premium placements" so that Marsh obtained "maximum concentration with Tier A and B" – the insurance companies with whom Marsh had the most

- 27 -

favorable Agreements. One Global Broking executive put it quite plainly in a September 2003 email: "We need to place our business in 2004 with those that have superior financials, broad coverage *and pay us the most*."

104.    The increased revenues Marsh gained from its relationship with its stable of preferred insurance companies, including Defendant Insurers, was explained in a July 2000 Marsh memorandum entitled, "BUSINESS DEVELOPMENT STRATEGIES," describing one of the insurance companies with which Marsh had an Agreement: "They have gotten the 'lions [sic] share' of our Environmental business PLUS *they get an unfair 'competitive advantage['] as our preferred [sic] [insurance company]*."

105.    Marsh and the other Broker Defendants have been able to ensure Defendant Insurers' participation in the conspiracy and to maximize their undisclosed revenue from the PSAs through their extraordinary leverage. In an email dated November 7, 2003, a Marsh Global Broking executive described his experience with the President of defendant ACE: "I made it clear that if ACE wants us to meet significant premium growth targets then ACE will have to pay *'above market'* for such [a] stretch ...." Defendant Insurers were made aware of, and fully understood, Marsh's influence on their business. Indeed, one executive at defendant AIG explained that Marsh threatened to "kill" AIG if it did not "*get to [the] right number*" on its Agreement with Marsh.

106.    Internally, Marsh rewards employees who maximize its contingent commission revenue by steering clients to only insurance companies with which it has PSAs. One Marsh employee was elevated to vice president, in part because he had been able to renew a client's business "by moving" that client to an insurance company with which Marsh had a PSA (noting "Neighborhood Health Partnership Estimated Revenue – $390,000."). Among his "[f]inancial success[es]" the soon-to-be vice president "was responsible for the renewal of a large HMO in

Miami and was successful with placing of this account with a [contingent commission insurance company] – Increased revenue from $120,000 to $360,000 (estimated)." In critiquing himself on a 2003 self appraisal form, the now vice president stated:

> Renewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship. **Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership.**

Other employees were similarly praised in performance evaluations for increasing Marsh's contingent commission income from insurance companies "**by achieving budgeted tiering goals.**"

## D. BROKER DEFENDANTS AND DEFENDANT INSURERS COLLUDED IN A BID-RIGGING SCHEME TO ALLOCATE CUSTOMERS AND CREATE THE ILLUSION OF COMPETITION

107.    In order to maximize their profits and fix, increase or stabilize the price of insurance, Broker Defendants and Defendant Insurers colluded in a bid-rigging scheme to allocate customers and deceive plaintiff and Class members into believing that the Broker Defendants were obtaining competitive insurance bids on behalf of their clients. The bid-rigging was facilitated by the Broker Defendants, who solicited and obtained fictitious high quotes from Defendant Insurers in order to guarantee that the predetermined preferred insurer would win the bidding competition, and by determining the terms of the winning and losing bid. The Defendant Insurers colluded with the brokers in the bid-rigging scheme because they were promised protection from competition in other bids. This systemic bid-rigging by the Broker Defendants and Defendant Insurers was achieved through multiple levels of manipulation.

108.    The details of Broker Defendant Marsh's bid-rigging have been made public as a result of the investigation by the New York Attorney General. To date, two AIG executives, including a senior vice president, have pleaded guilty to felony charges of scheming to defraud, and a vice president with ACE Ltd. has pleaded guilty to a misdemeanor charge of attempting to restrain

trade and competition. The guilty pleas were obtained in connection with bid-rigging facilitated by Marsh. On information and belief, the other Broker Defendants have also engaged in bid-rigging practices. Plaintiff will seek to amend its allegations regarding the other Broker Defendants' bid-rigging when more information is obtained through discovery or otherwise. Additionally, in response to the litigation that both Marsh and ACE are facing over the PSAs, both have purportedly discontinued collection and payment of Contingent Fees.

109.    **The "A Quote."**  If Marsh had an incumbent carrier for one of its clients, whose insurance policy was up for renewal, Marsh would solicit what was known as an "A Quote" from that Defendant Insurer. If the Defendant Insurer agreed to make a quote at the targeted premium and policy terms demanded by Marsh, regardless of its ability to quote more favorable terms or premium, the Defendant Insurer was guaranteed the policy renewal.

110.    **The "B Quote."**  At the same time, in order to deceive customers into believing that Marsh was obtaining competitive bids and to ensure that the incumbent carrier would get its policy renewed, Marsh would solicit non-incumbent Defendant Insurers to submit what was known as a "B Quote" (a phony quote which also was known as a "backup quote," "protective quote" or "throwaway quote"), with the understanding that these other insurers would ***not actually be making competitive bids***. "B Quote" insurers knew and understood that their turn would come later. Marsh often provided these other insurers with **target quotes** to be made, regardless of the insurers' ability to quote a lower premium below the target bid.

111.    For instance, in October 2003, an underwriter for AIG stated that with regard to a B Quote he had provided to Marsh: "This was not a real opportunity. Incumbent Zurich did what they needed to do at renewal. We were just there in case they defaulted. Broker ... said Zurich came in around $750K & wanted us to quote around $900K."

112.    The President of Casualty Risk for ACE explained: "[I]f we were asked for a 'B' quote for a lead umbrella then they provide us with pricing targets for that 'B' quote. It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do anything stupid' as respects pricing."

113.    Indeed, in those instances where a Defendant Insurer provided a B Quote that was too competitive to ensure its loss, Marsh would ask the Defendant Insurer to submit a higher quote. According to an email from an ACE assistant vice president to an ACE vice president of underwriting, it was explained that on one such occasion, the "[o]riginal quote [was] $990,000 .... We were more competitive than AIG in price and terms. **[Marsh] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business.**"

114.    In instances where the Defendant Insurers were not provided with a specific target B Quote but were nonetheless expected to lose the bidding competition, the Defendant Insurer would simply look at the expiring policy terms and premium, and provide a quote high enough to ensure that they would not be the winner or that they would make a comfortable profit in the rare instances where such B Quotes were awarded the contract.

115.    In the rare situation where a B Quote was inadvertently awarded a contract in a competitive bid, it was likely because the incumbent insurer was unable or unwilling to meet the Broker Defendant's A Quote target price. As further evidence of defendants' manipulation of the bidding process, since the successful B Quote bidder in such situations had not completed any underwriting analysis (since it had no intention of winning the contract), *the insurer would "back fill" the underwriting analysis in its file, i.e., prepare the necessary analysis after the fact*.

116.    In conspiring with insurers to rig insurance contract bids and allocate customers, Marsh completely disregarded the interests of the client and the possibility that another insurer may

offer a better deal for that client. Instead, Marsh doggedly pursued its own self interest in rigging the purported competitive bidding process. For instance, in June 2003, when Defendant Insurer ACE learned that a Marsh client, Brambles, USA, was unhappy with its incumbent carrier, Defendant Insurer AIG, Marsh nonetheless wanted AIG to keep the business. As detailed in a written communication by an ACE vice president of underwriting to the ACE President of Risk and Casualty: "Our rating has a risk at $890,000 and I advised [Marsh] that we could get to $850,000 if needed. [Marsh] gave me a song & dance that game plan is for AIG at $850,000 and to not commit our ability in writing." As a result, ACE maintained its practice over the following year of providing Marsh with inflated quotes.

117. **The "C Quote."** When there was no incumbent insurance carrier to protect, Marsh would solicit insurers for "C Quotes." Although it was understood that real competition was a possibility in such situations, Marsh often still provided premium targets to the insurers.

118. The Defendant Insurers' collusion in this bid-rigging scheme was facilitated by Marsh. For instance, the Executive Director of Marketing at Marsh Global Broking,[1] William Gilman, refused to allow AIG to submit a competitive quote when it was solicited for a "B Quote," and further warned AIG on a number of occasions that AIG would lose its entire book of business with Marsh if it failed to cooperate. Gilman's description of the arrangement between broker and insurer – *i.e.*, Marsh "protected AIG's ass" when it was the incumbent carrier up for policy renewal, and in return, Marsh expected AIG to help Marsh "protect" other incumbents by providing higher bids – is a classic example of defendants' agreement and participation in the scheme, course of conduct and conspiracy to manipulate the so-called "competitive" bidding.

---

[1]    Marsh's Global Broking office oversaw policy placement decisions in Marsh's major business lines and had authority over all of Marsh's PSAs.

119.    Defendants engaged in the collusive bidding on a massive scale.  The Hartford
Financial Services Group – which shared office space in the same facilities as Marsh in Lake Mary,
Florida and Los Angeles, California -- was asked on virtually a daily basis by Marsh employees for
inflated quotes or "indications" (non-binding proposed prices) for insurance coverage.  The Hartford
underwriters were told to price the quote or indication at 25% above a particular number.  In the Los
Angeles offices, Marsh even provided Hartford with a spreadsheet showing the accounts for which it
wanted Hartford to provide a losing quote or indication, along with the other insurers' quotes.

120.    The Defendant Insurers benefited from colluding in the bid-rigging scheme because
they did not have to compete with one another on price and other terms.

E.    **EFFECT OF DEFENDANTS' UNLAWFUL CONDUCT**

121.    As a result of defendants' conspiracy, contract or agreement to manipulate insurance
contract bids and allocate customers, plaintiff and the other members of the Class were injured in
their business or property.  Plaintiff and Class members paid more for insurance than they would
have in the absence of the bid-rigging scheme because Defendant Insurers did not compete on price
or other terms.

122.    By engaging in the course of conduct set forth above, defendants have breached and
continue to breach their contractual, fiduciary and other duties to their clients by omitting and failing
to disclose numerous material facts as alleged above, despite a duty to do so.

123.    Moreover, Broker Defendants have structured the Contingent Fees and Wholesale
Payments so as to make it impossible for Broker Defendants' clients, including plaintiff and
members of the Class, to discover the extent of compensation received by defendants or the material
disincentive that compensation creates to Broker Defendants to fulfill their legal and contractual
duties to plaintiff and members of the Class.

- 33 -

124.    Moreover, Broker Defendants have breached and continue to breach their legal and contractual obligations to represent the best interests of their clients, including plaintiff and members of the Class.

125.    Broker Defendants have profited enormously by inducing clients to use their insurance brokerage services through fraudulent misrepresentations as to how they formulate the insurance brokerage advice they provide customers and by failing to disclose the existence and operation of the Contingent Fees and Wholesale Payments.  Likewise, Defendant Insurers have profited enormously by receiving the business of Broker Defendants' clients through the fraudulent acts of the defendants.

126.    Defendants have also breached their legal and contractual obligations to their clients by not disclosing that their practices are in coordination with others in the insurance brokerage industry.

127.    Defendants' improper conduct is made more effective by, and enforced through, the conspiracy and racketeering enterprise described below.

### DEFENDANTS' FIDUCIARY DUTIES AND RELATIONSHIP OF TRUST AND CONFIDENCE WITH PLAINTIFF AND CLASS MEMBERS

128.    Defendants – both Brokers and Insurers – held and hold a relationship of trust and confidence with plaintiff and Class members as a result of the following:

(a)    Defendants are brokers and insurers characterized by elements of public interest which subject defendants to more stringent standards of conduct than those normally arising out of contract;

(b)    Defendants cultivated a relationship of trust and confidence with plaintiff and Class members by selling them insurance products that were purportedly tailored to meet their individual insurance needs;

- 34 -

(c)     Plaintiff and Class members often had prior relationships with defendants, which defendants exploited, to sell these insureds new policies that purportedly would better serve their individual needs as defendants were uniquely situated to assess through the many years of having serviced these insureds;

(d)     Defendants and their agents hold themselves out as highly-skilled insurance experts, possessing the special knowledge and expertise needed to interpret and understand the complex policies they offer. Defendants represented to plaintiff and Class members their proffered special knowledge and expertise in purchasing the policies; and

(e)     Defendants, in inducing plaintiff and Class members to purchase the policies discussed herein, hold themselves out as experts to and confidants of plaintiff and Class members, thereby encouraging plaintiff and Class members to reveal confidential and proprietary information. This confidential and proprietary information includes that contained in financial statements, tax returns, business plans, earnings projections and numerous other documents and related business information.

129.    Based on the foregoing, defendants owe plaintiff and Class members fiduciary duties, including the duty of good faith and fair dealing, the duty of full and fair disclosure, the duty of loyalty and the duty of care arising out of their relationship with plaintiff and Class members.

130.    Defendants have a duty to provide complete and truthful information to plaintiff and Class members when selling policies, including, without limitation, disclosing the source and amount of all information and otherwise complying with full disclosure laws and curing any prior misrepresentations or omissions.

131.    In addition to their duties derived from their relationship of trust and confidence, defendants have an independent duty to disclose information to plaintiff and Class members by

virtue of their special relationship with them. Defendants have sole knowledge of the source and amount of all income paid and received through the PSAs, defendants' steering, bid-rigging, tying arrangements and other wrongdoing.

132.    Defendants were aware that plaintiff and Class members have no access to the foregoing information and therefore could not evaluate the accuracy of the information provided to them. Defendants intentionally conceal this information and keep plaintiff and Class members uninformed of these facts. Defendants capitalize on their sole possession of material facts by providing plaintiff and Class members with false, misleading and incomplete policy information.

## RICO CONSPIRACY

133.    Defendants have not undertaken the practices set forth above in isolation but instead have done so as part of a common scheme and conspiracy.

134.    That common scheme and conspiracy not only involves *individual* Broker Defendants and the insurers that pay them Contingent Fees and Wholesale Payments, but also *all* Broker Defendants and the insurers that pay Contingent Fees and Wholesale Payments to defendants and their affiliates directly or indirectly, industry trade associations, and other entities.

135.    The object of the conspiracy was to increase Defendant Insurers' revenues by directing clients to the insurers and to increase the Broker Defendants' revenues beyond what clients would willingly pay for such services and to allow increased revenues without clients learning fully of the detriment to their interests.

136.    Each defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy: to commit acts of fraud in order for the Defendant Insurers to receive assured contracts based on noncompetitive bids and for the Broker Defendants to obtain Contingent Fees and/or Wholesale Payments, in violation of their legal and contractual duties to their clients as set forth above.

137.    Each defendant and member of the conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective to obtain Contingent Fees and/ or Wholesale Payments, in violation of their legal and contractual duties to their clients as set forth above.

138.    Indeed, for the conspiracy to succeed, each defendant and the other members of the conspiracy had to agree to implement and use the same or similar devices and fraudulent tactics against their clients, including plaintiff and members of the Class.

139.    Many aspects of defendants' parallel conduct would have been contrary to the individual self-interests of the conspirators if a conspiracy had not existed.  For example, in the absence of conspiracy, many of the Broker Defendants could have increased their business volumes compared to those of their competitors by resisting the increases in price that were caused by other defendants' unlawful patterns of behavior.  Such disciplining competitive behavior was absent from the pertinent markets, thereby supporting an inference of conspiracy.

140.    Numerous instances of common conduct and activity and similar facts, which evidence the presence of a conspiracy, exist among all defendants and other members of the conspiracy, including:

(a)    similar terms of contracts between defendants and their clients, including vague, misleading, and incomplete language purporting to disclose Contingent Fees and/or Wholesale Payments;

(b)    similar terms in PSAs regarding Contingent Fees; and

(c)    similar terms in agreements regarding Wholesale Payments.

