# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BENSLEY CONSTRUCTION, INC., on its own behalf and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05 11249 GAO |
| MARSH & MCLENNAN COMPANIES, INC. , ET AL. | ) ) ) | |
| Defendants. | ) ) | |

## MOTION TO SUBSTITUTE REPRESENTATIVE PLAINTIFF AND FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT, WITH INCORPORATED MEMORANDUM OF LAW

### INTRODUCTION

Plaintiff Bensley Construction, Inc. has recently informed the undersigned counsel that, due to an upcoming corporate transaction involving a change in ownership, it has decided that it is no longer able to serve as a class representative in this matter. Consequently, as Plaintiff's counsel indicated in its Memorandum of Law in Support of Motion to Remand, filed with this Court on July 21, 2005, Plaintiff submits this motion to substitute the representative plaintiff in this matter, and to file a Second Amended Complaint reflecting this change. Rehab Seating Systems, Inc. ("Rehab Seating"), a Massachusetts corporation and a member of the class alleged in the Amended Complaint, will serve as the new representative plaintiff.

00005638.WPD ; 1

## ARGUMENT

**I.    THE CIRCUMSTANCES PRESENT HERE ALLOW FOR AN AMENDMENT TO SUBSTITUTE THE REPRESENTATIVE PLAINTIFF**

Amendments to pleadings are to be freely allowed "when justice so requires." Fed. R.

Civ. P. 15(a).  The Supreme Court has stated:

> In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should . . . be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  Here, there was no undue delay, bad faith or dilatory

motive on the plaintiff's behalf.  Plaintiff Bensley Construction, Inc. found it necessary to

withdraw as representative plaintiff due to an upcoming corporate transaction involving a change

in ownership.  Counsel therefore moved quickly to locate a new plaintiff which will raise the

same claims on behalf of the class.

Rehab Seating is a Massachusetts corporation with principal place of business in

Massachusetts.  (2d Amd. Compl. ¶¶ 12-13).  During the Class Period, Rehab Seating purchased

Insurance Products within Massachusetts, including Workers Compensation and Employers

Liability Policies from Defendants Liberty Mutual Fire Insurance Co., Liberty Mutual Insurance

Company and affiliates of Defendant Liberty Mutual Group, Inc.  *Id.*  It also purchased

Commercial Property and Commercial General Liability policies from Defendant St. Paul

Travelers and/or its affiliates, during the Class Period.  *Id.*  Each of these insurers is a named

defendant in the Amended Complaint, and is included within the term "Insurer Defendants."  (2d

Amd. Compl. ¶¶ 22, 33).

Just as with Bensley Construction, Inc., Rehab Seating alleges that it paid inflated

premiums as a result of a widespread conspiracy among the Insurer and Broker Defendants involving undisclosed "contingent commission" agreements.  (2d Amd. Compl. ¶¶ 12-13).  In fact, the *only* changes included in the proposed Second Amended Complaint, other than changing the name of the plaintiff, are changes to paragraphs 12 and 13, describing the particular insurance policies purchased by Rehab Seating.  Otherwise, the Second Amended Complaint is identical to the Amended Complaint in all respects.

Because Rehab Seating will raise the same claims as Bensley Construction, Inc., and because this litigation is still at an early stage, prior to having taken any discovery, Defendants will not be prejudiced by this amendment.  *Reyna v. Flashtax, Inc.,* 162 F.R.D. 530, 532-33 (S.D. Tex. 1995) (motion to amend to substitute plaintiff granted where action was still in early stages with discovery just begun and no trial date had been set); *Shoreham Hotel Ltd. Partnership v. Wilder*, 866 F. Supp. 1, 3 (D.D.C. 1994) (granting plaintiff's motion to amend to substitute the originally-named plaintiff);  *Robinson v Penn Cent. Co.* 58 F.R.D. 436, 438-39 (S.D.N.Y.) (in class and derivative action, motion to amend complaint under Rule 15(a) to, *inter alia*, substitute named individual as sole representative of class granted where defendants did not demonstrate they would be in any way be prejudiced and plaintiffs were not guilty of bad faith or delay).

## II.    THE SUBSTITUTION OF THE REPRESENTATIVE PLAINTIFF DOES NOT SUBJECT PLAINTIFF TO CAFA

The substitution of a new representative plaintiff should not alter this Court's analysis of whether CAFA applies to this matter.  CAFA applies to any matter "commenced" on or after February 18, 2005.  As explained in Plaintiff's Memorandum in Support of Motion to Remand, this action was commenced when it was filed in state court on February 17, 2005.  (Remand Mem. at 3-10).

The substitution of a new representative plaintiff does not "commence" a new action, for purposes of CAFA or for any other purpose.  In *Knudson v. Liberty Mutual Insurance Company*, the Seventh Circuit recognized that certain changes to a case could, at least in theory, "commence" a new case and potentially subject it to CAFA.  *Knudson*, 2005 U.S. App. LEXIS 10440, at *4.  Such changes included adding a new defendant or adding new "claims."  *Id.* at *4-5.  As explained in *Knudson*, however, amendments to a complaint that "relate back" under a Fed. R. Civ. P. 15 analysis would not commence a new matter, and would therefore not bring the case within CAFA's reach.

Rule 15(c)(2) provides that an amendment of a pleading relates back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . ."[1]  This language is interpreted to mean that amendments relate back "when the amendment would not prejudice a defendant's right to defend claims brought against him." *Presley*, 188 F.R.D. 617, 628.  Thus, it is well-settled that in the context of a class action, the substitution of a representative plaintiff with another member of the class who alleges essentially the same claims "relates back" to the filing of the original complaint, and therefore does not commence a new case.  *Engers v. AT&T Corp.*, No. 98-3660, 2000 U.S. Dist. LEXIS 10937, at *11-12 (D.N.J., 2000) (claims of newly-added class representative related back where new plaintiff was a member of the class and raised the same claims); *Presley*, 188 F.R.D. at 629 ("[A]bsent a

---

[1]  The additional requirements of Rule 15(c)(3) do not apply here, as they "only apply to amendments adding or changing *defendants*."  *United States ex Rel. Presley v. Koch Indus.*, 188 F.R.D. 617, 627-29 (D. Okla., 1999) (emphasis added).  *See also Carson v. Merrill Lynch, Pierce, Fenner & Smith*, No. 97-5147, 1998 U.S. Dist. LEXIS 6903, at *35 (D. Ark. 1998) (holding that Rule 15(c)(2) applies where an amendment "merely substitutes one lead plaintiff for another in a class action lawsuit.  When this suit was commenced on September 4, 1997, defendants were put on notice that there were other members of the class who were asserting the same claims as Carson.").

showing of prejudice to the defendant, an amendment which substitutes one plaintiff . . . for the original plaintiff . . . with no corresponding change in the claims asserted against the defendant, will relate back under Rule 15(c)."); *Carson*, 1998 U.S. Dist. LEXIS 6903, at *35; *Manney v. Monroe*, 151 F. Supp. 2d 976, 997 (N.D. Ill. 2001) ("A plaintiff may usually amend his complaint under Rule 15(c) to . . . substitute or add as plaintiff the real party interest; or to add additional plaintiffs where the action, as originally brought, was a class action.") (quoting *Worthington v. Wilson*, 8 F.3d 1253, 1256 (7th Cir. 1993)).   It has even been held that when a plaintiff is deemed to be an inadequate class representative,  it is permissible to substitute a new representative plaintiff, whose claims relate back to the filing of the initial complaint.  *Griffith v. Bowen*, 678 F. Supp. 942, 947 (D. Mass. 1988) (Young, J.) ("[W]hile the named plaintiffs may no longer be adequate class representatives . . . there is no reason to punish the absent class.").

The concept of "relation back" is not only relevant to a statute of limitations analysis.  It is also relevant to determine the law governing a matter after amendment of a complaint.  In a case situation similar to the matter at hand, one federal district court was called upon to determine whether the addition of class representatives subjected a class action to the Prison Litigation Reform Act, a statute passed subsequent to the filing of the filing of the original complaint which made exhaustion of administrative remedies a jurisdictional predicate for federal actions by prisoners challenging the conditions of their confinement.   *Clark v. California*, No. C96-1486, 1998 U.S. Dist. LEXIS 6770, at *7 (N.D. Cal. May 11, 1998).  The Court held that because the claims of the newly-added class representatives met the relation back test of Fed. R. Civ. P. 15(c)(2), and because the "class representatives added by amendment were members of the class alleged in the original complaint," the case would not be subjected to the

new legislation. *Id.* at *8.

As explained above, Rehab Seating brings the same claims, individually, and on behalf of the class, as did Bensley Construction, Inc. In addition, Rehab Seating was clearly a member of the plaintiff class alleged in the Amended Complaint. Consequently, because the claims of the substituted representative plaintiff relate back to the February 17, 2005 filing of the complaint in this case, and the new representative plaintiff is a member of the class alleged in the Amended Complaint, this matter remains outside the scope of CAFA.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Substitute Representative Plaintiff and For Leave to File a Second Amended Complaint should be GRANTED

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)

Undersigned counsel certify that they have conferred with opposing counsel in a good faith effort to resolve or narrow the issues raised by this Motion, but have been unable to do so.