141.    During the past ten years, the conspiracy was conducted through and implemented by participation and coordination in industry groups, such as the Council of Insurance Agents &

Brokers, which, according to its website, is "the voice of the market leaders and the premier association for commercial insurance and employee benefits intermediates in the United States and abroad."

142. As a result of the conspiracy, defendants' clients, including plaintiff and members of the Class, made increased payments for insurance beyond what those payments would otherwise have been, lost the opportunity to reduce payment through negotiations, received less favorable coverage in terms of amounts and exclusions, and/or have been induced to purchase insurance from insurers of lesser quality and/or stability.

## RACKETEERING ALLEGATIONS

### A.    THE ENTERPRISE

143. Plaintiff, the Class members and defendants are "persons" within the meaning of 18 U.S.C. §1961(3).

144. Based upon plaintiff's current knowledge, the following group of persons constitute a group of persons associated in fact, referred to in this Complaint as the "Broker/Insurer Enterprise" (the "BIE"):

        (a)    defendants;

        (b)    other insurance brokerage firms not named as defendants in this Complaint;

        (c)    wholesale entities, whether affiliated with defendants or not, which receive Wholesale Payments and transmit those payments in whole or in part to defendants;

        (d)    insurers that pay Contingent Fees and Wholesale Payments; and

        (e)    insurance brokerage and insurance industry groups, such as the Council of Insurance Agents & Brokers.

145. The BIE is an ongoing organization which engages in, and whose activities affect, interstate commerce.

- 38 -

146.    While defendants participate in and are members of the BIE, they also have an existence separate and distinct from the enterprise.

147.    In order to establish and maintain the system of Contingent Fees and Wholesale Payments, while concealing the system and the inherent conflict of interests it creates from their clients, including plaintiff and members of the Class, defendants were required to participate in the conduct of and exercise control over the BIE.

148.    Defendants have participated in the conduct of, controlled and operated the BIE as follows:

(a)    by sharing and disseminating information regarding client contracting and client communication, insurance placement strategies, and relationships with insurers among other things;

(b)    by utilizing and supporting industry associations, such as the Council of Insurance Agents & Brokers, as vehicles for communication and the exchange and dissemination of information necessary to carry out the Contingent Fees and Wholesale Payments scheme;

(c)    by uniformly recommending insurance products of the Defendant Insurers to their clients in order to maximize the value of Contingent Fees and Wholesale Payments; and

(d)    by developing artificial competitive bidding processes.

149.    As set forth above, the BIE has an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants have engaged.

**B.    PREDICATE ACTS**

150.    Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) or 18 U.S.C. §1343 (relating to wire fraud). As set forth below, defendants

have engaged in and continue to engage in conduct violating each of those laws in order to effectuate their scheme.

151.    In addition, in order to make their scheme effective, each of the defendants sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. §2, which conduct is also indictable under 18 U.S.C. §§1341 and 1343.

152.    In order to carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of defendants' wrongful conduct, claims, responses to claims, and coverage letters.

153.    In order to carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including but not limited to agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of defendants' wrongful conduct, claims, responses to claims, and coverage letters.

154.    The matters and things sent by defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

(a)      materials containing false and fraudulent misrepresentations that the Broker Defendants would represent their clients' interests in the placement of insurance on behalf of plaintiff;

(b)      materials that concealed or failed to disclose the existence and effect of the Contingent Fees and the Wholesale Payments, including the conflict of interests that defendants had created between their legal and contractual obligations to their clients and the economic disincentives to honor those obligations from the Contingent Fees and Wholesale payments;

(c)      materials intended to induce clients to accept more expensive and lesser coverage from the Defendant Insurers than might be otherwise available in order to maximize premium revenue and to maximize Contingent Fees and/or Wholesale Payments to the Broker Defendants; and

(d)      materials intended to discourage clients from the aggressive pursuit of claims.

155.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiff and members of the Class and assuring Defendant Insurers of the placement of business and enabling Broker Defendants to collect Contingent Fees and Wholesale Payments. Specifically these misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

(a)      the broker defendants holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clientele;

(b)      the broker defendants' representations that they work for their clients and not the insurance companies. As one example, Marsh states: "Our guiding principle is to consider our

clients' best interest in all placements. We are our clients' advocates and we represent them in negotiations. We don't represent [insurance companies]";

       (c)    failing to disclose that an integral part of the broker defendants' business philosophy is to promote the interest of insurance companies in order to maximize revenue from contingent commission agreements. Therefore, the broker defendants steer business to favored insurance companies from whom they receive higher fees;

       (d)    failing to disclose the nature of the services the broker defendants provide in order to warrant their commissions;

       (e)    failing to disclose that the broker defendants are directing their clients to insurance companies based not on their merit, but rather on the web of kickbacks and contingent commissions they are able to structure; and

       (f)    contriving, falsifying and/or manipulating insurance bids to create the illusion of a competitive bidding process.

    156.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and plaintiff and members of the Class relied on the misrepresentations and omissions as set forth above.

    157.    As a result, plaintiff and members of the Class have been injured in their business or property by defendants' overt acts of mail and wire fraud and by their aiding and abetting each others' acts of mail and wire fraud in furtherance of the conspiracy.

## C.    PATTERN OF RACKETEERING ACTIVITY

    158.    Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity (*i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343 as described above) within the past ten years.

159.    In fact, each defendant has committed or aided and abetted in the commission of thousands of acts of racketeering activity.

160.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including plaintiff and members of the Class.

161.    The multiple acts of racketeering activity, which defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5).

## D.    RICO VIOLATIONS

162.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...."

163.    Through the pattern of racketeering activity described above, defendants have conducted or participated in the conduct of the affairs of the enterprise.

164.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

165.    Defendants' conspiracy to obtain Contingent Fees and Wholesale Payments by abandoning their legal and contractual duties to plaintiff and the Class, and to conceal their fraudulent scheme as described above accordingly violates 18 U.S.C. §1962(d).

## FRAUDULENT CONCEALMENT

166.    Defendants have affirmatively and fraudulently concealed their unlawful scheme, course of conduct and conspiracy from plaintiff.

- 43 -

167.    Plaintiff had no knowledge of defendants' fraudulent scheme and could not have discovered that defendants' representations were false or that defendants had concealed information and materials until shortly before the filing of this Complaint.

168.    Accordingly, the statute of limitations has been tolled with respect to any claims which plaintiff has brought as a result of the unlawful and fraudulent conduct alleged herein.

### THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

169.    Defendants' fraudulent scheme to obtain Contingent Fees and profit from Wholesale Payments creates an ongoing problem that will continue to cause plaintiff and members of the Class economic losses and threaten their ability to obtain appropriate insurance coverage at a fair price.

170.    A monetary judgment in this case will only compensate plaintiff and members of the Class for past losses. A monetary judgment will not cure the inherent and irreconcilable conflict of interest between the Contingent Fees and Wholesale payments on the one hand and the legal and contractual duties undertaken by defendants as set forth above.

171.    No individual client of any of the defendants has an adequate remedy, either administrative or at law, to recapture future losses associated with defendants' fraudulent conduct, breaches of contract and breaches of fiduciary, and other duties set forth above. The cost of pursuing such claims on an ongoing basis exceeds the amount at issue.

172.    Even a class action such as is asserted in this case is a significant undertaking that cannot be pursued on a regular or ongoing basis.

173.    Because of the need for multiple lawsuits to redress repeated and ongoing wrongs, plaintiff has no adequate remedy at law and would suffer irreparable harm in the absence of injunctive relief.

## CLASS ACTION ALLEGATIONS

174.    Plaintiff brings this action on behalf of itself and, pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B), (b)(2), and/or (b)(3), a nationwide Class consisting of all persons who between August 26, 1994 and the date of Class certification engaged the services of any one of the Broker Defendants or any of their subsidiaries or affiliates to obtain advice with respect to the procurement or renewal of insurance, and who entered into or renewed a contract of insurance with one of the Defendant Insurers. Excluded from the Class are defendants and their officers, affiliates, directors and employees.

175.    All Class members have suffered injury to their business or property by reason of defendants' unlawful conspiracy in restraint of trade, in that they were denied the benefits of fair and open competition.

176.    There are numerous questions of law and fact that are common to the claims of all class members as set forth above, including:

(a)    whether defendants entered into a contract, combination or conspiracy to manipulate the price and other terms of insurance contract bids submitted to plaintiff and Class members and to allocate the market for the sale of insurance;

(b)    whether defendants' contract, combination or conspiracy had the purpose and effect of reducing and unreasonably restraining competition in the sale of insurance;

(c)    the identity of the participants to the contract, combination or conspiracy;

(d)    the duration and extent of the contract, combination or conspiracy alleged in the Complaint;

(e)    the mechanisms used to accomplish the contract, combination or conspiracy;

(f)    whether defendants' conduct violated §1 of the Sherman Act;

- 45 -

(g)    the effect upon and the extent of injuries sustained by plaintiff and Class members;

(h)    the appropriate type and/or measure of damages; and

(i)    whether injunctive relief is necessary to restrain future violations.

177.    All Class members have been damaged by the wrongful conduct of defendants to the extent that, through the Contingent Fees and Wholesale Payments, steering, bid-rigging and/or tying arrangements, defendants have given themselves an incentive to distort the applicable marketplace for insurance products and services, increase premiums paid, fail to reduce such payments, impair coverage for clients, reduce client claims and/or cause clients to be placed with insurers of inferior financial quality or stability and acted on that incentive.

178.    The Class is so numerous that joinder of its members is impracticable.

179.    The exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery.

180.    The Class is ascertainable in that the names and addresses of all Class members can be identified in business records maintained by the defendants.

181.    There are numerous questions of law and fact that are common to the claims of all Class members as set forth above, including:

(a)    whether the Broker Defendants contractually agreed to represent the best interests of their clients in connection with insurance matters;

(b)    whether the Broker Defendants represented and marketed themselves as representing the best interests of their clients in connection with insurance matters;

(c)    whether the Broker Defendants contracted to receive Contingent Fees from insurers based on the volume of business defendants placed with those insurers;

- 46 -

(d)     whether the Broker Defendants further arranged to receive Wholesale Payments from insurers indirectly through affiliated wholesale entities based on the business defendants placed with those insurers;

(e)     whether the Contingent Fees created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(f)     whether the Wholesale Payments created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(g)     whether the Broker Defendants directed their subsidiaries and affiliates to engage in the conduct alleged in this Complaint;

(h)     whether the Broker Defendants fraudulently concealed or failed to disclose the Contingent Fees and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(i)     whether defendants fraudulently concealed or failed to disclose the Wholesale Payments and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(j)     whether defendants' conduct breached their legal and contractual duties to their clients;

(k)     whether defendants engaged in mail and/or wire fraud;

(l)     whether defendants engaged in a pattern of racketeering activity;

(m)     whether the BIE is an enterprise within the meaning of 18 U.S.C. §1961(4);

(n)      whether defendants conducted or participated in the conduct of the affairs of the BIE through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(o)      whether defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(p)      whether defendants' overt and predicate acts in furtherance of a conspiracy and/or aiding and abetting and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to plaintiff's and the Class members' business or property;

(q)      whether plaintiff and the Class are entitled to injunctive, declaratory, and/or other equitable relief;

(r)      whether plaintiff and the Class are entitled to an award of attorneys' fees and expenses against defendants;

(s)      whether the Broker Defendants steered their clients to the Insurance Defendants; and

(t)      whether the Broker Defendants engaged in bid-rigging, involving the use of phony insurance quotes to its clients.

182.    The claims of the representative plaintiff are typical of those of the Class it represents.

183.    Plaintiff's antitrust claims are typical of the claims of Class members. All of the Class members, like plaintiff, sustained antitrust injury as a result of defendants' conspiracy, contract or combination in restraint of trade. Plaintiff and Class members were damaged as a result of purchasing insurance directly from the Insurer Defendants or their co-conspirators at prices that were artificially inflated by the market allocation and bid-rigging scheme.

184.    The claims of the representative plaintiff and the Class members have a common origin and share a common basis. Their claims originate from the same illegal, fraudulent

- 48 -

conspiracy on the part of defendants and defendants' acts in furtherance of that conspiracy, including defendants' own fraudulent conduct. as well as conduct by defendants that aided and abetted the fraudulent conduct of others.

185.    As such, plaintiff has been the victim of one or more of the illegal practices of one or more of the defendants set forth above, including the false representations that defendants would act in the best interest of plaintiff in the procurement of insurance for plaintiff, concealing and failing to disclose the existence, extent and effect of the Contingent Fees and the Wholesale Payments, the conflict of interests that defendants created for themselves through the receipt of those Contingent Fees and Wholesale Payments, steering and bid-rigging.

186.    The named plaintiff states claims for which relief may be granted that are typical of those of the absent Class members.  If brought and prosecuted individually, the claims of each Class member would require proof of the same material and substantive facts, and seek the same relief.

187.    The claims of the named plaintiff are sufficiently aligned with the interests of the absent members of the Class to ensure that the universal claims of the Class will be prosecuted with diligence and care by plaintiff as representative of the Class.

188.    The representative plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the Class.

189.    The representative plaintiff is willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

190.    The interests of the named plaintiff are co-extensive with and not antagonistic to those of the absent Class members.

191.    The named plaintiff has retained the services of counsel indicated below. Said counsel are experienced in complex class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent the named plaintiff and all absent Class members.

192.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B). The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

193.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the Class.

194.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

195.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the Class predominate over any questions affecting only individual members.

196.    Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint in that:

(a)  individual claims by the Class members will be impracticable as the costs of pursuit would far exceed what any one plaintiff or Class member has at stake;

(b)  as a result, very little litigation has been commenced over the controversies alleged in this Complaint and individual members are unlikely to have interest in prosecuting and controlling separate individual actions;

(c)  the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d)  the proposed class action is manageable.

## FIRST CLAIM FOR RELIEF

### (Conspiracy to Violate 18 U.S.C. § 1962(d))

197.  Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

198.  This claim for relief arises under 18 U.S.C. §1964(c).

199.  In violation of 18 U.S.C. §1962(d), defendants have, as set forth above, conspired to violate 18 U.S.C. §1962(c) by conducting or participating in the conduct of the affairs of the BIE through a pattern of racketeering activity.

200.  In violation of 18 U.S.C. §1962(d), defendants have, as set forth above, conducted or participated in the conduct of the affairs of the BIE through a pattern of racketeering activity.

201.  As a direct and proximate result, plaintiff and members of the Class have been injured in connection with their business or property by the predicate acts constituting the pattern of racketeering activity.

202.  Specifically, plaintiff and members of the Class have been injured in their business or property by (i) paying excessive premiums for insurance notwithstanding that defendants undertook to negotiate in their behalf for the best possible terms, and (ii) receiving insurance that was inferior

to other available policies, which they accepted based on recommendations by defendants that were influenced by conflicts of interest.

203.    Defendants are accordingly liable to plaintiff and the Class for three times their actual damages as proved at trial plus interest and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))

204.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

205.    This claim for relief arises under 18 U.S.C. § 1964(c).

206.    In violation of 1962(c), defendants have, as set forth above, conducted or participated in the conduct of the affairs of the BIE through a pattern of racketeering activity.

207.    As a direct and proximate result, plaintiff and members of the Class have been injured in connection with their business or property by the predicate acts constituting the pattern of racketeering activity.