DATED: July 25, 2005

Respectfully submitted,

**GILMAN AND PASTOR, LLP**

By:    /s/ Kenneth G. Gilman, Esq.
Kenneth G. Gilman (BBO #192760)
Douglas M. Brooks (BBO ##058850)
Douglas J. Hoffman (BBO #640472)
60 State St., 37th Floor
Boston, MA 02109
Tel: (617) 742-9700
Fax: (617) 742-9701

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| REHAB SEATING SYSTEMS, INC., | ) | |
| on its own behalf and on behalf | ) | |
| of all others similarly situated, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | Civil Action No. 05 11249 GAO |
| | ) | |
| MARSH & MCLENNAN COMPANIES, INC. , | ) | |
| MARSH, INC., ACE USA, ACE INA, AMERICAN | ) | |
| INTERNATIONAL GROUP, AMERICAN RE- | ) | |
| INSURANCE COMPANY, ARTHUR J. | ) | **SECOND AMENDED CLASS** |
| GALLAGHER & CO., HILB ROGAL & HOBBS, | ) | **ACTION COMPLAINT** |
| COMPANY, WILLIS GROUP HOLDINGS, LTD., | ) | |
| WILLS NORTH AMERICA, INC., WILLIS GROUP, | ) | |
| LTD., UNIVERSAL LIFE RESOURCES, | ) | |
| UNIVERSAL LIFE RESOURCES, INC. (d/b/a ULR | ) | |
| INSURANCE SERVICES, INC.), THE CHUBB | ) | |
| CORPORATION, USI HOLDINGS, INC., METLIFE, | ) | |
| INC., PRUDENTIAL FINANCIAL, INC., | ) | |
| UNUMPROVIDENT CORPORATION, THE | ) | |
| ST. PAUL TRAVELERS COMPANIES, INC. , | ) | |
| ZURICH AMERICAN INSURANCE COMPANY, | ) | |
| LIBERTY MUTUAL GROUP INC., LIBERTY | ) | |
| MUTUAL INSURANCE COMPANY, LIBERTY | ) | |
| MUTUAL FIRE INSURANCE COMPANY, | ) | |
| EMPLOYERS INSURANCE COMPANY OF | ) | |
| WAUSAU and ST. JAMES INSURANCE | ) | |
| COMPANY LTD. , | ) | |
| | ) | |
|     Defendants. | ) | |

Plaintiff, Rehab Seating Systems, Inc., ("Plaintiff") by and through its undersigned

attorneys, brings this class action on behalf of itself and all others similarly situated for

compensatory and statutory damages under applicable State law.

00005644.WPD ; 1

## NATURE OF THE ACTION

1.      This is a class action for damages and injunctive relief brought under the laws of

Massachusetts.

2.      As alleged herein, the Defendants, which include insurance brokers (the "Broker

Defendants," defined below) and insurance companies (the "Insurer Defendants," defined below)

have engaged in a systematic breach of fiduciary duty, fraud, conspiracy, and course of unfair

and deceptive conduct in violation of Massachusetts law by which they have reduced

competition among insurance brokers and insurance carriers and caused Plaintiff and the other

members of the Class (defined below) to pay more for Insurance Products (defined below).

3.      The Defendants have engaged in this illegal conduct concerning Insurance

Products so that all Defendants could benefit from undisclosed commission and other secret fee

agreements among themselves.  Pursuant to these agreements, which Defendants variously refer

to with terms such as market service agreements, override agreements, or communication fee

agreements, (hereafter "Contingent Commission Agreements"), the Insurer Defendants have

paid additional compensation to the Broker Defendants based on such factors as the volume of

insurance that the Broker Defendants place with particular Insurer Defendants, the renewal of

that business, and the profitability of that business.  The Broker Defendants benefit from the

Contingent Commission Agreements by reaping additional, undisclosed commissions and other

revenue from the Insurer Defendants.  The Insurer Defendants benefit from the Contingent

Commission Agreements by ensuring that their products are purchased from the Broker

Defendants' clients at above-market or artificially-inflated rates, at less favorable terms, and/or

with less or no competition.  The Insurer Defendants have paid hundreds of millions of dollars to

the Broker Defendants pursuant to the Contingent Commission Agreements as illegal kickbacks.

00005644.WPD ; 1                                    -2-

4.      The unlawful arrangements described herein have injured Plaintiff and the Class and have created a direct conflict of interest between the Broker Defendants and their clients, Plaintiff and the Class.  Insurance brokers work for their clients, act on their clients' behalf, and are their clients' fiduciaries.  Through their marketing and brokerage scheme, the Broker Defendants hold themselves out to the public as independent, experienced, and trusted insurance brokers who are experts in the analysis, procurement and renewal of insurance products.  They also hold themselves out as zealous and loyal advocates for their clients who will represent their clients' best interests in obtaining insurance products on their behalf.

5.      The Broker Defendants are bound to abide by their fiduciary obligations and duties of loyalty to their clients, including Plaintiff and the Class, to exercise good faith in performing their services, and to act in accordance with their clients' best interests.  The Broker Defendants accordingly owe their clients a duty to obtain for them the best insurance in terms of coverage and price.  The Broker Defendants also owe their clients a duty of candor and full disclosure, and therefore must disclose to their clients the sources and amounts of all income received from any transactions involving them.

6.      Due to their expertise and promises of fiduciary advice and services, Plaintiff and the Class engaged the services of Broker Defendants, unaware that their brokers, the Broker Defendants, entered into the undisclosed Contingent Commission Agreements with the Insurer Defendants, and furthermore, that the Broker Defendants were engaging in this illegal conduct with specific Insurer Defendants to further Defendants' own financial interests.

7.      The Contingent Commission Agreements destroy any objectivity that the Broker Defendants have in advising and servicing their clients and constitute a breach of the Broker Defendants' fiduciary and other duties to their clients.  The Broker Defendants have failed to

adequately disclose to their clients the existence and/or terms of the Contingent Fee Agreements, or the fees that they receive pursuant to those agreements. While purporting to provide independent and fiduciary services to Plaintiff and the Class, the Broker Defendants have violated their duties to them, deceived them, willfully acted against their interests, and wrongfully enriched themselves at the expense of Plaintiffs and the Class.

8.      The Insurer Defendants are bound to abide by their fiduciary obligations and duties of loyalty to their clients, including Plaintiff and the Class. As fiduciaries of Plaintiff and members of the Class, Insurer Defendants were obligated to discharge their duties solely in the interests of Plaintiff and members of the Class, and specifically to provide insurance through a fair bidding process, exercising good faith and fair dealing, full and fair disclosure, and care and loyalty to the interests of Plaintiff and members of the Class. The Insurer Defendants have breached those duties by participating in a conspiracy with each other and with the Broker Defendants in order to obtain additional business through the undisclosed Contingent Commission Agreements described herein, in disregard of the interests of the Plaintiff and members of the Class.

9.      In connection with the Contingent Commission Agreements, certain of the Defendants have also engaged in a bid-rigging and customer allocation scheme by which they have allocated customers among themselves to maximize their respective revenues and other benefits under the Contingent Commission Agreements. As part of this scheme, certain of the Insurer Defendants submit fictitious bids to certain of the Broker Defendants to ensure that a pre-determined Insurer Defendant will be selected as the winning bidder and thereby obtain the business of the Insurance Broker Defendant's client. In this manner, these Defendants

intentionally create the false appearance of an open and competitive bid selection process to deceive the Broker Defendants' clients into the belief that true market competition had occurred.

10.    As set forth in detail herein, Plaintiff and the Class have been the victims in a widespread and pervasive fraudulent scheme in which the Defendants have reaped literally billions of dollars at their expense.  All of the Defendants benefit at the expense of the Class. The Broker Defendants maximize their commissions and revenues resulting from increased premiums under the Contingent Commission Agreements by ensuring that their clients purchase insurance products only from those carriers with which the Broker Defendants have Contingent Commission Agreements, and, further, that their clients' policies are renewed with those particular insurers.  The Insurer Defendants in turn are able to sell their insurance products at less competitive rates and terms than would otherwise be dictated by a free market, while increasing the volume and profitability of their business and protecting themselves from competition.

11.    Further evidencing the pervasiveness of the scheme alleged is the fact that it has attracted massive government attention, including an investigation by the Massachusetts Attorney General.  As described in detail below, several state Attorneys General and departments of insurance have launched formal investigations and/or filed actions against one or more of the Defendants.  These investigations have resulted in fines or settlements totaling in the hundreds of millions of dollars.  Numerous officers of employees of the Defendants have been forced to resign, and ***at least ten employees or officers of the Defendants have already pled guilty to criminal charges*** in connection with the very conduct described herein.  As observed by California insurance commissioner John Garamendi, in the midst of launching an investigation into several of the Defendants named herein, among others: "All across America a

scandal is erupting.  The insurance industry has been involved in ripping off consumers in a new way."

**PARTIES**

12.     Plaintiff and proposed class representative, Rehab Seating Systems, Inc., is a Massachusetts corporation with principal place of business in Massachusetts.  Plaintiff purchased Insurance Products at inflated prices within Massachusetts, including Workers Compensation and Employers Liability Policies from Defendants Liberty Mutual Fire Insurance Co., Liberty Mutual Insurance Company and affiliates of Defendant Liberty Mutual Group, Inc., during the Class Period.

13.     Plaintiff also purchased Insurance Products at inflated prices within Massachusetts, including Commercial Property and Commercial General Liability policies, from Defendant St. Paul Travelers and/or its affiliates, during the Class Period.

**BROKER DEFENDANTS**

14.     Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware corporation with its principal place of business in New York County, New York, and at all times relevant hereto conducted business in the Commonwealth of Massachusetts.  Defendant Marsh Inc. (together with MMC, "Marsh") is a Delaware corporation and is a wholly owned subsidiary of MMC, with its principal place of business in New York County, New York, at all times relevant hereto conducted business in the Commonwealth of Massachusetts, and maintains an office in Boston, Massachusetts.  Throughout the Class Period, Marsh, as described in detail below, engaged in illegal and unethical Contingent Commission Agreements and/or participated in bid-rigging with various insurers, including within the Commonwealth of Massachusetts.  The Contingent Commission Agreements described herein constituted more than half of Marsh's $1.5

billion in earnings in 2003.  Marsh has been investigated and sued by several state attorneys

general, and has agreed to pay $850 million to settle a lawsuit filed against it by the New York

Attorney General in connection with the conduct alleged herein.  In addition, three Marsh

employees have pled guilty to criminal charges in connection with the Contingent Commission

Agreements and other conduct alleged.

15.     Defendant Hilb Rogal & Hobbs Company ("HRH") is a Virginia corporation with

principal place of business at 4951 Lake Brook Drive, Suite 500, Glen Allen, Virginia 23060,

and at all times relevant hereto conducted business in the Commonwealth of Massachusetts.