208.    Specifically, plaintiff and members of the Class have been injured in their business or property by (i) paying excessive premiums for insurance notwithstanding that defendants undertook to negotiate on their behalf for the best possible terms, and (ii) receiving insurance that was inferior to other available policies, which they accepted based on recommendations by defendants that were influenced by conflicts of interest.

209.    Defendants are accordingly liable to plaintiff and the Class for three times their actual damages as proved at trial plus interest and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### (Aiding and Abetting)

210.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

211.    This claim for relief arises under 18 U.S.C. §1964(c).

212.    As set forth above, each defendant knowingly and with shared intent sought to and have aided and abetted the other defendants and other parties in the commission of predicate acts in the course of a pattern of racketeering activity and in violation of 18 U.S.C. §1962(c), as described above.

213.    As a result, pursuant to 18 U.S.C. §2, each defendant is liable for the racketeering violations committed by other defendants as if it had committed those violations itself.

214.    As a direct and proximate result of the fact that each defendant aided and abetted other defendants in violations of 18 U.S.C. §1962(c), plaintiff and members of the Class have been injured in connection with their business or property by the predicate acts constituting the pattern of racketeering activity.

215.    Specifically, plaintiff and members of the Class have been injured in their business or property by (i) paying excessive premiums for insurance notwithstanding that defendants undertook to negotiate in their behalf for the best possible terms, and (ii) receiving insurance that was inferior to other available policies, which they accepted based on recommendations by defendants that were influenced by conflicts of interest.

216.    Defendants are accordingly liable to plaintiff and the Class for three times their actual damages as proved at trial plus interest and attorneys' fees.

### FOURTH CLAIM FOR RELIEF

### (Injunctive and Declaratory Relief)

217.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

218.    This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

219.    As set forth in plaintiff's First and Second Claims for Relief and in this Amended Complaint, defendants have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and are expected to do so in the future.

220.    As set forth above, plaintiff has no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

221.    Plaintiff is accordingly entitled to declaratory relief declaring the receipt of Contingent Fees and Wholesale Payments by defendants in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining defendants from further violations of 18 U.S.C. §§1962(c) and (d).

### FIFTH CLAIM FOR RELIEF

### (Agreements in Restraint of Trade)

222.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

223.    Defendants and their co-conspirators have engaged in an unlawful contract, combination or conspiracy in unreasonable restraint of interstate trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1.

224.    Specifically, defendants have fixed, raised, maintained or stabilized at an artificially high level the price paid by plaintiff and Class members for insurance by participating in a bid-rigging and market allocation scheme.

225.    Each of the defendants has engaged in one or more overt acts in furtherance of the unlawful contract, combination or conspiracy. Defendants implemented the unlawful scheme by the following acts, among others:

(a)    agreeing, though the use of collusive fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts for the purpose, and with the effect of, unreasonably restraining trade and commerce;

- 54 -

(b)     agreeing to allocate insurance customers among the Defendant Insurers, denying such customers – such as plaintiff and other members of the Class – the benefits of free and open competition;

(c)     agreeing on the prices and the other terms to be submitted in collusive, fictitious and inflated bids for contracts for insurance; and

(d)     agreeing which Defendant Insurer would supply the "winning" bid for a particular insurance contract.

226.    Defendants' unlawful conspiracy constitutes a *per se* violation of §1 of the Sherman Act, 15 U.S.C. §1.  Alternatively, their conduct violates the Sherman Act under a rule of reason analysis.

227.    Various persons, not named as defendants, participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of that conspiracy.

228.    The aforesaid combination and conspiracy had the following effects, among others:

(a)     price competition among the Defendant Insurers and their co-conspirators for insurance was restrained and suppressed;

(b)     prices paid by plaintiff and Class members for insurance were fixed, raised, maintained or stabilized at artificially high, supra-competitive levels; and

(c)     plaintiff and other members of the Class were deprived of the benefits of free and open competition in the purchase of insurance.

229.    As a direct and proximate result of the contract, combination or conspiracy alleged in this Amended Complaint, plaintiff and other members of the Class were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract – as to the Marsh defendants only)

230.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

231.    Defendants have entered into contracts with plaintiff and members of the Class under which defendants agreed to represent the interests of plaintiff and members of the Class in connection with the procurement of insurance and other insurance-related matters.

232.    Defendants have breached the terms of their contracts with plaintiff and members of the Class.

233.    Plaintiff and members of the Class have been deprived of the benefits of their agreements with defendants.

234.    As a result of defendants' breach of contract, plaintiff and members of the Class have suffered damages.

235.    Defendants are accordingly liable to plaintiff and members of the Class for breach of contract for damages in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

236.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

237.    Because the defendants were fiduciaries of the plaintiff and members of the Class, plaintiff and members of the Class placed confidence and trust in defendants, authorized defendants to exercise discretionary functions for their benefit, and relied on defendants' superior expertise in risk management and the procurement of insurance.

238.    Defendants accepted and solicited that confidence and trust as described above.

239.    As fiduciaries of plaintiff and members of the Class, defendants were obligated to discharge their duties solely in the interests of plaintiff and members of the Class, and specifically to

find the best available coverage at the best price, exercising good faith and fair dealing, full and fair disclosure, care and loyalty to the interests of plaintiff and members of the Class.

240.    Defendants have breached those duties by acting in their own pecuniary interests in disregard of the interests of plaintiff and members of the Class as set forth above.

241.    Defendants are accordingly liable for breach of fiduciary duty to plaintiff and members of the Class for the damages suffered by plaintiff in an amount to be proved at trial.

242.    Plaintiff and members of the Class are further entitled to an accounting by defendants with respect to all Contingent Fees and Wholesale Payments received by defendants.

## EIGHTH CLAIM FOR RELIEF

### (Misrepresentation)

243.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

244.    Defendants, purporting to be acting in the interests of plaintiff and members of the Class, have recommended that plaintiff and members of the Class purchase certain insurance policies from insurers who were paying Contingent Fees and/or Wholesale Payments to defendants.

245.    In reliance upon the recommendations made by defendants, plaintiff and members of the Class purchased insurance policies that required them to pay higher premiums than would have been the case had defendants actually been representing the best interests of plaintiff and members of the Class in connection with their insurance needs.

246.    In reliance upon the recommendations made by defendants, plaintiff and members of the Class purchased insurance policies under terms less advantageous (or from less stable issuers) than would have been the case had defendants actually been representing the best interests of plaintiff and members of the Class in connection with their insurance needs.

247.    In fact, as a result of the incentives created through the Contingent Fees and the Wholesale Payments, defendants were acting in the interests of the insurers who were issuing the policies that defendants were recommending to plaintiff and members of the Class.

248.    Defendants negligently have made material misrepresentations of fact and omissions of material fact to plaintiff and members of the Class in connection with the procurement of insurance policies.

249.    Plaintiff and members of the Class have relied upon the misrepresentations made by defendants as set forth above.

250.    As a result of those misrepresentations, plaintiff and members of the Class have suffered damages, including the payment of inflated premiums and consequential damages as a result of purchasing inferior insurance policies.

251.    Defendants are accordingly liable to plaintiff and members of the Class for negligent misrepresentation for the damages suffered by plaintiff and the Class in an amount to be proved at trial.

## NINTH CLAIM FOR RELIEF

### (Donnelly Act)

252.    Plaintiff incorporate by reference the allegations above as if fully set forth herein.

253.    Defendants' unlawful conduct constitutes a violation of N.Y. General Business Law §340.  Defendants engaged in this conduct in New York.  In so doing, defendants restrained competition and the free exercise of activities in the conduct of business, trade and commerce, and in furnishing of services in New York.

254.    Defendants' restraints of business, trade and commerce have substantially affected business, trade and commerce in the state of New York.

255.    By reason of the foregoing, plaintiff and other members of the Class have sustained an injury to their business or property.

## TENTH CLAIM FOR RELIEF

### (Other State Antitrust Laws)

256.    Plaintiff incorporates by reference the allegations above as if fully set forth herein.

257.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Alabama Code §§8-10-1 *et seq.*

258.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562 *et seq.*

259.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 *et seq.*

260.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §§4-75-309 *et seq.* and Arkansas Stat. Ann. §§4-75-201 *et seq.*

261.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700 *et seq.* and Cal. Bus. & Prof. Code §§17000 *et seq.*

262.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §§4-75-309 *et seq.* and Arkansas Stat. Ann. §§4-75-201 *et seq.*

263.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Colorado Rev. Stat. §§6-4-101 *et seq.*

264.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Connecticut Gen. Stat. §§35-26 *et seq.*

265.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503 *et seq*.

266.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Delaware Code Ann. tit. 6, §§2103 *et seq*.

267.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Florida Stat. §§501.201 *et seq*.

268.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Georgia Code Ann. §§16-10-22 *et seq*. and Georgia Code Ann. §§13-8-2 *et seq*.

269.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Hawaii Rev. Stat. §§480-1 *et seq*.

270.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101 *et seq*.

271.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of 740 Illinois Comp. Stat. §§10/1 *et seq*.

272.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Indiana Code Ann. §§24-1-2-1 *et seq*.

273.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 *et seq*.

274.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq*.

275.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kentucky Rev. Stat. §§367.175 *et seq*., and relief can be granted in accordance with Kentucky Rev. Stat. §446.070.

276.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Louisiana Rev. Stat. §§51:137 *et seq.*

277.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

278.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maryland Code Ann. Title 11, §§11-201 *et seq.*

279.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Massachusetts Ann. Laws ch. 92 §§1 *et seq.*

280.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773 *et seq.*

281.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.52 *et seq.*

282.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§75-21-1 *et seq.*

283.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Missouri Stat. Ann. §§416.011 *et seq.*

284.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Montana Code Ann. §§30-14-101 *et seq.*

285.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 *et seq.*

286.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A *et seq.*

287.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Hampshire Rev. Stat. Ann. §§356:1 *et seq.*

288.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Jersey Stat. Ann. §§56:9-1 *et seq.*

289.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 *et seq.*

290.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

291.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat.. §§75-1 *et seq.*

292.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§51-08.1-01 *et seq.*

293.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §§1331.01 *et seq.*

294.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Oklahoma Stat. tit. 79 §§203(A) *et seq.*

295.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Oregon Rev. Stat. §§646.705 *et seq.*

296.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Pennsylvania common law.

297.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Rhode Island Gen. Laws §§6-36-1 *et seq.*

298.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Carolina. Code §§39-3-10 *et seq.*

299.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.*

300.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

301.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Texas Bus. & Com. Code §§15.01 *et seq.*

302.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911 *et seq.*

303.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 *et seq.*

304.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Virginia Code §§59-1-9.2 *et seq.*

305.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Washington Rev. Code §§19.86.010 *et seq.*

306.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia §§47-18-1 *et seq.*

307.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq.*

308.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wyoming Stat. §§40-4-101 *et seq.*

## ELEVENTH CLAIM FOR RELIEF

### (Deceptive Trade Practices)

309.    Plaintiff incorporates by reference the allegations above as if fully set forth herein.

310.    Defendants' unlawful conduct constitutes a violation of N.Y. General Business Law §349 and §350.  Through such conduct, in which defendants engaged in New York, defendants engaged in unfair acts, false advertising and/or deceptive trade practices in furnishing of services in New York.

311.    Defendants' unfair acts, false advertising and/or deceptive trade practices have substantially affected business, trade and commerce in the state of New York.

312.    By reason of the foregoing, plaintiff and other members of the Class have sustained an injury to their business or property.

## TWELVTH CLAIM FOR RELIEF

### (Other Unfair and Deceptive Practices Statutes)

313.    Plaintiff incorporates by reference the allegations above as if fully set forth herein.

314.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

315.    As a direct result of defendants' anticompetitive, deceptive, unfair, unconscionable and fraudulent conduct, plaintiff and members of the Class were forced to pay higher prices than they would have in the absence of the conspiracy.

316.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. §45.50.471 *et seq.*

317.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §44-1522 *et seq.*

318.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code §4-88-101 *et seq*.

319.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq*.

320.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. §6-1-105 *et seq*.

321.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b *et seq*.

322.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code §2511 *et seq*.

323.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code §28-3901 *et seq*.

324.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq*.

325.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. §10-1-392 *et seq*.

326.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §480 *et seq*.

327.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code §48-601 *et seq*.

328.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS §505/1 *et seq*.

329.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. §50-623 *et seq.*

330.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. §367.110 *et seq.*

331.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. §51:1401 *et seq.*

332.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. §207 *et seq.*

333.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code §13-101 *et seq.*

334.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A *et seq.*

335.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. §445.901 *et seq.*

336.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §8.31 *et seq.*

337.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. §407.010 *et seq.*

338.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code §30-14-101 *et seq.*

339.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq.*

340.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.*

341.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. §358-A:1 *et seq.*

342.    Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Rev. Stat. §56:8-1 *et seq.*

343.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. §57-12-1 *et seq.*

344.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq.*

345.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code §51-15-01 *et seq.*

346.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. §1345.01 *et seq.*

347.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. 15 §751 *et seq.*

348.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605 *et seq.*

349.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. §201-1 *et seq.*

350.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. §6-13.1-1 *et seq.*

351.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws §39-5-10 *et seq.*

352.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. code Laws §37-24-1 *et seq.*

353.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code §47-18-101 *et seq.*

354.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code §17.41 *et seq.*

355.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code §13-11-1 *et seq.*

356.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. §2451 *et seq.*

357.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code §59.1-196 *et seq.*

358.    Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code §19.86.010 *et seq.*

359.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code §46A-6-101 *et seq.*

360.    Plaintiff and members of the class have been injured in their business and property by reason of defendants' unfair or deceptive acts alleged in this Count. Their injury consists of paying higher prices than they would have paid in the absence of the conspiracy. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from defendants' unlawful conduct.

## THIRTEENTH CLAIM FOR RELIEF

### (Unjust Enrichment)

361.    Plaintiff incorporates by reference the allegations above as if fully set forth herein.

362.    Defendants have benefited from their unlawful acts through the overpayments for insurance products by plaintiff and other Class members and the increased profits resulting from such overpayments.  It would be inequitable for defendants to be permitted to retain the benefit of these overpayments, which were conferred by plaintiff and retained by defendants.

363.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to defendants of such overpayments, from which plaintiff and the other Class members may make claims on a *pro rata* basis for restitution, including but not limited to, funds paid by insurers to the brokers.