According to HRH's Internet web site, it is the seventh largest insurance brokerage firm in the

United States, with over 120 offices throughout the nation, including offices in Boston, Lowell

and Wilmington, Massachusetts.  Throughout the Class Period, HRH engaged in illegal and

unethical Contingent Commission Agreements and/or participated in bid-rigging with various

insurers, including within the Commonwealth of Massachusetts.  HRH's contingent commission

revenue was at least in the hundreds of millions of dollars during the Class Period, including

$37.3 million in the first quarter of 2005 alone.  HRH has been subpoenaed by at least 10 state

insurance regulators, including those in Massachusetts, Connecticut, Florida, and North

Carolina, following Spitzer's investigation of contingent commissions and alleged bid-rigging

among the largest brokers.  HRH perpetrated and participated in a massive scheme to manipulate

the market for commercial insurance.

16.     Defendant Willis Group Holdings Limited ("Willis") is a Bermuda corporation

with principal place of business at Ten Trinity Square, London EC3P 3AX, England.  Willis

maintains offices throughout the United States, at all times relevant hereto conducted business in

the Commonwealth of Massachusetts, and maintains an office in Boston, Massachusetts.

According to its filings with the SEC, Willis and its subsidiaries provide management consulting and insurance brokerage services, both directly and indirectly through its associates. Throughout the Class Period, Willis engaged in illegal and unethical Contingent Commission Agreements and/or participated in bid-rigging with various insurers, including within the Commonwealth of Massachusetts. Willis' contingent commission revenue was at least in the hundreds of millions of dollars during the Class Period, including $80 million in 2003 and $21 million in the first quarter of 2004 alone. Willis has received requests for documents and information pertaining to its undisclosed compensation practices from at least 19 states and the District of Columbia. Willis has also announced that it has reached agreements with the Attorney General of New York and the Attorney General of Minnesota to resolve issues raised by those offices' pending investigations into Willis' contingent commissions, and has paid a total of $51 million to resolve those claims. In addition, in May 2005, Willis announced it had set aside an additional $20 million to resolve further potential legal claims.

17.    Defendant Arthur J. Gallagher & Co. ("AJG") is a Delaware corporation with principal place of business at Two Pierce Place, Itasca, Illinois 60143, at all times relevant hereto conducted business in the Commonwealth of Massachusetts, and maintains offices in Boston and Braintree, Massachusetts. According to its Internet web site, AJG is the world's fourth largest insurance brokerage and risk management services firm. AJG's principal activity is the negotiation and placement of insurance for its clients. AJG operates through a network of more than 250 sales and service offices located throughout the United States, including within Massachusetts. Throughout the Class Period, AJG engaged in illegal and unethical Contingent Commission Agreements and/or participated in bid-rigging with various insurers, including within the Commonwealth of Massachusetts. AJG's contingent commission revenue was at least

in the hundreds of millions of dollars during the Class Period. According to Securities and
Exchange Commission filings, AJG's contingent commissions were $39.5 million in 2004, $32.6
million in 2003, $25.2 million in 2002, and $20.7 million in the first quarter of 2005. In addition
to a probe by the New York state Attorney General, a mix of 14 other state attorneys general and
state departments of insurance have issued subpoenas to AJG or initiated investigations relating
to the company's handling of contingent commissions and other business practices. AJG has
announced that it has set aside $35 million to settle certain of these investigations.

        18.     Defendant USI Holdings, Inc. ("USI") is a Delaware corporation with principal
place of business at 555 Pleasantville Road, Suite 160 South Briarcliff Manor, NY 10510, and at
all times relevant hereto conducted business in the Commonwealth of Massachusetts, and
maintains offices in Leominster and Woburn, Massachusetts. According to its Internet web site,
USI is the 9th largest insurance brokerage firm in the United States, with operations in 19 states,
including Massachusetts. Throughout the Class Period, USI engaged in illegal and unethical
Contingent Commission Agreements and/or participated in bid-rigging with various insurers,
including within the Commonwealth of Massachusetts. USI's contingent commission revenue
was at least in the hundreds of millions of dollars during the Class Period, including $18 million
in the first quarter of 2005 alone. According to its report on SEC form 10-Q for the quarter
ending September 30, 2004, USI's revenues from contingent commissions were approximately
$17.0 million and $16.1 million for the nine months ended September 30, 2004 and 2003,
respectively. USI has received subpoenas from, among others, the Attorneys General of the
States of New York and Connecticut requesting documents and seeking information as part of an
industry-wide investigation of the conduct alleged herein.

19.     Defendant Universal Life Resources ("ULR") is a California Limited Partnership and Defendant ULR Insurance Services, Inc. ("ULR Insurance") is a California corporation, both with principal place of business at 12264 El Camino Real, Suite 303, San Diego, California, and at all times relevant hereto conducting business in the Commonwealth of Massachusetts. Universal Life Resources promotes itself as a national group life, accident and disability consulting company that provides broker services to its clients, the insured. ULR Insurance is the general partner of Universal Life Resources and it is the successor-in-interest of Universal Life Resources Insurance Services, Inc. and Universal Life Resources, Inc. ULR Insurance is authorized to sell insurance on behalf of Metropolitan Life Insurance Company, Prudential Insurance Company of America, Life Insurance Company of North America, Connecticut General Life Insurance Company, Provident Life and Accident Insurance Company, and UnumProvident Life Insurance Company of America. Throughout the Class Period, the ULR defendants engaged in illegal and unethical Contingent Commission Agreements and/or participated in bid-rigging with various insurers, including within the Commonwealth of Massachusetts. In November 2004, the New York State Insurance Department issued citations to ULR Insurance, ULR and other related entities as part of the Department's ongoing investigation with New York State Attorney General Eliot Spitzer's office into Contingent Commission Agreements. The ULR entities were charged with steering business illegally to insurers who paid fees that were not disclosed to the corporations that retained them.

## INSURER DEFENDANTS

20.     Defendant The St. Paul Travelers Companies, Inc. ("St. Paul Travelers") is a Minnesota corporation with principal place of business at 385 Washington Street, St. Paul, MN 55102, at all times relevant hereto conducted business in the Commonwealth of Massachusetts,

and maintains an office in Middleboro, Massachusetts.   The St. Paul Companies, Inc. ("The St.

Paul") and Travelers Property Casualty Corp. ("Travelers") merged to form St. Paul Travelers on

April 1, 2004.  St. Paul Travelers provides commercial property-casualty insurance, personal

property-casualty insurance and asset management services nationwide, including within

Massachusetts.  Throughout the Class Period, St. Paul Travelers entered into illegal and

unethical Contingent Commission Agreements and/or participated in bid-rigging with various

insurance brokers, including within the Commonwealth of Massachusetts.  St. Paul Travelers

was named in an internal Willis communication recently made public as one of the insurers

receiving an unfair competitive advantage due to its Contingent Commission Agreement with

Willis.

        21.       Defendant Zurich American Insurance Company ("Zurich") is a New York

corporation with principal place of business at 1400 American Lane, Schaumburg, IL 60196, at

all times relevant hereto conducted business in the Commonwealth of Massachusetts, and

maintains offices in Massachusetts.  Zurich is a subsidiary of Zurich Financial Services, an

insurance-based financial services provider headquartered in Zurich, Switzerland.  Zurich

describes itself as "a leading commercial property-casualty insurance provider serving the global

corporate, large corporate, middle market, small business . . .  specialties and programs sectors."

Throughout the Class Period, Zurich entered into illegal and unethical Contingent Commission

Agreements and/or participated in bid-rigging with various insurance brokers, including within

the Commonwealth of Massachusetts.  In fact, two senior underwriters from Zurich have pleaded

guilty to criminal charges in connection with the conduct alleged herein.

        22.       Defendant Liberty Mutual Group Inc. is a Massachusetts corporation with

principal place of business at 175 Berkeley St., Boston, MA 02117.  Liberty Mutual Group, Inc.

sells insurance in the United States through four direct subsidiaries, Liberty Mutual Insurance

Company, Liberty Mutual Fire Insurance Company, Employers Insurance Company of Wausau

and St. James Insurance Company Ltd. (collectively, "Liberty"). Liberty describes itself as "the

eighth largest property and casualty insurer in the United States." Throughout the Class Period,

Liberty entered into illegal and unethical Contingent Commission Agreements and/or

participated in bid-rigging with various insurance brokers, including within the Commonwealth

of Massachusetts. Liberty was named in an internal Willis communication recently made public

as one of the insurers receiving an unfair competitive advantage due to its Contingent

Commission Agreement with Willis. Liberty also entered into a Contingent Commission

Agreement with AON Corporation, the world's largest reinsurance broker, largest captive

insurance company manager, and second largest insurance brokerage firm, which has been sued

by, among others, the New York Attorney General for its participation in the contingent

commission scandal. Liberty was also subpoenaed by the Connecticut and New York Attorneys

General in their investigations of contingent commission practices in the insurance industry, and

the Massachusetts Attorney General has also begun an investigation into Liberty's Contingent

Commission Agreements.

      23.      Defendant MetLife, Inc. ("MetLife") is a publicly-held company, incorporated in

the State of Delaware and headquartered in the State of New York, and at all times relevant

hereto conducted business in the Commonwealth of Massachusetts. MetLife designs, develops,

markets and sells insurance products for individuals and business clients throughout the United

States. For purposes of this Complaint, MetLife includes it subsidiary, Metropolitan Life

Insurance Company ("Metropolitan Life"), as well as other subsidiaries, affiliates, partnerships,

joint ventures, divisions, business units and affiliated entities that are authorized to sell insurance

in the United States.  During the Class Period, Metlife, along with its subsidiaries and affiliates,

engaged in illegal and unethical Contingent Commission Agreements and/or participated in bid-

rigging, including within the Commonwealth of Massachusetts.  In 2003 alone, Metlife paid

approximately $25 million in contingent commissions.  MetLife has received several subpoenas

from the New York A.G.'s office seeking information regarding its compensation agreements

with brokers, and has also received formal requests from other state authorities, including the

Massachusetts and Connecticut A.G.'s offices, seeking information regarding its Contingent

Commission Agreements and bid-rigging activities.  Metlife was also identified in a suit by the

New York Attorney General as one insurer that paid contingent commissions to Defendant ULR.