**WHEREFORE**, plaintiff, OptiCare Health Systems, Inc., demands judgment against defendants as follows:

A.    Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying plaintiff as the representative of the Class, and designating its counsel as counsel for the Class;

B.    A declaration that defendants have committed the violations alleged herein;

C.    On its First Claim for Relief, against defendants jointly and severally in an amount equal to treble the amount of damages suffered by plaintiff and members of the Class as proved by trial plus interest and attorneys' fees and expenses;

D.    On its Second Claim for Relief, against defendants jointly and severally in an amount equal to treble the amount of damages suffered by plaintiff and members of the Class as proved by trial plus interest and attorneys' fees and expenses;

- 69 -

E.      On its Third Claim for Relief, against defendants jointly and severally in an amount equal to treble the amount of damages suffered by plaintiff and members of the Class as proved by trial plus interest and attorneys' fees and expenses;

F.      On its Fourth Claim for Relief for a declaratory judgment declaring the receipt of Contingent Fees and Wholesale Payments by defendants in violation of 18 U.S.C. §§1962(c) and (d) and injunctive relief enjoining defendants from further violations of 18 U.S.C. §§1962(c) and (d);

G.      On its Fifth Claim for Relief, against defendants jointly and severally in an amount equal to treble the amount of damages suffered by plaintiff and members of the Class as proved by trial plus interest and attorneys' fees and expenses;

H.      On its Sixth Claim for Relief, against defendants jointly and severally, the amount of damages suffered by plaintiff and members of the Class as proved by trial plus interest;

I.      On its Seventh Claim for Relief for an accounting by each defendant with respect to all Contingent Fees and Wholesale Payments received by that defendant;

J.      On its Eighth Claim for Relief, against defendants jointly and severally, the amount of damages suffered by plaintiff and members of the Class as proved by trial plus interest; together with such other and further relief as the Court may deem just and proper.

K.      On its Ninth Claim for Relief, against defendants jointly and severally a judgment, for damages sustained by plaintiff and members of the Class, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

L.      On its Tenth Claim for Relief, against defendants jointly and severally a judgment, for damages sustained by plaintiff and members of the Class, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

M.     On its Eleventh Claim for Relief, against defendants jointly and severally a judgment, for damages sustained by plaintiff and members of the Class, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

N.     On its Twelfth Claim for Relief, against defendants jointly and severally a judgment, for damages sustained by plaintiff and members of the Class, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages.

O.     On its Thirteenth Claim for Relief, against defendants jointly and severally, disgorgement of defendants' unjust enrichment;

P.     An injunction preventing defendants from engaging in future anticompetitive practices;

Q.     Costs of this action, including reasonable attorneys fees and expenses; and

R.     Any such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

DATED:  October 19, 2004

Respectfully submitted,

MILBERG WEISS BERSHAD
& SCHULMAN LLP


_____s/ Joseph P. Guglielmo_____
EDITH M. KALLAS (EK-0841)
J. DOUGLAS RICHARDS (JDR-6038)
MICHAEL M. BUCHMAN (MB-1172)
JOSEPH P. GUGLIELMO (JG-2447)
One Pennsylvania Plaza
New York, NY  10119
Telephone:  212/594-5300
212/868-1229 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
THEODORE J. PINTAR
JAMES D. MCNAMARA
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

WHATLEY DRAKE, LLC
JOE R. WHATLEY, JR.
2323 Second Avenue North
Birmingham, AL  35203
Telephone:  205/328-9576
205/328-9669 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

PARRY, DEERING, FUTSCHER
  & SPARKS, PSC
ROBERT P. SPARKS
441 Garrard Street
Covington, KY  41011
Telephone:  859/291-9000
859/291-9300 (fax)

DRUBNER HARTLEY & O'CONNOR
JAMES E. HARTLEY, JR.
500 Chase Parkway, 4th Floor
Waterbury, CT  06708
Telephone:  203/753-9291
203/753-6373 (fax)

Attorneys for Plaintiff

H:\NrPortbl\DOCS\PCARUSO\234322_1.DOC

**EXHIBIT D**

DuaneMorris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
CHICAGO
HOUSTON
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BOSTON
WASHINGTON, DC
ATLANTA
MIAMI
PITTSBURGH
NEWARK
ALLENTOWN
WILMINGTON
HARRISBURG
PRINCETON
WESTCHESTER

JAMES W. CARBIN
DIRECT DIAL: 973.424.2035
E-MAIL: JWCARBIN@DUANEMORRIS.COM

www.duanemorris.com

June 17, 2005

Mr. Michael J. Beck
Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
Room G-255, North Lobby
One Columbus Circle, N.E.
Washington, DC 20002

**Re:**  Notice of <u>Bensley Construction, Inc. v. Marsh & McLennan Companies, Inc., et al.</u>,
C.A. No.: 05-11249-GAO (D.Mass.) as a Tag-Along Action to MDL No. 1663
<u>In re Insurance Brokerage Antitrust Litigation</u>

Dear Mr. Beck:

We are counsel to MetLife, Inc. in the captioned MDL and Bensley litigations.

Pursuant to <u>Rule</u> 7.5(e) of the rules of the Judicial Panel on Multidistrict Litigation (the "Panel"), we submit this letter on behalf of MetLife, Inc., which is a defendant in <u>Bensley Construction, Inc. v. Marsh & McLennan Companies, Inc., et al.</u>, Civil Action No. 05-11249-GAO, pending in the United States District Court for the District of Massachusetts ("<u>Bensley</u>"). We are writing to notify you that <u>Bensley</u> is a tag-along action to MDL No. 1663, <u>In re Insurance Brokerage Antitrust Litigation</u> ("MDL 1663").

<u>Bensley</u> involves common questions of fact and law with other actions previously transferred in MDL 1663 and is therefore a tag-along action within the meaning of <u>Rule</u> 1.1 of the Rules of the Panel. We enclose a copy of the <u>Bensley</u> original Class Action Complaint and First Amended Class Action Complaint, which were filed in Massachusetts Superior Court and removed to United States District Court. Much like the actions previously transferred by the Panel, <u>Bensley</u> alleges that defendants have unlawfully "reduced competition among insurance brokers and insurance carriers and caused Plaintiffs and the other members of the Class . . . to pay more for Insurance Products . . ." (<u>Bensley</u> First Amended Complaint¶2. <u>Bensley</u> alleges that this was done through a conspiracy to "allocat[e] the market" by "steer[ing]" customers (<u>id.</u> ¶¶103(b) & 62) by means of "undisclosed Contingent Commission Agreements" (<u>id.</u> ¶65), and in some instances "colluding . . . to rig bids and submit false quotes" (<u>id.</u> ¶63). These are substantively the same allegations that prompted the Panel to transfer the actions in MDL 1663.

DUANE MORRIS LLP    A DELAWARE LIMITED LIABILITY PARTNERSHIP                    WALTER J. GREENHALGH, RESIDENT PARTNER

744 BROAD STREET, SUITE 1200   NEWARK, NJ 07102-3889                         PHONE: 973.424.2000   FAX: 973.424.2001
NWK\108897.1

Duane Morris

Mr. Michael J. Beck
Clerk of the Panel
Judicial Panel on Multidistrict Litigation

June 17, 2005
Page 2

See MDL 1663 Transfer Order, Feb. 17, 2005 ("All [transferred] actions are purported class actions involving allegations that common defendants and/or their alleged co-conspirators have engaged in a combination and conspiracy to affect the sale of insurance . . . by rigging bids and allocating customers"); see also, e.g., Opticare Health Sys. v. Marsh & McLennan Cos., Inc., et al., C.A. No. 1;04-6954 (S.D.N.Y.), Complaint ¶1 (transferred to MDL 1663 on Feb. 17, 2005; alleging "steer[ing]" involving "contingent commission" agreements and "bid-rigging," both allegedly resulting in sale of insurance at "above-market rates").

The allegations of Bensley are also closely similar to those in Palm Tree Computers, Inc., et al. v. ACE USA, et al., No. 6:05-422 (M.D. Fla.) ("Palm Tree"), which was conditionally transferred to the District of New Jersey by Conditional Transfer Order No. 3 in MDL 1663. The same law firm represents plaintiffs in both Bensley and Palm Tree, the allegations of the original Complaint in Bensley are nearly identical to those of Palm Tree, Bensley was filed the day after Palm Tree was filed, and many of the same entities are named as defendants.

The discovery in this tag-along case will be very similar to that in the MDL.

For these reasons, we request the Panel transfer Bensley to the District of New Jersey for assignment to the Honorable Faith S. Hochberg for coordinated or consolidated pretrial proceedings as part of MDL 1663. Thank you for your attention to this matter. Please contact the undersigned if you require any additional information.

Sincerely,

/s/ James W. Carbin /dmn

James W. Carbin

JWC:dmn
Cc:     All counsel on the attached list
Encl.

EXHIBIT E

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA,
ORLANDO DIVISION

PALM TREE COMPUTERS SYSTEMS,
INC., DELTA RESEARCH INSTITUTE,
INC., on their behalf and on behalf of all
others similarly situated

          Plaintiffs,

          v.

ACE USA, ACE INA, AMERICAN
INTERNATIONAL GROUP, AON
CORPORATION, AMERICAN RE-
INSURANCE COMPANY, AON
BROKERS SERVICES, INC., AON RISK
SERVICES COMPANIES, INC., AON
RISK SERVICES INC. U.S., AON
GROUP, INC., AON SERVICES GROUP,
INC., ARTHUR J. GALLAGHER & CO.,
WILLIS GROUP HOLDINGS LTD.,
WILLIS NORTH AMERICA, INC.,
WILLIS GROUP LTD., UNIVERSAL
LIFE RESOURCES, UNIVERSAL LIFE
RESOURCES, INC. d/b/a ULR
INSURANCE SERVICES, INC., THE
CHUBB CORPORATION, THE
HARTFORD FINANCIAL SERVICES
GROUP, INC., HARTFORD FIRE
INSURANCE COMPANY, HARTFORD
INSURANCE CO. OF THE
SOUTHEAST, HARTFORD
UNDERWRITERS INS. CO., USI
HOLDINGS, INC., METLIFE, INC.,
PRUDENTIAL FINANCIAL, INC.,
FIRST MARKET INTERNATIONAL,
INC., and UNUMPROVIDENT
CORPORATION,

          Defendants.

Civil Action No. 6:05-cv-00422-ACC-
JGG

**THE HARTFORD DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO THE CHUBB CORPORATION'S MOTION TO REMAND**

{OR887156;1}

Defendants The Hartford Financial Services Group, Inc., Hartford Fire Insurance Company, the Hartford Insurance Company of the Southeast, and the Hartford Underwriters Insurance Company (collectively, "The Hartford") respectfully submit this Memorandum of Law in Opposition to The Chubb Corporation's ("Chubb") Motion to Remand ("Remand Mot.").

## PRELIMINARY STATEMENT

Chubb's remand motion rests on the mistaken notion that this case should be sent back to state court merely because Chubb, a defendant, does not join in removal. Chubb is wrong. Under the special removal provisions of the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p(c) and 78bb(f)(2) ("SLUSA"), applicable here, covered class actions like this case must be litigated in federal court. No defendant can veto removal. Moreover, even if the general removal rules applied, Chubb's objection to removal would be untimely. Chubb's motion also fails because the only defendants that must join in a notice of removal under the general removal statutes are those—unlike Chubb—already served when the removal notice is filed.

The Complaint in this action (the "Complaint") was filed on February 16, 2005 in Florida state court. It asserts fraud allegations on behalf of a vast class of purchasers of virtually every known insurance product. Among such products are variable life insurance and variable annuity contracts, "covered securities" under SLUSA, the inclusion of which renders this action removable under SLUSA. The Hartford accordingly filed a Notice of Removal (the "Notice") under SLUSA on March 18, 2005, before any Defendant had been served.

Chubb's motion, filed on April 26, 2005, does not contest that variable life insurance and variable annuities are encompassed by the Complaint, rendering SLUSA applicable to this case. Indeed, Chubb does not mention SLUSA at all. Chubb instead seeks to remand solely by

invoking the so-called "unanimity rule" of the general removal statute, a procedural requirement that certain defendants in a multi-defendant case must join in the removal notice. That rule, however, does not control here, for three reasons.

*First*, the unanimity rule does not apply at all in cases removed under SLUSA. The unanimity rule was created by courts interpreting the general removal statute, and thus does not apply when there is an "[i]ndependent statutory basis for removal." 16 James Wm. Moore et al., *Moore's Federal Practice* § 107.11[1][d], at 107-41 (3d ed. 2005). SLUSA provides just such an independent statutory basis for removal. Under SLUSA, "*[n]o covered class action* based upon the statutory or common law of any State . . . *may be maintained in any State . . . court* . . . ," and "*[a]ny covered class action* brought in any State court involving a covered security . . . *shall be removable . . .*" 15 U.S.C. §§ 77bb(f)(1) & (2) (emphasis added). SLUSA's mandate that a covered class action must be litigated in federal court defeats Chubb's effort to remand this case to state court.

*Second*, even if the general removal statute were to control here, Chubb's remand motion would be barred as untimely. 28 U.S.C. § 1447(c) requires that a remand motion "on the basis of any defect other than lack of subject matter jurisdiction ***must** be made within 30 days after the filing of the notice of removal . . . .*" (Emphasis added.) Chubb's motion, which does not challenge this Court's subject matter jurisdiction under SLUSA, was filed 39 days after the Notice was filed.

*Third*, the unanimity rule does not apply when "the non-consenting defendants had not been served with process at the time the notice of removal was filed." *Bradwell v. Silk Greenhouse, Inc.*, 828 F. Supp. 940, 943 n.2 (M.D. Fla. 1993). Chubb concedes that it had not

been served when the Notice here was filed.  Chubb's objection to removal accordingly provides

no basis for remand.

     For each of these reasons, Chubb's motion should be denied.

## FACTS

     The Complaint in this case was filed on February 16, 2005, in Seminole County, Florida.

It asserts claims under the laws of all 50 states on behalf of a putative global class of insurance

purchasers based on the alleged failure of insurance brokers and carriers to disclose certain

commission arrangements and the alleged rigging of certain bids for insurance policies.

(Complaint *passim*.)  Class members allegedly include all purchasers of "insurance products"

from 1994 to the present.  (*Id.* ¶ 164.)  "Insurance products" are defined as a broad list of

personal, commercial, property and casualty, life and other forms of insurance.  (*Id.* ¶ 31.)  No

type of insurance is specifically excluded.

     The Hartford removed the case on March 18, 2005.  (*See* Notice at 10.)  As shown in the

Notice, SLUSA compels removal because the Complaint asserts misrepresentations or omissions

in connection with the sale of products—variable life insurance and variable annuities—that are

"covered securities" under SLUSA.  (*Id.* at 2-7.)  Plaintiffs moved to remand the case on April 1,

2005, and The Hartford filed its opposition on April 18, 2005, along with a motion to stay the

proceedings pending transfer of this case to the United States District Court for the District of

New Jersey by the Judicial Panel on Multidistrict Litigation (the "MDL Panel").  Both motions

are *sub judice* as of the date of this filing.

     When The Hartford filed its Notice, no Defendant had been served with the Complaint.

(*Id.* ¶¶ 19, 20.)  Indeed, according to Plaintiffs' Proofs of Service, the first Defendant was not

served until April 11, 2005, almost a month after the Notice was filed.  (*See* Notice of Service of

{OR887156;1}

Process served by certified mail on American Re-Insurance Company on April 11, 2005.)

Chubb itself admits it was not served until April 19, 2005 (Remand Mot. ¶ 6, at 3), and it filed

the present motion on April 26, 2005 (*id.* at 9), 39 days after the Notice was filed.

Chubb's sole argument in favor of remand is that "Chubb, a party defendant, does not

consent to . . . removal." (*Id.* at 4-7.) Nowhere does Chubb contest that SLUSA properly applies

and confers federal subject matter jurisdiction in this case.

## ARGUMENT

### I.    SLUSA Renders Chubb's Objection To Removal Irrelevant

Though Chubb maintains that remand is required under the unanimity rule, Chubb utterly

fails to address SLUSA, which, like other special removal statutes, permits removal

notwithstanding the objection of a co-defendant.