     24.     Defendant Prudential Financial, Inc. ("Prudential") is a publicly-held company

incorporated in the State of New Jersey and which conducts substantial business throughout the

United States, and at all times relevant hereto conducted business in the Commonwealth of

Massachusetts.  Prudential designs, develops, markets and sells insurance products for

individuals and business clients.  For purposes of this Complaint, Prudential includes its

subsidiary, The Prudential Insurance Company of America ("Prudential Insurance"), as well as

its other subsidiaries, affiliates, partnerships, joint ventures, divisions, business units and

affiliated entities that are authorized to sell insurance in the United States.  During the Class

Period, Prudential, along with its subsidiaries and affiliates, engaged in illegal, unethical and

undisclosed Contingent Commission Agreements and/or participated in bid-rigging, including

within the Commonwealth of Massachusetts.  Prudential has or had Contingent Commission

Agreements with at least 150 brokers, including Broker Defendant ULR.  Prudential was

identified as an insurer participating in the conduct alleged herein in lawsuits brought by the

Attorney General of New York and the California Insurance Commissioner.  Prudential was

named as a defendant in the California Insurance Commissioner's suit.

25.    Defendant UnumProvident Corporation ("UnumProvident") is a publicly-traded

company incorporated in Delaware and headquartered in Tennessee which is the leading

provider of a group long-term, short-term and individual disability income products in the world.

Unumprovident is registered to do business in Commonwealth of Massachusetts, maintains an

office in Boston, Massachusetts, and maintains a registered agent at 101 Federal Street, Boston,

Massachusetts 02110.  For purposes of this Complaint, UnumProvident includes its subsidiaries,

UnumProvident Life Insurance Company of America and Provident Life and Accident Insurance

Company, as well as other subsidiaries, affiliates, partnerships, joint ventures, divisions, business

units and affiliated entities that are authorized to sell insurance and conduct business in

Massachusetts.  During the Class Period, UnumProvident, along with its subsidiaries and

affiliates, engaged in illegal, unethical and undisclosed Contingent Commission Agreements

and/or participated in bid-rigging, including within the Commonwealth of Massachusetts.  In

June 2004, UnumProvident received a subpoena from the Office of the New York Attorney

General requesting documents and information relating to compensation agreements between

insurance brokers and the Company and its subsidiaries.  In addition, on October 26, 2004,

UnumProvident received a subpoena from the Office of the Attorney General of the State of

Connecticut requesting, *inter alia*, information regarding compensation agreements with brokers.

On October 25, 2004, UnumProvident also received a letter from the Massachusetts Division of

Insurance seeking similar information.

26.    Defendant ACE USA, ("ACE") is a subsidiary of ACE INA, the U.S.-based

division of the ACE Group of Companies which provides insurance and reinsurance for a diverse

group of clients around the world, and at all times relevant hereto conducted business in the Commonwealth of Massachusetts. ACE Limited, which has over $49 billion in assets, is the Bermuda-based holding company of the ACE Group of Companies which had a written $14.6 billion in 2003 gross premiums. ACE, which includes ACE's operations in Canada, is organized into the following business units: ACE Accident & Health, ACE Casualty Risk, ACE Professional Risk, ACE Risk Management, ACE Select Markets, ACE Specialty Products, ACE US International, and ESIS, Inc. During the Class Period, ACE, along with its subsidiaries and affiliates, engaged in illegal, unethical and undisclosed Contingent Commission Agreements and/or participated in bid-rigging, including within the Commonwealth of Massachusetts. ACE has received at least 43 separate subpoenas and requests for information from various state and federal sources for information related to ongoing investigations into the conduct alleged herein, including an inquiry from the Attorney General of Massachusetts. In addition, an Assistant Vice President in ACE's excess casualty division has pled guilty to criminal charges based on the conduct alleged herein. ACE has also dismissed or suspended at least five other employees based on the same or similar conduct. In addition, ACE's chief executive officer, Susan Rivera, who had led ACE USA since May 2002 and directed all aspects of ACE INA's North American commercial insurance operations, has resigned.

27.     Defendant American International Group ("AIG") is a Delaware corporation with its principal place of business located at 70 Pine Street, New York, New York, 10270, at all times relevant hereto conducted business in the Commonwealth of Massachusetts, and maintains offices in Boston, Massachusetts. AIG is the world's leading international insurance and financial services organization, with operations in more than 130 countries and jurisdictions. AIG member companies serve commercial, institutional and individual customers through the

most extensive worldwide property-casualty and life insurance networks of any insurer.  In the United States, AIG companies are the largest underwriters of commercial and industrial insurance and AIG American General is a top-ranked life insurer.  AIG's global businesses also include retirement services, financial services and asset management.  During the Class Period, AIG, along with its subsidiaries and affiliates, engaged in illegal, unethical and undisclosed Contingent Commission Agreements and/or participated in bid-rigging, including within the Commonwealth of Massachusetts.  In addition, four AIG employees have pled guilty to criminal charges in connection with the conduct alleged herein.

28.    Defendant The Chubb Corporation ("Chubb") is a New Jersey corporation with its principal place of business located at 15 Mountain View Road, Warren, New Jersey 07059, at all times relevant hereto conducted business in the Commonwealth of Massachusetts, and maintains an office in Boston, Massachusetts.  Chubb is a holding company for a family of property and casualty insurance companies known informally as the Chubb Group of Insurance Companies (the P&C Group).  The P&C Group is divided into three business units.  Chubb Commercial Insurance offers a range of commercial customer insurance products, including coverage for multiple peril, casualty, workers' compensation and property and marine. Chubb Specialty Insurance offers specialized executive protection and professional liability products for privately and publicly owned companies, financial institutions, professional firms and healthcare organizations.  Chubb Specialty Insurance also includes the Company's surety and accident businesses, as well as its reinsurance assumed business.  Chubb Personal Insurance offers products for individuals with fine homes and possessions who require more coverage choices and higher limits than standard insurance policies.  Chubb serves property and casualty customers from more than 130 offices in 29 countries and 32 states.  During the Class Period,

Chubb, along with its subsidiaries and affiliates, engaged in illegal, unethical and undisclosed

Contingent Commission Agreements and/or participated in bid-rigging, including within the

Commonwealth of Massachusetts.  Chubb was named in an internal Willis communication

recently made public as one of the insurers receiving an unfair competitive advantage due to its

Contingent Commission Agreement with Willis.

29.     Defendant American Re-Insurance Company ("ARC") is a wholly owned

subsidiary of the German-based Munich Reinsurance Company, and does business through its

Munich-American Risk Partners division ("Munich").  Munich's principal place of business is

located at 685 College Road East, Princeton, New Jersey, 08543, and at all times relevant hereto

conducted business in the Commonwealth of Massachusetts.  ARC is licensed in all 51 U.S.

jurisdictions and operates in the U.S. and elsewhere to provide reinsurance capacity to a wide

variety of clients, and maintains an office in Boston, Massachusetts. Munich offers a broad range

of insurance and reinsurance products including but not limited to: casualty, property, workers'

compensation, professional liability, management and corporate liability, and healthcare.  During

the Class Period, ARC and Munich engaged in illegal, unethical and undisclosed Contingent

Commission Agreements and/or participated in bid-rigging, including within the Commonwealth

of Massachusetts.

30.     At all material times, upon information and belief, each Defendant authorized

and/or acted by and through its officers, employees, agents, servants, and/or representatives,

including those actively engaged in the management of Defendants' business or affairs.

31.     Subject to the definition of "Insurance Products" below, at all material times,

every reference made in this Complaint to any corporate Defendant includes predecessors,

successors, parents, subsidiary, affiliates, and divisions of the corporation for the corresponding time period.

32.     For the purposes of this Complaint, MARSH, AJG, WILLIS, USI, HRH and ULR are referred to collectively as "Broker Defendants."

33.     AIG, ACE, ARC, Metlife, Chubb, Unumprovident, St. Paul Travelers, Zurich, Prudential and Liberty are referred to collectively as "Insurer Defendants."

34.     For the purposes of this Complaint, the Insurer Defendants and the Broker Defendants will be referred to collectively as "Defendants."

35.     Plaintiff sues the Broker Defendants both individually and as representatives of a class comprised of all insurance brokers and agents that, during the Class Period, engaged in the illegal and unethical Contingent Commission Agreements described herein with the Insurer Defendants.

36.     Plaintiff sues the Insurer Defendants both individually and as representatives of a class comprised of all insurance companies that, during the Class Period, engaged in illegal and unethical Contingent Commission Agreements described herein with various insurance brokers.

37.      Plaintiff does not know the exact number of members of each Defendant Class, because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, the Defendant class members are sufficiently numerous and geographically dispersed throughout the United States.

38.     Questions of law and fact common to the members of the Insurer Defendant Class and the Insurance Broker Defendant Class predominate over questions, if any, that may affect only individual members of those classes, including legal and factual issues relating to liability and damages.

39.     The claims brought against the Insurer Defendants and the Broker Defendants are typical of the claims brought against the members of the classes they represent.

40.     The Insurer Defendants and the Broker Defendants are adequate representatives of the classes they represent, as they have no interests that are adverse to, or in conflict with, other members of those classes.

41.     The prosecution of separate actions against each member of the Defendant Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

42.     Class action treatment is also superior to other methods available for the fair and efficient adjudication of this controversy, and Plaintiff knows of no difficulty to be encountered by litigating this action against the Insurer Defendants and the Broker Defendants on a classwide basis.

## DEFINITIONS

43.     For the purposes of this Complaint, the term "Insurance Products" consists of commercial general liability insurance, property and casualty insurance, excess property and casualty or liability insurance, health insurance, surplus lines reinsurance, personal life and accident insurance, and homeowners and automobile insurance and reinsurance, but excludes variable life insurance policies, variable annuities, or any other insurance product that could be characterized as a "covered security" under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. §§ 77(p) and 78(bb)(f).  Also excluded from this definition of Insurance Products is any insurance policy or coverage provided as part of an employee benefit plan or which is otherwise subject to or actionable under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.