SLUSA makes it unlawful for "covered class actions" like this one to proceed in state

court under any circumstances: "No covered class action based upon the statutory or common

law of any State . . . may be maintained in any State . . . court . . . ." 15 U.S.C. § 77bb(f)(1).

SLUSA further commands that such actions are absolutely removable to federal court: "Any

covered class action brought in any State court involving a covered security . . . shall be

removable . . . ." 15 U.S.C. § 77bb(f)(2). Nowhere does SLUSA predicate removal on any

defendant's consent, much less upon the unanimous consent of all defendants. Nor does any

reported case of which The Hartford is aware condition removal under SLUSA on the consent of

all defendants—with good reason. The unanimity rule is inconsistent with SLUSA's terms.

SLUSA on its face prohibits covered class actions from being litigated in state court altogether,

and provides no exception for situations where a party does not consent.

{OR887156;1}

That a defendant's objection to removal is irrelevant under SLUSA is consistent with the hornbook law that an "[i]ndependent statutory basis for removal does not require that all defendants join when removal is specifically authorized by statute." 16 *Moore's Federal Practice* § 107.11[1][d], at 107-41; *see also* 14C Charles Alan Wright & Alan R. Miller, *Federal Practice & Procedure Jurisdiction* § 3731, at 265-66 (3d ed. 2004) ("[W]hen removal of a case is pursuant to a special removal statute that so provides, all defendants may not be required to join in the notice of removal."). For instance, co-defendants may not object to removal under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides that "[a] civil action or criminal prosecution commenced in a State court against any of the following may be removed by . . . The United States or any agency thereof or any officer (or any person acting under that officer) . . . ." As the Tenth Circuit held in *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034-35 (10th Cir. 1998), "[t]he Congressional policy permitting federal officer removal could easily be frustrated by simply joining non-federal defendants unwilling to remove if consent of co-defendant(s) were required." The same reasoning has led courts to permit removal notwithstanding a defendant's objection under the bankruptcy removal statute, the FSLIC statute, and other special removal statutes. *See, e.g., Sommers v. Abshire*, 186 B.R. 407, 408, 409 (E.D. Tex. 1995) (holding that "bankruptcy removal statute does not require that all defendants join in the removal of a state court proceeding"); *Davis v. Federal Savings and Loan Ins. Corp.*, 879 F.2d 1288, 1289 (5th Cir. 1989) (removal proper under FSLIC statute where removal petition was not joined by all named defendants); *Fabe v. Aneco Reinsurance Underwriting Ltd.*, 784 F. Supp. 448, 452 (S.D. Ohio 1991) (agent of foreign state properly removed under removal provision of Foreign Sovereign Immunities Act of 1976 despite failure of other named defendant to join in removal papers).

Such reasoning is even more compelling with respect to SLUSA. Unlike other special removal statutes (which state that actions "may" be removed), SLUSA categorically prohibits removable actions from going forward in state court. So SLUSA, unlike the special removal statutes listed above, does not even allow the option of proceeding with the action in state court. Given Congress's mandate that covered class actions proceed only in federal court, it would certainly be contrary to the letter and spirit of SLUSA to allow one defendant, like Chubb, nonetheless to insist that a removed action be remanded to state court.

Nor under SLUSA is there any need for the unanimity rule, which was created by the Supreme Court under the general removal provision of 28 U.S.C. § 1441(a) ("Section 1441(a)") to prevent one or more defendants from removing a case while others remain in state court, thereby forcing a plaintiff to litigate in two fora. *See Chicago, Rock Island & Pacific Railway Co. v. Lissa Martin*, 178 U.S. 245, 248 (1900) (adopting unanimity requirement because "[a] defendant has no right to say that an action shall be several which a plaintiff elects to make joint"); *see also Doe v. Kerwood*, 969 F.2d 165, 167 (5th Cir. 1992) (same). SLUSA, however, does not present a risk of such claim splitting, since it mandates that all covered class actions must proceed in federal court. There accordingly is no need for the unanimity rule under SLUSA, even if, contrary to fact, SLUSA's terms permitted it.

In sum, SLUSA is a special removal statute that mandates the removal of covered class actions notwithstanding any party's objection. Chubb does not contest that this is a covered class action subject to removal under SLUSA. Chubb's motion consequently should be denied for this reason alone.

II.    **Chubb's Remand Motion Is**
       **Untimely Under 28 U.S.C. § 1447(c)**

Chubb's remand motion should also be denied because even if the general removal

provisions applied here, Chubb's motion would be untimely.

Section 1447(c) provides:  "A motion to remand the case on the basis of any defect other

than lack of subject matter jurisdiction *must be made within 30 days after the filing of the notice*

*of removal . . . .*"  (Emphasis added.)  Chubb's motion to remand is not predicated on an asserted

lack of subject matter jurisdiction; to the contrary, the unanimity rule is a purely procedural

matter that has nothing to do with jurisdiction,[1] which renders Chubb's motion subject to the 30-

day time limit of Section 1447(c).  Chubb further concedes that its motion was filed more than

30 days after the Notice was filed.  (Remand Mot. at 5.)  That should be the end of the matter:

Chubb's motion is untimely under the plain language of Section 1447(c).  *Hughes Aircraft Co. v.*

*Jacobson*, 525 U.S. 432, 438 (1999) ("[O]ur analysis begins with the language of the statute.

And where the statutory language provides a clear answer, it ends there as well.").

Despite the plain language of Section 1447(c)—which requires non-jurisdictional remand

motions within 30 days after a notice of removal is *filed*—Chubb maintains that it timely filed its

motion on April 26, 2005, because the 30-day time limit should run from the date Chubb was

*served* with the Complaint on April 19, 2005.  (Remand Mot. at 5.)  In support of its theory,

Chubb says that commencing the 30-day clock on the date the Notice was filed would effectively

deprive later-served defendants like Chubb of the right to seek remand under 28 U.S.C. § 1448,

---

[1] *Russell Corp. v. American Home Assur. Co.*, 264 F.3d 1040, 1044 (11th Cir. 2001) (challenge
to removal based on "the unanimity requirement 'is clearly based on a defect in the removal
process,'" and does not go to subject matter jurisdiction) (quoting *In re Bethesda Mem'l Hosp.*
*Inc.*, 123 F.3d 1407, 1410 & n.2 (11th Cir.1997)); *see also McMahon v. Bunn-O-Matic Corp.*,
150 F.3d 651, 653 (7th Cir. 1998) (alleged failure of co-defendants to consent to removal is a
procedural defect).

because Chubb was served with the Complaint more than 30 days after the Notice was filed, and no party has an obligation to act in a matter until it is served with the complaint.  (Remand Mot. at 6.)

The inconsistency Chubb posits does not exist, however.  There is no conflict between, on the one hand, the 30-day time limit for filing non-jurisdictional challenges to removal and, on the other hand, the preservation of a later-served defendant's opportunity to seek remand under Section 1448.  Read in tandem, these rules merely bar a later-served defendant from challenging the non-jurisdictional aspects of a removal notice, while preserving that defendant's ability to seek remand on jurisdictional grounds.

This result is consistent not only with the plain language of Section 1447(c) (wholly ignored by Chubb), but also with the underlying purposes of the 30-day time limit in Section 1447(c).  The 30-day period is intended to settle the forum for the litigation as early as possible in the life of the case, as expressly set out in the House Report accompanying Section 1447(c): "[s]o long as the defect in removal procedure does not involve a lack of federal subject matter jurisdiction, there is no reason why either State or Federal courts, or the parties, should be subject to the burdens of shuttling a case between two courts that each have subject matter jurisdiction."  H.R. Rep. No. 100-889, at 72 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5982, 6033; *see also In re Bethesda Mem'l Hosp.*, 123 F.3d 1407, 1410 (11th Cir. 1997) (Section 1447(c) was intended to prevent "shuffling of cases of cases between state and federal court after the first thirty days based on purely procedural defects"); *Federal Deposit Ins. Corp. v. Loyd*, 955 F.2d 316, 322 (5th Cir. 1992) ("The purpose of the thirty-day requirement [of § 1447(c)] is to ensure that procedural defects be raised, if raised at all, within thirty days of removal in order to ensure timely consideration by the district court, thereby minimizing the burdens on all parties and the

{OR887156;1}

courts involved."); *Schmude v. Sheahan*, 198 F. Supp. 2d 964, 968 (N.D. Ill. 2002) ("procedural

defects in removal must be resolved quickly or not at all") (citing *In re Continental Cas. Co.*, 29

F.3d 292, 294-95 (7th Cir.1994)).

Chubb's reading of Section 1447(c) would subject the courts and the parties to precisely

the risk the 30-day time limit was designed to avoid.  Under Chubb's view, a new defendant

added to the case months or years after removal could still seek remand within 30 days of being

served with the complaint, based solely on a procedural defect in the notice of removal.  Remand

in that instance would impose substantial costs on both the federal court that had been presiding

over the matter (in terms of time wasted in mastering the case), and on the state court to which

the case would be remanded (which would have to learn the advanced proceedings from scratch).

It would also impose similar costs on the parties.  There is no practical basis for such a reading of

Section 1447(c), even if that reading could be squared with the statute's plain text.

Nor is it unfair to Chubb or other later-served defendants to bar them from challenging

the procedural aspects of removal, as Chubb implies.  As Section 1448 indicates, later-served

defendants are merely treated "as in cases originally filed in . . . district court."  *See* 14C *Federal

Practice & Procedure* § 3738, at 390-91 ("After the removal of an action from state court, the

federal district court acquires full and exclusive subject matter jurisdiction over the litigation.

The case will proceed as if it had been brought in the federal court originally.").  Put differently,

Chubb is in no worse a position than if it had been named as a defendant in a case originally filed

in federal court, which of course would provide no opportunity to challenge procedural defects in

removal.

None of the cases Chubb cites is on point.  Thus:

- In *Hanken v. Credit Bureau of Kalispell, Inc.*, No. CV 00-99-M-DWM, 2000 WL 1375260 (D. Mont. Sept. 20, 2000) (cited at page 5 of Chubb's motion), the court

granted remand where certain previously served defendants had failed to join in removal, and the removing defendants had failed to respond to the remand motion of certain defendants. Nothing in this case supports Chubb's proposed reading of Section 1447(c).

- Chubb cites *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999) (at pages 5-7 of Chubb's motion), for the uncontroversial proposition that "'[a]n individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process.'" (Remand Mot. at 6 (quoting *Murphy Bros*).) But nothing about Section 1447(c)'s 30-day clock *requires* a party to engage in litigation before service. It merely provides a point of repose beyond which defects in removal procedure may not be raised, much as a statute of limitations provides a point of repose on the merits of a claim.

- In *Hooper v. Albany Int'l Corp.*, 149 F. Supp. 2d 1315 (M.D. Ala. 2001) (cited at page 5 of Chubb's motion), a defendant served with the complaint after removal filed a statement that it consented to removal. Plaintiff argued that the case should be remanded because the later-served defendant did not join the original notice at the time it was filed. The court rejected the argument and denied remand, noting in passing *dicta*, in a footnote, that the later-served defendant had the choice to "either 'accept the removal or exercise [its] right to choose the state forum by making a motion to remand,'" *id.* at 1319 n.2, and that, in this instance, the defendant had joined in removal. The court's summary of the later-served defendants' options merely parrots what Section 1448 provides on its face. The court's opinion says nothing about what grounds a remand motion may invoke if it is made more than 30 days after removal.

- In *Creekmore v. Food Lion, Inc.*, 797 F. Supp. 505 (E.D. Va. 1992) (cited at page 5 of Chubb's motion), the removal notice asserted that two defendants, one served at the time of removal and one not, consented to removal, but neither defendant signed the removal notice nor submitted a separate document stating its consent. The court held that the statement in the notice that the co-defendants consented was insufficient. In analyzing the question, the court stated in passing *dicta*, again in a footnote, that only the consent of the served defendant was actually necessary, and, confusingly, that the later served defendant "had 30 days from the time it was served to move to remand the case" under 28 U.S.C. § 1448. *Id.* at 509 n.6. Not only is this statement utterly irrelevant to the issue the court was examining, but it is also widely off-mark; first, a defendant is only bound by Section 1447(c)'s 30-day clock with respect to motions to remand based on procedural defects in removal; and, second, the 30-day clock runs from the filing of the notice of removal, not from service on the defendant.

Chubb's motion accordingly is untimely under Section 1447(c). For that reason alone, Chubb's motion should be denied.

{OR887156;1}

III.    **The Consent of Defendants Served**
        **After A Notice Of Removal Is Filed**
        **Is Not Required**

Chubb's motion fails for a third independent reason:  even under the general removal statutes, the unanimity rule does not require the consent of defendants served after the notice of removal is filed.  Chubb was not served when the Notice here was filed, so its lack of consent is irrelevant.

As this Court and others have recognized, the unanimity rule does not apply where "'the non-consenting defendants had not been served with process at the time the notice of removal was filed.'" *Diebel v. S.B. Trucking Co.*, 262 F. Supp. 2d 1319, 1329 (M.D. Fla. 2003) (quoting *Bradwell v. Silk Greenhouse, Inc.*, 828 F. Supp. 940, 943 n.2 (M.D. Fla. 1993)); *see also Lewis v. Rego Co.*, 757 F.2d 66, 68 (3d Cir. 1985); *Barnes v. Cathers & Dembrosky*, No. 02CV5296(RO), 2003 WL 22928640, at *2 (S.D.N.Y. Dec. 10, 2003) ("One exception to the unanimity rule is that a defendant who has not yet been served is not required to join in the notice of removal."); *Liebau v. Columbia Cas. Co.*, 176 F. Supp. 2d 1236, 1243 (D. Kan. 2001) (same).  Chubb acknowledges this exception to the unanimity rule.  (Remand Mot. at 4.)  Nonetheless, Chubb implicitly seems to maintain that defendants served after removal still may invoke their own lack of consent in order to send a removed case back to state court.  (*See id.*)

Chubb cites no case in support of this proposition, and The Hartford is aware of none. Post-removal events—like the service of additional defendants—should not affect the validity of removal.  *Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939) (validity of removal determined "at the time of the petition for removal"); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1097 n.13 (11th Cir. 1994) (in evaluating remand, "facts are assessed on the basis of plaintiff's complaint *as of the time of removal*") (emphasis in original); *see also, e.g., Vera v. Saks & Co.*, 335 F.3d 109, 116 n.2 (2d Cir. 2003) ("[W]e generally evaluate a defendant's right to remove a case to federal

{OR887156;1}

court at the time the removal notice is filed."); *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 265 (5th Cir. 1995) ("'[P]ost-removal events cannot deprive a court of jurisdiction once it has attached.'") (citation omitted).

The reason for this rule is straightforward. Without such a rule, "disposition of the issue would never be final, but would instead have to be revisited every time" something new happened after removal. *Cavallini*, 44 F.3d at 264. Focusing solely on the state of the record at the time of removal thus "permits early resolution of which court has jurisdiction, so that the parties and the court can proceed with, and expeditiously conclude, the litigation." *Id.*

Chubb's proposed interpretation of the unanimity rule would certainly undermine these goals. New defendants served months or even years after a case is removed would be able to upset a settled forum at substantial cost to the courts and the parties. Accordingly, even if Chubb's motion had been timely, the unanimity rule would not undermine removal, and Chubb's motion should be denied for that reason as well.