44.     For purposes of this Complaint, "Contingent Commission Agreement" refers to an agreement whereby insurers pay sums to insurance brokerage companies to obtain business from the latter.  The precise terms of these agreements, or the names used by the individual insurers or brokers are within the exclusive possession of the Defendants, but they commonly require the insurance company to pay the broker based on one or more of the following:  (a) how much business a broker places with the insurer; (b) how many of the brokers' clients renew policies with the insurer; and (c) the profitability of the business placed by the broker.

### JURISDICTION & VENUE

45.     Jurisdiction over each Defendant exists and is proper in the Commonwealth of Massachusetts.

46.     At all material times, without limiting the generality of the foregoing, jurisdiction exists over each Defendant (directly or through agents who at the time were acting with actual and/or apparent authority and within the scope of such authority) in each of the following respects.  Defendants:

    a.      Transacted business in the Commonwealth of Massachusetts;

    b.      Contracted to supply and/or obtain services and/or goods and Insurance Products in the Commonwealth of Massachusetts;

    c.      Intentionally availed themselves of the benefits of doing business in the Commonwealth of Massachusetts;

    d.      Produced, promoted, sold, marketed and/or distributed their  Insurance Products and/or services in this Commonwealth and, thereby, have purposefully profited from their access to this Commonwealth's markets;

    e.      Caused tortious damage by acts or omissions in the Commonwealth of Massachusetts;

    f.      Caused tortious damage in the Commonwealth of Massachusetts by acts or omissions committed outside Massachusetts while:  (i) regularly doing or soliciting

business in this Commonwealth concerning their Insurance Products; and/or, (ii) engaging in other persistent courses of conduct within Massachusetts; and/or, (iii) deriving substantial revenue from goods used or services rendered in Massachusetts;

      g.      Committed acts and omissions which Defendants knew would cause injury (and, in fact, did cause injury) in the Commonwealth of Massachusetts to Plaintiff and members of the Class (as defined herein) while: (i) regularly doing or soliciting business in Massachusetts; and/or, (ii) engaging in other persistent courses of conduct within Massachusetts; and/or (iii) deriving substantial revenue from goods used or services rendered in Massachusetts concerning Defendants' Insurance Products;

      h.      Conspired with others who did have the requisite minimum contacts with Massachusetts; and/or

      i.      Otherwise had the requisite minimum contacts with Massachusetts, such that under the circumstances it is fair and reasonable to require Defendants to come to this Court to defend this action.

47.      Neither the Plaintiff nor any member of the Class has suffered damages exceeding $74,999.00 each, even when trebled. In no event will Plaintiff or any member of the Class accept damages in excess of $74,999.00. Further, attorneys' fees on a pro-rata basis will not exceed $74,999.00 for each class member.

48.      Plaintiff states, and intends to state, a cause of action solely under the laws of Massachusetts and specifically denies any attempt to state a cause of action under the laws of the United States of America, including, without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1, the Securities Act of 1933, 15 U.S.C. §§ 77a, the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq., SLUSA, or ERISA.

49.      Venue is proper in this County because Defendants regularly transact business in this County, including the brokerage, sales and service of Insurance Products, and/or maintain offices or authorized agents in this County.

## ADDITIONAL ALLEGATIONS OF WRONGDOING

### BACKGROUND

50.     There are three types of entities in the insurance market: (i) clients; (ii) brokers and independent agents (collectively, "brokers"); and (iii) insurance companies.  If the market were operating fairly and efficiently, the roles of these entities would be as follows:  Brokers are hired by clients to advise them as to coverage needs and to find insurance companies offering that coverage.  Brokers, acting in the best interest of the client, are to obtain price quotes, present the quotes to the client, and make recommendations to the client based on price and other factors.  Insurance companies submit quotes to the brokers, who in turn pass the quotes along to the client with a recommendation.  If selected by the client, the insurer enters into a contract to provide insurance for that client's risk.

51.     In this structure, the client makes two types of payments:  (1) it pays its broker an advisory fee or a commission for locating the best insurer; and (2) it pays the chosen insurance company premiums for the coverage itself.

52.     In addition to the first commission payment described above, pursuant to the Contingent Commission Agreement scheme described herein and unbeknownst to Plaintiff and the other members of the Class, the Broker Defendants would receive a second payment from the Insurer Defendants.  These agreements generally require the Insurer Defendant to pay the Insurance Broker Defendant based on one or more of the following:  (1) how much business the broker places with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

53.    During the 1990s, Defendants designed and executed a business plan under which the Insurer Defendants agreed to pay the Broker Defendants "contingent commissions" to steer them business and shield them from competition.

54.    These Contingent Commission Agreements created improper incentives for Defendants, as the contingent commission payments to the Broker Defendants determined to whom business would be directed.

55.    This business plan, as practiced by Defendants, was phenomenally profitable for both the Broker Defendants and the Insurer Defendants.  This profit margin, however, comes at the expense of Plaintiff and the other members of the Class, and the marketplace for insurance, which Defendants have corrupted by distorting and elevating the price of insurance for every policyholder.  Hundreds of millions of dollars of the Insurance Broker and Insurer Defendants' profits have, at all times relevant hereto, been derived from the illegal activities described herein.

### THE BROKER DEFENDANTS FALSELY AND DECEPTIVELY PROMOTE A "FIDUCIARY RELATIONSHIP" BETWEEN BROKERS AND CLIENTS

56.    The Broker Defendants claim that they work for their client, not for the insurance companies.  Each Broker Defendant owes a strict fiduciary duty to its clients, including Plaintiff and the Class.

57.    However, through the Contingent Commission Agreements, the Broker Defendants have actually promoted the interests of insurance companies over the interests of their clients, and have otherwise breached their fiduciary duties to their clients.

58.    The Contingent Commission Agreements create perverse incentives for the Broker Defendants.  For example, when Broker Defendants steer business to the favored insurance companies, i.e. the Insurer Defendants, those insurance companies, in turn, pay the

Broker Defendants higher fees.  In addition, when Broker Defendants help favored insurance companies (Insurer Defendants) retain their existing business at renewal time, those insurance companies pay Broker Defendants higher fees.  Those insurance companies also pay Broker Defendants higher fees when Broker Defendants steer more profitable business (policies with low claims ratios) to favored Insurer Defendants.

59.     Most importantly, when the clients pay higher premiums, volume and profitability rise -- again increasing the Broker Defendants' fees.  Broker Defendants, therefore, do not, as they routinely contend, put their client's best interests first, nor are these Broker Defendants truly their clients' advocate.  To the contrary, Broker Defendants have represented their own interests and those of their favored Insurer Defendants.  Both the Insurer Defendants and Broker Defendants profit because of their common interest to maximize premiums, which is created by the Contingent Commission Agreements.

60.     In addition, Broker Defendants have repeatedly provided clients with false and inflated quotes.  They frequently designate a winner, and then solicit inflated bids from other insurance companies, who provide such bids, knowing that later they themselves will have a turn to get business without meaningful competition.  A choice made by a client under these circumstances has been made under false pretenses created by both Broker Defendants and the complicit Insurer Defendants.

61.     As further set forth below, steering business to Insurer Defendants with whom they have Contingent Commission Agreements is fundamental to the Broker Defendants' business plan.

### THE INSURER DEFENDANTS PARTICIPATED IN
### KICKBACK SCHEMES WITH BROKER DEFENDANTS

62.    The Insurer Defendants have participated in the illegal and massive conspiracy described herein.  These Insurer Defendants have paid hundreds of millions of dollars for Broker Defendants to steer business their way, and otherwise engage in a breach of fiduciary duty to Plaintiff and Class Members.

63.    At times, the Insurer Defendants have gone even further, colluding with Broker Defendants to rig bids and submit false quotes to unwitting clients throughout the United States.

64.    At all material times, these Insurer Defendants had opportunities to refrain from engaging in the unlawful conduct alleged herein.  However, at no time did they report the Broker Defendants to federal, state, or local law enforcement agencies or financial services and insurance regulatory agencies.  Instead, the Insurer Defendants engaged in the collusion described herein, costing their clients hundreds of millions, if not billions, of dollars.

### ALL BROKER AND INSURER DEFENDANTS ENGAGED IN
### UNLAWFUL USE OF UNDISCLOSED CONTINGENT COMMISSION AGREEMENTS

65.    The practice of using undisclosed Contingent Commission Agreements was widespread throughout the insurance industry throughout the Class Period.  The practice was the product of an unlawful conspiracy between the Insurer Defendants and the Broker Defendants. Any single Broker Defendant could not continue to utilize these arrangements unless it knew and had the understanding that its competing brokers were likewise using them and that insurers were acquiescing in and cooperating with their use.  Individual insurers likewise agreed to these arrangements with the knowledge and understanding that other competing insurers agreed to them as well.

66.     Though ongoing for many years, the practice reached a new level beginning in the mid 1990s, due partly to the efforts of William Gilman ("Gilman"), a Managing Director at Marsh and the Executive Marketing Director of Marsh Global Broking ("MGB").  Gilman helped to further the system at the heart of the scandal – channeling business to insurance companies that paid the biggest commissions to Marsh, rather than to insurers willing to provide the lowest quotes.  In the early 1990s, in order to satisfy MMC's demand for greater profits, Marsh began to increasingly emphasize Contingent Commission Agreements, also referred to by Marsh as Market Service Agreements, ("MSAs"), that required insurers to pay Marsh fees based on the volume of business referred.

67.     In the late l990s, Marsh began internally rating the insurance companies with whom it dealt based on how much they paid Marsh pursuant to their contingent commission agreements.  Managers were instructed by Marsh executives to steer clients to those insurance companies with which Marsh had the most profitable Contingent Commission Agreements. Marsh executives issued these instructions even though they knew that the Insurer Defendants with the more favorable Contingent Commission Agreements would have an unfair competitive advantage over other insurers.

68.     The other Broker Defendants also participated in escalating the use of Contingent Commission Agreements, and the practices complained of herein are widespread and the resultant breaches of fiduciary duty extend throughout the insurance industry.  The New York Attorney General's office stated, after filing an action against Broker Defendant Marsh:

> [t]he actions against the brokerage firm, Marsh & McLennan Companies, and the two executives stem from a widening investigation of fraud and anti-competitive practices in the insurance industry.  Evidence revealed in today's lawsuit also implicates other major insurance carriers . . . The insurance industry needs to take a long, hard look at itself . . . If the practices identified in our suit are as

widespread as they appear to be, then the industry's fundamental business model needs major corrective action and reform. There is simply no responsible argument for a system that rigs bids, stifles competition and cheats customers. . ."