## IV.    This Case Should Be Stayed Pending Transfer By The Judicial Panel On Multidistrict Litigation

Aside from arguing that this case should be remanded, Chubb separately maintains that the "Court should not stay the action but should decide Chubb's motion to remand" (Remand Mot. at 7-8), in response to The Hartford's April 18, 2005 motion to stay this action pending transfer to the District of New Jersey by the MDL Panel. Chubb's only argument, however, is that subject matter jurisdiction should be determined at an early stage of litigation. (Remand Mot. at 8.) But Chubb does not contest subject matter jurisdiction in this case under SLUSA, as shown above. Further, as shown in The Hartford's memorandum of law in support of its stay application, to the extent plaintiffs here challenge SLUSA's scope and reach in their remand motion, those arguments present questions of interest to many participants in the MDL cases.

{OR887156;1}

(*See* April 18, 2005 Memorandum of Law in Support of The Hartford's Motion to Stay

Proceedings Pending Determination of Transfer by the Judicial Panel on Multidistrict Litigation,

at 8-10.)  Accordingly, a stay pending transfer to the MDL judge so that she may consider those

arguments would be the most efficient result for all parties concerned.

## CONCLUSION

For the foregoing reasons, Chubb's motion to remand this action should be denied.


OF COUNSEL:

ANDREA J. ROBINSON, ESQUIRE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

PAUL A. ENGELMAYER, ESQUIRE
ROBERT W. TRENCHARD, ESQUIRE
ROBIN L. ALPERSTEIN, ESQUIRE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

    /s/ Virginia B. Townes
James E. Foster, Esquire
Florida Bar Number:  142015
Virginia B. Townes, Esquire
Florida Bar Number: 361879
AKERMAN SENTERFITT
Post Office Box 231
255 South Orange Avenue
Orlando, FL  32802-0231
Phone:  (407) 843-7860
Fax:    (407) 843-6610
Email:  james.foster@akerman.com
       virginia.townes@akerman.com


Counsel for Defendants,
THE HARTFORD FINANCIAL SERVICES
GROUP, INC.; HARFORD FIRE
INSURANCE COMPANY; HARFORD
INSURANCE CO. OF THE SOUTHEAST;
and HARTFORD UNDERWRITERS INS.
CO.

{OR887156;1}

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 13, 2005, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECT system which will send a notice of electronic filing to

the following:

**Kenneth G. Gilman, Esquire**
Newgate Tower, Suite 602
5150 North Tamiami Trail
Naples, Florida 34103

**David Hughes Harris, Esquire**
Goldstein, Buckley, Cechman, Rice & Purtz, P.A
1515 North Broadway
Fort Meyers, FL 33902.

**Marvin Barkin, Esquire**
Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.
101 E. Kennedy Blvd, Suite 2700
P.O. Box 1102
Tampa, FL 33601-6553

**Dustin D. Deese, Esquire**
Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.
101 E. Kennedy Blvd, Suite 2700
P.O. Box 1102
Tampa, FL 33601-6553

**Martin B. Unger, Esquire**
The Unger Law Group, P.L.
P.O. Box 4909
Orlando, FL 32802-4909

**Christopher Gilbert, Esquire**
The Unger Law Group, P.L.
P.O. Box 4909
Orlando, FL 32802-4909

**Timon V. Sullivan, Esquire**
Ogden & Sullivan, P.A.
113 S. Armenia Ave.
Tampa, FL 33609-1006

{OR887156;1}

Service by United States Mail, first-class postage pre-paid, was made upon:

**Douglas S. Eakeley, Esquire**
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, N.J. 07068

**Leslie M. Smith, Esquire**
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

**Joseph Angland, Esquire**
Dewey Ballantine, LLP
1301 Avenue of the Americas
New York, NY 10019

**Richard C. Pepperman, II, Esquire**
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

**Ned Gelhaar, Esquire**
Hancock Rothert & Bunshoft, LLP
515 South Figueroa Street, 17th Floor
Los Angeles, CA 90071

this 13th day of May, 2005.

　　　　　　　　　　　　　／s／ Virginia B. Townes
　　　　　　　　　　　Virginia B. Townes, Esquire

EXHIBIT F

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| PALM TREE COMPUTERS SYSTEMS, INC., DELTA RESEARCH INSTITUTE, INC., on their behalf and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>– v –<br><br>ACE USA, ACE INA, AMERICAN INTERNATIONAL GROUP, AON CORPORATION, AMERICAN REINSURANCE COMPANY, AON BROKERS SERVICES, INC., AON RISK SERVICES COMPANIES, INC., AON RISK SERVICES INC. U.S., AON GROUP, INC., AON SERVICES GROUP, INC., ARTHUR J. GALLAGHER & CO., WILLIS GROUP HOLDINGS LTD., WILLIS NORTH AMERICA, INC., WILLIS GROUP LTD., UNIVERSAL LIFE RESOURCES, UNIVERSAL LIFE RESOURCES, INC. d/b/a ULR INSURANCE SERVICES, INC., THE CHUBB CORPORATION, THE HARTFORD FINANCIAL SERVICES GROUP, INC., HARTFORD FIRE INSURANCE COMPANY, HARTFORD INSURANCE CO. OF THE SOUTHEAST, HARTFORD UNDERWRITERS INS. CO., USI HOLDINGS, INC., METLIFE, INC., PRUDENTIAL FINANCIAL, INC., FIRST MARKET INTERNATIONAL, INC., and UNUMPROVIDENT CORPORATION,<br><br>Defendants. | No. 6:05-cv-00422-ACC-JGG |

**DEFENDANT METLIFE, INC.'S MEMORANDUM IN OPPOSITION TO
DEFENDANT THE CHUBB CORPORATION'S MOTION TO REMAND**

**TABLE OF CONTENTS**

BACKGROUND ........................................................................................................1

ARGUMENT ..........................................................................................................3

   I.  Remand Should Be Denied for the Reasons Stated by the Hartford Defendants
      Because the Case Is Properly in Federal Court Under SLUSA. ...........................3

   II. In Any Event, Remand Is Inappropriate Based on MetLife, Inc.'s
       Supplemental Grounds for Removal Under CAFA. ...............................................4

CONCLUSION ........................................................................................................8

## INTRODUCTION

Defendant MetLife, Inc. submits this memorandum in opposition to the motion filed by Defendant The Chubb Corporation ("Chubb") seeking to remand the case to the Circuit Court for the Eighteenth Judicial Circuit in and for Seminole County, Florida.

For the reasons previously stated by the Hartford Defendants,[1] the Court should stay this action pending transfer to the District of New Jersey by the Judicial Panel on Multidistrict Litigation (the "MDL Panel"), as the United States District Judge in the transferee district is fully competent to consider any issues raised by the motions to remand filed by Plaintiffs and by Chubb. But regardless of whether this Court or the transferee judge considers the pending motions to remand, remand should be denied.

Remand is inappropriate not only for the reasons stated by the Hartford Defendants in their papers, but also for the additional reason that the action is removable under the Class Action Fairness Act of 2005. That recently enacted statute provides that a class action is removable by any defendant without the need for complete diversity of citizenship, regardless of the involvement of covered securities, and without the need for other defendants to join.

## BACKGROUND

On February 16, 2005, Plaintiffs filed this purported nationwide class action in Seminole County Circuit Court, alleging antitrust and other claims under the laws of all 50

---

[1]    The "Hartford Defendants" are The Hartford Financial Services Group, Inc., Hartford Fire Insurance Company, Hartford Insurance Company of the Southeast, and Hartford Underwriters Insurance Company.

states and the District of Columbia.  The Complaint seeks certification of a class of "All persons or entities that purchased insurance products and services from Defendants during the period from January 1, 1994 to the present."  (Complaint ¶ 164.)

Two days after Plaintiffs filed their complaint, President Bush signed into law the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (Feb. 18, 2005) ("CAFA"). Among other things, CAFA amends 28 U.S.C. § 1332 to provide, in a new subsection (d), for federal district court jurisdiction over class actions in which the classwide amount in controversy exceeds $5,000,000 as long as minimal diversity of citizenship is present.  It also adds a new 28 U.S.C. § 1453, explicitly providing that any defendant can remove a class action without the consent of other defendants.  CAFA provides that it applies to cases that have been "commenced" after the date of enactment of the act—language that has been interpreted, in a closely related context, to mean that a newly enacted jurisdictional statute applies to cases first removed to federal court after enactment.

One month later, Plaintiffs still had not served process on any of the Defendants. Nevertheless, the Hartford Defendants filed a notice of removal on the ground that the action was removable under an older statute, the Securities Litigation Uniform Standards Act of 1988, Pub. L. No. 105-353, 112 Stat. 3227 (1988), *codified in pertinent part at* 15 U.S.C. §§ 77p and 78bb(f) ("SLUSA").[2]  Plaintiffs filed a motion to remand on April 1, 2005,

---

[2]    Defendant American International Group ("AIG") had already removed the case on the preceding day, March 17, 2005, alleging complete diversity of citizenship.  AIG's notice of removal was docketed as a separate case from the Hartford Defendants' notice.  AIG subsequently withdrew its notice on the ground that complete diversity was not present, and this Court dismissed that case.

claiming the action was not subject to SLUSA. The Hartford Defendants moved to stay this action pending transfer by the MDL Panel and opposed the remand motion.

According to the returns of service filed by Plaintiffs, process was served on some of the Defendants beginning on April 11, 2005. Plaintiffs served a summons and complaint on MetLife, Inc. on April 26, 2005.[3] That same day, Defendant Chubb served its motion to remand, claiming that it had a unilateral right to defeat removal, even though it had not been served with process at the time of the Hartford Defendants' initial removal.

MetLife, Inc. opposes remand. MetLife, Inc. is filing herewith its Supplement to the Hartford Defendants' Notice of Removal, which asserts MetLife, Inc.'s right to remove the case to this Court pursuant to CAFA.

## ARGUMENT

I.    **Remand Should Be Denied for the Reasons Stated by the Hartford Defendants Because the Case Is Properly in Federal Court Under SLUSA.**

The Hartford Defendants are filing, on this date, an opposition to Chubb's motion to remand, explaining that Chubb's refusal to consent does not defeat removal under SLUSA. MetLife, Inc. joins in the Hartford Defendants' opposition to Chubb's motion, as well as in the Hartford Defendants' April 29, 2005 opposition to Plaintiffs' motion to remand.

As explained in the Hartford Defendants' opposition to Chubb's motion, Chubb may not unilaterally require remand of an action that was removed under SLUSA before Chubb

---

[3]    MetLife, Inc. is not subject to personal jurisdiction in Florida and therefore disputes the effectiveness of Plaintiffs' purported service of process. Nothing in this brief or in the MetLife, Inc.'s Supplement to the Hartford Defendants' Notice of Removal should be construed as a waiver of any objections to personal jurisdiction.

was even served with process. For the reasons stated by the Hartford Defendants, the action

was properly removed under SLUSA, and the motions for remand filed by the Plaintiffs and

Chubb are completely without merit.

## II.    In Any Event, Remand Is Inappropriate Based on MetLife, Inc.'s Grounds for Removal Under CAFA.

Even if Chubb's or Plaintiffs' motion to remand were somehow effective against the

Hartford Defendants' SLUSA removal, remand would nonetheless be inappropriate, because

MetLife has timely asserted its right to remove the case pursuant to CAFA, which explicitly

provides that the case may be removed by any one defendant. As yet, no party has filed a

motion to remand challenging MetLife, Inc.'s supplement to the notice of removal. Any

remand to state court would therefore be premature. *See Palm Tree Computers Sys., Inc. v.*

*ACE USA, Inc.*, No. 6:05-cv-418 (April 20, 2005) (Doc. 21) (inappropriate to remand case to

state court based on AIG's notice of removal, where Hartford Defendants' grounds for

removal had not yet been considered).

MetLife, Inc. reserves the right to respond to any grounds Plaintiffs or Chubb may

assert in a motion to remand directed to MetLife, Inc.'s supplement to the notice of removal;

but believes that Plaintiffs and Chubb would have no valid basis for the motion. Plaintiffs

and Chubb cannot challenge the timeliness of MetLife's assertion of the CAFA grounds for

removal, because MetLife's supplement to the removal notice is being filed within 30 days

after the initial service of the summons and complaint on MetLife. *See Murphy Bros. v.*

*Michetti Pipe Stringing*, 526 U.S. 344, 350 (1999) (defendant's 30-day time to remove

begins running, at the earliest, upon formal service of a summons upon the defendant). Nor

can Plaintiffs and Chubb rely on the carveout provision that excludes from CAFA removal

4

"any class action that *solely* involves . . . a claim concerning a covered security as defined

under [SLUSA]." 28 U.S.C. § 1453(d), *as added by* CAFA § 5, 119 Stat. at 13 (emphasis

added). While this case involves covered securities under SLUSA, it does not "solely"

involve covered securities, because plaintiff's claims include insurance products that are non-

securities as well as those that are securities.

Plaintiffs apparently believed that by filing when the passage of CAFA was

imminent, they would be able to avoid the application of CAFA. In this Circuit, "the

propriety of removal is evaluated at the time the petition for removal is filed," *Maseda v.*

*Honda Motor Co., Ltd.*, 861 F.2d 1248, 1253 (11th Cir. 1988). CAFA provides that "The

amendments made by this Act shall apply to any civil action commenced on or after the date

of enactment of this Act," CAFA § 9, 119 Stat. at 14 (to be codified at 28 U.S.C. § 1332

note); and Courts have previously interpreted the same language, in other statutes amending

federal district court jurisdiction, to mean that an action filed in state court is "commenced"

for purposes of federal jurisdiction when it is removed to federal court. *Hunt v. Transport*

*Indem. Ins. Co.*, No. 90-00041, 1990 WL 192483, 1990 U.S. Dist. LEXIS 16555 (D. Haw.

July 30, 1990); *Gasper v. Nat'l Tea Co.*, No. 89-5168, 1990 WL 6031, 1990 U.S. Dist.

LEXIS 639 (E.D. La. Jan. 24, 1990); *Lorraine Motors, Inc. v. Aetna Cas. & Sur. Co.*, 166

F. Supp. 319 (E.D.N.Y. 1958).[4] This action was initially removed after February 18, 2005,

the date CAFA was signed into law, and is therefore subject to CAFA.

---

[4]  The word "commenced" in CAFA's effective-date provision contrasts with the
CAFA's frequent and consistent use of the word "filed" when it referencing the initial filing
of the complaint in a state or federal court. *Compare* CAFA sec. 9 ("commenced") *with*
CAFA sec. 3(a), 28 U.S.C. § 1711(2) ("filed"), *and id.* sec. 4(a), 28 U.S.C. § 1332(d)(1)(B),
(continued)

In *Hunt, Gasper*, and *Lorraine Motors*, the court was faced with a change in the minimum amount in controversy for diversity cases—in *Hunt* and *Gasper*, from $10,000 to $50,000, and in *Lorraine Motors*, from $3,000 to $10,000. In each case, the complaint had been filed in state court before the amendment and removed to federal court after the amendment. And in each of those cases, the statute provided, much like CAFA, that the statutory change applied to any action that was "commenced after the date of the enactment of this Act," *Lorraine Motors*, 166 F. Supp. at 320, or "commenced on or after the 180th day after the date of enactment of this [Act]," *Hunt*, 1990 WL 192483, at *2; *see Gasper*, 1990 WL 6031, at *1. In each of those cases, the Court concluded that an action is "commenced" for these purposes on the date of removal to federal court, in light of the longstanding rule that the propriety of removal is evaluated as of the time the petition for removal is filed, *Hunt*, 1990 WL 192483, at *5 (citing *Maseda*, 861 F.2d at 1253), and in light of the statutory amendment's purpose, in those cases, of restricting the diversity jurisdiction of the federal courts, *Gasper*, 1990 WL 6031, at *2; *Lorraine Motors*, 166 F. Supp. at 322.