69.     In testimony given before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, New York Attorney General ("A.G.") Elliott Spitzer ("Spitzer") further confirmed that "contingent commissions have affected practically every line of insurance business" including reinsurance.

70.     Contingent commissions comprise 5 percent of revenues and 15 percent of earnings for publicly traded brokers.  It has been estimated that in 2003 alone, industry-wide property/casualty contingent commissions totaled $4.2 billion.

71.     This contingent commission system gave the incentive to the Broker Defendants to direct their clients to insurers that would necessarily increase the compensation of the Broker Defendants and their agents and profits, at the expense of clients, who were deprived of fair price competition for insurance products.  Yet, none of these practices were fully and accurately described to clients and most were secret and never disclosed at all, even though the Broker Defendants had a fiduciary obligation to do so.  When individual employees of the Broker or Insurer Defendants raised concerns about the ethical consequences of the Contingent Commission Agreements, they were ignored.

72.     Thus, while the Broker Defendants portrayed themselves as "advocates" for their clients who acted in their clients' best interest, by virtue of the practices described herein, they repeatedly and consistently acted against the best interests of their clients in order to maximize their own profits through unfair and unlawful competitive acts.

73.     The Broker Defendants have explicitly told insurance companies that Contingent Commission Agreements more favorable to the Broker Defendants would result in the Broker

Defendants selling more of that insurer's policies.  Consequently, the Insurer Defendants realize

they can increase sales by agreeing to pay a higher contingent commission rate to the Broker

Defendants.  Broker Defendants also threaten to cut insurers out if they did not agree to a high

enough contingent commission rate.  In addition, the Broker Defendants have also made a

practice of transferring existing clients to insurers willing to pay a higher contingent commission

rate.

74.    Often, the Contingent Commission Agreements provide that the Broker

Defendant would receive a bonus for renewals of existing coverage, which increased if the

renewal rate among all of the Broker's clients was above a particular percentage.

75.    At times, the Insurer Defendants also colluded with the Broker Defendants to rig

bids and submit false quotes to unwitting clients throughout the United States, in furtherance of

the conspiracy by the Broker Defendants and Insurer Defendants to allocate customers and

utilize Contingent Commission Agreements on an industry-wide basis.

76.    Although the Broker Defendants had a fiduciary duty to field independent bids

from various insurers, so that the client could have the choice of their best premium rate, in a

bid-rigging situation, the Broker Defendant would solicit a single bid from one Insurer it wished

to designate as the "winner."  The Broker Defendant would then solicit artificially high bids

from other Insurers, so that it would appear that the client was receiving a good deal.  In other

situations, the Broker Defendant would solicit an artificially-inflated opening bid so the Broker

Defendant would appear to have provided a valuable service when it later solicited a lower bid

from another Insurer.  The Insurer Defendants cooperated in this practice by submitting false

bids, with the promise of having the Broker Defendant steer a different client in its direction.

### The Investigations And Prosecutions By Government Agencies

77.     The conduct described herein has attracted massive government attention, further

evidencing the industry-wide breadth of Defendants' scheme.  State A.G.'s and insurance

departments nationwide have launched investigations into the undisclosed Contingent

Commission Agreements, bid-rigging, and other conduct described herein, demonstrating the

industry-wide character of the scheme alleged.  These investigations and the resulting lawsuits

have resulted in the payment of hundreds of millions of dollars in fines or settlements paid by the

Broker and Insurer Defendants.

78.     Government entities in Massachusetts, New York, Minnesota, California,

Connecticut, Delaware, Florida, Illinois, New Jersey, Pennsylvania and other states have

launched investigations into insurers and insurance brokers.  Specifically:

    a.      Massachusetts Attorney General Thomas Reilly has launched an
investigation into insurers in the state to examine the contingent commissions that they
pay insurance brokers for new business.  Massachusetts is actively investigating the
contingent commissions paid in the state, and is targeting insurance brokers who advise
businesses on all forms of insurance, such as health, life and disability insurance.

    b.      The Massachusetts Division of Insurance has issued market-conduct
examination letters to 11 domestic insurance groups and 21 insurance companies,
similarly looking into price-fixing and bid-rigging allegations.  This probe focuses
primarily on property/casualty insurers, as well as on life and health insurers.

    c.      In 2004, New York Attorney General Elliot Spitzer began an investigation
into the use of contingent commission arrangements, and has since brought actions
against several of the Defendants named herein for their contingent commission and bid-
rigging practices.

    d.      Connecticut A.G. Richard Blumenthal has issued subpoenas to 42 of the
nation's largest insurers and insurance brokers pursuant to his own investigation of the
practices described herein

    e.      At least 25 insurers that do business in Florida, including Insurer
Defendants MetLife Inc and UnumProvident, have received subpoenas from state
regulators investigating improper broker--compensation arrangements.  The subpoenas,

which seek documents and answers to interrogatories, were issued by the Florida Department of Financial Services and the Florida Office of Insurance Regulation.

       f.      On November 18, 2004, California's Department of Insurance initiated a lawsuit in state court under California's insurance laws against ULR, MetLife, UnumProvident and others for fraudulent practices similar to those described herein.

79.      The Defendants named herein have been specifically targeted by governmental authorities pursuant to these, and other, investigations.  For example, Insurer Defendant ACE has revealed that it has received 43 separate subpoenas and requests for information from various state and federal sources for information related to ongoing investigations into the conduct alleged herein.  This includes inquiries from the A.G.'s of Massachusetts, Connecticut, the District of Columbia, Florida, Minnesota, New York, Ohio, Pennsylvania, Texas and West Virginia.  In addition, it includes inquires from insurance departments and other regulatory authorities in California, Florida, Illinois, Maryland, Michigan, Minnesota, New York, North Carolina, Pennsylvania and Texas.

80.      On October 14, 2004, Spitzer filed a lawsuit against Broker Defendant Marsh in New York state court, alleging that " [s]ince at least the late 1990s, Marsh has designed and executed a business plan under which insurance companies have agreed to pay Marsh more than a billion dollars in so-called 'contingent commissions' to steer them business and shield them from competition."  Spitzer's complaint alleged, inter alia, violations of New York's laws prohibiting antitrust violations and fraudulent business practices.  Marsh has since agreed to pay $850 million to settle a lawsuit filed against it by the New York Attorney General in connection with the conduct alleged herein.  Marsh has also been investigated and sued by several other state attorneys general.

81.     On November 12, 2004, the New York A.G.'s office also filed a lawsuit against Defendant ULR, Douglas P. Cox ("Cox") (President and CEO of ULR) and a company (Benefits Commerce) of which Cox is the sole shareholder based on allegations similar to those raised herein.

82.     Broker Defendant Willis has received requests for documents and information pertaining to its undisclosed compensation practices from at least 19 states and the District of Columbia.  On April 8th, 2005, Defendant Willis announced that it had agreed to pay a total of $51 million to resolve claims brought against it by the Attorney General of New York and the Attorney General of Minnesota resulting from Willis' contingent commission practices.  In addition, in May 2005, Willis announced it had  set aside an additional $20 million to resolve further potential legal claims.

83.     Insurer Defendant MetLife has admitted that it has received several subpoenas from the New York A.G.'s office seeking information regarding certain compensation agreements between insurance brokers and MetLife.  Metlife has also received formal requests from other state authorities, including the Massachusetts and Connecticut A.G.'s offices, seeking information regarding its Contingent Commission Agreements and bid-rigging activities.

84.     On October 19, 2004, Defendant UnumProvident announced that the New York A.G.'s office had served subpoenas upon it, seeking information as to both its use of contingent commission agreements and "information regarding its quoting process."  UnumProvident's unlawful conduct was further detailed in a complaint filed against it by the New York A.G.'s office on November 12, 2004.

85.     In March 2005, AON Corporation, the world's largest reinsurance broker, largest captive insurance company manager, and second largest insurance brokerage firm, announced

that it had settled a suit filed by Spitzer and other state A.G.'s, alleging the same conduct alleged

herein, for a total of $190 million.  AON Corporation's contingent commission revenue was at

least in the hundreds of millions of dollars during the Class Period, and amounted to

approximately $200 million in 2003, $35 million in the first quarter of 2004, and  $12 million in

the first quarter of 2005.

86.     Defendant AJG has also been the subject of numerous government investigations

with regard to contingent commissions.  In addition to a probe by Spitzer, a mix of 14 other state

attorneys general and state departments of insurance have issued subpoenas to AJG or initiated

investigations relating to the company's handling of contingent commissions and other business

practices.  AJG has announced that it has set aside $35 million to settle these investigations.

AJG also admitted in a Form 10-K filed on February 9, 2004 that "AJG may also receive

contingent commissions which are based on the estimated profit the underwriting insurance

company earns and/or the overall volume of business placed by AJG in a given period of time.

Occasionally, AJG shares commissions with other brokers who have participated with AJG."

Thus, AJG has publicly conceded that it has horizontal agreements with other brokers to share

contingent commissions.

87.     Broker Defendant USI has also disclosed that it received a subpoena, requesting

documents and seeking other information, from Spitzer's office related to his probe of

undisclosed contingent commissions.

88.     Broker Defendant HRH has been subpoenaed by at least 10 state insurance

regulators, including those in Massachusetts, Connecticut, Florida, and North Carolina,

following Spitzer's investigation of contingent commissions and alleged bid-rigging among the

largest brokers.

89.     Insurer Defendant UnumProvident has been subpoenaed and asked to produce documents regarding its commission practices by the A.G.'s offices or insurance departments of several states, including Massachusetts, New York and Maine.

90.     Insurer Defendant Chubb is also one of many insurance companies subpoenaed by state A.G.'s recently for information related to contingent commissions.  Chubb was named in an internal Willis communication recently made public through a government investigation as one of the insurers receiving an unfair competitive advantage due to its Contingent Commission Agreement with Willis.