There is no reason to interpret the virtually identical language of CAFA to depart from the rule that an action is "commenced" for purposes of federal jurisdiction on the date it is removed to federal court. Unlike most earlier jurisdictional amendments, CAFA was enacted to expand diversity jurisdiction, not to restrict it. In enacting CAFA, Congress stated that its purpose was to "restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under

---

(d)(3), (d)(3)(B), (d)(3)(E), (d)(3)(F), (d)(4)(A)(i)(I), (d)(4)(A)(i)(II)(cc), (d)(4)(A)(i)(III), (d)(4)(A)(ii), (d)(4)(B), (d)(11)(B)(ii)(I) ("filed").

diversity jurisdiction." CAFA § 2(b)(2), 119 Stat. at 5 (to be codified at 28 U.S.C. § 1711 note). Consistent with this purpose, CAFA's removal provision represents a dramatic reversal of the traditional restrictive attitude toward removal in diversity cases: among other things, CAFA allows removal where complete diversity is absent and only minimal diversity is present, allows removal when a defendant resides in the state where the action was filed, allows removal by a single defendant, and allows discretionary appeals from remand orders that would have been wholly unreviewable under prior law. *See* 28 U.S.C. §§ 1332(d), 1453, *as added by* CAFA §§ 4(a)(2), 5(a), 119 Stat. at 9, 12. CAFA should be construed with due regard to its purpose of providing a federal forum for nationwide class actions. Any countervailing concern for avoiding disruption of pending state proceedings is wholly absent here, as Plaintiffs had not even served process on any of the Defendants by the time CAFA was passed and the action was removed.[5]

---

[5] For this reason, the case is unlike *Pritchett v. Office Depot, Inc.,* 404 F.3d 1232 (2005). In *Pritchett*, the case had been pending in state court nearly two years before CAFA was enacted and was removed to federal court shortly before trial. Unlike *Pritchett*, this is a newly filed action, no substantial proceedings have taken place in state court, and the notice of removal was filed within 30 days after service of process (and in the case of the Hartford Defendants' initial notice, was filed before process was even served).

## CONCLUSION

For all of the foregoing reasons, Defendant MetLife, Inc. respectfully requests that

remand be denied.

Dated: May 13, 2005

METLIFE, INC.

By its attorney,

_Christopher C. Iker  Fla.Bar No.01583_

Martin B. Unger
Florida Bar No. 235032
THE UNGER LAW GROUP, P.L.
701 Peachtree Rd.
P.O. Box 4909
Orlando, FL 32802-4909
Tel: (407) 425-6880
Fax: (407) 425-0595
Email: munger@ungerlawgroup.com

8

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent by United States mail, first class postage prepaid, this 13th day of May 2005, to the attorneys for each of the parties that has appeared in this action, at the following addresses:

Joseph Angland
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019

Marvin E. Barkin
Trenam, Kemker, Scharf, Barkin,
    Frye, O'Neill & Mullis, P.A.
P.O. Box 1102
Tampa, FL 33601-1102

Douglas S. Eakeley and Dustin D. Deese
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068

James E. Foster
Akerman Senterfitt
P.O. Box 231
Orlando, FL 32802-0231

Ned Gelhaar
Hancock Rothert & Bunshoft LLP
515 South Figueroa St., 17th Floor
Los Angeles, CA 90071

Kenneth G. Gilman
Gilman and Pastor, LLP
60 State Street, 37th Floor
Boston, MA 02109

David Hughes Harris
Goldstein Buckley Cechman Rice & Purtz P.A.
1515 Broadway
Fort Myers, FL 33901

Richard C. Pepperman, II
Sullivan & Cromwell
125 Broad St.
New York, NY 10004

Andrea J. Robinson
Wilmer Cutler Pickering Hale & Dorr, LLP
60 State St.
Boston, MA 02109

Robert W. Trenchard
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY 10022

Leslie M. Smith
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

Timon V. Sullivan
Ogden & Sullivan, P.A.
113 S. Armenia Ave.
Tampa, FL 33609-1006

Virginia B. Townes
Akerman Senterfitt
255 S. Orange Ave. 17th Floor
P.O. Box 231
Orlando, FL 32802-0231

Martin B. Unger, Esq.
Florida Bar No. 235032

9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BENSLEY CONSTRUCTION, INC., on its own )
behalf and on behalf of all others similarly situated, )
)
)
Plaintiff, )
)
v. )
)
MARSH & MCLENNAN COMPANIES, INC., )
MARSH, INC., ACE USA, ACE INA, AMERICAN )
INTERNATIONAL GROUP, AMERICAN )
REINSURANCE COMPANY, ARTHUR J. )
GALLAGHER & CO., HILB ROGAL & HOBBS, )
COMPANY, WILLIS GROUP HOLDINGS, LTD., )
WILLIS NORTH AMERICA INC., WILLIS GROUP )
LTD., UNIVERSAL LIFE RESOURCES, )     Civil Action No. 05 11249 GAO
UNIVERSAL LIFE RESOURCES, INC. (d/b/a ULR )
INSURANCE SERVICES, INC.), THE CHUBB )
CORPORATION, USI HOLDINGS, INC., METLIFE, )
INC., PRUDENTIAL FINANCIAL, INC., )
UNUMPROVIDENT CORPORATION, THE ST. )
PAUL TRAVELERS COMPANIES, INC., ZURICH )
AMERICAN INSURANCE COMPANY, LIBERTY )
MUTUAL GROUP INC., LIBERTY MUTUAL )
INSURANCE COMPANY, LIBERTY MUTUAL )
FIRE INSURANCE COMPANY, EMPLOYERS )
INSURANCE COMPANY OF WAUSAU, and ST. )
JAMES INSURANCE COMPANY LTD., )
)
Defendants. )
)

## MEMORANDUM IN SUPPORT OF MOTION TO STAY THIS ACTION
## PENDING A DETERMINATION ON TRANSFER BY
## THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

Defendants Marsh & McLennan Companies, Inc., Marsh, Inc., ACE USA, ACE

INA, American International Group, Inc., American Reinsurance Company, Arthur J.

Gallagher & Co., Hilb Rogal & Hobbs Company, Willis Group Holdings, Ltd., Willis

21969391v5

North America Inc., Willis Group Ltd., Universal Life Resources, Universal Life
Resources, Inc. (d/b/a ULR Insurance Services, Inc.), USI Holdings, Inc., MetLife, Inc.,
Prudential Financial, Inc., UnumProvident Corporation, The St. Paul Travelers
Companies, Inc., and Zurich American Insurance Company (collectively, "Movants")
respectfully submit this Memorandum in support of their motion to stay this action until
the Judicial Panel on Multidistrict Litigation (the "JPML") either transfers this action to
the District of New Jersey or denies transfer. [1]

## PRELIMINARY STATEMENT

This action is one of over twenty cases filed in or removed to various federal
courts across the country against insurers and insurance brokers claiming deceptive and
anticompetitive conduct in the insurance industry. The actions were filed on the heels of
an investigation by the New York Attorney General, which resulted in two widely
publicized civil suits against two insurance brokers regarding their sales practices. Each
of these actions, like Plaintiff's action here, is based on the allegations contained in the
New York Attorney General complaints and purports to allege industry-wide
anticompetitive practices. In light of the similarity of the underlying allegations, the
JPML in February 2005 transferred the cases that had been brought to its attention to the

---

[1]   The Complaint names as a Defendant "American International Group" and not
"American International Group, Inc." In filing this motion, the Movants reserve any
and all rights and defenses available under Rule 12 of the Federal Rules of Civil
Procedure, including but not limited to, arguments concerning ineffective service of
process, personal jurisdiction, and that any defendant is not a proper party to this
action.

2

United States District Court for the District of New Jersey, where they have been assigned to Judge Faith S. Hochberg as *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663.

On June 17, 2005, the JPML clerk was notified that this action raises issues of fact and law in common with the previously transferred actions. This action is based on the same alleged conduct and seeks certification of a class that is a subset of the putative classes in the cases that have been consolidated and transferred to Judge Hochberg. Movants thus anticipate that the JPML will also transfer the present action to Judge Hochberg. As a result, Movants respectfully request that the Court stay all proceedings in this action until after the JPML either transfers the action to Judge Hochberg or denies transfer.

A stay is in the interest of justice and efficiency because this action and the consolidated actions are based on the same factual allegations, raise the same legal issues, and involve nearly identical claims. Allowing Judge Hochberg to resolve all issues— including any objections that Plaintiff may raise to the appropriateness of removal—will promote judicial economy and prevent inconsistent rulings. A single judge, rather than several, should decide the relevant questions.

Permitting this action to go forward without a stay, particularly into discovery, would defeat the purpose of the JPML's transfer of the other cases to Judge Hochberg for coordinated and consolidated pretrial proceedings. Although plaintiff in the instant action has failed to allege that it had any nexus with nearly all of the Defendants, nineteen of the Defendants in this action (all but The Chubb Corporation and the Liberty

3

Defendants) are defendants in the proceedings before Judge Hochberg, and each is already litigating the same issues and allegations in the District of New Jersey. Judge Hochberg has consolidated the cases into two groups, has entered a scheduling order, and has established procedures for the parties to confer on the establishment of a document depository and a confidentiality order. The efficiencies of this approach would be lost if Defendants here were forced to proceed simultaneously in this district.

In contrast to the prejudice and cost that would result to Defendants from denying a stay, Plaintiff—who delayed service of the summons and complaint for nearly three months—will not be prejudiced by a brief stay until the issue of where this case will be litigated is resolved. The paramount goals of the multidistrict litigation statute, to promote judicial economy and avoid inconsistent adjudications, are best served in this case if this action is stayed in its entirety pending a decision on transfer by the JPML.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On February 17, 2005—one day before the President signed the Class Action Fairness Act of 2005 into law, and four months after the New York Attorney General filed the Complaint on which this Action is based—Plaintiff's counsel filed this purported statewide class action on behalf of a Middlesex County plaintiff in Massachusetts Superior Court for Essex County. The day before, Plaintiff's counsel had filed a purported nationwide class action, *Palm Tree Computers, Inc. v. Ace USA, Inc. et al.*, in a state court in Sanford, Florida, raising nearly the same allegations asserted here. Ex. A (*Palm Tree* complaint).

4

The same day as Plaintiff filed this action, the JPML transferred three putative class actions, alleging conduct identical to that described in this action, to the Honorable Faith S. Hochberg in the United States District Court for the District of New Jersey for coordinated or consolidated pre-trial proceedings in conjunction with a case that was already pending before Judge Hochberg. *See In re Insurance Brokerage Antitrust Litigation*, 360 F. Supp. 2d 1371 (J.P.M.L. 2005). In transferring these actions to Judge Hochberg, the JPML concluded that "[c]entralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to class certification matters), and conserve the resources of the parties, their counsel and the judiciary." *Id.* at 1372. The transferred actions were "purported class actions involving allegations that common defendants and/or their alleged co-conspirators have engaged in a combination and conspiracy to affect the sale of insurance sold in the United States by rigging bids and allocating customers." *Id.* The JPML issued a conditional transfer order with respect to ten other cases in March 2005, four more cases in April 2005, and three cases in June 2005. Additional related cases have also been filed directly in the District of New Jersey and assigned to Judge Hochberg.

Judge Hochberg has consolidated the actions in the MDL proceeding into two groups (one involving commercial insurance and the other involving employee benefit insurance) and has established a schedule for filing amended complaints and dispositive motions. *See* Ex. B (Judge Hochberg's Order No. 4). She also has ordered the establishment of a document depository to coordinate discovery and has directed the

5

parties to confer on discovery and confidentiality procedures. *See id.* This process is underway.

The First Amended Class Action Complaint in this action is closely similar to many of the complaints in the MDL. The First Amended Complaint, like the complaints in the MDL actions, alleges that insurance brokers and underwriters failed to disclose that the underwriters paid "contingent commissions" to the brokers based on, among other things, the volume of business the broker delivered. *Compare* First Amended Complaint ("FAC") ¶¶ 65-76 *with, e.g.,* Ex. C (*Opticare* Complaint) ¶¶ 70-106 (one of the cases transferred to MDL 1663).[2] Further, the First Amended Complaint alleges that brokers and insurers engaged in certain instances of "bid-rigging" to ensure that brokers meet their targets under the contingent commission agreements. *Compare* FAC ¶¶ 63 & 75-76 *with, e.g.,* Ex. C, ¶¶ 107-120. Like the plaintiffs in the MDL, plaintiffs in this action seek certification of a class of insurance purchasers, although the First Amended Complaint seeks to limit the proposed class to Massachusetts residents, a proposed class that is entirely included (except for a small difference in the proposed class period) within the proposed nationwide classes in the MDL complaints. *Compare* FAC ¶ 115 *with, e.g.,* Ex. C, ¶ 174.

On June 15, 2005, Defendant Marsh & McLennan Companies, Inc. removed this action to this Court. On June 17, 2005, Defendant MetLife, Inc. notified the JPML Clerk

---

[2]     As noted above and in the Notice of Removal filed on June 15, 2005, while Plaintiff makes such allegations, allegations of a nexus between the Plaintiff and most of the Defendants is entirely lacking.

6

by letter of the status of this case as a potential tag-along to the pending proceedings in

the District of New Jersey. Ex. D. Movants expect that the JPML will in the near future

issue a Conditional Transfer Order in accordance with its procedures, which will transfer

the action to the District of New Jersey if no objections are filed, and which will allow an

opportunity for briefing the issue of transfer if any party objects. *See* JPML Rule 7.4.

## ARGUMENT

## I.    THIS COURT HAS AUTHORITY TO ISSUE THE REQUESTED STAY

This Court has broad discretion to issue a stay based on its inherent power to

control its docket. *See Landis v. North American Co.*, 299 U.S. 248, 254 (1936); *see also*

*Clinton v. Jones*, 520 U.S. 681, 706 (1997). In particular, a District Court has discretion

to decide whether, in the circumstances of the particular case, justice would be best

served by a stay of proceedings in the putative transferor court when an MDL transfer is

pending. *See, e.g., Portnoy v. Zenith Laboratories,* No. 86-3512, 1987 WL 10236, at *1

(D.D.C. Apr. 21, 1987).

As the *Manual for Complex Litigation* notes, "the objective of transfer is to

eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce

litigation cost, and save time and effort on the part of the parties, the attorneys, the

witnesses and the courts." *Manual for Complex Litigation (Fourth)* § 20.131 at 220

(1995). As a result, District Courts may stay proceedings pending transfer in order to

further these goals.