**DEFENDANTS' OFFICERS AND EMPLOYEES HAVE
PLED GUILTY TO CRIMINAL CONDUCT, OR BEEN FIRED
OR SUSPENDED BASED ON THE CONDUCT DESCRIBED HEREIN**

91.     Pursuant to the numerous government investigations described above, several of the Defendants' employees and high-level officers have pled guilty to criminal charges stemming from their participation in the contingent commission and bid-rigging scheme alleged herein.

92.     Four AIG employees have plead guilty to criminal charges:

a.      On October 14, 2004, Karen Radke, Senior VP of Excess Casualty, pled guilty to one count of "scheming to defraud."

b.      That same day, Jean-Baptist Pateossian, a manager in the National Accounts unit, also pled guilty to one count of "scheming to defraud."

c.      On February 15, 2005, a guilty plea was entered for John Mohs, a Vice President at AIG subsidiary American Home Assurance Company, for a felony count of first degree "scheming to defraud," which carries a maximum sentence of 18 months to four years in state prison;

d.      Also on February 15, 2005, a guilty plea was entered for Carlos Coello, an Underwriter at American Home Assurance Company, for one count of second degree "scheming to defraud."

93.     Three Marsh employees have pled guilty to criminal charges:

a.      On February 6, 2005, the New York A.G.'s office announced that Robert Stearns ("Stearns"), a Vice-President at Marsh, had pleaded guilty to felony criminal charges of fraud in connection with the rigging of bids for insurance business.  AIG, ACE, and Zurich were among the insurers identified in Stearns' felony plea.

b.      On February 15, 2005, a guilty plea was entered for Joshua Belway, Managing Director in Marsh's Excess Casualty division, for a felony count of first degree "scheming to defraud" in connection with the conduct alleged herein.

c.      On February 24, 2005, a guilty plea was entered for Kathryn Winter, a Marsh broker and managing director, in the New York Supreme Court for New York County.  The offense carries a  maximum sentence of 16 months to four years in state prison.

94.     In November 2004, two senior underwriters in Zurich's specialty excess casualty division, John Keenan and Edward Coughlin, also plead guilty to criminal charges for violations of New York's Donnelly Act, which prohibits agreements in unreasonable restraint of trade and competition.

95.     On October 15, 2004, Patricia Abrams ("Abrams"), an Assistant Vice-President in Defendant ACE's Excess Casualty division, plead guilty to committing improper practices. Between 2002 and 2004 Abrams conspired with Marsh to submit false bids.

96.     In addition to the criminal charges and guilty pleas, Defendants have also forced resignations and suspended several employees, including high-level officers, thus confirming that the wrongdoing alleged herein was pervasive and occurred at the highest levels of these companies.  For example, on October 15, 2004, Jeffery W. Greenberg, Marsh's former Chairman and CEO, announced that Ray Groves ("Groves"), Chairman and CEO of MMC, would be replaced by Michael Cherlasky ("Cherlasky"), formerly head of Marsh Kroll, MMC's risk consulting subsidiary.

97.     Subsequently, Jeffrey Greenberg abruptly resigned as Chairman and CEO of MMC on October 25, 2004, and was replaced by Cherlasky.

98.     Marsh also dismissed Gilman and three other Marsh executives:  Edward McNenney, Gregory Doherty and Glenn Bosshardt.  A fifth executive, Gilman's daughter, Samantha Gilman, has been suspended but is still in Marsh's employ.

99.     In addition, on November 8, 2004 Marsh announced that Roger E. Egan, President and Chief Operating Officer of Marsh, Christopher M. Treanor, Marsh's Chairman and Chief Executive Officer of Global Placement, and William L. Rossoff, Senior Vice-President and General Counsel of MMC, were resigning.

100.     On November 18, 2004 five members of Marsh's Board of Directors:  Ivlathis Cabiallavetta; Peter Coster; Groves; Charles A. Davis; and A.J.C. Smith, stepped down, ostensibly so that the company could thereafter adhere to best corporate governance practices.

101.     On January 7, 2005 a new position of "Chief Compliance Officer" was created at Marsh, to be filled by Senior Vice-President E. Scott Gilbert.

102.     ACE announced on November 4, 2004, that it was dismissing two employees, Abrams and Geoffrey Gregory, President of ACE Casualty Risk, for their involvement in improper activities relating to the submission of improper bids.  Three other employees who worked in ACE Casualty Risk were also suspended.  In addition, ACE USA's chief executive officer, Susan Rivera, who had led ACE USA since May 2002 and directed all aspects of ACE INA's North American commercial insurance operations, has resigned.

EFFECTS OF DEFENDANTS' UNLAWFUL CONDUCT

103.    Defendants' conduct had the purpose or effect, or the tendency or capacity,

unreasonably to restrain trade and to injure competition and purchasers throughout the United

States, including Massachusetts, by, among other things:

        a.    Limiting the number of insurers competing to sell insurance to persons
seeking such insurance;

        b.    Allocating the market for the sale of insurance; and

        c.    Using inflated bids, prices and other terms of sale with respect to
insurance to mask the absence of free and open competition by insurers for the sale of
such insurance.

104.    As a direct result of this illegal conduct, competition in the sale of insurance in

Massachusetts and elsewhere was substantially reduced and otherwise unlawfully restrained, and

Plaintiff and Class Members were injured.

105.    In addition, Defendants, by failing to disclose material information about their

business conduct and activities to Plaintiff and Class members, violated Massachusetts law.

106.    Further, Defendants' actions as set forth above were gross, wanton, and willful;

were aimed at the public generally; and involved a high degree of moral culpability.

## FRAUDULENT CONCEALMENT

107.    Throughout the relevant period, Defendants affirmatively and fraudulently

concealed their unlawful conduct from Plaintiff and the Class.

108.    Plaintiff and the members of the Class did not discover, and could not discover

through the exercise of reasonable diligence, that Defendants were violating the law as alleged

herein until shortly before this litigation was commenced.

109.    As a result of Defendants' fraudulent concealment, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

110.    Plaintiff exercised due diligence to learn of its legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the antitrust violations alleged above until after October 14, 2004, when New York Attorney General's Office filed a Complaint outlining these allegations in the Supreme Court of New York.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

111.    During the period covered by this Complaint, Plaintiff and members of the Class purchased substantial amounts of insurance products from the Defendants.

112.    As a direct result of the Defendants' misconduct set forth herein, Plaintiff and members of the Class paid substantially more for Insurance Products than they would have paid in the absence of Defendants' actions.

113.    By reason of the alleged violations of Defendants' actions, Plaintiff and members of the Class have been injured in their business and property and have suffered damages in an amount to be determined.

114.    The Defendants' actions will continue absent an injunction.  Plaintiff and members of the Class are likely to buy Insurance Products in the future and will be repeatedly injured unless the continuation of this misconduct is enjoined.

## CLASS ACTION ALLEGATIONS

115.    Plaintiff brings this action pursuant to Mass. R. Civ. P. 23, on behalf of all members of the following Class:

All persons or entities residing in Massachusetts that purchased Insurance Products in the Commonwealth of Massachusetts during the period from January 1, 1994 through the present, where the price of those Insurance Products was inflated as a result of the Contingent Commission Agreements between members of the Broker Defendant class and the Insurer Defendant class, or where the purchase of the Insurance Product was subject to a Contingent Commission Agreement.

116.    Excluded from the Class are all Defendants, their officers, subsidiaries and affiliates, and all government entities.

### Numerosity

117.    Plaintiff does not know the exact number of class members, because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the class members are sufficiently numerous and geographically dispersed.

### Common Questions of Law & Fact

118.    Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members including legal and factual issues relating to liability and damages.

119.    Among the questions of law and fact common to the Class are the following:

a.    Whether Defendants and their co-conspirators combined, conspired, or contracted to do anti-competitive acts, including entering into Contingent Commission Agreements, and/or price-fixing, rigging bids, and customer allocation;

b.    When and how this conspiracy, combination, or contract was formed;

c.    The identity of any other parties not named in this Complaint who participated in the conspiracy;

d.    Whether legal, pro-competitive reasons exist for Defendants' actions;

e.    Whether the Class suffered and continues to suffer damages from the Defendants' actions;

f.    The appropriate measure of damages sustained by Plaintiff and other members of the class;

g.    Whether Defendants fraudulently concealed the existence of the violations alleged herein; and

h.    Whether Defendants were and continue to be unjustly enriched to the detriment of the Class.

### Typicality

120.    The alleged combination and conspiracy consisted of an agreement, understanding, and concert of action among Defendants and co-conspirators to fix prices for insurance products and services and to coordinate bid prices for sales and services related to Insurance Products in Massachusetts.

121.    Plaintiff's claims are typical of the claims of other Class members because it was injured in the same manner by Defendants' unlawful and anticompetitive practices complained of herein.

### Adequacy of Representation

122.    Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel who are competent and experienced in the prosecution of antitrust and class action litigation.  Plaintiff has no interests that are adverse to, or in conflict with, other members of the Class.

### Superiority of Class Action

123.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

124.    Class action treatment is superior to other methods available for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate these claims.

125.    Plaintiff knows of no difficulty to be encountered by litigating this action that would preclude its maintenance as a class action.

## COUNT ONE
### BREACH OF FIDUCIARY DUTY
### INSURER DEFENDANTS

126.    Plaintiff, on behalf of himself and the Class, incorporates the above paragraphs herein.

127.    Because Insurer Defendants were fiduciaries of Plaintiff and members of the Class, Plaintiffs and members of the Class placed confidence and trust in the Insurer Defendants, authorized the Insurer Defendants to exercise discretionary functions for their benefit, and relied upon the Insurer Defendants' superior expertise in risk management and insurance.

128.    Insurer Defendants accepted and solicited that confidence described above.

129.    As fiduciaries of Plaintiff and members of the Class, Insurer Defendants were obligated to discharge their duties solely in the interests of Plaintiff and members of the Class, and specifically to provide insurance through a fair bidding process, exercising good faith and fair dealing, full and fair disclosure, and care and loyalty to the interests of Plaintiff and members of the Class.