7

## II. ALL FACTORS SUPPORT STAYING THIS ACTION.

In determining whether a stay of the proceedings is appropriate, courts consider
(1) judicial economy; (2) the hardship and inequity on the moving party without a stay;
(3) and prejudice the non-moving party will suffer if a stay is granted. *See, e.g., Falgoust
v. Microsoft Corp.*, No. 00-0779, 2000 WL 462919, at \*2 (E.D. La. Apr. 19, 2000);
*Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997). Because all three
of these factors weigh strongly in favor of a stay, a stay should be granted.

### A. A Stay Is Necessary To Promote Judicial Economy And Avoid Inconsistent Rulings.

Judicial efficiency results from a stay because if a case is later transferred to an
MDL proceeding, the transferor court will have "needlessly expended its energies
familiarizing itself with the intricacies of a case that would be heard by another judge,
[and] any efforts on behalf of the [transferor] court concerning case management will
most likely have to be replicated by the judge that is assigned to handle the consolidated
litigation. . . ." *Rivers*, 980 F. Supp. at 1360-61. Consequently, a majority of courts have
concluded that staying preliminary pretrial proceedings pending a ruling on a motion to
transfer and consolidate by the JPML is appropriate to conserve judicial resources. *Id.* at
1361. The factors that courts have considered in granting stays—uniformity, consistency,
and predictability—all favor staying this action.

Transfer of this action to MDL 1663 is a virtual certainty, as there are numerous
common issues of law and fact. As discussed above, this action is based on the same
allegations of fact as the cases consolidated before Judge Hochberg. The First Amended

8

Complaint in this action, like the complaints in MDL 1663, seeks class certification and sets forth virtually the same set of allegations against insurance brokers and insurance companies. In fact, nineteen of the Defendants in this case are defendants in MDL 1663 and thus are litigating the identical issues in that forum. Because of these similarities, the same issues will arise in this action and the consolidated cases—including the grounds for motions to dismiss, whether any basis for challenging federal jurisdiction exists, whether or to what extent class certification is appropriate, and the scope of discovery, liability, and damages.

Allowing this to go forward without a stay, particularly into discovery, would put the possibility of efficient and coordinated proceedings at risk and would defeat the purpose of the JPML's transfer of the other cases to Judge Hochberg. Pursuant to a pretrial order issued by Judge Hochberg, a schedule for amended pleadings and motion practice has been set, and the parties in the MDL are in the process of developing a plan for consolidated and coordinated discovery and other pretrial proceedings. In the absence of a stay, the efficiencies of this coordinated approach—for the judiciary as well as the parties—would be diminished or lost.

Any motion to remand this case to Massachusetts Superior Court on jurisdictional grounds would only provide a further reason for staying this action pending transfer to MDL 1663. The questions raised in any remand motion are likely to include some of the same issues that have arisen in the *Palm Tree* case filed by Plaintiff's counsel in Florida state court, and may well arise in additional actions during the course of the MDL proceeding. The *Palm Tree* remand motions involve, among other things, issues

9

concerning the interpretation of the effective-date provision of the Class Action Fairness Act of 2005 and the effect of the failure of Defendant The Chubb Corporation ("Chubb") to join the notice of removal. *See, e.g.,* Exs. E & F. We expect that, if Plaintiff or Chubb moves to remand this case, it will raise the same issues here. In order to promote consistency and efficiency and conserve judicial resources, a single court should resolve these jurisdictional issues, including any attendant factual issues. *See, e.g., Falgoust,* 2000 WL 462919, at *2 ("[C]onsistency and economy would be served by resolution of these [jurisdictional remand] issues by a single court after transfer by the JPML."); *Weinke v. Microsoft Corp.*, 84 F. Supp. 2d 989, 990 (E.D. Wis. 2000) (exercising discretion to stay case pending transfer by JPML "in the interest of judicial economy and to avoid inconsistent results" after plaintiff had moved to remand for lack of subject-matter jurisdiction); *Tench v. Jackson Nat'l Life Ins. Co.*, No. 99 C 5182, 1999 WL 1044923, at *2 (N.D. Ill. Nov. 12, 1999) (stay appropriate because the issue of calculation of the amount in controversy "may arise again in other actions" so that "resolution in a single [MDL] forum will ensure consistency and avoid duplicative efforts"); *Johnson v. AMR Corp.*, No. 95-7659, 1996 WL 164415, at *3 (N.D. Ill. Apr. 3, 1996) (staying case where a jurisdictional objection to removal was pending because "[o]nce transferred [to the MDL], the jurisdictional objections can be heard and resolved by a single court") (citation omitted); *Boudreaux v. Metropolitan Life Ins. Co.*, No. 95-138, 1995 WL 83788, at *2 (E.D. La. Feb. 24, 1995) ("the policies of efficiency and

10

consistency of pre-trial rulings are furthered by a stay" where "the issue involved in this remand motion is likely to be common to other transferred cases [in the MDL]").[3]

## B. Movants Would Suffer Hardship And Inequity Without A Stay

Movants would face substantial hardship in the absence of a stay. Movants are already defending nearly identical allegations in claims now consolidated before Judge Hochberg. Without a stay, Movants would be forced to litigate on multiple fronts, facing inconsistent rulings and expending unnecessary costs. Because the costs of discovery in these actions are likely to be considerable, the latter is a particularly significant risk. Courts recognize that such risks constitute a hardship and inequity justifying a stay. *See, e.g., Falgoust*, 2002 WL 462919, at *2 (defendant would suffer "considerable hardship and inequity" if forced to simultaneously litigate multiple suits in multiple courts and could potentially suffer conflicting rulings by different judges in multiple suits); *Weinke,* 84 F. Supp. 2d at 990 (noting "disadvantages of litigating identical claims in multiple venues").

In addition, denying a stay would defeat the purpose of the JPML's consolidation and transfer of the other cases to Judge Hochberg. The JPML transferred substantially similar cases to Judge Hochberg in order to *eliminate* duplicative discovery, prevent

---

[3]   This case is therefore unlike *In re Massachusetts Diet Drug Litigation*, 338 F. Supp. 2d 198 (D. Mass. 2004), in which the remand motion raised issues unique to the case. And even if for some reason the case were ultimately to be remanded to state court (though there are no grounds to do so), a stay at this time will allow for improved coordination between Judge Hochberg and the state court. A stay would help Judge Hochberg achieve the goal of avoiding duplicative discovery between state and federal court actions, regardless of where this action ultimately proceeds.

11

inconsistent pretrial rulings, and conserve the resources of the parties. *See In re Insurance Brokerage Antitrust Litigation*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005). Without a stay, Defendants may be subject to each of the very harms that the JPML intended to eliminate.

## C. A Brief Stay Will Not Prejudice the Non-Moving Parties in Any Way

Neither Plaintiff nor the non-moving Defendants will suffer any prejudice from a stay in these circumstances. The stay is likely to be brief. The JPML will likely meet soon to consider the transfer request, and, in keeping with its past practice, will likely issue a decision promptly. *See, e.g., Falgoust*, 2000 WL 462919, at * 2 (considering delay likely to be short). A slight delay is not prejudicial. *See id.; see also Weinke*, 84 F. Supp. 2d at 990 (plaintiffs' "cursory assertions of prejudice" based on delay and geographic disruption "[did] not outweigh the disadvantages of litigating identical claims in a multitude of venues"). Particularly since Plaintiff delayed nearly three months after filing the complaint before serving the Defendants, Plaintiff should not be heard to complain that a brief additional delay will somehow cause it prejudice.

Moreover, though the merits of transfer is an issue for the JPML and not for this Court, no party will be prejudiced by litigating this proposed class in New Jersey rather than Massachusetts. Plaintiff's counsel is also prosecuting a similar proposed class action brought in Florida on behalf of a putative nationwide class and now awaiting consideration of transfer by the JPML. *See* Ex. A. Nothing in the First Amended Complaint's factual allegations, beyond Plaintiff's domicile and principal place of business, is specific to Massachusetts. Given that Plaintiff's own counsel and others are

12

already seeking to litigate the same matter on behalf of a proposed nationwide class that includes the Plaintiff, no hardship will be caused by litigating these issues in a single forum, rather than in multiple forums across the country. Transfer will also serve the interests of the members of the proposed plaintiff class, by preventing the confusion that could result from the possibility of communications from two different sets of attorneys and courts if a class or classes were to be certified (though defendants deny that certification is appropriate). And Defendant Chubb, which is a New Jersey corporation having its principal place of business in Warren, New Jersey, surely will not suffer any hardship by litigating in New Jersey rather than Massachusetts.

## CONCLUSION

For the foregoing reasons, this action should be stayed until the JPML either transfers this action to the District of New Jersey or denies transfer.

Dated: June 20, 2005

13

21969391v5

Marsh & McLennan Companies, Inc., and
Marsh Inc., on their own behalf and on
behalf of and with the consent of ACE USA;
ACE INA; Zurich American Insurance
Company; American International Group,
Inc.; American Re-Insurance Company;
Arthur J. Gallagher & Co.; Hilb Rogal &
Hobbs, Company; Willis Group Holdings,
Ltd.; Willis North America Inc.; Willis
Group Ltd.; Universal Life Resources;
Universal Life Resources, Inc. (d/b/a ULR
Insurance Services, Inc.); USI Holdings
Corp.; MetLife, Inc.; Prudential Financial,
Inc.; UnumProvident Corporation; The St.
Paul Travelers Companies, Inc.,

By:  /s/ Joshua Vitullo_____
Daniel S. Savrin  BBO #555434
Joshua Vitullo  BBO #654310
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
617-951-8000
*Attorneys for Defendants Marsh &*
*McLennan Companies, Inc., and Marsh Inc.*

Mitchell J. Auslander, Esq.
John R. Oller, Esq.
Christopher J. St. Jeanos, Esq.
Kristin Branson, Esq.
Wilkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8000
*Of Counsel for Defendants Marsh &*
*McLennan Companies, Inc., and Marsh Inc.*

14

Philip T. Newbury BBO #370070
Mark J. Claflin BBO #657175
Howd & Ludorf, LLC
65 Wethersfield Ave.
Hartford, CT 06114
860-249-1361
*Attorneys for Defendants*
*ACE USA and ACE INA*

H. Lee Godfrey, Esq.
Neal S. Manne, Esq.
Johnny W. Carter, Esq.
Jeffrey R. Seely, Esq.
Susman Godfrey LLP
1000 Louisiana St., Ste. 5100
Houston, TX 77002
713-651-9366
*Of Counsel for Defendants*
*ACE USA and ACE INA*

Bruce W. Edmands, BBO #151360
Eckert Seamans Cherin & Mellott, LLC
One International Place
Boston, MA 02110
617-342-6886
*Attorneys for Defendant*
*Zurich American Insurance Company*

Brien T. O'Connor, BBO #546767
Timothy J. Casey, BBO #650913
Ropes & Gray LLP
One International Place
Boston, MA 02110
617-951-7000
*Attorneys for Defendant*
*American International Group, Inc.*

15

Roberta A. Kaplan, Esq., BBO #559570
Paul, Weiss, Rifkind, Wharton &
  Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
*Attorneys for Defendant*
*American International Group, Inc.*

John F. Collins, Esq.
Molly Lehr, Esq.
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019
212-259-8000
*Attorneys for Defendant*
*American Re-Insurance Company*

Edwin M. Larkin, Esq.
Lina M. Viviano, Esq.
200 Park Avenue
New York, NY 10166-4193
212-294-6700
*Of Counsel for Defendant*
*Arthur J. Gallagher & Co.*

Terry M. Grimm, Esq.
Stephen C. Schulte, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601312-558-5890
*Of Counsel for Defendant*
*Arthur J. Gallagher & Co.*

Juliane Balliro, BBO #028010
Perkins Smith & Cohen LLP
One Beacon Street, 30th Floor
Boston, MA 02108-3106
617-854-4000
*Attorneys for Defendant*
*Hilb Rogal & Hobbs, Company*

16

James V. Masella III, BBO #562882
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
212-558-4000
*Attorneys for Defendant Willis Group
Holdings, Ltd., Willis North America Inc.,
and Willis Group Ltd.*

Richard C. Pepperman II, Esq.
Anastasia A. Angelova, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498
212-558-4000
*Of Counsel for Defendant Willis Group
Holdings, Ltd., Willis North America Inc.,
and Willis Group Ltd.*

David Gabianelli, Esq.
Ray L. Wong, Esq.
Ned M. Gelhaar, Esq.
Hancock Rothert and Bunshoft LLP
Four Embarcadero Center, Ste. 300
San Francisco, CA 94111
415-981-5550
*Of Counsel for Defendants Universal Life
and Resources, Universal Life Resources,
Inc. (d/b/a ULR Insurance Services, Inc.)*

Ian Crawford BBO #544475
Todd & Weld LLP
28 State Street, 31st Fl.
Boston, MA 02109
617-720-2626
*Attorneys for Defendant USI Holdings Corp.*

17

Robert H. Pees, Esq.
Vadim Sarma, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY 10022-2524
212-872-1000
*Of Counsel for Defendant*
*USI Holdings Corp.*

Daniel B. Winslow, BBO #541972
Patricia R. Rich, BBO #640578
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
617-289-9200
*Attorneys for Defendant MetLife, Inc.*

James W. Carbin
Eric Breslin
Duane Morris LLP
744 Broad St.
Newark, NJ 07102
973-424-2000
*Of Counsel for Defendant MetLife, Inc.*

Barry Y. Weiner BBO #519700
Maureen Mulligan BBO #556482
Ruberto, Israel & Weiner
100 North Washington Street
Boston, MA 02114
617-742-4200
*Attorneys for Defendant*
*Prudential Financial, Inc.*

John R. Middleton, Jr., Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
973-597-2582
*Of Counsel for Defendant*
*Prudential Financial, Inc.*

18

Joseph Hamilton, BBO #546394
Mirick, O'Connell, DeMallie &
    Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
*Attorneys for Defendant*
*UnumProvident Corporation*

Deborah E. Hryb, Esq.
Patrick W. Shea, Esq.
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Blvd., 9th Floor
Stamford, CT 06901
203-961-7400
*Of Counsel for Defendant*
*UnumProvident Corporation*

David H. LaRocca, Esq.
Michael J. Garvey, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
212-455-2377
*Of Counsel for Defendant The St. Paul*
*Travelers Companies, Inc.*

19

## EXHIBIT LIST

Exhibit A    Class Action Complaint and Jury Demand, *Palm Tree Computers Systems et al. v. ACE USA et al.*, No. 05-CA-373-16-W (Fla. Cir. Ct., 18th Cir., Seminole County).

Exhibit B    Order No. 4, *In re Insurance Brokerage Antitrust Litigation*, No. 04-5184 (FSH) (D.N.J.).

Exhibit C    Amended Class Action Complaint, *Opticare Health Systems, Inc. v. Marsh & McLennan Companies, Inc. et al.*, No. 04 CV 06954 (DC) (S.D.N.Y.)

Exhibit D    June 17, 2005 Letter to JPML Clerk.

Exhibit E    The Hartford Defendants' Memorandum of Law in Opposition to the Chubb Corporation's Motion to Remand, *Palm Tree Computers Systems et al. v. ACE USA et al.*, 6:05-cv-422-ORL-22KRS (M.D. Fla.).

Exhibit F    Defendant MetLife, Inc.'s Memorandum in Opposition to Defendant the Chubb Corporation's Motion to Remand, *Palm Tree Computers Systems et al. v. ACE USA et al.*, 6:05-cv-422-ORL-22KRS (M.D. Fla.).