130.     Insurer Defendants have breached those duties by participating in a conspiracy with each other and with the Broker Defendants in order to obtain additional business through the undisclosed Contingent Commission Agreements described herein, in disregard of the interests of the Plaintiff and members of the Class.

131.     As a result of Insurer Defendants' conduct, Plaintiff and members of the Class have suffered damages.

132.     Insurer Defendants are accordingly liable for breach of fiduciary duty to Plaintiff and members of the Class for the damages suffered in an amount to be proven at trial.

133.     Neither Plaintiff nor any member of the Class has suffered damages exceeding $74,999.00 each, even when trebled.  In no event will Plaintiff or any member of the Class accept damages in excess of $74,999.00.  Further, attorneys' fees on a pro-rata basis will not exceed $74,999.00 for each class member.

## COUNT TWO
### BREACH OF FIDUCIARY DUTY
### BROKER DEFENDANTS

134.     Plaintiff, on behalf of himself and the Class, incorporates the above paragraphs herein.

135.     The Broker Defendants knowingly and willingly assumed a fiduciary responsibility to their clients, including Plaintiff and Class members.  As brokers for Plaintiff and Class members, the Broker Defendants acted as representatives, agents, and fiduciaries. Plaintiff and Class members reasonably relied on the Broker Defendants to inform them of any compensation the Broker Defendants would receive for their services and what expenses Plaintiff and Class members would incur.  Plaintiff and Class members placed trust and

confidence in the Broker Defendants to deal fairly and employ due diligence in obtaining Insurance Products for Plaintiffs and Class members.

136.    As brokers for Plaintiff and Class members, acting as their representative, agent, and fiduciary, the Broker Defendants had a duty to disclose material facts to Plaintiff and Class members that were relevant to the parties' relationships.  The Broker Defendants were obligated to disclose to Plaintiff and Class members the existence of the Contingent Commission Agreements, or other payments made by insurance companies (e.g. Insurer Defendants) which were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

137.    As brokers for Plaintiff and Class members, the Broker Defendants are bound to abide by their fiduciary obligations and duties of loyalty to their clients, including Plaintiff and the Class, to exercise good faith in performing their services, and to act in accordance with their clients' best interests.  The Broker Defendants accordingly owe their clients a duty to obtain for them the best insurance in terms of coverage and price, regardless of any additional commissions the Insurer Defendants may have been willing to pay them.

138.    As brokers for Plaintiff and Class members, acting as their representative, agent, and fiduciary, the Broker Defendants had a duty to remit to Plaintiff and Class members any undisclosed profit the Broker Defendants collected in connection with or because of the procurement of Insurance Products on behalf of Plaintiff and Class members.

139.    The Broker Defendants breached their fiduciary duties owed to Plaintiff and Class members, including the duties of good faith, loyalty, and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia*, the following:

a.     Entering into undisclosed Contingent Commission Agreements with the Insurer Defendant, thereby knowingly creating an obvious conflict of interest;

b.     Secretly profiting at the expense of Plaintiff and Class members;

c.     Failing to disclose to Plaintiff and Class members the existence of the Contingent Commission Agreements, and/or other alleged agreements with insurance companies/Insurer Defendants; and

d.     Failing to remit to Plaintiff and Class members the undisclosed profits collection in connection with or because of the procurement of Insurance Products on behalf of Plaintiff and Class members.

140.    As a result of the Broker Defendants' conduct, Plaintiff and members of the Class have suffered damages.

141.    The Broker Defendants are accordingly liable for breach of fiduciary duty to Plaintiff and members of the Class for the damages suffered in an amount to be proven at trial.

142.    Neither Plaintiff nor any member of the Class has suffered damages exceeding $74,999.00 each, even when trebled.  In no event will Plaintiff or any member of the Class accept damages in excess of $74,999.00.  Further, attorneys' fees on a pro-rata basis will not exceed $74,999.00 for each class member.

## COUNT THREE
### UNJUST ENRICHMENT

143.    Plaintiff, on behalf of himself and the Class, incorporates the above paragraphs herein.

144.    Defendants have knowingly accepted and benefitted from the overcharges they have been able to levy for insurance products and services resulting from the acts alleged herein and the overpayments by Plaintiff and the Class.

145.    As a direct and proximate result of the Defendants' acts and practices, Defendants have been and are continuing to be unjustly enriched at the expense of and to the detriment of the Plaintiff and members of the Class.

146.    Plaintiff and the Class have conferred upon the Defendants an economic benefit in the nature of revenues resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Class.

147.    The economic benefit of overcharges obtained by Contingent Commission Agreements, bid rigging, price-fixing, and customer allocation is a direct and proximate cause of Defendants' anticompetitive behavior restricting competition.

148.    The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class have paid supra-competitive sums during the Class Period for the Insurance Products.

149.    It would be inequitable for Defendants to be permitted to retain any of the proceeds of the conspiracy.

150.    Defendants' profits from the illegal actions described herein warrant disgorgement and refunding it to Plaintiff and the Class.

## COUNT FOUR
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

151.    Plaintiff, on behalf of himself and the Class, incorporates the above paragraphs herein.

152.    Both the Insurer Defendants and the Broker Defendants knowingly and willingly assumed a fiduciary responsibility to their clients, including Plaintiff and Class members.  Each

Defendant class knowingly and intentionally aided and abetted the other's breaches of fiduciary duty by, *inter alia*:

>    a.    Entering into undisclosed Contingent Commission Agreements, thereby knowingly creating an obvious conflict of interest between Plaintiff and the Class and each Defendant Class;

>    b.    The Insurer Defendants' submission of false bids in furtherance of bid-rigging or customer allocation agreements;

>    c.    Failing to disclose to Plaintiff and Class members the existence of the Contingent Commission Agreements, bid-rigging, and/or customer allocation agreements described herein.

153.    As a result of the Defendants' conduct, Plaintiff and members of the Class have suffered damages.

154.    The Defendants are accordingly liable for aiding and abetting a breach of fiduciary duty to Plaintiff and members of the Class, for the damages suffered in an amount to be proven at trial.

155.    Neither Plaintiff nor any member of the Class has suffered damages exceeding $74,999.00 each, even when trebled.  In no event will Plaintiff or any member of the Class accept damages in excess of $74,999.00.  Further, attorneys' fees on a pro-rata basis will not exceed $74,999.00 for each class member.

## COUNT FIVE
### BREACH OF CONTRACT

156.    Plaintiff, on behalf of himself and the Class, incorporates the above paragraphs herein.

157.    The Broker Defendants formed an agreement with class members to perform insurance brokerage services on their behalf, and to obtain for them the best insurance in terms of coverage and price, regardless of any additional commissions the Insurer Defendants may

have been willing to pay.  The Insurer Defendants formed an agreement with class members to provide insurance through a fair bidding process, while exercising full and fair disclosure, and care and loyalty to the interests of Plaintiff and members of the Class.

158.    Defendants' agreements with class members constituted enforceable contracts.

159.    Defendants breached their contracts with Plaintiff and all Class members through the conduct alleged herein, including, *inter alia*:

   a.    Entering into undisclosed Contingent Commission Agreements, thereby knowingly creating an obvious conflict of interest between Plaintiff and the Class and each Defendant Class;

   b.    Engaging in bid-rigging and/or entering into customer allocation agreements;

   c.    Failing to disclose to Plaintiff and Class members the existence of the Contingent Commission Agreements, bid-rigging, and/or customer allocation agreements described herein.

160.    Defendants' breaches of their contracts with Plaintiff and the other members of the Class were material.

161.    As a result of the Defendants' conduct, Plaintiff and members of the Class have suffered damages.

162.    Defendants are accordingly liable for breach of contract, for the damages suffered in an amount to be proven at trial.

163.    Neither Plaintiff nor any member of the Class has suffered damages exceeding $74,999.00 each, even when trebled.  In no event will Plaintiff or any member of the Class accept damages in excess of $74,999.00.  Further, attorneys' fees on a pro-rata basis will not exceed $74,999.00 for each class member.

## COUNT SIX

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

164.    Plaintiff, on behalf of himself and the Class, incorporates the above paragraphs herein.

165.    The Insurer Defendants and Broker Defendants had an implied contractual duty to perform their obligations in good faith.

166.    Defendants breached this covenant of good faith and fair dealing in the performance of their contracts with Plaintiff and all Class members through the conduct described herein, including, *inter alia*:

> a.    Entering into undisclosed Contingent Commission Agreements, thereby knowingly creating an obvious conflict of interest between Plaintiff and the Class and each Defendant Class;

> b.    Engaging in bid-rigging and/or entering into customer allocation agreements;

> c.    Failing to disclose to Plaintiff and Class members the existence of the Contingent Commission Agreements, bid-rigging, and/or customer allocation agreements described herein.

167.    Defendants' breaches of the covenant of good faith and fair dealing were material.

168.    As a result of the Defendants' conduct, Plaintiff and members of the Class have suffered damages.

169.    The Defendants are accordingly liable for breach of the covenant of good faith and fair dealing, for the damages suffered in an amount to be proven at trial.

170.    Neither Plaintiff nor any member of the Class has suffered damages exceeding $74,999.00 each, even when trebled.  In no event will Plaintiff or any member of the Class

accept damages in excess of $74,999.00.  Further, attorneys' fees on a pro-rata basis will not

exceed $74,999.00 for each class member.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class pray for judgment as follows:

A.    Certifying the Class and the Defendant Classes pursuant to Mass. R. Civ. P. 23,

certifying Plaintiff as the representative of the Class, and designating its counsel as counsel for

the Class;

B.    Granting Plaintiff and the Class all damages as permitted by law;

C.    Granting Plaintiff's and the Class' costs of prosecuting this action; and

D.    Granting such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable as a matter of right.

DATED: July 25, 2005

_____
Kenneth G. Gilman (BBO #192760)
Douglas M. Brooks (BBO ##058850)
Douglas J. Hoffman (BBO #640472)
GILMAN AND PASTOR, LLP
60 State Street, 37th Floor
Boston, MA 02109
Telephone:  (617) 742-9700
Facsimile:  (617) 742-9701

Attorneys for Plaintiff and Proposed Class
Representative REHAB SEATING SYSTEMS,
INC.