UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BENSLEY CONSTRUCTION, INC. on its own behalf and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MARSH & MCLENNAN COMPANIES, INC., MARSH, INC., ACE USA, ACE INA, AMERICAN INTERNATIONAL GROUP, AMERICAN RE-INSURANCE COMPANY, ARTHUR J. GALLAGHER & CO., HILB ROGAL & HOBBS, COMPANY, WILLIS GROUP HOLDINGS, LTD., WILLIS NORTH AMERICA INC., WILLIS GROUP LTD., UNIVERSAL LIFE RESOURCES, UNIVERSAL LIFE RESOURCES, INC. (d/b/a ULR INSURANCE SERVICES, INC.), THE CHUBB CORPORATION, USI HOLDINGS, INC., METLIFE, INC., PRUDENTIAL FINANCIAL, INC., UNUMPROVIDENT CORPORATION, THE ST. PAUL TRAVELERS COMPANIES, INC., ZURICH AMERICAN INSURANCE COMPANY, LIBERTY MUTUAL GROUP INC., LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, EMPLOYERS INSURANCE COMPANY OF WAUSAU, and ST. JAMES INSURANCE COMPANY LTD., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. 05 11249 GAO |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

Defendants Marsh & McLennan Companies, Inc., and Marsh, Inc. (collectively "Marsh"), ACE USA, ACE INA, American International Group, Inc., American Re-Insurance Company, Arthur J. Gallagher & Co., Hilb Rogal & Hobbs Company, Willis Group Holdings, Ltd., Willis North America Inc., Willis Group Ltd., Universal Life Resources, Universal Life Resources, Inc. (d/b/a ULR Insurance Services, Inc.), USI Holdings, Inc., MetLife, Inc., Prudential Financial, Inc., UnumProvident Corporation, The St. Paul Travelers Companies, Inc.,

and Zurich American Insurance Company[1] (collectively the "Opposing Defendants") oppose Plaintiff's Motion to Remand, filed on July 21, 2005. Opposing Defendants incorporate by reference the Notice of Removal filed by Marsh on June 15, 2005. Further, Opposing Defendants submit that in the best interest of judicial efficiency and comity, and to avoid the possibility of inconsistent rulings, a decision on remand should await transfer to the MDL proceedings. *See* Defendants' Motion to Stay This Action Pending a Determination on Transfer by the Judicial Panel on Multi-District Litigation. However, in the event the Court wishes to reach the merits of the remand motion at this time, despite the pendency of proceedings before the MDL panel, the Court should deny the motion for the reasons stated herein.

Plaintiff's Motion to Remand is in keeping with Plaintiff's dominant effort throughout this matter to seek to use any means available to evade federal court jurisdiction. With this effort, Plaintiff misstates controlling First Circuit law on fraudulent joinder and the amount in controversy. It also ignores both the content and the purposes of the recently enacted Class Action Fairness Act, which provides an additional basis for federal jurisdiction. While Plaintiff simultaneously argues that this matter was legitimately commenced before the passage of the Class Action Fairness Act (hereinafter "CAFA"), Pub. L. 109-2, Plaintiff also seeks to jettison the lone plaintiff (Bensley Construction Corporation) and substitute an entirely new plaintiff (Rehab Seating Systems, Inc.), who has no connection to either the insurance products purchased by Bensley *nor any other connection to Bensley whatsoever.* As such, the proposed substitution of Rehab Seating, if allowed, would constitute a new commencement under CAFA and

---

[1] The Complaint names as "American International Group" and not "American International Group, Inc." as a defendant, "USI Holdings, Inc." and not "USI Holdings Corporation," as a defendant, and both "ACE USA" and "ACE INA," as defendants; yet none of these entities is an insurance company, nor did any of these companies sell any insurance to the current putative class representative or to the proposed substitute class representative. In filing this stipulation, the Opposing Defendants reserve any and all rights and defenses available under Rule 12 of the Federal Rules of Civil Procedure, including but not limited to, arguments concerning ineffective service of process, personal jurisdiction, and that any defendant is not a proper party to this action.

LITDOCS/610574.5

independently support federal court jurisdiction.

Under both pre-CAFA diversity removal principles, and pursuant to CAFA, federal jurisdiction over this matter is proper. Further, as CAFA is applicable to both the Bensley First Amended Complaint and the proposed Rehab Seating Second Amended Complaint, Plaintiff's efforts to keep this matter out of federal court – and the appropriate forum, the Multi-District Litigation case entitled *In re Insurance Brokerage Antitrust Litigation*, MDL # 1663, Civ. No. 04-5184 (D. N.J.) ("the MDL proceedings") – should be rejected. As noted above, Opposing Defendants submit that prudence dictates that a decision on remand should, likewise, await transfer to the MDL proceedings. *See* Defendants' Motion to Stay This Action Pending a Determination on Transfer by the Judicial Panel on Multi-District Litigation.

## I.    FACTUAL ALLEGATIONS

At every turn, Plaintiff has attempted to keep this matter out of the forum in which it belongs – the MDL proceedings that involve the same factual allegations and same legal theories as well as a putative class that includes all putative class members in this case.[2]

Plaintiff Bensley claims to be a "Massachusetts Corporation with principal place of business in Massachusetts." First Amended Complaint ¶ 12. Bensley alleges it purchased insurance products "from" ACE USA and Zurich. *Id*. at ¶¶ 12-13. Bensley purchased insurance from ACE through the involuntary automobile insurance assigned risk pool. *See* Declaration of Deborah S. Troxel. Established pursuant to Mass. Gen. L. c. 175, § 113H, the Commonwealth

---

[2] As discussed in Defendants' Motion to Stay This Action Pending a Determination on Transfer by the Judicial Panel on Multi-District Litigation and in Marsh's Notice of Removal, the MDL Proceeding, is pending in the District of New Jersey (the "MDL Court") and involves a putative nationwide class on behalf of insurance purchasers, asserting many of the very same claims against most of the same defendants as in the Amended Complaint herein. The underlying factual allegations, while phrased somewhat differently, are virtually identical in substance. On August 1, 2005, two new amended and consolidated complaints were filed in the MDL proceeding. These two complaints – split between commercial insurance purchasers and employee benefits plaintiffs-- are attached as exhibits B and C to this opposition. Because the Massachusetts action has been removed to federal court, it should, likewise, be subject to transfer and consolidation of proceedings in the District of New Jersey as part of the same MDL.

Automobile Reinsurers ("CAR") administers the involuntary automobile insurance assigned risk pool, which provides insurance to "all qualified applicants who are unable to obtain such coverage through the voluntary market."  *See* Commonwealth Automobile Reinsurers– Plan of Operation, Article I, available at http://www.commauto.com/manuals/planofop/pdf/planofoperation.pdf (last visited August 15, 2005).  CAR assigns insurance contracts to eligible companies and individuals, determines which insurance carrier will cover the eligible companies or individuals, and determines the price of assigned risk insurance premiums.  *Id.*  Bensley purchased insurance from Zurich through a New Hampshire brokerage firm that is neither a defendant in this case nor mentioned once in the forty-eight page, 170 paragraph First Amended Complaint.  *See* Declaration of Robert L. Terry, Jr.  Neither the CAR nor the New Hampshire broker are alleged to be involved in a conspiracy with any of the brokers or insurance companies sued here.[3]

Bensley's efforts to keep this matter out of federal court began when it filed this case on February 17, 2005, the day before the President signed CAFA into law.  Bensley never served that placeholder Complaint on a single Defendant.

Indeed, on February 16, 2005 the day before Bensley filed the original Complaint in this matter, Bensley's counsel filed a nearly identical complaint in a Florida state court, naming many of the same defendants as were named in the instant case, and virtually mimicking the claims that have been asserted in the instant case.  A copy of the Florida complaint is attached to the Notice of Removal as Exhibit C.[4]

---

[3] The essential premise of the First Amended Complaint is that the group of broker defendants, which notably fails to include either the New Hampshire broker or the Commonwealth of Massachusetts's CAR, with whom Plaintiff dealt, are alleged to have engaged in a vast "conspiracy."  *See* Plaintiff's Motion to Remand ("Plaintiff's Motion") at p. 15 ("The Amended Complaint centers on allegations that Plaintiff and class members purchased Insurance Products issued by the Insurer Defendants . . . at prices that were inflated due to a wide-ranging conspiracy among the Insurer Defendants and the Broker Defendants.").  The First Amended Complaint, however, does not allege any connection between Bensley and the brokers sued.

[4] As discussed in Defendants' Motion to Stay and in Marsh's Notice of Removal, the Florida case was

(Footnote Continued on Next Page.)

On May 16, 2005, 88 days after filing the original Complaint in this case (and two days before the original Complaint would have been dismissed automatically pursuant to Mass. R. Civ. Proc. 4(j)), Bensley filed a First Amended Complaint in Massachusetts.[5]

On June 15, 2005, Marsh removed this action to federal court by filing a Notice of Removal. On June 17, 2005, Defendants informed the Judicial Panel on Multi-District Litigation that this matter should be transferred to the MDL proceedings. On June 20, 2005, certain defendants filed a Motion to Stay This Action Pending a Determination on Transfer by the Judicial Panel on Multi-District Litigation. After the Motion to Stay was filed, on July 8, 2005, Liberty Mutual Group Inc., and certain of its subsidiaries, hereinafter referred to collectively as "the Liberty Defendants," filed motions seeking to dismiss this action. Plaintiff opposed both sets of motions.

Despite having no connection to Bensley, the First Amended Complaint fraudulently joined the Liberty Defendants in order to defeat federal jurisdiction. The Liberty Defendants have no nexus to Bensley[6] but did provide Plaintiff's counsel with the ability to allege the presence of a named defendant having a Massachusetts principal place of business.

In a further contrivance to avoid federal jurisdiction, Plaintiff repeatedly disclaims all damages, *on behalf of a putative class*, above $74,999.00 for any claimant. *See* First Amended Complaint at ¶¶ 47, 133, 142, 155, 163, 170. This disclaimer, however, is inconsistent not only

---

(Footnote Continued from Previous Page.)

also removed to the Middle District of Florida based upon, *inter alia*, the Securities Litigation Uniform Standards Act ("SLUSA") and, thereafter, briefing commenced on a motion to remand. A conditional transfer order in that case is currently pending before the MDL Panel. If that order is entered, the Florida litigation will also be transferred to the District of New Jersey and consolidated with the MDL litigation. The Middle District of Florida has yet to rule upon a remand motion.

[5] As noted in Marsh's Notice of Removal, the First Amended Complaint removed certain SLUSA allegations so as to attempt to evade federal jurisdiction.

[6] Indeed, despite filing nearly the same matter in Florida, Plaintiff's counsel named the Liberty Defendants only in the instant matter, while ignoring them in Florida.

- 5 -

with the fiduciary duties of an adequate class representative but also with the common fund Plaintiff seeks to create in its request for "disgorgement" of all the Defendants' "profits." *See* First Amended Complaint at ¶¶ 147-150.  Plaintiff's request for "disgorgement" is not based on individualized assessments of damages and does not limit the amount sought.  Instead, Plaintiff seeks disgorgement of all such "profits" obtained by all Defendants.  As set forth below, if allowed, the entire putative class would have a joint and undivided interest in such "profits."

Tacitly recognizing the fraudulent joinder issues, on July 25, 2005, more than one month after removal, weeks after the Liberty Defendants filed their motions to dismiss this action, and more than five months after Plaintiff hastily filed this action in an attempt to beat the enactment of CAFA by one day, Plaintiff filed a motion to substitute a completely new entity as "class representative" because Plaintiff Bensley was not willing to prosecute the action.  The new entity – Rehab Seating Systems, Inc. – is not alleged to be affiliated with, or in any way connected to, Plaintiff Bensley.  Rehab Seating is alleged to be a "Massachusetts corporation with principal place of business in Massachusetts," that did, however, purchase insurance issued by one of the Liberty Defendants.  Second Amended Complaint ¶ 12.

Rehab Seating is not alleged to have participated in any of the same insurance transactions that Bensley engaged in.  Indeed, as Rehab Seating purchased its workers' compensation insurance through the involuntary assigned risk pool, *see* Affidavit of Arthur J. Eldridge, it has no connection either to any insurance broker defendant or to Plaintiff Bensley.[7]

As noted in both the Motion to Stay and the Notice of Removal, this case belongs in the

---

[7] Pursuant to Mass. Gen. L. c. 152, § 65A, under the involuntary assigned risk pool program for workers' compensation insurance, the Commonwealth, through the Workers' Compensation Rating and Inspection Bureau ("WCRIB"), assigns insurance contracts to eligible companies, determines which insurance carrier will cover the eligible companies, and determines the price of assigned risk insurance premiums. *See* Massachusetts Workers' Compensation Assigned Risk Pool – Plan of Operation, available at https://www.wcribma.org/Mass/Residual/planOfOperation.aspx (last visited August 10, 2005).  As with the CAR, noted above, the Commonwealth's WCRIB has not been joined as a defendant, even though it is through the WCRIB that Plaintiff Rehab purchased its insurance at allegedly inflated rates.

MDL proceedings, which has 20 similar cases before it. Indeed, the MDL process continues to advance: since the original Notice of Removal was filed – Class plaintiffs have filed two consolidated complaints, and discovery is well underway, with Marsh alone having produced over 4 million pages of documents to date. *See* Exs. A-E attached hereto.

As set forth below, Plaintiff has used a number of contrivances and devices with the aim of avoiding federal jurisdiction. Given the nature of the underlying allegations and facts, and the law under both diversity jurisdiction and CAFA, this matter properly belongs in federal court.

## II.    DIVERSITY JURISDICTION EXISTS

### A.    This Court Has Jurisdiction Over this Case Pursuant to 28 U.S.C. § 1332

This case was properly removed pursuant to the Court's diversity jurisdiction. A case may be removed pursuant to 28 U.S.C. § 1441 if (1) the case is between citizens of different States; and, (2) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a).

In an effort to defeat federal jurisdiction, Bensley attempted to join a non-diverse party – the Liberty Defendants – to defeat the complete diversity rule. However, the Liberty Defendants have no connection to Bensley and were fraudulently joined.

In an additional attempt to avoid proper federal jurisdiction, Bensley repeatedly attempted to plead – on behalf on an entire putative class for whom Plaintiff's counsel is a supposed fiduciary if a class is certified – an amount in controversy of less than $75,000. This self-imposed artificial and arbitrary limitation clearly is at odds with the best interests of the putative class Plaintiff seeks to represent. Nonetheless, because Bensley is seeking disgorgement of all profits, which it pleads to be in the hundreds of millions of dollars, and because this remedy is sought on a class-wide basis, Bensley has in substance pleaded a common fund, to which each class member would have a common and undivided interest. Such a common fund amply satisfies the amount in controversy requirement.

- 7 -

**B.    The Liberty Defendants Were Fraudulently Joined and Should Be Disregarded for Removal Purposes**

An action may be removed to this Court pursuant to 28 U.S.C. § 1441(b) if diversity jurisdiction exists under 28 U.S.C. § 1332(a) and "if none of the parties in interest **properly joined** and served as defendants is a citizen of" Massachusetts. 28 U.S.C. § 1441(b) (emphasis added). The only Defendants who are citizens of Massachusetts are the Liberty Defendants. But, as explained below, they were not properly joined.

Clear and unequivocal First Circuit law holds that a party who is fraudulently joined to defeat removal need not join in the removal petition *and is disregarded in determining diversity of citizenship* for purposes of § 1332(a) and citizenship for purposes of § 1441(b). *Polyplastics, Inc. v. Transconex, Inc.*, 713 F.2d 875, 877 (1st Cir. 1983); *Carey v. Board of Gov. of Kernwood Co. Club*, 337 F. Supp. 2d 339, 341 (D. Mass. 2004) ("If, however, a request for remand is based upon a fraudulent joinder of a non-diverse defendant without a real connection to the controversy, 'the right of removal cannot be defeated' and remand is inappropriate.") (citation omitted).

"A joinder is considered fraudulent if it is a sham and a device used to join a party 'without any reasonable basis in fact and without any purpose to prosecute the cause in good faith.'" *Carey*, 337 F. Supp. 2d at 341-42; *see also Mills v. Allegiance Healthcare Corp.*, 178 F. Supp. 2d 1, 5 (D. Mass. 2001) (*quoting Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 98 (1921)).

The telltale signs of fraudulent joinder are present here:

- Plaintiff mentions the Liberty Defendants only once in the forty-eight page, 170-paragraph complaint, and only then to introduce them as a party to the suit. *See* First Amended Complaint ¶ 22.

- Plaintiff Bensley did not purchase insurance from the Liberty Defendants and has no relationship – contractual or otherwise – with any of the Liberty Defendants. *See id.* at ¶¶ 12-13 (describing Plaintiff's alleged relationship with some other defendants).

- 8 -

Bensley instead purchased its insurance through the involuntary Massachusetts assigned-risk pool and a New Hampshire brokerage firm, neither of which is a party to this case.

- None of the six counts against the Liberty Defendants states a claim upon which relief could be granted. *See* Motion to Dismiss of Saint James Insurance Company, Ltd.; Motion to Dismiss of Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Employers Insurance Company of Wausau; Motion to Dismiss of Liberty Mutual Group, Inc.; *see also* Notice of Removal ¶ 20.

"[I]t is a fundamental principle of law that whether subject matter jurisdiction exists is a question answered by looking to the complaint as it existed at the time the petition for removal was filed." *Anderson v. Electronic Data Sys. Corp.*, 11 F.3d 1311, 1316 & n.8 (5th Cir. 1994); *see also Ching v. Mitre Corp.*, 921 F.2d 11, 13 (1st Cir. 1990) ("An amendment to a complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction."); *Hazel Bishop, Inc. v. Perfemme, Inc.*, 314 F.2d 399, 403 (2d Cir. 1963) (a case is not to be remanded "if it was properly removable upon the record as it stood at the time that the petition for removal was filed"). This principle applies, in particular, in cases of fraudulent joinder. *See Moore v. Interstate Fire Ins., Co*, 717 F. Supp. 1193, 1198 (S.D. Miss. 1989) ("[T]he propriety of removal where fraudulent joinder is alleged is determined by reference to the pleading filed by the plaintiff in state court, and not on the basis of any amended pleadings which plaintiff might attempt to file in the federal forum. **Thus, here, plaintiff would not be permitted to amend her complaint in an effort to state a claim against [the fraudulently joined defendant] as a device for securing remand**.") (emphasis added).  As such, Plaintiff's counsel's tacit recognition of the original fraudulent joinder, and effort to cure it by substituting Bensley – which has no purported connection to the Liberty Defendants – with a new plaintiff, Rehab Seating, that allegedly does, serves no purpose. Rehab Seating's connection to the Liberty Defendants is tenuous at best – Rehab Seating, too, purchased its insurance through the involuntary Massachusetts assigned risk pool, not through a broker. In any event, such a

- 9 -

transparent effort to defeat jurisdiction, filed after both removal and the Motions to Dismiss have been filed in this case, must be completely ignored for purposes of diversity analysis.

In contending that the Liberty Defendants were not originally fraudulently joined in the Bensley claim, Plaintiff includes a reference to the "juridical links" doctrine and a co-conspiracy theory, arguing that Bensley had a connection to defendants Zurich and ACE, which allegedly had some link to the Liberty Defendants. *See* Plaintiff's Motion at 17-18. Plaintiff cites no cases that apply such expansive theories in the context of fraudulent joinder or the jurisdictional power of the court to hear this matter. In contrast, the "juridical link" doctrine is a "doctrine developed under Rule 23 based on judicial efficiency and expedience." *Henry v. Circus Casinos, Inc*., 233 F.R.D. 541, 544 n.2 (D. Nev. 2004) (rejecting the use of the juridical link doctrine outside Rule 23 analysis). In fact, the "juridical links" does not apply outside of the limited world of the Rule 23 typicality analysis. *See In re Eaton Vance Corp. Sec. Litig.,* 220 F.R.D. 162, 171 (D. Mass. 2004) (rejecting the use of the "juridical link" doctrine outside a Rule 23 analysis; "Rather, the juridical link doctrine should be confined to an analysis of Rule 23(a).")

Factually, even if it were applicable, neither the "juridical link" or co-conspirator theory helps Plaintiff here. Bensley purchased insurance through the involuntary assigned risk pool and a small New Hampshire brokerage – neither are parties with whom Plaintiff allege the Liberty Defendants has a nexus. *See* First Amended Complaint ¶ 22. Indeed, the First Amended Complaint is devoid of any specific allegations of "links" between the Liberty Defendants and any party with whom Bensley has alleged *it* has a connection. *See* First Amended Complaint ¶¶ 12-13 (Bensley purchased insurance "from" ACE and Zurich). In other words, not only does the complaint fail to make any specific allegations of a relationship – of any sort – between the Liberty Defendants and Bensley, it fails to make any specific allegations of any links from Bensley to any party that *itself* has a connection with the Liberty Defendants. As the Liberty Defendants are not alleged to have any connection to either Plaintiff Bensley or any other party with whom Plaintiff Bensley alleges that it has a connection, it is apparent that, under Plaintiff's proffered (albeit, inapplicable) juridical links analysis, the Liberty Defendants were included

- 10 -

solely to defeat diversity.

### C. Plaintiff's Unjust Enrichment Allegations Amount to a Common, Indivisible Fund of Assets That Exceeds the Amount in Controversy Requirement

Despite repeated efforts to artificially limit the amount of damages Plaintiff seeks to recover on behalf of a putative class of all Massachusetts insurance purchasers to an amount below the amount in controversy requirement, Bensley seeks through its unjust enrichment claim a broader scope of relief, including that the Court require Defendants to "disgorge" their "profits from the illegal actions."   First Amended Complaint ¶ 150.   Bensley seeks in its pleadings potential disgorgement, above and beyond any contractual damages, of hundreds of millions of dollars of "profits" in which the entire class, and not any specific individual, would have a right to share.   *See, e.g.*, *id*. at ¶ 14 ("The Contingent Commission Agreements described herein constituted more than half of Marsh's $1.5 billion in earnings in 2003); *id*. (noting the $850 million settlement between Marsh and the New York Attorney General); *id*. at 16 (alleging Willis's contingent commission revenue as "at least in the hundreds of millions of dollars during the Class Period"); *id*. at ¶ 17 (alleging Arthur J. Gallagher & Co.'s contingent commission revenue to be "at least in the hundreds of millions"); *id*. at ¶ 18 (alleging USI's contingent commission revenues to be "at least in the hundreds of millions of dollars during the Class Period").   Simply put, the disgorgement claim seeks an amount that does not depend on the sum of each of the putative individual, opting-in class member's claims.

The First Circuit made clear years ago that a common fund, valued as a whole, determines the amount in controversy.   *Berman v. Narragansett Racing Ass'n*, 414 F.2d 311, 314-15 (1st Cir. 1969) ("The pecuniary result that the judgment would directly produce would be the awarding of a fund of several million dollars to the class.   We think it is the amount of the entire fund, and not what each pursewinner's individual share will eventually be, that determines the amount in controversy here.").   Unjust enrichment claims commonly are treated as creating indivisible common funds because such claims – and specifically the claims as alleged in this matter – seek damages different than any contractual damage both from (and to) any individual

- 11 -

class member.  Thus, damages not based upon individual class members' own alleged injuries are indivisible as each class member has the same right to the entire pot as any other class member; therefore, aggregation is required.  *E.g., Durant v. Servicemaster Co.*, 147 F. Supp. 2d 744, 750-51 (E.D. Mich. 2001) (holding that "[a]ggregation thus is required of the amount Plaintiffs seek to recover under the theory of unjust enrichment.  For that reason, this Court holds that the jurisdictional amount is satisfied, and this Court has diversity jurisdiction over this case."); *see also In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702 (D. Md. 2001) (finding same); *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp. 2d 37 (D.D.C. 1999) (finding same).

Plaintiff's unjust enrichment claim reads as follows:

147. The economic benefit of overcharges obtained by Contingent Commission Agreements, bid rigging, price-fixing, and customer allocation is a direct and proximate cause of Defendants' anticompetitive behavior restricting competition.

148. The benefit held by Defendants rightfully belongs to Plaintiff **and the Class**, as Plaintiff **and the Class** have paid supra-competitive sums during the Class Period for the Insurance Products.

149. It would be inequitable for Defendants to be permitted to retain any of the proceeds of the conspiracy.

150. Defendants' profits from the illegal actions described herein warrant disgorgement and refunding it to Plaintiff **and the Class**.

First Amended Complaint ¶¶ 147-150 (emphasis added).  Plaintiff seeks disgorgement that would flow from Defendants to the entire class of plaintiffs.  The claim is not based upon contractual damages from each individualized plaintiff within the putative class, but rather asserts a claim for the entire profits regardless of their alleged individual damages.

Contrary to Plaintiff's suggestion, courts routinely find that such pleadings lead to aggregation.  For example, in *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, virtually identical pleadings led the Court to hold that the class had a collective right to the entire amount of the disgorged profits:

As stated above, plaintiff's complaint claims that, without reference to any actual damages sustained by any individual plaintiff, defendants must disgorge the

- 12 -

profits derived from their illegal anticompetitive activities, including the Hoechst-Andrx Agreement. **If any given plaintiff does not collect his, her, or its share, then it does not change the amount of profits of which defendants must be disgorged**. Thus, according to the complaint, the plaintiff class has a collective right to a disgorgement in the amount of the unjust enrichment, and that amount does not depend upon the number of plaintiffs.

48 F. Supp. 2d 37, 41 (D.D.C. 1999) (emphasis added).

Similarly, in *In re Microsoft Corp. Antitrust Litig*., facing virtually the same theory of recovery, Judge Motz held in light of the class's collective right to the entirety of the disgorged profits, removal was proper:

[A]t least theoretically, an individual plaintiff, regardless of the particular damages he has suffered, might recover the entire unjust benefit obtained by the defendant. "A plaintiff may receive a windfall in some cases, but this is acceptable in order to avoid any unjust enrichment on the defendant's part." *In re Cardizem* [*CD Antitrust Litig.*, 90 F.Supp. 2d 819, 828 (E.D.Mich.1999)] (citing North Carolina law on disgorgement). This follows from the nature of the remedy. **"Restitution measures the remedy by the defendant's gain and seeks to force disgorgement of that gain. It differs in its goal or principle from damages, which measures the remedy by the plaintiff's loss and seeks to provide compensation for that loss."** Dan B. Dobbs, Law of Remedies § 4.1(1) (1993).

Here, plaintiffs have claimed disgorgement in addition to their claims for damages, and they have not disavowed their entitlement to that remedy under the substantive state laws giving rise to their causes of action. In light of these facts, I find that the cases that include a claim for disgorgement have been properly removed.

127 F. Supp. 2d 702, 720-21 (D. Md. 2001) (emphasis added).

Plaintiff also quotes out of context from *Gattegono v. Sprint Corp*., 297 F. Supp. 2d 372 (D. Mass. 2003), in a vain effort to distinguish controlling case law. Federal courts routinely have held that unjust enrichment claims that do not differentiate between the right to individualized damages and the right of the class to recover must be aggregated. This is the law of the First Circuit, *per Berman*. Unlike the plaintiff in *Natale v. Pfizer*, Nos. CIV.A.05-10590-WGY, CIV.A.05-10591-WGY, 2005 WL 1793451 (D. Mass. July 28, 2005), Bensley's disgorgement claim specifically seeks disgorgement of "profits," and not merely individualized

- 13 -

damages. *See Id*. at *14 (distinguishing *Durant*, *Aetna*, and *Microsoft* from the case then at bar, as *Natale* – unlike the Plaintiff here – did not seek disgorgement of all profits). Therefore, the claim must be aggregated and considered as a whole. When that is done, the jurisdictional amount is easily met.

## III.    THIS ACTION WAS PROPERLY REMOVED PURSUANT TO THE CLASS ACTION FAIRNESS ACT OF 2005

### A.    Congress Passed CAFA to Curb Abuses Epitomized by this Case

Independent of any decision regarding diversity, pursuant to CAFA, this case should remain in federal court.

The Class Action Fairness Act of 2005 was signed into law by President George W. Bush on February 18, 2005. Pub.L. 109-2 (2005). "The Class Action Fairness Act of 2005 is a modest, balanced step that would address some of the most egregious problems in class action practice." S. REP. 109-14, 2005 U.S.C.C.A.N. 3, 5.

Congress recognized standard abuses in the class action context and sought to remedy them. Among the abuses Congress explicitly noted were "'copy cat' class actions (i.e., duplicative class actions asserting similar claims on behalf of essentially the same people)." *Id*. at 23. Congress anticipated and rejected the type of diffuse strands of litigation Plaintiff seeks to engage in here:

> [s]ometimes these duplicative actions are filed by lawyers who hope to wrest the potentially lucrative lead role away from the original lawyers. In other instances, the "copy cat" class actions are blatant forum shopping-the original class lawyers file similar class actions before different courts in an effort to find a receptive judge who will rapidly certify a class. When these similar, overlapping class actions are filed in State courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The "competing" class actions must be litigated separately in an uncoordinated, redundant fashion because there is no state court mechanism for consolidating state court cases. The result is enormous waste-multiple judges of different courts must spend considerable time adjudicating precisely the same claims asserted on behalf of precisely the same people. As a result, state courts and class counsel may "compete" to control the cases, often harming all the parties involved. **In contrast, when overlapping cases are pending in different federal courts, they can be consolidated under one single judge to promote judicial efficiency and ensure consistent**

- 14 -

**treatment of the legal issues involved.**

*Id.* (footnotes omitted and emphasis added).

In this matter a proper forum is already present where these overlapping copycat cases may be consolidated under one single judge, promoting judicial efficiencies and ensuring consistent treatment for both the proposed plaintiff class and the various defendants.

Of particular concern to Congress were class action attorneys who sought to "'game the system' and keep class actions in state court by naming local defendants who are not real parties to the controversy or by amending their pleadings after the deadline for removal." *Id.* at 27. CAFA was enacted to combat such gamesmanship, by creating "efficiencies in the judicial system [ ] enabling overlapping and 'copycat' cases to be consolidated in a single federal court, rather than proceeding simultaneously in numerous state courts under the current system." *Id.*

By enacting CAFA, Congress's "overall intent" is to "strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications." *Id.* at 34.[8] Importantly, Congress explicitly noted that "[i]f a purported class action is removed pursuant to [CAFA], **the named plaintiff(s) should bear the burden of demonstrating that the removal was improvident**." *Id.* at 40 (emphasis added); *see also Natale v. Pfizer*, Nos. CIV.A.05-10590-WGY, CIV.A.05-10591-WGY, 2005 WL 1793451, at *5 (D. Mass. July 28, 2005) ("Under the Act, **the burden of removal is on the party opposing removal** to prove that remand is appropriate.") (emphasis added); *In re Textainer P'ship Sec. Litig.*, No. C 05-0969 MMC, 2005 WL 1791559, at *3 (N.D. Cal. July 27, 2005) (quoting Congressman Sensenbrenner, at 151 Cong. Rec. H723-01, H-727 (2005): "[I]f a Federal court is uncertain . . . the court should err in favor of exercising jurisdiction over the case."); *Waitt v. Merck & Co., Inc.,* No. C05-0759L, 2005 WL 1799740, at *2 (W.D. Wash. July 27, 2005) ("The Court holds that Merck's reading of CAFA is the correct one and that it is plaintiff's responsibility to demonstrate that removal from

---

[8] Thus, pre-CAFA *dicta* cited by Plaintiff, *see* Plaintiff's Motion at 3, arguing for a federal policy against the invocation of jurisdiction has been explicitly overruled by Congress in the CAFA setting.

- 15 -

state court was improvident.").[9]    Thus, Bensley is incorrect when it states that "[t]he party seeking removal has the burden of demonstrating the existence of federal jurisdiction." Plaintiff's Motion at 3.

The Senate Report described some of the abuses CAFA seeks to avoid, detailing the very abuses at the heart of the present case:

> For example, as noted previously, counsel often include in their complaint **extraneous parties** in order to prevent the complaint from complying with the current 'complete diversity' requirement. Our federal courts have ruled that those arguably extraneous parties can be ignored in the jurisdictional analysis if their claims are meritless, and quite frequently, the claims of those parties are challenged in class actions as part of the jurisdictional analysis, requiring the court to take time to engage in the complicated process of assessing the merits of their claims. Under current law, this time-consuming 'fraudulent joinder' issue arises in many purported class actions that are removed to federal court.
>
> Similarly, the process of assessing whether a class action complies with the current **jurisdictional amount requirement** is also often 'an expensive and time consuming process' requiring discovery on the nature and value of the named plaintiffs' claims. As noted previously, in some federal Circuits, the jurisdictional amount requirement in a class action is satisfied by showing that any member of the proposed class is asserting damages in excess of $75,000, and in other Circuits, the question is whether each and every member of the putative class has individually an amount in controversy exceeding $75,000. Again, this time-consuming issue, often requiring significant amounts of  record review and fact-finding, is litigated very frequently in the many class actions that are removed to federal court under current law.
>
> In sum, [CAFA] will make the resolution of class action jurisdictional issues easier-not harder. The need to deal with the bona fides of counsel's efforts to use dubious parties to avoid diversity will evaporate. In short, it will be much easier to figure out whether any class member is diverse as to any defendant (the "minimal

---

[9] Congress repeated this intent throughout the Senate Report.  *See* S. REP. 109-14,  2005 U.S.C.C.A.N. 3, 41 ("As noted above, it is the intent of the Committee that the named plaintiff(s) should bear the burden of demonstrating that a case should be remanded to state court (e.g., the burden of demonstrating that more than two-thirds of the proposed class members are citizens of the forum state). Allocating the burden in this manner is important to ensure that the named plaintiffs will not be able to evade federal jurisdiction with vague class definitions or other efforts to obscure the citizenship of class members."); *id.* ("It is the Committee's intention with regard to each of these exceptions that the party opposing federal jurisdiction shall have the burden of demonstrating the applicability of an exemption.").

diversity" inquiry established by S. 5) than resolving the fraudulent joinder issues regularly presented under the current rule ("complete diversity"). Likewise, it will be much easier to determine whether the amount in controversy presented by a purported class as a whole (that is, in the aggregate) exceeds $5 million than it is to assess the value of the claim presented by each and every individual class member, as is required by the current diversity jurisdictional statute.

*Id*. at 62-63 (emphasis added).

Additionally, Congress noted that the Act is designed to "prevent plaintiffs from evading federal jurisdiction by hiding the true nature of their case."  S. REP. 109-14, 2005 U.S.C.C.A.N. 3, 11.  Indeed, anticipating pleadings of the very type that were filed in the instant case, Congress explicitly noted that CAFA is applicable whenever "the plaintiff subsequently amends the pleadings in such a way that removal becomes proper."  *Id.*  Recognizing that this change in federal law may engender some "gaming" on behalf of plaintiffs' attorneys seeking to keep out of federal court, Congress additionally extended the period of time to effectuate removal after filing, removing the one-year requirement previously codified.  "This change is intended to prevent attorneys from engaging in the type of gaming that occurs under the current class action system . . . .  By allowing class actions to be removed at **any time when changes are made to the pleadings** that bring the case within section 1332(d)'s requirements for federal jurisdiction, this provision will ensure that such fraudulent pleading practices can no longer be used to thwart federal jurisdiction."  *Id*. at 47 (emphasis added).

In short, it is with exactly this type of case in mind that Congress passed CAFA.

## B.    CAFA Applies in this Case.

Pursuant to CAFA, a class action may be removed without the consent of any other defendant, *see* 28 U.S.C. § 1453(b) ("such action may be removed by any defendant without the consent of all defendants"), upon, *inter alia*, the following conditions:

1.  The matter in controversy exceeds the aggregated sum or value of $5,000,000. 28 U.S.C. § 1332(d)(2).

2.  And, any member of a class of plaintiffs is a citizen of a State different from

- 17 -

any defendant.  28. U.S.C. § 1332(d)(2)(A).[10]

There is no dispute that the instant matter satisfies these two requirements.  Bensley is a citizen of Massachusetts while every defendant – other than the Liberty Defendants – is a citizen of a different state.  *See* First Amended Complaint §§ 13-21 & 23-29.  There also is no dispute that the class is seeking more than $5,000,000 in damages.  *See Berry v. Am. Express Publ'g*, No. CV 05-302 AHS (ANx), 2005 U.S. Dist. LEXIS 15514, *12-14 (D. Cal., 2005) (discussing aggregation of damages under CAFA).

The only dispute – as plaintiff focuses in its Motion to Remand – is whether CAFA is applicable to the instant case, as the original complaint was filed in a state court on February 17, 2005, the day before CAFA was enacted.[11]

### C. Even in the Absence of the Amended Complaint, the Filing of the Original Complaint Did Not Commence the Action in State Court According to Massachusetts Law

As a matter of Massachusetts law, Plaintiff's original filing, erroneously filed with the clerk of the Essex Superior Court, did not commence an action pursuant to CAFA prior to CAFA's enactment.  Accordingly, Plaintiff's filing of its original, hastily crafted, complaint does not constitute a "commencement" under Massachusetts law.

As the Tenth Circuit noted in *Pritchett v. Home Depot, Inc.*, 404 F.3d 1232, 1235 (10th Cir. 2005), at times state law informs the court when a matter is commenced under CAFA.  For example, the *Pritchett* court noted that, "[o]f course, some states provide that service of process may commence a suit." *Id*. (*citing* Conn. Gen.Stat. § 52-45a (2003)).  The Seventh Circuit has similarly reached the same conclusion twice in the last few days.  *See Schorsch v. Hewlett-Packard Co*., No. 05-8017, 2005 WL 1863412, *2 (7th Cir. Aug. 8, 2005) ("[S]tate rather than

[10] Exceptions to this new rule contained in 28 U.S.C. § 1332(d)(3)-(5) do not apply here and plaintiff does not suggest otherwise.

[11] Section 9 of the Act provides, "The amendments made by this Act shall apply to any civil action commenced on or after the date of the enactment of this Act."  28 U.S.C. §1332 Note.

LITDOCS/610574.5

federal practice must supply the rule of decision. . . . [S]ome states may deem it commenced when the filing fee is paid, or when the clerk finds the complaint procedurally sufficient (states may allow clerks to reject papers that are not in proper form, as the Clerk of the Supreme Court does), or when the first (or last) defendant is served with process"); *Pfizer v. Lott*, No. 05-8013, 2005 WL 1840046, at *2 (7th Cir. Aug. 4, 2005) ("For what was removed was the suit that had been brought in the Illinois state court, and under Illinois law the filing of the complaint had 'commenced' the suit.") (*citing* 735 ILCS 5/2-201 & *Kohlhaas v. Morse*, 183 N.E.2d 16, 19 (Ill. App. 1962)).

Under Massachusetts Rules of Civil Procedure, a case is not "commenced" until the Complaint and summons are mailed to or filed in the proper court. As the applicable Massachusetts Rule states:

> A civil action is commenced by (1) mailing to the *clerk of the proper court* by certified or registered mail a complaint and an entry fee prescribed by law, or (2) filing such complaint and an entry fee *with such clerk*.

Mass. R. Civ. Proc. 3 (emphasis added).

The official Reporters' Notes to that rule make clear that "[t]he phrase 'proper court' means the court in which requirements of venue and jurisdiction . . . are met." The action below, however, was not filed in a court with the proper venue. For venue to be proper, a case with a Massachusetts resident party must be filed "in the county where one of [the parties] lives or has his usual place of business." Mass. Gen. L. c. 223 § 1. This case was filed in the County of Essex. However, Plaintiff has not alleged that any party lives or has its usual place of business in Essex County. *See* Ex. B at ¶¶ 12-29, 49. Nor could Plaintiff so challenge because no defendant has its usual place of business in Essex County, and the named Plaintiff has its usual place of business in Middlesex County. *See* Notice of Removal Ex. E (Annual Corporation Report for Bensley Construction). Therefore, venue was improper in the case as filed in Essex County, and the case had not "commenced," pursuant to Mass. R. Civ. P. 3, prior to the enactment of CAFA.

Contrary to Plaintiff's suggestion, Plaintiff's Motion at 9 n.4, Massachusetts state courts routinely look to the Reporters' notes in their interpretations of the Rules. Indeed, in an effort to

- 19 -

clarify and lend meaning to a Rule, courts consider the Reporters' Notes "'an influential guide.'" *Commonwealth v. Sheridan*, 667 N.E.2d 279, 281 (Mass. App. Ct. 1996) (*quoting Commonwealth v. McDonald*, 21 Mass. App. Ct. 368, 371, 487 N.E.2d 224 (1986)). The First Circuit has endorsed the use of the Massachusetts Reporters' Notes in interpreting Massachusetts Court Rules. *See United States v. One-Sixth Share of James J. Bulger In All Present & Future Proceeds of Mass Millions Lottery Ticket Number M246233*, 326 F.3d 36, 44 (1st Cir. 2003). Further, the plain language of the rule itself – requiring that an action be commenced in the "proper court" – leads to the same result as the Reporters' Nnote.

Similarly, Plaintiff's argument that an action filed in the improper venue "is treated as if it were 'commenced' as of the date it was filed in the initial court," is also simply wrong as a matter of law. For example, an action filed in the improper venue may not be afforded the same statute of limitations period that an action filed in the proper venue would be afforded. In *Ciampa v. Beverly Airport Com'n*, the Massachusetts Court of Appeals made clear that the statute of limitations tolling provisions embodied in Mass. Gen. L. c. 260 § 3 do not apply to actions dismissed for improper venue. 650 N.E.2d 816, 817 (Mass. App. Ct. 1995). While a case may be transferred for improper venue under Mass. Gen. L. c. 223, § 15, such transfer is permissive, not mandatory. *See Brooks v. Maloney*, 766 N.E.2d 912, 912 ("[A] judge may in his discretion allow a motion to dismiss on the basis of improper venue" so long as there is "some basis."). Dismissal is an available remedy. It is therefore incorrect to state that an action with clearly improper venue could not or would not be dismissed. Moreover, such an argument says nothing about when an action is commenced under Rule 3 of the Massachusetts Rules of Civil Procedure.

In its rush to file this action prior to the passage of CAFA, Plaintiff failed to follow established Massachusetts procedure, which resulted in the case not "commencing" pursuant to Massachusetts Rule of Civil Procedure 3 or for CAFA purposes until after the enactment of the Act.

- 20 -

**D.    Plaintiff's Proposed <u>Substitution</u> Commences New Litigation Under CAFA**

If the Court were to grant Plaintiff's Motion to Amend the Complaint, that would provide an additional reason that CAFA establishes federal jurisdiction over this action.

With the proposed substitution of Rehab Seating for Bensley, Plaintiff will have commenced a new case for CAFA purposes. Plaintiff's effort to use the prior complaint as a placeholder is precisely the type of activity that CAFA was designed to avoid. The very purpose of the Act would be thwarted if plaintiffs could file placeholder cases to "beat" the onset of CAFA, only to re-file an "amended" complaint when a willing plaintiff is located. Indeed, Plaintiff in this matter has needed *two* amended complaints merely to identify a plaintiff who is willing to prosecute this litigation.

Both the Congressional intent and recent case law dictate that the substitution of Rehab for Bensley triggers CAFA. The clear intent of Congress in passing CAFA is to stop lawyers from attempting to "game the system." As Congress noted, CAFA is designed to protect against changes in a case that allow a plaintiff to file under one set of rules – allowing plaintiff to sidestep federal jurisdiction – and alter course midstream.

As set forth in its motion, Bensley no longer wishes to engage in this litigation. *See* Motion at 1 n.1. This matter has not been certified as a class action so there is no Plaintiff in this matter other than Bensley itself. As such, the ordinary course is for Bensley to dismiss the action and allow Rehab Seating to file its own action, styled as a class action or not. However, doing so would clearly trigger CAFA and federal jurisdiction, which Plaintiff's attorneys have assiduously attempted to avoid at every step. Regardless of Plaintiff's efforts, CAFA applies.

Federal Circuits have recognized that CAFA applies whenever there is this type of a change in party or request for relief.[12] In *Knudsen v. Liberty Mutual Insur. Co.*, 411 F.3d 805, ___

---

[12] Opposing Defendants oppose the amended complaint only on the limited basis that the Second Amended Complaint does not relate back to the First Amended Complaint for CAFA purposes. In other words, to the extent that Bensley must remove itself from this litigation, and Rehab Seating becomes lead plaintiff, Opposing Defendants' only issue is that the substitution of a new, unrelated plaintiff, triggers CAFA and compels federal jurisdiction.

(7th Cir. June 7, 2005) (pagination unavailable), the Seventh Circuit, in rejecting a "significant change" test for determining whether or not a new case has commenced after CAFA's enactment, drew a distinction between changes of the kind made by the plaintiffs in that case (a slight change to the class definition) and changes that could in fact constitute a new case (e.g., adding a new party). It suggested that a "new claim for relief (a new "cause of action" in state practice), the addition of a new defendant, or any other step sufficiently distinct that courts would treat it as independent for limitations purposes" would commence a case for CAFA purposes. *Id.* As the *Knudsen* court made clear, CAFA applies whenever an amended complaint "is sufficiently independent of the original contentions that it must be treated as fresh litigation." *Id*;[13] *cf. Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 69 (1996) (even if case not removable originally, defendant may remove after receipt of amendment rendering case removable).

The Seventh Circuit has further clarified its position in *Schorsch v. Hewlett-Packard Co.*, No. 05-8017, 2005 WL 1863412 (7th Cir. Aug. 8, 2005). In *Schorsch*, plaintiff filed suit in 2003 in Illinois state court. *Id.* at *1. In May 2005, however, plaintiffs amended the complaint to alter the class definition. *Id.* Defendants promptly removed the action claiming that the amended class definition triggered CAFA. While the Seventh Circuit ruled that the amendment did not trigger CAFA because it did not change an actual party – only class members who were "vicariously" represented – the court made clear that an amended complaint substituting a new party would trigger CAFA. *Id.* ("The proposed amendment certainly does not add parties to the suit: there were and are only two, Schorsch and HP. Class members are represented vicariously but are not litigants themselves."). (*citing Amchem Products, Inc. v. Windsor*, 521 U.S. 591

---

[13] The *Knudsen* court took pains to note (1) that it did *not* hold that the Rule 15(c) approach applies to CAFA, and (2) that to the extent Rule 15(c) type rules apply to CAFA, it is only a "model" not to be taken too literally. *Knudsen v. Liberty Mutual Insur. Co.*, 411 F.3d 805, __ (7th Cir. June 7, 2005) (pagination unavailable) ("We imagine, though we need not hold, that a similar approach will apply under the 2005 Act, perhaps modeled on Fed.R.Civ.P. 15(c)."). Thus, even though Plaintiff's claims here do not relate back to the original complaint, it is not necessary for the Court to make that determination.

(1997), and *Devlin v. Scardelletti*, 536 U.S. 1 (2001)).  In the instant case, however, Plaintiff has not attempted to merely amend the class definition for persons "vicariously" represented. Rather, Plaintiff has sought to "add parties to the suit," action both *Knudsen* and *Schorsch* suggest may trigger federal jurisdiction under CAFA.

Trial courts have already started to deal with the analogous area of amended complaints adding party defendants after CAFA's enactment.  In *Adams v. Fed. Mat. Co.*, *Inc.*, 2005 U.S. Dist. LEXIS 15324 (W.D. Ky. July 28, 2005), plaintiffs amended a class action complaint after CAFA was enacted, adding a new defendant.  *Id.* at *6.  Defendants sought removal within thirty-days of the newly amended complaint.  *Id.*  The Court denied the subsequent motion to remand stating that:

> As suggested by the *Knudsen* court, then, Plaintiffs' decision to add [ ] a defendant presents precisely the situation in which it can and should be said that a new action has 'commenced' for purposes of removal pursuant to the CAFA. This is both a logical extension of pre-existing removal practice and in keeping with the general intent of Congress in passing the CAFA - that is, extending the privilege of removal to federal district courts to defendants in large class actions on the basis of minimal diversity.

*Id.* at *13-14.

In the First Circuit, regardless of whether plaintiff is adding a new defendant or substituting a new plaintiff, the same standards under Rule 15(c) apply.  As the First Circuit noted in *Young v. Lepone*, Rule 15(c) does not facially apply to situations when the plaintiff seeks to substitute a new plaintiff; however, First Circuit precedent, consistent with precedent from the sister circuits, allows for the substitution or addition of plaintiffs in specific, limited circumstances.  305 F.3d 1, 14 (1st Cir. 2002) ("Although the text of Rule 15(c)(3) seems to contemplate changes in the identity of defendants, we have recognized that the rule can be applied to amendments that change the identity of plaintiffs.") (*citing Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n*, 814 F.2d 32, 35 (1st Cir. 1987)).

While theoretically plaintiff may attempt to utilize Rule 15(c), "[i]n practice, however, relation back is far from automatic."  *Id.*  To determine if the substitution of a plaintiff "relates

- 23 -

back" to the original pleading, the court applies a four part test:

> [**1**] [T]he amended complaint must arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; [**2**] there must be a sufficient identity of interest between the new plaintiff, the old plaintiff, and [**3**] their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them; and [**4**] undue prejudice must be absent.

*Id*. at 14 (*citing Allied Int'l*, 814 F.2d at 35-36) (numeration added).

"The identity of interest requirement reflects this line of thought; it 'ensures that the old and new plaintiffs are sufficiently related so that the new plaintiff was in effect involved in [the proceedings] unofficially from an early stage.'" *Id*. at 15. Bensley's transaction – purchasing Ace and Zurich insurance products, *see* First Amended Complaint ¶¶ 12-13 – and Rehab Seating's transaction – purchasing a Liberty Defendant's insurance product, *see* Second Amended Complaint ¶¶ 12-13 – have no connection to each other, other than being insurance transactions. Plaintiff makes no allegations that the two transactions are in any way related. Thus, the Second Amended Complaint does not relate back to the First Amended Complaint's transaction, and Plaintiff cannot avail itself of the relation back doctrine.

Further, the substitution of parties must be between individuals or entities with a sufficient overlap in identity such that the new party "in no way alters the known facts and issues on which the action is based." *Id*. As the First Circuit notes, "when a new plaintiff attempts to enter a pending action under the aegis of Rule 15(c)(3), courts should require substantial structural and corporate overlap to ensure that the defendant is not called upon to defend against new facts and issues." *Id*. at 15. There is no corporate connection between Bensley and Rehab Seating. *Compare* First Amended Complaint ¶¶ 12-13 *with* Second Amended Complaint ¶¶ 12-13. They purchased different policies from different insurers through different intermediaries. Indeed, the only connection between the two parties is the presence of the same lawyers for each.

Additionally, there is undue prejudice to the Opposing Defendants, who would be able to remove this matter as a new, post-CAFA action if Rehab were required to file a new suit instead of trying to slide through the backdoor of this one. Rehab Seating, on the other hand, would

- 24 -

suffer no prejudice if this matter were removed – their claims (if any) are already being asserted upon their behalf in the MDL proceedings, or they can individually opt out of any class that may be certified in the MDL proceedings.  Further, the putative class is not being precluded from any valid claims based upon time-based defenses, such as a statute of limitations argument, because the filing of the MDL proceedings may toll the statute of limitations for all putative class members in that case.

As the Second Circuit has said, relation-back principles are to "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense."  *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 19 (2d Cir. 1997) (*quoting* Fed. R. Civ. P. 15 Advisory Committee Note (1991)).  As the Supreme Court has written, bad faith or dilatory motive negates a claim for relationship back.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  This is not an "inconsequential" pleading error.  Rather, this is a case of lawyerly machinations of the type Congress condemned as improper in enacting CAFA.

None of the district court cases Plaintiff cites is apposite.  Plaintiff cites one case from the District of Massachusetts: *Griffith v. Bowen*, 678 F. Supp. 942, 947 (D. Mass. 1988).  Yet, in *Griffith*, the Court was concerned with the mootness of the plaintiff's claim prejudicing the claims of the absent putative class members.  Here there is no question of mootness; Plaintiff Bensley merely wishes to no longer be a part of the litigation.  Further, the claims asserted by the class are also asserted in the MDL matter – the putative class's interests are already being considered by Judge Hochberg in New Jersey.

Plaintiff has not carried its burden.  The new amended complaint, if allowed, does not relate back, but rather commences a new action for CAFA purposes.

### E.    Commencement Pursuant to CAFA Does Not Take Place until Removal

Additionally, the Opposing Defendants submit that a case does not "commence" pursuant to CAFA until the date it is removed, and not the date the case was initially filed in state court.  In similar contexts where the federal jurisdictional statutes were altered in the middle of

- 25 -

litigation cases have made this same holding.  *See, e.g., Lorraine Motors, Inc. v. Aetna Cas. & Sur. Co.*, 166 F. Supp. 319, (E.D.N.Y. 1958) (noting that "it is not at all unusual for the Congress to use the term 'commenced' to describe the institution in federal court of a case which has been removed from State court"); *see also Hunt v. Transport Indem. Ins. Co.*, No. 90-00041, 1990 WL 192483, at *2-3 (D. Hawaii July 30, 1990) (holding that "sounder view" was to construe the term "commenced" amendment to 28 U.S.C. §1332 to mean the date of removal, not the date of filing in state court); *Sayers v. Sears, Roebuck & Co.*, 732 F. Supp. 654 (W.D. Va. 1990) (same).  On these grounds, as well, the case was not "commenced" until May 2005, well after CAFA's enactment.

The holdings in *Pritchett v. Office Depot, Inc.*, 404 F.3d 1232 (10th Cir. 2005), and *Knudsen v. Liberty Mutual Insur. Co.*, 411 F.3d 805 (7th Cir. June 7, 2005) are not wholly to the contrary.  In fact, the Seventh Circuit in *Knudsen* expressly recognized that there may very well be circumstances under which a suit can be "commenced" for "federal [CAFA] purposes even if it bears an old docket number for state purposes."  *Id.* at __ (pagination unavailable).  Plaintiff's gamesmanship in the current case has brought about the type of circumstance envisioned by the *Knudsen* court.  By waiting to serve process upon the Defendants until well after CAFA was enacted, Plaintiffs has opened up the type of "new window of removal" cited by *Knudsen* that commences a case for CAFA purposes.  *Id.*[14]

Recently, Chief Judge Young recognized that the question of whether the removal date served as the "commencement" date for CAFA purposes "involves a controlling question of law as to which there is substantial ground for difference of opinion," and, therefore, issued an order allowing for "an immediate appeal from [this] order" to the First Circuit.  *Natale v. Pfizer*, Nos.

---

[14] In very recent decision, the Seventh Circuit rejected the argument that the fact that "removal [took place] within the 30-day deadline," requires a different outcome than *Knudsen*.  *See Pfizer v. Lott*, No. 05-8013, 2005 WL 1840046, at *1-2 (Aug. 4, 2005 7th Cir.).  That decision is not binding upon this court and, Opposing Defendants submit, ignores the remedial purpose of the Act as discussed above.

Civ.A.05-10590-WGY, Civ.A.05-10591-WGY, 2005 WL 1793451, *16 (D. Mass. July 28, 2005). Chief Judge Young ultimately adopted the holdings of *Pritchett* and *Knudsen*. *Id*. at *10-11.[15] Defendant Pfizer has sought review of this holding. *See* Ex. F (Letter from defendant Pfizer to Chief Judge Young dated August 4, 2005). The Opposing Defendants respectfully submit that this issue was wrongly decided in *Natale*, but that the *Natale* court asked the First Circuit to decide the ultimate issue. In the event this Court does not stay all proceedings – including the removal – pending the MDL panel's transfer decisions, then the Court should await the First Circuit's ultimate decision in *Natale* before making a decision.


## IV.    CONCLUSION.

For the foregoing reasons, the undersigned Defendants ask that this Court either defer ruling on Plaintiff's Motion to Remand or deny the motion.


Dated: August 15, 2005

                              Marsh & McLennan Companies, Inc., and
                              Marsh Inc., on their own behalf and on behalf
                              of and with the consent of ACE USA; ACE
                              INA; Zurich American Insurance Company;
                              American International Group, Inc.; American
                              Re-Insurance Company; Arthur J. Gallagher &
                              Co.; Hilb Rogal & Hobbs, Company; Willis
                              Group Holdings, Ltd.; Willis North America
                              Inc.; Willis Group Ltd.; Universal Life

---

[15] In doing so, Judge Young recognized the *Knudsen* court's acknowledgement that the addition of a new party could well commence a new piece of litigation for federal purposes. *Natale v. Pfizer*, Nos. Civ.A.05-10590-WGY, Civ.A.05-10591-WGY, 2005 WL 1793451, *6 n.13 (D. Mass. July 28, 2005). Judge Young further recognized that the question of party amendment issue is "different from and beyond the scope of, the matter here." *Id*.

Resources; Universal Life Resources, Inc.
(d/b/a ULR Insurance Services, Inc.); USI
Holdings Corp.; MetLife, Inc.; Prudential
Financial, Inc.; UnumProvident Corporation;
The St. Paul Travelers Companies, Inc.,


/s/ Josh Vitullo
Daniel S. Savrin BBO #555434
Joshua Vitullo BBO #654310
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
617-951-8000


Of Counsel:
Mitchell J. Auslander, Esq.
John R. Oller, Esq.
Christopher J. St. Jeanos, Esq.
Kristin Branson, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, N.Y. 10019-6099
212 728-8000


Philip T. Newbury BBO #370070
Mark J. Claflin BBO #657175
Howd & Ludorf, LLC
65 Wethersfield Ave.
Hartford, CT 06114
860-249-1361
*Attorneys for Defendants*
*ACE USA and ACE INA*

H. Lee Godfrey, Esq.
Neal S. Manne, Esq.
Johnny W. Carter, Esq.
Jeffrey R. Seely, Esq.
Susman Godfrey LLP
1000 Louisiana St., Ste. 5100
Houston, TX 77002
713-651-9366
*Of Counsel for Defendants*
*ACE USA and ACE INA*

Bruce W. Edmands, BBO #151360
Eckert Seamans Cherin & Mellott, LLC

- 28 -

One International Place
Boston, MA 02110
617-342-6886
*Attorneys for Defendant*
*Zurich American Insurance Company*

Brien T. O'Connor, BBO #546767
Timothy J. Casey, BBO #650913
Ropes & Gray LLP
One International Place
Boston, MA  02110
617-951-7000
*Attorneys for Defendant*
*American International Group, Inc.*

Kenneth A. Gallo, Esq.
Daniel J. Leffell, Esq.
Paul, Weiss, Rifkind, Wharton &
    Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
*Attorneys for Defendant*
*American International Group, Inc.*

Paula M. Bagger, BBO # 547703
Cooke Clancy & Gruenthal LLP
265 Franklin Street
Boston, MA  02110
(617) 428-6800
*Attorneys for Defendant*
*American Re-Insurance Company*

John F. Collins, Esq.
Molly Lehr, Esq.
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY  10019
212-259-8000
*Of Counsel for Defendant*
*American Re-Insurance Company*

Edwin M. Larkin, Esq.
Lina M. Viviano, Esq.
200 Park Avenue
New York, NY  10166-4193
212-294-6700

- 29 -

*Of Counsel for Defendant*
*Arthur J. Gallagher & Co.*

Terry M. Grimm, Esq.
Stephen C. Schulte, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL  60601312-558-5890
*Of Counsel for Defendant*
*Arthur J. Gallagher & Co.*

Juliane Balliro, BBO #028010
Wolf, Block, Schorr and Solis-Cohen LLP
One Beacon Street, 41st Floor
Boston, MA 02108-3106
617-226-4000
*Attorneys for Defendant*
*Hilb Rogal & Hobbs, Company*

James V. Masella III, BBO #562882
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
212-558-4000
*Attorneys for Defendant Willis Group Holdings,*
*Ltd., Willis North America Inc., and Willis Group*
*Ltd.*

Richard C. Pepperman II, Esq.
Anastasia A. Angelova, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
212-558-4000
*Of Counsel for Defendant Willis Group Holdings,*
*Ltd., Willis North America Inc., and Willis Group*
*Ltd.*

David Gabianelli, Esq.
Ray L. Wong, Esq.
Ned M. Gelhaar, Esq.
Hancock Rothert and Bunshoft LLP
Four Embarcadero Center, Ste. 300
San Francisco, CA  94111
415-981-5550
*Of Counsel for Defendants Universal Life and*
*Resources, Universal Life Resources, Inc. (d/b/a*
*ULR Insurance Services, Inc.)*

- 30 -

Ian Crawford BBO #544475
Todd & Weld LLP
28 State Street, 31st Fl.
Boston, MA  02109
617-720-2626
*Attorneys for Defendant USI Holdings Corp.*

Robert H. Pees, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY  10022-2524
212-872-1000
*Of Counsel for Defendant*
*USI Holdings Corp.*

Daniel B. Winslow, BBO #541972
Patricia R. Rich, BBO #640578
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA  02210
617-289-9200
*Attorneys for Defendant MetLife, Inc.*

James W. Carbin
Eric Breslin
Duane Morris LLP
744 Broad St.
Newark, NJ 07102
973-424-2000
*Of Counsel for Defendant MetLife, Inc.*

Barry Y. Weiner BBO #519700
Maureen Mulligan BBO #556482
Ruberto, Israel & Weiner
100 North Washington Street
Boston, MA 02114
617-742-4200
*Attorneys for Defendant*
*Prudential Financial, Inc.*

John R. Middleton, Jr., Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ  07068
973-597-2582
*Of Counsel for Defendant*
*Prudential Financial, Inc.*

- 31 -

Joseph Hamilton, BBO #546394
Mirick, O'Connell, DeMallie &
    Lougee, LLP
100 Front Street
Worcester, MA  01608-1477
*Attorneys for Defendant*
*UnumProvident Corporation*

Deborah E. Hryb, Esq.
Patrick W. Shea, Esq.
Paul, Hastings, Janofsky & Walker LLP
1055 Washington Blvd., 9th Floor
Stamford, CT  06901
203-961-7400
*Of Counsel for Defendant*
*UnumProvident Corporation*

 Paul C. Curnin
Michael J. Garvey, Esq.
David H. LaRocca, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017
212-455-2377
*Of Counsel for Defendant The St. Paul Travelers*
*Companies, Inc.*

LITDOCS/610574.5

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the following by hand-

delivery and/or first-class mail on August 15, 2005:

Bensley Construction Inc.                          Kenneth G. Gilman
                                                   Douglas J. Hoffman
                                                   Gilman and Pastor, LLP
                                                   60 State Street, 37th Floor
                                                   Boston, MA  02109


The Chubb Corporation                              John A.D. Gilmore
                                                   DLA Piper Rudnick Gray Cary
                                                   One International Place, 21st Fl.
                                                   Boston, MA  02110-2600

                                                   Laura Besvinick, Esq.
                                                   Hogan & Hartson LLP
                                                   Mellon Financial Center
                                                   1111 Brickell Avenue, Suite 1900
                                                   Miami, FL 33131


Liberty Mutual Group Inc.                          Ralph T. LePore, III, Esq.
Liberty Mutual Insur. Company                      James M. Tierney, Esq.
Liberty Mutual Fire Insur. Company                 Holland & Knight LLP
Employers Insur. Co. Of Wausau                     10 St. James Avenue
St. James Insurance Company Ltd.                   Boston, MA  02116




                                                   /s/ Josh Vitullo
                                                   Joshua Vitullo




- 33 -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

———————————————————— x

In re INSURANCE BROKERAGE          :          MDL No. 1663
ANTITRUST LITIGATION               :
                                   :          Civil No. 04-5184 (FSH)
APPLIES TO ALL ACTIONS             :
                                   :          Hon. Faith S. Hochberg
                                   :
                                   :          JURY TRIAL DEMANDED
                                   :
                                   :
———————————————————— x

## FIRST CONSOLIDATED AMENDED
## COMMERCIAL CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| NATURE OF THE CASE | | | 1 |
| JURISDICTION AND VENUE | | | 8 |
| PARTIES | | | 8 |
| A. | PLAINTIFFS | | 8 |
| B. | DEFENDANTS | | 18 |
|  | 1. | Broker-Defendants | 18 |
|  | 2. | Insurer Defendants. | 25 |
|  | FACTUAL ALLEGATIONS | | 41 |
| II. | THE COMMERCIAL INSURANCE AND BROKERAGE MARKETS | | 41 |
| III. | DUTIES OWED BY AN INSURANCE BROKER | | 42 |
| IV. | DEFENDANTS' IMPROPER CONTINGENT COMMISSION AGREEMENTS | | 49 |
| A. | Broker Defendants Receive Undisclosed KickBacks From Insurer Defendants | | 49 |
| B. | Methods of Calculating Contingent Commissions and Their Extraordinary Impact on Defendants' Business | | 58 |
| V. | BROKER DEFENDANTS IMPROPERLY STEER THEIR CLIENTS BASED UPON CONTINGENT COMMISSION AGREEMENTS TO MAXIMIZE PROFITS | | 64 |
| A. | Defendants' Collusive Bid-Rigging Scheme | | 86 |
| B. | Wholesale Payments | | 100 |
| C. | Reinsurance | | 103 |
| VI. | GLOBAL OR CENTRALIZED BROKING AS A MEANS TO FURTHER DEFENDANTS' CONSPIRATORIAL CONDUCT | | 108 |
| VII. | GOVERNMENTAL INVESTIGATIONS RELATING TO DEFENDANTS' PRACTICES | | 112 |

i

  A. Suspensions, Terminations or Resignations of Defendants' Employees.............112

  B. Certain Defendants Discontinue the Use of Contingent Commission
    Agreements ...................................................................................................114

VIII. CONSPIRACY ALLEGATIONS ................................................................................117

IX. RACKETEERING ALLEGATIONS ...........................................................................126

  A. THE COMMERCIAL INSURANCE ENTERPRISE.........................................126

  B. THE BROKER-CENTERED COMMERCIAL INSURANCE
    ENTERPRISES ................................................................................................128

  C. PREDICATE ACTS ........................................................................................130

X. PATTERN OF RACKETEERING ACTIVITY ...........................................................134

XI. RICO VIOLATIONS...................................................................................................134

XII. FRAUDULENT CONCEALMENT............................................................................135

XIII. THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF.............................135

XIV. CLASS ACTION ALLEGATIONS .............................................................................136

    FIRST CLAIM FOR RELIEF ........................................................................145

    SECOND CLAIM FOR RELIEF ....................................................................147

    THIRD CLAIM FOR RELIEF .......................................................................149

    FOURTH CLAIM FOR RELIEF (Violation of Section 1 of the Sherman
      Act Against all Defendants)..................................................................151

    FIFTH CLAIM FOR RELIEF ........................................................................153

    (Violation of Section 1 of the Sherman Act Against Defendant Participants
      in the Commercial Insurance Broker-Centered Conspiracies) ...............153

    SIXTH CLAIM FOR RELIEF (State Antitrust Laws against all
      Defendants)...........................................................................................155

    SEVENTH CLAIM FOR RELIEF (Breach of Fiduciary Duty Against the
      Broker Defendants on behalf of their Customers) ..................................160

EIGHTH CLAIM FOR RELIEF (Aiding and Abetting Breach of
    Fiduciary Duty Against Insurer Defendants) ........................................... 161

NINTH CLAIM FOR RELIEF (Unjust Enrichment Against all
    Defendants) .............................................................................................. 162

Plaintiffs, by and through their undersigned attorneys, allege upon their own knowledge, or where there is no personal knowledge, upon investigation of counsel or information and belief:

## <u>NATURE OF THE CASE</u>

1.      Plaintiffs' claims arise out of Defendants' massive scheme to manipulate the market for commercial insurance.  Defendants are the largest commercial insurance brokers ("Broker Defendants") and insurance companies ("Insurer Defendants") (collectively "Defendants", described below) in this country.  The Broker Defendants and Insurer Defendants engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers and raising, or maintaining or stabilizing premium prices above competitive levels.

2.      Defendants' conduct undermines the nature of the relationship that should exist between Defendants, plaintiffs and members of the Class, creates an overwhelming conflict of interest and breach of duties that have injured plaintiffs and the Class in their business and/or property, and has reduced or eliminated competition for insurance.  In this regard, Defendants have engaged in a common course of conduct, participated in the affairs of the enterprise (discussed more fully below) and conspired by engaging in the wrongful practices set forth herein that is clearly at odds with the Broker Defendants' duties and representations regarding the services and information they will provide to plaintiffs and the Class.  Broker Defendants have failed to disclose both their conflicts of interest and their joint conspiratorial motives with the Insurer Defendants.  As a result, Defendants have created the illusion of a competitive market for insurance, when, in fact, the selection, pricing and placement of the insurance products and

allocation of customers at issue in this litigation were the result of Defendants' collusion and anti-competitive conduct.

3.      Specifically, the Broker Defendants represent to their clients, which include plaintiffs and members of the Class, that they will provide unbiased advice and assistance in the selection of insurance products and services relating thereto, including claims administration. The Broker Defendants purport to offer independent expert brokering advice on such factors as coverage types and amounts, financial stability of carriers and overall cost of the insurance products, and thus act as a fiduciary as the agent of the client in this relationship, *i.e.*, considering its client's interest first in the placement of insurance.

4.      As set forth more fully below, contrary to these representations, the Broker Defendants do not represent their clients' best interests or act as fiduciaries in connection with the selection and placement of their clients' insurance.  The Insurer Defendants have improperly increased their profits and revenues by raising or maintaining premiums charged to (or by reducing the benefits or coverage received by) plaintiffs and the members of the Class. Together, the Broker Defendants and Insurer Defendants have acted in concert, conspired to reduce or eliminate competition for insurance and participated in the affairs of the enterprise.

5.      Defendants have effectuated their scheme through a variety of methods, including, *inter alia:*

- not disclosing or failing to adequately disclose payment to the Broker Defendants of contingent commissions (a.k.a. "overrides") which are based on such factors as the volume of insurance that the Broker Defendants place with a particular insurer ("volume contingency"), the renewal of that business ("persistency contingency"), and its profitability ("claims loss ratios contingency"), all of which the Broker Defendants, in concert with the Insurer Defendants, control, at least in part, by manipulating the market for insurance placed for their client;

2

- steering clients to "preferred" Insurer Defendants who participate in and further the scheme by paying exorbitant contingent commissions and other undisclosed kickbacks to the Broker Defendants;

- engaging in bid-rigging through the solicitation and manipulation of bids, including the submission of false or phony bids from the Insurer Defendants in order to obtain a preordained outcome of the client's selection of an insurer;

- unnecessarily placing insurance though wholly-owned wholesale entities which purport to act as intermediaries between the Broker Defendants and the Insurer Defendants, thereby enabling Defendants to collect additional improper fees; and

- entering into unlawful tying agreements under which the Broker Defendants steer primary insurance contracts to the Insurer Defendants on the condition that those insurers also use the Broker Defendants (or their reinsurance broker subsidiaries) for placing their reinsurance coverage with reinsurance carriers (many of whom are related entities) and thereby reaping additional improper revenue. This unlawful tying also has the effect of increasing the price of reinsurance, with the increased costs being passed on to the Insurer Defendants' customers, including plaintiffs and other members of the Class.

6. The Broker Defendants hold themselves out as expert agents and therefore fiduciaries in the analysis, procurement and renewal of insurance for meeting a customer's insurance needs. As brokers, they have a fiduciary duty to obtain the best coverage at the lowest cost and owe their clients the utmost duty of candor and full disclosure, including the duty to disclose the sources and amounts of all income received from any transactions involving their clients. As a result, the Broker Defendants owe their clients the duties of loyalty and care to always put their clients' interests ahead of their own. Clients, including plaintiffs and other members of the Class engage the Broker Defendants for their services based upon a belief in the Broker Defendants' expertise and promise of sound fiduciary brokerage advice. At all times that such engagements were entered into by plaintiffs and other members of the Class, they did so unaware that the Broker Defendants have acted in concert with and conspired with the Insurer Defendants in order to induce and/or steer them to purchase and/or renew coverage with Insurer Defendants at inflated prices and/or reduced coverage and benefits.

3

7.     To facilitate their conspiratorial conduct and achieve their goal of increased profits and revenues at the expense of their clients' best interests and in contravention of their fiduciary obligations, Defendants used their participation in certain industry trade groups such as the Council of Insurance Agents & Brokers (the "Council") and its predecessors for the purpose of accomplishing the objective of their scheme.  The Council's members place 80 percent – well over $90 billion – of all U.S. insurance products and services protecting businesses, industries, the government and the public-at-large.  The Council of Insurance Company Executives ("CICE"), a standing Committee of the Council, is comprised of more than 65 of the top commercial insurers.  Collectively, CICE members are responsible for writing more than three-quarters of the nation's commercial insurance premiums.  CICE co-hosts the annual Insurance Leadership Forum at the Greenbrier in White Sulphur Springs, West Virginia, an annual meeting that connects all the leaders of the commercial insurance marketplace – the CEOs of the top insurance carriers and the leading executives from the top one percent of agencies and brokerages.  The meetings allow for small breakout conferences, ad hoc meetings and social and professional interaction among all those attending.

8.     In addition to the industry meetings at the Greenbrier, the Council also facilitates many other forums, including the National Insurance Leadership Symposium, chief financial officer workshops and conferences where CFO's of the major brokerage firms focus on the fundamental and strategic issues facing their businesses, Executive Liaison Committees, email exchanges, market surveys, the sharing of operating results and financial analyses, insurance company sponsorships, peer-to-peer networking, as well as teleconferences between brokers and insurers, which facilitate Defendants' conspiratorial conduct.

4

9.     Defendants' scheme has recently come to light following investigations undertaken by various Attorneys General and state insurance departments.  To date, ten individuals, including former employees of Defendants AIG, ACE, Zurich or Marsh, have plead guilty, *inter alia*, for their participation in a scheme to trick and deceive clients pursuant to a deceptive bidding process.  Additionally, New York Attorney General Eliot Spitzer has entered into settlement agreements or assurances of discontinuance, together with the Superintendent of Insurance of New York and various other state attorneys general, including Connecticut and Minnesota, with three Broker Defendants:  Marsh, Aon, and Willis.  Spitzer, along with the Director of Illinois Division of Insurance and other state agencies, similarly entered into a Stipulation and Consent Order with a fourth Broker Defendant -- Arthur J. Gallagher & Co. Each settlement agreement or assurance of discontinuance required, among other things, that each Broker Defendant provide full disclosure of all forms of compensation received from insurers.

10.     In fact, New York State Attorney General Eliot Spitzer, testifying before the New York State Assembly Standing Committee on Insurance regarding Contingent Commission Agreements, stated: "Contingent commissions have infected practically every line of insurance business we examined, including employee benefits, medical malpractice, property, casualty, excess and surplus lines, executive risk, personal lines, marine and aviation."

11.     The Insurer Defendants have acted in concert with and conspired with the Broker Defendants by agreeing to pay billions of dollars in commissions and other undisclosed remuneration to Broker Defendants for insurance placement, creating an undisclosed conflict of interest that destroys the Broker Defendants' objectivity and breaches the fiduciary relationship between the Broker Defendants and their clients.  For example, the chart below reflects the

amount of premiums received and contingent commissions paid in 2004 by certain of the Insurer

Defendants:

| P&C/COMMERCIAL DEFENDANTS 2004 CONTINGENT COMMISSIONS PAID (BY INSURER GROUP)[1] | | |
|---|---|---|
| **Insurer Defendant** | **Net Premiums** | **Net Contingent Commissions** |
| ACE INA Group | 3,432,114,000 | 29,859,390 |
| Allianz (Fireman's Fund) | 4,112,717,000 | 70,327,460 |
| American International Group Inc. ("AIG") | 27,972,154,000 | 159,441,270 |
| American Re Corporation Group | 1,583,531,000 | 25,969,900 |
| Crum & Forster | 918,300,000 | 12,000,000 |
| Berkshire Hathaway | 15,762,335,000[2] | 515,428,354 |
| RLI Corp. | 511,348,000 | 5,368,000 |
| Chubb Group of Insurance Cos | 9,536,873,000 | 222,209,140 |
| CNA Insurance Companies | 7,365,081,000 | 121,523,830 |
| Hartford Insurance Group | 8,876,260,000 | 143,795,410 |
| Liberty Mutual Ins. Cos. | 12,514,360,000 | 106,372,060 |
| Wausau Insurance Co. | 39,718,190,000 | 136,463,000 |
| St. Paul Travelers Companies | 6,767,574,000 | 98,129,820 |
| Travelers Prop. Cas. Group | 13,175,778,000 | 267,468,290 |
| XL America Group | 726,578,000 | 13,732,324 |
| Zurich/Farmers Group | 17,050,186,000 | 148,336,610 |
| | | |
| Total | 170,023,379,000 | 2,076,424,858 |

The Broker Defendants and Insurer Defendants have also conspired to raise, maintain or stabilize

the price of insurance paid by plaintiffs and other members of the Class at an artificially high

---

[1] These figures do not reflect the total contingent commissions paid by a particular Defendant (including subsidiaries and affiliated companies within a group or holding company) and do not include contingent commissions paid for other lines of insurance such as life, health and disability insurance.

[2] Figures are for 2003.

6

level, by allocating the placement of insurance customers' business through a pervasive bid-rigging scheme.

12.     Defendants' conduct has eliminated the trust and client-focus necessary for the proper conduct of the broker-client and insurer-insured relationship and essentially reduced the procurement of insurance to the level one would expect of a fungible commodity.  In essence, through their illicit conduct, Defendants are placing insurance in order to improperly increase their profits, rather than arriving at the selection of an insurance product as part of a relationship based on trust and driven by what is in the clients' best interests.  This is a sentiment recently acknowledged by Joseph Plumeri, the CEO of Broker Defendant Willis, before an industry trade organization:  "For too long, this business has been about the placement only – what I've come to call manufacturing …And, if contingents create the appearance of a conflict for some brokers, they create that appearance for every broker."

13.     By steering customers, engaging in bid-rigging, customer allocation in order to maintain or increase market share, and in unlawful tying, all Defendants have been and are able to maintain or increase their profits at their customers' expense.  Broker Defendants are able to reap substantial amounts of additional undisclosed fees, while purporting to provide independent and unbiased brokerage advice to their customers, and Insurer Defendants have been and are able to raise, maintain or stabilize at an artificially high level the price paid by plaintiffs and members of the Class for insurance and the services relating thereto.  Defendants' concerted actions and practices have been and are undertaken as part of a scheme, common course of conduct, and conspiracy with other insurance brokerage firms, insurers and their affiliates, industry trade associations and other entities.  The result of these practices has been Defendants' sustained action and participation in the conduct of an enterprise through a pattern of racketeering activity.

7

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, and 1964, 28 U.S.C. §§1331, 1332 and 1367, and 15 U.S.C. §15. This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§1965(b) and (d). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

15. Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C. §1391(b), §12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391.

16. The Defendants are found, do business or transact business within this district, and conduct the interstate trade and commerce described below in substantial part within this district.

17. The trade and interstate commerce relevant to this action is the purchase and sale of insurance policies and related services.

18. During all or part of the period in which the events described in this First Consolidated Amended Complaint occurred, each of the Defendants sold insurance and related products and services and/or provided advice regarding the procurement or renewal of insurance or claims administration relating thereto to plaintiffs and other members of the Class in a continuous and uninterrupted flow of interstate commerce.

19. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

### A. PLAINTIFFS

20. Plaintiff OptiCare Health Systems, Inc. ("OptiCare") is a corporation incorporated under the laws of Delaware and has its principal place of business in Waterbury, Connecticut. OptiCare is an integrated eye care services company that, among other things, provides managed

8

vision and professional eye care products and services.  At all material times herein, OptiCare
was a party to agreements with defendant Marsh USA Inc. (Connecticut) for the provision of
insurance brokerage services covering a variety of insurance needs and risks.  Under these
agreements, Marsh USA Inc. (Connecticut) placed insurance coverage on OptiCare's behalf with
a number of insurance companies, including (1) Hartford Fire Insurance Company (a subsidiary
of The Hartford Financial Services Group, Inc.), (2) Twin City Fire Insurance Co. (a subsidiary
of The Hartford Financial Services Group, Inc.), (3) American International Specialty Lines
Insurance Co. (a subsidiary of American International Group, Inc.), (4) Lexington Insurance
Company (a subsidiary of American International Group, Inc.), (5) Travelers Indemnity
Company (a subsidiary of St. Paul Travelers Cos.), and (6) Federal Insurance Co. (a subsidiary
of Chubb Corp.).

21.     Plaintiff Comcar Industries, Inc. ("Comcar") is a corporation incorporated under
the laws of Florida and has its principal place of business in Auburndale, Florida.  Comcar is a
trucking company that, among other things, hauls commodities throughout the United States.  At
all material times herein, Comcar was a party to agreements with defendant Marsh USA, Inc. for
the provision of insurance brokerage services covering a variety of insurance needs and risks.
Under these agreements, Marsh placed insurance coverage on Comcar's behalf with a number of
insurance companies, including:  (1) American Alternative Insurance Corporation (a unit of
American Re Corporation Group), (2) Birmingham Fire Insurance Company of Pennsylvania (a
subsidiary of American International Group, Inc.), (3) Lexington Insurance Company (a
subsidiary of American International Group, Inc.), (4) American Guarantee & Liability Insurance
Co. (a subsidiary of Zurich American Insurance Co.), (5) American Home Assurance Company
(a subsidiary of American International Group, Inc.), (6) National Union Fire Insurance

9

Company of Pittsburgh, Pa. (a subsidiary of AIG Inc.), (7) Insurance Co. of the State of Pennsylvania (a subsidiary of American International Group, Inc.), and (8) Twin City Fire Insurance Co. (a subsidiary of Hartford Financial Services Group, Inc.

22.      Plaintiff QLM Associates, Inc. ("QLM"), at all material times herein, was a party to agreements with Sedgwick of New Jersey, Inc. and Sedgwick Noble Lowndes (subsidiaries of Defendant Marsh & McLennan Cos. which later merged into Marsh USA Inc.) for the provision of the insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Sedgwick of New Jersey, Inc. and/or Marsh USA Inc. placed insurance coverage on QLM's behalf with a number of insurance companies, including: (1) Zurich American Insurance Co., and (2) Federal Insurance Co. (a subsidiary of Chubb Corp.).

23.      Plaintiff Sunburst Hospitality Corporation ("Sunburst"), at all material times herein, was a party to agreements with Marsh USA Inc., Aon Risk Services, Inc. of Maryland, and Willis of New York, Inc. (formerly Willis Corroon Corp. of New York) for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh USA Inc. placed insurance coverage with a number of insurance companies, including (1) Lexington Insurance Co. (a subsidiary of American International Group Inc.), (2) Crum & Forster, (3) Travelers, (4) Zurich American Insurance Company (a subsidiary of Zurich Financial Services), (5) St. Paul Fire & Marine Insurance Co. (a subsidiary of St. Paul Travelers Cos.), (6) Hartford, and (7) Westchester Surplus Lines Insurance Co. (a subsidiary of ACE Ltd.). Aon Risk Services, Inc. of Maryland also placed insurance coverage with a number of insurance companies, including (1) Wausau, (2) Gulf Insurance Co. (a subsidiary of St. Paul Travelers Cos. Inc.), (3) Travelers, and (4) National Union Fire Ins. Co. (a subsidiary of American International Group Inc.).  Willis Corroon Corp. of New York also placed insurance coverage with a number

10

of insurance companies, including (1) National Union Fire Ins. Co. (a subsidiary of American International Group Inc.), and (2) St. Paul Fire, (a subsidiary of St. Paul Travelers Cos.).

24.     Plaintiff Robert Mulcahy ("Mulcahy"), at all material times herein, was an independent contractor and a party to agreements with Arthur J. Gallagher & Co., through his employer Vestax Securities Corp., for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Arthur J. Gallagher & Co. placed insurance coverage with a number of insurance companies, including National Union Fire Insurance Co. of Pittsburgh, Pa. (a subsidiary of American International Group Inc.).

25.     Plaintiff Accent on Eyes Corp. ("Accent"), at all material times herein, was a party to agreements with Marsh Affinity Group Services, a unit of Seabury & Smith, Inc., for the provision of insurance brokerage services.  Under these agreements, Marsh Affinity Group Services placed insurance coverage on Accent's behalf with a number of insurance companies, including Chicago Insurance Company, an affiliate of the Fireman's Fund Insurance Company.

26.     Plaintiff Golden Gate Bridge, Highway and Transportation District ("Golden Gate") is a multi-county political subdivision of the State of California.  It operates the Golden Gate Bridge and two public transit systems:  The Golden Gate Transit bus system and the Golden Gate Ferry.  At all material times herein, Golden Gate was a party to agreements with Marsh Risk & Insurance Services, a division of Marsh, Inc. for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Marsh placed insurance coverage on Golden Gates's behalf with a number of insurance companies, including (1) American International Specialty Lines Insurance Co. (a subsidiary of American International Group, Inc.), (2) Illinois Union Insurance Co. (a subsidiary of ACE Ltd.), (3) Indemnity Insurance Co. of North America (a subsidiary of ACE Ltd.),  (4) Steadfast Insurance Co. (a

11

subsidiary of Zurich American Insurance Co.), (5) National Union Fire Insurance Co. of Pittsburgh, Pa. (a subsidiary of American International Group Inc.), (6) Lexington Insurance Co. (a subsidiary of American International Group Inc.), (7) American Home Assurance Co. (a subsidiary of American International Group Inc.), (8) Westchester Surplus Lines Ins. Co. (a subsidiary of ACE Ltd.), (9) Fidelity & Deposit Company of Maryland (a subsidiary of Zurich North America Insurance Co.), (10) Hartford Steam Boiler Inspection and Insurance Co. (a subsidiary of American International Group Inc.), (11) United States Fire Insurance Co. (a subsidiary of Crum & Forster Holdings Corp.), (12) Pacific Insurance Co., Ltd. (a subsidiary of Hartford Financial Services Group, Inc.), (13) Mt. Hawley Insurance Co. (a subsidiary of RLI Corp.), (14) Continental Insurance Co. (a subsidiary of CNA Financial Corp.), (15) Zurich American Insurance Company (a subsidiary of Zurich Financial Services), (16) Empire Fire & Marine Insurance Co. (a subsidiary of Zurich American Insurance Co.), and (17) St. Paul Mercury Insurance Co. (a subsidiary of St. Paul Travelers Cos.).

27.     Plaintiff Glenn Singer ("Singer") at all material times herein, was a party to agreements with Marsh USA Inc. for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh placed insurance coverage on Singer's behalf with a number of insurance companies, including, among others: (1) American Home Assurance Company (a subsidiary of American International Group, Inc.), (2) American International Insurance Company (a subsidiary of American International Group, Inc.), (3) The Insurance Company of the State of Pennsylvania (a subsidiary of American International Group, Inc.), (4) AIU Insurance Company (a subsidiary of American International Group, Inc.), (5) Lexington Insurance Company (subsidiary of American International Group, Inc.), and (6) The Chubb Corporation.

12

28.    Plaintiff Priority Ultrasound Services ("Priority Ultrasound"), at all material times herein, was a party to agreements with Affinity Insurance Services, Inc., formerly known as Aon Direct Group, Inc. for the provision of insurance brokerage services.  Under these agreements, Aon placed insurance coverage on Priority Ultrasound's behalf with a number of insurance companies, including American Casualty Co. of Reading, PA (a subsidiary of CNA Financial Corp.).

29.    Plaintiff Redwood Oil Company ("Redwood"), at all material times herein, was a party to agreements with Gallagher Hefferman Insurance Brokers, a division of Arthur J. Gallagher & Co., for the provision of insurance brokerage services.  Under these agreements, Arthur J. Gallagher & Co. placed insurance coverage on Redwood's behalf with a number of insurance companies, including (1) Commerce and Industry Insurance Co. (a subsidiary of American International Group, Inc.), and (2) New Hampshire Insurance Company (a subsidiary of American International Group, Inc.).

30.    Plaintiff The Omni Group of Companies ("Omni") is an affiliation of businesses with its principal place of business in Phoenix, Arizona.  For purposes of this complaint, Omni includes its affiliated companies, namely Dominion Pacific Commercial, L.L.C., a construction company offering consultation, cost analysis, construction drawing supervision, design/build and turnkey construction for ground-up commercial buildings and commercial tenant improvements. Omni is a full service real estate firm that also provides assistance to institutions turning around troubled properties for leasing or sale.  Omni was a party to agreements with defendant Acordia for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Acordia placed insurance coverage on Omni's behalf with a number of insurance companies, including (1) Fireman's Fund Insurance Company (a subsidiary of Allianz

13

AG), (2) RLI Insurance Company (a subsidiary of RLI Corp.), and (3) Mt. Hawley Insurance Co. (a subsidiary of RLI Corp.).

31.     Plaintiff Bayou Steel Corporation ("Bayou"), at all material times herein, was a party to agreements with Aon Risk Services, Inc. of Louisiana, Aon Risk Services of Texas, Inc. and Marsh USA Inc., for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Aon Risk Services Inc. of Louisiana and/or Aon Risk Services of Texas, Inc. placed insurance coverage on Bayou's behalf with a number of insurance companies, including:  (1) ACE USA, Inc. (a subsidiary of ACE Ltd.), (2) American Guarantee & Liability Insurance Co. (a subsidiary of Zurich American Insurance Co.), (3) American International Specialty Lines Insurance Co. (a subsidiary of American International Group Inc.), (4) Executive Risk Indemnity Inc. (a subsidiary of Chubb Corp.), (5) Federal Insurance Co. (a subsidiary of Chubb Corp.), (6) Gulf Insurance Co. (a subsidiary of St. Paul Travelers Cos.), (7) National Union Fire Insurance Co. of Louisiana (a subsidiary of American International Group Inc.), (8) Nutmeg Insurance Co. (a subsidiary of Hartford Financial Services Group Inc.), (9) St. Paul, (10) Greenwich Insurance Co. (a subsidiary of XL Capital Ltd.), and (11) Indian Harbor Insurance Co. (a subsidiary of XL Capital Ltd.).  Also, Marsh USA Inc. placed insurance coverage on Bayou's behalf with a number of insurance companies, including:  (1) ACE American Insurance Co. (a subsidiary of ACE Ltd.), (2) ACE USA, Inc. (a subsidiary of ACE Ltd.), (3) American Guarantee & Liability Insurance Co. (a subsidiary of Zurich North America Insurance Co.), (4) Commerce and Industry Insurance Co. (a subsidiary of American International Group Inc.), (5) Executive Risk Indemnity Inc. (a subsidiary of Chubb Corp.), (6) Federal Insurance Co. (a subsidiary of Chubb Corp.), (7) Gulf Insurance Co. (a subsidiary of St. Paul Travelers Cos. Inc.), (8) Lexington Insurance Co. (a subsidiary of American

14

International Group Inc.), (9) Liberty Mutual Insurance Co., (10) National Union Fire Insurance. Co. of Pittsburgh, Pa. (a subsidiary of American International Group Inc.), (11) National Union Fire Insurance Co. of Louisiana (a subsidiary of American International Group Inc.), (12) St. Paul Fire and Marine Insurance Co. (a subsidiary of St. Paul Travelers Cos.), (13) Twin City Fire Insurance Co. (a subsidiary of Hartford Financial Services Group Inc.), (14) Wausau Underwriters Ins. Co. (a subsidiary of Liberty Mutual Insurance Co.), and (15) Indian Harbor Insurance Co. (a subsidiary of XL Capital Ltd.).

32. Plaintiff Clear Lam Packaging, Inc. ("Clear Lam"), at all material times herein, was a party to agreements with Arthur J. Gallagher Risk Management Services, Inc., for the provision of insurance brokerage services covering a variety of insurance needs. Under these agreements, Arthur J. Gallagher placed insurance coverage on Clear Lam's behalf with a number of insurance companies, including: (1) Travelers Casualty & Surety Company of America (a subsidiary of St. Paul Travelers Cos.), (2) National Surety Corp. (a subsidiary Fireman's Fund Insurance Co.), (3) Twin City Fire Insurance Co. (a subsidiary of Hartford Financial Services Group Inc.), (4) Zurich American Insurance Company (a subsidiary of Zurich Financial Services), and (5) Liberty Mutual Fire Insurance Co. (a subsidiary of Liberty Mutual Insurance Co.).

33. Plaintiff Cellect, LLC ("Cellect"), at all material times herein, was a party to agreements with Marsh USA, Inc. for the provision of insurance brokerage services covering a variety of insurance needs. Under these agreements, Marsh placed insurance coverage on Cellect's behalf with a number of insurance companies, including, among others: (1) American International Group, Inc., (2) St. Paul, and (3) Zurich.

15

34.     Plaintiff The Enclave, LLC ("Enclave"), at all material times herein, was party to agreements with USI Insurance Services of Florida, Inc. (d/b/a/ USI Florida) for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, USI Insurance Services of Florida, Inc. placed insurance coverage on Enclave's behalf with a number of insurance companies, including Empire Indemnity Insurance Co. (a subsidiary of Zurich North America Insurance Co.).

35.     Plaintiff Gateway Club Apartments, Ltd. ("Gateway"), at all material times herein, was party to agreements with USI Insurance Services of Florida, Inc. (d/b/a/ USI Florida) for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, USI Insurance Services of Florida, Inc. placed insurance coverage on Gateway's behalf with a number of insurance companies, including (1) Federal Insurance Co. (a subsidiary of Chubb Corp.), (2) Lexington Insurance Co. (a subsidiary of American International Group Inc.), (3) Gulf Insurance Co. (a subsidiary of St. Paul Travelers Cos. Inc.), (4) Continental Casualty Co. (a subsidiary of CNA Financial Corp.), (5) Athena Assurance Company (a subsidiary of St. Paul Travelers Cos.), (6) American Guarantee & Liability Insurance Co. (a subsidiary of Zurich North America Insurance Co.), (7) Vigilant Insurance Co. (a subsidiary of Chubb Corp.), and (8) Mt. Hawley Insurance Co. (a subsidiary of RLI Corp.).

36.     Plaintiff Theodore S. Forman ("Forman"), at all material times herein, was a party to agreements with Summit Global Partners of Florida, Inc. for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Summit Global Partners of Florida, Inc. placed insurance coverage on Forman's behalf with a number of insurance companies, including Assurance Company of America (a subsidiary of Zurich North America Insurance Co.).

16

37.     Plaintiff Michigan Multi-King Corp. ("Michigan Multi-King"), at all material times herein, was a party to agreements with Aon Risk Services, Inc. of Michigan for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Aon Risk Services, Inc. of Michigan placed insurance coverage on Michigan Multi-King's behalf with a number of insurance companies, including:  (1) Travelers Casualty and Surety Company of America (a subsidiary of St. Paul Travelers Cos.), (2) St. Paul Fire and Marine Insurance Co. (a subsidiary of St. Paul Travelers Cos.), and (3) Federal Insurance Co. (a subsidiary of Chubb Corp.).

38.     Plaintiff City of Stamford ("Stamford") is a municipal corporation incorporated under the laws of the State of Connecticut.  At all material times herein, Stamford was a party to agreements with defendant Marsh USA, Inc., and/or Marsh McLennan, Inc., (collectively "Marsh") for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh placed insurance coverage on Stamford's behalf with a number of insurance companies, including, among others:  (1) American International Marine Agency of NY (a division of AIG), (2) Hartford Fire Insurance Company (a subsidiary of Hartford Financial Services Group, Inc.), (3) The Hartford Fidelity and Bonding (a subsidiary of Hartford Financial Services Group, Inc.), (4) Lexington Insurance Company (a subsidiary of AIG), (5) St Paul Fire & Marine (a subsidiary of St. Paul Travelers Cos.), (6) Traveler's Casualty & Surety Company of America (a subsidiary of St. Paul Travelers Cos.), (7) Westchester Surplus Lines Insurance Company (a subsidiary of ACE Ltd.), and (8) Zurich American Insurance Company (a subsidiary of Zurich Financial Services Group).

## B. DEFENDANTS

### 1. Broker-Defendants

39.     Defendant Marsh & McLennan Companies, Inc. ("Marsh & McLennan") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in New York, New York. Marsh & McLennan is a global corporation and the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement and servicing of insurance, as well as investment management and consulting.

40.     Defendant Marsh Inc. ("Marsh Inc.") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New York.  Marsh Inc. is a primary subsidiary of Marsh & McLennan and an entity through which risk and insurance services, such as insurance and reinsurance brokerage, are provided.  Marsh Inc. is considered a Marsh & McLennan operating unit and provides insurance brokerage through various subsidiaries of its own.

41.     Defendant Marsh USA Inc. ("Marsh USA") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New York.  Marsh USA is a subsidiary of Marsh Inc. and provides insurance brokerage services.

42.     Defendant Marsh USA Inc. (Connecticut) ("Marsh Connecticut") is a corporation incorporated under the laws of Connecticut and has its corporate headquarters in New York, New York, and is one of a number of corporations under the name "Marsh USA Inc." incorporated in various states.  Marsh Connecticut is a subsidiary of Marsh & McLennan and provides insurance brokerage services.

43.     Defendant Seabury & Smith, Inc. ("Seabury & Smith") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New

18

York, and is one of a number of corporations under the name "Seabury & Smith, Inc." incorporated in various states. Seabury & Smith is a subsidiary of Marsh & McLennan and provides brokerage services through its Marsh Affinity Group Services unit.

44. Defendants Marsh & McLennan, Marsh Inc., Marsh USA, Marsh Connecticut and Seabury & Smith shall be referred to collectively herein as "Marsh."

45. Defendant Aon Corporation ("Aon Corp.") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois. Aon Corp. is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

46. Defendant Aon Broker Services, Inc. ("Aon Broker") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois. Aon Broker is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

47. Defendant Aon Risk Services Companies, Inc. ("Aon Risk") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Risk is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

48. Defendant Aon Risk Services Inc. U.S. ("Aon Risk U.S.") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Risk U.S. is a subsidiary of and/or affiliated with Aon Corp. and Aon Risk, and provides customers with risk management and insurance brokering services.

49. Defendant Aon Risk Services, Inc. of Maryland ("Aon Risk Maryland") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in

Chicago, Illinois. Aon Risk Maryland is a subsidiary of Aon Corp., and provides customers with risk management and insurance brokering services.

50. Defendant Aon Risk Services, Inc. of Louisiana ("Aon Risk Louisiana") is a corporation incorporated under the laws of Louisiana and has its corporate headquarters in Chicago, Illinois. Aon Risk Louisiana is a subsidiary of Aon Corp., and provides customers with risk management and insurance brokering services.

51. Defendant Aon Risk Services of Texas, Inc. ("Aon Risk Texas") is a corporation incorporated under the laws of Texas and has its corporate headquarters in Chicago, Illinois. Aon Risk Texas is a subsidiary of Aon Corp., and provides customers with risk management and insurance brokering services.

52. Defendant Aon Risk Services, Inc. of Michigan ("Aon Risk Michigan") is a corporation incorporated under the laws of Michigan and has its corporate headquarters in Chicago, Illinois. Aon Risk Michigan is a subsidiary of Aon Corp., and provides customers with risk management and insurance brokering services.

53. Aon Group, Inc. ("Aon Group") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Group is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

54. Aon Services Group, Inc. ("Aon Services") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois. Aon Services is a subsidiary of and/or affiliated with Aon Corp. and Aon Group, and provides customers with risk management and insurance brokering services.

20

55.     Aon Re, Inc. ("Aon Re") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois.  Aon Re is a subsidiary of Aon Corp. and provides customers with reinsurance and brokerage services.

56.     Defendant Affinity Insurance Services, Inc. ("Affinity") is a subsidiary of Aon Corp. and is incorporated under the laws of Pennsylvania, with headquarters in Chicago, Illinois. Affinity provides its customers with risk management and insurance brokering services.

57.     Aon Re Worldwide, Inc. ("Aon Re Worldwide") is a subsidiary of Aon Corp. and is incorporated under the laws of Delaware with headquarters on Chicago, Illinois.  Aon Re Worldwide provides customers with reinsurance coverage and is the largest reinsurance brokerage business in the U.S.

58.     Defendants Aon Corp., Aon Broker, Aon Risk, Aon Risk U.S., Aon Risk Maryland, Aon Risk Louisiana, Aon Risk Texas, Aon Risk Michigan, Aon Services, Aon Re, Affinity, and Aon Re Worldwide shall be referred to collectively herein as "Aon."

59.     Defendant Willis Group Holdings Limited ("Willis Group") is a corporation incorporated under the laws of Bermuda whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in London, England.  Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.  Willis Group is the third largest global brokerage firm in the world, with over $212 billion in revenues in 2003 alone.

60.     Defendant Willis Group Limited ("Willis Ltd.") is a private limited company registered in England and Wales with corporate headquarters in London, England.  Willis Ltd. is a subsidiary of Willis Group and provides insurance services through subsidiaries of its own.

61.     Defendant Willis North America, Inc. ("Willis NA") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New York. Willis NA is a subsidiary of Willis Ltd., and provides customers with risk management and insurance brokering services. Willis Ltd. and, in turn, Willis NA provide their insurance brokering services and operate principally through the offices of their subsidiaries and affiliates.

62.     Defendant Willis of New York, Inc. ("Willis NY") is a subsidiary of and is incorporated under the laws of New York with headquarters in New York, New York. Willis provides customers with risk management and insurance brokering services.

63.     Defendant Stewart Smith Group ("Stewart Smith"), was a wholly owned subsidiary of Willis Ltd. with its headquarters in New York, New York. Stewart Smith is the third-largest wholesale intermediary for commercial lines of insurance in the United States, writing over $1 billion in premium in 2003. It claims to specialize in hard-to-place, unique, difficult, and specialty businesses.

64.     Willis Re Inc. ("Willis Re") is a wholly owned subsidiary of Willis Ltd. with its headquarters in New York, New York. Willis Re provides its customers with reinsurance brokering services. Willis Re describes itself as "one of the world's premier global reinsurance broker."

65.     Defendants Willis Group, Willis Ltd., Stewart Smith, Willis NA, Willis NY, Stewart Smith and Willis Re shall be referred to collectively herein as "Willis."

66.     Defendant Arthur J. Gallagher & Co. ("Gallagher Co." or "AJG") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Itasca, Illinois. Gallagher provides customers with risk management and insurance brokerage services. Gallagher is the fourth

22

largest global insurance broker by 2003 revenue, providing customers with risk management and insurance brokerage services worldwide.

67.     Defendant Arthur J. Gallagher Risk Management Service, Inc. ("Gallagher Risk") is a subsidiary of Gallagher, and is incorporated under the laws of Illinois, with headquarters in Itasca, Illinois.  Gallagher Risk provides customers with property/casualty brokerage, risk management and consulting services.

68.     Defendants Gallagher Co. and Gallagher Risk shall be referred to collectively herein as "Gallagher."

69.     Defendant Wells Fargo & Company is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in San Francisco, California.  Wells Fargo & Company provides customers with risk management and insurance brokerage services through two separate insurance operations:  (i) Wells Fargo Insurance Services, and (ii) Acordia, Inc., a Wells Fargo subsidiary.  Collectively, Wells Fargo Insurance and Acordia/Wells Fargo compromise the fifth largest broker in the United States, garnering $800.5 million revenues in 2003.

70.     Defendant Acordia, Inc. ("Acordia/Wells Fargo") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Acordia/Wells Fargo provides customers with risk management and insurance brokerage services.

71.     Defendants Wells Fargo & Company and Acordia/Wells Fargo shall be referred to collectively as "Wells Fargo."

72.     Defendant Brown & Brown, Inc. ("Brown") is a corporation incorporated under the laws of Florida whose shares are listed and publicly traded on the New York Stock Exchange

23

and has its corporate headquarters in Daytona Beach, Florida. Brown provides customers with risk management and insurance brokerage services.

73. Defendant Hilb, Rogal & Hobbs Company ("Hilb" or "HRH") is a corporation incorporated under the laws of Virginia whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Glen Allen, Virginia. HRH provides customers with risk management and insurance brokerage services.

74. Defendant BB&T Corporation ("BB&T Corp.") is a corporation incorporated under the laws of North Carolina whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Winston-Salem, North Carolina. BB&T Corp. is a financial holding company that conducts its business operations primarily through its commercial banking subsidiaries, including Branch Banking and Trust Company. Through its subsidiaries and affiliates, BB&T Corp. provides customers with risk management and insurance brokerage services.

75. Defendant Branch Banking and Trust Company ("Branch Bank") is a corporation incorporated under the laws of North Carolina and has its corporate headquarters in Winston-Salem, North Carolina. Branch Bank is BB&T Corp.'s largest subsidiary, which, through one of its own principal operating subsidiaries, BB&T Insurance Services, Inc., provides customers with risk management and insurance brokering services.

76. Defendant BB&T Insurance Services, Inc., ("BB&T Insurance") is a corporation incorporated under the laws of North Carolina and has its corporate headquarters in Raleigh, North Carolina. BB&T Insurance provides customers with risk management and insurance brokerage services.

24

77.     Defendants BB&T Corp., Branch Bank and BB&T Insurance shall be referred to collectively as "BB&T."

78.     Defendant U.S.I. Holdings Corporation ("USI Holding") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the NASDAQ National Market and has its corporate headquarters in Briarcliff Manor, New York. USI provides customers with risk management and insurance brokerage services.

79.     Defendant Summit Global Partners of Florida, Inc. ("Summit Global") is a subsidiary of USI, and is incorporated under the laws of Florida with headquarters in Boca Raton, Florida.  Summit Global provides customers with risk management and insurance brokerage services.

80.     Defendant USI Insurance Services of Florida, Inc., d/b/a USI Florida ("USI Florida") is a subsidiary of USI, and is incorporated under the laws of Florida, with headquarters in Plantation, Florida.  USI Florida provides customers with risk management and insurance brokerage services.

81.     Defendants USI Holdings, Summit Global and USI Florida shall be referred to collectively as "USI."

82.     Defendant Hub International Limited ("Hub") is a corporation incorporated under the laws of Ontario, Canada, whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in Chicago, Illinois.  Hub provides customers with risk management and insurance brokerage services.

### 2.     Insurer Defendants.

83.     Defendant American International Group, Inc. ("AIG Inc.") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in New York, New York.  As described by

25

AIG, Inc. itself, "AIG member companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer." AIG, Inc. and its related companies are the largest underwriters of commercial and industrial insurance in the United States.

84. Defendant Lexington Insurance Company ("Lexington") is a subsidiary of AIG Inc. and is also partly owned by National Union Fire Insurance Company of Pittsburgh, PA, The Insurance Company of the State of Pennsylvania and Birmingham Fire Insurance Company of Pennsylvania, which are all subsidiaries of AIG Inc. as well. Lexington is incorporated under the laws of Delaware with headquarters in Boston, Massachusetts. Lexington operates as an underwriter of managed care professional liability insurance.

85. Defendant American International Specialty Lines Insurance Co. ("AISPLIC") is a subsidiary of AIG Inc. and is incorporated under the laws of Alaska with headquarters in Jersey City, New Jersey. AISPLIC operates as an underwriter of liability, property, casualty and marine insurance.

86. Defendant Birmingham Fire Insurance Co. of Pennsylvania ("Birmingham Fire") is a subsidiary of AIG Inc. and is incorporated under the laws of Pennsylvania with headquarters in New York, New York. Birmingham Fire operates as an underwriter of property and casualty insurance.

87. Defendant American Home Assurance Co. ("American Home") is a subsidiary of AIG Inc. and is incorporated under the laws of New York with headquarters in New York, New York. American Home operates as a provider of commercial umbrella/excess liability and primary and excess workers' compensation insurance.

26

88.     Defendant National Union Fire Insurance Co. of Pittsburgh, Pa. ("National Union Pittsburgh") is a subsidiary of AIG Inc. and is incorporated under the laws of Pennsylvania with headquarters in New York, New York.  National Union Pittsburgh operates as a provider of liability products and services.

89.     Defendant National Union Fire Insurance Co. of Louisiana ("National Union Louisiana") is a subsidiary of AIG Inc. and is incorporated under the laws of Louisiana with headquarters in Baton Rouge, Louisiana.  National Union Louisiana operates as a provider of liability products and services.

90.     Defendant American International Insurance Co. ("American Int'l") is a subsidiary of AIG Inc. and is incorporated under the laws of New York with headquarters in New York, New York.  American Int'l operates as an underwriter of property and casualty insurance.

91.     Defendant The Insurance Company of the State of Pennsylvania ("Ins. Co. PA") is a subsidiary of AIG Inc. and is incorporated under the laws of Pennsylvania with headquarters in Harrisburg, Pennsylvania.  Ins. Co. PA operates as an underwriter of property and casualty insurance.

92.     Defendant AIU Insurance Co. ("AIU") is a subsidiary of AIG Inc. and is also partly owned by Ins. Co. PA, National Union Pittsburgh and Birmingham Fire, which are all subsidiaries of AIG Inc. as well.  AIU is incorporated under the laws of New York with headquarters in New York, New York.  AIU operates as an underwriter of property and casualty insurance.

93.     Defendant Commerce and Industry Insurance Co. ("Commerce & Industry") is a subsidiary of AIG Inc., and is incorporated under the laws of New York with headquarters in

27

New York, New York.  Commerce & Industry operates as an underwriter of property and casualty insurance.

94.     Defendant New Hampshire Insurance Co. ("NH Ins.") is a subsidiary of AIG Inc., and is incorporated under the laws of Pennsylvania, with headquarters in Harrisburg, Pennsylvania.  NH Ins. operates as an underwriter of property and casualty insurance.

95.     Defendant Hartford Steam Boiler Inspection and Insurance Co. ("Hartford Steam") is a subsidiary of AIG Ins, and is incorporated under the laws of Connecticut, with headquarters in Hartford, Connecticut.  Hartford Steam describes itself as "a global specialty insurer and reinsurer" offering "a range of specialty coverages, engineering-based risk management, and loss reduction services."

96.     Defendants AIG Inc., Lexington, AISPLIC, Birmingham Fire, American Home, National Union Pittsburgh, National Union Louisiana, American Int'l, Ins. Co. PA, AIU, Commerce & Industry, NH Ins. and Hartford Steam shall be referred to collectively as "AIG."

97.     Defendant ACE Limited ("ACE Ltd.") is a corporation incorporated under the laws of the Cayman Islands whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in Hamilton, Bermuda.  ACE Ltd. owns ACE INA Holdings, Inc.  As described by ACE Ltd. itself, the "ACE Group of Companies is one of the world's largest providers of insurance and reinsurance."

98.     Defendant ACE INA Holdings, Inc. ("ACE INA"), is a U.S. based insurance organization incorporated under the laws of Delaware and is headquartered in Philadelphia, Pennsylvania.  ACE INA oversees insurance operations that span the globe and, through its operating companies, including ACE USA, Inc., is a leading provider of insurance and reinsurance.

28

99.     Defendant ACE USA, Inc. ("ACE USA") is an operating company of ACE INA and is a corporation incorporated under the laws of Delaware and is headquartered in Philadelphia, Pennsylvania.  ACE USA operates through several insurance companies using a network of offices throughout the United States.  ACE USA's operations "provide a broad range of P&C insurance and reinsurance products to a diverse group of commercial and non-commercial enterprises and consumers.  These products include excess liability, excess property, workers' compensation, general liability, automobile liability, professional lines, aerospace, accident and health (A&H) coverages and claim and risk management products and services."

100.    Defendant ACE American Insurance Co. ("ACE American") is a subsidiary of ACE Ltd. and is incorporated under the laws of Pennsylvania, with headquarters in Philadelphia, Pennsylvania.  ACE American operates as an underwriter of property and casualty insurance.

101.    Defendant Westchester Surplus Lines Insurance Co. ("Westchester Surplus") is a subsidiary of ACE Ltd. and is incorporated under the laws of Georgia with headquarters in Philadelphia, Pennsylvania.  Westchester Surplus operates as a provider of specialty property and casualty insurance and services.

102.    Defendant Illinois Union Insurance Co. ("Illinois Union") is a subsidiary of ACE Ltd. and is incorporated under the laws of Illinois, with headquarters in Chicago, Illinois.  Illinois Union operates as an underwriter of property and casualty insurance.

103.    Defendant Indemnity Insurance Co. of North America ("Indemnity Ins.") is a subsidiary of ACE Ltd. and is incorporated under the laws of Pennsylvania, with headquarters in Philadelphia, Pennsylvania.  Indemnity Ins. operates as an underwriter of property and casualty insurance.

104.    Defendants ACE Ltd., ACE INA, ACE USA, and ACE American, Westchester Surplus, Illinois Union and Indemnity Ins. shall be referred to collectively herein as "ACE."

105.    Defendant The Hartford Financial Services Group, Inc. ("Hartford Financial") is one of the largest investment and insurance companies in the United States.  Hartford is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Hartford, Connecticut.  Hartford represents that it "is a leading provider of investment products, life insurance and group and employee benefits; automobile and homeowners products; and business insurance."

106.    Defendant Hartford Fire Insurance Co. ("Hartford Fire") is a subsidiary of Hartford Financial and is an incorporated under the laws of Connecticut with headquarters in Hartford, Connecticut.  Hartford Fire operates as an underwriter of property and casualty insurance.

107.    Defendant Twin City Fire Insurance Co. ("Twin City") is a subsidiary of Hartford Financial and is incorporated under the laws of Indiana with headquarters in Hartford, Connecticut.  Twin City operates as an underwriter of property and casualty insurance.

108.    Defendant Pacific Insurance Co., Ltd. ("Pacific Ins.") is a subsidiary of Hartford Financial and is incorporated under the laws of Connecticut, with headquarters in Boston, Massachusetts.  Pacific Ins. operates as an underwriter of property and casualty insurance.

109.    Defendant Nutmeg Insurance Co. ("Nutmeg Ins.") is a subsidiary of Hartford Financial and is incorporated under the laws of Connecticut, with headquarters in Hartford, Connecticut.  Nutmeg Ins. operates as an underwriter of property and casualty insurance.

110.    Defendant The Hartford Fidelity & Bonding Co. ("Hartford Fidelity") is a subsidiary of Hartford Financial and is incorporated under the laws of Connecticut, with

30

headquarters in Hartford, Connecticut. Hartford Fidelity operates as an underwriter of property and casualty insurance.

111. Defendants Hartford Financial, Hartford Fire, Twin City, Pacific Ins., Nutmeg Ins. and Hartford Fidelity shall be referred to collectively as "Hartford."

112. Defendant Munich Reinsurance Co. ("Munich Re") is a provider of reinsurance, primary insurance and asset management services. Munich Re is a German corporation with headquarters in Munich, Germany. Munich Re's shares are traded on several German stock exchanges. Munich Re describes itself as "one of the world's largest reinsurers."

113. Defendant American Re Corporation ("American Re") is a subsidiary of Munich Re and is incorporated in the State of Delaware and headquartered in Princeton, New Jersey. American Re is one of the leading providers of reinsurance in the United States. Through its subsidiaries, American Re writes treaty and facultative reinsurance, insurance, and provides related services to insurance companies, other large businesses, government agencies, pools and other self-insurers.

114. Defendant American Re-Insurance Co. ("American Re-Insurance") is a wholly owned subsidiary of American Re and is incorporated under the laws of Delaware and headquartered in Princeton, New Jersey. American Re-Insurance is a provider of treaty and facultative reinsurance, insurance and related services to insurance companies, large businesses and government agencies.

115. Defendant American Alternative Insurance Corp. ("American Alternative") is a unit of American Re and is incorporated under the laws of Delaware and headquartered in Princeton, New Jersey. American Alternative is a provider of property and casualty insurance.

31

116.    Defendant Munich-American Risk Partners, Inc. ("Munich-American") is a wholly owned subsidiary of American Re and is incorporated under the laws of Delaware and headquartered in Princeton, New Jersey.  Munich American develops custom risk transfer, risk sharing and risk managing solutions that preserve and enhance the assets and operations of its clients.

117.    Defendants Munich Re, American Re, American Re-Insurance, American Alternative and Munich-American, shall be referred to collectively herein as "Munich."

118.    Defendant St. Paul Travelers Companies, Inc. ("St. Paul Travelers") is a corporation incorporated under the laws of Minnesota and has its corporate headquarters in St. Paul, Minnesota.  St. Paul Travelers was formed from a 2004 merger between Travelers Property Casualty Corp. and The St. Paul Companies, Inc.  The merger created the second largest commercial insurance company in the United Sates offering a variety of property and casualty insurance products through its various subsidiaries.  St. Paul Travelers describes itself as "a leading provider of property casualty insurance and surety products and of risk management services to a wide variety of business and organizations and to individuals" whose products are distributed through "independent insurance agents and brokers."

119.    Defendant St. Paul Fire & Marine Insurance Co. ("St. Paul Fire") is a subsidiary of St. Paul Travelers and is incorporated under the laws of Minnesota with headquarters in St. Paul, Minnesota.  St. Paul Fire operates as an underwriter of property and casualty insurance.

120.    Defendant Gulf Insurance Co. ("Gulf Ins.") is a subsidiary of St. Paul Travelers, and is incorporated under the laws of Connecticut with headquarters in New York, New York.  Gulf Ins. operates as an underwriter of property and casualty insurance.

121.    Defendant St. Paul Mercury Insurance Co. ("St. Paul Mercury") is a subsidiary of St. Paul Travelers, and is incorporated under the laws of Minnesota, with headquarters in St. Paul, Minnesota.  St. Paul Mercury operates as an underwriter of property and casualty insurance.

122.    Defendant Travelers Casualty & Surety Co. of America ("Travelers Casualty") is a subsidiary of St. Paul Travelers, and is incorporated under the laws of Connecticut, with headquarters in Hartford, Connecticut.  Travelers Casualty operates as an underwriter of property and casualty insurance.

123.    Defendant Travelers Indemnity Company ("Travelers Indemnity") is a subsidiary of St. Paul Travelers and is incorporated under the laws of Connecticut with headquarters in Hartford, Connecticut.  Travelers Indemnity operates as an underwriter of property and casualty insurance.

124.    Defendant Athena Assurance Co. ("Athena Assurance") is a subsidiary of St. Paul Travelers, and is incorporated under the laws of Minnesota, with headquarters in St. Paul, Minnesota.  Athena Assurance operates as an underwriter of property and casualty insurance.

125.    Defendants St. Paul Travelers, St. Paul Fire, Gulf Ins., St. Paul Mercury, Travelers Casualty, Travelers Indemnity and Athena Assurance shall be referred to collectively herein as "St. Paul."

126.    Defendant Berkshire Hathaway Inc. ("Berkshire Hathaway") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Omaha, Nebraska. Berkshire Hathaway, through its more than fifty domestic and international subsidiaries and affiliates comprised under Berkshire Hathaway Insurance Group provides insurance and reinsurance services.

33

127. Defendant Berkshire Hathaway Insurance Group ("Berkshire Hathaway Insurance") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Omaha, Nebraska. Berkshire Hathaway Insurance provides insurance and reinsurance services through four entities: General Re, GEICO, Berkshire Hathaway Reinsurance Group and Berkshire Hathaway Primary Group.

128. Defendant General Re Corporation ("General Re") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Stamford, Connecticut. General Re is a reinsurance unit and wholly owned subsidiary of Berkshire Hathaway and provides its customers global reinsurance and related operations. Gen Re is one of the four largest reinsurers worldwide and is market leader in the U.S. and is represented in all major reinsurance markets worldwide.

129. Defendant General Reinsurance Corp. ("General Reinsurance") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Stamford, Connecticut. General Reinsurance is a reinsurance unit and wholly owned subsidiary of Berkshire Hathaway and provides its customers global reinsurance and related operations.

130. Defendants Berkshire Hathaway, Berkshire Hathaway Insurance, General Re and General Reinsurance are collectively referred to as "General Re."

131. Defendant Zurich Financial Services Group ("Zurich Financial") is a corporation incorporated under the laws of Switzerland. Zurich Financial has its corporate headquarters in Zurich, Switzerland, and describes itself as "an insurance-based financial services provider with an international network" with "key markets" in "North America and Europe."

132. Defendant Zurich American Insurance Co. ("Zurich American") is a corporation incorporated under the laws of New York and headquartered in Schaumburg, Illinois. Zurich

34

American is an indirect wholly owned subsidiary of Zurich Financial, and represents that it is a "leading commercial property-casualty insurance provider serving the global corporate, middle market, small business, specialties and program sectors in the United States and Canada."

133.    Defendant Steadfast Insurance Co. ("Steadfast") is a subsidiary of Zurich American, and is incorporated under the laws of Delaware, with headquarters in Schaumburg, Illinois.  Steadfast operates as an underwriter of property and casualty insurance.

134.    Defendant Fidelity & Deposit Company of Maryland ("Fidelity & Deposit") is a subsidiary of Zurich American, and is incorporated under the laws of Maryland, with headquarters in Schaumburg, Illinois.  Fidelity & Deposit operates as an underwriter of property and casualty insurance.

135.    Defendant Empire Fire & Marine Insurance Co. ("Empire Fire") is a subsidiary of Zurich American, and is incorporated under the laws of Nebraska, with headquarters in Schaumburg, Illinois.  Empire Fire operates as an underwriter of property and casualty insurance.

136.    Defendant American Guarantee & Liability Insurance Co. ("American Guarantee") is a subsidiary of Zurich American, and is incorporated under the laws of New York, with headquarters in Schaumburg, Illinois.  American Guarantee operates as an underwriter of property and casualty insurance.

137.    Defendant Empire Indemnity Insurance Co. ("Empire Indemnity") is a subsidiary of Zurich American, and is incorporated under the laws of Oklahoma, with headquarters in Omaha, Nebraska.  Empire Indemnity operates as an underwriter of property and casualty insurance.

138.    Defendant Assurance Company of America ("Assurance Co.") is a subsidiary of Zurich American, and is incorporated under the laws of New York, with headquarters in

Schaumburg, Illinois.  Assurance Co. operates as an underwriter of property and casualty insurance.

139.    Defendants Zurich Financial, Zurich American, Steadfast, Fidelity & Deposit, Empire Fire, American Guarantee, Empire Indemnity and Assurance Co. shall be referred to collectively  herein as "Zurich."

140.    Defendant The Chubb Corporation ("Chubb Corp.") is a corporation incorporated under the laws of New Jersey and has its corporate headquarters in Warren, New Jersey.  Chubb Corp. is one of the ten largest property and casualty insurance providers in the United States, with 2004 assets of $44.3 billion and revenues of $13.2 billion.  Chubb Corp. provides its insurances lines through a family of insurance subsidiaries known informally as the "Chubb Group of Insurance Companies."

141.    Defendant Federal Insurance Co. ("Federal Ins.") is a subsidiary of Chubb Corp. and is incorporated under the laws of Indiana with headquarters in Warren, New Jersey.  Federal Ins. operates as an underwriter of property and casualty insurance.

142.    Defendant Executive Risk Indemnity Inc. ("Executive Risk") is a subsidiary of Chubb Corp. and is incorporated under the laws of Delaware, with headquarters in Warren, New Jersey.  Executive Risk operates as an underwriter of property and casualty insurance.

143.    Defendant Vigilant Insurance Co. ("Vigilant Ins.") is a subsidiary of Chubb Corp. and is incorporated under the laws of New York, with headquarters in New York, New York.  Vigilant Ins. operates as an underwriter of property and casualty insurance.

144.    Defendants Chubb Corp., Federal Ins., Executive Risk and Vigilant Ins. shall be referred to collectively herein as "Chubb."

145.    Defendant Crum & Forster Holdings Corp. ("Crum & Forster Holdings") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Morristown, New Jersey. Crum & Forster Holdings represents that it is "a national property and casualty insurance group providing a broad range of standard and specialty insurance products."

146.    Defendant United States Fire Insurance Co. ("US Fire") is a subsidiary of Crum & Forster Holdings, and is incorporated under the laws of Delaware, with headquarters in Morristown, New Jersey.  US Fire operates as an underwriter of property and casualty insurance.

147.    Defendants Crum & Forster Holdings and US Fire shall be referred to collectively herein as "Crum & Forster."

148.    Defendant Fireman's Fund Insurance Co. ("Fireman's Fund Ins.") is a subsidiary of Allianz AG, and is incorporated under the laws of California, with headquarters in Novato, California.  Fireman's Fund operates as an underwriter of property and casualty insurance.

149.    Defendant Chicago Insurance Co. ("Chicago Ins.") is a pooling affiliate of Fireman's Fund Ins. and a subsidiary of Allianz AG.  Chicago Ins. is incorporated under the laws of Illinois, with headquarters in Chicago, Illinois.  Chicago Ins. operates as an underwriter of property and casualty insurance.

150.    Defendant National Surety Corp. ("National Surety") is a pooling affiliate of Fireman's Fund Inc., and is incorporated under the laws of Illinois, with headquarters in Chicago, Illinois.  National Surety operates as an underwriter of property and casualty insurance.

151.    Defendants Fireman's Fund Ins., Chicago Ins. and National Surety shall be referred collectively herein as "Fireman's Fund."

152.    Defendant RLI Corporation ("RLI Corp.") is a corporation incorporated under the laws of Illinois, whose shares are listed and publicly traded on the New York Stock Exchange,

37

with its corporate headquarters in Peoria, Illinois. RLI Corp. is a holding company that underwrites selected property and casualty insurance through its insurance subsidiaries.

153. Defendant RLI Insurance Co. ("RLI Ins.") is a subsidiary of RLI Corp., and is incorporated under the laws of Illinois, with headquarters in Peoria, Illinois. RLI Ins. is a provider of property and casualty insurance.

154. Defendant Mt. Hawley Insurance Co. ("Mt. Hawley") is a subsidiary of RLI Corp., and is incorporated under the laws of Illinois, with headquarters in Peoria, Illinois. Mt. Hawley is a provider of property and casualty insurance.

155. Defendants RLI Corp., RLI Insurance and Mt. Hawley shall be referred to collectively herein as "RLI."

156. Defendant XL Capital Ltd. ("XL Capital") is a corporation incorporated under the laws of the Cayman Islands and has its corporate headquarters in Hamilton, Bermuda and whose shares are listed and publicly traded on the New York Stock Exchange. XL Capital is a provider of insurance and reinsurance services.

157. Defendant Greenwich Insurance Co. ("Greenwich Ins.") is a subsidiary of XL Capital and is incorporated under the laws of Delaware, with headquarters in Stamford, Connecticut. Greenwich Ins. is a provider of property and casualty insurance.

158. Defendant Indian Harbor Insurance Co. ("Indian Harbor") is a subsidiary of XL Capital and is incorporated under the laws of North Dakota, with headquarters in Stamford, Connecticut. Indian Harbor is a provider of property and casualty insurance.

159. Defendants XL Capital, Greenwich Ins. and Indian Harbor shall be referred to collectively herein as "XL Capital" or "XL."

160.     Defendant CNA Financial Corp. ("CNA Financial") is a corporation incorporated under the laws of Delaware, whose shares are listed and publicly traded on the New York Stock Exchange, with its corporate headquarters in Chicago, Illinois.  CNA Financial is an insurance holding company whose primary subsidiaries consist of property and casualty insurance companies.

161.     Defendant The Continental Insurance Corp. ("Continental Ins.") is a subsidiary of CNA Financial and is incorporated under the laws of South Carolina, with headquarters in Chicago, Illinois.  Continental Ins. is a provider of property and casualty insurance.

162.     Defendant American Casualty Co. of Reading, PA ("American Casualty") is a subsidiary of CNA Financial and is incorporated under the laws of Pennsylvania, with headquarters in Chicago, Illinois.  American Casualty is a provider of property and casualty insurance.

163.     Defendant Continental Casualty Co. ("Continental Casualty") is a subsidiary of CNA Financial and is incorporated under the laws of Illinois, with headquarters in Chicago, Illinois.  Continental Casualty is a provider of property and casualty insurance.

164.     Defendants CNA Financial, Continental Ins., American Casualty and Continental Casualty shall be referred to collectively herein as "CNA."

165.     Defendant Liberty Mutual Holding Company, Inc. ("Liberty Mutual Holding") is a corporation incorporated under the laws of Massachusetts, with headquarters in Boston, Massachusetts. Liberty Mutual Holding operates as a mutual holding company structure, owned by its policyholders, and includes three principal insurance companies in the group – Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company and Employers Insurance

Company of Wausau – each of which are stock insurance companies under the ownership of Liberty Mutual Holding.

166.    Defendant Liberty Mutual Insurance Co. ("Liberty Mutual Ins.") is a subsidiary of Liberty Mutual Holding, and is incorporated under the laws of Massachusetts, with headquarters in Boston, Massachusetts.  Liberty Mutual operates as a provider of fire, marine, life and casualty insurance services.

167.    Defendant Liberty Mutual Fire Insurance Co. ("Liberty Mutual Fire") is a subsidiary of Liberty Mutual Holding, and is incorporated under the laws of Massachusetts, with headquarters in Boston, Massachusetts.  Liberty Mutual Fire operates as an underwriter of property and casualty insurance.

168.    Defendant Wausau Underwriters Insurance Co. ("Wausau") is a subsidiary of Employers Insurance Co. of Wausau, which is a subsidiary of Liberty Mutual Holding, and is incorporated under the laws of Wisconsin, with headquarters in Wausau, Wisconsin.  Wausau operates as an underwriter of property and casualty insurance.

169.    Defendants Liberty Mutual Holding, Liberty Mutual Ins., Liberty Mutual Fire and Wausau shall be referred to collectively herein as "Liberty Mutual."

170.    Defendant AXIS Specialty Insurance Company ("AXIS Specialty") is a Connecticut-domiciled insurer that transacts property, casualty and surplus lines insurance.

171.    Defendant AXIS Surplus Insurance Company ("AXIS Surplus") is an Illinois-domiciled insurer that transacts property, casualty and surplus lines insurance.

172.    Defendant AXIS Reinsurance Company ("AXIS Re") is a New York-domiciled insurer that transacts property and casualty insurance and reinsurance.

173.     Collectively, AXIS Specialty, AXIS Surplus, and AXIS Re are referred to herein as "AXIS."  AXIS wrote $188,761,000 in net premiums as of 2003, with $325,842,000 in direct premiums written.  Defendant Willis has identified AXIS as a top insurer of its clients between 2002 and 2004.

## FACTUAL ALLEGATIONS

## II.     THE COMMERCIAL INSURANCE AND BROKERAGE MARKETS

174.     The market for commercial property and casualty insurance brokering in the United States features economic conditions that are consistent with and conducive to the conspiracy alleged herein.  The industry for commercial insurance brokering is highly concentrated, with the Defendant Brokers controlling most of the assets in the market.  In fact, 9 of the top 10 brokers in the United States are Defendants here:  Marsh, Aon, Gallagher, Willis, Wells Fargo, BB&T, Hilb, Brown & Brown and USI.

175.     During the Class Period, Broker Defendants and their co-conspirators dominated and controlled the brokering market for commercial property and casualty insurance.  They exercised their market power by rigging bids, allocating customers and insurance markets, demanding contingent fees, stabilizing, raising or maintaining premium prices at a supra-competitive level, coercing insurers to participate in the anticompetitive conduct, and boycotting insurers who refused to participate.

176.     Likewise, the Insurer Defendants dominate the commercial property and casualty insurance market with over $65 billion in collective net premiums written.  The Insurer Defendants exercise their insurance market power by rigging bids, allocating customers and the commercial insurance market, paying contingent fees, raising, stabilizing or maintaining premium prices at a supra-competitive level, coercing brokers to participate in the anticompetitive activity, and boycotting brokers who refused to participate.  In controlling the

41

commercial insurance market and participating in the anticompetitive conduct, Broker Defendants and Insurer Defendants at times acted against their individual economic interests.

## III.    DUTIES OWED BY AN INSURANCE BROKER

177.    The Broker Defendants hold themselves out as providing, and do in fact provide, insurance brokerage services for businesses, individuals, public entities, associations, professional services organizations, private clients and many others.  Broker Defendants are leaders in the insurance brokerage industry and their business clearly comprises the overwhelming majority of the insurance brokerage market in the U.S.

178.    The services that the Broker Defendants provide to their clients include, *inter alia*, analysis of risk and insurance options, procurement and renewal of insurance, interpretation of insurance policies, monitoring the insurance industry on the client's behalf, keeping clients informed as to developments in the insurance marketplace, and assisting clients with the filing and processing of claims against the policies they place.  It is because they offer these services that customers, like plaintiffs and other members of the Class, seek out Broker Defendants for their expertise, skill and experience.

179.    In this capacity, Broker Defendants broker a wide range of insurance lines, including traditional property-liability insurance, business entity liability insurance, casualty insurance in a multitude of forms, workers compensation surplus, reinsurance, personal lines, mortgage guarantee, fidelity and surety, which their customers ultimately purchase.

180.    In their marketing materials and agreements with clients, Broker Defendants represent that they are highly skilled and independent insurance brokerage experts and possess the special knowledge and expertise necessary to interpret and understand the complex and sophisticated business and personal risks faced by their clients and to determine which corresponding insurance products, services and insurance companies best fit their clients' needs.

42

181.     Broker Defendants encourage their clients to rely on their widely purported knowledge, independence and expertise in procuring insurance coverage.  Broker Defendants counsel their clients concerning the complex and specialized insurance they are purchasing. Broker Defendants create a confidential and/or fiduciary relationship with their customers based on their role as brokers and their common, uniform representations to their clients, like plaintiffs, that they will provide unbiased, independent expert insurance brokering advice on the most efficient and cost effective insurance products available.

182.     The sole purpose of the Broker Defendants' role is to act on behalf of and provide plaintiffs and members of the Class with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

183.     Plaintiffs and other members of the Class rely upon the sophistication and expertise of the Broker Defendants -- derived from Broker Defendants' familiarity with the Insurance Defendants, the overall marketplace, as well as customs and practices of the insurance industry -- to make informed independent decisions when formulating strategies concerning their insurance needs and risks.  Plaintiffs and other members of the Class have therefore engaged the services of the Broker Defendants in order to assist them in meeting many different aspects of their insurance needs, including but not limited to risk assessment, insurance procurement and/or renewal and the filing and processing of claims on existing insurance policies.

184.     In their standard contracts with clients, including plaintiffs, the Broker Defendants agree:  (i) that they will solely represent the interests of their clients in transactions with insurers; (ii) that they will act on behalf of their clients in the selection and placement of insurance and the negotiation of terms; (iii) that they will act on behalf of their clients in connection with the filing

43

and processing of claims; and (iv) that they will act as the exclusive insurance broker for their clients.

185.    Broker Defendants represent themselves to their clients as fiduciaries and, in fact, have created a fiduciary relationship with their clients based on the trust imparted on them by their clients and their perceived ability to provide unbiased, independent, and expert insurance brokerage advice.  Such representations are made through advertisements, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mails and interstate wires.

186.    For instance, the New York Attorney General's Complaint against Marsh cites a Marsh document created to assist its employees in responding to client questions.  It reads: ***"Our guiding principle is to consider our client's best interest in all placements.  We are our clients' advocates and we represent them in negotiations.  We don't represent the [insurance companies]."***

187.    Marsh's website states: "Our mission is 'To create and deliver risk services that make our clients more successful.'"  The website also adds: "Our clients benefit from the total capabilities of Marsh, Inc. and Marsh & McLennan Companies, Inc…. This systematic structure provides a breadth of dept of risk solutions unavailable from any other single source."

188.    Similarly, Aon's official website states, "One of our core values is always maintaining a client focus . . .  By truly listening to our clients and working with them as a partner, we can best develop solutions that work seamlessly with their business."  *Available at* www.aon.com/about/aon_corporation/default.jsp (last visited on July 31, 2005).  Furthermore, Aon's Code of Ethics states:  "Satisfied clients are the key to Aon's success.  Earn our clients' continued loyalty every day by treating them fairly, delivering the products and services they

44

want and exceeding their expectations."  Additionally, according to a sales brochure, Aon states: "Our mission is simply this, 'to provide our clients with the highest level of service.'  Our employees work for you with your goals and objective always at the forefront."  Aon insists that its clients' goals are realized "by placing our clients first at all times."

189.    Similarly, Willis has included on its website a client bill of rights, which misleadingly states: "Willis represents the **client's best interests** through our client advocacy model.  Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs.  Willis' customized recommendations and solutions will be driven by what is in the client's best interests.  This is the centerpiece of the value Willis provides its clients."  *Available at* http://willis.com (last visited July 31, 2005). Moreover, in Willis' Global Policy Manual, the company states that Willis associates "should act in good faith and in the interests of their clients at all times. . ." and that they should "provide objective and impartial advice in the interests of our clients."  *Available at* http://willis.com/whoweare/corporategovernance/ethicalcode.pdf (last visited July 31, 2005)

190.    Likewise, Gallagher's "Client Commitment" document posted on its website states:  "**We always recommend that which is in the client's best interest, even if it diminishes our revenues**."  *Available at* http://www.ajg.com/portal/communities/community (last visited July 31, 2005) [Emphasis added.]

191.    Acordia's official website (*available at* http://www.acordia.com, last visited July 31, 2005) similarly describes Acordia's promise to provide open and honest advice to its clients:

> Acordia's Commitment:
>
> Acordia's core values center around **doing what is ethical and what is right for the customer.  If it is right for the customer it is right for Acordia**.  We are leaders during periods of change.  We maintain the highest standards with our customers and believe in taking the steps to follow these values:

45

1.     *Value and reward open, honest, and two-way communication*.

2.     Be accountable for and proud of your conduct and decisions.

3.     *Do what's right for the customer*.

4.     Talk and act with the customer in mind.

5.     Exceed the expectations of customers.

[Emphasis added].

192.     Acordia's website further states that Acordia "[p]roved[es] our customers with full disclosure on the revenue, including contingent commissions we earn at the beginning of our relationship and at the time of policy renewal" and that it "mak[es] insurance placements in the best interest of our customers."

193.     Brown & Brown similarly describes itself on its website (*available at* http://www.bbinsurance.com, last visited June 31, 2005), as "an independent insurance intermediary organization that provides a variety of insurance products and services to corporate, institutional, professional and individual clients."  Brown & Brown has represented that its services include "the efficient management of risk and its related costs, meeting the business insurance needs or companies ranging from small retail establishments to multinational corporations."

194.     Similarly, the official Hub website (*available at* http://www.hubinternational. com, last visited July 31, 2005) states, "Hub International is dedicated to maintaining and upholding the highest standards of ethical conduct and integrity in all of our dealings with you, our client.  We want to be your trusted risk advisor, and as such, we need to earn your confidence.  So we are making a promise."  Hub's website goes on to state, "We are open and honest as to how we are paid for placing your insurance."

46

195.    In USI's 2004 Annual Report, the company states its "goal has been to become a

trusted advisor to our clients.  With each passing year, we continue to gain strength – through

acquisitions, new business and education – and we continue to consistently deliver on

commitments."  Moreover, a letter from USI's Chairman, President and Chief Executive Officer

to the Shareholders in the 2004 Annual Report states:

> USI Holdings Corporation is a human capital business.  We
> understand the value of people and we are committed to the people
> and institutions that make our business successful – our clients, our
> associates, our carrier relationships and our shareholders.
>
> …
>
> We are committed to providing each of our clients with
> knowledgeable service professionals who are connected to local
> and national markets and have access to sophisticated solutions.

196.    USI has also represented on its website (*available at* http://www.usi.bix.com, last

visited July 31, 2005) that "USI clients enjoy convenient access to a broad spectrum of flexible,

cost-effective products and strategically enhanced services for insurance, risk management,

financial management, employee benefits and asset management programs tailored to their

unique needs."

197.    HRH has stated on its website (*available at* http://www.hrh.com, last visited July

31, 2005): "An insurance relationship, more than any other business relationship, is built on trust.

You either have it or you don't."  It further warrants, "Specialist Knowledge: we use our

knowledge to solve problems for the benefit of our clients.  From Fortune 500 companies to

trade associations, individuals and small businesses, at HRH we provide tailor-made risk

management solutions based on expert advice and customized risk assessment."

198.    BB&T's website similarly states that, our mission is "[h]elping our ***Clients***

achieve economic success and financial security" and our purpose is "providing excellent service

47

to our clients, as our **Clients** are our source of revenues." *Available at* http://www.bbandt.com (last visited July 31, 2005).

199.    Based on the nature of the relationship between the parties and the representations described herein, the Broker Defendants are common law fiduciaries to plaintiffs and members of the Class, and therefore owe their clients, including plaintiffs and other members of the Class: (i) a duty of loyalty to act in the best interests of their clients and to always put their clients' interests ahead of their own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Broker Defendants, including the duty to disclose the source and amounts of all income they receive in or as a result of any transaction involving their clients; (iii) a duty of care in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (v) a duty to use their best business judgment in connection with any insurance-related products or services purchased by their clients – in other words to find the best coverage at the lowest price; and, (vi) a duty of good faith and fair dealing.

200.    The Broker Defendants breached these duties by accepting Contingent Commissions and other kickbacks from the Insurer Defendants in exchange for steering business to them.  Thus, rather than providing objective, impartial advice which was in their clients' best interest, the Broker Defendants maximized their Contingent Commissions and other compensation, at the expense of their clients.

48

## IV.    DEFENDANTS' IMPROPER CONTINGENT COMMISSION AGREEMENTS

### A.    Broker Defendants Receive Undisclosed KickBacks From Insurer Defendants

201.    Although Broker Defendants receive a flat fee or standard commission from either their clients and/or the Insurer Defendants, they have also knowingly and willfully conspired to enter into undisclosed fee agreements with the Insurer Defendants for other types of compensation and remuneration.  Pursuant to Defendants' scheme and common course of conduct, the Broker Defendants steer their clients to purchase insurance from the Insurer Defendants, with whom the Broker Defendants have entered into such agreements, so that the Broker Defendants can receive undisclosed compensation.  All Defendants ratified and adopted this scheme through the payment of and/or receipt of undisclosed compensation and the imposition of the undisclosed fees and costs resulting in injury to plaintiffs and members of the Class.

202.    Pursuant to such Contingent Commission Agreements, certain insurance companies, including Insurer Defendants, pay fees to Broker Defendants based on (i) the *volume* of premiums generated by Broker Defendants' sales of Insurer Defendants' products, (ii) the growth of business and *renewal* of existing business, and (iii) the *profitability* of the book of business purchased by Broker Defendants' clients, *i.e.*, agreed upon favorable total claims/loss ratios with a particular insurer  ("Contingent Commissions").

203.    Contingent Commissions were often memorialized by the Broker Defendants in, *inter alia*, "placement service agreements" ("PSAs"), "override agreements," "millennium agreements," "extra compensation agreements," "producer compensation agreements" or, more recently, "market service agreements" ("MSAs") or "Compensation for Services to Underwriters" ("CSUs").  This transparent change in nomenclature was motivated by increased

49

scrutiny of the compensation practices at issue in this litigation. Collectively, these Contingent Commission agreements will be hereinafter referred to as "Contingent Commission Agreements" or "Agreements").

204.    Pursuant to Defendants' conspiracy and common scheme, the Broker Defendants solicit business from individuals and entities interested in purchasing insurance and steer them to purchase insurance from the Insurer Defendants and other carriers, with whom the Broker Defendants have entered into PSAs or other profit sharing agreements so that the Broker Defendants can receive undisclosed compensation, including Contingent Commissions and other kickbacks. The PSA's were a means of implementing or effectuating the conspiratorial agreement of the Defendants as all Defendants ratified, adopted and knowingly participated in this scheme through the payment and receipt of undisclosed compensation and the imposition of the undisclosed fees and costs, resulting in injury to plaintiffs and members of the Class.

205.    Defendants either fail entirely to disclose the Contingent Commission Agreements or fail to adequately disclose them. These undisclosed fees, coupled with Defendants' anti-competitive steering, bid-rigging and tying arrangements (described below), mean that plaintiffs and members of the Class are not aware of their existence, operation or effect. Taken together, Defendants breached the duties owed to their clients/insureds, including plaintiffs and Class members, by failing to fully and accurately disclose, *inter alia*, the following:

        (a)     the existence, source and amount of their Contingent Commissions;

        (b)     the material impact of the Contingent Commissions on their overall profitability;

50

(c)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their fiduciary duties to plaintiffs and members of the Class;

(d)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty of care to plaintiffs and members of the Class;

(e)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty of loyalty to plaintiffs and members of the Class;

(f)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty to provide impartial advice to plaintiffs and members of the Class;

(g)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty to exercise their best judgment on behalf of plaintiffs and members of the Class;

(h)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty of candor and full disclosure to plaintiffs and the members of Class; and

(i)     that the Contingent Commissions have created economic disincentives for Defendants to carry out their contractual obligations to plaintiffs and members of the Class.

206.    In the absence of proper disclosure of the Contingent Commissions, plaintiffs and members of the Class justifiably relied, to their detriment, on Broker Defendants' representations that they were providing independent expertise and representing their clients' interests in accordance with their contractual, fiduciary and other duties as alleged above.  Plaintiffs and members of the Class also justifiably relied upon Defendants' representations in connection with the insurance policies they purchased.

51

207.     Defendant Marsh continued to fail to adequately disclose Contingent Commission Agreements following the investigations of various state attorneys generals of the insurance industry in 2004.  For example, Marsh posted a Frequently Asked Questions page on MSAs on its website in 2004 (which Marsh has subsequently removed), saying that it had no conflicts with clients because of MSAs:

> Our guiding principle is to consider our clients' best interests in all placements. We are our clients' advocate and represent clients in our negotiations.  We don't represent the markets.  We work closely with clients on the design of their risk transfer program to address the complexity of decisions that have to be taken into account, such as market financial strength, a market's expertise in the line of coverage needed, its claims-paying history, clients' service requirements, breadth of coverage, pricing, and other terms and conditions.  We also work with insurers, and part of what an insurer pays us for is an iterative planning and communications process that allows the insurer to create more competitive proposals for our clients, which of course benefits those clients. In all cases, clients retain the final decision on the market chosen to handle its business.

As Marsh's subsequent settlement conceded, however, among other things, Marsh did not act in its clients' best interests, did not advocate fairly on their behalf, and failed to provide clients with the information needed to make informed placement decisions.  Moreover, as J.P. Morgan noted in a 2004 report on the use by brokers of Contingent Commissions, "when we have pushed back in an attempt to determine the size and source of offsetting expenses [for such commissions], no significant, valid offsets were presented.…  We are hard-pressed to describe any material cost associated with these revenues."  Hugh Warns et al., Insurance-Non-Life: Contingents May Be Smaller, But More Prominent in 2004, US Equity Research J.P. Morgan Sec., Inc. (Jan. 13, 2004).

208.     Additionally, in the fall of 2004, for property and casualty lines, Marsh briefly posted on its website a list of Insurer Defendants it had Contingent Commission Agreements

52

with, including American International Group, ACE Group, Allianz Group, Axis Group,

Berkshire Hathaway, Chubb Group, CNA, The Hartford Financial Services Group, Liberty

Mutual Group, Munich Re Group, St. Paul Travelers Companies, XL Capital and Zurich

Financial Services.

209.    Similarly, when the New York AG began investigating the insurance industry,

Aon's CEO, Patrick G. Ryan, was reported as being "not fazed" by the investigations and as

being "very comfortable" with the conduct of Aon's employees.  In an SEC Form 8-K filed on

December 6, 2004, Ryan backtracked, claiming he was misquoted on the first point and that he

had been wrong on the second.  As part of Aon's settlement with various state attorneys generals,

Ryan was ultimately compelled to issue a public apology for the misdeeds of the company.

210.    Those misdeeds included false postings on Aon's use of CSUs on its website in

2004.  Aon misleadingly stated that CSUs are compensation for valuable services performed:

"Aon performs activities and provides services of value to insurers, including providing access to

its substantial distribution networks, pre- and post-placement technical services, sharing of Aon's

knowledge and expertise as an industry leader, policy design and review, research and

development, risk analysis, claims management, administration and other underwriting-related

activities.  Providing these services ultimately benefits our clients, the insurance markets and

Aon."

211.    Gallagher also engaged in similar false statements.  On October 19, 2004, J.

Patrick Gallagher, Jr. issued a memorandum to all employees distinguishing its conduct from

Marsh's.  The memorandum explained:

> Gallagher's business model is structured to enable our producers
> and account managers to put the interests of our clients first. This
> is reinforced in the following ways: - Our Mission Statement states
> that Gallagher succeeds by placing the needs of our clients first. -

53

> We have professional standards in place that govern how we
> interact with our clients and the insurance companies. These
> standards are reviewed and updated often and we audit our
> compliance with those standards frequently. - The Gallagher Code
> of Conduct requires that we conduct ourselves professionally and
> ethically. - And, the Gallagher Way spreads the word about our
> Shared Values – it is our culture to operate under the highest moral
> and ethical behavior. We spend considerable time and energy
> conveying to our employees that we must do the right thing for our
> clients, even if it means less profits for Gallagher.

This statement was belied by Gallagher's Stipulation and Consent Order with the Illinois State Attorney General and Illinois Department of Insurance on May 18, 2005, which disclosed that Gallagher systematically steered clients to insurers who paid it the largest kickbacks.

212.    Following increased scrutiny of the insurance industry in 2004, including the investigation by New York Attorney General Eliot Spitzer and California Insurance Commissioner John Garamendi, Defendants began adding disclosure information to their websites acknowledging that the Contingent Commission Agreements between brokers and insurers created a conflict of interest.  However, many Defendants continued to make inadequate disclosures, by failing to disclose the steering, bid-rigging and other improper practices described below.

213.    Defendants agreed to build Contingent Commissions into the cost of insurance and services relating thereto that the Insurer Defendants offer to Broker Defendants' clients. Therefore, plaintiffs and other members of the Class ultimately pay the cost of these undisclosed fees through higher premiums.  It is Defendants' policy and practice not to disclose to plaintiffs and other members of the Class that additional fees will be paid by Insurer Defendants and factored into the cost of clients' plans.

214.    Indeed, so pervasive have Marsh's efforts been to hide from its clients the amount of compensation it receives from placing its clients' insurance that it directed employees to

redact and "white-out" the commission income identified in the insurance "binders," *i.e.*, the temporary insurance contracts, prepared by the insurance carrier and sent to Marsh for transmittal to the client/insured.

215. In one instance, a senior vice president at Defendant Munich was reprimanded by Marsh for referring to the Placement Service Agreement between Munich and Marsh in certain correspondence. Munich immediately attempted to salvage the situation: "We acknowledge that this was inappropriate behavior and will do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the PSA. I apologize for the consternation that this has caused within the Marsh organization."

216. Marsh's policy of misleading clients about the payment and receipt of Contingent Commissions recently came to light in the guilty plea of a former Marsh managing director, Joshua M. Bewlay, who plead guilty to a felony charge of scheming to defraud on February 14, 2005. Mr. Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to "discourage the client from obtaining an answer on how Marsh received compensation from insurance companies. Mr. Bewlay's testimony states the following, in relevant part:

> Finally, during my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid. ***The protocol required multiple layers of inquiry to discourage the client from obtaining an answer***. Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry. [Emphasis added.]

Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client.[3]  In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.

When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries. [*People of the State of New York v. Joshua Bewlay*, Plea Testimony (Feb. 15, 2005) at p. 11-12.]

217.    Mr. Bewlay similarly admitted in his plea agreement that he made misleading statements about the amount of compensation Marsh received from insurers.  Mr. Bewlay's plea agreement states, in relevant part:

From in and before 1999 through 2004, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property, namely insurance premiums, commissions and fees, from ten or more persons, to wit, clients of Marsh, by false and fraudulent pretenses, representations and promises, to wit, misleading statements about the amount of compensation Marsh derived from insurance carriers, and so obtained property from one or more such person, in that ***Mr. Bewlay referred client inquiries for disclosure of such compensation to a designated Marsh employee, knowing that said employee would provide misleading information concerning Marsh's compensation to the clients.***  [Emphasis added.]  [Joshua Bewlay Plea Agreement (filed Feb. 14, 2005) at ¶5.]

---

[3] According to the criminal complaint against Mr. Bewlay, "the protocol," directed Marsh employees to tell inquiring clients that Marsh received up to 1% to 2% in PSAs/MSA as a bonus from insurers, when, in fact, Marsh sometimes earned as much as 10% to 15%.  *People of the State of New York v. Joshua Bewlay* (filed Feb. 22, 2005).

218.    The other Broker Defendants similarly fail to disclose or sufficiently disclose the existence of Contingent Commissions and other compensation in their client contracts and proposals.  For instance, neither Wells Fargo nor Willis ever advised insured clients of the amounts of contingency fees paid by the Insurer Defendants.  Indeed, although Willis has claimed "to disclose such arrangements to clients in contracts," its 2001 contract with 3M Company does not make any discernable disclosure about Willis' receipt of Contingent Commissions.

219.    Similarly, Willis' 2002 contract with Allina Hospitals & Clinics ("Allina") does not disclose Willis' Contingent Commission Agreements even though it details Willis' fee structure and schedule.  In fact, the Allina contract provides explicitly for Willis to be paid a fee in quarterly installments by Allina, and that such fees "are in lieu of any commissions on any policy described or referred to in this section."  The contract further requires that if Willis' agreements with any "insurers, surplus line brokers, wholesalers, reinsurers, intermediaries or other third parties require WILLIS to receive commissions on any policy described or referred to in this section . . . WILLIS will credit such commissions received against this fee."  However, on information and belief, Willis received Contingent Commissions in connection with Allina's account but did not either disclose or credit those amounts to the client.

220.    Similarly, Gallagher failed to disclose the existence of Contingent Commissions, at least in property, liability, D&O and umbrella coverage areas.  A former Gallagher employee stated that Gallagher "avoid[e]d sharing these at all costs" with clients.  This former employee noted that not sharing this information with clients was possible since the clients typically paid the entire premium to the insurer who would then forward the commission to Gallagher.

57

221.    Similarly, when employees at USI were asked by clients whether USI received commissions, employees were told to say that the agency was compensated "accordingly."

222.    Likewise, a former HRH employee stated that if certain projected production goals were met, HRH would receive additional compensation in terms of Contingent Commissions, which were often not disclosed to clients.

**B.    Methods of Calculating Contingent Commissions and Their Extraordinary Impact on Defendants' Business**

223.    The Contingent Commissions were imposed on all product lines of insurance for which the Broker Defendants provide insurance brokering services, including, *inter alia*, professional liability (such as directors and officers liability and errors and omissions liability); workers compensation; and property and casualty and life.

224.    Contingent Commissions are often based upon a percentage of the entire "book of business" that a broker places with a particular carrier in any given year. For example, at Wells Fargo, the amounts of Contingent Commissions were based upon both the volume of all the insurance placed by Wells Fargo with an individual carrier, as well as the "loss ratio" associated with that entire book.

225.    Similarly, at Willis, Contingent Commissions are paid at the end of the year, if the broker met the volume and loss ratio calculations. These payments averaged between 5%-15% of the broker's annual commissions for the entire book of business placed with a given carrier. Contingent Commissions are paid to Willis brokers in exchange for two benefits to the insurance carrier. The first benefit is that brokers are thereby encouraged to steer a high volume of business (*i.e.*, premiums). The second is that brokers are encouraged to place higher-quality business, meaning clients with fewer "claims experience," that ultimately results in higher profits for the insurance carrier or, in the worst cases, actively encouraged, to the client's detriment, to

58

not submit claims or to assist the Insurer Defendants in denying claims. The lower the loss ratio, the higher the carrier's profit.

226.    The Broker Defendants, including Marsh, Aon and Willis, also received Contingent Commissions based on the rate at which their clients renew their policies with the insurance carriers, which increased as the threshold level of business with the carrier increased. For example, Defendant AIG's 2003 Agreement with Marsh provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIG at a rate of 85% or higher. If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%. Thus, the more clients the Broker Defendants could get to renew their policies, the more Contingent Commissions they would receive.

227.    Aon entered into performance enhance fund agreements, which provided that Aon would receive as a commission approximately 17% of the premium on new business and 10% on renewed business placed with an insurer. When Aon reached the threshold of $10 million of business with a carrier, Aon would retroactively get an additional 1.5% bonus based on all the business done with that carrier for that year. Aon would ultimately decide which carriers it would steer insurance business to based on whichever of those insurers were closer to the threshold by which Aon would get a kickback of 1.5% retroactive for the year. The carrier thus would be chosen by Aon based on either the agreement or the highest commission it could obtain, regardless of the client's best interest.

228.    Gallagher has also admitted that it "may also receive contingent commissions which are based on the estimated profit the underwriting insurance company earns and/or the overall volume of business placed by Gallagher in a given period of time. Occasionally, Gallagher shares commissions with other brokers who have participated with Gallagher in

59

placing insurance or servicing insureds."  Thus, Gallagher has publicly conceded that it has horizontal agreements with other brokers to share Contingent Commissions.

229.    Similarly, a former Wells Fargo employee stated that Contingent Commission Agreements were executed and monitored at corporate offices, not at individual outlying offices. As revealed in the West Virginia AG's complaint, Acordia/Wells Fargo's national Contingency Fee agreements were called "Millennium Agreements," and pursuant to those national agreements, Acordia/Wells Fargo was paid overrides for insurance business placed by its various branches throughout the United States.

230.    Willis entered into Contingent Commission Agreements with Defendant Hartford not only on the national level but also on the local level.  In an email dated February 2, 2004, Craig Pankow, Regional Marketing Officer for the Northwest, addresses three local offices: "I have been talking with Hartford with respect to our contingency agreements for the [Northwest Region] . . . .  We have been offered VIP status if we hit $3,500,000 on a combined basis.  VIP status increases our potential income on premium by several points."  Pankow concluded that the local offices should "combine" their Contingency Fee agreements so that they would earn additional points for "the combined new business over $250,000."

231.    Further examples of the Insurer Defendants' Contingent Commission Agreements with the Broker Defendants include:  agreements between Gallagher and Hartford providing for a straight 14% commission for writing insurance business and a 5% override at the end of the year for obtaining a specified volume of business; profit-sharing agreements between Gallagher and Chubb providing for a 5% override on all new business if it achieved a $1 million threshold written in a six-month period; agreements between Marsh and AIG for Contingent Commissions in connection with renewal of policies in 2003; agreements between Wells Fargo and Hartford to

60

accept Contingent Commissions and bonuses; and agreements between Hilb and various insurers for negotiated up-front commissions with favored insurers based on projected production goals. None of these agreements were disclosed to clients.

232. Defendant Marsh's investment subsidiary, MMC Capital, has invested at least $1.7 billion in more than 30 companies offering insurance, reinsurance, and claims administration services since 1985, including the AXIS parent holding company, AXIS Capital Holdings, Ltd. Marsh owns 9.7% of AXIS Capital Holdings Ltd. through direct stock ownership in its stake in a private-equity partnership called Trident II that is managed by MMC Capital.

233. While investing in AXIS, Marsh also generated revenue for AXIS while acting as its broker. For example, AXIS used Defendant Marsh and Guy Carpenter & Co., Marsh's reinsurance unit, for 38 percent of its gross written premiums in 2002, according to an AXIS filing with the U.S. Securities and Exchange Commission.

234. AXIS has received subpoenas from the Office of the Attorney General of the State of New York seeking information regarding incentive commission agreements, fictitious and inflated quotes, conditioning direct insurance on the placement of reinsurance and related matters. In addition, AXIS has received subpoenas and requests for information from various state insurance regulators regarding these same matters. AXIS has admitted that, "[c]onsistent with long-standing and wide-spread industry practice," it has entered into incentive arrangements, but claims to have ceased entering into such arrangements and to have ceased making payments under such arrangements.

235. After New York Attorney General Elliot Spitzer criticized the conflict of interest, steering and self-dealing posed by brokers such as defendant Marsh owning insurance and

reinsurance companies, Marsh sold 3.7 million shares of its interest in AXIS. However, Marsh retained about 50% of its interest in AXIS.

236.    Contingent Commissions can be exorbitant, as demonstrated by the following:

- Contingent Commissions paid to Marsh, in addition to standard commissions, are typically a flat percentage of up to 5% of the total premiums written with an insurance carrier and paid directly to Marsh. Marsh announced on October 18, 2004 that it received *$845 million* in Contingent Commissions in 2003 alone, accounting for 7% of its overall revenue of $11.6 billion. Additionally, from January 2004 through June 2004, Marsh reported revenue from contingency commissions that totaled approximately *$420 million*.

- Aon's 10-Q filed with the SEC on November 9, 2004 reported that Contingent Commissions for the 9 months ended September 30, 2004 were approximately *$117 million*, and had Aon continued to receive Contingent Commissions in the fourth quarter of 2004, they would have recorded approximately *$50 million* of additional revenue. New York Attorney General Eliot Spitzer's complaint against Aon ("Aon AG Complaint") alleges that Aon generated about *$170 million* from contingent commissions in 2003, a quarter of the company's $663 million net income that year.

- Similarly, Willis announced on October 21, 2004, when it pledged to end the practice of receiving Contingent Commissions, that it had expected to generate an estimated *$160 million* worldwide in 2004 from Contingent Commissions. Of this amount, $35 million was attributable to North American accounts.

- In an October 19, 2004 letter, Gallagher's CEO Patrick Gallagher told employees that Gallagher received approximately *$33 million* in contingent commissions in 2003, representing 2% of its gross revenues that year.

- Additionally, Willis and Wells Fargo depended on the receipt of Contingency Commissions for maintaining their profitability. The two largest single items for revenue were commissions and Contingent Commissions. At Wells Fargo, Contingent Commissions on the P&C side of the business amounted to nearly 50% of the commission revenue for those lines.

- In a recent conference call, BB&T reported revenues of over *$22 million* from Contingent Commissions in 2004.

- In Brown & Brown's 10-Q filed with the SEC on May 10, 2005, the Company reported that for the first three months of 2005 it collected almost *$28 million* in Contingent Commissions.

- For some brokers, obtaining revenue from Contingent Commissions continues unabated, despite their promises to cease insisting upon such commissions.

Several Defendants are still earning millions of dollars in Contingent Commissions on client contracts entered into in the past. For example, in a 2005 Sandler O'Neill presentation, Gallagher said it earned *$20.7 million* in the first quarter of 2005 in Contingent Commission contracts. Likewise, Aon, in its May 2005 SEC Form 10-Q, said it earned *$13 million* in contingent commissions in the first quarter of 2005.

237.    Illustrative of the incentive relationship between the Broker Defendants and

Insurer Defendants is Hartford's business model, whereby Hartford pays Contingent

Commissions based on three typical contingency requirements and ranks its brokers based on

whether and how well they meet these requirements. The first requirement, the "new business

target," also known as Hartford's "growth incentive," requires a certain volume of new business

to be placed by the broker. The second requirement, the volume of retained premium, or the

"retention target," is based on a percentage of existing business renewed or maintained with

Hartford by the broker. And the third requirement is based on the profitability of the total book

of business placed with Hartford. If a broker met the overall volume criteria but fell short in one

of the three categories -- new business, retention, or profitability -- there were penalties built into

the compensation formula which included either no payment at all, or a certain percentage of full

payment after all penalties were assessed. Additionally, Hartford would not make a contingency

payment unless the total claims experience fell below a particular percentage of the premium

paid, or the "loss ratio."

238.    Brokers that meet Hartford's requirements are classified as "platinum brokers,"

"gold brokers" or "high impact brokers." Hartford encourages brokers to produce more business

for Hartford, and thereby reap the rewards of moving up the ladder of the different

classifications. The larger and more profitable business placed with Hartford results in "more

preferential treatment" and "better contingency contracts." Marsh and Aon both qualified as

Hartford's "platinum brokers." Hartford recoups the cost of paying Contingent Commissions by

building it into the "expense ratio" or the overall costs of administering policies sold. This

expense ratio is captured as part of the premiums charged for its insurance products and services.

## V. BROKER DEFENDANTS IMPROPERLY STEER THEIR CLIENTS BASED UPON CONTINGENT COMMISSION AGREEMENTS TO MAXIMIZE PROFITS

239. To maximize the undisclosed revenue the Broker Defendants receive from the

Agreements and in furtherance of Defendants conspiracy to maintain and/or increase market

share, Broker Defendants steer their clients, including plaintiffs and members of the Class, to

Insurer Defendants in return for Contingent Commissions.

*240.* For example, Marsh and the other Broker Defendants dictated to its brokers which

insurance companies' policies they were to sell. A managing director within Marsh advised

colleagues that "Some [Contingent Commission Agreements] are better than others . . . . ***I will***

***give you clear direction on who [we] are steering business to and who we are steering business***

***from.***" [Emphasis Added.]

241. Marsh's Global Broking executives also used a "tiering report" that segregated

insurance companies by how favorable their Agreements were to Marsh. The tiering report

instructed recipients to "monitor premium placements" so that Marsh obtained "maximum

concentration with Tier A and B" – the insurance companies with whom Marsh had the most

favorable Agreements. One Global Broking executive put it quite plainly in a September 2003

email: "We need to place our business in 2004 with those that have superior financials, broad

coverage and ***pay us the most***." [Emphasis in original].

242. The increased revenues Marsh gained from its relationship with its stable of

preferred insurance companies, including Insurer Defendants, was explained in a July 2000

Marsh memorandum entitled, "BUSINESS DEVELOPMENT STRATEGIES," describing one

of the insurance companies with which Marsh had an Agreement: "They have gotten the 'lions

64

[sic] share' of our Environmental business PLUS *they get an unfair 'competitive advantage[']*
*as our preferred [sic] [insurance company].*"

243.    Further evidence of the conspiratorial conduct between the Insurer Defendants
and Broker Defendants is an email dated November 7, 2003, from a Marsh Global Broking
executive which states, "I made it clear that if ACE wants us to meet significant premium growth
targets then ACE will have to pay 'above market' for such [a] stretch ...."

244.    Another example of Marsh's influence on the Insurer Defendants was further
revealed in the Connecticut AG Complaint against Ace which further illustrated how one
insurance company found itself shut out by Marsh and found it necessary to enter into
Contingent Commission Agreements simply to get business, stating: "We are now being heavily
penalized by Marsh for not having the [PSA] agreement signed.  We are being systematically
excluded from…placements that we would otherwise like the chance to write."  Another
insurance executive noted: "With Marsh if we don't have an override we should not call on them
. . . they flat out told us if we want to write business we need to have an override, end of story . . .
without them we are letting business walk away."

245.    Further demonstrating their disregard of their clients' interests, Marsh would
avoid placing insurance with an insurer if doing so would put its receipt of Contingent
Commissions at risk.  For example, a report from Marsh's Los Angeles office describes that in
late 2003, brokers in Marsh's Los Angeles office were ordered to temporarily stop selling
personal coverage lines from AIG in order to avoid reducing commission payments to Marsh.
Marsh did not want to exceed an annual cap on policies with AIG in states with a high risk of
earthquakes, hurricanes or other costly disasters, since exceeding the limit could reduce
contingency commissions that Marsh expected to receive from AIG.  As reported in the Los

65

Angeles Times, one broker stated "[t]he whole department couldn't believe it. We kept saying, 'If this ever gets out, [the company would] be in so much trouble."

246.    Internally, Marsh rewards employees who maximize their contingent commission revenue by steering clients to only insurance companies with which it has Contingent Commission Agreements.  One Marsh employee was elevated to vice president, in part because he had been able to renew a client's business "by moving" that client to an insurance company with which Marsh had a PSA (noting "Neighborhood Health Partnership Estimated Revenue – $390,000.").  Among his "[f]inancial success[es]" the soon-to-be vice president "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [contingent commission insurance company] – increased revenue from $120,000 to $360,000 (estimated)."  In critiquing himself on a 2003 self appraisal form, the now vice president stated:

> Renewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship.  ***Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership***. [Emphasis added.]

Other employees were similarly praised in performance evaluations for increasing Marsh's contingent commission income from insurance companies "***by achieving budgeted tiering goals***." [Emphasis added.]

247.    Aon also engaged in numerous instances of steering business to maximize Contingent Commissions and in other conduct that exploited its position of trust with a client for its own benefit.  Exemplifying Aon's practice of steering business to insurers is a statement made by one of the leading executives of Aon's Syndication Group, Robert Needle, to his subordinates at a Syndication Operations Meeting: "[w]e should continue to grow our book with Chubb and also Hartford and Wausau based on our favorable contingency agreements."

66

248.     Similarly, in March 2003, Aon's head of Middle Markets, Carol Spurlock, also highlighted Aon's efforts to direct business to certain insurers when she responded to a colleague's email regarding whether Aon should direct business to Zurich, since Zurich had not paid Contingent Commissions to the division in 2002: "Going forward, we are going to push Zurich. I just today negotiated our incentive so that we will get paid next year." A month later, she described the relationship to another colleague:

> We have always had an extremely nice contingency with the excess folks at Zurich. We received a huge check from them on umbrella business last year. We did not have a middle market contingency last year, we do this year. So yes place lotz [sic] of business with Zurich . . .

249.     Indeed, Defendant Aon Risk Services ("ARS") used its ability to steer as a means of pressuring insurers. For example, in December 2003, ARS steered business away from Hartford in retaliation for Hartford's decision to use a different broker for its own D&O policies. Hartford's officials offered to "make it up to Aon" by using Aon as its broker on Hartford's property insurance, which had previously been placed without the use of a broker. Michael O'Halleran (Aon's Chief Operating Officer) was not satisfied with the offer. In a December 1, 2003 email to Needle, O'Halleran stated, "[i]s this a good tradeoff. Let's also take some business from them." In response, Needle examined all placements with Hartford and recommended that Aon only keep clients with Hartford on the lines that paid Contingent Commissions. Needle wrote the following email in December 2003:

> In terms of taking business from [Hartford] our commercial [contingent commission] is favorable and I don't want to negatively impact. However, the D&O [Director and Officer] deal is not that attractive and Eric [Andersen, co-head of the Financial Services Group] and I have discussed trying to drive more end of the year premium to our major partners in that line – AIG, XL and Chubb.

67

250.     ARS provided financial incentives to employees who steered placements to insurers that paid ARS Contingent Commissions.  Needle told one insurer that, "Insurer incentives are a key factor in the property bonus pool."  Similarly, Eric Andersen, co-head of Aon's Financial Services Group, stated:

> To provide commentary on the [contingent commissions].  The revenue that arrives from the [contingent commissions] are [sic] integral to our budget and profit derived from FSG [Financial Services Group].  When we are being evaluated, they look at the full picture of earnings.  Our bonus pool is set as a percentage of revenue. . . If our [contingent commissions] fall, our ability to use the percents that we use to pay individual brokers would need to be changed.  In short, it is a critical factor in our business and has a direct impact on how much we can pay people in FSG.

251.     Furthermore, in an email to Anderson and Ronald Moyer, Managing Director of Aon Financial Services Group, regarding a proper response to: "what is in it for them" or "what does this money get used for," Moyer responded:

> As far as the "what's in it for me" question, I would like to know the names of the people that actually ask that question.  That said, I think it is safe to say that, over the past couple of years, [*the PSA money] has funded our entire bonus pool* as well as our investment hires and still contributed significantly to the bottom line of the company.  Anyone who does not see that as advantageous for them personally is looking through the wrong end of their telescope.  [Emphasis added].

252.     Aon's Private Risk Management Unit ("APRM"), which sells personal lines insurance products to individual clients, also engaged in steering practices.  In 2000, APRM began to steer all new business to Chubb and/or Fireman's Fund.  This was due in part to a new "Syndication Master Plan" and Chubb and Fireman's agreements to pay the salaries of Aon brokers pursuant to "producer funding agreements."

68

253.    The "Syndication Master Plan," under the direction of Bruce Macbeth, called for APRM to consolidate its high net worth clients with the two insurers that paid APRM the highest contingent commissions: Chubb and Fireman's Fund.

254.    Pursuant to the "producer funding agreements," Chubb and Fireman's would fund up to 50% of the salary and benefits of certain Aon personal lines brokers for the purpose of selling insurance.  As described in the Aon AG Complaint, the Aon brokers held themselves out as Aon employees in every respect without disclosing that insurers were funding their salaries as part of an Aon commitment to steer business to those insurers.

255.    As part of its investment, Chubb was actively involved in selecting Aon producers, often hand-picking new Aon employees based on their previous demonstrated commitment to Chubb.  In 1999, a Florida recruiting firm charged Chubb $18,800 in fees for finding "just the right person" to staff a personal lines position in Aon's Chicago office.  Another producer hired in Cleveland to fill a Chubb funded position was told that he would receive an annual bonus once he exceeded the annual sales goal of $300,000 in new Chubb Personal Line premiums.  In the first year of his employment, the same Cleveland producer was instructed by his supervisors that he should only offer Chubb insurance to prospective clients.  Other insurance could be sold, but only if Chubb insurance was not available.  Similar producer funding agreements were in place in Aon's New York, Illinois, Oregon and Florida offices.

256.    The producer funding agreements were part of Aon's overall strategy to steer business to its strategic partners, Chubb and Fireman's Fund, in return for high Contingent Commissions.  In Aon's Illinois office, Chubb promised increased Contingent Commissions to Aon for writing automobile policies, and bonuses of $1,000 or $2,000 to the Chubb/Aon producer, the Chubb/Aon producer's supervisor and other Aon staff if personal lines growth

69

exceeded 8%. A December 22, 1999 letter memorializing a national Chubb/Aon producer funding agreement stated: "Aon agrees to give Chubb & Son first right of refusal to personal lines business written through the Aon Private Client Group at the assigned offices." And in 2001, Chubb loaned Aon $500,000 to "assist in building your personal lines operation. The agreement forgave the loan if Aon produced 13% premium growth to Chubb in 2001 and provided for an additional contribution of $250,000 if Aon achieved 15% growth.

257.    Aon and Chubb's Contingent Commission Agreement supported their steering behavior. For example, on November 13, 2001, Carton Brydon (an Aon executive) sent his staff an email noting that "we need to get $3,000,000 in written premium with Chubb by years end - a daunting task no doubt - but it means $500,000 to APRM if we do." Brydon further instructed: "[w]hen we get a good AIG quote, we should share it with Chubb and [Fireman's] Fund as a last look. ***They are paying us to be in this position; we need to force them to act.***" [Emphasis added]. Brydon concluded his email by saying that doing business with AIG was not financially advantageous to Aon given the contingent commission monies available from Chubb and Fireman's Fund.

258.    On November 20, 2001, Bruce Macbeth echoed Brydon's previous email regarding the need to steer business to Chubb to meet the Chubb contingent commission goals:

> One of the issues we need to address on Monday is in the short
> term, we need to steer all submissions to Chubb. I am finding that
> most submissions are submitted to all three carriers and we all
> know what AIG will do to buy market share. We need to
> emphasize that AIG should only be used if there is an underwriting
> issue with Chubb, which we can address. If we approach AIG on
> all submissions, the reason for carrier chosen will always be rate
> and it will slow submission process.

259.    On November 25, 2001, Macbeth sent Brydon another email highlighting his speaking points for an upcoming conference call among APRM's executives:

70

> **With our override agreements with Chubb and Fire Fund, we
> need to direct all new business exclusively to them for the next
> month and beyond.** Chubb should be the first chose for any risk
> with Fireman's Fund a second thought. [Emphasis added].

260. Brydon added the following comment to Macbeth's proposed speaking points:

> While I agree in principal [sic], I really do not want to say this.
> We certainly need to get everything we possibly can with Chubb as
> their carrot will disappear if we don't hit the numbers - however,
> with Fund, they are paying us both to hire new personnel and for
> growth, and even if we don't hit the numbers, the carrot doesn't
> disappear. Thus, let's don't go on record with putting Chubb 1st
> and Fund 2nd. They should be equal. **We should just push Chubb
> a little harder behind the scenes to get them the business.**
> [Emphasis added].

261. Macbeth's email also noted that they have developed a "pipeline report" to ensure that business is directed to Chubb and Fireman's Fund. The pipeline report would track and control the process to these insurers. Macbeth describes that "[t]he purpose of this report is not only to be sure we are placing risks properly to the right markets, but to be certain that they are giving us full consideration even on the more difficult risk, not just 'cherry-picking' the simple ones, which anyone can do."

262. Furthermore, with respect to AIG, Macbeth's email repeated Aon's concern that doing business with AIG at that time was not as lucrative as doing business with Chubb and Fireman's Fund, since AIG was not providing any Contingent Commissions:

> We must use them only for the complex accounts, which generate
> over $35,000 in premium. If we submit all risks to them, they will
> write a majority of them because of their rate flexibility. In
> addition, we do not have any overrides for growth, nor we will get
> any in the foreseeable future, just standard brokerage commissions.

263. AIG, however, changed its tune in 2003 and entered into a contingent commission agreement with APRM. Therefore, APRM refined its approach and quoted all new business to Chubb, Fireman's Fund, *and* AIG.

71

264.     Aon also reprimanded its brokers for failing to steer to the preferred list of insurers.  Astonishingly, Aon executives reprimanded brokers who exercised independent judgment on behalf of their clients in the placement process.  In a May 2003 email, Brydon complained that an Aon broker was going to move an account from Chubb to AIG "without giving Chubb a chance to get a last look" and noting that  "[t]his is unacceptable."  Brydon further stated:  "[I]t is time for consequences.  No commission for the sale . . . regardless of what happens.  He needs to be written up."

265.     At Willis, override revenue was a primary focus at all levels – nationally, regionally, and locally.  According to a former Willis employee, overrides were important to maintaining Willis' profitability, especially in the P&C area, thereby resulting in a company-wide focus on meeting volume and persistency thresholds set forth in its Contingent Commission Agreements with carriers.

266.     As revealed by the Assurance of Discontinuance filed on April 7, 2005 ("Willis Assurance of Discontinuance"), and as further described below, beginning in 2003, Willis centralized its push to maximize override revenues through a national office, called Willis Global Markets.

267.     According to the Willis Assurance of Discontinuance, in an April 4, 2004 e-mail, James Drinkwater, Managing Director of Willis Global Markets, explained that "our PSA's [Contingent Commission Agreements] are a reward for services that we provide to carriers such as carrier advocacy . . . .  Carrier Advocacy includes transparency into our organization and our book, access to our leadership and our clients, *an unfair competitive advantage* as well as other benefits that partnership brings."  In a May 15, 2003 e-mail, he further explained that Willis would attract greater Contingency Commission revenue by "driving business to these carriers."

72

268.     In a September 2003 internal Report, Drinkwater identified which carriers Willis should steer business towards, stating: ***"Special attention is being given to St. Paul, Chubb, Liberty Mutual, Hartford and Crum & Forster due to special [PSA] agreements."*** [Emphasis added].  Similarly, an October 17, 2003 email from Drinkwater to Regional Marketing Officers stated: "I want to see you directing the flow of business to these companies ["Partner Markets" Crum & Forster, Chubb, St. Paul and Hartford, insurers with which Willis had contingent revenue agreements]." *See* Willis Assurance of Discontinuance.  As he explained, "moving business wherever possible to our Partner Markets ... will have significant revenue implications to the Group." *Id*.

269.     In accordance with Drinkwater's directive, a November 1, 2003 email from Northwest Regional Executive Director, Chris Engstrom, to local brokers, instructed: "Please review the attached strategy ... which is being driven and supported by marketing at a local, regional and national level."  The attached memo stressed that one of Willis' "KEY OBJECTIVES" was to "[m]aximize premium volume flow to key carriers with most attractive contingent income agreements."  Willis Assurance of Discontinuance.  Indeed, as noted previously, Willis hosted weekly or bi-weekly conference calls, attended by managers of each outlying Willis office, where corporate accounting updated Willis' financial positions with respect to individual carriers and informed the field of which carriers to favor.

270.     Further, to meet persistency targets, Willis created a list of its top 200 accounts which were up for renewal at the time "to ensure the appropriate Marketing and Income Strategy is in place to maximize revenue to the group."

271.     Willis' mantra for increasing undisclosed Contingent Commissions was constantly pushed on its brokers.  As revealed in the Willis Assurance of Discontinuance, a

73

November 11, 2003 email from Willis North America's Chief Marketing Officer emphasized: "Don't forget the advantages of placing as much business as possible with the carriers we have negotiated special deals with, as you look for ways to maximize revenues the last few months of this year and into 2004."

272. Further, in a December 8, 2003 email entitled, "Fourth Quarter Push," the CEO of Willis North America, Mario Vitale, rallied Willis brokers, stating: "The 2003 production year is quickly coming to a close, but we have a very long way to go." He continued: "***Staying consistent with our mantra, let's try to: Keep what clients you already have; Get more from existing clients; Open more new accounts … [and] Maximize contingent income.***" [Emphasis added].

273. Willis conspired with carriers to steer business their way in exchange for the Contingency Fees. While negotiating their 2004 override agreement with ACE, James Drinkwater stated in a December 11, 2003 email to Susan Rivera, ACE's President: "One final comment, and possibly most importantly, the quicker I can get word to our offices that we have agreed to a partnership for 2004 the more opportunity that we may have to get off to a good start in 2004 and focus on writing January 1st business." *See* Willis Assurance of Discontinuance.

274. The Contingent Commission incentives offered by insurance carriers to Willis have become more important to Willis' profitability, especially in the P&C area, causing more focus and concerns about potential for meeting the required volume necessary to qualify for contingent payments.

275. Gallagher also engaged in improper steering practices. For example, Gallagher brokers were provided a list of approved insurers from which brokers should place insurance,

including, *inter alia*: CNA, Hartford, Audubon (a division of AIG), St. Paul Travelers, and Zurich. Of course, the brokers were rewarded for steering business to these "partner" carriers.

276. Gallagher steered business to insurance companies with whom they entered into Contingent Commission Agreements, dating back to at least 1997. As detailed in the Arthur J. Gallagher & Co. Assurance of Voluntary Compliance, filed on May 18, 2005 ("Gallagher Assurance"), on March 14, 1997, Craig Van der Voort, an executive of Gallagher-Great Lakes, Inc., sent a memorandum to Gallagher-Great Lakes managers informing them of a lucrative agreement with Chubb. This memorandum urged managers not only to direct new business to Chubb, but also to consider redirecting business then currently placed with other insurers. The memorandum states, in relevant part:

> Chubb recently agreed to one of the most lucrative New Business Incentives that I have ever seen . . .
>
> We really have to take advantage of this opportunity and shoot for net new Chubb business in excess of $1,000,000. That would pay us an extra 10% on **everything** and this bonus does not go through a production formula, it goes straight to the bottom line.
>
> Managers, please watch over the marketing in your units and direct our "new/new" placements to Chubb when feasible…[We] may, in fact, want to move business from some of the companies that are **not** major players in our office….Also, this agreement should not be discussed outside the office or with other markets. [Emphasis in original]

277. Gallagher's relationship with Chubb continued. As described in the Gallagher Assurance, Van der Voort and a Gallagher Regional Manager met with Chubb representatives in early 2001 and discussed how the contingent commissions were designed to "drive" business to Chubb. In the spring of 2001, Van der Vort urged branch managers of Arthur J. Gallagher Risk Management Services in Chicago to meet Chubb contingency targets:

> We had incentive deal that would have paid a 5% override on all new business if wrote $1,000,000 of new business between

75

October 1, 2000 and April 1, 2001. We actually wrote about $750,000 so we did not make it. The same offer has been made for the period April 1 through September 30, 2001. Let's try to make something of this. Every AJGRMS Division has lines of business that match up with Chubb. Get the word out to your production staff.

278.    In September 2001, Van der Voort wrote the following email to branch managers of Arthur J. Gallagher Risk Management Services in Chicago, again advising them to place business with those insurance carriers with whom they have Contingent Commission Agreements:

We have other special bonus agreements in place with markets like Chubb, Fireman's Fund, and Hartford . . . We are expected to seek out these special agreements and support them so that additional revenues can be earned. Please do what you can in your respective divisions to support our "partner" markets and any bonus plans.

279.    The Gallagher Assurance revealed that Chubb, however, was not the only insurer Gallagher steered business to in return for Contingent Commissions. As openly acknowledged in an internal correspondence dated July 8, 2002, Van der Voort told Gallagher managers that the purpose of Gallagher's override agreement with carrier Crum & Forster was "***to reward continued growth with C&F.***" [Emphasis added.] Incidentally, under the terms of the override agreement with Crum & Forster, Gallagher would receive 2% additional commissions if it placed $15 million of premiums with Crum & Forster and as much as 3% additional commissions if it placed $25 million. To guarantee that managers met Crum & Foster thresholds, the Vice President of Gallagher's' Market Relations told all branch and regional managers: "Through October, our national Crum & Forster volume is almost $23 million. We need to surpass $25 million in order to qualify for a full 4% on our total volume. Let's make sure that happens over the final 2 months of the year."

280.    On December 4, 2003, Van der Voort urged Gallagher managers to "pump" up

the volume of its business placed with Crum & Forster and other carrier partners, stating:

> With year-end approaching, *it is our last chance to pump
> additional premium volume into these markets* so that it is
> included in the 2003 contingent income calculation.  Some of our
> more lucrative incentive programs are in place with these
> companies

| | | |
|---|---|---|
| 1 | Crum & Forster | (National) |
| 2 | Hartford | (National) |
| 3 | St. Paul | (Local) |
| 4 | CNA | (Local) |
| 5 | Chubb | (Local) |
| 6 | Travelers | (Local) |
| 7 | Wausau | (National) |

> Any opportunity which you or your staff have to support these
> markets, either through renewal retention or new business, will
> help generate additional revenue for AJG.  If we can have a strong
> finish with Crum & Forster, it is possible for AJG to meet a
> threshold, which pays Gallagher 4% of our eligible C&F
> premiums.  *See* Gallagher Assurance.  [Emphasis Added].

281.    Similarly, Gallagher steered large amounts of business to Hartford.  The

Gallagher Assurance reveals that on February 14, 2003, the CEO of Gallagher and others were

informed by Van der Voort that Hartford paid a $1.8 million dollar "bonus" under their profit-

sharing agreement.  Van der Voort encouraged managers to continue steering business to

Hartford:  "The same plan is in place for 2003 and we need to get our branches to take advantage

and work more closely with Hartford.  We have a strong relationship at the top and they want to

grow with us."  As revealed in the Gallagher Assurance of Voluntary Compliance ("Gallagher

Assurance"), Gallagher made it a company-wide policy to focus on obtaining Contingent

Commissions.  In a July 21, 2003 meeting of Gallagher top executives, CEO Patrick Gallagher

made it clear that the Company should push Contingent Commissions.  As memorialized in the

minutes afterwards: "Contingents are important and we want people fighting for them."

282.     The Insurer Defendants with whom Gallagher received Contingent Commissions from were clear in what they expected from Gallagher in return.  For example, Chubb "intended to reward [one other Gallagher subsidiary] for the production of profitable new business to Chubb."  *See* Gallagher Assurance.

283.     Furthermore, in lieu of or in addition to formal override agreements, Gallagher has entered into subsidy arrangements with certain Insurer Defendants, including AIG, Chubb, and Hartford, unbeknownst to its clients.  Illustrative of AIG and Gallagher's arrangement is a September 25, 2002 memo addressed to Gallagher's CEO which stated: "While AIG avoids discussions of incentive income or contingent payments, they seem agreeable to supporting expense subsidies when it benefits their growth as well."

284.     Consequently, AIG rewarded Gallagher with $2 million worth of subsidies in 2002 and an additional $2.5 million in subsidies in 2003.  On August 18, 2004, Van der Voort notified CEO Patrick Gallagher and President of Brokerage Services, James Gault, of these subsidies and told them they could discuss the arrangement with AIG CEO Hank Greenberg. *See* Gallagher Assurance.

285.     AIG's subsidies sometimes took the form of "hiring subsidies."  AIG offered to pay the annual salary of certain Gallagher brokers in exchange for Gallagher's promise to grant AIG an exclusive "first right of refusal" for prospective insurance business.  According to documents produced in the Illinois AG's investigation, "AIG only offers a subsidy when they believe it is an investment that will be paid back many times over in the form of new business." *Id*.  Subsequently, the companies arranged to place an AIG-funded broker in Gallagher's Chicago office.  In a June 16, 2004 email, Van der Voort assured AIG that the branch manager "understands that in recognition of a hiring subsidy from AIG World Source, you would expect

78

to get the first look at qualifying submissions and as a result, write a significant percentage of their applicable business." In correspondence to the relevant managers, Van der Voort instructed: "Keep in mind, AIG World Source . . . will expect their fair share of business in return and it will be up to you to make sure that actually happens."

286. All of these arrangements were concealed from Gallagher's clients. The Gallagher Assurance reveals that on May 26, 2004, a Vice-President in the Brokerage Services Division represented to a client that AIG has "no need to offer incentives to anyone. Historically, they **never** have incentivized anyone to do business with their firm and it is a philosophy and model they continue to incorporate in todays [sic] marketplace." [Emphasis in original]

287. Similarly, Chubb agreed to pay a hiring subsidy, as set forth in a March 4, 2004 document that explained: "The advanced pay out is to support hiring of staff within [Gallagher's] unit that will specifically support Chubb production." "[I]n return for Chubb's contribution to individuals salary, [Gallagher's unit] was required to meet specific new business goals with Chubb." *See* Gallagher Assurance.

288. Hartford also paid the salaries of certain Gallagher brokers and it is believed that other Insurer Defendants have done so as well.

289. According to a former Gallagher employee, certain Gallagher producers were "spotlighted" at monthly meetings for writing large volumes of new business. Additionally, rewards would go directly to managers who oversaw individual brokers. As described in the Gallagher Assurance, branch managers were informed that they could personally receive potential bonuses for maximizing contingent income:

> Keep in mind that contingent income is very important to the BSD
> [Brokerage Services Divisions] and each branch will be given

79

credit on the monthly Board Report for the proportionate share of contingent income they help generate with a market in a given year. ***The actual allocated branch contingent results also have a big effect on individual branch manager bonuses and performance evaluations so your results will be tracked and they do make a difference.*** [Emphasis added.]

290.    Indeed, on April 6, 1998, branch managers of the Gallagher Brokerage Service Divisions were praised for their "efforts to move and offer new business to Chubb," receiving up to $19,300 bonuses each in April 1998 for placing new business with Chubb and moving existing business from other carriers to Chubb.

291.    Other Broker Defendants went to great lengths to instruct their employees to recommend those policies and terms that would generate the highest Contingent Commissions. For example, Wells Fargo ran financial reports to determine volumes of business sold for individual carriers.  These reports allowed Wells Fargo to analyze where they could get "the most bang for the buck" toward the end of the year by steering business toward a carrier offering the best opportunity for the greatest contingency commission.  Indeed, Wells Fargo issued directives to its employees emphasizing particular carriers and was considered a "premier provider" with certain insurers.  Wells Fargo steered business towards those carriers with which it had Contingent Commission Agreements, including St. Paul Travelers, CNA and Hartford.

292.    Wells Fargo also held monthly customer service representative meetings at each local office.  Since the customer representatives dealt directly with both the insureds and the carriers, they were informed by in-house marketing about the brokers' proximity to receiving override payments in order to help facilitate the placement of policies with specific carriers, toward the goal of meeting a threshold target.

293.    As described in the West Virginia AG's Complaint, Acordia/Wells Fargo's had national agreements with certain "Millennium Partners," or carriers, to which it would direct its

80

local branches to steer business towards in exchange for Contingency Fees.  In entering into such agreements, Acordia/Wells Fargo executives focused on securing the greatest amount of Contingent Commission revenue, or "getting in the money," as one executive put it. Acordia/Wells Fargo had "Millenium" Agreements with Chubb, Hartford and St. Paul Travelers, among others.  Its "Millenium Partners" did not offer "free money," but rather they expected preferential treatment in the placement and renewal of policies brokered by Acordia/Wells Fargo for their Contingency Fee "kickers."  Indeed, due to those "kickers," Acordia/Wells Fargo steered its clients to purchase insurance policies at artificially high prices with the terms favorable, not to the client, but to Acordia/Wells Fargo's "Partner" carriers.

294.    USI also dictated to its brokers which insurance companies' policies they were to sell.  For instance, a former USI employee explained that USI brokers were told not to move business from certain carriers, including Defendant Hartford, because the commissions were higher.  Furthermore, at monthly department meetings, USI employees were told to "stick with the higher commission carriers."

295.    Hub brokers were similarly told to steer business to certain preferred insurance carriers.  According to a former Hub employee, Hub management would instruct its brokers to steer business to Chubb because of the incentives Chubb had to offer.  When this former employee asked why Hub gave so much business to Chubb, her account manager informed her that "that's where they [Hub] wanted to the business, even though it wasn't the best thing for the client."  Another former Hub employee described that management instructed him to send business to Hartford and to do "everything [he] could to give it to Hartford in order to get [Hub] over a certain threshold."

296.     Similarly, office managers at Hub received monthly reports which reflected brokers' progress in channeling business to certain insurers, namely, Chubb, St. Paul and Hartford.

297.     Brokers at HRH were also specifically told to direct business to those insurance carriers with which HRH had negotiated the highest Contingent Commissions, regardless of the impact on clients.  Indeed, brokers at HRH were told to place insurance with certain insurance carriers, including CNA, since there was a "deal" with CNA.

298.     A former Brown & Brown employee acknowledged that steering took place with specific insurers such as Hartford which provided end of year bonuses and kickbacks based on volumes of business placed.

299.     Moreover, Brown & Brown put pressure on carriers so that it could earn more contingent commission and volume based income.  In fact, Brown & Brown management would hand out documents to personnel specifically identifying the names of carriers Brown & Brown had volume agreements and ranking those carriers according how lucrative the volume agreements and fees were.  Brown & Brown's agreements with Insurer Defendants included CNA and St. Paul on property & casualty business as well as certain others on the life and health business.

300.     As detailed herein, the Contingent Commissions are maximized by the Broker Defendants steering their clients, including plaintiffs and other members of the Class, to purchase only policies issued by the Insurer Defendants, in return for the Contingent Commissions.  The Broker Defendants place their clients' business predominantly with the Insurer Defendants to maximize the Contingent Commissions they receive at the expense of their clients and in breach of their fiduciary duties.  Contrary to the expectations of their clients,

Broker Defendants' financial interests are thus in direct conflict with their clients' interests. The Broker Defendants' duties owed to their clients have been co-opted by the Contingent Commission Agreements, and the steering and bid-rigging resulting therefrom.

301.    The Insurer Defendants likewise fail to adequately disclose to plaintiffs and members of the Class the existence of Contingent Commissions and the impact those commissions have on insurance arrangements. Instead, the Insurer Defendants actively take part in and cooperate with the Broker Defendants in their effort to conceal the Contingent Commission Agreements, and the revenue generated pursuant thereto, from their respective clients.

302.    The industry itself has recognized that undisclosed Contingent Commissions corrupt the whole process. Clients are misled into thinking they are receiving impartial advice and the most economical and appropriate insurance products and services when, in fact, the broker is steering them towards products that will maximize the profits of the broker and insurer, to the detriment of the client. As the Risk and Insurance Management Society, Inc. ("RIMS") stated in a press release dated August 24, 2004:

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which this relationship is built. In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

303.    In fact, following the investigation by various state attorneys general into Contingent Commission Agreements between insurance brokers and insurers, Defendants have also acknowledged that receipt or payment of Contingent Commissions are inherently wrong. For example, Joe Plumeri, the CEO of Willis, who had been an active proponent of his company's expanding use of contingent commissions, conceded in an April 2005 speech to RIMS:

For too long, this business has been about the placement only – what I've come to call manufacturing. Under this model, getting the placement at the right price and the right coverage is all that matters. But this approach leads to the commoditization of insurance, and I don't think anyone in this room would equate insurance to soy beans.

This approach also invites the perception of conflict that comes with contingent commissions; that's inconsistent with the principle of client advocacy and therefore is unacceptable.

It must be 100% clear who the broker is working for. That means a broker can only be paid by one party in any transaction.

It's time we step up to a higher standard. Contingents should be abolished throughout the industry. Carriers shouldn't pay them. Brokers shouldn't accept them.

If anyone says, "But we're an agent (rather than a broker): surely we can get contingents based on the profitability of the carrier's book?" To them I say, "That's fine, just make it 100% clear – up front - that you are acting for the carrier, and not the client."

Some times when you are up against it, you have to get creative.

Faced with the loss of contingent commissions, the sight of the gallows should focus our minds. Brokers should focus less on finding a way to simply replace the lost revenue and more on what is really important – having the integrity to work harder to deliver creative solutions and bring real value. Anybody think that's a big idea?

And, if contingents create the appearance of a conflict for some brokers, they create that appearance for every broker. Why is my cholesterol bad but for the others it is good? It doesn't matter whether the broker is global, regional or local – based in the U.S., London, or anywhere around the world. It's time to say "enough."

Contingent commissions. Over. Done. Finished.

304. The volume of Contingent Commissions together with the Wholesale Payments that are received by Broker Defendants have a material impact on their overall profitability. The Contingent Commissions payable under the Agreements have resulted in a conspiracy between and among the Defendants to engage in steering, bid-rigging and illegal tying arrangements, in

84

order to allocate customers and maintain market share because the Agreements are intended to and do create an incentive for Broker Defendants to:

(a)    maximize the volume of insurance placed with the Insurer Defendants, parties to the Agreements;

(b)    maximize the volume of renewal business placed with the Insurer Defendants;

(c)    fail to seek, on behalf of their clients, the most advantageous terms on the insurance coverage;

(d)    fail to advise their clients to negotiate reductions of premiums payable through adjustments of terms, such as deductibles, in order to maximize the profitability of those policies for purposes of calculating the Contingent Commissions payable under the applicable Agreements; and

(e)    discourage clients from filing certain claims or assisting the Insurer Defendants in denying or reducing claims under their policies in order to maximize the profitability of those policies for purposes of calculating the Contingent Commissions payable under the applicable Agreements.

305.    As a result of the Contingent Commissions, plaintiffs and members of the Class have paid insurance premiums in excess of what they would have paid had Broker Defendants acted in accordance with (i) the terms of their contracts, (ii) their fiduciary and other duties, and (iii) their representations to their clients.

306.    Through Defendants' fraudulent misrepresentations and failure to make adequate disclosure of the Contingent Commissions as set forth above, Defendants have knowingly misled and continue to mislead and deceive their clients, including plaintiffs and members of the Class,

85

into believing that they provide independent, unbiased and expert brokerage services tailored to the needs of their clients.

### A.      Defendants' Collusive Bid-Rigging Scheme

307.     To maximize their profits and raise, maintain or stabilize the price of insurance, as part of their steering practices, Defendants colluded in a bid-rigging scheme to allocate customers and deceive plaintiffs and Class members into believing that the Broker Defendants were obtaining competitive insurance bids from the Insurer Defendants on behalf of their clients. The bid-rigging was facilitated by the Broker Defendants, who solicited and obtained fictitious high quotes from Insurer Defendants to guarantee that the predetermined preferred insurer would win the bidding competition, and by determining the terms of the winning and losing bid.  These fictitious quotes were often referred to as "A Quotes," "B Quotes," and "C Quotes."  The Insurer Defendants colluded with the Broker Defendants in the bid-rigging scheme because they were promised protection from competition in other bids.  This systemic bid-rigging by the Broker Defendants and Insurer Defendants was achieved through multiple levels of manipulation.

308.     Defendants' bid-rigging scheme involved the Broker Defendants hand picking Insurer Defendants for bidding out the client's account, and providing the hand picked Insurer Defendants with information regarding that client's current rates and policy terms to ensure that the selected insurer would receive the business at a particular price.  In manipulating the bidding process therefore, the Broker Defendants shared their clients' confidential information, unbeknownst to the clients.

309.     Although discovery in this action has not yet commenced, significant details of Broker Defendant Marsh's bid-rigging schemes have been made public as a result of the investigation by the New York Attorney General.  Moreover, following the filing of the Marsh AG Complaint, Marsh engaged Davis Polk & Wardwell ("DPW") and Kroll, Inc., ("Kroll") to

86

conduct an internal investigation into the bid-rigging activities and other unlawful conduct alleged in the Marsh AG Complaint.

310.    To date, ten individuals have plead guilty to criminal charges for their involvement in the bid-rigging scheme.  This includes four AIG executives (Karen Radke, Jean-Baptist Tateossian, Carlos Coello and John Mohs) who have plead guilty to felony or misdemeanor charges of scheming to defraud; a vice president with ACE (Patricia Abrams) who has plead guilty to a misdemeanor charge of attempting to restrain trade and competition; two executives from Zurich (John Keenan and Edward Coughlin) who have plead guilty to attempting to restrain trade and competition; three executives from Marsh, including a senior vice president (Robert Stearns) who has plead guilty to a felony charge of scheming to defraud; and two senior managing directors (Kathryn Winter and Joshua Bewlay) who have also plead guilty to felony charges of scheming to defraud.

311.    Each of the individuals at ACE, AIG and Zurich who have so far plead guilty have acknowledged that they have submitted false quotes, in participation in a scheme with individuals at Marsh, to allow Marsh to control the market.  In turn, the insurance carriers were promised protection from competition in other bids when their business was up for renewal.  The guilty plea of one AIG executive, illustrative of the guilty pleas of the other AIG, ACE and Zurich individuals, states the following, in relevant part:

> During his career at AIG, Mr. Mohs and other AIG employees participated in a scheme with individuals at Marsh Inc. ("Marsh"), an insurance brokerage also based in Manhattan.  The goals of this scheme included allowing Marsh to control the market and to protect incumbent insurance carriers, including AIG, when their business was up from renewal.
>
> During this time period, Marsh and AIG personnel periodically instructed Mohs to submit specific quotes for insurance rates that Mr. Mohs believed:

87

a.	were higher than those of incumbent carriers,

b.	were designed to ensure that the incumbent carriers would win certain business, and

c.	resulted in clients being tricked and deceived by this deceptive bidding process.  [John Mohs Plea Agreement (filed Jan. 27, 2005)].

312.	Robert Stearns, one of the Marsh individuals who plead guilty to a felony charge of scheming to defraud on January 4, 2004, similarly admitted that from about September 2002 through 2004, he participated in a scheme with individuals at various insurance companies, including Defendants AIG, ACE, and Zurich.  The goals of the scheme included allowing Marsh to control the market, to protect incumbent insurance carriers when their business was up for renewal, and to maximize Marsh's profits."  Robert Stearns Plea Agreement (filed Jan. 4, 2005).

313.	Another Marsh managing director who plead guilty to a felony charge of scheming to defraud on February 14, 2005, also admitted to engaging in a bid-rigging scheme. Mr. Bewlay's plea agreement states, in relevant part:

From approximately 1998 through 2003, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property… by false and fraudulent pretenses, representations promises, to wit, noncompetitive quotes from insurance carriers that Marsh conveyed to marsh clients. . . *in that Mr. Bewlay and others at Marsh regularly instructed insurance carriers to submit noncompetitive quotes, that were presented to clients as competitive, thus ensuring that the client would select the carrier, typically the incumbent, that Marsh had pre-determined should win the business.*  [Joshua Bewlay Plea Agreement (filed Feb. 15, 2005)].

314.	Additionally, Kathryn Winter, another Marsh managing director who plead guilty to a felony charge of scheming to defraud on February 24, 2005, similarly admitted that she "participated in a scheme with individuals at various insurance companies, including AIG, ACE and Zurich," where the "primary goal of th[e] scheme was to maximize Marsh's profits by

88

controlling the market, and protecting incumbent insurance carriers when their business was up for renewal." Kathryn Winter Plea Agreement (filed Feb. 18, 2005).

315.    **The "A Quote."**  If Marsh had an incumbent carrier for one of its clients whose insurance policy was up for renewal, Marsh would solicit what was known as an "A Quote" from that Insurer Defendant.  If the Insurer Defendant agreed to make a quote at the targeted premium and policy terms demanded by Marsh, regardless of its ability to quote more favorable terms or premium, the Insurer Defendant was guaranteed the policy renewal.

316.    **The "B Quote."**  At the same time, to deceive customers into believing that Marsh was obtaining competitive bids and to ensure that the incumbent carrier would get its policy renewed, Marsh would solicit non-incumbent Insurer Defendants to submit what was known as a "B Quote" (a phony quote which also was known as a "backup quote," "protective quote" or "throwaway quote"), with the understanding that these other insurers would not actually submit competitive bids.  "B Quote" insurers knew and understood that their turn would come later.  According to the DPW memo released by Marsh, there were "widespread instances in which Marsh Inc. brokers solicited so-called 'B quotes' from various insurance carriers." Marsh often provided these other insurers with target quotes to be made, regardless of the insurers' ability to quote a lower premium below the target bid.  The insurers, including the Insurer Defendants, complied because Marsh would protect them when they were the incumbent carrier up for renewal.

317.    **The "C Quote."**  When there was no incumbent insurance carrier to protect, Marsh would solicit insurers for "C Quotes."  Although it was understood that real competition was a possibility in such situations, Marsh often still provided premium targets to the insurers.

89

318.     Illustrative of Marsh's false quote scheme is Marsh's agreement with Zurich. Brokers at Marsh instructed senior underwriters at Zurich to submit protective quotes on business where Marsh predetermined which insurance carrier would win the bid.  Understanding that the quotes were intended to allow Marsh to control the bidding process, protect the incumbent and convince the insured that the incumbent had the best bid, underwriters at Zurich complied with Marsh's requests by submitting their quotes, thereby allowing Marsh to obtain property in the form of millions of dollars in commissions and fees from each of numerous policyholders and insurance companies.  The Zurich underwriters engaged in this scheme knowing that they would benefit from the scheme when Zurich was the incumbent insurance company.  Underwriters at ACE and AIG also engaged in similar schemes with Marsh, by complying with Marsh's instructions to submit false quotes to clients.  On information and belief, the other Insurer Defendants have also engaged in a similar scheme with Marsh as well as the other Broker Defendants.

319.     Marsh's process for obtaining false quotes from Insurer Defendants was highly systematic.  For instance, on October 29, 2003, the former Marsh executive, Robert Stearns, who plead guilty to a felony charge of scheming to defraud, sent an email to five of his colleagues at Marsh's Global Broking Unit, attaching a document that outlined some of the ". . .  very specific protocols on how we place business. . ."  The document provides that: "Request 'B' quotes early b/c last week of every month markets only focus on 'live' opportunities v. quoting B's (careful that alternative 'B' doesn't beat incumbents quote -- it's not always price, it could be attachment point or coverage)."  *People of the State of New York v. Robert Stearns* (filed Nov. 16, 2004).

320.     Marsh often directed the selected insurers to submit A, B, and C Quotes.  For instance, in October 2003, an underwriter for AIG stated that with regard to a B Quote he had

provided to Marsh: "This was not a real opportunity.  Incumbent Zurich did what they needed to

do at renewal.  We were just there in case they defaulted.  Broker ... said Zurich came in around

$750K & wanted us to quote around $900K."

321.    Similarly, in an email dated March 5, 2004 from a Marsh employee to an AIG

employee, the Marsh employee stated that another insurance company, Zurich, "has released a

quote of $173,720 . . . Please have AIG provide an email indication for $50mm xP."

Subsequently, the Marsh employee informed the AIG employee that "[T]he incumbent hit the

target . . ." and instructed the AIG employee, ". . .  need an indication for $50mm at $200,000."

The AIG employee replied that he would send such an indication under a separate email, and a

minute later he sent an e-mail containing the quote requested by Marsh and AIG did not get the

account.  *People of the State of New York v. Jean-Baptist Tateossian* (filed Oct. 10, 2004).

322.    Likewise, as explained by the President of Casualty Risk for ACE: "[I]f we were

asked for a 'B' quote for a lead umbrella then they provide us with pricing targets for that 'B'

quote.  It has been inferred that the 'pricing targets' provided are designed to ensure underwriters

'do not do anything stupid' as respects [sic] pricing."

323.    Munich was also continuously asked by Marsh to submit "false quotes" to

"manipulate market pricing and present other carriers' quotes in a more favorable light."  In fact,

in an email from a Marsh senior vice president to a Munich regional manager, Munich was asked

for a "non-quote" on a particular account, which meant Munich was to either decline the risk

altogether or submit a higher quote than the incumbent carrier's.  For instance, as set forth in the

Marsh AG Complaint, in September 2001, where AIG was the incumbent carrier, Munich

complied with Marsh's request to submit a B quote so that the incumbent, AIG, would get the

business.

91

324.    Another illustration of Munich's participation in the scheme to submit B quotes was detailed in the criminal complaint filed against one of the Marsh managing directors, Mr. Bewlay, who plead guilty to the crime of scheme to defraud.  According to the criminal complaint against Mr. Bewlay, Munich complied with Marsh's requests to submit false bids, with the understanding that Munich would be protected when it was up for renewal.  The complaint also illustrates Zurich's participation in the scheme.  The complaint states, in relevant part:

> [O]n March 4, 2002, defendant disseminated a broking plan to certain Marsh brokers in the Excess Casualty department for another piece of business, in which he instructed them to get "B quotes from MARP and Zurich," in order to protect the incumbent, AIG.  In subsequent e-mails, defendant reiterated his request for a B quote from Zurich and MARP, requested one from Kemper as well, and provided AIG's quote of $825,000 to ensure that the B quotes were less competitive.  Indeed, MARP complied with the request by indicating that they would be "well north of $1M" for the placement.  Zurich complied as well by submitting a quote of $1,045,000.  Defendant provides this information to the client through the Marsh Client Advisor, and the client ultimately bound the business with AIG.  [Bewlay Compl.]

325.    Therefore, in those instances where an Insurer Defendant provided a B Quote that was too competitive to ensure its loss, Marsh would ask the Insurer Defendant to submit a higher quote.  According to an email from an ACE assistant vice president to an ACE vice president of underwriting, it was explained that on one such occasion, the "[o]riginal quote [was] $990,000 ....  We were more competitive than AIG in price and terms.  *[Marsh] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business.*"

326.    In instances where the Insurer Defendants were not provided with a specific target B Quote but were nonetheless expected to lose the bidding competition, the Insurer Defendant would simply look at the expiring policy terms and premium, and provide a quote high enough to

92

ensure that they would not be the winner or that they would make a comfortable profit in the rare instances where such B Quotes were awarded the contract.

327.    In the rare situation where a B Quote was inadvertently awarded a contract in a competitive bid, it was likely because the incumbent insurer was unable or unwilling to meet the Broker Defendant's A Quote target price. As further evidence of Defendants' manipulation of the bidding process, since the successful B Quote bidder in such situations had not completed any underwriting analysis (since it had no intention of winning the contract), the insurer would "back fill" the underwriting analysis in its file, *i.e.*, prepare the necessary analysis after the fact.

*328.*    From the Insurer Defendants' perspective, providing B Quotes only served to benefit their interests, as the Insurer Defendants' were promised future contracts in exchange for their collusion. For example, ACE's President of Casualty Risk stated that he "support[ed]" Marsh's business model, explaining that "Marsh is constantly asking us to provide what they refer to as 'B' quotes for a risk. They openly acknowledge we will not bind these 'B' quotes in the layers we are be [sic] to quote by that **they 'will work us into the program' at another point.**"

329.    Another example of the Defendants' agreement and participation in the bid-rigging process is demonstrated by the communications from the former Executive Director of Marketing at Marsh Global Broking, William Gilman, who refused to allow AIG to submit a competitive quote when it was solicited for a "B Quote," and further warned AIG on a number of occasions that AIG would lose its entire book of business with Marsh if it failed to cooperate. Gilman's description of the arrangement between broker and insurer – *i.e.*, Marsh "protected AIG's ass" when it was the incumbent carrier up for policy renewal, and in return, Marsh expected AIG to help Marsh "protect" other incumbents by providing higher bids – is a classic

93

example of Defendants' agreement and participation in the scheme, common course of conduct and conspiracy to manipulate the so-called "competitive" bidding.

330.     Indeed, in an email dated October 3, 2001, Mr. Bewlay sent an email to a broker on Marsh's AIG dedicated team informing him that if he provided AIG's quote before Friday, the Marsh managing director ***"c[ould] do a Type B on it and protect [him]."***  In subsequent emails, the AIG broker was provided with a quote of $79,750, thereby ensuring that no alternate quote would be more competitive.  Zurich and Munich complied by submitting false quotes for $110,000 and $135,000 respectively, and the client ultimately bound with AIG.  *See* Bewlay Compl.

331.     Moreover, Insurer Defendants were aware at all times that such conduct was anti-competitive.  For instance, in an exchange dated November 3, 2003 between Geoffrey Gregory, the President of ACE's casualty unit in Philadelphia and Susan Rivera, the President and CEO of ACE, describing the arrangement of bids with Marsh, Gregory warned Rivera that the way the bids were being arranged "could potentially be construed as simply creating the appearance of competition."  Despite this email discussion, ACE continued to provide Marsh with inflated quotes.

332.     Another illustration of Defendants' agreements and participation in the scheme is set forth in a June 20, 2003 email from an ACE assistant vice president of underwriting to another ACE vice president, which states:  "Currently, we have about $6M in new business [with ACE] which is the best in Marsh Global Broking, so I do not want to hear that you are not doing 'B' quotes or we will not bind anything."

333.     Additionally, the felony complaint against Mr. Stearns describes how various Insurer Defendants, including Zurich, AIG, ACE and St. Paul, were involved in the bid-rigging

94

scheme with Marsh, even with respect to one single account.  A March 5, 2003 email from Mr.

Bewlay to Mr. Stearns states the following:  "Bob, could you get the quote from Pete.  AIG was

to hit 25 percent increase.  Then we need B quotes at the expiring attachments."  *The People of*

*the State of New York v. Robert Stearns*.   Further emails reflect that Zurich, ACE and St. Paul

subsequently offered losing quotes on this account.  In one email dated March 17, 2003, a Marsh

broker instructed an ACE underwriter: "need a 'B' for shits and giggles."  As a result, the client

renewed the insurance policy with AIG.  *Id.*

334.     St. Paul's participation in the bid-rigging scheme is further highlighted by a

March 11, 2003 email from Mr. Stearns to a Marsh broker to obtain an inflated "B" quote from

Zurich so that the business could be steered to St. Paul.  The email states: "Can you get me a B

from Zurich.  Client will be binding with [incumbent] St. Paul at $270,000 all coverages as

expiring.  $325,000 should work."  *Id.*

335.     Similarly, Defendant The Hartford – which shared office space in the same

facilities as Marsh in Lake Mary, Florida and Los Angeles, California – was asked on virtually a

daily basis by Marsh employees for inflated quotes or "indications" (non-binding proposed

prices) for insurance coverage, and they willingly complied.  The Hartford underwriters were

told to price the quote or indication at 25% above a particular number.  In the Los Angeles

office, Marsh even provided Hartford with a spreadsheet showing the accounts for which it

wanted Hartford to provide a losing quote or indication, along with the other insurers' quotes.

Hartford has received subpoenas from regulators in five states that are investigating bid-rigging

and information on compensation agreements.

336.     In conspiring with insurers to rig insurance contract bids and allocate customers,

Marsh completely disregarded the interests of the client and the possibility that another insurer

may offer a better deal for that client. Instead, Marsh doggedly pursued its own self-interests and the interests of its co-conspirators in rigging the purported competitive bidding process. For instance, in June 2003, when Insurer Defendant ACE learned that a Marsh client, Brambles, USA, was unhappy with its incumbent carrier, Insurer Defendant AIG, Marsh nonetheless wanted AIG to keep the business. As detailed in a written communication by an ACE vice president of underwriting to the ACE President of Risk and Casualty: "Our rating has a risk at $890,000 and I advised [Marsh] that we could get to $850,000 if needed. [Marsh] gave me a song & dance that game plan is for AIG at $850,000 and to not commit our ability in writing." As a result, ACE maintained its practice over the following year of providing Marsh with inflated quotes.

337.    Other Broker Defendants have similarly engaged in this type of improper bid-rigging conduct as well. For example, the Senior Vice President of Aon's Financial Services Group frequently ordered brokers to contact Insurer Defendants AIG, CNA, and/or Zurich and inform them of a competitor's bid. This also occurred with Mass Mutual, wherein she was ordered to contact Frank Frieri at Zurich and give him the figures regarding the bid submitted by CNA.

338.    Further, Aon on at least two occasions recommended inflated bids, thereby placing Aon's interests above the interests of the client. In September 2003, ARS instructed Zurich that its bid of $246,922 for the workers compensation business of Fieldstone Investment Corp. was too low and suggested that Zurich raise its bid before the bids were shown to the client. By doing this, ARS wanted to help Zurich recoup funds Zurich had expended on an unrelated client's account, Pearlstine Distributors, Inc.

96

339.     After learning from ARS that it should raise its bid, on September 26, 2003,

Zurich submitted a revised quote of $290,000 for the workers compensation portion.  Though the

bid was subsequently raised to account for more employees, the inflated bid was never reduced

and it remained artificially high.  On November 13, 2003, after the account was bound with

Zurich, the ARS employee assigned to the Fieldstone account wrote Spurlock to explain what

had occurred:

> We wanted to let you know that when we first started negotiating
> this deal with [the Zurich underwriter], his initial WC premium
> came in at $246,922. The expiring premium with the same payroll
> was $283,532.  He quoted $36,310 less than expiring.  We came
> back to him and allowed him to increase his initial WC quote to
> approx. same as expiring, $283, 532. We allowed Zurich to get
> more money on this . . . This is an example of Aon letting Zurich
> have more rate and premium when we could have held them at a
> cheaper price.

340.     The next day Spurlock wrote to the Zurich executive who had negotiated the

agreement on the Pearlstine account and stated: "[t]his one deal gave you twice the amount

compromised on the Pearlstine account.  Are we in agreement that we have now met that

obligation[?]"  Spurlock wrote a subsequent email, noting that in additional to settling the

Pearlstine debt to Zurich, the bid also helped Aon get closer to achieving payout on its

contingent commission goal:

> Congrats again on Fieldstone.  Not only was that new nice hit, it
> certainly helped us on two fronts.  It obviously helps to get us
> closer to our premium goal with Zurich and also to make up the
> $18k in premium that they helped us out on [Pearlstine], go away.
> As I recall you were able to get them $36k more in premium than
> they originally quoted to more than make up for what we owed
> them.  ***That is the way a National operation should work***.
> [Emphasis added].

341.     Aon frequently used Zurich to inflate bids, and Zurich willingly complied because

it knew its turn would be coming.  On July 9, 2004, a syndicator in the ARS environmental unit

97

sent out requests for quotes from insurers for coverage of pollution liability on a condominium

project in New York City being developed by Pitcarin Properties, Inc.  Zurich's underwriter

determined that a reasonable quote for the coverage would be in the mid-sixty thousand dollar

range.  The Aon syndicator told him that his bid was too low and that he wanted Zurich to quote

in the upper ninety thousand dollar range.  The Zurich underwriter agreed to provide the higher

quote.  In an email to the Zurich underwriter, the Aon syndicator wrote: "[i]t was good talking to

you just now, and it was refreshing to hear some willingness to take this opportunity on . . . .

[t]he target is in the upper 90s."

342.    Four days after the conversation, Zurich provided a formal quote to ARS of

$92,497.  In its bid, however, Zurich failed to provide coverage for three scheduled non-owned

disposal sites, something the syndicator had indicated that Pitcarin required.  In a follow-up

conversation, the Zurich underwriter orally agreed to cover the disposal sites without increasing

its premium.  Although Zurich had the lowest quote, ARS advised Pitcarin to reject Zurich and

take a higher AIG quote of $99,519.  ARS justified the recommendation by telling Pitcarin that

Zurich had refused to cover the disposal sites.

343.    Similarly, at Defendant HRH, when new contract bids are solicited by the

insurance broker, it is customary practice to give a "last look" to the incumbent insurance

company.  The last look allows the incumbent to match the low bid.  Allowing the incumbent to

retain an existing contract can be beneficial to the client, but HRH perverted this practice by

giving the last look to companies that paid the greatest financial incentive, whether or not they

were the incumbent.

344.    Likewise, employees at Gallagher told CNA and Audobon "what price they had

to beat" and that they could secure "whatever they wanted" from Gallagher.  Gallagher

98

producers often placed clients with certain insurance carriers without shopping for additional insurance quotes.  In late 2004, Florida Attorney General Charlie Crist issued a subpoena to Gallagher investigating whether it engaged in illicit bid-rigging.

345.    Willis has also generated false bids from its preferred carriers.  In 2001, Willis solicited false bids from Zurich North America and CNA in connection with its client's ABM contract with the Detroit Airport.  Willis was required to obtain three bids for that proposal but only received a quote from the Fireman's Fund.  Thus, Willis asked Zurich and CNA to provide alternative bids as a favor.  In his solicitation of the bids, the Willis broker stated via email:

> [W]e need the alternative quotes to come in higher than [Fireman's Fund's] first dollar indication.  I have come up with a premium breakdown that follows, and need a quote letter from you so that ABM can meet the terms of the insurance requirement. [Willis Assurance at 9.]

Thereafter, Zurich and CNA submitted the false bids as requested.  These bids were submitted by Willis to the Detroit Metro Airport on behalf of its client ABM.

346.    There was also widespread use throughout the industry of "accommodation quotes."  It was common — within Marsh and throughout the industry — for brokers to solicit quotes, however high, from carriers that otherwise were disinclined to bid on a particular client's risk.  Such quotes were provided by the disinclined carriers as a favor or "accommodation" when a broker was unable otherwise to obtain a complement of quotes that was extensive enough to satisfy a client's expectations.  As with the "B quote" scenario discussed above, such "accommodation" requests were at times accompanied by a disclosure by the broker to the carrier of information concerning other carriers' bids.  The fact that such a quote was an "accommodation" quote was not something that brokers typically disclosed to clients.  Such "accommodation quotes" by insurance carriers helped further the conspiracy among the

99

Defendants to deceive plaintiffs and Class members into believing that the Broker Defendants were obtaining competitive insurance bids from the Insurer Defendants on behalf of their clients.

347.     On information and belief, the other Broker Defendants have also engaged in bid-rigging practices.

**B.     Wholesale Payments**

348.     In addition to the improper practices described above, Broker Defendants received additional income by improperly placing their clients' business with insurers through related wholesale entities that purport to act as intermediaries between broker and insurer, and receive commissions ("Wholesale Payments") from the insurers for placing the business of the clients of the brokers.  As a result of these relationships, the Wholesale Payments are channeled to Defendants in whole or in part.

349.     For example, Willis placed its clients' business through its wholesaler, Stewart Smith, to generate additional commission, even where an intermediary was unnecessary.  As described in an email dated April 9, 2004, from James Drinkwater to a regional director: "If we are to sustain and grow world class … we must support them [Stewart Smith and other subsidiaries] so that they can in turn support us in growing our revenues …."  He stressed that it was only appropriate to use a non-owned intermediary where "properly authorized and we must have made every effort, used every resource and relationship to place the business internally …." Further, "[i]f a business unit fails to comply with this simple protocol … commissions that would have been earned by our Owned Wholesale Entity will be deducted from the business unit concerned."

350.     Similarly, a memorandum dated October 31, 2003 instructed brokers to "[m]aximize a new volume bonus arrangement with Stewart Smith by moving accounts to Stewart Smith that are written net of commission (fee).  Craig will send a list of possible

100

accounts to each CEO." In addition, the memo instructed that brokers must: "Identify key accounts, both new and renewal, which will maximize income from the utilization of Willis Group resources including Stewart Smith ...." In this manner, Willis generated additional commissions through its subsidiary wholesaler, unbeknownst to its clients and contrary to its fiduciary obligations.

351.    On April 9, 2004, James Drinkwater - the Managing Director of Willis Global Markets – instructed Randy Pugh in an email that before a "non-owned intermediary" could be used, he "must have made every effort, used every resource and relationship to place the business internally …." Further, he warned that if a business unit did not comply with "this simple protocol," "commissions that would have been earned by our Owned Wholesale Entity will be deducted from the business unit concerned."

352.    As set forth in the Willis Assurance of Discontinuance, a December 1, 2003 email from the Director of Marketing in Florida stated that "after negotiating acceptable premiums, we ran this [client account] through Stewart Smith [Willis' wholesaler] for additional income to group of more than $156,000.  Fee Account."  That email also described another account that was "renew[ed] with AIG, via Stewart Smith (versus direct), [generating] additional income to group of $100,000.  Fee account."

353.    Between 2002 and 2004, Stewart Smith paid Willis over $62 million for brokering business originated by Willis through Stewart Smith.  The carriers that sold insurance to Willis' clients with Stewart Smith as an intermediary include: ACE USA, Hartford, Renaissance Re Group, XL Capital, AIG, Axis Capital, Liberty Mutual, St. Paul Travelers, and Zurich.

354. While serving the interests of Defendants, the wholesale entities do not serve the interest of Defendants' clients. Specifically, the Wholesale Payments create the same economic disincentives as Contingent Commissions for Broker Defendants to fulfill their legal and contractual duties to their clients, including plaintiffs and members of the Class.

355. As a result of the Wholesale Payments, plaintiffs and members of the Class have paid insurance premiums in excess of what they would have paid had Broker Defendants acted in accordance with (i) the terms of their contracts, (ii) their fiduciary and other duties, and (iii) their representations to their clients.

356. Through Defendants' fraudulent misrepresentations and failure to make adequate disclosure of the Wholesale Payments as set forth above, Broker Defendants have knowingly misled and continue to mislead and deceive their clients, including plaintiffs and members of the Class, into believing that they provide independent, unbiased and expert brokerage services tailored to the needs of their clients.

357. In the absence of proper disclosure of the Wholesale Payments, plaintiffs and members of the Class justifiably relied on Broker Defendants' representations that they were providing independent expertise to their clients and representing their clients' interests in accordance with their contractual, fiduciary and legal duties, as alleged above.

358. Broker Defendants have collected the Wholesale Payments as part of the same fraudulent scheme, course of conduct and conspiracy described above, under which Broker Defendants encourage reliance on their purported independent expertise while failing to disclose the inherent conflicts of interests they have created through the Contingent Commissions and the Wholesale Payments and acting in service of their own interests and at the expense of those of their clients.

## C.       Reinsurance

The Broker Defendants utilized their improper steering practices to obtain additional fees by tying the purchase of primary insurance with the placement of such coverage with reinsurance carriers through the Broker Defendants' reinsurance broker subsidiaries.  Plaintiffs and the Class are injured by the improper tying arrangements, in that ultimately the cost of the reinsurance Contingent Commissions paid by the Insurer Defendants (both primary and reinsurance) to the Broker Defendants (through their reinsurance, broker subsidiaries and affiliates) is included in the inflated premiums and/or reduced coverages provided to plaintiffs and members of the Class.

359.    Gallagher utilizes its relationships with its "preferred" carriers to obtain additional fees for its reinsurance subsidiaries.  For example, in a letter dated May 7, 2002, VP of Market Relations for the Brokerage Services Division, Craig Van der Voort stated to Executive VP of Brokerage Services, James Gault, that he would "try and *leverage the specific companies [AIG, Chubb and Hartford] for more of their reinsurance business*."  (Gallagher Assurance at 9) (emphasis added).

360.    The foregoing example demonstrates Willis' improper tying and collection of additional fees through its wholesaler Stewart Smith as well as its reinsurer Willis Re. Specifically, an email dated November 3, 2003 from the head of Willis' Northeast Marketing instructed brokers to: "run all fee accounts through Stewart Smith, the Willis wholesaler, wherever possible,"… "feed our biggest contingency players, Hartford, St. Paul, Chubb and Liberty Mutual," and look to get Willis Re [reinsurance] involved in any accounts possible." (Willis Assurance at 7).

361.    As stated in the Willis Assurance of Discontinuance, Willis employee Tony Ainsworth coordinated the effort to leverage Willis' relationship with insurers to generate

103

reinsurance business.  Mr. Ainsworth prepared spreadsheets on a monthly basis to demonstrate

Willis' success in this area.

362.    After these illegal activities came to light, Willis scrambled to minimize its

documentation of such practices.  In a November 15, 2004 email, Ainsworth stated that

management:

> have decided to suspend all e mail and/or written correspondence
> between Willis Re Fac [Faculative] and Willis Retail/Wholesale
> effective immediately.  This will mean that we will no longer track
> [retail] broker / share renewal / leverage business, etc….***It does not
> mean that we will not be working with Retail/Wholesale on
> accounts but more in a low key manner.  Keep talking to our
> friends and find out where business is being sent ......just do it
> verbally or in person!*** [Willis Assurance (emphasis added)].

363.    There was massive steering of reinsurance between Aon and Chubb.  Specifically,

Chubb was alleged to not have lived up to its agreement to appoint Aon Re as the broker for

Chubb's reinsurance in exchange for Aon steering retail business to Chubb.   Executives at both

Chubb and Aon repeatedly met to discuss their Contingent Commission Agreements.  A memo

prepared for Chubb's CEO Dean O'Hare stated that "[w]e need to tell them [Aon] we are open

for business (*e.g.*, their new business production) and are ***paying*** them extra for it."  Thereafter,

O'Hare (against the advice of others at Chubb and without consulting with other Chubb staff)

had his secretary notify senior Chubb executives that Chubb had selected Aon Re for its D&O

reinsurance business.

364.    Notes of a meeting discussing this decision stated:

> Dean O'Hare has promised Pat Ryan Aon will get the lion share of
> [Chubb Executive Risk's] reinsurances.  Promise made some time
> ago and Ryan called Dean [O'Hare] in S.A. earlier this week to
> make sure promise being upheld.  Told Dean that Aon handling
> [reinsurance] is critically important to Aon and Chubb having
> positive relations and if Chubb give [reinsurance][sic] to Aon Ryan
> willing to put his personal credibility and friendship w/Dean on the
> line to make sure Chubb receive [sic] preferential treatment from

> Aon. [Four Chubb executives] all opposed to the decision but
> believe this is a done deal and do not believe they can convince
> Dean to change his mind.

365.    Over the next three years, an executive at Aon continued to monitor the

Aon/Chubb relationship.  A May 6, 2003 letter to the Aon executive stated "there is quite a bit of

attention being paid to the Chubb relationship.  We have 3 areas of focus and 3 corresponding

PSA agreements, notably in the commercial insurance, D&O and personal lines areas."  Later

correspondence to Chubb noted "I can tell you unequivocally that we [Aon] have maintained a

very aggressive pro-Chubb position as you have repositioned your book of business based on

your allocation position."

366.    Aon also promised to steer retail business to AIG in return for AIG's commitment

to use Aon Re's reinsurance services.  In the fall of 2000, AIG indicated that it was considering

handling in-house a particular reinsurance program called CCA.  In a November 27, 2000 email

to top Aon executives on both the retail and reinsurance sides of the business, an Aon executive

explained: "In return for a commitment of $10,000,000 in new gross premium from ARS US,

AIG has agreed to appoint Aon Re for an additional 2.5% placement of the CCA program, which

[AIG] has indicated is worth $750,000 in commission for Aon Re."

367.    Similarly, in February 2000, Aon also promised Liberty Mutual Group retail

business if Liberty Group used Aon Re for Liberty Mutual Group's reinsurance needs.  Since

Liberty Mutual had an affiliation agreement with Employers Insurance of Wausau, Liberty

Mutual Group undertook a review of its property reinsurance program.  Scott Clark (the head of

Aon Re's Property Practice Group) attended a meeting with Liberty Mutual executives during

the week of February 14, 2000 regarding whether Liberty Mutual should use Aon Re on Aon

produced business.  Clark wrote an email on February 23, 2000 to O'Halleran explaining what

he told Liberty Mutual at the meeting:

105

> I told them we are best qualified to handle their corporate
> reinsurance program.  Reinsurance is extremely important to Aon
> and without it we just won't grow as well as with it.  I told them if
> we don't get their reinsurance there is no point in these "love ins."
> Needless to say I got their attention, some say I was too strong but
> we have got to stop screwing around with the interdependence
> message, especially to those that can give us their reinsurance,
> depend on Aon for production and have mediocre brokers  . . . ."

Following the 2000 review, Aon Re obtained Liberty Mutual's reinsurance business.  Liberty

Mutual depended on Aon for production and apparently did not want to risk losing retail

business.

368.    As stated in the Aon AG Complaint, Aon's practice of leveraging its retail

brokerage arrangements to obtain reinsurance business became so routine that it memorialized

these arrangements in what became known as "clawbacks."  Many of these clawbacks shared a

similar pattern: initially, the insurer would express displeasure at Aon Re's brokerage

commissions and would threaten to shop around for competitive rates.  However, to further their

conspiratorial conduct, Aon Re would offer the insurer an incentive by heavily discounting its

reinsurance brokerage commissions.  To recover the compensation lost by the discount, Aon Re

would negotiate a "clawback," allowing it to reduce or eliminate the reinsurance brokerage

discounts by steering retail insurance business to the insurer.

369.    Significantly, these "clawback" arrangements remained subject to confidentiality

agreements and, as a result, Aon's retail clients were *not* informed that Aon steered, or had

incentives to steer, business to selected insurers to recoup the discounts Aon Re offered to these

insurers on the brokerage reinsurance account.  *See* Aon AG Complaint.

370.    As noted above, Liberty Mutual gave its reinsurance brokerage contract to Aon

Re in 2000.  In 2002 and 2003, Aon negotiated a clawback arrangement with Liberty Mutual.

Aon orchestrated an agreement whereby Aon agreed to increase Liberty Mutual's retail

insurance premiums in exchange for keeping Aon Re as its property reinsurance broker.

Moreover, as an added incentive, Aon agreed to reduce the brokerage commission but negotiated

a provision that allowed it to recapture the discount if Aon met specified targets based on the

volume or premiums for Liberty Mutual on its retail insurance business (*i.e.*, clawback).  The

terms of this agreement were secret and not disclosed.  *See* Aon AG Complaint.

371.    Another example of a clawback agreement is between Aon and RLI Insurance.  In

2001, Aon negotiated an agreement whereby Aon Re would pay RLI a 20% rebate on all

brokerage RLI paid to Aon Re for placing its reinsurance agreements.  Aon Re also promised to

pay RLI an additional 5% rebate on its reinsurance brokerage commissions if Aon did not

produce 20% growth in annual retail premium to RLI.  In a July 27, 2001 letter, RLI's president

and COO explained that linking the reinsurance rebate to retail growth provided "a very strong

incentive for us to utilize Aon Re as our primary reinsurance intermediary."

372.    Furthermore, on March 25, 2003, Aon Re "committed to [] delivering more

[retail] business to RLI" in exchange for Aon's retention of RLI's reinsurance business.

Pursuant to this commitment, Aon promised "to produce $25 million in retail premium

production for the product line."

373.    In addition, Aon Re provided direct financial incentives for the Broker

Defendants steer reinsurance to preferred reinsurers in exchange for Contingent Commissions.

For example, Aon Re paid an additional bonus to its brokers "as an incentive for having placed

business with Kemper last year."  According to the Aon AG Complaint, "Kemper paid Aon Re

reinsurance contingent commissions of $557,934.50 in 1997, $570,000 in 1998 and $2.5 million

in 1999."

VI.    **GLOBAL OR CENTRALIZED BROKING AS A MEANS TO FURTHER
       DEFENDANTS' CONSPIRATORIAL CONDUCT**

374.    In direct contrast to the purported purpose of the Broker Defendants -- to provide

honest and unbiased advice to plaintiffs and members of the class -- Defendants created

centralized internal departments for the purpose of monitoring, facilitating and advancing the

collection of Contingent Commissions, kickbacks and other improper fees though the conduct

described above.  For example, in the early 1990s, defendant Marsh created a "global broking"

division designed to bring the marketing of its insurance brokering services under one

centralized department -- the Global Broking Division ("Global Broking").  Global Broking was

used to facilitate the placement of all of Marsh's major business lines.  The Global Broking

Division was based out of Marsh's Manhattan office, with regional centers set up around the

country to ensure that field agents and brokers were placing their clients' insurance business with

Marsh's Global Broking's preferred carriers, including Defendants AIG, Hartford, ACE and

Munich.  Upon establishment of the Global Broking Division, Marsh centralized its Contingent

Commission Agreements, replacing separate agreements previously negotiated by Marsh's

regional and local offices and other undisclosed fees paid by Insurer Defendants.  In fact, and

contrary to their fiduciary duties owed to plaintiffs and members of the Class, Marsh's former

Chairman of U.S. Operations, Robert Newhouse stated that Global Broking's purpose was to

maximize revenues and that all Marsh employees and field agents were to abide by the Global

Broking system.

375.    To better centralize and control its relationships with the Insurer Defendants,

Global Broking took control of marketing and business development from field brokers and

agents and imposed stringent control over the placement of all insurance business with Marsh's

clients.  Global Broking internally rated the Insurer Defendants based on the contingent

108

commission and other undisclosed fee agreements.  Global Broking provided its brokers a "tiering report" to provide *"clear direction on who [we] are steering business to and who we are steering business from."*  *See* Marsh AG Complaint.  By no longer allowing the field agents and brokers to deal directly with the insurance carriers, Marsh was able to conceal its conduct, including the fraudulent agreements and bid-rigging (described above) with its preferred insurance companies, including Insurer Defendants.

376.    To counteract the adverse effect of Marsh's Global Broking on the revenues received by Marsh field agents and brokers, Marsh initiated a "revenue repatriation" program under which certain of Global Broking's national Contingent Commissions were shared with local and regional offices.  Nevertheless, when certain field agents, brokers and employees did not follow Global Broking's directives, they were reprimanded.  The head of Global Broking's Excess Casualty group responded in June 2003 to an employee in Marsh's Seattle office, criticizing her for placing insurance directly with a carrier on behalf of a client, thus denying a contingent commission to Global Broking:  "The GB repatriation dollars are no small component of your office's budget.  You have lowered that amount with this placement.  You may want to consider [that] in the future."

377.    Likewise, Willis as did many of the other Broker Defendant's established similar divisions or operating units.  As set forth in the Willis Assurance of Discontinuance, Willis had a division called Willis Global Markets North America to assist it in maximizing its profits and revenues through such undisclosed fees and used this entity to centralize the receipt of Contingent Commissions.

378.    According to the NY Attorney General's Complaint, Aon restructured its ARS business to consolidate control over Contingent Commissions in the hands of a small group of

executives known as the Syndication Group.  The leading executives were Robert Needle (Managing Principal of Retail Syndication), Carol Spurlock (Managing Director of Commercial Risks) and Ronald Moyer (Managing Director of Financial Services).  The Syndication Group organized each product line into national units and oversaw the placements and negotiations of new national Contingent Commissions agreements.

379.    To accomplish the goal of maximizing amounts received under the Contingent Commission Agreements, the Syndication Group identified certain insurers as premier or strategic market partners based on the profitability of the relationship with the insurer rather than the quality and price of the financial product offered by the insurer.

380.    Aon's primary focus on maximizing profit was clearly articulated in a June 2001 proposed Syndication Master Plan.  The proposed master plan for the Private Risk Management Group called for rating clients either A, B and C.  The proposal stated that "[c]leansing the system of "C" clients is imperative, if we are to implement our new strategy."  C clients are the lower premium clients and, as a result, less profitable for Aon and its strategic market partners. Finally, the proposal noted the need to have a uniform contingent commission policy with the strategic partners.

381.    Similarly, Wells Fargo Contingent Commission Agreements were executed and monitored at corporate offices, not at individual outlying offices.

382.    Moreover, Hilb's national office negotiated all commission agreements with favored insurance companies.  When a regional office put together a bid-proposal, Hilb's national office would intervene and ensure that business was going to one of the favored insurance companies.  A former Hilb employee who worked in one of Hilb's regional offices often received calls from Hilb's national benefits administrator instructing him to place business

with one of the favored insurance companies when putting bids together. This former employee noted that local producers resented the intervention of the national office as none of the up-front or contingent commissions ever "trickled down to their level."

383. Similarly, BB&T's Contingent Commission Agreements were routed through BB&T's centralized marketing department where only the heads of marketing at BB&T, not the account managers, were allowed to contact insurers.

384. Hub also had a corporate function in place whereby influence was exerted over regional brokers to steer clients to preferred insurers in order to maximize the company's contingent commissions. According to a former Hub employee who worked as a business manager for three Hub offices, Hub would send monthly statements to the local managers stating the level of commitment Hub had made to certain insurers, and detailing how much business the local manager had given to that insurer to date, and that Hub needs to fulfill its commitment. According to this former employee, "business is driven to specific carriers because of commitments made on contingent arrangements." Hub's vice-president of marketing, John Curran, was responsible for entering into such contingent arrangements with carriers such as Chubb, St. Paul Travelers, and Hartford, and ensuring that Hub maximized its Contingent Commission Agreements with the insurers. As Curran explained in an insurance industry journal entitled *Rough Notes* "[w]e work with insurance companies to develop a business plan that will help us both accomplish our objectives." According to the former Hub employee, "[i]f John Curran calls and says what have you got to give to Chubb – [some people] may place a piece of business with Chubb because John asked them to."

385. Indeed, when brokers at Hub failed to meet certain directives at the corporate level, they were let go by the company. For instance, Hub fired employees who refused to

jeopardize their relationships with a local client in order to fulfill Contingent Commission

Agreements made at the corporate level.

## VII. GOVERNMENTAL INVESTIGATIONS
## RELATING TO DEFENDANTS' PRACTICES

386.    A very large number of state attorneys general, and federal and state regulators

have commenced investigations concerning the Defendants' practices identified above.

Settlement agreements or assurances of discontinuances have been entered into by the New York

Attorney General, together with the Superintendent of Insurance of New York as well as various

other state attorneys generals including Connecticut and Minnesota, with three Broker

Defendants:  Marsh, Aon, and Willis.  Spitzer, along with the Director of Illinois Division of

Insurance and other state agencies similarly entered into a Stipulation and Consent Order with a

fourth Broker Defendant - Defendant Arthur J. Gallagher & Co.  Each settlement agreement or

assurance of discontinuance agreed to a prohibition of receiving contingent compensation from

insurers and required, among other things, that each Broker Defendant provide full disclosure of

all forms of compensation received from insurers.

387.    Additionally, subpoenas have been issued to almost every other defendant

including, Ace, AIG, Aon, AXIS, BB&T, Brown & Brown, Chubb, CAN, Gallagher, General

Re, Hartford, Hilb, Hub, Liberty Mutual, Marsh, St. Paul Travelers, Twin City Fire, USI, Wells

Fargo, Willis and Zurich, NFP.

### A.    Suspensions, Terminations or Resignations of Defendants' Employees

388.    Numerous employees of both the Broker Defendants and Insurer Defendants

have either been fired or have resigned from their positions.

389.    On October 20, 2004, Marsh suspended four employees whose names surfaced as

a result of the investigations into the company's Contingent Commissions and bid-rigging

practices. The four employees include William Gilman, executive director of marketing at Marsh Global Broking and a managing director of Marsh; Greg Doherty, a senior vice president in Marsh Global Broking's excess casualty division; Edward McNenney, a brokerage executive; and Samantha Gilman, Mr. Gilman's daughter. William Gilman, Doherty, McNenney, and Glenn Boshardt, a Marsh executive, were ultimately dismissed from Marsh.

390.    On October 25, 2004, Marsh's Chairman and Chief Executive Officer, Jeffrey Greenberg resigned. Michael G. Cherkasky replaced Mr. Greenberg as Chairman and Chief Executive Officer.

391.    On November 8, 2004, Roger E. Egan, President and Chief Operating Officer of Marsh Inc., Marsh's risk and insurance services subsidiary, Christopher M. Treanor, Marsh Inc.'s Chairman and Chief Executive Officer of Global Placement; and William L. Rosoff, Senior Vice President and General Counsel of Marsh, were asked to step down from their positions.

392.    On November 18, 2004, Marsh announced that five members of Marsh's Board of Directors -- Mathis Cabiallavetta, Peter Coster, Ray J. Groves, Charles A. Davis, and A.J.C. Smith -- were stepping down from the company.

393.    Patricia Abrams, a Vice President at ACE who pleaded guilty to charges of attempting to restrain trade and competition on October 14, 2004 and admitted to submitting inflated bids to Marsh on ACE's behalf, was fired from the company after having been previously suspended. Geoffrey G. Gregory, the president of ACE's casualty risk unit in Philadelphia was also fired in early November. Also in November 2004, ACE announced that it suspended three unidentified employees, noting that the three worked on a team that did business principally with Marsh's Global Broking Unit. On January 4, 2004, ACE's CEO, Susan Rivera,

the recipient of an email from Mr. Gregory warning of possible anti-competitive practices, resigned from ACE.

394.    On November 11, 2004, Hartford fired two of its Los Angeles underwriters in connection with governmental investigations into Hartford's bid-rigging practices.

395.    On May 27, 2005, HRH announced that the company's president, Robert B. Lockhart, resigned as president and from the company's board of directors.  Another HRH employee has been fired and one placed on leave, in connection with an internal investigation in response to queries from regulators that the company may have received Contingent Commissions.

### B.    Certain Defendants Discontinue the Use of Contingent Commission Agreements

396.    As a result of the governmental investigations into Defendants' compensation practices, several Defendants including, *inter alia*, Marsh, Aon, Gallagher, Willis, Liberty Mutual, AIG and ACE have discontinued the use of Contingent Commission Agreements and instituted other reforms designed to avoid conflicts of interests in the brokerage industry.  For example, as part of its settlement with Spitzer, Marsh agreed to a prohibition of receiving contingent compensation from insurance carriers.  Marsh also agreed to provide clients with a comprehensive disclosure of all forms of compensation received from insurers and to adopt and implement company-wide, written standards of conduct for the placement of insurance.

322.    Likewise, as part of their settlement agreement and/or assurances of discontinuance with various state attorney generals, Aon, Willis and Gallagher agreed to prohibition of accepting or requesting of any insured any Contingent Compensation.

397.    Similarly, following the filing of the New York Attorney General Complaint against Marsh, ACE/INA posted a response to the following question by the National Association of Insurance Commissioners' "NAIC" inquiry into contingent commissions:

Q:    What additional requirements or safeguards should be in place to prohibit a producer from placing its own financial or other interests ahead of its customer's interests in an insurance transaction?

A:    Ban on contingent commissions, brokers should be required to elect compensation from the insured or insurer; not both; all standard commission should be disclosed by broker and should be included on the copy of the policy delivered to the insured.

*Available at* http://www.naic.org/committee_activities/executive/docs/Comace2-2.doc. (last visited July 31, 2005).

398.    A Letter from Paul Mattera, Senior Vice President of Liberty Mutual, to NAIC Commissioner M. Diane Koken, dated March 9, 2005 regarding contingent commission is by far most telling of how a ban on contingent commissions is necessary to avoid conflicts of interests in the brokerage industry.  The letter states the following, in relevant part:

Liberty Mutual believes that the cornerstone of good regulation and sound business practice is transparency in insurance transactions.  Our customers deserve to know whether the producer they are working with represents them or us.  All parties must be clear as to "who represents whom."  Thus, we support the application of disclosure requirements to agents and brokers. The integrity of the entire transaction flows from a clear understanding of whose interests are represented by the producer.

…

Prohibition of Broker Contingent Commissions

While appropriate broker disclosure is in the customer's interest – and we strongly support it – disclosure alone is not enough.  Brokers can be conflicted when they receive payment from both buyers and sellers.  In fact, the concerns that give rise to the "best available insurer" requirements, discussed above, are ameliorated when contingent commissions are out of the buying and selling equation.

115

> Liberty Mutual believes broker "contingent commissions" are inappropriate and should be prohibited. Brokers should be compensated only by a fee paid by the customer or by standard commission paid by the insurer as a percentage of the total cost of the policy purchased. While there is nothing inherently wrong with contingent commissions, PSAs and MSAs, when brokers are paid in a manner that can lead to a misalignment of broker interests, the value of contingent commissions is outweighed by the need to assure an open, unconflicted market. In these circumstances, disclosure alone is not an adequate remedy.

*Available at* http://www.naic.org/committee_activities/executive/docs/Comlibmut2.doc. (last visited July 31, 2005)

399.    Although some Defendants have discontinued the use of contingent commissions following the investigators by various state attorney generals and other regulatory agencies, many other Defendants continue to use Contingent Commissions. For example, BB&T and HRH recently disclosed that they will continue to accept Contingent Commissions. BB&T has stated the following:

> We still have this under review, but we intend to play by the rules…If the rules remain the same – that profit-sharing agreements are legal – then we'll continue to accept them.

*Available at* http://www.sellingwithtechnology.com/newsletter%202005/articles%20021405/Insurance2.htm (last visited July 31, 2005)

400.    BB&T has also stated, in a conference call, that not only would BB&T not discontinue Contingent Commissions in the wake of recent scandals, but that it stood ready to become a beneficiary of the issues that are going on in the insurance business" since Marsh was expected to lose market share.

401.    Indeed, HRH recently stated that they will "not renounce[e] overrides or contingent commissions." They stated that they will "stop accepting volume based contingent commissions but will continue to take profit-based contingent commissions from insurers."

116

402.     Similarly, Hub will continue to accept Contingent Commissions as it recently

detailed on its official website:

> Will Hub continue to accept contingents and volume overrides from insurers?
>
> A:     Yes, for now. We believe we are conducting our business fairly and do not
> see a need to implement a significant change in our business practices
> independent of any industry-wide changes.  However, we must be sure, if we
> make any changes, that new practices are widely accepted and valued by
> customers. As we indicated earlier, our task force is working to address a variety
> of scenarios with respect to this issue. That being said, the situation is fluid - so
> we will keep you informed.

*Available at* http://www.us.hubinternational.com/dbw/index.cfm?fuseaction=content.ga (last

visited July 31, 2005)

## VIII.  <u>CONSPIRACY ALLEGATIONS</u>

403.     Defendant Brokers and Insurers have engaged in a common course of conduct and

conspiracy which creates a conflict of interest clearly at odds with the Defendants'

representations regarding the services they will provide as well as the duties inherent in the

relationship which exists between Class Members and Defendants

404.     Although Defendants have created the illusion of a competitive market for

insurance, the selection, pricing and placement of the insurance products at issue in this litigation

were, in fact, the result of Defendants' collusion.

405.     Broker Defendants and the Insurer Defendants have engaged in a conspiracy and

common course of conduct to restrain trade in the market for commercial insurance and

reinsurance.  Broker Defendants and Insurance Defendants conspired to rig bids, allocate

customers and to maintain the price of insurance products in these markets at supra-competitive

levels.

406.     The purpose and effect of the conspiracy is to increase compensation for the

Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or

117

eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying. As a result of the conspiracy, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms and this lack of competition enabled them to charge premiums that were higher than they would have been absent the conspiracy. The Broker Defendants, in turn, profited from the conspiracy through the receipt of Contingent Commissions and Wholesale Payments.

407.    The actions of the Defendants were all part of the same conspiracy to increase revenues and to suppress or eliminate competition. Each Defendant was aware of the general nature of this scheme and its role in facilitating the objectives of the conspiracy. Each enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of plaintiffs and the other Class.

408.    Each Defendant and co-conspirator has agreed to the overall objective of the conspiracy.

409.    Each Defendant and co-conspirator has committed acts of fraud in furtherance of this conspiratorial objective.

410.    In furtherance of the conspiracy, Defendants and co-conspirators have agreed to implement and use the same or similar devices and fraudulent tactics against their clients, including plaintiffs and other members of the Class.

411.    The same pattern and cause of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among all Defendants and co-conspirators, including:

(a)     similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct;

(b)     similar agreements between the Broker Defendants and their clients which include either no language or vague, misleading, and incomplete language purporting to disclose compensation, steering, and bid-rigging arrangements between and among the Broker Defendants and the Insurer Defendants;

(c)     similar agreements regarding Contingent Commissions and other payments between and among the Broker Defendants and the Insurer Defendants;

(d)     similar practices regarding the reporting of their arrangements;

(e)     similar agreements regarding Wholesale Payments between and among Defendants;

(f)     similar tactics for steering customers to the Insurer Defendants and for placement of the Insurer Defendants products.

(g)     similar tactics for coercing submission of false bids, client steering, allocation of markets and customers, and stabilizing, raising or maintaining premium prices above competitive levels;

(h)     similar tactics for boycotting or refusing to deal with insurers who refused to participate in the conspiracy.

412.     Defendants would not have undertaken the practices alleged herein absent an agreement among all Defendants.  Paying brokers significant additional commissions is not in the best individual interest of the Insurer Defendants.  The Insurer Defendants would agree to pay such fees only with a corresponding agreement of increased premium revenue and the participation of other insurers.

119

413.     This parallel conduct would not have occurred absent either an explicit or tacit agreement among the Defendants.  It is not in the individual best interests of an Insurance Company to pay huge Contingent Commissions to the Brokers with which it does business.  The Insurance companies would only agree to do so if they knew that these payments would be offset by the increased premiums they could charge on account of not having to compete for business and only if they knew that other insurance companies were likewise paying such commissions.

414.     The conspiracy has been conducted, implemented and facilitated through various mechanisms including direct communications among Defendants, sharing of information between Defendants and movement of employees among Defendants as well as through other means such as industry trade groups such as the Council of Insurance Agents and Brokers ("the Council") and its predecessors the National Association of Insurance Brokers ("NAIB"), the National Association of Casualty and Surety Executives (NASCE) and the National Association of Casualty and Surety Agents ("NASCA") as well as the American Insurance Association ("AIA") and the Reinsurance Association of America ("RAA").

415.     The Council, founded in 1913 to represent larger metropolitan agencies, represents the top tier of commercial insurance brokers in the United States in both property/casualty and the benefits sectors.  Defendants are well-represented in the Council.  The Council's Executive Committee includes representatives of the Broker Defendants including Marsh, Willis, Aon, Gallagher, Hilb, Brown & Brown, BB&T, Hub and USI.  The Council's Officers and Board of Directors includes representatives of the Broker Defendants also.

416.     The Council's roots have always been in larger commercial agents and brokers. In fact, only the top one percent of all agents and brokers qualify for membership.  The Council's members place 80 percent – well over $90 billion – of all U.S. insurance products and services

120

protecting business, industry, government and the public-at-large.  In 2004, The Council's Board

of Directors and officers included representatives of Broker Defendants Acordia, Aon, BB&T,

Brown & Brown, Gallagher, HRH, Marsh, USI and Willis.

417.    Professional networking is at the very heart of the Council and is a major part of

who the Council is and what it does.  The Council orchestrates the industry's most important

market meetings.  The Council's meetings "change the shape and scope and add to the bottom

line of already successful brokerage firms."

418.    The Council of Insurance Company Executives, a standing Committee of the

Council, is comprised of more than 65 of the top commercial insurers.  Collectively, CICE

members are responsible for writing more than 75% of the nation's commercial business

insurance premiums.  The CICE was formed when the Council assumed the "managerial

operations of its insurance association counterpart" -- the National Association of Casualty &

Surety Executives.  Prior to this time, the National Association of Casualty & Surety Executives

and the Council (previously the National Association of Casualty & Surety Agents) had met

annually and had worked cooperatively in addressing common problems.  In 2004, the leadership

of the CICE included members of Insurer Defendants ACE, Chubb and Zurich.

419.    The Council of Insurance Company Executives co-hosts the annual Insurance

Leadership Forum at the Greenbrier, an annual meeting that connects all the leaders of the

commercial insurance marketplace – the CEOs of the top insurance carriers and the leading

executives from the top one percent of agencies and brokerages.  Considered the premier

meeting of the commercial insurance marketplace, the event brings together all sectors of the

market including primary carriers, reinsurers, top intermediaries and third party firms.  For high-

volume commercial insurance brokerages and for every major carrier, there is no better place to

take the pulse of the commercial insurance market-place – and build important business bonds –
than "Greenbrier."

420.     Attendees include executives from the brokerage firms and virtually every leading
commercial insurer and reinsurer.  The Council boasts that this is the best opportunity in the
industry for insurers, agents and brokers to meet and focus on where the industry is and where it
is heading.

421.     The meetings allow for small breakout conferences, ad hoc meetings and social
interaction among all those attending.  According to Council materials, Council members do
more business at the Greenbrier meeting than at any other five-day stretch of the year.  Any
industry leader truly concerned with the workings of the industry's production sector, with
profitability, and with client service must attend.

422.     Attendees are able to hold discussions and meetings that they would not otherwise
have the ability to hold.  The bottom line is that Council members go to the Greenbrier to have
strategic conversations with insurers.

423.     In addition to the industry meetings at the Greenbrier, the Council also facilitates
many other forums including the National Insurance Leadership Symposium, chief financial
officer workshops and conferences where CFO's of the major brokerage firms focus on the
fundamental and strategic issues facing their businesses, Executive Liaison Committees, email
exchanges, market surveys, the sharing of operating results and financial analyses, insurance
company sponsorships, peer-to-peer networking, as well as teleconferences between brokers and
insurers.  For 2004-2005, the Council scheduled at least 17 different meetings across the country
for its members, groups within its ranks and/or insurance carrier representatives.  The Council
has also issued at least eight "Member Alerts" related to Contingent Commissions and related

122

lawsuits, including an October 17, 2005 member update on "Council strategy", lawsuit summary and question and answer discussion.

424.     The Council operates in a strategic alliance with the American Insurance Association ("AIA") and the Reinsurance Association of America.  ("RAA").  Together, these three associations lead the commercial insurance marketplace.

425.     The American Insurance Association is the leading property-casualty insurance trade organization in the United States.  The Reinsurance Association of America is the trade association of reinsurers and reinsurance brokers.

426.     AIA and RAA have both acted as host sponsors for the Greenbrier conferences and have been members of the Council's Leadership Circle, recognized industry leaders that underwrite the Council's networking and professional development initiatives.  The Council, AIA and RAA also co-sponsor the National Insurance Leadership Symposium.

427.     There were other industry conferences where Defendants were present.  At a 2003 Annual Executive Conference of the Property/Casualty Industry insurance company executives, including Insurer Defendants, agreed to hold the line on underwriting discipline and resist any temptation to prematurely soften property/casualty market prices.  For example, James Schiro, CEO of Zurich Financial Services said "Let's not get pulled into a soft market. We are not ready for a soft market and cannot afford one.... Let's not get in a race for marketshare."  Oversight Hearing on the Insurance Brokerage Practices, Including Potential Conflicts of Interest and the Adequacy of the Current Regulatory Framework Before the Senate Committee on Governmental Affairs (Nov. 16, 2004) (statement of J. Robert Hunter, Director of Insurance) at 4.  He added that "we need several more years of profitability" --a theme emphasized again and again by CEOs speaking at the meeting.  Maurice Greenberg, chairman and CEO of AIG, added that "in a

123

risk business like ours, the pursuit of marketshare at the expense of earnings is not a great strategy." *Id*. at 4. Following Mr. Greenberg's speech, William Berkley, chairman and CEO of W.R. Berkley Corp. said during a discussion of capital strength that "the goal of any carrier should not just be to sell more insurance and get bigger, but to make more money on a risk-adjusted basis. That requires adequate pricing." *Id*. at 4-5. Or, as Mr. Greenberg put it, "We absolutely need to hold the line on pricing and not give in to excessive competition." *Id*. at 5. This mindset meant that insurers would support a system of protecting incumbents on placements obtained as a result of kickbacks and tie-ins, because the incumbencies were spread around to different insurers by the conspiring brokers and insurers in a way that ensured profits for all.

428. As a result of Defendants' conspiracy, plaintiffs and other members of the Class have made payments for insurance and other "services" beyond what those payments would have been absent the conspiracy. In addition, plaintiffs and Class members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

429. In the alternative, the Broker Defendants and the Insurer Defendants are engaged in a number of separate but parallel conspiracies, each involving a Defendant Broker and the insurance companies with which each had Contingent Commission Agreements.

430. A minimum of six broker-centered conspiracies exist, including the following:

(a) A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which Marsh had Contingent Commission Agreements;

(b) An Aon-centered conspiracy consisting of Aon and the insurance companies with which Aon had Contingent Commission Agreements;

124

      (c)      A Willis-centered conspiracy consisting of Willis and the insurance companies with which Willis had Contingent Commission Agreements;

      (d)      A Gallagher-centered conspiracy consisting of Gallagher and the insurance companies with which Gallagher had Contingent Commission Agreements;

      (e)      A Wells Fargo-centered conspiracy consisting of Wells Fargo and the insurance companies with which Wells Fargo had Contingent Commission Agreements; and

      (f)      A USI-centered conspiracy consisting of USI and the insurance companies with which USI had Contingent Commission Agreements.

431.     The purpose and effect of each of these conspiracies is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the Class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying. As a result of the conspiracies, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms, and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy.

432.     Each Defendant and member of each such conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

433.     Each Defendant and member of each such conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

434.     As a result of Defendants' conspiracy, plaintiffs and other members of the Class have made payments for insurance and other "services" beyond what those payments would have been absent each such conspiracy. In addition, plaintiffs and other Class members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

IX.     **RACKETEERING ALLEGATIONS**

435.    Plaintiffs, Class members and Defendants are "persons" within the meaning of 18 U.S.C. §1961(3).

A.      **THE COMMERCIAL INSURANCE ENTERPRISE**

436.    Based upon plaintiffs' current knowledge, the following persons constitute a group of persons and entities associated-in-fact, hereinafter referred to in this Complaint as "The Commercial Insurance Enterprise":

(a)     Defendants;

(b)     wholesale entities, whether affiliated with Defendants or not, that receive Wholesale Payments and transmit those payments in whole or in part to Defendants;

(c)     other insurers that pay Contingent Commissions, Wholesale Payments, and other kickbacks;

(d)     other brokers, intermediaries, agents and other insurance entities that received or have received undisclosed compensation;

(e)     other entities that engage or have engaged in steering practices and/or bid rigging;

(f)     other insurance brokerage and insurance industry groups, such as the Council of Insurance Agents and Brokers, the American Insurance Association and Reinsurance Association of America.

437.    The Commercial Insurance Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

438.    Through the Commercial Insurance Enterprise, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants

126

as well as the premium revenues for the Insurer Defendants and to reduce or eliminate

competition for the insurance coverage business of the members of the class by, *inter alia*,

allocating customers, dividing territories, bid-rigging and tying.

439.    While Defendants participate in and are members of the Commercial Insurance

Enterprise, they also have an existence separate and distinct from the enterprise.

440.    To establish and maintain the system of Contingent Commissions and Wholesale

Payments, while concealing the system and the inherent conflicts of interest it creates,

Defendants were required to participate in an exercise to control the Commercial Insurance

Enterprise.

441.    Defendants have participated in the conduct of and have controlled and operated

the affairs of the Commercial Insurance Enterprise in at the least the following ways:

(a)    by entering into Contingent Commission Agreements and Wholesale

Payment arrangements with the expectation and understanding that both the brokers and insurers

would recognize increased profits and that the insurers would have insurance business steered to

them without having to compete for that business;

(b)    by developing and competing in an artificial competitive bidding process

designed to create the appearance of competition where none existed;

(c)    by sharing and disseminating information;

(d)    by formalizing relationships among participants in the Commercial

Insurance Enterprise for the payment of undisclosed compensation;

(e)    by uniformly recommending insurance products of the Insurer Defendants

in order to maximize the value of Contingent Commissions and Wholesale Payments;

127

(f)      by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

(g)      by utilizing and supporting industry associations as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

(h)      by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Broker Defendants; and

(i)      by engaging in bid-rigging.

442.    The Commercial Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

## B.      THE BROKER-CENTERED COMMERCIAL INSURANCE ENTERPRISES

443.    Alternatively, each Defendant Broker and the insurers with which each had Contingent Commission Agreements constitute a group of persons and entities associated-in-fact, referred to collectively in this Complaint as the "Broker-Centered Commercial Insurance Enterprises."  At a minimum, six such enterprises exist:

(a)      Marsh and the insurers, including the Insurer Defendants, with which Marsh has Contingent Commission Agreements;

(b)      Aon and the insurers, including the Insurer Defendants, with which Aon had Contingent Commission Agreements;

(c)      Willis and the insurers, including the Insurer Defendants, with which Willis had Contingent Commission Agreements;

(d)      Gallagher and the insurers, including the Insurer Defendants, with which Gallagher had Contingent Commission Agreements;

(e)     Wells Fargo and the insurers, including the Insurer Defendants, with which Wells Fargo had Contingent Commission Agreements; and

(f)     USI and the insurers, including the Insurer Defendants, with which USI had Contingent Commission Agreements.

444.     Through each of Broker-Centered Commercial Insurance Enterprises, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

445.     While Defendants participate in and are members of the Broker-Centered Commercial Insurance Enterprises, they also have an existence separate and distinct from the enterprise.

446.     To establish and maintain the system of Contingent Commissions and Wholesale Payments, while concealing the system and the inherent conflicts of interest it creates, Defendants were required to participate in the conduct of an to exercise control over the Broker-Centered Commercial Insurance Enterprises.

447.     Defendants have participated in the conduct of and have controlled and operated the affairs of the Broker-Centered Commercial Insurance Enterprises in at the least the following ways:

(a)     by entering into Contingent Commission Agreements and Wholesale Payment arrangements with the expectation and understanding that both the brokers and insurers

would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

        (b)     by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

        (c)     by sharing and disseminating information;

        (d)     by formalizing relationships among participants in the Broker-Centered Commercial Insurance Enterprises for the payment of undisclosed compensation;

        (e)     by uniformly recommending insurance products of the Insurer Defendants in order to maximize the value of Contingent Commissions and Wholesale Payments;

        (f)     by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

        (g)     by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

        (h)     by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Broker Defendants; and

        (i)     by engaging in bid-rigging.

     448.    Broker-Centered Commercial Insurance Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

## C.    PREDICATE ACTS

     449.    Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) or 18 U.S.C. §1343 (relating to wire fraud).  As set forth below,

Defendants have engaged in and continue to engage in conduct violating each of those laws to effectuate their scheme.

450.    In addition, to make their scheme effective, each of the Defendants sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. §2, which conduct is also indictable under 18 U.S.C. §§1341 and 1343.

451.    To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters.

452.    To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including but not limited to agreements, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters.

453.    The matters and things sent by Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

131

(a)     materials containing false and fraudulent misrepresentations that the Broker Defendants would represent their clients' interests in the placement of insurance on behalf of plaintiffs;

(b)     materials that concealed or failed to disclose the existence and effect of the Contingent Commissions, Wholesale Payments and other undisclosed compensation, including the conflict of interests that Defendants had created between their legal and contractual obligations to their clients and the economic disincentives to honor those obligations;

(c)     materials intended to induce clients to accept more expensive and lesser coverage from the Insurer Defendants than might be otherwise available in order to maximize premium revenue and to maximize Contingent Commissions, Wholesale Payments and other undisclosed compensation to the Broker Defendants;

(d)     materials intended to discourage clients from the aggressive pursuit of claims;

(e)     materials designed to encourage acceptance of new coverage or renewal of existing coverage;

(f)     materials designed to create the appearance of an active, open and free marketplace for pairmony coverage and reinsurance; and

(g)     invoices and payments related to Defendants' improper scheme.

454.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and members of the Class and assuring Insurer Defendants of the placement of business and enabling Broker Defendants to collect Contingent Commissions and Wholesale Payments.  Specifically these misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

(a)     the Broker Defendants holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clients;

(b)     the Broker Defendants' representations that they work for their clients and not the insurance companies;

(c)     the failure to disclose Defendants' conflicts of interest;

(d)     the failure to disclose that an integral part of the Broker Defendants' business philosophy is to promote the interest of insurance companies to maximize revenue from Contingent Commission Agreements.  Therefore, the Broker Defendants steer business to favored insurance companies from whom they receive higher fees;

(e)     the failure to disclose the nature of the services the Broker Defendants provide in order to warrant their commissions;

(f)     the failure to disclose that the Broker Defendants are directing their clients to insurance companies based not on their merit, but rather on the web of kickbacks and Contingent Commissions and other undisclosed compensation they are able to structure; and

(g)     the contrivance, falsification and/or manipulation of insurance bids to create the illusion of a competitive bidding process.

455.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and plaintiffs and members of the Class relied on the misrepresentations and omissions.  Plaintiffs and the Class rely upon Defendants' misrepresentations and omissions by retaining and continuing to retain the Broker

Defendants and by purchasing Defendants' insurance products at higher rates than plaintiffs would have paid absent Defendants' conspiracy.

456.    As a result, plaintiffs and members of the Class have been injured in their business or property by Defendants' overt acts of mail and wire fraud and each others' acts of mail and wire fraud in furtherance of the conspiracy.

## X.    PATTERN OF RACKETEERING ACTIVITY

457.    Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5), by committing at least two acts of racketeering activity (*i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343 as described above) within the past ten years.

458.    In fact, each Defendant has committed or aided and abetted in the commission of thousands of acts of racketeering activity.

459.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including plaintiffs and members of the Class.

460.    The multiple acts of racketeering activity, which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5).

## XI.    RICO VIOLATIONS

461.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...."

134

462.     Through the pattern of racketeering activity described above, Defendants have conducted or participated in the conduct of the affairs of the enterprises.

463.     Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

464.     Defendants' conspiracy to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business by abandoning their duties to plaintiffs and the Class, and to conceal their fraudulent scheme as described above accordingly violates 18 U.S.C. §1962(d).

## XII.   FRAUDULENT CONCEALMENT

465.     Defendants have affirmatively and fraudulently concealed their unlawful scheme, course of conduct and conspiracy from plaintiffs.  In fact as part of the conspiracy, Defendants went to great lengths to create the appearance of a competitive market for insurance coverage, where no such competitive market existed.

466.     Plaintiffs had no knowledge of Defendants' fraudulent scheme and could not have discovered that Defendants' representations were false or that Defendants had concealed information and materials until shortly before the filing of this Complaint.

467.     Accordingly, the statute of limitations has been tolled with respect to any claims which plaintiffs have brought as a result of the unlawful and fraudulent conduct alleged herein.

## XIII.   THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

468.     Defendants' fraudulent scheme to reduce of eliminate competition, earn higher premium revenues and profit from Contingent Commissions and profit from Wholesale Payments creates an ongoing problem that will continue to cause plaintiffs and members of the Class economic losses and threaten their ability to obtain appropriate insurance coverage at a fair price.  A monetary judgment in this case will only compensate plaintiffs and members of the

135

Class for past losses.  A monetary judgment will not restore competition, nor cure the inherent and irreconcilable conflict of interest created by the existence of the Contingent Commissions and Wholesale Payments.

469.    No individual client of any of the Defendants has an adequate remedy, neither administrative nor at law, to recapture future losses associated with Defendants' fraudulent and conspiratorial conduct, breaches of contract and fiduciary duty, and other duties set forth above. The cost of pursuing such claims on an ongoing basis exceeds the amount at issue.

470.    Even a class action such as is asserted in this case is a significant undertaking that cannot be pursued on a regular or ongoing basis.

471.    Because of the need for multiple lawsuits to redress repeated and ongoing wrongs, Plaintiffs have no adequate remedy at law and would suffer irreparable harm in the absence of injunctive relief.

## XIV.  CLASS ACTION ALLEGATIONS

472.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B), (b)(2), and/or (b)(3), on behalf of a nationwide Class consisting of all persons who between August 26, 1994 and the date of Class certification engaged the services of any one of the Broker Defendants or any of their subsidiaries or affiliates to obtain advice with respect to the procurement or renewal of insurance, and who entered into or renewed a contract of insurance with one of the Insurer Defendants.  Excluded from the Class are Defendants and their officers, affiliates, directors and employees.

473.    All Class members have suffered injury to their business or property by reason of Defendants' unlawful conduct as alleged herein.

474.    There are numerous questions of law and fact that are common to the claims of all class members as set forth above, including:

136

(a)      whether Defendants entered into a contract, combination or conspiracy to manipulate the price and other terms of insurance contract bids submitted to plaintiffs and Class members and to allocate the market for the sale of insurance;

(b)      whether Defendants' contract, combination or conspiracy had the purpose and effect of reducing and unreasonably restraining competition in the sale of insurance;

(c)      the identity of the participants to the contract, combination or conspiracy;

(d)      the duration and extent of the contract, combination or conspiracy alleged in the Complaint;

(e)      the mechanisms used to accomplish the contract, combination or conspiracy;

(f)      whether Defendants' conduct violated §1 of the Sherman Act;

(g)      the effect upon and the extent of injuries sustained by plaintiffs and Class members;

(h)      the appropriate type and/or measure of damages; and

(i)      whether injunctive relief is necessary to restrain future violations.

(j)      whether the Broker Defendants contracted to receive Contingent Commissions from insurers based on the volume of business Defendants placed with those insurers;

(k)      whether the Broker Defendants further arranged to receive Wholesale Payments from insurers indirectly through affiliated wholesale entities based on the business Defendants placed with those insurers;

(l)     whether the Contingent Commissions created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(m)     whether the Wholesale Payments created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(n)     whether the Broker Defendants directed their subsidiaries and affiliates to engage in the conduct alleged in this Complaint;

(o)     whether the Broker Defendants fraudulently concealed or failed to disclose the Contingent Commissions and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(p)     whether Defendants fraudulently concealed or failed to disclose the Wholesale Payments and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(q)     whether Defendants' conduct breached their fiduciary duties to their clients;

(r)     whether Defendants engaged in mail and/or wire fraud;

(s)     whether Defendants engaged in a pattern of racketeering activity;

(t)     whether the Enterprises alleged herein are enterprises within the meaning of 18 U.S.C. §1961(4);

(u)     whether Defendants conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

138

(v)    whether Defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(w)    whether Defendants' overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to plaintiffs' and the Class members' business or property;

(x)    whether plaintiffs and the Class are entitled to injunctive, declaratory, and/or other equitable relief;

(y)    whether plaintiffs and the Class are entitled to an award of attorneys' fees and expenses against Defendants;

(z)    whether Defendants violated RICO and state laws;

(aa)    whether Defendants fully disclosed the nature and extent of Contingent Commissions relating to the products and services.

475.    All Class members have been damaged by the wrongful conduct of Defendants to the extent that, through the Contingent Commissions and Wholesale Payments, steering, bid-rigging and/or tying arrangements, Defendants have given themselves an incentive to distort the applicable marketplace for insurance products and services, increase premiums paid, fail to reduce such payments, impair coverage for clients, reduce client claims and/or cause clients to be placed with insurers of inferior financial quality or stability and acted on that incentive.

476.    The Class is so numerous that joinder of its members is impracticable.

477.    The exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery.

478.    The Class is ascertainable in that the names and addresses of all Class members can be identified in business records maintained by the Defendants.

139

479.    There are numerous questions of law and fact that are common to the claims of all

Class members as set forth above, including:

(a)    whether the Broker Defendants contractually agreed to represent the best

interests of their clients in connection with insurance matters;

(b)    whether the Broker Defendants represented and marketed themselves as

representing the best interests of their clients in connection with insurance matters;

(c)    whether the Broker Defendants contracted to receive Contingent

Commissions from insurers based on the volume of business Defendants placed with those

insurers;

(d)    whether the Broker Defendants further arranged to receive Wholesale

Payments from insurers indirectly through affiliated wholesale entities based on the business

Defendants placed with those insurers;

(e)    whether the Contingent Commissions created conflicts of interests for the

Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual

duties to their clients;

(f)    whether the Wholesale Payments created conflicts of interests for the

Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual

duties to their clients;

(g)    whether the Broker Defendants directed their subsidiaries and affiliates to

engage in the conduct alleged in this Complaint;

(h)    whether the Broker Defendants fraudulently concealed or failed to

disclose the Contingent Commissions and/or their amount, extent, and impact upon the Broker

Defendants' ability to fulfill their legal and contractual duties to their clients;

140

(i)      whether Defendants fraudulently concealed or failed to disclose the Wholesale Payments and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(j)      whether Defendants' conduct breached their legal and contractual duties to their clients;

(k)      whether Defendants engaged in mail and/or wire fraud;

(l)      whether Defendants engaged in a pattern of racketeering activity;

(m)      whether the Commercial Insurance Enterprise or the Commercial Insurance Broker Centered Enterprise is an enterprise within the meaning of 18 U.S.C. §1961(4);

(n)      whether Defendants conducted or participated in the conduct of the affairs of the BIE through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(o)      whether Defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(p)      whether Defendants' overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to plaintiffs' and the Class members' business or property;

(q)      whether plaintiffs and the Class are entitled to injunctive, declaratory, and/ or other equitable relief;

(r)      whether plaintiffs and the Class are entitled to an award of attorneys' fees and expenses against Defendants;

(s)      whether the Broker Defendants steered their clients to the Insurer Defendants in return for Contingent Commissions and Wholesale Payments from the Insurer Defendants;

141

(t)     whether Defendants engaged in bid-rigging, involving the use of phony insurance quotes to plaintiffs and members of the Class;

(u)     whether the Insurer Defendants increased the premiums and/or reduced coverage and claim payments because of Contingent Commissions and Wholesale Payments;

(v)     whether the Insurer Defendants profited as a result of the increased premiums and/or reduced coverage and claims paid; and

(w)     whether the Insurer Defendants maintained or increased market share as a result of the unlawful activities described herein.

480.    The claims of the representative plaintiffs are typical of those of the Class they represent.

481.    Plaintiffs' antitrust claims are typical of the claims of Class members.  All of the Class members, like plaintiffs, sustained antitrust injury as a result of Defendants' conspiracy, contract or combination in restraint of trade.  Plaintiffs and Class members were damaged as a result of purchasing insurance directly from the Insurer Defendants or their co-conspirators at prices that were artificially inflated by the market allocation and bid-rigging scheme.

482.    The claims of the representative plaintiffs and the Class members have a common origin and share a common basis.  Their claims originate from the same illegal, fraudulent conspiracy on the part of Defendants and Defendants' acts in furtherance of that conspiracy, including Defendants' own fraudulent conduct. as well as conduct by Defendants that aided and abetted the fraudulent conduct of others.

483.    As such, plaintiffs have been the victim of one or more of the illegal practices of one or more of the Defendants set forth above, including the false representations that Defendants would act in the best interest of plaintiffs in the procurement of insurance for

142

plaintiffs, concealing and failing to disclose the existence, extent and effect of the Contingent Commissions and the Wholesale Payments, the conflict of interests that Defendants created for themselves through the receipt of those Contingent Commissions and Wholesale Payments, steering and bid-rigging.

484.    The named plaintiffs state claims for which relief may be granted that are typical of those of the absent Class members.  If brought and prosecuted individually, the claims of each Class member would require proof of the same material and substantive facts, and seek the same relief.

485.    The claims of the named plaintiffs are sufficiently aligned with the interests of the absent members of the Class to ensure that the universal claims of the Class will be prosecuted with diligence and care by plaintiffs as representative of the Class.

486.    The representative plaintiffs will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the Class.

487.    The representative plaintiffs are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

488.    The interests of the named plaintiffs are co-extensive with and not antagonistic to those of the absent Class members.

489.    The named plaintiffs have retained the services of counsel who are experienced in complex insurance and antitrust class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent the named plaintiffs and all absent Class members.

490.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B).  The prosecution of separate actions by individual members of the Class would

143

create a risk of adjudications with respect to individual members of the Class that would, as a

practical matter, be dispositive of the interests of other members of the Class who are not parties

to the action or could substantially impair or impede their ability to protect their interests.

491.    The prosecution of separate actions by individual Class members would create a

risk of inconsistent or varying adjudications with respect to individual members of the Class,

which would establish incompatible standards of conduct for the parties opposing the Class.

Such incompatible standards of conduct and varying adjudications, on what would necessarily be

the same essential facts, proof and legal theories, would also create and allow the existence of

inconsistent and incompatible rights within the Class.

492.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants

have acted or refused to act on grounds generally applicable to the Class, making final

declaratory or injunctive relief appropriate.

493.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the

questions of law and fact that are common to members of the Class predominate over any

questions affecting only individual members.

494.    Moreover, a class action is superior to other methods for the fair and efficient

adjudication of the controversies raised in this Complaint in that:

(a)    individual claims by the Class members will be impracticable as the costs

of pursuit would far exceed what any one plaintiff or Class member has at stake;

(b)    as a result, very little litigation has been commenced over the

controversies alleged in this Complaint and individual members are unlikely to have interest in

prosecuting and controlling separate individual actions;

(c)      the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d)      the proposed class action is manageable.

### FIRST CLAIM FOR RELIEF

**(Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c)
All Plaintiffs Against all Defendants)**

495.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

496.    This cause of action is brought pursuant to 18 U.S.C. §1964(c)

497.    As set forth above, in violation of 18 U.S.C. §1962(d), Defendants have conspired to violate 18 U.S.C. §1962(c).

498.    As a direct and proximate result, plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, plaintiffs and members of the Class have been injured by, among other things, paying excessive premiums for insurance and other "services" than they would have in the absence of the conspiracy.

499.    Accordingly, Defendants are liable to plaintiffs and the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

### ALTERNATIVE FIRST CLAIM FOR RELIEF

**(Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c) Against All Defendants involved in Broker-Centered Conspiracies)**

500.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

501.   This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(d) by the following plaintiffs against the following Defendants:

(a)   Marsh's customers against the Defendants involved in the Marsh -centered conspiracy;

(b)   Aon's customers against the Defendants involved in the Aon-centered conspiracy;

(c)   Willis's customers against the Defendants involved in the Willis-centered conspiracy;

(d)   Gallagher's customers against the Defendants involved in the Gallagher-centered conspiracy;

(e)   Wells Fargo's customers against the Defendants involved in the Wells Fargo-centered conspiracy; and

(f)   USI's customers against the Defendants involved in the USI-centered conspiracy.

502.   As set forth above, in violation of 18 U.S.C. §1962(d), Defendants in each Commercial Insurance Broker-Centered Conspiracy have conspired to violate 18 U.S.C. §1962(c).

503.   As a direct and proximate result, plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, plaintiffs and members of the Class have been injured by, among other things, paying excessive premiums for insurance and other "services" than they would have in the absence of the conspiracy.

146

504.     Accordingly, Defendants in each of the Commercial Insurance Broker-Centered Enterprises are liable to plaintiffs and the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(Violation of 18 U.S.C. §1962(c)
All Plaintiffs Against all Defendants)**

505.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

506.     This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c).

507.     As set forth above, in violation of 1962(c), Defendants have conducted or participated in the conduct of the affairs of the Commercial Insurance Enterprise through a pattern of racketeering activity.

508.     As a direct and proximate result, plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, plaintiffs and members of the Class have been injured in their business or property by, among other things, paying more for insurance and other "services" than they would have paid absent Defendants' illegal conduct.

509.     Accordingly, Defendants are liable to plaintiffs and the Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

**ALTERNATIVE SECOND CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. §1962(c) Against all Defendants in the Commercial Insurance Broker-Centered Enterprises)**

510.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

147

511. This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c) by the following plaintiffs against the following Defendants:

(a) Marsh's customers against Defendants associated-in-fact in the Marsh-centered Enterprise;

(b) Aon's customers against Defendants associated-in-fact in the Aon-centered Enterprise;

(c) Willis's customers against Defendants associated-in-fact in the Willis-centered Enterprise;

(d) Gallagher's customers against Defendants associated-in-fact in the Gallagher-centered Enterprise;

(e) Wells Fargo's customers against Defendants associated-in-fact in the Wells Fargo-centered Enterprise; and

(f) USI's customers against Defendants associated-in-fact in the USI-centered Enterprise.

512. As set forth above, in violation of 1962(c), Defendants in each of the Commercial Insurance Broker-Centered Enterprises have conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity.

513. As a direct and proximate result, plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, plaintiffs and members of the Class have been injured in their business or property by, among other things, paying more for insurance and other "services" than they would have absent Defendants' illegal conduct.

148

514.     Accordingly, Defendants in each of the Commercial Insurance Broker-Centered Enterprises are liable to plaintiffs and the Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### (Injunctive and Declaratory Relief under RICO by All Plaintiffs against all Defendants)

515.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

516.     This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

517.     As set forth in plaintiffs' First and Second Claims for Relief and in this Amended Complaint, Defendants have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and unless enjoined, will continue to do so in the future.

518.     As set forth above, plaintiffs have no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

519.     Accordingly, plaintiffs are entitled to declaratory relief declaring the illegal and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining Defendants from further violations of 18 U.S.C. §§1962(c) and (d).

## ALTERNATIVE THIRD CLAIM FOR RELIEF

### (Injunctive and Declaratory Relief under RICO against Defendants in the Commercial Insurance Broker-Centered Enterprises)

520.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

149

521. This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

522. As set forth in plaintiffs' First and Second Claims for Relief and in this Amended Complaint, Defendants in the Commercial Insurance Broker-Centered Enterprises and Commercial Insurance Broker-Centered Conspiracies have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and unless enjoined, will continue to do so in the future.

523. As set forth above, plaintiffs have no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

524. Accordingly, the following plaintiffs are entitled to declaratory relief declaring the illegal and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining the following Defendants from further violations of 18 U.S.C. §§1962(c) and (d):

(a) Marsh's customers against Defendants associated-in-fact in the Marsh-centered Enterprise and involved in the Marsh-centered conspiracy;

(b) Aon's customers against Defendants associated-in-fact in the Aon-centered Enterprise and involved in the Aon-centered conspiracy;

(c) Willis's customers against Defendants associated-in-fact in the Willis-centered Enterprise and involved in the Willis-centered conspiracy;

(d) Gallagher's customers against Defendants associated-in-fact in the Gallagher-centered Enterprise and involved in the Gallagher-centered conspiracy;

(e) Wells Fargo's customers against Defendants associated-in-fact in the Wells Fargo-centered Enterprise and involved in the Wells-Fargo centered conspiracy; and

(f)      USI's customers against Defendants associated-in-fact in the USI-centered

Enterprise and involved in the USI-centered conspiracy.

### FOURTH CLAIM FOR RELIEF

### (Violation of Section 1 of the
### Sherman Act Against all Defendants)

525.     Plaintiffs repeat and reallege the allegations contained above as if fully stated

herein.

526.     Defendants and their co-conspirators have engaged in unlawful contracts,

combination or conspiracies in restraint of interstate trade and commerce in violation of section 1

of the Sherman Act, 15 U.S.C. §1.

527.     Specifically, Defendants have entered into agreements the purpose and effect of

which were to suppress or eliminate competition, and to raise, raise, maintain or stabilize prices

for insurance products in the United States at artificially high levels.

528.     Each of the Defendants has engaged in one or more overt acts in furtherance of

the unlawful contract, combination or conspiracy.  Defendants implemented the unlawful scheme

by the following acts, among others:

- Agreeing to steer business to Insurer Defendants in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

- Agreeing, through the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

- Agreeing to engage in activities that give the appearance of competition where none existed;

- Agreeing to allocate insurance customers among the Insurer Defendants, denying such customers – such as plaintiffs and other members of the Class – the benefits of free and open competition; and

- Agreeing on the prices and the other terms to be submitted in collusive, fictitious and inflated bids for contracts for insurance;

151

529.     Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured.  Moreover, the acts of the Broker Defendants in establishing and enforcing Contingent Commission Agreements in the insurance industry, constitutes coercion within the meaning of the McCarran-Ferguson Act.  In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants, in essence, participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

530.     Defendants' unlawful conspiracy constitutes a per se violation of section 1 of the Sherman Act, 15 U.S.C. §1.  Alternatively, their conduct violates the Sherman Act under a rule of reason analysis.

531.     Various persons, not named as Defendants, participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of that conspiracy.

532.     The aforesaid combination and conspiracy had the following effects, among others:

- prices paid by plaintiffs and Class members for insurance were, raised, maintained or stabilized at artificially high, supra-competitive levels; and

- plaintiffs and other members of the Class were deprived of the benefits of free and open competition in the purchase of insurance.

533.     As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Amended Complaint, plaintiffs and other members of the Class were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

## FIFTH CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act Against Defendant Participants in the Commercial Insurance Broker-Centered Conspiracies)

534.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

535.     This claim is brought by the following plaintiffs against the following Defendants:

(a)     Marsh customers against the participants in the Marsh-centered broker conspiracy;

(b)     Aon customers against the participants in the Aon-centered broker conspiracy;

(c)     Willis customers against the participants in the Willis-centered broker conspiracy;

(d)     Gallagher customers against the participants in the Gallagher-centered broker conspiracy;

(e)     Wells-Fargo customers against the participants in the Wells-Fargo centered broker conspiracy; and

(f)     USI customers against the participants in the USI centered-broker conspiracy.

536.     Each Defendant in the broker-centered conspiracies has, with their co-conspirators, engaged in unlawful contracts, combination or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

537.     Specifically, these Defendants have entered into agreements with their co-conspirators, the purpose and effect of which were to suppress or eliminate competition, and to

153

raise, maintain or stabilize prices for insurance products in the United States at artificially high levels.

538.    Each of these Defendants has engaged in one or more overt acts in furtherance of the unlawful contract, combination or conspiracy.  Defendants implemented the unlawful scheme by the following acts, among others:

- Agreeing to steer business to the Insurer defendant participants in the conspiracy in exchange for undisclosed fees kickbacks and other payments from the Insurer Defendants;

- Agreeing, though the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

- Agreeing to engage in activities that give the appearance of competition where none existed;

- Agreeing to allocate insurance customers among the conspiring Insurer Defendants, denying such customers – such as plaintiffs and other members of the Class – the benefits of free and open competition; and

- Agreeing on the prices and the other terms to be submitted in collusive, fictitious and inflated bids for contracts for insurance;

539.    Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured.  Moreover, the acts of the Broker Defendants in establishing and enforcing Contingent Commission Agreements in the insurance industry, constitutes coercion within the meaning of the McCarran-Ferguson Act.  In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants, in essence, participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

540.    Defendants' unlawful conspiracy constitutes a *per se* violation of section 1 of the

Sherman Act, 15 U.S.C. § 1.  Alternatively, their conduct violates the Sherman Act under a rule

of reason analysis.

541.    Various persons, not named as defendants, participated as co-conspirators in the

Broker-centered conspiracies, and performed acts and made statements in furtherance of that

conspiracy.

542.    The aforesaid combinations and conspiracies each had the following effects,

among others:

- price competition among the Insurer Defendants and their co-conspirators for
  insurance was restrained and suppressed;

- prices paid by plaintiffs and Class members for insurance were raised, maintained
  or stabilized at artificially high, supra-competitive levels; and

- plaintiffs and other members of the Class were deprived of the benefits of free and
  open competition in the purchase of insurance.

543.    As a direct and proximate result of the Commercial Insurance Broker-Centered

contracts, combinations and conspiracies alleged in this Amended Complaint, plaintiffs and other

members of the Class were injured in their business or property in that they purchased insurance

at higher prices and on terms less favorable than would have been available in a competitive

market.

## SIXTH CLAIM FOR RELIEF

### (State Antitrust Laws against all Defendants)

544.    Plaintiffs incorporate by reference the allegations above as if fully set forth

herein.

545.    By reason of the foregoing, Defendants have entered into agreements in restraint

of trade in violation of Alaska Stat. §§45.50.562 et seq.

155

546.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 et seq.

547.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §§4-75-309 et seq. and Arkansas Stat. Ann. §§4-75-201 et seq.

548.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700 et seq., §§16720 et seq., and Cal. Bus. & Prof. Code §§17000 et seq.

549.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colorado Rev. Stat. §§6-4-101 et seq.

550.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Connecticut Gen. Stat. §§35-26 et seq.

551.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503 et seq.

552.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Delaware Code Ann. tit. 6, §§2103 et seq.

553.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Florida Stat. §§501.201 et seq.

554.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Georgia Code Ann. §§16-10-22 et seq. and Georgia Code Ann. §§13-8-2 et seq.

555.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Rev. Stat. §§480-1 et seq.

156

556.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101 et seq.

557.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Comp. Stat. §§10/1 et seq.

558.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Indiana Code Ann. §§24-1-2-1 et seq.

559.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 et seq.

560.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

561.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kentucky Rev. Stat. §§367.175 et seq., and relief can be granted in accordance with Kentucky Rev. Stat. §446.070.

562.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Louisiana Rev. Stat. §§51:137 et seq.

563.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 et seq.

564.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maryland Code Ann. Title 11, §§11-201 et seq.

565.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Massachusetts Ann. Laws ch. 92 §§1 et seq.

566.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773 et seq.

157

567.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.52 et seq.

568.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§75-21-1 et seq.

569.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Missouri Stat. Ann. §§416.011 et seq.

570.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Montana Code Ann. §§30-14-101 et seq.

571.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 et seq.

572.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A et seq.

573.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Rev. Stat. Ann. §§356:1 et seq.

574.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Jersey Stat. Ann. §§56:9-1 et seq.

575.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 et seq.

576.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §340 et seq., and N.Y. Ins. Law § 2316(a).

577.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

158

578.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat.. §§75-1 et seq.

579.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§51-08.1-01 et seq.

580.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §§1331.01 et seq.

581.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oklahoma Stat. tit. 79 §§203(A) et seq.

582.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Rev. Stat. §§646.705 et seq.

583.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Rhode Island Gen. Laws §§6-36-1 et seq.

584.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Carolina. Code §§39-3-10 et seq.

585.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 et seq.

586.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§47-25-101 et seq.

587.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Texas Bus. & Com. Code §§15.01 et seq.

588.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911 et seq.

159

589.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 et seq.

590.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Virginia Code §§59-1-9.2 et seq.

591.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Washington Rev. Code §§19.86.010 et seq.

592.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§47-18-1 et seq.

593.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 et seq.

594.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wyoming Stat. §§40-4-101 et seq.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against the
### Broker Defendants on behalf of their Customers)

595.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

596.     Each Broker defendant was a fiduciary to its own client plaintiffs.  Because of this, the plaintiffs placed confidence and trust in their Brokers, authorized them to exercise discretionary functions for their benefit, and relied on their superior expertise in risk management and the procurement of insurance.

597.     The Broker Defendants accepted and solicited that confidence and trust as described above.

160

598.     As fiduciaries of plaintiffs and members of the Class, the Broker Defendants were obligated to discharge their duties solely in the interests of their plaintiff clients, and specifically to find the best available coverage at the best price, exercising good faith and fair dealing, full and fair disclosure, care and loyalty to the interests of their client plaintiffs.

599.     Defendants have breached those duties by acting in their own pecuniary interests in disregard of the interests of their client plaintiffs as set forth above.

600.     Accordingly, Defendants are liable for breach of fiduciary duty to their client plaintiffs,  and are liable for the damages suffered by plaintiffs in an amount to be proved at trial.

601.     Plaintiffs and members of the Class are further entitled to an accounting by Defendants with respect to all Contingent Commissions, Wholesale Payments and other improper payments received by Defendants.

## EIGHTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of
### Fiduciary Duty Against Insurer Defendants)

602.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

603.     As alleged above, a fiduciary relationship existed between each Broker and its Plaintiff clients.

604.     The Broker Defendants breached this fiduciary duty by acting in their own pecuniary interests and in disregard of the interests of their client plaintiffs as set forth above.

605.     The Insurer Defendants knowingly participated in that breach by, among other things, engaging in the fraudulent and conspiratorial conduct described above.

606.     Plaintiffs have suffered damages proximately caused by the Insurer Defendants' participation in the Broker Defendants' breach.

161

607.    Accordingly, the Insurer Defendants are liable to plaintiffs for damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF

### (Unjust Enrichment Against all Defendants)

608.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

609.    Defendants have benefited from their unlawful acts by receiving excessive premium revenue and enormous Contingent Commissions and Wholesale Payments.  These payments have been received by Defendants at plaintiffs' expense, under circumstances where it would be inequitable for Defendants to be permitted to retain the benefit.

610.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants in the form of their excessive premium revenue and contingent commission and wholesale payments from which plaintiffs and the other Class members may make claims on a pro rata basis for restitution. .

**WHEREFORE**, plaintiffs, demand judgment against Defendants as follows:

(a)    Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying plaintiff as the representative of the Class, and designating its counsel as counsel for the Class;

(b)    A declaration that Defendants have committed the violations alleged herein;

(c)    On its First Claim for Relief, against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses.  On the Alternative First Claim for Relief against the Defendants in each Commercial Insurance Broker Centered Conspiracy

162

jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses;

(d)    On its Second Claim for Relief, against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses.  On the Alternative Second Claim for Relief against the Defendants in each Commercial Insurance Broker Centered Enterprise jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses;

(e)    On its Third Claim for Relief, for a declaratory judgment declaring the anticompetitive and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d) and injunctive relief enjoining Defendants from further violations of 18 U.S.C. §§1962(c) and (d).  On the Alternative Third Claim for Relief against the Defendants in each Commercial Insurance Broker Centered Conspiracy and Enterprise for a declaratory judgment declaring the anticompetitive and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d) and injunctive relief enjoining Defendants from further violations of 18 U.S.C. §§1962(c) and (d);

(f)    On its Fourth Claim for Relief against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses;

(g)    On its Fifth Claim for Relief, against Defendant participants in the Commercial Insurance Broker-Centered Conspiracies jointly and severally in an amount equal to

treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses;

(h)     On its Sixth Claim for Relief, against the Defendants jointly and severally a judgment, for damages sustained by plaintiffs and members of the Class, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages plus interest and attorneys' fees and expenses;

(i)     On its Seventh Claim for Relief, against the Broker Defendants jointly and severally in the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest;

(j)     On its Eighth Claim for Relief, against Insurer Defendants jointly and severally, in the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest;

(k)     On it Ninth Claim for Relief, against Defendants jointly and severally, for disgorgement of Defendants' unjust enrichment and/or imposing a constructive trust upon Defendants' ill-gotten monies, freezing Defendants' assets, and requiring Defendants to pay restitution to plaintiffs and the Class and to restore to all funds acquired by means of any act or practice declared by this Court to be unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

(l)     An injunction preventing Defendants from engaging in future anticompetitive practices;

(m)     Costs of this action, including reasonable attorneys fees and expenses; and

(n)     Any such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: August 1, 2005

MILBERG WEISS BERSHAD
& SCHULMAN, LLP

_/s/ Edith M. Kallas_

Edith M. Kallas
Joseph P. Guglielmo
J. Douglas Richards
Michael M. Buchman
Elizabeth Rosenberg
Lili R. Sabo
One Pennsylvania Plaza
New York, NY 10119-0165
Tel.: 212-594-5300
Fax: 212-868-1229

MILLER FAUCHER AND CAFFERTY LLP

_/s/ Bryan C. Clobes_

Bryan C. Clobes
Ellen Meriwether
Michael S. Tarringer
Melody Forrester
Timothy Fraser
One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA 19103
Tel.: 215-864-2800
Fax: 215-864-2810

_Plaintiffs' Co-Lead Counsel_

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS, LLP

John J. Stoia, Jr.
Theodore J. Pintar
Bonny E. Sweeney
James D. McNamara
Mary Lynne Calkins
Rachel L. Jensen
Amelia F. Burroughs

165

401 B. Street, Suite 1600
San Diego, CA 92101
Tel.:  619-231-1058
Fax:  619-231-7423

**FOOTE, MEYERS, MIELKE & FLOWERS**
Robert M. Foote
416 South Second Street
Geneva, IL 60134
Tel.:  630-232-6333

**LEVIN, FISHBEIN, SEDRAN & BERMAN**
Howard J. Sedran
510 Walnut Street - Suite 500
Philadelphia, PA  19106
Tel.:  215-592-1500
Fax:  215-592-4663

**DRUBNER HARTLEY & O'CONNOR**
James E. Hartley, Jr.
Gary O'Connor
Charles S. Hellman
500 Chase Parkway, 4th Floor
Waterbury, CT 06708
Tel.:  203-753-9291
Fax:  203-753-6373

**FINE KAPLAN & BLACK**
Roberta D. Liebenberg
1845 Walnut Street
Philadelphia, PA 19103
Tel.:  215-567-6566
Fax:  215-568-5872

**THE FURTH FIRM, LLP**
Michael P. Lehman
Thomas P. Dove
Julio J. Ramos
Jon T. King
225 Bush Street, Suite 1500
San Francisco, CA 94104
Tel.:  415-433-2070
Fax:  415-982-2076

**GRAY, WEISS AND WHITE**
Mark K. Gray

166

1200 PNC Plaza
Louisville, KY 40202
Tel.:  502-585-2060

**HANZMAN & CRIDEN, P.A.**
Michael E. Criden
Kevin B. Love
220 Alhambra Circle, Suite 400
Coral Gables, FL 33134
Tel.:  305-357-9000
Fax:  305-357-9050

**LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS, LLP**
Samuel H. Rudman
200 Broadhollow Road, Suite 406
Melville, NY 11747
Tel.:  631-367-7100
Fax:  631-367-1173

**MEREDITH COHEN GREENFOGEL
  & SKIRNICK, P.C.**
Steven J. Greenfogel
Daniel B. Allanoff
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Tel.:  215-564-5182
Fax:  215-569-0958

**WHATLEY  DRAKE, LLC**
Joe R. Whatley, Jr.
Charlene Ford
Richard Rouco
Richard Frankowski
2323 Second Avenue North
Birmingham, AL 35203
Tel.:  205-328-9576
Fax:  205-328-9669

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
Mary Jane Edelstein Fait
Adam J. Levitt
656 West Randolph Street
Suite 500 West

167

Chicago, IL 60661
Tel.: 312-466-9200
Fax: 312-466-9292

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
Fred Taylor Isquith
270 Madison Avenue, 10th Floor
New York, NY 10016
Tel.: 212-545-4600
Fax: 212-545-4653

**ZWERLING, SCHACHTER &**
  **ZWERLING, LLP**
Robert S. Schachter
Stephen L. Brodsky
Justin M. Tarshis
41 Madison Avenue
New York, NY 10010
Tel.: 212-223-3900
Fax: 212-371-5969

**ALEXANDER, HAWES & AUDET, LLP**
William M. Audet
300 Montgomery Street, Ste. 400
San Francisco, CA 94104
Tel.: 415-982-1776

**BEELER, SCHAD & DIAMOND, P.C.**
Lawrence W. Schad
James Shedden
Michael S. Hilicki
Tony H. Kim
332 South Michigan Avenue, Suite 1000
Chicago, IL 60604
Tel.: 312-939-6280
Fax: 312-939-4661

**BONNETT, FAIRBOURN, FRIEDMAN &**
**BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Hurd
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Tel.: 602-274-1100

Fax:  602-274-1199

**CHAVEZ LAW FIRM, P.C.**
Kathleen C. Chavez
P.O. Box 772
Geneva, IL 60134
Tel.:  630-232-4480
Fax:  630-232-8265

**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles
Michael D. Gottsch
361 West Lancaster Avenue
Haverford, PA  19041
Tel.:  610-642-8500
Fax:  610-649-3633

**COHN, LIFLAND, PEARLMAN,**
 **HERRMANN & KNOPF**
Peter S. Pearlman
Park 80 Plaza West One
Saddle Brook, NJ  07663
Tel.:  201-845-9600
Fax:  201-845-9423

**COOPER & KIRKHAM, P.C.**
Josef D. Cooper
655 Montgomery Street, 17th Floor
San Francisco, CA 94111
Tel.:  415-788-3030
Fax:  415-882-7040

**LARRY D. DRURY, LTD.**
Larry D. Drury
Two North LaSalle Street
Suite 700
Chicago, IL 60602
Tel.:  312-346-7950

**FINKELSTEIN, THOMPSON**
 **& LOUGHRAN**
Burton H. Finkelstein
L. Kendall Satterfield
Halley F. Ascher
1050 30th Street, N.W.
Washington, D.C.  20007

169

Tel.: 202-337-8000
Fax: 202-337-8090

**HANSON BRIDGES MARCUS VLAHOS
RUDY LLP**
David J. Miller
333 Market Street, 23rd Floor
San Francisco, CA 94105
Tel.: 415-777-3200
Fax: 415-541-9366

**JANSSEN, MALLOY, NEEDHAM,
MORRISON, REINHOLTSEN &
CROWLEY, LLP**
W. Timothy Needham
730 Fifth Street, Post Office Drawer 1288
Eureka, CA 95502
Tel.: 707-445-2071
Fax: 707-445-8305

**KLAFTER & OLSEN LLP**
Jeffrey A. Klafter, Esq.
1311 Mamaroneck Avenue, Suite 220
White Plains, NY 10602
Tel.: 914-997-5656
Fax: 914-997-2444

**LITE DEPALMA GREENBERG
& RIVAS, LLC**
Allyn Z. Lite
Bruce D. Greenberg
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel.: 973-623-3000
Fax: 973-623-0858

**JEFFREY LOWE, P.C.**
Jeff Lowe
8235 Forsyth Blvd., Ste. 1100
St. Louis, MO 63105
Tel.: 314-721-3668

**MAGER WHITE & GOLDSTEIN, LLP**
Jayne Arnold Goldstein
2825 University Drive, Suite 350

170

Coral Springs, FL 33065
Tel.: 954-341-0844
Fax: 954-341-0855

**LAW OFFICES OF RANDY R. RENICK**
Randy R. Renick
128 North Fair Oaks Avenue, Ste. 204
Pasadena, CA 91103
Tel.: 626-585-9600

**SAVERI & SAVERI, INC.**
Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
One Eleven Pine, Suite 1700
San Francisco, CA 94111-5619
Tel.: 415-217-6810
Fax: 415-217-6813

**LAW OFFICES OF FRANCIS O. SCARPULLA**
Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel.: 415-788-7210
Fax: 415-788-0707

**SPARKMAN-ZUMMACH, P.C.**
Martin W. Zummach
P.O. Box 266
Southaven, MS 38671
Tel.: 662-349-6900
Fax: 662-349-6800

**LEVINE DESANTIS, LLC**
Mitchell B. Jacobs, Esq.
150 Essex St., Ste. 303
Millburn, New Jersey 07041
Tel: 973-376-9050
Fax: 973-379-6898

*Attorneys for Plaintiffs*

171

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

———————————————————————————x

IN RE: INSURANCE BROKERAGE :  Hon. Faith S. Hochberg
ANTITRUST LITIGATION     :

             :  Civil No. 04-5184

APPLIES TO ALL ACTIONS   :

             :  MDL No. 1663

             :

             :

———————————————————————————— x

## COMMERCIAL INSURANCE PLAINTIFFS' RICO CASE
## STATEMENT PURSUANT TO LOCAL RULE 16.1(B)(4)

Plaintiffs pursuant to Order No. 3,[1] submit this Amended RICO Case Statement under

Local Civil Rule 16.1(B)(4).

1.    **State whether the alleged unlawful conduct is in violation of 18 U.S.C. § 1962(a), (b), (c) and/or (d).**

Plaintiffs assert violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).  There is no

alleged violation of 18 U.S.C. § 1962(a) or 18 U.S.C. § 1962(b).

2.    **List each defendant and state the alleged misconduct and basis of liability of each defendant.**

**Broker Defendants**

Marsh & McLennan Companies, Inc.

Marsh Inc.

Marsh USA Inc.

Marsh USA Inc. (Connecticut)

Seabury & Smith, Inc.[2]

Aon Corporation

Aon Broker Services, Inc.

Aon Risk Services Companies, Inc.

Aon Risk Services Inc. U.S

Aon Risk Services, Inc. of Maryland

Aon Risk Services, Inc. of Louisiana

---

[1] Pursuant to Order No. 1, dated March 11, 2005, Plaintiffs previously submitted a Joint RICO Case Statement, which addressed both commercial insurance allegations and employee benefit allegations.  This Amended RICO Case Statement pertains only to the commercial insurance allegations.

[2] Defendants Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA Inc., Marsh USA Inc. (Connecticut) and Seabury & Smith, Inc. shall be referred to collectively herein as "Marsh."

Aon Risk Services of Texas, Inc.

Aon Risk Services, Inc. of Michigan

Aon Group, Inc.

Aon Services Group, Inc.

Aon Re, Inc.

Affinity Insurance Services, Inc.

Aon Re Worldwide, Inc.[3]

Willis Group Holdings Limited

Willis Group Limited

Willis North America, Inc.

Willis of New York, Inc.

Stewart Smith Group

Willis Re Inc.[4]

Arthur J. Gallagher & Co.

Arthur J. Gallagher Risk Management Service, Inc.[5]

Wells Fargo & Company

Acordia, Inc.[6]

---

[3] Defendants Aon Corporation, Aon Broker Services, Inc., Aon Risk Services Companies, Inc., Aon Risk Services Inc. U.S., Aon Risk Services, Inc. of Maryland, Aon Risk Services, Inc. of Louisiana, Aon Risk Services of Texas, Inc., Aon Risk Services, Inc. of Michigan, Aon Group, Inc., Aon Services Group, Inc., Aon Re, Inc., Affinity Insurance Services, Inc. and Aon Re Worldwide, Inc. shall be referred to collectively herein as "Aon."

[4] Defendants Willis Group Holdings Limited, Willis Group Limited, Willis North America, Inc., Willis of New York, Inc., Stewart Smith Group and Willis Re Inc. shall be referred to collectively herein as "Willis."

[5] Defendants Arthur J. Gallagher & Co. and Arthur J. Gallagher Risk Management Service, Inc. shall be referred to collectively herein as "Gallagher."

Brown & Brown, Inc.

Hilb, Rogal & Hobbs Company

BB&T Corporation

Branch Banking and Trust Company

BB&T Insurance Services, Inc. [7]

U.S.I. Holdings Corporation

Summit Global Partners of Florida, Inc.

USI Insurance Services of Florida, Inc., d/b/a USI Florida[8]

Hub International Limited

**Insurer Defendants**

American International Group, Inc.

Lexington Insurance Company

American International Specialty Lines Insurance Co.

Birmingham Fire Insurance Co. of Pennsylvania

American Home Assurance Co.

National Union Fire Insurance Co. of Pittsburgh, Pa.

National Union Fire Insurance Co. of Louisiana

American International Insurance Co.

The Insurance Company of the State of Pennsylvania

---

[6] Defendants Wells Fargo & Company and Acordia, Inc. shall be referred to collectively as "Wells Fargo."

[7] Defendants BB&T Corporation, Branch Banking and Trust Company and BB&T Insurance Services, Inc. shall be referred to collectively as "BB&T."

[8] Defendants U.S.I. Holdings Corporation, Summit Global Partners of Florida, Inc. and USI Insurance Services of Florida, Inc., d/b/a USI Florida shall be referred to collectively as "USI."

AIU Insurance Co.

Commerce and Industry Insurance Co.

New Hampshire Insurance Co.

Hartford Steam Boiler Inspection and Insurance Co.[9]

ACE Limited

ACE INA Holdings, Inc.

ACE USA, Inc.

ACE American Insurance Co.

Westchester Surplus Lines Insurance Co.

Illinois Union Insurance Co.

Indemnity Insurance Co. of North America[10]

The Hartford Financial Services Group, Inc.

Hartford Fire Insurance Co.

Twin City Fire Insurance Co.

Pacific Insurance Co., Ltd.

Nutmeg Insurance Co.

The Hartford Fidelity & Bonding Co.[11]

---

[9] Defendants American International Group, Inc., Lexington Insurance Company, American International Specialty Lines Insurance Co., Birmingham Fire Insurance Co. of Pennsylvania, American Home Assurance Co., National Union Fire Insurance Co. of Pittsburgh, Pa., National Union Fire Insurance Co. of Louisiana, American International Insurance Co., The Insurance Company of the State of Pennsylvania, AIU Insurance Co., Commerce and Industry Insurance Co., New Hampshire Insurance Co. and Hartford Steam Boiler Inspection and Insurance Co. shall be referred to collectively as "AIG."

[10] Defendants ACE Ltd., ACE INA, ACE USA, and ACE American, Westchester Surplus, Illinois Union and Indemnity Ins. Shall be referred to collectively herein as "ACE."

Munich Reinsurance Co.

American Re Corporation

American Re-Insurance Co.

American Alternative Insurance Corp.

Munich-American Risk Partners, Inc.[12]

St. Paul Travelers Companies, Inc.

St. Paul Fire & Marine Insurance Co.

Gulf Insurance Co.

St. Paul Mercury Insurance Co.

Travelers Casualty & Surety Co. of America

Travelers Indemnity Company

Athena Assurance Co.[13]

Berkshire Hathaway Inc.,

Berkshire Hathaway Insurance Group

General Re Corporation

General Reinsurance Corp.[14]

Zurich Financial Services Group

---

[11] Defendants Hartford Financial, Hartford Fire, Twin City, Pacific Ins., Nutmeg Ins. And Hartford Fidelity shall be referred to collectively as "Hartford."

[12] Defendants Munich Re, American Re, American Re-Insurance, American Alternative and Munich-American, shall be referred to collectively herein as "Munich."

[13] Defendants St. Paul Travelers, St. Paul Fire, Gulf Ins., St. Paul Mercury, Travelers Casualty, Travelers Indemnity Company and Athena Assurance shall be referred to collectively herein as "St. Paul."

[14] Berkshire Hathaway Inc., Berkshire Hathaway Insurance Group, General Re Corporation, and General Reinsurance Corp. are collectively referred to as "General Re."

Zurich American Insurance Co.

Steadfast Insurance Co.

Fidelity & Deposit Company of Maryland

Empire Fire & Marine Insurance Co.

American Guarantee & Liability Insurance Co.

Empire Indemnity Insurance Co.

Assurance Company of America[15]

The Chubb Corporation

Federal Insurance Co.

Executive Risk Indemnity Inc.

Vigilant Insurance Co.[16]

Crum & Forster Holdings Corp.

United States Fire Insurance Co.[17]

Fireman's Fund Insurance Co.

Chicago Insurance Co.

National Surety Corp.[18]

RLI Corporation

---

[15] Defendants Zurich Financial, Zurich American, Steadfast, Fidelity & Deposit, Empire Fire, American Guarantee, Empire Indemnity and Assurance Co. shall be referred to collectively herein as "Zurich."

[16] Defendants Chubb Corp., Federal Ins., Executive Risk and Vigilant Ins. Shall be referred to collectively herein as "Chubb."

[17] Defendants Crum & Forster Holdings and US Fire shall be referred to collectively herein as "Crum & Forster."

[18] Defendants Fireman's Fund Ins., Chicago Ins. And National Surety shall be referred collectively herein as "Fireman's Fund."

RLI Insurance Co.

Mt. Hawley Insurance Co.[19]

XL Capital Ltd.

Greenwich Insurance Co.

Indian Harbor Insurance Co.[20]

CNA Financial Corp.

The Continental Insurance Corp.

American Casualty Co. of Reading, PA

Continental Casualty Co.[21]

Liberty Mutual Holding Company, Inc.

Liberty Mutual Insurance Co.

Liberty Mutual Fire Insurance Co.

Wausau Underwriters Insurance Co.[22]

AXIS Specialty Insurance Company

AXIS Surplus Insurance Company

AXIS Reinsurance Company[23]

---

[19] Defendants RLI Corp., RLI Insurance and Mt. Hawley shall be referred to collectively herein as "RLI."

[20] Defendants XL Capital, Greenwich Ins. and Indian Harbor shall be referred to collectively herein as "XL Capital" or "XL."

[21] Defendants CNA Financial, Continental Ins., American Casualty and Continental Casualty shall be referred to collectively herein as "CNA."

[22] Defendants Liberty Mutual Holding, Liberty Mutual Ins., Liberty Mutual Fire and Wausau shall be referred to collectively herein as "Liberty Mutual."

[23] Collectively, AXIS Specialty, AXIS Surplus, and AXIS Re are referred to herein as "AXIS."

**Misconduct and Basis of Liability of Each Defendant**

Defendants have engaged in a conspiracy, described herein in Section 14, to increase premium revenues for the insurers and contingent commissions and other remuneration (*i.e.*, wholesale payments) for the brokers through kickbacks in return for steering of customers, bid rigging and unlawful tying.

Defendants have implemented and executed their scheme through a pattern of racketeering comprised of repeated predicate acts of mail and wire fraud.

Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud). As set forth below, defendants have engaged in and continue to engage in conduct violating each of those laws in order to effectuate their scheme.

*PREDICATE ACTS:*

In order to carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to contingent commission agreements (also known, among other names, as "compensation agreements", "market service agreements" or "profit-sharing agreements"), correspondence, policy materials, insurance binders, fee schedules, commission schedules, payments from clients, brokers and insurers, claims, responses to claims, and coverage letters.

9

In order to carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including but not limited to contingent commission agreements, correspondence, policy materials, insurance binders, fee schedules, commission schedules, payments from clients, brokers and insurers, claims, responses to claims, and coverage letters.

Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and class members and assuring Insurer Defendants of the placement of insurance and enabling Broker Defendants to collect undisclosed fees and other remuneration.

These misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

a. the Broker Defendants holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clients;

b. the Broker Defendants' representations that they work for their clients and not the insurance companies;

c. the failure to disclose Defendants' conflicts of interest;

d. the failure to disclose that an integral part of the Broker Defendants' business philosophy is to promote the interest of insurance companies in order to maximize revenue from contingent commission agreements and similar agreements. Therefore, the Broker Defendants steer business to favored insurance companies from whom they receive higher fees;

e. the failure to disclose the nature of the services the Broker Defendants provide in order to warrant their commissions;

f. the failure to disclose that the Broker Defendants are directing their clients to insurance companies based not on their merit, but rather on the web of kickbacks, contingent commissions and other undisclosed compensation they are able to structure; and

10

g.    the contrivance, falsification and/or manipulation of insurance bids to create the illusion of a competitive bidding process.

Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and plaintiffs and class members relied on the misrepresentations and omissions as set forth above.

### CONSPIRACY

Defendants have not undertaken these practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy, as detailed herein in Section 14, which includes not only the defendants and their affiliates but industry trade associations and other entities.

### ENTERPRISE

*See* answer to Section 6

### RICO LIABILITY

Each defendant satisfies the definition of "person" within the meaning of 18 U.S.C. § 1961(c) and each continues to pose a threat to plaintiffs, the class members and others. Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) by committing or aiding and abetting in the commission of at least two acts of racketeering activity (*i.e.*, indictable violations of 18 U.S.C. §§ 1341and 1954) within the past ten years. In fact, each defendant has committed or aided and abetted the commission of thousands of acts of racketeering activity. Defendants have participated in or conducted the affairs of the enterprises, described herein in Section 6, through this pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). Plaintiffs have been injured in their business and property by defendants' RICO violations. Accordingly, plaintiffs and class members are entitled

to recover the damages they have sustained. Plaintiffs and class members are also entitled to declaratory and injunctive relief.

**3.    List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

Additional wrongdoers not named as defendants include Karen Radke, Jean-Baptiste Tateossian, Carlos Coello and James Mohs of AIG; Patricia Abrams of ACE; John Keenan and Edward Coughlin of Zurich American Insurance Company; and Robert Stearns, Joshua Bewlay and Kathryn Winter of Marsh. These ten individuals have pleaded guilty to criminal charges for their involvement in a bid-rigging scheme.

Additional wrongdoers not named as defendants include officers and employees of the named defendants, a well as other insurance brokers and insurance companies not named as defendants who assisted in carrying out the wrongful conduct alleged in the complaint. Other wrongdoers, co-conspirators and aiders and abettors will be identified during the course of discovery.

**4.    List the alleged victims and state how each victim was allegedly injured.**

Plaintiffs and class members are victims of defendants' pattern of racketeering activity, overt acts and fraudulent scheme.

Plaintiffs and class members in the conspiracies, described herein in Section 14, retained the services of the Defendants who sold insurance or provided advice regarding the procurement or renewal of insurance in a continuous and uninterrupted flow of interstate commerce. As a direct and proximate result of the Defendants' scheme, plaintiffs and class members have been, and continue to be injured in their business and property in several respects: (i) plaintiffs and class members have paid excessive premiums for insurance notwithstanding that the Broker Defendants undertook to negotiate on their behalf for the best possible terms, including

premiums, coverage and benefits; (ii) plaintiffs and class members have received insurance that

was inferior to other available polices, which they accepted based on recommendations by

Broker Defendants that were influenced by conflicts of interest; and (iii) plaintiffs and class

members have purchased insurance at higher prices and on terms less favorable than would have

been available in a competitive market.  The Defendants' conduct directly and proximately

causes a loss of business and property resulting in legally cognizable injury to plaintiffs and class

members for which relief is appropriate.

5.    **Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.  A description of the pattern of racketeering shall include the following information:**

      a.    **List the alleged predicate acts and the specific statutes which are allegedly violated;**

Defendants have engaged in numerous predicate acts of mail and wire fraud.  In carrying

out these overt acts and fraudulent schemes described throughout this Amended RICO Case

Statement, defendants have violated federal laws including mail and wire fraud, 18 U.S.C. §§

1341 and 1343.  These predicate acts constitute a pattern of racketeering through which

defendants have violated 18 U.S.C. 1962(c) and (d).

      b./c.    **Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts; If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, provide the "circumstances constituting fraud or mistake [which] shall be stated with particularity."  Fed. R. Civ. P. 9(b). Identify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;**

The participants in the predicate acts include all defendants as well as various other

wrongdoers not named as defendants, as set forth in Section 2.

The facts and circumstances surrounding the predicate acts evidence a fraudulent scheme

constituting a pattern of racketeering.  The object of the fraudulent scheme has been to and is to

13

increase the insurers' premium revenues by the Broker Defendants steering clients to the insurers in return for kickbacks which increase the Broker Defendants' revenues beyond what clients would otherwise be willing to pay for such services. Therefore, the kickbacks were undisclosed by the defendants and were passed on to plaintiffs and class members without the latters knowledge.

**Mail and Wire Fraud:**

Defendants have violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by sending materials by the postal service, by commercial interstate carrier, by wire or other interstate electronic media for the purpose of executing or attempting to executed a scheme to defraud or obtain money by false pretenses, representations or promises.

Defendants misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and class members and assuring Insurer Defendants of the placement of business and enabling the Broker Defendants to collect undisclosed commissions and fees.

These misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

a.   the Broker Defendants holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clients;

b.   the Broker Defendants' representations that they work for their clients and not the insurance companies.;

c.   the failure to disclose Defendants' conflicts of interest;

d.   the failure to disclose that an integral part of the Broker Defendants' business philosophy is to promote the interest of insurance companies in order to maximize revenue from Contingent Commission Agreements. Therefore, the Broker Defendants steer business to favored insurance companies from whom they receive higher fees;

14

e.  the failure to disclose the nature of the services the Broker Defendants provide in order to warrant their commissions;

f.  the failure to disclose that the Broker Defendants are directing their clients to insurance companies based not on their merit, but rather on the web of kickbacks, contingent commissions and other undisclosed compensation they are able to structure; and

g.  contrivance, falsification and/or manipulation of insurance bids to create the illusion of a competitive bidding process.

In order to carry out or attempt to carry out the above described schemes to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to contingent commission agreements, correspondence, policy materials, insurance binders, fee schedules, commission schedules, payments from clients, brokers and insurers, claims, responses to claims, and coverage letters.

In order to carry out or attempt to carry out the above described schemes to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including but not limited to contingent commissions agreements, correspondence, policy materials, insurance binders, fee schedules, commission schedules, payments from clients, brokers and insurers, claims, responses to claims, and coverage letters.

The matters and things sent by Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

15

a.     materials containing false and fraudulent misrepresentations that the Broker Defendants would represent their clients' interests in the placement of insurance on behalf of plaintiffs;

b.     materials that concealed or failed to disclose the existence and effect of the contingent commissions, wholesale payments and other undisclosed compensation, including the conflict of interests that defendants had created between their legal and contractual obligations to their clients and the economic disincentives to honor those obligations;

c.     materials intended to induce clients to accept more expensive and lesser coverage from the Insurer Defendants than might be otherwise available in order to maximize premium revenue and to maximize contingent commissions, wholesale payments and/or other undisclosed compensation to the Broker Defendants;

d.     materials intended to discourage clients from the aggressive pursuit of claims;

e.     materials designed to encourage acceptance of new coverage or renewal of existing coverage;

f.     materials designed to create the appearance of an active, open and free market for primary coverage and reinsurance; and

g.     invoices and payments related to the Defendants' improper scheme.

Other matter and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by defendants include information or communications in furtherance of or necessary to effectuate the schemes.

**Examples of Predicate Acts**

The alleged predicate acts occur on a regular and on-going basis. The following are some examples of predicate acts. Specific details regarding more precise dates, times, places and identities of other parties participating in many of the predicate acts will be provided after further investigation and discovery.

**Examples of Predicate Acts by the Broker Defendants**

16

Throughout the Class Period, the Broker Defendants regularly disseminated by mail and wire information containing materially false and misleading representations and omissions regarding the nature of the services that they offer and the manner in which they are compensated for their services. In these materials, the Broker Defendants have repeatedly represented that they will act in the best interests of their clients and their employees in providing unbiased advice and assistance in the selection of insurance products and services relating thereto, including claims administration. These materials represent that the Broker Defendants will provide expert brokering advice and will act as fiduciaries of their clients and their employees in placing insurance on the best terms possible and at the best price available. The Broker Defendants have also represented that they will fully disclose the manner in which they are compensated for their services. Such representations are materially false and misleading because they fail to disclose the clear conflict of interest created as a result of the improper contingent compensation agreements the Broker Defendants have entered into with the Insurer Defendants and that they have conspired with the Insurer Defendants for the purposes of eliminating competition and increasing their profits and revenues by raising or maintaining premiums charged to (or by reducing the benefits or coverage received by) plaintiffs and members of the class.

**Marsh**

In a document created to assist employees in responding to client questions, Marsh has written: "Our guiding principle is to consider our client's best interest in all placements. We are our clients' advocates and we represent them in negotiations. We don't represent the [insurance companies]." This purported "guiding principle" figures prominently in Marsh's marketing materials. (Complaint in *People of State of N.Y. v. Marsh & McLennan Cos., Inc.*, ¶¶ 19, 22, 24 (N.Y. Cty. Supreme Court).

Marsh also posted a website (<http://www.msa.marsh.com>) to describe its contingent commission agreements (reffered to as MSAs) that was itself materially false and misleading. The website asserted that MSA's compensate Marsh for services provided to insurers, allegedly including "streamlined access to clients," "intellectual capital," "product development," "development and provision of technology" and "administrative and information services." All of these "services," however, are services Marsh is already fiduciarily obligated to provide to clients.

The foregoing statements and other statements issued by Marsh were materially false and misleading, as they failed to disclose that the true purpose of Marsh's contingent commission agreements was to steer clients to those insurers who paid Marsh the most money and filed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**Aon**

Aon's has stated on its website: "one of our core values is always maintaining a client focus . . . By truly listening to our clients and working with them as a partner, we can best develop solutions that work seamlessly with their business." Further, Aon's publicly disseminated Code of Ethics states: "Satisfied clients are the key to Aon's success. Earn our clients' continued loyalty every day by treating them fairly, delivering the products and services they want and exceeding their expectations."

As late as September 2004, Aon's website stated that it "believes a foundation of trust between broker and client must be supported by disclosure and transparency. Disclosure of agreements and relationships with insurers is an important part of this relationship." Http://www.aon.com/about/csu/csu_faq.jsp. However, Aon consistently misled its clients about

18

the true nature of its compensation agreements and in many cases provided no disclosure whatsoever to its clients about the role incentives played in its placement decisions.

The foregoing statements and other statements issued by Aon were materially false and misleading, as they failed to disclose that the true purpose of Aon's contingent commission agreements was to steer clients to those insurers who paid Aon the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**Willis**

Willis has included on its website (http://www.willis.com) a client bill of rights, which misleadingly stated: "Willis represents the *client's best interests* through our client advocacy model. Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs. Willis' customized recommendations and solutions will be driven by what is in the client's best interests. This is the centerpiece of the value Willis provides its clients."

**Gallagher**

Gallagher has included on its website a document entitled "Client Commitment," which misleadingly states: "*We always recommend that which is in the client's best interest, even if it diminishes our revenues.*" [Emphasis added.]

The foregoing statements and other statements issued by Gallagher were materially false and misleading, as they failed to disclose that the true purpose of Gallagher's contingent commission agreements was to steer clients to those insurers who paid Gallagher the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**Acordia/Wells Fargo**

Acordia has included on its website (http://www.acordia.com) a description of Acordia's promise to provide open and its honest advice to its clients:

> Acordia's Commitment:
>
> Acordia's core values center around ***doing what is ethical and what is right for the*** customer***. If it is right for the customer it is right for Acordia.*** We are leaders during periods of change. We maintain the highest standards with our customers and believe in taking the steps to follow these values:
>
> 1. ***Value and reward open, honest, and two-way communication.***
>
> 2. Be accountable for and proud of your conduct and decisions.
>
> 3. ***Do what's right for the customer.***
>
> 4. Talk and act with the customer in mind.
>
> 5. Exceed the expectations of customers.

*Id.* [Emphasis added]. Acordia has also stated on its website that it will "[m]ak[e] insurance placements in the best interest of our customers."

Acordia's website has also included a description of its contingent commission agreements with insurers that are materially false and misleading. The website states that Acordia "[p]roved[es] our customers with full disclosure on the revenue, including contingent commissions we earn at the beginning of our relationship and at the time of policy renewal."

The foregoing statements and other statements issued by Acordia were materially false and misleading, as they failed to disclose that the true purpose of Acordia's contingent commission agreements was to steer clients to those insurers who paid Acordia the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**Brown & Brown**

Brown & Brown has described itself on its website (http://www.bbinsurance.com) as "an independent insurance intermediary organization that provides a variety of insurance products and services to corporate, institutional, professional and individual clients." Brown & Brown has represented that its services include "the efficient management of risk and its related costs, meeting the business insurance needs of companies ranging from small retail establishments to multinational corporations."

The foregoing statements and other statements issued by Brown & Brown were materially false and misleading, as they failed to disclose that the true purpose of Brown & Brown's contingent commission agreements was to steer clients to those insurers who paid Brown & Brown the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**HUB**

HUB has stated on its website (http://www.hubinternational.com):

> Our Commitment
>
> Hub International is dedicated to maintaining and upholding the highest standards of ethical conduct and integrity in all of our dealings with you, our client. We want to be your trusted risk advisor, and as such, we need to earn your confidence. So we are making a promise.

Additionally, with respect to the receipt of contingent commissions, HUB's website states: "We are open and honest as to how we are paid for placing your insurance." *Id.*

The foregoing statements and other statements issued by HUB were materially false and misleading, as they failed to disclose that the true purpose of HUB's contingent commission agreements was to steer clients to those insurers who paid HUB the most money and failed to

21

disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**USI**

USI has represented on its website (www.usi.biz) that "USI clients enjoy convenient access to a broad spectrum of flexible, cost-effective products and strategically enhanced services for insurance, risk management, financial management, employee benefits and asset management programs tailored to their unique needs."

The foregoing statement and other statements issued by USI were materially false and misleading, as they failed to disclose that the true purpose of USI contingent commission agreements was to steer clients to those insurers who paid USI the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**HRH**

HRH has stated on its website (http://www.hrh.com):

> At HRH, we provide customized and innovative insurance and risk management solutions for businesses, associates and individuals. We offer our clients specialist knowledge in a wide range of industries and products, competitive pricing, unparalleled service, and access to the best carriers in the industry.

The foregoing statements and other statements issued by HRH were materially false and misleading, as they failed to disclose that the true purpose of HRH's contingent commission agreements was to steer clients to those insurers who paid HRH the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**BB&T**

22

BB&T has stated on its website (http://www.bbandt.com) that its mission is "Helping our Clients achieve economic success and financial security" and its purpose is "providing excellent service to our clients, as our Clients are our source of revenues."

BB&T's website also inadequately disclosed that the purpose of its contingent commission agreements was to steer clients to those insurers who paid BB&T the highest contingent commissions. BB&T's website states:

> Contingent Commissions (sometimes referred to as "profit-sharing") which can be based on profitability, premium volume, and/or growth.

The foregoing statements and other statements issued by BB&T were materially false and misleading, as they failed to disclose that the true purpose of BB&T's contingent commission agreements was to steer clients to those insurers who paid BB&T the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

## Examples of Predicate Acts Directed to Plaintiffs

On or about September 26, 2000 Marsh USA Inc. sent OptiCare Health Systems, Inc. ("OptiCare") a letter confirming OptiCare's intention to retain Marsh as its insurance broker pursuant to a Client Service Agreement. The letter failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the letter failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The letter also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the letter failed to disclose that Marsh engaged in an elaborate bid-rigging scheme

23

with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about September 26, 2001 Marsh USA Inc. sent OptiCare a letter confirming OptiCare's intention to retain Marsh as its insurance broker pursuant to a Client Service Agreement. The letter failed to adequately disclose the compensation agreements that Marsh had with various insurers Insurer Defendants for the payment of contingent commissions. Moreover, the letter failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The letter also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the letter failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about November 15, 2002 Marsh USA Inc. sent OptiCare a letter a letter confirming OptiCare's intention to retain Marsh as its insurance broker pursuant to a Client Service Agreement. The letter provided, among other things, that Marsh would "identify and negotiate on the Client's behalf with insurers." The letter failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the letter failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The letter also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the letter failed to disclose that Marsh engaged in an elaborate bid-rigging scheme

with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about November 20, 2003 Marsh USA Inc. sent OptiCare a letter confirming OptiCare's intention to retain Marsh as its insurance broker and enclosing the Client Service Agreement. The Client Service Agreement provided, among other things, that Marsh would "identify and negotiate on the Client's behalf with insurers" and "[u]se its best efforts to place insurance on behalf of the client." The Agreement failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the Agreement failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The Agreement also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the Agreement failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about December 31, 2003, Marsh USA, Inc. sent Clear Lam Packaging, Mr. Thomas Wedoff, Vice President of Finance, a remittance statement for consulting fees for placing general liability insurance totaling $8,750.00. The remittance statement failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the remittance statement failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The remittance statement also failed to disclose that Marsh was steering

25

customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the remittance statement failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about December 31, 2002, Marsh USA, Inc. sent Clear Lam Packaging, Mr. Thomas Wedoff, Vice President of Finance, a remittance statement for consulting fees for placing general liability insurance totaling $8,750.00. The remittance statement failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the remittance statement failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The remittance statement also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the remittance statement failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about March 30, 2003, Marsh USA, Inc. sent Clear Lam Packaging, Mr. Thomas Wedoff, Vice President of Finance, a remittance statement for consulting fees for placing general liability insurance totaling $8,750.00. The remittance statement failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the remittance statement failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The remittance

statement also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the remittance statement failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about June 30, 2003, Marsh USA, Inc. sent Clear Lam Packaging, Mr. Thomas Wedoff, Vice President of Finance, a remittance statement for consulting fees for placing general liability insurance totaling $8,750.00. The remittance statement failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the remittance statement failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The remittance statement also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the remittance statement failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about September 30, 2003, Marsh USA, Inc. sent Clear Lam Packaging, Mr. Thomas Wedoff, Vice President of Finance, a remittance statement for consulting fees for placing general liability insurance totaling $8,750.00. The remittance statement failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the remittance statement failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The remittance statement also failed to disclose that Marsh was steering

27

customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the remittance statement failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about March 30, 2004, Marsh USA, Inc. sent Clear Lam Packaging, Mr. Thomas Wedoff, Vice President of Finance, a remittance statement for consulting fees for placing general liability insurance totaling $8,750.00. The remittance statement failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, the remittance statement failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have in advising its clients and constitutes a breach of Marsh's fiduciary duties. The remittance statement also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, the remittance statement failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

Marsh (Marsh Risk & Insurance Services, a division of Marsh and its predecessor J&H Marsh & McLennan) has sent annually to the Golden Gate Bridge District ("District") summaries of insurance. These were typically directed to Joseph Wise, its current Auditor-Controller, or his predecessors, such as John Quigley. These include general summaries, such as those transmitted in September of 1994, September of 1995, October of 1996, September of 1997, July of 1998, October of 1999, October of 2000, March of 2002 and undated summaries for 2003-04 and 2004-05. Marsh also transmitted to the District policies (with summaries) relating to individual lines of insurance, such as a November 30, 2000 communication

28

concerning the District's Umbrella/Excess Liability Program for 2000-01 and information on the District's Property Insurance Policies transmitted in April of 1998.

These transmittals failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, these transmittals failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have had in advising its clients and constitute a breach of Marsh's fiduciary duties. These transmittals also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions. Furthermore, these transmittals failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

Marsh (Marsh Global Broking, Marsh USA Inc.) has sent to Sunburst Hospitality Corp. ("Sunburst") various summaries and other descriptions of insurance. These were typically directed to Chuck Warczak, its Chief Financial Officer and/or Candi Tamar, its Manager of Risk Management. These include coverage and executive summaries, such as those transmitted in December 18, 2001, an undated presentation and insurance summary from 2001, a Client Service Agreement dated November 19, 2002, and remittance statements and invoices dated January 13 and 22, and March 28, 2003. During this same time period, Marsh also transmitted to Sunburst policies (with summaries) relating to various lines of insurance.

These transmittals failed to adequately disclose the compensation agreements that Marsh had with various Insurer Defendants for the payment of contingent commissions. Moreover, these transmittals failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have had in advising its clients and constitute a breach of

29

Marsh's fiduciary duties.  These transmittals also failed to disclose that Marsh was steering customers to Insurer Defendants who have agreed to pay contingent commissions.  Furthermore, these transmittals failed to disclose that Marsh engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

On or about December 30, 2002 Arthur J. Gallagher Risk Management Services, Inc. ("Gallagher") sent Clear Lam Packaging a Fee Agreement confirming Clear Lam Packaging's intention to retain Gallagher as its insurance broker.  The Fee Agreement provided among other things, that Gallagher would "use its best efforts to secure insurance for the proper administration of Client's business."  The Fee Agreement failed to adequately disclose the compensation agreements that Gallagher had with the Insurer Defendants for the payment of contingent commissions.  Moreover, the Agreement failed to disclose that the undisclosed compensation agreements destroy any objectivity that Gallagher has in advising its clients and constitutes a breach of Gallagher's fiduciary duties.  The Fee Agreement also failed to disclose that Gallagher was steering customers to Insurer Defendants who have agreed to pay contingent commissions.  Furthermore, the Fee Agreement failed to disclose that Gallagher engaged in an elaborate bid-rigging scheme with the insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

The predicate acts occur on a regular and on-going basis.  Specific details regarding more precise dates, times, places and identities of other parties participating many of the predicate acts will be provided after further investigation and discovery.

        d.      **State whether there has been a criminal conviction in regard to the predicate acts;**

To date, there have been ten criminal convictions in connection with the allegations in the complaints in the following proceedings:

a. *People v. Patricia Abrams* (N.Y. County Supreme Court) (felony complaint against former ACE executive resulting in guilty plea entered on or about October 14, 2004);

b. *People v. Karen Radke* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about October 14, 2004);

c. *People v. Jean-Baptiste Tateossian* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about October 14, 2004);

d. *People v. John Keenan* (N.Y. County Supreme Court) (felony complaint against former Zurich American Insurance Company executive resulting in guilty plea entered on or about November 16, 2004);

e. *People v. Edward Coughlin* (N.Y. County Supreme Court) (felony complaint against former Zurich American Insurance Company executive resulting in guilty plea entered on or about November 16, 2004);

f. *People v. Robert Stearns* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about January 4, 2005);

g. *People v. Carlos Coello* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about January 19, 2005);

h. *People v. John Mohs* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about January 25, 2005);

i. *People v. Joshua M. Bewlay* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about February 14, 2005); and

j. *People v. Kathryn Winter* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about February 18, 2005).

**e.     State whether civil litigation has resulted in a judgment in regard to the predicate acts;**

There have been settlements by state authorities with some of the defendants that have resulted in consent decrees but no judgments have been entered.

      **f.    Describe how the predicate acts form a "pattern of racketeering activity"; and**

Defendants' predicate acts form a "pattern of racketeering activity" of at least two acts of racketeering activity within the past ten years. Each predicate act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including plaintiffs and members of the class. The predicate acts of racketeering activity were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

      **g.    State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail.**

The predicate acts of mail fraud and wire fraud were part of a common plan to increase the Insurer Defendants' revenues by directing clients to the insurers and to increase the Broker Defendants' revenues beyond what clients would willingly pay for such services and to allow increased revenues without clients learning fully of the detriment to their interests.

In the conspiracies, defined herein in Section 14, the predicate acts evidence a recurring and systematic means by which the Defendants have induced plaintiffs and class members to pay excessive premiums for insurance, excessive fees for services, to receive insurance that was inferior to other available policies, and to purchase insurance at higher prices and on terms less favorable than would have been available in a competitive market.

**6.    State whether the existence of an "enterprise" is alleged within the meaning of 18 U.S.C. § 1961(4). If so, for each such enterprise, provide the following information:**

      **a.    State the names of the individuals, partnerships, corporations, associations or other legal entities, which allegedly constitute the enterprise.**

**Commercial Insurance Enterprise**

The following groups of persons constitute a group of persons associated in fact, referred to herein as the "Commercial Insurance Enterprise" ("CI Enterprise"): (1) defendants; (2) wholesale entities, whether affiliated with Defendants or not, which receive wholesale payments and transmit those payments in whole or in part to defendants; (3) other insurers that pay contingent commissions, wholesale payments and other kickbacks; (4) other brokers, intermediaries, agents and other insurance entities that receive or have received undisclosed compensation; (5) other entities that engage or have engaged in steering practices and/or bid-rigging; and (6) other insurance brokerage and insurance industry groups, such as the Council of Insurance Agents & Brokers and Reinsurance Association of America.

The Commercial Insurance Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

**The Broker-Centered Commercial Insurance Enterprise**

Alternatively, each Broker Defendant and the insurers with which each had contingent commission agreements constitute a group of persons and entities associated in fact, referred to collectively as the "Broker-Centered Commercial Insurance Enterprises." At a minimum, six such enterprises exist:

    a.    Marsh and the insurers, including the Insurer Defendants, with which Marsh has contingent commission agreements;

    b.    Aon and the insurers, including the Insurer Defendants, with which Aon had contingent commission agreements;

    c.    Willis and the insurers, including the Insurer Defendants, with which Willis had contingent commission agreements;

    d.    Gallagher and the insurers, including the Insurer Defendants, with which Gallagher had contingent commission agreements;

33

e.   Wells Fargo and the insurers, including the Insurer Defendants, with
     which Wells Fargo had contingent commission agreements

f.   USI and the insurers, including the Insurer Defendants, with which USI
     had contingent commission agreements.

**b.   Describe the structure, purpose, function and course of conduct of the
       enterprise;**

**The Commercial Insurance Enterprise**

Through the Commercial Insurance Enterprise, Defendants engage in consensual decision

making regarding the implementation of their fraudulent scheme and function s a continuing unit

for the common purpose of increasing compensation for the Broker Defendants as well as

premium revenues for the Insurer Defendants and to reduce or eliminate compensation for the

insurance coverage business of the members of the class, by, *inter alia*, allocating customers,

dividing territories, bid-rigging and tying.

While Defendants participate in and are members of the Commercial insurance

Enterprise, they also have an existence separate and distinct from the enterprise.

In order to establish and maintain the system of contingent commissions and wholesale

payments, while concealing the system and the inherent conflicts of interest it creates,

Defendants were required to participate in the conduct of and to exercise control over the

Commercial Insurance Enterprise.

Defendants have participated in the conduct of and have controlled and operated the

affairs of the Commercial Insurance Enterprise in at the least the following ways:

a.   by entering into contingent commission agreements and wholesale
     payment agreements with the expectation and understanding that both the
     brokers and insurers would recognize increased profits and that the
     insurers would have insurance business steered to them without having to
     compete for that business;

b.   by developing and competing in artificial competitive bidding process
     designed to create the appearance of competition where none existed;

34

     c.      by sharing and disseminating information;

     d.      by formalizing relationships among participants in the Commercial Insurance Enterprise for the payment of undisclosed compensation;

     e.      by uniformly recommending insurance products of the Insurer Defendants to their clients in order to maximize the value of contingent commissions and wholesale payments;

     f.      by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

     g.      by utilizing and supporting industry associations as vehicles for communication and the exchange and dissemination of information necessary to carry out the contingent commissions scheme;

     h.      by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Commercial Broker Defendants; and

     i.      by engaging in bid-rigging.

The Commercial Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

### The Broker-Centered Commercial Insurance Enterprise

Through each of Broker-Centered Commercial Insurance Enterprises, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

While Defendants participate in and are members of the Broker-Centered Commercial Insurance Enterprises, they also have an existence separate and distinct from the enterprise.

In order to establish and maintain the system of contingent commissions and wholesale payments, while concealing the system and the inherent conflicts of interest it creates,

Defendants were required to participate in the conduct of an to exercise control over the Broker-Centered Commercial Insurance Enterprises.

Defendants have participated in the conduct of and have controlled and operated the affairs of the Broker-Centered Commercial Insurance Enterprises in at the least the following ways:

a. by entering into contingent commission agreements and wholesale payment agreements with the expectation and understanding that both the brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

b. by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

c. by sharing and disseminating information;

d. by formalizing relationships among participants in the Broker-Centered Commercial Insurance Enterprises for the payment of undisclosed compensation;

e. by uniformly recommending insurance products of the Insurer Defendants in order to maximize the value of Contingent Commissions and Wholesale Payments;

f. by sharing management and employees between and among the Broker Defendants and the Insurer Defendants; and

g. by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme.

h. by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Broker Defendants; and

i. by engaging in bid-rigging.

**c.     State whether any defendants are employees, officers or directors of the alleged enterprise;**

Defendants are not employees, officers or directors of the enterprises.

**d.     State whether any defendants are associated with the alleged enterprise;**

Defendants are associated with the enterprises and participate and control the affairs of the enterprises. Defendants' control and participation in the enterprise is necessary for the successful operation of defendants' scheme. While defendants participate in and are members of the enterprises, defendants also have an existence separate and distinct from the enterprises.

e.     **State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and**

Defendants are members of the enterprises but have an existence separate and distinct from the enterprises.

f.     **If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

Defendants are perpetrators of the racketeering activity.

7.     **State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants have engaged.

8.     **Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

The enterprises function by providing insurance consultation, advice and related services as well as insurance products. Many of these services and products are legitimate and non-fraudulent. Normally the activities of the enterprises involve recommendations and the provision of insurance products which best meet the needs of the insured. However, Defendants, through the CI Enterprise and the Broker-Centered Enterprise have engaged in a pattern of racketeering activity which involves a fraudulent scheme to increase premium revenue for the insurers and

commissions and other revenue for the brokers through steering of customers, bid-rigging and

unlawful tying.

9.   **Described what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

By steering customers, engaging in bid-rigging and customer allocation, Broker

Defendants benefit by reaping substantial amounts of additional undisclosed fees.  Insurer

Defendants benefit by placing their products with the Broker Defendants' clients at above-

market rates, without having to face competition and with the guarantee of the renewal of

business.

10.  **Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

The activities of the enterprises are national in scope.  The enterprises have a substantial

impact upon the economy and upon interstate commerce.  The enterprises were carried out

through mail, wire and other facilities of interstate commerce.

11.  **If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

Plaintiffs do not allege a violation of 18 U.S.C. § 1962(a).

a.   **State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

Not applicable.

b.   **Describe the use or investment of such income.**

Not applicable.

12.  **If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Plaintiffs do not allege a violation of 18 U.S.C. § 1962(b).

13.  **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

a.      **State who is employed by or associated with the enterprise; and**

See response to Section 6(a) above.

b.      **State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

The same entity is not both the liable person and the enterprise under § 1962(c).

c.      **Describe specifically how the defendant(s) participated in the operation or management of the enterprise.**

Defendants have participated in the operation or management of the enterprise as follows:

a.      by entering into contingent commission agreements and wholesale payment arrangements with the expectation and understanding that both brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

b.      by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

c.      by sharing and disseminating information;

d.      by formalizing relationships among participants in the enterprises for the payment of undisclosed compensation;

e.      by utilizing and supporting industry associations, such as the Council of Insurance Agents & Brokers, as vehicles for communication and the exchange and dissemination of information necessary to carry out the contingent commissions scheme;

f.      by uniformly recommending insurance products of the Insurer Defendants to clients in order to maximize the value of contingent commissions;

g.      by steering customers to the Insurer Defendants who have agreed to pay contingent commissions;

h.      by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Broker Defendants; and

i.      by engaging in bid-rigging.

14.     **If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

Plaintiffs hereby offer the following descriptions of the alleged conspiracies.

**The Commercial Insurance Conspiracy**

Defendant Brokers and Insurers have engaged in a common course of conduct and conspiracy which creates a conflict of interest clearly at odds with the Defendants' representations regarding the services they will provide as well as the duties inherent in the relationship which exists between Class Members and Defendants

Although Defendants have created the illusion of a competitive market for insurance, the selection, pricing and placement of the insurance products at issue in this litigation were, in fact, the result of Defendants' collusion.

The common scheme and conspiracy involves all of the Broker Defendants and the Insurer Defendants as well as other brokers and insurers who have undertaken the wrongful conduct set forth herein as well as other entities which have facilitated the conspiracy.

The purpose and effect of the conspiracy is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying. As a result of the conspiracy, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy. The Broker Defendants, in turn, profited from the conspiracy through the receipt of Contingent Commissions and wholesale payments.

The actions of the Defendants were all part of the same conspiracy to increase revenues and to suppress or eliminate competition. Each Defendant was aware of the general nature of

40

this scheme and its role in facilitating the objectives of the conspiracy.  Each enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of Plaintiffs and the other Class.

Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

Each Defendant and member of the conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

In furtherance of the conspiracy, Defendants and other members of the conspiracy have agreed to implement and use the same or similar devices and fraudulent tactics against their clients, including Plaintiffs and other members of the Class.

Numerous instances of common conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among all Defendants and other members of the conspiracy, including:

a.   similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealing of their conflicts of interest and wrongful conduct;

b.   similar agreements between the Broker Defendants and their clients which include either no language or vague, misleading, and incomplete language purporting to disclose compensation, steering and bid-rigging arrangements between and among the Broker Defendants and the Insurer Defendants;

c.   similar agreements regarding contingent commissions and other payments between and among Broker Defendants and Insurer Defendants;

d.   similar practices regarding the reporting of their arrangements;

e.   similar agreements regarding wholesale payments between and among Defendants; and

f.   similar tactics for steering customers to the Insurer Defendants and for the placement of the Insurer Defendants' products.

Defendants would not have undertaken the practices alleged herein absent an agreement among all Defendants. Paying brokers significant additional commission and fees is not in the best individual interest of the Insurer Defendants. The Insurer Defendants would agree to pay such fees only with a corresponding agreement of increased premium revenue and the participation of other insurers.

The conspiracy has been conducted, implemented and facilitated through various mechanisms including direct communications among Defendants, sharing of information between Defendants and movement of employees among Defendants as well as through other means such as industry trade groups such as the Council of Insurance Agents and Brokers ("the Council") and its predecessors the National Association of Insurance Brokers ("NAIB"), the National Association of Casualty and Surety Executives (NASCE) and the National Association of Casualty and Surety Agents ("NASCA") as well as the American Insurance Association ("AIA") and the Reinsurance Association of America ("RAA").

The Council, founded in 1913 to represent larger metropolitan agencies, represents the top tier of commercial insurance brokers in the United States in both property/casualty and the benefits sectors.

The Council's roots have always been in larger commercial agents and brokers. In fact, only the top one percent of all agents and brokers qualify for membership. The Council's members place 80 percent – well over $90 billion – of all U.S. insurance products and services protecting business, industry, government and the public-at-large and they administer billion of dollars in employee benefits.

Professional networking is at the very heart of The Council and is a major part of who The Council is and what it does. The Council orchestrates the industry's most important market

meetings – the number one expectation of members. The Council's meetings "change the shape and scope and add to the bottom line of already successful brokerage firms."

The Council of Insurance Company Executives, a standing committee of The Council, is comprised of more than 65 of the top commercial insurers. Collectively, CICE members are responsible for writing more than three-quarters of the nation's commercial business insurance premiums. The CICE was formed when the Council assumed "the managerial operations of its insurance association counterpart" – the National Association of Casualty & Surety Executives. Prior to this time, the National Association of Casualty & Surety Executives and the Council (previously the National Association of Casualty & Surety Agents) had met annually and had worked cooperatively in addressing common problems.

The Council of Insurance Company Executives co-hosts the annual Insurance Leadership Forum at the Greenbrier, an annual meeting that connects all the leaders of the commercial insurance marketplace – the CEO's of the top insurance carriers and the leading executives from the top one percent of agencies and brokerages. Considered the premier meeting of the commercial insurance marketplace, the event brings together all sectors of the market including primary carriers, reinsurers, top intermediaries and third party firms. For high-volume commercial insurance brokerages and for every major carrier, there simply is no better place to take the pulse of the commercial insurance market-place – and build important business bonds – than "The Greenbrier."

Attendees include executives from the brokerage firms and virtually every leading commercial insurer and reinsurer. The Council boasts that this is the best opportunity in the industry for insurers, agents and brokers to meet and focus on where the industry is and where it's heading.

The meetings allow for small breakout conferences, ad hoc meetings and social interaction among all those attending. According to Council materials, Council members do more business at The Greenbrier meeting than at any other five-day stretch of the year. Any industry leader truly concerned with the workings of the industry's production sector, with profitability, and with client service must attend.

Attendees are able to hold discussions and meetings that they would not otherwise have the ability to do. The bottom line is that Council members go to The Greenbrier to have strategic conversations with insurers.

In addition to the industry meetings at The Greenbrier, The Council also facilitates many other forums including the National Insurance Leadership Symposium, chief financial officer workshops and conferences where CFO's of the major brokerage firms focus on the fundamental and strategic issues facing their businesses, Executive Liaison Committees, email exchanges, market surveys, the sharing of operating results and financial analyses, insurance company sponsorships, peer-to-peer networking, as well as teleconferences between brokers and insurers.

The Council operates in a strategic alliance with the American Insurance Association ("AIA") and the Reinsurance Association of America. ("RAA"). Together, these three associations lead the commercial insurance marketplace.

The American Insurance Association is the leading property-casualty insurance trade organization in the United States. The Reinsurance Association of America is the trade association of reinsurers and reinsurance brokers.

AIA and RAA have both acted as host sponsors for the Greenbrier conferences and have been members of the Council's Leadership Circle, recognized industry leaders that underwrite

44

the Council's networking and professional development initiatives. The Council, AIA and RAA also co-sponsor The National Insurance Leadership Symposium.

As a result of the conspiracy, defendants' clients and policyholders, including plaintiffs and class members, made increased payments for insurance and other "services" beyond what they would have otherwise had the significant undisclosed compensation not been embedded into the rate charged for the products. In addition, plaintiffs and class members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

### The Broker-Centered Commercial Insurance Conspiracy

In the alternative, the Broker Defendants and the Insurer Defendants are engaged in a number of separate but parallel conspiracies, each involving a Defendant Broker and the insurance companies with which each had contingent commission agreements.

At a minimum, six broker-centered conspiracies exist, including the following:

a.  A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which Marsh had contingent commission agreements;

b.  An Aon-centered conspiracy consisting of Aon and the insurance companies with which Aon had contingent commission agreements;

c.  A Willis-centered conspiracy consisting of Willis and the insurance companies with which Willis had contingent commission agreements;

d.  A Gallagher-centered conspiracy consisting of Gallagher and the insurance companies with which Gallagher had contingent commission agreements;

e.  A Wells Fargo-centered conspiracy consisting of Wells Fargo and the insurance companies with which Wells Fargo had contingent commission agreements;

The purpose and effect of each of these conspiracies is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the Class by, *inter*

*alia*, allocating customers, dividing territories, bid-rigging and tying. As a result of the conspiracies, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms, and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy.

Each Defendant and member of each such conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

Each Defendant and member of each such conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

As a result of Defendants' conspiracy, Plaintiffs and other members of the Class have made payments for insurance and other "services" beyond what those payments would have been absent each such conspiracy. In addition, plaintiffs and other Class members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

**15.    Describe the alleged injury to business or property.**

Plaintiffs and class members in the Commercial Insurance Conspiracy and the Broker-Defendant Centered Commercial Insurance Conspiracy have been injured in their business or property by (i) paying excessive premiums for insurance notwithstanding that the Broker Defendants undertook to negotiate on their behalf for the best possible terms, (ii) receiving insurance that was inferior to other available policies, which they accepted based on recommendations by the Broker Defendants that were influenced by conflicts of interest; and (iii) purchasing insurance at higher prices and on terms less favorable than would have been otherwise available in a competitive market.

**16.    Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

The predicate acts with respect to the enterprises caused the cost of insurance obtained by the plaintiffs and class members to increase, thereby injuring them in their business and property.

**17.    List the damages sustained by reason of the violation of § 1962, indicating the amount for which each defendant is allegedly liable.**

Plaintiffs and class members seek compensatory damages for the losses they have sustained as a result of defendants' scheme, for three times their actual damages. Plaintiffs and class members also seek declaratory and injunctive relief.

**18.    List all other Federal causes of action, if any, and provide the relevant statute numbers.**

The following additional Federal claim has been alleged in the actions currently pending before the Court: Sherman Act, 15 U.S.C. § 1.

**19.    List all pendent state claims, if any.**

The pendent state claims include claims for unjust enrichment and breach of fiduciary duty. Additionally, defendants are alleged to have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

State Antitrust Laws

Alaska Sta. §§45.50.462 *et seq.*

Arizona Revised Stat. §§44-1401 *et seq.*

Arkansas Stat. Ann. §44-75-309 *et seq.*, §§4-75-201 *et seq.*

Cal. Bus. Prof. Code §§16700 *et seq.*, §§17000 *et seq.*

Colorado Rev. Stat. §§6-4-101 *et seq.*

Connecticut Gen. Stat. §§35-26 *et seq.*

D.C. Code Ann. §§28-4503 *et seq.*

Delaware Code Ann. Tit. 6, §§2103 *et seq.*

Florida Stat. §§501-201 *et seq.*

Georgia Code Ann. §§16-10-22 *et seq*, §§ 13-8-2 *et seq.*

Hawaii Rev. Stat. §§480-1 *et seq.*

Idaho Code §§48-101 *et seq.*

740 Illinois Comp. Stat. §§10/1 *et seq.*

Indiana Code Ann. §§24-1-2-1 *et seq.*

Iowa Code §§553.1 *et seq.*

Kansas Stat. Ann. §§50-101 *et seq.*

Kentucky Rev. Stat. §§367.175 *et seq.*, §446.070

Louisiana Rev. Stat. §§55:137 *et seq.*

Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

Maryland Code Ann. Title 11, §§11-201 *et seq.*

Massachusetts Ann. Laws ch. 92 §§1 *et seq.*

Michigan Comp. Laws. Ann. §§445.773 *et seq.*

Minnesota Stat. §§325D.52 *et seq.*

Mississippi Code Ann. §§75-21-1 *et seq.*

Missouri Stat. Ann. §§416.011 *et seq.*

Montana Code Ann. §§30-14-101 *et seq.*

Nebraska Rev. Stat. §§59-801 *et seq.*

Nev. Rev. Stat. Ann. §§598A *et seq.*

New Hampshire Rev. Stat. Ann. §§356:1 *et seq.*

New Jersey Stat. Ann. §§56:9-1 *et seq.*

New Mexico Stat. Ann. §§57-1-1 *et seq.*

N.Y. Gen. Bus. Law §§340 *et seq.*

North Carolina Gen. Stat. §§75-1 *et seq.*

North Dakota Cent. Code §§51-08.1-01 *et seq.*

Ohio Rev. Code §§1331.01 *et seq.*

Oklahoma Stat. tit. 79 §§203(A) *et seq.*

Oregon Rev. Stat. §§646.705 *et seq.*

Rhode Island Gen. Laws §§6-36-1 *et seq.*

South Carolina Code §§39-1-10 *et seq.*

South Dakota Codified Laws Ann. §§37-1 *et seq.*

Tennessee Code Ann. §§47-25-101 *et seq.*

Texas Bus. & Com. Code §§15.01 *et seq.*

Utah Code Ann. §§76-10-911 *et seq.*

Vermont Stat. Ann. 9 §§2453 *et seq.*

Virginia Code §§59-1-9.2 *et seq.*

Washington Rev. Code §§19.86.010 *et seq.*

West Virginia §§47-18-1 *et seq.*

Wisconsin Stat. §§133.01 *et seq.*

Wyoming Stat. §§40-4-101 *et seq.*

**20.    Provide any additional information that you feel would be helpful to the Court in processing your RICO claim.**

Although plaintiffs are already in possession of substantial information supporting their claims, they believe that a significant volume of additional relevant evidence supporting their claims will be included in the discovery defendants are scheduled to begin producing forthwith. Therefore, plaintiffs reserve the right to amend this statement in order to provide the court with

additional information uncovered during discovery that will assist in the processing of the RICO claims asserted in this action.

Dated: August 1, 2005

                                  **MILBERG WEISS BERSHAD**
                                      **& SCHULMAN, LLP**

                                     _____/S/ EDITH M. KALLAS_____
                                      Edith M. Kallas
                                      Joseph P. Guglielmo
                                      J. Douglas Richards
                                      Michael M. Buchman
                                      Elizabeth Rosenberg
                                      Lili R. Sabo
                                      One Pennsylvania Plaza
                                      New York, NY  10119-0165
                                      Tel.:  212-594-5300
                                      Fax:  212-868-1229

                                      *Plaintiffs' Co-Lead Counsel*

                                    **MILLER FAUCHER AND CAFFERTY LLP**

                                      _____/S/ BRYAN C. CLOBES_____
                                      Bryan C. Clobes
                                      Ellen Meriwether
                                      Michael S. Tarringer
                                      Melody Forrester
                                      Timothy Fraser
                                      One Logan Square
                                      18th and Cherry Streets, Suite 1700
                                      Philadelphia, PA  19103
                                      Tel.:  215-864-2800
                                      Fax:  215-864-2810

                                      *Plaintiffs' Co-Lead Counsel*

**LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS, LLP**
John J. Stoia, Jr.
Theodore J. Pintar
Bonny E. Sweeney
James D. McNamara
Mary Lynne Calkins
Rachel L. Jensen
Amelia F. Burroughs
401 B. Street, Suite 1600
San Diego, CA 92101
Tel.: 619-231-1058
Fax: 619-231-7423

**FOOTE, MEYERS, MIELKE & FLOWERS**
Robert M. Foote
416 South Second Street
Geneva, IL 60134
Tel.: 630-232-6333

**LEVIN, FISHBEIN, SEDRAN & BERMAN**
Howard J. Sedran
510 Walnut Street - Suite 500
Philadelphia, PA 19106
Tel.: 215-592-1500
Fax: 215-592-4663

**DRUBNER HARTLEY & O'CONNOR**
James E. Hartley, Jr.
Gary O'Connor
Charles S. Hellman
500 Chase Parkway, 4th Floor
Waterbury, CT 06708
Tel.: 203-753-9291
Fax: 203-753-6373

**FINE KAPLAN & BLACK**
Roberta D. Liebenberg
1845 Walnut Street
Philadelphia, PA 19103
Tel.: 215-567-6566
Fax: 215-568-5872

**THE FURTH FIRM, LLP**
Michael P. Lehman
Thomas P. Dove
Julio J. Ramos
Jon T. King
225 Bush Street, Suite 1500
San Francisco, CA 94104
Tel.: 415-433-2070
Fax: 415-982-2076

**GRAY, WEISS AND WHITE**
Mark K. Gray
1200 PNC Plaza
Louisville, KY 40202
Tel.: 502-585-2060

**HANZMAN & CRIDEN, P.A.**
Michael E. Criden
Kevin B. Love
220 Alhambra Circle, Suite 400
Coral Gables, FL 33134
Tel.: 305-357-9000
Fax: 305-357-9050

**LERACH COUGHLIN STOIA GELLER**
  **RUDMAN & ROBBINS, LLP**
Samuel H. Rudman
200 Broadhollow Road, Suite 406
Melville, NY 11747
Tel.: 631-367-7100
Fax: 631-367-1173

**MEREDITH COHEN GREENFOGEL**
  **& SKIRNICK, P.C.**
Steven J. Greenfogel
Daniel B. Allanoff
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Tel.: 215-564-5182
Fax: 215-569-0958

**WHATLEY DRAKE, LLC**
Joe R. Whatley, Jr.
Charlene Ford
Richard Rouco
Richard Frankowski
2323 Second Avenue North
Birmingham, AL 35203
Tel.: 205-328-9576
Fax: 205-328-9669

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
Mary Jane Edelstein Fait
Adam J. Levitt
656 West Randolph Street
Suite 500 West
Chicago, IL 60661
Tel.: 312-466-9200
Fax: 312-466-9292

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
Fred Taylor Isquith
270 Madison Avenue, 10th Floor
New York, NY 10016
Tel.: 212-545-4600
Fax: 212-545-4653

**ZWERLING, SCHACHTER &**
  **ZWERLING, LLP**
Robert S. Schachter
Stephen L. Brodsky
Justin M. Tarshis
41 Madison Avenue
New York, NY 10010
Tel.: 212-223-3900
Fax: 212-371-5969

**ALEXANDER, HAWES & AUDET, LLP**
William M. Audet
300 Montgomery Street, Ste. 400
San Francisco, CA 94104
Tel.: 415-982-1776

**BEELER, SCHAD & DIAMOND, P.C.**
Lawrence W. Schad
James Shedden
Michael S. Hilicki
Tony H. Kim
332 South Michigan Avenue, Suite 1000
Chicago, IL 60604
Tel.: 312-939-6280
Fax:  312-939-4661

**BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Hurd
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Tel.:  602-274-1100
Fax:  602-274-1199

**CHAVEZ LAW FIRM, P.C.**
Kathleen C. Chavez
P.O. Box 772
Geneva, IL 60134
Tel.:  630-232-4480
Fax:  630-232-8265

**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles
Michael D. Gottsch
361 West Lancaster Avenue
Haverford, PA  19041
Tel.:  610-642-8500
Fax:  610-649-3633

**COHN, LIFLAND, PEARLMAN,
  HERRMANN & KNOPF**
Peter S. Pearlman
Park 80 Plaza West One
Saddle Brook, NJ  07663
Tel.:  201-845-9600
Fax:  201-845-9423

**COOPER & KIRKHAM, P.C.**
Josef D. Cooper
655 Montgomery Street, 17th Floor
San Francisco, CA 94111
Tel.: 415-788-3030
Fax: 415-882-7040

**LARRY D. DRURY, LTD.**
Larry D. Drury
Two North LaSalle Street
Suite 700
Chicago, IL 60602
Tel.: 312-346-7950

**FINKELSTEIN, THOMPSON
  & LOUGHRAN**
Burton H. Finkelstein
L. Kendall Satterfield
Halley F. Ascher
1050 30th Street, N.W.
Washington, D.C. 20007
Tel.: 202-337-8000
Fax: 202-337-8090

**HANSON BRIDGES MARCUS VLAHOS
  RUDY LLP**
David J. Miller
333 Market Street, 23rd Floor
San Francisco, CA 94105
Tel.: 415-777-3200
Fax: 415-541-9366

**JANSSEN, MALLOY, NEEDHAM,
  MORRISON, REINHOLTSEN &
  CROWLEY, LLP**
W. Timothy Needham
730 Fifth Street, Post Office Drawer 1288
Eureka, CA 95502
Tel.: 707-445-2071
Fax: 707-445-8305

**KLAFTER & OLSEN LLP**
Jeffrey A. Klafter, Esq.
1311 Mamaroneck Avenue, Suite 220
White Plains, NY 10602
Tel.: 914-997-5656
Fax: 914-997-2444

**LITE DEPALMA GREENBERG**
  **& RIVAS, LLC**
Allyn Z. Lite
Bruce D. Greenberg
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel.: 973-623-3000
Fax: 973-623-0858

**JEFFREY LOWE, P.C.**
Jeff Lowe
8235 Forsyth Blvd., Ste. 1100
St. Louis, MO 63105
Tel.: 314-721-3668

**MAGER WHITE & GOLDSTEIN, LLP**
Jayne Arnold Goldstein
2825 University Drive, Suite 350
Coral Springs, FL 33065
Tel.: 954-341-0844
Fax: 954-341-0855

**LAW OFFICES OF RANDY R. RENICK**
Randy R. Renick
128 North Fair Oaks Avenue, Ste. 204
Pasadena, CA 91103
Tel.: 626-585-9600

**SAVERI & SAVERI, INC.**
Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
One Eleven Pine, Suite 1700
San Francisco, CA 94111-5619
Tel.: 415-217-6810
Fax: 415-217-6813

**LAW OFFICES OF FRANCIS O. SCARPULLA**
Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Tel.:  415-788-7210
Fax:  415-788-0707

**SPARKMAN-ZUMMACH, P.C.**
Martin W. Zummach
P.O. Box 266
Southaven, MS 38671
Tel.:  662-349-6900
Fax:  662-349-6800

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re INSURANCE BROKERAGE ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) | Civil Nos. 04-5184, 05-5743, 05-1064, 05-1079, 05-1167, 05-1168, 05-1169, 05-1214 (FSH)<br><br>MDL No. 1663<br><br>Hon. Faith S. Hochberg<br><br>JURY TRIAL DEMANDED |

**FIRST CONSOLIDATED AMENDED EMPLOYEE BENEFITS
CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE ...............................................................................7

PARTIES .................................................................................................................8

    A.    THE PLAINTIFFS.................................................................................8

    (1)    Employee Plaintiffs.............................................................................8

    (2)    Employer Plaintiffs ..........................................................................10

    B.    THE DEFENDANTS..........................................................................13

    (1)    Broker Defendants ...........................................................................13

    (2)    Insurer Defendants ...........................................................................20

FACTUAL ALLEGATIONS .................................................................................24

    A.    THE EMPLOYEE BENEFITS INSURANCE BROKERAGE MARKET ..........24

    (1)    Employee Benefit Programs .............................................................24

    (2)    Defendants' Fiduciary Duties and Relationship of Trust and Confidence with Plaintiffs and Class Members ..................................25

    B.    DEFENDANTS' COMPENSATION AGREEMENTS.......................35

    (1)    Contingent Commission Agreements ...............................................35

    (2)    Communication Fees ........................................................................47

    (3)    Broker Bonuses.................................................................................50

    C.    DEFENDANTS CONCEAL THE PAYMENTS FROM PLAINTIFFS AND CLASS MEMBERS .......................................................51

    (1)    Defendants Fail to Disclose Payments in Marketing Materials, Policyholder Agreements and Policyholder Communications .............51

    (2)    Defendants Conceal Payments on Governmental Forms.....................53

Page

D.     BROKER DEFENDANTS STEER BUSINESS TO INSURER DEFENDANTS ...........................................................................59

(1)     Steering ...............................................................................................59

(2)     "Low-Hanging Fruit".............................................................................65

(3)     Defendants' Bid-Rigging Scheme ........................................................66

E.     WHOLESALE PAYMENTS....................................................................73

F.     REINSURANCE.......................................................................................75

G.     INVESTIGATIONS INTO DEFENDANTS' PRACTICES................................77

(1)     Government Investigations into Defendants' Practices.........................77

(2)     Suspensions, Terminations and Resignations of Defendants' Employees ............80

(3)     Defendants Discontinue the Use of Contingent Commission Agreements ..........81

H.     CONSPIRACY ALLEGATIONS ..........................................................82

I.     ENTERPRISE...........................................................................................88

(1)     The Employee Benefits Insurance Enterprise......................................88

(2)     The Broker-centered Employee Benefits Enterprises............................91

J.     RACKETEERING ACTIVITY .................................................................93

(1)     Predicate Acts ......................................................................................93

(2)     Pattern of Racketeering Activity..........................................................98

(3)     RICO Violations ..................................................................................98

K.     EFFECTS OF DEFENDANTS' MISCONDUCT................................................99

L.     THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF.................100

M.     FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ...............101

CLASS ACTION ALLEGATIONS ...........................................................................103

**Page**

    A.      Class Definitions ........................................................................103

    B.      Rule 23(a) .................................................................................106

    C.      Rules 23(b)(1), 23(b)(2) and 23(b)(3) .....................................108

COUNT I ........................................................................................................109

                Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c)  All Plaintiffs Against all Defendants ......................................109

ALTERNATIVE COUNT I ............................................................................109

                Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c) Against All Defendants involved  in Broker-Centered Conspiracies ...............................................................................109

COUNT II .......................................................................................................110

                Violation of 18 U.S.C. §1962(c) All Plaintiffs Against all Defendants .............110

ALTERNATIVE COUNT II ...........................................................................111

                (Violation of 18 U.S.C. §1962(c) Against all Defendants in the Employee Benefits Insurance Broker-Centered Enterprises) ................................111

COUNT III ......................................................................................................112

                Injunctive and Declaratory Relief under RICO by  All Plaintiffs against all Defendants ...................................................................................112

alternative count iii ........................................................................................112

                Injunctive and Declaratory Relief under RICO against Defendants in the Employee Benefits Insurance Broker-Centered Enterprises .............................112

COUNT IV ......................................................................................................113

                Violation of the Sherman Act, 15 U.S.C. Section 1, All Plaintiffs Against All Defendants ..............................................................................113

COUNT V ........................................................................................................115

**Page**

Violation of Section 1 of the Sherman Act, Against Defendant Participants in the ULR-centered Conspiracy ........................................................ 115

COUNT VI ................................................................................................ 118

Violation of Section 1 of the Sherman Act, Against Defendant Participants in the Marsh-centered Conspiracy .................................................... 118

COUNT VII ............................................................................................... 120

Violation of Section 1 of the Sherman Act, Against Defendant Participants in the Aon-centered Conspiracy .................................................... 120

COUNT VIII .............................................................................................. 123

Violation of State Antitrust Laws All Plaintiffs Against All Broker Defendants ................................................................................................ 123

COUNT IX ................................................................................................ 127

Pursuant to ERISA Sections 1109 and 502(a)(2) ERISA Employer Subclass and ERISA Employee Subclass Against Insurer Defendants ............... 127

COUNT X .................................................................................................. 130

Pursuant to ERISA Section 502(a)(3) ERISA Employer Subclass and ERISA Employee Subclass Against Insurer Defendants .................................. 130

COUNT XI ................................................................................................ 130

Violation of State Antitrust Laws Non-ERISA Employee Subclass and Non-ERISA Employer Subclass Against Insurer Defendants ........................... 130

COUNT XII ............................................................................................... 135

Common Law Breach of Fiduciary Duty; All Plaintiffs Against the Broker Defendants ................................................................................................ 135

COUNT XIII .............................................................................................. 138

Aiding and Abetting Breach of Fiduciary Duty Non-ERISA Employee Subclass and Non-ERISA Employer Subclass Against Insurer Defendants ....... 138

COUNT XIV .............................................................................................. 139

|  | **Page** |
|---|---|
| Unjust Enrichment All Plaintiffs Against All Broker Defendants | 139 |
| COUNT XV | 140 |
| Unjust Enrichment Non-ERISA Employer Subclass and Non-ERISA Employee Subclass Against Insurer Defendants | 140 |
| prayer for relief | 142 |
| JURY DEMAND | 146 |

Plaintiffs, by and through their undersigned attorneys, submit the following Consolidated Amended Class Action Complaint (the "Complaint"), upon their own knowledge, or where there is no personal knowledge, upon information and belief.

### NATURE OF THE ACTION

1.      This class action challenges Defendants' anti-competitive scheme and unlawful conspiracy to fraudulently market and sell insurance products and related services to and/or through employee benefit plans.  This nation's largest insurance brokers ("Broker Defendants") and insurance companies ("Insurer Defendants") (collectively "Defendants," described below) have conspired to manipulate the insurance market through undisclosed profit-sharing agreements and kickbacks in an effort to capture larger market shares and profits to the detriment of their unwitting clients and insureds.  Although the Broker Defendants are hired to find the best insurance coverage at the lowest price, the Insurer Defendants pay the Broker Defendants undisclosed or inadequately disclosed Contingent Commissions, Communication Fees, and other compensation so that the Broker Defendants will steer their clients to them.  Through these kickbacks, the Insurer Defendants have co-opted the Broker Defendants' fiduciary duties and responsibilities to their clients, and breached their own duties under the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      On behalf of Plaintiffs and all those similarly situated, this nationwide class action seeks disgorgement of all undisclosed profit sharing and kickbacks, damages (including RICO and antitrust treble damages), punitive damages and prospective injunctive relief to put an end to defendants' fraudulent and anti-competitive practices.

3.      This action is brought by Plaintiffs representing two separate Classes, each with a subclass:

(a)      an Employee Class and a Non-ERISA Employee Subclass (together, the "Employee Plaintiffs"), and

(b)     an Employer Class and a Non-ERISA Employer Subclass (together, the "Employer Plaintiffs") (Employee and Employer Plaintiffs are collectively referred to as "Plaintiffs").

4.     The Employee Plaintiffs bring this nationwide Class action on behalf of themselves and all other ERISA and non-ERISA plan employees that have acquired or paid for, in full or in part, an insurance product and related services from the Insurer Defendants as part of an employee benefit plan with the direct or indirect help, assistance or involvement of any of the Broker Defendants and/or have paid for supplemental insurance coverage made available to the Employee Class by an Insurer Defendant and Broker Defendant in addition to the basic employee benefit plan insurance (the "Employee Classes").

5.     The Employer Plaintiffs bring this nationwide class action on behalf of themselves and all other ERISA and non-ERISA plan employers that have acquired or paid in full or in part for an insurance product for an employee benefit plan from the Insurer Defendants with the direct help, assistance or involvement of any of the Broker Defendants (the "Employer Classes").  The Employee and Employer Classes shall be referred to as the "Classes" or "Class Members."

6.     The Broker Defendants are insurance brokers that represent and advertise that they provide specialized advice, expertise and recommendations in the development, implementation and modification of employee benefit plans.  Their clients are all sizes of employers, associations and employees seeking to procure such products as group life and accidental death and dismemberment, long term disability, health, dental, vision and a supplemental insurance.  Plaintiffs use the Broker Defendants as their bargaining representatives to identify and determine which insurance products and services best fit their needs, and from which insurance carriers to purchase those products and services.  The Broker Defendants also provide advice about the renewal or modification of insurance policies, and act as an intermediary between the employee benefit plan and the Insurer Defendants.

7.  Plaintiffs hire the Broker Defendants for their objective advice and their expertise in the complex area of employee benefit coverage. As brokers, they owe fiduciary and other duties to Plaintiffs, including the duties to find superior insurance products at the lowest price, to put the interests of Plaintiffs and the Classes first, and to exercise the duties of loyalty, good faith, due care and full disclosure.

8.  Rather than providing independent and objective brokerage services and advice, the Broker Defendants have secretly conspired with the Insurer Defendants to steer Plaintiffs and members of the Classes to the Insurer Defendants in exchange for undisclosed fees, commissions and other kickbacks from the Insurer Defendants.

9.  These undisclosed Contingent Commissions corrupt the market for insurance and turn the broker-client relationship on its head. Indeed, while the Broker Defendants are supposed to represent their clients, their duties to their clients have been co-opted by the Insurer Defendants. Plaintiffs are misled into believing that they are receiving impartial advice and the most economical and appropriate insurance products and services that are designed for their individual needs, when, in fact, the broker is simply steering them towards an insurance company and its products in order to maximize the broker's own profit – even if it is not in its client's best interest.

10.  The Risk and Insurance Management Society, Inc. ("RIMS") has acknowledged the effect that undisclosed Contingent Commissions have on the market:

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which this relationship is built. In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

11.  In addition to the standard consulting fees or commissions, these Agreements provide that the Insurer Defendants will compensate the Broker Defendants based on: (a) the total volume of insurance placed by the Broker Defendants ("volume contingency"); (b) the renewal of that business ("persistency contingency"); and/or (c) its profitability (claims and loss ratios) ("profitability

contingency") (collectively "Contingent Commissions"). All of these factors are controlled by Defendants, who manipulate the insurance market to the detriment of Plaintiffs and the Classes. The Agreements are essentially profit-sharing agreements between and among Defendants and are one means through which Defendants implemented or effectuated their conspiratorial agreement.

12. The Agreements constitute a blatant conflict of interest by all Defendants because the Broker Defendants have a financial interest in recommending only those insurance products offered by the Insurer Defendants. Also, they are financially motivated not to seek a reduction of premiums but to renew at a higher rate, and to discourage clients from filing policy claims to maximize profitability of the policies for purposes of calculating their Contingent Commissions.

13. In addition to Contingent Commissions, the Broker Defendants have exacted compensation through other inadequately disclosed payments, namely "communication fees," "enrollment fees," "service fees," "finders fees" and/or "administration fees" (collectively, "Communication Fees").

14. In connection with the basic insurance coverage offered to Plaintiffs and Class Members through their employers' benefit plans, the Insurer Defendants, through the Broker Defendants, offer directly to the employees optional supplemental insurance coverage, such as supplemental life or long-term disability. The undisclosed Communication Fees purportedly cover the Broker Defendants' costs in communicating with employees concerning the supplemental insurance coverage. The Employee Plaintiffs and the Employee Classes personally pay the premiums for this supplemental coverage, which is extremely profitable to the Broker Defendants because they receive Communication Fees. Supplemental coverage is also highly profitable for the Insurer Defendants because they can sell overpriced insurance coverage to a captive audience.

15. The Insurer Defendants are willing and able to pay the Broker Defendants' Contingent Commissions, Communication Fees and other undisclosed kickbacks because it ensures

that the Insurer Defendants will maintain or increase their market share. Plus, the Insurer Defendants simply build these costs into their premiums anyway. Plaintiffs and Class Members are unaware that the Insurer Defendants capture the undisclosed compensation by charging them higher premiums, which results in overpriced insurance compared to what would otherwise be available on the open competitive market.

16.     In recent years, the Agreements have yielded over a billion dollars in Contingent Commissions for the Broker Defendants. In 2003 alone, the Marsh Defendants and Aon Defendants (defined below) collected at least $850 million and $190 million, respectively, in Contingent Commissions. Defendant Gallagher received Contingent Commissions of $39.5 million in 2004, $32.6 million in 2003, and $25.2 million in 2002. Between 2000 and 2004, the ULR Defendants (defined below) collected $40,271,432 in Contingent Commissions and $18,986,403 in communications fees, representing over 62% of its total income during that time.

17.     As part of their scheme and conspiracy to manipulate the insurance market, Defendants also engage in an industry practice known as "low-hanging fruit," whereby the Insurer Defendants flip existing clients, with whom they have direct contracts (no broker involvement), to the Broker Defendants, enabling them to earn commissions. In exchange the Broker Defendants agree to steer additional business to the Insurer Defendants.

18.     Defendants also have engaged in bid-rigging. The Broker Defendants manipulate the bidding process by leaking their clients' current rates and policy terms to carriers that the Broker Defendants handpick to bid for the clients' accounts. The Broker Defendants request other Insurer Defendants to submit artificially inflated or otherwise false or misleading bids in return for promised future business, ensuring that the predetermined preferred insurers win the business. Bid-rigging allows the Broker Defendants to maximize their Contingent Commission income and the Insurer

- 5 -

Defendants to, *inter alia*, lock in renewal business at above market rates and capture larger market share.

19.     Further, the Defendants have entered into unlawful tying agreements under which the Broker Defendants steer primary insurance contracts to the Insurer Defendants on the condition that those insurers also use the Broker Defendants (or their reinsurance broker subsidiaries) for placing their reinsurance coverage with reinsurance carriers (many of whom are related entities) and thereby reaping additional improper revenue.  This unlawful tying also has the effect of increasing the price of reinsurance, with the increased costs being passed on to the Insurer Defendants' customers, including Plaintiffs and Class Members.

20.     Defendants' conduct has eliminated the trust and client-focus necessary for the proper conduct of the broker-client and insurer-insured relationship.  Defendants' conduct also has reduced the procurement of insurance to the level one would expect of a fungible commodity.  In essence, through their illicit conduct,  Defendants are colluding to place insurance to improperly maximize their own profit, rather than arriving at the selection of an insurance product and related services as part of a relationship based on trust and driven by what is in the clients' best interests.

(a)     This sentiment was recently expressed by Joseph Plumeri, the CEO of defendant Willis before an industry trade organization: "For too long, this business has been about the placement only – what I've come to call manufacturing . . . .  But this approach leads to the commoditization of insurance, and I don't think anyone in this room would equate insurance to soy beans."

21.     As a result of defendants' anti-competitive conduct and fraudulent scheme, Plaintiffs and the Classes have suffered substantial damages.  The Classes have been injured in fact by: (a) not being made aware of the Defendants' conflicts of interest, their undisclosed compensation arrangements and being afforded access to a competitive marketplace; (b) paying undisclosed fees

- 6 -

and other charges embedded in the premiums of the insurance products; (c) receiving insurance that was more expensive, provided reduced benefits, and/or was otherwise inferior to other available insurance products; (d) not being reimbursed for money improperly collected by insurers to pay kickbacks to brokers; and (e) not receiving the full benefits of their employment compensation or their compensation package offered to employees.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, 1964, and 28 U.S.C. §§1331, 1332, 1367 and 15 U.S.C. §15. This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §1965(b) and (d). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

23. Venue is proper in this District pursuant to 18 U.S.C. §1965(a) because all the Defendants are found, do business, or transact business in this District. In addition, venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

24. The trade and interstate commerce relevant to this action is the purchase and sale of insurance policies and related services.

25. During all or part of the period in which the events described herein, each of the Defendants sold insurance and/or provided advice regarding the procurement or renewal of insurance or claims administration relating thereto to Plaintiffs and other Class Members in a continuous and uninterrupted flow of interstate commerce.

26. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

# PARTIES

## A.   THE PLAINTIFFS

### (1)   Employee Plaintiffs

27.   Plaintiff David Boros ("Boros") is a resident of Irvine, California.  Plaintiff Boros purchased group life insurance through the UCLA Alumni Association ("UCLA"), which retained Marsh to act as the broker for it and its alumni.  Marsh placed the life insurance purchased by Boros with defendant Hartford (as defined below) effective June 2000.  Plaintiff Boros was damaged by Defendants' conduct as alleged herein.

28.   Plaintiff Cynthia C. Brandes ("Brandes") is a resident of Maricopa County, Arizona, and has been employed by Intel, Inc. ("Intel") for over 20 years.  On behalf of its employees, including Brandes, Intel retained defendant ULR to act as a broker and advisor in connection with its ERISA employee benefit plan.  ULR placed Intel's group medical and dental plans with defendant CIGNA.  Plaintiff Brandes participated in these plans and contributed to the premium payments for this insurance through payroll deductions.  In addition to the basic employee benefit plans sponsored by Intel, Brandes sold supplemental insurance from defendant Unum, which also was brokered by ULR.  Plaintiff Brandes purchased supplemental life insurance and supplemental and dependent accidental death and dismemberment insurance from Unum and has paid 100% of the premiums for this insurance through payroll deductions.  At no time did ULR advise Brandes that it received Contingent Commissions and Communication Fees and other improper compensation from Cigna and Unum in connection with her insurance purchases.

29.   Plaintiff Alicia A. Pombo ("Pombo") is a resident of Los Angeles County, California, and was employed by BP Corporation North America Inc. ("BP Corp.") from July 16, 1984 until July 2003.  On behalf of its employees, including Pombo, BP retained defendant ULR to act as a broker and advisor in connection with its ERISA employee benefit plan.  ULR placed BP's basic life

insurance and occupational accidental death insurance plans with defendant MetLife (defined below). While she was a BP employee, Pombo received basic life insurance coverage through this plan and contributed to the premium payments for this insurance through payroll deductions. In addition to the basic life insurance plan sponsored by BP, Pombo was sold supplemental group life insurance from defendant MetLife, which also was brokered by ULR. Plaintiff Pombo purchased supplemental life insurance for herself and her two children. While a BP employee, she contributed to the premium payments for this insurance through payroll deductions. Since terminating her employment with BP, Pombo has kept these policies in force and has paid 100% of the premiums for this insurance. At no time did ULR advise Pombo that it had received Contingent Commissions, Communication Fees and other improper compensation from MetLife in connection with her insurance purchases.

30. Plaintiff MaryAnn Waxman ("Waxman") is a resident of Boulder, Colorado, and has been employed by IBM for the past five years. On behalf of its employees, including Waxman, IBM retained a subsidiary of defendant Marsh (defined below) to act as a broker and advisor in connection with its ERISA employee benefit plan. Marsh placed IBM's supplemental group life insurance, dependent group life insurance and accidental death and dismemberment insurance with defendant MetLife. Plaintiff Waxman has purchased supplemental life insurance and accidental death and dismemberment insurance from MetLife and has paid 100% of the premiums for this insurance. At no time did Marsh or MetLife advise Waxman of the Contingent Commissions, Communication Fees and other improper compensation MetLife paid Marsh in connection with her insurance purchases.

31. Plaintiff Richard H. Kimball ("Kimball") is a resident of Harris County, Texas. Until 2004, Kimball was employed by the Houston Independent School District ("HISD"). HISD sponsors a non-ERISA employee benefit plan under which its employees can purchase insurance

- 9 -

products, including group health, vision and dental insurance, group life insurance, disability insurance and accidental death and dismemberment insurance.  On behalf of its employees, HISD retained Mercer, a subsidiary of Marsh, to act as its broker and advisor in connection with its employee benefit plan.  Marsh has placed insurance on behalf of HISD with, among others, CIGNA and Aetna for health insurance, Spectra for vision insurance and National Pacific for dental insurance.  While employed at HISD, Kimball has received health, vision and dental insurance through HISD's plan and contributed to the premium payments for this coverage through payroll deductions.

32.    The Employee Plaintiffs have been injured by Defendants' conduct by, *inter alia*, having been denied the benefit of unbiased brokerage advice, directly or indirectly, having paid higher insurance premiums and/or receiving lesser benefits and having lost the opportunity to purchase insurance in a free and truly competitive marketplace.

**(2)    Employer Plaintiffs**

33.    Plaintiff City of Danbury, Connecticut ("Danbury") is a municipal corporation organized under the laws of the State of Connecticut.  In January 2002, Danbury retained defendant Aon to act as a broker and advisor in connection with its non-ERISA employee benefit plan.  In its response to Danbury's Request for Quotation, Aon agreed to perform an analysis in order to "uncover areas for improvement in [Danbury's] current programs whether they are financial, benefit structure, service or some combination of the three."  Aon also agreed in its Letter of Understanding with Danbury that Aon's services would include review of current and proposed benefit program and financial arrangements in order to identify "cost efficiencies" and "obtain lower cost of coverage."  Aon placed insurance on Danbury's behalf with, among others, Anthem for health Insurance, defendant MLIC (defined below) for life, dental, long term disability, and accidental death and dismemberment insurance.  At Aon's urging, Danbury agreed that Aon would be compensated for its

services through commissions paid by insurers.  However, Aon did not disclose and/or inadequately disclosed that it received Contingent Commissions and engaged in other improper conduct with insurers that created clear conflicts of interest.  Indeed, despite requests from Danbury representatives, Aon refused to provide detailed information regarding the commissions it received as a result of placing insurance on behalf of Danbury, saying that it was not possible to do so.

34.     Plaintiff Connecticut Spring & Stamp Company ("Connecticut Spring") is a corporation organized under the laws of the State of Connecticut and has its headquarters in Farmington, Connecticut.  Connecticut Spring manufactures metal stampings, springs and subassemblies for use in a number of industries.  Connecticut Spring retained a subsidiary of defendant Marsh & McLennan to help select and place insurance for Connecticut Spring's ERISA employee benefit plans.  Marsh placed insurance on Connecticut Spring's behalf with, among others, ConnectiCare, Inc., for heath insurance; Delta Dental for dental insurance; and Highmark for life and disability insurance.  Plaintiff Connecticut Spring was damaged by Defendants conduct as alleged herein.  However, Marsh did not disclose and/or inadequately disclosed to Connecticut Spring that it received Contingent Commissions from insurers that created clear conflicts of interest.

35.     Plaintiff Fire District of Sun City West ("Fire District") is a municipal fire department located in Sun City West, Arizona.  Fire District operates three fire stations through which it provides fire protection and emergency services to the community of Sun City and surrounding portions of Maricopa County, Arizona.  Fire District utilized Marsh's services in selecting and placing insurance for its non-ERISA employee benefit plans.  Marsh placed insurance on the Fire District's and its employees behalf with, among others, the following insurers:  MetLife for dental insurance, life insurance and accidental death and dismemberment insurance; Ameritas Life Insurance Corp. for dental insurance; United Healthcare Ins. Co. for health insurance; Blue Cross Blue Shield of Arizona for health insurance; Standard Insurance for long term disability insurance;

- 11 -

Reliance Standard for life insurance, accidental death and dismemberment insurance, and long term disability insurance; and Guarantee Mutual Life Co.  However, Marsh did not disclose that it has received Contingent Commissions, Communication Fees and other compensation from insurers and engaged in other improper conduct that created clear conflicts of interest.

36.     Plaintiff Golden Gate Bridge, Highway and Transportation District ("Golden Gate") is a multi-county political subdivision of the State of California based in the city and county of San Francisco.  It operates the Golden Gate Bridge and two public transit systems: the Golden Gate Transit bus system and the Golden Gate Ferry.  Between 1994 and 2002,[1] Golden Gate retained William M. Mercer, Inc. (now Mercer Human Resource Consulting LLP for brokerage services. Mercer placed insurance on Golden Gate's behalf with, among others, the following insurers: Principal Mutual Life Insurance Company for life and accidental death and disability insurance; Blue Shield of California, Kaiser Health Plan; Ace as its medical stop loss insurer; and Health Plan of the Redwoods for health insurance.  However, Mercer did not disclose and/or inadequately disclosed that it received Contingent Commissions, Communication Fees and other compensation from insurers and engaged in other improper conduct that created clear conflicts of interest.

37.     Employer Plaintiffs have been injured by Defendants' conduct by, *inter alia*, having been denied the benefit of unbiased brokerage advice, having paid higher insurance premiums and/or received lesser benefits for the plans that it sponsors, and having lost the opportunity to purchase insurance in a free and truly competitive marketplace.

---

[1]     Towers Perrin replaced Mercer as Golden Gate's broker in July 2002.

**B.     THE DEFENDANTS**

**(1)     Broker Defendants**

38.     Defendant Aon Corporation ("Aon Corp.") is incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Aon Corp. is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

39.     Defendant Aon Consulting Inc. ("Aon Consulting") is a wholly-owned subsidiary of defendant Aon Corp., and is headquartered at 200 East Randolph Street, Chicago, IL 60601.  Aon Consulting provides employee benefit consulting services to employers of all sizes.  Aon Corp. and Aon Consulting shall be referred to collectively herein as "Aon" or "Aon Defendants."

40.     Defendant Aon Broker Services, Inc. ("Aon Broker") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois.  Aon Broker is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

41.     Defendant Aon Risk Services Companies, Inc. ("Aon Risk") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois.  Aon Risk is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

42.     Defendant Aon Risk Services Inc. U.S. ("Aon Risk U.S.") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois.  Aon Risk U.S. is a subsidiary of and/or affiliated with Aon Corp. and Aon Risk, and provides customers with risk management and insurance brokering services.

43.     Aon Group, Inc. ("Aon Group") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois.  Aon Group is a subsidiary of

and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

44. Aon Services Group, Inc. ("Aon Services") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois. Aon Services is a subsidiary of and/or affiliated with Aon Corp. and Aon Group, and provides customers with risk management and insurance brokering services.

45. Aon Re, Inc. ("Aon Re") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois. Aon Re is a subsidiary of Aon Corp. and provides customers with reinsurance and brokerage services.

46. Defendant Arthur J. Gallagher & Co. ("Gallagher") is incorporated under the laws of Delaware, its shares are listed and publicly traded on the New York Stock Exchange, and its corporate headquarters is in Itasca, Illinois. Gallagher provides customers with risk management and insurance brokerage services.

47. Defendant Gallagher Benefit Services, Inc. ("GBS") is a Delaware corporation with its principal place of business at 2 Pierce Place, Itasca, IL 60143. A wholly-owned subsidiary of defendant Gallagher, GBS provides employee benefits consulting, planning, and acquisition services to employers. Defendants Gallagher and GBS shall be referred to collectively as "Gallagher" or the "Gallagher Defendants."

48. Defendant BB&T Corporation ("BB&T Corp.") is incorporated under the laws of North Carolina, its shares are listed and publicly traded on the New York Stock Exchange, and its corporate headquarters is in Winston Salem, North Carolina. BB&T Corp. conducts its business operations primarily through its commercial banking subsidiaries, including Branch Banking and Trust Company. Through its subsidiaries and affiliates, BB&T Corp. provides customers with risk management and insurance brokerage services.

49.     Defendant BB&T Insurance Services, Inc. ("BB&T Insurance") is incorporated under the laws of North Carolina and its corporate headquarters is in Raleigh, North Carolina.  BB&T Insurance is a principal operating subsidiary of parent BB&T Corp.'s largest subsidiary, Branch Bank.   BB&T Insurance provides customers with risk management and insurance brokerage services.  Defendants BB&T Corp. and BB&T Insurance shall be referred to collectively as "BB&T" or the "BB&T Defendants."

50.     Defendant Brown & Brown, Inc. ("Brown") is incorporated under the laws of Florida and its corporate headquarters is in Daytona Beach, Florida.  Brown's shares are listed and publicly traded on the New York Stock Exchange.  Brown provides customers with risk management and insurance brokerage services.

51.     Defendant Brown & Brown Insurance Benefits, Inc. ("Brown Benefits") is a Florida corporation located in Daytona Beach, Florida.  Brown Benefits promotes and advertises itself as a national consulting company that provides employee benefit brokering advice.  Defendants Brown and Brown Benefits shall be referred to collectively as "Brown."

52.     Defendant Hilb Rogal, & Hobbs Company ("Hilb Rogal") is incorporated under the laws of Virginia and its corporate headquarters is in Glen Allen, Virginia.  Hilb Rogal's shares are listed and publicly traded on the New York Stock Exchange.  Hilb Rogal provides customers with risk management and insurance brokerage services and describes itself as the nation's seventh largest insurance and risk management intermediary.

53.     Defendant Frank F. Haack & Associates ("Haack") is an insurance brokerage and employee benefits consulting operation incorporated under the laws of the State of Wisconsin.  In 2004 Haack was acquired by Hilb Rogal and is part of Hilb Rogal's Midwest region.

54.     Defendant O'Neill, Finnegan & Jordan Insurance Agency, Inc. ("OFJ") is incorporated under the laws of Massachusetts and its principal place of business is in Boston,

Massachusetts. OFJ provides employee benefits consulting and brokerage services to public and private employer entities. Defendants Hilb Rogal, Haack, and OFJ shall be referred to collectively as "Hilb," "HRH," the "Hilb Defendants" or the "HRH Defendants."

55. Defendant HUB International Limited ("HUB") is incorporated under the laws of Ontario, Canada and has its corporate headquarters in Chicago, Illinois. Its shares are listed and publicly traded on the New York Stock Exchange. HUB provides customers with risk management and insurance brokerage services.

56. Defendant Talbot Financial Corporation ("Talbot") is incorporated under the laws of the State of Washington and has its corporate headquarters in Albuquerque, New Mexico. Talbot is a subsidiary of HUB. As described by Talbot itself, the "Talbot Financial Corporation is a diversified distributor of financial products and services, specializing in insurance and annuities. [Talbot is] one of the nation's top twenty insurance brokers and one of the country's largest distributors of investment products through banks, thrifts, and credit unions." Defendants HUB and Talbot shall be referred to collectively as "HUB" or the "HUB Defendants."

57. Defendant Marsh & McLennan Companies, Inc. ("MMC" or "Marsh & McLennan") is incorporated under the laws of Delaware and has its corporate headquarters in New York City, New York. Its shares are listed and publicly traded on the New York Stock Exchange. MMC is a global corporation and the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement of insurance, as well as investment management and consulting.

58. Defendant Marsh Inc. ("Marsh Inc.") is a corporation incorporated under the laws of Delaware and its corporate headquarters is in New York, New York. Marsh Inc. is a primary subsidiary of MMC and an entity through which risk and insurance services, such as insurance and

reinsurance brokerage, are provided. Marsh Inc. is considered a MMC operating unit and provides insurance brokerage through various subsidiaries of its own, including Marsh USA Inc.

59.     Defendant Marsh USA, Inc. is incorporated in Delaware and provides customers with risk management and insurance brokering services.

60.     Defendant Mercer, Inc. ("Mercer") is incorporated under the laws of the State of Delaware and its corporate headquarters is in New York, New York. Mercer is considered a MMC operating unit and operates as a "family" of specialized consulting firms.

61.     Defendant Mercer Human Resource Consulting, LLP ("Mercer Human Resource") is a corporation organized under the laws of the state of Delaware, and maintains an office in Norwalk, Connecticut. As a subsidiary of Mercer, Inc., it provides consulting regarding, among other things, employee benefit plans.

62.     Defendant Seabury & Smith, Inc. ("Seabury & Smith") is a corporation incorporated under the laws of Delaware and its corporate headquarters is in New York, New York, and is one of a number of corporations operating under the "Seabury & Smith, Inc." name. Seabury & Smith is a subsidiary of MMC and provides brokerage services for employee benefits programs through its Marsh@WorkSolutions[SM] unit, as well as Marsh Affinity Group Services and Marsh Advantage America division.

63.     Defendants Marsh & McLennan, Marsh Inc., Marsh USA Inc., Mercer, Mercer Human Resource and Seabury & Smith shall be referred to collectively herein as "Marsh" or the "Marsh Defendants."

64.     Defendant Universal Life Resources ("ULR") is a California Limited Partnership with its principal place of business in California. It is located at 12264 El Camino Real, Suite 303, San Diego, California. ULR promotes and advertises itself as a national group life, accident and disability consulting company that provides broker services to its clients – employers ands

employees. ULR advertises through brochures, marketing materials, solicitations and its website that it helps "employers develop and implement improved plans that reduce costs for both the employer and its employees." Effective July 10, 2005, ULR began "transitioning" its consulting, service and support responsibilities for its customers to Trion Group, Inc. After October 31, 2005, ULR claims it will no longer assume responsibility for its clients' benefit plans.

65.     Defendant ULR Insurance Services, Inc. ("ULR Insurance"), is a California corporation that maintains its home offices and principal place of business in San Diego, California.

66.     Defendant Benefits Commerce is a California corporation. It shares its corporate headquarters with ULR at 12264 El Camino Real, Suite 303, San Diego, California 92130. Benefits Commerce is also an employee benefits consultant.

67.     Defendant Doug P. Cox is a resident of California. Cox is the principal shareholder and President of defendant Universal Life Resources, Inc. Defendants ULR, ULR Insurance Services, Inc., Benefits Commerce and Doug Cox shall be referred to collectively as "ULR" or the "ULR Defendants."

68.     Defendant USI Holdings Corporation ("USI") is incorporated under the laws of Delaware and has its corporate headquarters in Briarcliff Manor, New York. Its shares are listed and publicly traded on the NASDAQ National Market. USI provides customers with risk management and insurance brokerage services.

69.     Defendant USI Consulting Group ("USI Consulting") is headquartered in Glastonbury, Connecticut. USI Consulting is a subsidiary of USI Holdings Corporation. USI Consulting is one of the nation's largest benefits consulting firms serving mid-sized organizations offering services in employee benefits.

70.     Defendant USI Insurance Services Corporation ("USI Insurance") is the sixth largest insurance brokerage firm in the nation with its headquarters in New York, New York. USI

- 18 -

Insurance is a subsidiary of USI Holdings Corporation. USI Insurance is a nationwide brokerage/consulting firm specializing in commercial insurance, employee benefits and financial services. Defendants USI, USI Consulting and USI Insurance shall be referred to collectively as "USI."

71. Defendant Wells Fargo & Company ("Wells Fargo") is incorporated under the laws of Delaware and has its corporate headquarters in San Francisco, California. Its shares are listed and publicly traded on the New York Stock Exchange. Wells Fargo provides customers with risk management and insurance brokerage services through two separate insurance operations: (a) Wells Fargo Insurance Services, and (b) Acordia, Inc., a Wells Fargo subsidiary.

72. Defendant Acordia, Inc. ("Acordia") is incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois. Acordia provides customers with risk management and insurance brokerage services. Acordia is a subsidiary of defendant Wells Fargo. Defendants Wells Fargo and Acordia shall be referred to collectively as "Wells Fargo."

73. Defendant Willis Group Holdings Limited ("Willis Group") is incorporated under the laws of Bermuda and its corporate headquarters is in London, England. Its shares are listed and publicly traded on the New York Stock Exchange. Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

74. Defendant Willis North America, Inc. ("Willis NA") is incorporated under the laws of Delaware and has its corporate headquarters in New York, New York. Willis NA is a subsidiary of Willis Group, and provides customers with risk management and insurance brokering services. Willis Group and, in turn, Willis NA provide their insurance brokering services and operate principally through the offices of their subsidiaries and affiliates. Defendants Willis Group and Willis NA shall be referred to collectively as "Willis."

**(2)** **Insurer Defendants**

75.     Defendant ACE Limited ("ACE Ltd.") is incorporated under the laws of the Cayman Islands, its shares are listed and publicly traded on the New York Stock Exchange, and its corporate headquarters is in Hamilton, Bermuda.  ACE Ltd. owns ACE INA Holdings, Inc.  As described by ACE Ltd., the "ACE Group of Companies is one of the world's largest providers of insurance and reinsurance."

76.     Defendant ACE USA is an operating company of ACE INA, incorporated under the laws of Delaware and headquartered in Philadelphia, Pennsylvania.  ACE USA operates through several insurance companies using a network of offices throughout the United States.  ACE USA's operations "provide a broad range of P&C insurance and reinsurance products to a diverse group of commercial and non-commercial enterprises and consumers.  These products include excess liability, excess property, workers' compensation, general liability, automobile liability, professional lines, aerospace, accident and health (A&H) coverages and claim and risk management products and services."

77.     Defendant Insurance Company of North America ("INA") is a subsidiary of ACE.  INA is incorporated under the laws of the State of Pennsylvania and has its headquarters in Philadelphia, Pennsylvania.  INA offers life and disability insurance.  Defendants ACE Ltd., ACE USA and INA shall be referred to collectively as "ACE" or the "ACE Defendants."

78.     Defendant American International Group, Inc. ("AIG Inc.") is incorporated under the laws of Delaware and its corporate headquarters is in New York, New York.  AIG Inc.'s shares are listed and publicly traded on the New York Stock Exchange.

79.     Defendant AIG Life Insurance Company ("AIG Life") is headquartered in Wilmington Delaware.

80.     Defendant American Home Assurance Co. ("American Home") is incorporated under the laws of New York and is owned by defendant AIG.  Defendants AIG Inc., AIG Life and American Home shall be referred to collectively as "AIG" or the "AIG Defendants."

81.     Defendant Connecticut General Life Insurance Company ("Connecticut General") is a publicly held subsidiary of CIGNA Corporation and is incorporated and headquartered in Connecticut.  Connecticut General had over $6.3 billion in net premiums written as of July 2004.

82.     Defendant Life Insurance Company of North America ("LINA") is a subsidiary of CIGNA Corporation, incorporated and headquartered in Pennsylvania.  LINA operates as an underwriter of various lines of insurance, including life insurance.  Defendants Connecticut General and LINA shall be referred to collectively as "CIGNA" or the "CIGNA Defendants."

83.     Defendant Hartford Financial Services Group, Inc. ("Hartford Financial") is one of the largest investment and insurance groups in the United States.  Hartford Financial is incorporated under the laws of Delaware, its shares are listed and publicly traded on the New York Stock Exchange, with its corporate headquarters in Hartford, Connecticut.  Hartford Financial represents that it "is a leading provider of investment products; life insurance and group and employee benefits; automobile and homeowners products; and business insurance."

84.     Defendant Hartford Life & Accident Insurance Company ("Hartford Life & Accident") is a wholly owned subsidiary of defendant Hartford Financial.  Hartford Life & Accident is incorporated under the laws of Connecticut and is headquartered in Simsbury, Connecticut.  Hartford Life & Accident provides life, medical stop loss, and supplemental health insurance to businesses and individuals.  Hartford Life & Accident Insurance had over $2.2 billion in net written premiums as of July 2004.

85.     Defendant Hartford Life Group Insurance Company ("Hartford Group") is a wholly owned subsidiary of defendant Hartford Financial with its headquarters in Chicago, Illinois. Hartford Group provides group accident and health insurance to employers.

86.     Defendant Hartford Life Insurance Company ("Hartford Life") is a subsidiary of Hartford Financial.   Hartford Life is incorporated under the laws of Connecticut, and is headquartered in Simsbury, Connecticut.  Hartford Life offers group life insurance to employers and had over $9.7 billion in net written premiums as of July 2004.  Hartford Group paid at least $434 million in commissions in 2003, and its 2004 revenue exceeded $5.6 billion.  Defendants Hartford Financial, Hartford Life & Accident, Hartford Group, and Hartford Life shall be referred to collectively as "Hartford" or the "Hartford Defendants."

87.     Defendant Metropolitan Life Inc. ("MetLife Inc.") is a publicly held company, incorporated in the State of Delaware and headquartered in the State of New York.  MetLife Inc. designs, develops, markets and sells insurance products for individuals and business clients.

88.     Metropolitan Life Insurance Company ("MLIC") also is a publicly held company, incorporated and headquartered in New York.  Metropolitan Life Insurance Company ranked first in the nation for net premiums written as of July 2004, with over $28 billion in net written premiums.

89.     Defendant Paragon Life Insurance Company ("Paragon") is incorporated under the laws of the State of Missouri with its corporate headquarters in St. Louis, Missouri.  Paragon is a subsidiary of MetLife Inc.   Paragon offers group and supplemental life insurance products. Defendants MetLife Inc., MLIC and Paragon shall be referred to collectively as "MetLife" or the "MetLife Defendants."

90.     Defendant Prudential Financial, Inc. ("Prudential Financial") is a publicly held company incorporated in the State of New Jersey and headquartered in Newark, New Jersey.

Prudential Financial designs, develops, markets and sells insurance products for individuals and business clients.

91.     Defendant Prudential Insurance Company of America ("Prudential Insurance") is a subsidiary of Prudential Financial.  Prudential Insurance is incorporated in the State of New Jersey, with its headquarters in Newark, New Jersey.  Prudential Insurance offers life insurance and annuities.  It ranked fourth in the nation for net premiums written – nearly $14 billion – as of July 2004.  Defendants Prudential Financial and Prudential Insurance shall be referred to collectively as "Prudential" or the "Prudential Defendants."

92.     Defendant UnumProvident Corporation ("UnumProvident") is a publicly held company incorporated in the State of Delaware with its headquarters in Tennessee.  UnumProvident is a leading provider of group long term, short term and individual disability income products in the United States.  Through its subsidiaries, UnumProvident claims to insure more than 25 million people.  UnumProvident had over $2.7 billion in net premiums written as of July 2004.

93.     Defendant Provident Life and Accident Insurance Company ("Provident") is a subsidiary of UnumProvident.  Provident is a Tennessee corporation, with its headquarters in Chattanooga, Tennessee. Provident provides disability, life and accident insurance and services to individuals, both directly and through their employers.

94.     Defendant Unum Life Insurance Company of America ("ULICA") is a wholly owned subsidiary of UnumProvident.  Headquartered in Portland, Maine, ULICA provides group and long-term disability insurance, employee benefits and individual disability insurance.  Defendants UnumProvident, Provident and ULICA shall be referred to collectively as "Unum" or "UnumProvident."

- 23 -

## FACTUAL ALLEGATIONS

**A.    THE EMPLOYEE BENEFITS INSURANCE BROKERAGE MARKET**

**(1)    Employee Benefit Programs**

95.    Employee benefit programs are integral to the success of American businesses.  The overwhelming majority of Americans purchase insurance through their employers.  Employers seek to offer lucrative benefit plans to recruit and retain employees in a highly competitive marketplace. In a 2004 study conducted by MetLife, 65% of employees reported benefits as an extremely important factor in making employment decisions, second only to job satisfaction.  The Broker Defendants recognize this and use it in their marketing.  For example, Broker Defendant Haack acknowledges that, "the right kind of compensation package can attract and retain the best employees."  Haack also notes that employee turnover costs can be exorbitant – "the average cost of turnover is 25% of an employee's annual salary plus 25% of the cost of benefits.  Benefits can amount to 30% of wages."

96.    Given the importance of employee benefit plans, employers typically hire insurance brokers, agents, producers or consultants ("brokers") to advise them how to design, obtain and modify their employee benefit insurance programs offered to their employees and prospective employees.

97.    Employee benefit plans typically include group life, accidental death and dismemberment, long-term disability, group health, vision and/or dental insurance.  In addition to basic or regular coverage provided under the plan, employees are marketed by Defendants' supplemental coverage, particularly supplemental life and disability insurance, including group universal life.  The Broker Defendants received Communication Fees and other compensation on the supplemental coverage.

98.     The Broker Defendants and Insurer Defendants dominate the employee benefits insurance market.  In controlling the employee benefits insurance market and participating in the anticompetitive conduct, Broker Defendants and Insurer Defendants at times acted against their individual economic interests.

### (2)     Defendants' Fiduciary Duties and Relationship of Trust and Confidence with Plaintiffs and Class Members

#### (a)     The Broker Defendants Are Fiduciaries

99.     The Broker Defendants represent that they are highly skilled and independent insurance brokerage experts that possess the special knowledge and expertise necessary to interpret and understand the complex and sophisticated business risks and employee benefits needs faced by their clients and to determine which corresponding insurance products and insurance companies best fit their clients' needs.

100.    Broker Defendants encourage their clients to rely on their widely purported knowledge, independence and expertise in procuring insurance coverage.  Broker Defendants counsel their clients concerning the complex and specialized insurance clients seek to purchase. Broker Defendants create a confidential and/or fiduciary relationship with their customers based on their role as brokers and their common, uniform representations to their clients, like plaintiffs, that they will provide unbiased, independent expert insurance brokering advice on the most efficient and cost effective insurance products available.

101.    The sole purpose of the Broker Defendants' role is to act on behalf of and provide Plaintiffs and Class Members with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice and information regarding the insurance companies they recommend.

102.    Plaintiffs and other members of the Classes rely upon the sophistication and expertise of the Broker Defendants – derived from Broker Defendants' familiarity with the Insurance

Defendants, the overall marketplace, as well as customs and practices of the insurance industry – to make informed independent decisions when formulating strategies concerning their insurance needs. Plaintiffs and Class Members have therefore engaged the services of the Broker Defendants to assist them in meeting many different aspects of their insurance needs, including but not limited to insurance procurement and/or renewal and filing and processing claims on existing insurance policies.

103.    In their standard contracts with clients, including Plaintiffs and Class Members, the Broker Defendants agree that:  (i) they will solely represent the interests of their clients in transactions with insurers; (ii) they will act on behalf of their clients in the selection and placement of insurance and the negotiation of terms; (iii) they will act on behalf of their clients in connection with the filing and processing of claims; and (iv) they will act as the exclusive insurance broker for their clients.

104.    Broker Defendants represent themselves as fiduciaries and, in fact, have created a fiduciary relationship with Plaintiffs and the Classes based on the trust imparted on them by Plaintiffs and the Classes and their perceived ability to provide unbiased, independent, and expert insurance brokerage advice.  Such representations are made through advertisements, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mails and interstate wires.

105.    For example, Marsh's 2004 Annual Report highlights its "strengths" which include: "highly specialized knowledge, access to global insurance capacity, and industry expertise in all the major categories of risk."

106.    In responding to client questions, Marsh employees are instructed to respond: "Our guiding principle is to consider our client's best interest in all placements.  We are our clients' advocates and we represent them in negotiations.  We don't represent the [insurance companies]."

107.    Marsh's website states, "Our mission is 'To create and deliver risk services that make our clients more successful.'"  The website also adds:  "Our clients benefit from the total capabilities of Marsh, Inc. and Marsh & McLennan Companies, Inc . . . . This systematic structure provides a breadth and depth of risk solutions unavailable from any other single source."

108.    Aon's 2004 Annual Report states:  "Our clients trust us to provide expertise, value and innovative solutions.  Expertise is the foundation for our effectiveness . . . ."  The Report further states that "our clients value our expertise and trust that all work is done on their behalf."  Aon goes on to state that it "aims to be the world's most responsive, client-focused insurance and consulting services company in the world."  According to a sales brochure, Aon states that: "Our mission is simply this, 'To provide our clients with the highest level of service.'  Our employees work for you with your goals and objective always at the forefront."  Aon insists that its clients' goals are realized "by placing our clients first at all times."

109.    Similarly, Willis has included on its website a client bill of rights, which misleadingly states: "Willis represents the **_client's best interests_** through our client advocacy model.  Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs.  Willis' customized recommendations and solutions will be driven by what is in the client's best interests.   This is the centerpiece of the value Willis provides its clients."[2]  Moreover, in Willis' Global Policy Manual, the company states that Willis associates "should act in good faith and in the interests of their clients at all times. . ." and that they should "provide objective and impartial advice in the interests of our clients."

--------

[2]      Unless otherwise noted herein all emphasis is added.

- 27 -

110.     Likewise, Gallagher's "Client Commitment" document posted on its website states:

"*We always recommend that which is in the client's best interest, even if it diminishes our revenues*."

111.     Acordia's official website similarly describes Acordia's promise to provide open and honest advice to its clients:

Acordia's Commitment:

Acordia's core values center around doing what is ethical and what is right for the customer.  If it is right for the customer it is right for Acordia.  We are leaders during periods of change.  We maintain the highest standards with our customers and believe in taking the steps to follow these values:

1.     Value and reward open, honest, and two-way communication.

2.     Be accountable for and proud of your conduct and decisions.

3.     Do what's right for the customer.

4.     Talk and act with the customer in mind.

5.     Exceed the expectations of customers.

112.     Acordia's website further states that Acordia "[p]roved[es] our customers with full disclosure on the revenue, including Contingent Commissions we earn at the beginning of our relationship and at the time of policy renewal" and that it "mak[es] insurance placements in the best interest of our customers.

113.     Brown & Brown similarly describes itself on its website as "an independent insurance intermediary organization that provides a variety of insurance products and services to corporate, institutional, professional and individual clients."  Brown & Brown has represented that its services include "the efficient management of risk and its related costs, meeting the business insurance needs or companies ranging from small retail establishments to multinational corporations."

114.     ULR's website likewise boasts that "[t]he services we offer are unique and highly specialized."  It professes to objectively canvas a broad array of insurance companies for superior

- 28 -

yet economical insurance coverage. And that it provides its "client and prospective clients the 'best in class' consulting information." ULR's website also claims: "Our focus is to assist clients in the design, implementation and management of Group Life and Accident Insurance programs to achieve cost efficiencies and plan improvements."

115. Hilb Rogal has represented "we make it our business to understand our clients' businesses, employees and risks, as well as the insurance and financial markets, so that we can find them the carriers and coverages that best fit their needs." Its website states that "an insurance relationship, more than any other business relationship, is built on trust. You either have it or you don't." The website further warrants, "Specialist Knowledge: We use our knowledge to solve problems for the benefit of our clients. From Fortune 500 companies to trade associations, individuals and small businesses, at HRH we provide tailor-made risk management solutions based on expert advice and customized risk assessment."

116. BB&T's website similarly states that, its mission is "[h]elping our **Clients** achieve economic success and financial security" and its purpose is "providing excellent service to our clients, as our **Clients** are our source of revenues."

117. In Willis' Global Policy Manual, the company states that Willis associates "should act in good faith and in the interests of their clients at all times . . ." and that they should "provide objective and impartial advice in the interests of our clients."

118. Likewise, Gallagher's "Client Commitment" document posted on its website states that Gallagher will "always recommend that which is in the client's best interest, even if it diminishes our revenues."

119. Employers like plaintiffs Danbury, Connecticut Spring, the Fire District, and Golden Gate, hire insurance brokers to advise them on how to design, obtain and modify their employee

benefit packages which may include group life, accidental death and dismemberment, long term disability, group health insurance, and dependant coverages.

120. Plaintiffs and Class Members retain the Broker Defendants to locate insurance carriers that offer superior insurance coverage and benefits at the lowest possible price. To do this, the Broker Defendants are to solicit quotes from insurers, present insurers' proposals to their clients, recommend the optimal proposal for their clients and represent the clients in negotiations with the insurer.

121. As ULR outlines to its clients, the brokers' duties include the following:

- undertaking to "[b]uild an RFP to support plan and pricing objectives";

- distribute it to all "qualified carriers";

- gather "all pertinent financial documents" from the insurers;

- interview responsible insurer personnel;

- review the insurers' pricing methodology;

- "evaluate all RFP responses";

- use "proprietary ULR tools to facilitate . . . selection";

- help the client select the carrier; and

- "negotiat[e] the final terms and conditions."

122. The Broker Defendants also provide advice about the renewal of insurance policies and act as an intermediary between the client and the insurance carrier. The Broker Defendants further assist employers and employees in filing claims, making eligibility payments, and providing other support services.

123. Upon being designated as consultant or broker of record, the Broker Defendants request and obtain confidential, proprietary, sensitive and personal information relating to their clients, including financial and medical information.

124. For these services, the broker is typically paid a standard commission or an agreed-to fee by the employer and its employees through the employee benefit plan. This is the only compensation that is disclosed to Plaintiffs and Class Members. Employers pay a portion or all of the premiums to the insurance company for the selected basic coverages and/or services. Employees may pay a portion of the premiums for the basic coverages and, as direct purchasers, pay the entire premium amount for any supplemental coverage they elect to purchase through the plan.

125. The Broker Defendants are fully aware that the proposals they prepare and submit are intended for the benefit of their clients' employees.

126. Defendants aggressively solicit employees, such as plaintiffs Boros, Brandes, Kimball, Pombo, and Waxman, to purchase expensive supplemental coverage, particularly supplemental life and disability insurance, which is paid for by the employee, typically through an employer-sponsored payroll deduction.

127. Based on the conduct and representations described above, the Broker Defendants are common law fiduciaries to Plaintiffs and Class Members, and therefore owe Plaintiffs and Class Members: (a) a duty of loyalty to act in the best interests of their clients and to always put their clients' interests ahead of their own; (b) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Broker Defendants – including the duty to disclose the sources and amounts of all income they receive in or as a result of any transaction involving their clients; (c) a duty of care in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (d) a duty to provide impartial advice in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants – including to find superior coverage at the lowest price; and (e) a duty of good faith and fair dealing.

128.     Broker Defendants breached these duties by failing to disclose and accepting Contingent Commissions, Communication Fees, overrides, kickbacks and other compensation from the Insurer Defendants in exchange for steering business to them.  Thus, rather than providing objective, impartial advice which was in their clients' best interests, the Broker Defendants maximized their Contingent Commission and other compensation from kickbacks, at the expense of their clients.  Indeed, they were being compensated on both ends of the transaction but failed to disclose this to Plaintiffs and Class Members.

(b)     The Insurer Defendants Are Fiduciaries

129.     The Insurer Defendants are fiduciaries vis-à-vis ERISA Plaintiffs within the meaning of 29 U.S.C. §1002(21)(A) by virtue of their exercise of discretionary authority, control and responsibility over the management and disposition of plan assets.  The employee benefit plans' asset is a group insurance policy issued by the Insurer Defendants.  The premiums collected from employee participants and employer sponsors are also assets of the Plans.  The Insurer Defendants retain authority to determine whether a claim is paid and are ERISA fiduciaries by virtue of such authority.   The Insurer Defendants also assume some of the duties associated with plan administration, such as providing notice and disclosure of information required under ERISA.

130.     The Insurer Defendants breached these duties when, *inter alia*, they agreed or conspired to pay the ULR Defendants undisclosed or inadequately disclosed compensation in the form of overrides, Communication Fees, and other forms of remuneration in connection with Plaintiffs' and the Class Members' employee benefit plans.  These fees were built into the cost of the policies and resulted in higher premium costs to Plaintiffs and Class Members.  These fees are not reasonable expenses related to services needed for administering the plan.

131.    The Insurer Defendants concealed or failed to disclose compensation paid to the Broker Defendants to Plaintiffs and the Class, as well as to governmental agencies as alleged herein, even though the information was subject to disclosure under ERISA's reporting requirements.

132.    The Insurer Defendants encouraged and compensated the Broker Defendants for attempting to influence claims-loss ratios, claims filing, and renewal of policies.  Such compensation agreements resulted in actions adverse to the interest of Plaintiffs and Class Members.  The override agreements described herein created a system of incentives for the Broker Defendants that harmed Plaintiffs and Class Members by denying them the full benefit of their employee benefit plans.

133.    As detailed above, the Insurer Defendants also engaged in the practice of "low-hanging" fruit, bid-rigging, and other anti-competitive conduct.  These practices placed the financial interest of the Insurer Defendants ahead of the interests of the employee participants and beneficiaries, such as Plaintiffs and the Class.  As ERISA fiduciaries, the Insurer Defendants were obligated to refrain from the conduct that was harmful to their interests.

134.    The Insurer Defendants profited as a result of the scheme with the Broker Defendants to overcharge expenses paid by Plaintiffs and Class Members.  The Insurer Defendants received business that they would not otherwise have received in the absence of the Agreements with the Broker Defendants.  The conduct of the Insurer Defendants violated the sole interest and exclusive purpose duties of 29 U.S.C. §1104.  The Insurer Defendants engaged in deceptive conduct to overcharge Plaintiffs and the Class.  Such conduct is inconsistent with the duty of loyalty imposed under ERISA.

135.    Insurer Defendants also held and hold a relationship of trust and confidence with Plaintiffs and Class Members as a result of the following:

- Insurer Defendants cultivated a relationship of trust and confidence with Plaintiffs and Class Members by selling them insurance products that purportedly met their insurance needs;

- Insurer Defendants represent that the premium rates charged to Plaintiffs and Class Members are based on a complex mixture of risk factors and market demands, not illegal kickbacks and other undisclosed compensation paid to the Broker Defendants and Plaintiffs had no means of ascertaining otherwise;

- Insurer Defendants had access to Plaintiffs and Class Members' confidential, personal and proprietary information; and

- Insurer Defendants are characterized by elements of public interest which subject them to more stringent standards of conduct than those normally arising out of contract.

136.   Based on the foregoing, Insurer Defendants owe Plaintiffs and Class Members fiduciary duties, including the duty of good faith and fair dealing, the duty of full and fair disclosure, the duty of loyalty and the duty of care arising out of their relationship with Plaintiffs and Class Members.

137.   Insurer Defendants have a duty to provide complete and truthful information to Plaintiffs and Class Members when selling policies, including, without limitation, disclosing the source and amount of all compensation paid to the Broker Defendants and otherwise complying with full disclosure laws and curing any prior misrepresentations or omissions.  Insurer Defendants also have a duty to fully disclose all compensation paid on Forms 5500, filed with the I.R.S. and the D.O.L.

138.   In addition, Insurer Defendants have an independent duty to disclose information to Plaintiffs and Class Members by virtue of their special relationship with them.  Insurer Defendants have sole knowledge of the source and amount of all income paid and received through their compensation agreements, and of their steering, bid-rigging, market allocation, and other wrongdoing.

139.   Insurer Defendants breached these duties by conspiring to pay and paying kickbacks to the Broker Defendants in exchange for steering the Brokers' clients to them even when to do so was not in the clients' best interests.  Defendants were aware that Plaintiffs and Class Members had

no access to the foregoing information and therefore could not evaluate the accuracy of the information provided to them. In paying such kickbacks the Insurer Defendants manipulated the market for insurance and co-opted the Broker Defendants' duties, fiduciary and otherwise, to their clients.

## B. DEFENDANTS' COMPENSATION AGREEMENTS

140. Pursuant to Defendants' conspiracy, scheme and common course of conduct, the Broker Defendants solicit business from employers interested in purchasing group insurance on behalf of and for their employees. The Broker Defendants also directly solicit the employees to purchase supplemental insurance. The Broker Defendants steer them to purchase insurance from the Insurer Defendants and other carriers, with whom the Broker Defendants have entered into the Agreements, so that the Broker Defendants can receive undisclosed compensation, including Contingent Commissions, Communication Fees and other kickbacks. All Defendants ratified, adopted and knowingly participated in this scheme through the payment of undisclosed compensation and imposition of the undisclosed fees and costs resulting in injury to Plaintiffs and the Classes. Indeed, all Defendants sought to maximize the payment of such kickbacks without properly disclosing such compensation to Plaintiffs and the Classes.

### (1) Contingent Commission Agreements

141. Contingent Commission agreements provide that Insurer Defendants will pay undisclosed fees to the Broker Defendants based on (a) the volume of premium generated by the sales of Broker Defendants' products , (b) the renewal of existing business (persistency), and (c) the profitability of the book of business (or premium amount) purchased by Plaintiffs and Class Members (*i.e.*, a favorable claims and loss ratio). These agreements are referred to in the industry as "override agreements" "extra compensation agreements," "special producer agreements," "preferred broker compensation plans" and "brokerage house agreements" (collectively, "Agreements"), which

provide for Contingent Commissions (a.k.a. overrides) and other undisclosed or inadequately disclosed compensation to the Broker Defendants.

142.    Contingent Commissions often are based on a percentage of the entire "book of business" that a broker places with a particular carrier in any given year.  For example Marsh receives Contingent Commissions based on the volume of business Marsh places for a particular carrier in a particular year.  Thus, Contingent Commissions received from the insurance carriers are aggregated over the entire "book of business" placed with a specific insurance carrier and typically not collected in an account-specific manner, that it, Contingent Commissions received from defendant AIG are paid based on the total amount of business Marsh steers to AIG, not individually for each Marsh individual client account steered to AIG.  This was confirmed by Marsh CEO Jeffrey Greenberg:  "We don't break out contingent commissions.  That is not separately enumerated because it is part of our business model . . . ."  However, the business placed by a Broker Defendant can be determined on a client-by-client basis.

143.    Similarly, at Willis Contingent Commissions are paid at the end of the year, if the broker meets the minimum volume and loss ratio calculations.  These payments average between 5%-15% of the broker's annual commissions for the book of business placed.   Contingent Commissions are paid to brokers in exchange for two benefits to the insurance carrier: The first is to encourage brokers to steer a high volume of business and the second is for brokers to place higher-quality business, meaning policies and clients with fewer "claims experience" that ultimately result in higher profits for the insurance carrier.   The lower the loss ratio, the higher the carrier's profit.  Insurer Defendants are willing to share a percentage of profits with brokers as a reward for not placing business that does not add to the Insurer Defendants' margin.

144.    Broker Defendants also received Contingent Commissions based on either the rate at which their clients renew their policies with the Insurer Defendants, or by meeting a threshold level

of business with the carrier. For example, AIG's 2003 Agreement with Marsh provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIG at a rate of 85% or higher. If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%.

145.    Similarly, Aon entered into Performance Enhance Fund ("PEF") agreements, which provide that Aon received as a commission approximately 17% of the premium on new business and 10% on renewed business placed with an insurer. When Aon reaches the threshold of $10 million of business with a carrier, Aon receives an additional 1.5% of all the business done with that carrier for that year. Financial Services Group in New York is the main decision maker who ultimately decides which carriers get the contracts to insure a client, based on which carriers are closer to the threshold by which Aon receives a kickback of 1.5%, retroactive for the year. The carrier is chosen by Aon based on either the PEF or the highest commission, regardless of the clients' best interest.

146.    Hartford's agreements with Gallagher provide for a straight 14% commission for writing business, and a 5% override at the end of the year for writing a specified volume of business.

147.    MetLife and Cigna agreed with Hilb based on projected production goals whereby Hilb would later receive additional compensation in the form of Contingent Commissions if production goals were met. None of these agreements were disclosed to clients.

148.    The Broker Defendants also are compensated by the profitability of the policies, *i.e.*, the lower the claims the more fees that are earned. Hilb receives Contingent Commissions based on profitability, premium growth, total premium volume or some combination of these factors. Similarly, Wells Fargo receives Contingent Commissions based upon both the volume of the book of business placed by Wells Fargo with an individual carrier, as well as the "loss ratio" associated with that book.

- 37 -

149.     Contingent Commissions, also known as "override fees," can sometimes be as much as 15% of the total amount of business that the broker places in an entire year.  For instance, Marsh announced on October 18, 2004, that it received at least $845 million in Contingent Commissions in 2003 alone, accounting for 7% of its overall revenue of $11.6 billion and almost 50% of its net income.  Additionally, from January 2004 through June 2004, Marsh reported revenue from Contingent Commissions that totaled approximately $420 million.

150.     Aon's Contingent Commissions for the 12 months ended September 30, 2004, were approximately $117 million and Aon continued to receive Contingent Commissions in the fourth quarter of 2004, they would have recorded approximately $50 million of additional revenue.  Aon received an additional $91 million in "other compensation for services to underwriters" for the nine months ended September 30, 2004.

151.     Brown & Brown states that for the first three months of 2005 it collected almost $29 million in Contingent Commissions from insurance companies based primarily on the volume of business placed, retention ratios and profitability of the aggregate business written.

152.     Similarly, Gallagher and ULR received $33 million and $11.5 million, respectively, in Contingent Commissions in 2003 alone, accounting for nearly half of ULR's total revenues for 2003.  And, Willis announced that on October 21, 2004, it obtained an estimated $160 million in 2004 from the use of Contingent Commissions.

153.     The Broker Defendants put their interests ahead of their clients by refusing to place their business with insurance carriers that do not pay overrides even if that insurance carrier would provide the most cost-effective or superior coverage.

154.     For example, Aetna's refusal to pay undisclosed Contingent Commissions has had a direct result on its business with brokers: "Attached is our agreement with Aon's suggested revisions . . . .  They also made it clear that the lack of an override puts us at a severe disadvantage.  This is

- 38 -

evidenced by the fact that we haven't written a case with them in several years."  Aetna also

explained:  "Our SE Regional Broker Conference at the Cloister was a great success . . . [a]fter a

nice exchange of comments one of the brokers made a comment that changed the direction of the

discussion. . . 'you guys just don't get [it], price and ease of administration is not the issue. . . it's my

compensation.'"  (Emphasis in original).  Similarly, Aetna states:  "[A broker] indicated that he had

400+ . . . accounts and that half used to be with Aetna . . . til they made cutbacks in Commissions . . .

.  Now Aetna has none.  He indicated that [Aetna] had the lowest rates in the county [sic] . . . but he

gave business to BXBS [Blue Cross Blue Shield] because of commissions.  He told us to load our

rates 5-10% (give him ½) and we'd get all of his business."

155.    Defendants conspired to build Contingent COmmissions into the cost of the plans that

the Insurer Defendants offered to the Broker Defendants' clients.  Therefore, Plaintiffs and the Class

ultimately pay the cost of these undisclosed fees through higher policy premiums and/or reduced

benefits.  For example, a study by the Consumer Federation of America found that Contingent

Commissions account for 1.67 % of the premiums charged by Hartford.

156.    Yet, the Insurer Defendants fail to disclose to Plaintiffs and the Classes the conflict of

interest created by Contingent Commissions.  Although the Insurer Defendants are parties to the

Agreements, the specific amount of compensation received by the Broker Defendants and the

amount charged to the clients to cover the fees is not disclosed in any meaningful way to Plaintiffs

and Class Members.  Indeed, the Insurer Defendants actively take part in and cooperate with the

Broker Defendants in their effort to conceal the Agreements, and the revenue generated pursuant

thereto, from their respective clients.

157.    The concerted lack of disclosure is exemplified by The Group Insurance Commission

of Massachusetts' ("GIC") purchase of Unum group life insurance in 2001 through Broker

Defendant OFJ.  GIC seeks to reduce unnecessary costs by refusing to pay commissions or other

sales add-ons with respect to insurance policies it purchases. GIC likewise employs its "no commissions" policy vis-a-vis the insurance carriers that provide coverage to GIC members to prevent any actual or apparent conflicts of interest by its consultants.

158.     Notwithstanding OFJ's certification to the client that OFJ "will not receive commissions, either directly or indirectly, for any work we do in connection with this [GIC] engagement," OFJ received payments from Unum directly attributable to GIC's purchase of Unum group life insurance. Although OFJ instructed Unum not to pay base commissions attributable to the GIC purchase (approximately $28,000), OFJ continued to solicit and receive commissions pursuant to its Special Producer Agreement ("SPA") with Unum specifically attributable to GIC's purchase (over $400,000 in 2001 alone).

159.     Neither Unum nor OFJ disclosed to GIC, either at the consulting contract stage, the life insurance contract stage, or when Unum made payments to OFJ based on the GIC purchase, the existence of the Unum/OFJ SPA (or any other compensation agreement), or that Unum paid OFJ more than $400,000 in "new business" compensation as a result of the GIC purchase.

160.     However, in January 2003, GIC learned, for the first time, that Unum was paying OFJ compensation directly attributable to the GIC policy. GIC promptly demanded that Unum stop paying OFJ on the GIC policy. Unum and OFJ ultimately assured GIC that Unum's payments would cease and that Unum would "recoup" its previous payments to OFJ.

161.     In the absence of proper disclosure of the conflict of interest created by Contingent Commissions and other bonuses, Plaintiffs and Class Members justifiably relied on the Broker Defendants' representations that they were providing independent expertise to their clients and representing their clients' interests in accordance with their contractual, fiduciary and other duties as alleged herein. Plaintiffs and Class Members also justifiably relied upon the Broker Defendants' representations in connection with the insurance policies and services they purchased.

- 40 -

162.    As a result of the Commission Agreements, the Broker Defendants have breached their fiduciary and other duties owed to Plaintiffs and Class Members through steering (the placement of Broker Defendants' clients' business with the participating insurers) and bid-rigging (the manipulation of the purportedly competitive bidding process whereby the Broker Defendants utilize phony bids to ensure that a particular insurer will get the business at above market rates).

163.    As a result of the Contingent Commission steering, bid rigging, market allocation and other wrongful conduct, Plaintiffs and Class Members have paid insurance premiums in excess of what they would have paid had Defendants not engaged in such conduct.   The Defendants are fully aware that these Contingent Commissions and other kickbacks will impact all consumers' insurance and increase the cost of insurance.  According to Marsh: "*No client could be made to believe that this cost is not additive to the gross premium–hence we are indeed adding to the clients [sic] cost of risk.*"

### (a)    CIGNA's Contingent Commission Agreements

164.    Illustrative of Defendants' scheme and the consequences to Plaintiffs and the Classes is CIGNA's broker bonus plan whereby CIGNA pays an override commission based on the entire book of business placed by the broker in a given year.  For any broker to sell through CIGNA, it must sign a Blanket Commission Agreement ("BCA"), identifying the various types of benefits coverage for which the broker will solicit clients and sell policies.  For each type of plan CIGNA offers, the BCAs identify a "commission scale" that CIGNA will pay the Broker Defendants.

165.    In early 2003, CIGNA offered a "broker incentive plan," whereby brokers could accumulate points by selling plans for more than one line of coverage.  By placing business in multiple lines with CIGNA, brokers are entitled to another percentage point of commission on the entire book sold.  All information, advertisements and brochures disseminated to brokers throughout

the country were printed and mailed from CIGNA's home office marketing department in Philadelphia.

166.    As part of its 2004 Rewards Program, CIGNA compensated brokers for policy renewals as follows:

| Persistency Level | Renewal Commission Incentive Payments |
|---|---|
| 95% - 100% | 20% |
| 90% - 94.9% | 15% |
| 85% - 89.9% | 10% |

167.    Further, CIGNA's 2004 Commissions & Incentives materials disseminated to brokers contains a bolded heading: ***Incentives for Renewals with Rate Increases***.  Underneath the text reads: "You will earn one Coverage Credit for each policy renewal with a rate increase.  To be eligible, renewal rate increases must be effective 2/01/2004 to 01/31/2005.  The Coverage Credits you earn for these sold rate increases will help increase your eligibility for the New Sales Incentive payment." In addition, CIGNA enters into case-specific commission agreements with brokers to compensate them for delivering certain accounts to CIGNA.

168.    CIGNA provides brokers with printed promotional materials detailing how CIGNA will reward brokers with compensation and incentives that are "meaningful" to the brokers and that demonstrate CIGNA's appreciation.  As explained in CIGNA's "2004 Commissions and Incentives" brochure, these extra payments to the brokers are designed to "make it easy for [the broker] to recommend CIGNA to their clients."

169.    CIGNA's promotional materials also state:

As you know, our program rewards you for both new and renewal Group Insurance business as well as retention of in-force business.  And, with our program, ***there are no caps***, so you will be rewarded for your total results.

- 42 -

170.    Emphasizing "additional compensation" and "no caps" throughout, CIGNA's broker materials demonstrate CIGNA's incentives to producers go considerably beyond standard commissions, providing an unlimited amount of compensation and kickbacks to brokers.

171.    Within CIGNA, the overrides serve to "create a partnership with brokers," whereby the broker assists CIGNA in persuading Plaintiffs and Class Members to place new business with CIGNA and to remain insured by CIGNA instead of bidding out the policies to other insurance carriers.

172.    CIGNA also encourages brokers to participate in reducing claims. It tallies the "claims experience" of each broker's accounts in monthly reports. These reports are used by brokers to encourage employers, and thus employees, to limit claims experience, including not reporting all covered claims. Reduction of claims is specifically connected to the profitability of the business for both CIGNA and the broker of record.

173.    Brokers that are successful in maintaining and increasing volume year after year are denoted by CIGNA in its written Agreements as "Platinum Brokers."

**(b)    Hartford's Contingent Commission Agreements**

174.    As with other Insurer Defendants, Hartford pays overrides to brokers based on: (a) total dollar amount of new business placed, (b) amount of retained premium (renewed policies), and (c) profitability of the broker's book of business. Hartford sets "new business targets" or "growth incentives" for brokers to qualify for an override in a given year. Hartford also sets "retention targets" based on the percentage of existing business that the broker renews or maintains with Hartford. Further, Hartford requires a certain percentage amount of profitability for the broker's book of business based on the claims experience of the premium paid, *i.e.*, the profitability or "loss ratio" of the book of business. Hartford's standard Agreements require "[s]uccessful results in all three categories . . . for any compensation to be payable." Thus, even if a broker meets the

overall volume target, it does not qualify for an override payment if it fails to renew a specified percentage of policies with Hartford.

175.    For example, Hartford's 2003 and 2004 "VIP Management Expense Allowance Program Agreements" provided that ULR would receive overrides if it met the following requirements:

- New Business:

    - Standard Compensation is 1% of premium dollars received in new business.

    - Incentive Compensation is an additional .50% for every premium dollar beyond $25 million in new business.

- Existing Business:

    - Standard Compensation is 1% of premium paid for existing business.

    - Persistency Incentive Compensation is an additional .50% if a minimum of 90% of ULR's book of business remained with Hartford throughout the term of the agreement.

    - Profitability Incentive Compensation is an additional .50% if the Actual to Expected (A/E) loss ratio is 96% or less.  However, no compensation based on profitability is paid if the persistency drops below 88%.

176.    If a broker meets Hartford's production thresholds, it may be designated a "platinum broker," "gold broker" or "high impact broker."  Each of these designations determines the "profit sharing formula" incorporated into Hartford's override agreements.  "Platinum brokers" are those that steer the greatest amount of premium dollars annually to Hartford.  Consequently, such brokers receive the most preferential treatment and the greatest percentage amounts of overrides from Hartford.  Marsh and Aon both qualified as "platinum brokers."

177.    Hartford recoups the cost of paying overrides by building it into the "expense ratio," or the overall costs of administering the policies sold.  This expense ratio is captured as part of the premiums charged for its insurance products and services, and therefore such overrides are ultimately paid by Plaintiffs and the Class.

- 44 -

### (c)    MetLife's Contingent Commission Agreements

178.    MetLife's national broker contracts provide for a gross premium override of between 2% and 5%, as well as an annual producer bonus and marketing service fees based on profitability and the amount of business generated.  For example, MetLife's compensation to ULR (beyond standard commissions) has been memorialized in their Preferred Broker Compensation Plan II ("PBCP II") each year.  Under the 1998 PBCP II, ULR earned override compensation, based on its sale of MetLife's Group Universal Life ("GUL") policies to at least five new customers in a given year, totaling at least $25 million.  The override percentages were as follows:

- 1% of annual premiums for cases written with a non-participating financial arrangement to which PBCP II applied;

- sliding scale from .25% to .5% for cases with a participating financial arrangement to which PBCP II applied.

Per-case maximum payment was $200,000.  In addition to those payments, ULR was eligible for an asset trailer of 15 basis points on the cash accumulation account of each GUL policy to which PBCP II was applicable.

179.    MetLife has had a number of Agreements in addition to its Standard Broker Agreement, including the Single Case Commission Agreement (Non-Standard Agreement), Producer Agreements, Brokerage House Agreements (Overrides) and Preferred Broker Compensation Plans. At best, Plaintiffs and Class Members are informed only of the Standard Broker Agreement commissions.  In addition, MetLife field executives have requested modifications to existing broker compensation arrangements based on the needs of the broker, rather than the insured.  Although requests for modifications were sometimes based on errors in the compensation agreements, typically such requests involved rebates, also known as "back-end sweeteners."

180.    MetLife has acknowledged that it made override payments to brokers totaling approximately $25 million for business sold and serviced in 2003, alone.

181. MetLife recouped the cost of broker commissions by dramatically increasing its rates on renewal. In fact, MetLife's renewal rates sometimes increased by as much as 40%-50%. Similar to the Cigna "Partnering Program," the brokers help ensure Plaintiffs and Class Members will renew with MetLife, despite high renewal premium rates. One way they do this is by bid-rigging – directing non-incumbent insurance carriers to submit high bids, thereby making MetLife appear competitive.

182. However, when MetLife was confronted with the question about whether its Agreements with certain brokers translated into higher premium rates, a MetLife representative responded: "I am not going to tell you that, I'm not in a position to have that discussion."

### (d) Prudential's Contingent Commission Agreements

183. The Agreements between Prudential and brokers are titled Quality Business Incentive Award Agreements ("QBIAAs"). The QBIAAs are customized agreements in lieu of Prudential's standard producer incentive awards and are the sum of the Persistency Award plus the New Business Award, capped at $500,000 per account.

184. Prudential's persistency awards are calculated both regionally and nationally. Prudential's Regional New Business Awards required at least $5 million in new premiums and National New Business Awards required at least $10 million in aggregated regional new sales.

185. The 1998 QBIAA provided for 1% overrides on annual premiums of at least $1 million; 2% on annual premiums of at least $2 million, and 3% on annual premiums of at least $3 million.

### (e) UnumProvident's Contingent Commission Agreements

186. UnumProvident enters into Special Producer Agreements ("SPAs") with certain brokers each year. By express terms, the SPAs provide compensation to brokers for providing one or more of the following: "consulting, brokerage intermediary assistance, billing/premium

administration, claims administration and fiduciary assistance on specified insurance products." Compensation for any of those services is described as "Extra Compensation."

187.   Under UnumProvident's 2000 SPA, it paid ULR 2% of annualized new sales premiums, provided ULR brought in three new lines of coverage and $3 million in premiums.

**(2)   Communication Fees**

188.   Communication Fees (a.k.a. "enrollment fees" or "service/administrative fees"), are simply another form of undisclosed, kickbacks relating to supplemental group life, disability and/or other insurance sold directly to employees.

189.   Defendants promote the supplemental benefits to employees since such coverage is profitable to both the Insurer and Broker Defendants.  The promotions and advertisements are referred to as "communications."  The communication materials are usually designed to look like they were issued by the employer using the employer's logo or color scheme and often accompanied by a cover letter from an executive of the employer.  Occasionally, they are issued under the insurance carrier's letterhead.  This is because employers generally prefer to have a "single source" talking to their employees about insurance.  The fees are based on the total number of employees, not  just those employees who pay for supplemental coverage.

190.   For example, MetLife and ULR had an "Ad Hoc Consulting Service Agreement" for 1998-2000, which provided as follows with regard to customers to whom ULR sold GUL plans:

- ULR will run implementation meetings for each customer, and

- ULR will design, print and distribute employee communication material.

MetLife compensated ULR ***$10.00 per employee*** in the first year of each GUL plan, or ***$20.00*** for Group Variable Universal Life ("GVUL") plans.

191.   Communication Fees are extremely lucrative.  A ULR invoice for Communication Fees to MetLife for nearly $150,000 showed that the cost to ULR in providing these

"implementation and enrollment" services amounted only to $65,000, netting ULR nearly $85,000 in profit. Thus, while purporting to be a "communication fee," the claimed services are either illusory or bear no relation to the amount of such fees.

192.     Whether the insurance carrier or broker ultimately provides the communications, the Communication Fees are paid by the Insurer Defendants to the Broker Defendants and recaptured in the premium rates charged to the employees and their dependents who choose optional or supplemental insurance coverage (including dependent coverage).

193.     For example, a September 12, 2002 ULR e-mail regarding bidding on the Cummins' account states: "During the conference calls with the insurance carriers please have all rates include a flat 3% commission level and they are to include a $5 per employee communications fee for ULR."

194.     The Insurer Defendants did just that – including Communication Fees in the premiums charged Plaintiffs and Class Members.  In March 2004, for example, an employee benefits broker who represented retail giant Wal-Mart e-mailed Prudential to inquire whether Prudential included a communication fee in its premium rates for employee supplemental coverage.  The Prudential executive responded:

> [W]e do build in the cost of communication materials. . . . The WalMart rates are not be (sic) reduced any further.

195.     Similarly, when the same questions were posed by the broker to a MetLife executive, also in connection with Wal-Mart, MetLife's response, similar to Prudential's, demonstrates the Insurer Defendants' collusion with the broker:

> The communications we are paying on Wal-Mart . . . is included in the rates that we have offered.  If you were to ask us to pay communications cost of $3 or $6 per employee, *we would build the additional expenses . . . into our rates*.

At that time, MetLife was paying $10 per employee in Communication Fees to ULR. When later asked why MetLife paid these fees, which resulted in higher rates to ULR's clients – the insured – the same MetLife executive responded, "*[w]e build this in because the Broker [ULR] tells us to.*"

196. Defendants conceal the Communication Fees from Plaintiffs and the Class. For example, in January 2003, when soliciting a proposal from CIGNA, the ULR Defendants instructed CIGNA that "[T]he communications fees . . . should not be communicated to the client without ULR's prior consent."

197. Even when confronted by the client, Defendants falsely deny such fees. For instance, when ULR client Chevron/Texaco inquired about the existence and/or impact of Communication Fees on their premium rates, both the head of Sales and head of Product Development at MetLife adamantly and falsely denied that any Communication Fees were built into the policy rates. In fact, MetLife paid ULR nearly $300,000 for Communication Fees in connection with the Chevron/Texaco account that year and its 2002-2003 undisclosed compensation agreement with ULR provided that these fees would "be included in [MetLife's] rates charged to employees."

198. The Broker Defendants' agreements with their clients also conceal Communication Fees. ULR's agreement with Safeway, for example, states that the insurance carrier (UnumProvident) will pay a $50,000 fee for RFP, and that the costs of ULR "implementing and communicating the new plan" are "included in the RFP cost." In fact, ULR levied a communication fee of $10 per employee for supplemental life insurance and $5 per employee for supplemental disability insurance for that plan. Again, this fee was passed along to Safeway's employees through higher premiums and/or lower benefits. In addition, UnumProvident paid ULR overrides based on a percentage of the total premium for delivering Safeway's insurance business.

199. The Insurer Defendants collude with the Broker Defendants and pay Communication Fees even though they acknowledge they are outrageous. For example, a UnumProvident executive

- 49 -

noted: "In the past year, we have paid Doug Cox/ULR several million dollars and we don't have a lot of formal documentation other than e-mail messages and invoices." From 2000 to 2003, UnumProvident paid ULR $3.5 million in Communication Fees which UnumProvident has admitted were "excessive" and "outrageous."

200. The Insurer Defendants do not absorb these "outrageous" fees – Plaintiffs and Class Members do.

201. The other Broker Defendants also accepted Communication Fees from Insurer Defendants. For example, Gallagher and USI both advertise on their websites that they provide communications to employees.

**(3)    Broker Bonuses**

202. Insurer Defendants also pay special "Broker Bonuses," which are additional undisclosed kickbacks to brokers for delivering certain volumes of business and, in certain cases, specific accounts.

203. Additionally, Insurer Defendants also sponsor regional and local paid trips for brokers and all expense-paid corporate functions and seminars at luxury resorts for certain broker. Eligibility for the trips is based on certain volumes of premium placed with Insurer Defendants, as well as number of cases or volume of certain lines of insurance.

204. For example, one insurer announced to Aon producers that "[we] want your business! In exchange for your business, we want you to be our guest at a [company] Platinum Rewards event in 2004. Based on the total number of new or retained [company] Members you write this year you can qualify to join us at one of these three great destinations."

205. Insurer Defendants also set aside "entertainment budgets" for sponsoring trips and other incentives. Once again, like other kickbacks provided to brokers, these expenses are embedded

in the carriers' administrative expenses and thus recaptured within the premium rates charged or benefits provided to Plaintiffs and the Classes.

## C.  DEFENDANTS CONCEAL THE PAYMENTS FROM PLAINTIFFS AND CLASS MEMBERS

### (1)  Defendants Fail to Disclose Payments in Marketing Materials, Policyholder Agreements and Policyholder Communications

206.    While the Broker Defendants purport to represent their clients and their employees and to act in their best interests, the Broker Defendants fail to disclose in their advertisements, brochures or otherwise that they have been appointed as agents on behalf of the Insurer Defendants. This undisclosed conflict and dual remuneration breaches the Broker Defendants' fiduciary duties. For example, ULR executive, Douglas Cox, is authorized to sell insurance on behalf of MetLife, Prudential, LINA, Provident and UnumProvident.  Thus, while the Broker Defendants represent to their clients that they are acting on their behalf as their agent of record or consultant in obtaining the most appropriate and cost-effective insurance policies by objectively canvassing the market, they are in fact simply delivering to Plaintiffs and the Classes the insurance carriers that have appointed them to solicit and sell employee benefit plans.

207.    Broker Defendants do not disclose to Plaintiffs and the Classes that additional fees will be paid by the Insurer Defendants and factored into the cost of their employee benefit plans.  In fact, Defendants actively conceal this information.

208.    For example, Marsh's policy of misleading clients about Contingent Commissions recently came to light in the guilty plea of a former Marsh managing director, Joshua M. Bewlay, who pleaded guilty to a felony charge of scheming to defraud on February 14, 2005, testified that Marsh established a procedure or a "protocol" intended "to discourage the client from obtaining an answer" on how Marsh received compensation from insurance companies.  Indeed, Mr. Bewlay

- 51 -

testified that the "Marsh protocol required multiple layers of inquiry to discourage the client from obtaining the answer."

209.     Marsh also directs employees to redact and "white-out" the commission income identified in the insurance "binders," *i.e.*, the temporary insurance contracts, prepared by the insurance carrier and sent to Marsh for transmittal to the client/insured.

210.     In one instance, a senior vice president at Munich was reprimanded by Marsh for referring to the Agreement between them in correspondence.  Munich immediately attempted to salvage the situation:  "We acknowledge that this was inappropriate behavior and will do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the PSA.  I apologize for the consternation that this has caused within the Marsh organization."

211.     The other Broker Defendants also fail to disclose, or sufficiently disclose, the existence of Contingent Commissions and other compensation in their client contracts and proposals. Neither company ever advised insured clients of the amounts of Contingent Commissions paid although commissions and Contingent Commissions were the two largest single items of revenue.

212.     Similarly, a former Gallagher employee stated that Gallagher "avoid[e]d sharing these [commissions] at all costs" with clients.  This former employee noted that not sharing this information with clients was possible since the clients typically paid the entire premium to the insurer who would then forward the commission to Gallagher.

213.     On March 30, 2005, UnumProvident announced it would change its disclosure practices relating to broker compensation.  Without detailing its present disclosure practices, if any, UnumProvident said that, "going forward," "customers can obtain from producers information about all compensation paid to the producer.  As part of the changes to its policies and procedures, the company will provide appropriate notices to customers stating its policy surrounding disclosure and

will provide information on its website about its producer compensation programs." The press release further states, "Other changes include requiring customer approval of compensation paid by UnumProvident to the producer when the customer is also paying a fee to the producer, and strengthening certain policies and procedures associated with new business and quoting activities." This partial corrective action – which can only be verified through discovery – demonstrates that UnumProvident previously had not provided customers with appropriate information about compensation paid to brokers and had not informed customers that it compensated producers who had already been compensated by the customer, and that certain UnumProvident's practices to garner new business were improper.

214.    Prospective injunctive relief is necessary and proper to insure: (i) that Defendants fully disclose all compensation paid to the Broker Defendants and any agreements between the Broker Defendants and the Insurer Defendants, and (ii) that Defendants do not later abandon such corrective action.

215.    Insurer Defendants also have conspired to conceal from Plaintiffs and Class Members compensation they pay to the Broker Defendants. For example, in response to an inquiry by ULR client International Truck and Engine Corporation ("International Truck"), MetLife falsely stated in a December 9, 2003 letter to ULR that "Universal Life Resources is acting on behalf of the group customer in the above named case and is not acting on behalf of MetLife and is not receiving compensation from MetLife." This was patently false. That same year, ULR and MetLife had an override agreement in place under which ULR Defendants received $8.5 million for 2003, part of which is attributed to the International Truck account.

**(2)    Defendants Conceal Payments on Governmental Forms**

216.    Under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), insurance carriers have a duty to disclose to the employee benefit plan administrator all commissions

and fees paid to brokers, agents and other persons on the Form 5500, filed with the IRS and DOL. Under 29 U.S.C. §1023(a), insurance companies must disclose "all commissions and administrative service or other fee" paid to the broker that placed the employee benefit plan.

217.    Department of Labor ("DOL") regulations (29 C.F.R. §2520.103-5(d)(1)) require insurance carriers to certify the accuracy and completeness of the disclosed compensation in a written declaration on a Form 5500.  Every individual or entity subject to Form 5500 filing requirements must maintain records that sufficiently verify, explain and/or clarify the disclosed information.  The underlying records must be available for examination for at least six years after the filing date.

218.    The DOL has stated: "29 C.F.R. §2520.103-1 and the instructions for the Schedule [A] require the plan administrator filing an annual report using the Form 5500 to . . . report information about each agent, broker, and other person who was paid commissions or fees, including the amount of commissions and fees paid."  DOL Op. 2005-02A.  Further, the scope of this requirement includes "all fees and commissions directly or indirectly attributable to a contract between a plan and insurance company."  As made explicit by the DOL: "This includes commissions and fees paid by an insurance company, where the broker's, agent's or other person's eligibility for the payment or the amount of the payment is based, in whole or in part, on the value (*e.g.*, policy amounts, premiums) of contracts or policies (or classes thereof) placed with or retained by an ERISA plan, including, for example, persistency and profitability bonuses."  *Id.*  As such, the DOL explicitly found Contingent Commissions were and had been subject to the Form 5500 disclosure rules.

219.    The DOL further specified that "non-monetary forms of compensation, such as prizes, trips, cruises, gifts or gift certificates, club memberships, vehicle leases, and stock awards, must be reported if the entitlement to or the amount of the compensation was based, in whole or in part, on policies or contracts placed with or retained by ERISA plans."  DOL Op. No. 2005-02A.  Finally,

"[f]inder's fees and other similar payments made by a third party to brokers, agents, and others in connection with an insurance policy must be disclosed by the [insurance carrier] where the [insurance carrier] reimburses the third party for the payment either separately or as a component of fees paid by the [insurance carrier] to the third party." *Id.*

220.     Section 501 of ERISA makes it criminal to willfully violate ERISA's disclosure requirements, as well as the DOL's regulations, promulgated there under, and violators are subject to a $100,000 fine and imprisonment for up to 10 years in the case of an individual, and a $500,000 fine for entities.

221.     The payment and receipt of Contingent Commissions, Communication Fees and other undisclosed compensation clearly fall within these Form 5500 reporting requirements. Defendants have intentionally and willfully failed to disclose and conspired to conceal the Contingent Commissions, Communication Fees and other compensation paid on the Report 5500 (and Schedule A thereto). Indeed, the Broker Defendants have directed insurers not to report the amounts and nature of compensation paid for specific client accounts. For example, at a major meeting between brokers and insurers in September 2003, the Broker Defendants requested that "the expenses/funding not appear on the 5500 form."

222.     ULR has similarly requested the concealment of such fees in connection with its client Rubicon. When asked by Prudential: "[T]he amount of commissions reported on the Report on Form 5500 is less than what was received in 2003. How would you like us to proceed?" Rob Combi of ULR responded, "Just leave alone. Thanks."

223.     Similarly, the Special Producer Agreements between ULR and UnumProvident state: "Extra compensation will not be reflected on ERISA Schedule A Reports" submitted to ULR's clients for filing with the IRS and DOL.

- 55 -

224.    Attempting to justify its earlier participation in the concealment of kickbacks, UnumProvident's Vice President of Distribution Strategy & Compensation stated to certain brokers that: "[p]ractices that may have been acceptable in the past need to be reviewed on an ongoing basis, and if necessary changes to be compliant with the strict dictates of today's business world." The letter continued: "It has come to our attention that provision 5b of your Special Producer Agreement is one such provision that should not be contained in the document. It states that: 'Extra Compensation will not be reflected on ERISA Schedule A reports. . . .' ERISA requires us to report broker fees and commissions on ERISA covered cases to the Plan Administrator. . . . Accordingly, we are asking for your cooperation and understanding in the deletion of section 5b . . . ." UnumProvident thereby acknowledges that it knowingly conspired with Defendants not to disclose such compensation on the Report on Form 5500.

225.    CIGNA also conceals Contingent Commissions, Communication Fees and other kickbacks to brokers from Plaintiffs and Class Members on the Form 5500, whether based on CIGNA's broker bonus plans or broker-specific "national override agreements."

226.    Similarly, Hilb failed to disclose its Contingent Commissions to brokers on the Form 5500. A former employee of both Wells Fargo and Willis likewise confirms that he never saw any Form 5500 disclosures Wells Fargo or Willis regarding the amounts of Contingent Commissions received for purposes of reporting on Form 5500.

227.    And, Mercer complained about one insurer's bonus program agreement in particular because it did not sufficiently conceal the Contingent Commissions. Mercer stated that it had been told that "the '2004 Producer Administrative Agreement' would be the type of document we would want if we did not want to have client-specific, disclosed compensation showing up on [Forms 5500]. In fact, we don't want it appearing on [Forms 5500] since we have communicated to all our clients that overrides are used to offset certain costs of doing business which our [sic] common to all

of our client relationships." Mercer added that having overrides on the 5500 "is not ideal for us because overrides and regular commissions might be combined on one amount, raising questions from clients on why our commission disclosures are less than [Form 5500] commission...Is this a requirement that is set in stone or not? This could be a potential deal-breaker for us . . . ."

228. Most insurance companies comply with the brokers' demands and will do whatever is necessary to conceal their conspiracy. As one insurance company informed Mercer: "The full amount will be 5500 reportable . . . If this does not work, we can provide alternative options, such as a producer administrative agreement . . . ."

229. This "option" became quite popular. According to the Connecticut Attorney General Richard Blumenthal's ("Connecticut A.G." or "Blumenthal") complaint against Marsh, one insurer stated that: "Marsh is interested in having most of their bonus off of the 5500" and that according to an internal company e-mail, "[w]e are encouraging our Producers to be paid MORE off of the 5500. I thought it was [the company's] position to have bonus reportable." According to the Connecticut AG Complaint, Marsh and other Broker Defendants were all receiving checks clearly identified as non-disclosed under Form 5500.

230. Marsh is not the only Broker Defendant to direct Insurer Defendants to falsify federal disclosure forms. A former employee at MetLife was asked by an associate sales manager in Chicago to delete the information concerning an override payment to Aon so that the sales manager might maintain his relationship with Aon. When the former employee refused, he was told by the Chicago sales manager that "[t]his is not going to be good for me because I did not disclose this information on the front end." The former employee was subsequently asked to leave the company.

231. Defendants also have conspired to falsify information about legitimate commissions on governmental forms to avoid alerting Plaintiffs and Class Members to other undisclosed compensation agreements. For instance, ULR's bid for Dell's employee life insurance coverage

- 57 -

claimed that its only compensation was a $120,000 payment from the insurance carrier that was ultimately selected. ULR indicated to UnumProvident that it would receive the Dell account, but UnumProvident represented to ULR that it could only submit the low bid if ULR waived the $120,000 RFP fee. ULR agreed but required UnumProvident to falsely report the commission on Dell's Schedule A Report because otherwise the failure to pay and report that commission would raise "red flags," because Dell had already authorized the payment. A UnumProvident employee explained:

> We removed the commissions so that we could get to the pricing of one of our competitors, ***but the client, probably not aware of broker override programs***, would find it fishy if there were no commissions paid to ULR for the marketing. So we are ***making this arrangement so that we facilitate the [Schedule A] expectations from the client. We do not, however, wish to involve Dell in these discussion [sic] at all***.

232.     Owing to the obvious illegality of this practice, certain insurers have balked at the Broker Defendants' requests. As early as 2001, one Aetna e-mail said of Marsh that "[a] BIG issue we will have with the [large brokers] is 'what do we do with those accounts where we are not currently paying any commission (client is paying them directly) . . . plus the issue of these monies now possibly showing up on a 5500."

233.     Further, in the wake of the brokerage scandal, some insurance carriers have changed their practices with respect to the Form 5500 disclosures. For example, Defendant UnumProvident recently admitted that it was "struggling with [ULR's] request to pay non-reportable fees" to ULR, that is, paying ULR Defendants compensation that was not reported on the Form 5500. ULR Defendants' response in May 2004 was to revive defendant Benefits Commerce, a previously dormant corporation, as a receivership for undisclosed fees. ULR has admitted that the purpose in doing so was to avoid having UnumProvident report ULR's Communication Fees.

### D.   BROKER DEFENDANTS STEER BUSINESS TO INSURER DEFENDANTS

#### (1)   Steering

234.   Driven by consolidation in the brokerage industry, brokers have been able to exert considerable market power and influence in the insurance marketplace.

235.   The Broker Defendants use their position of influence to maximize the undisclosed revenue they receive from the Insurer Defendants by steering their clients to purchase policies from those insurance carriers, including the Insurer Defendants herein, with which they have negotiated the highest Contingent Commissions and other forms of undisclosed kickbacks.  The Broker Defendants also specifically recommend those policies and terms that they believe will generate the highest amount of compensation from the insurance carrier.

236.   For example, based entirely on maximizing Contingent Commissions, Marsh dictated to its brokers which insurance companies' policies they were to sell.  This was confirmed by allegations in the New York Attorney General's ("N.Y.A.G.") Complaint and documents attached thereto, wherein a managing director within Marsh advised colleagues that:  "Some [Contingent Commission agreements] are better than others. . . .  I will give you clear direction on who [we] are steering business to and who we are steering business from."

237.   Marsh's Global Brokering executives also used a "tiering report" that segregated insurance companies by how favorable their Agreements were to Marsh.  The tiering report instructed recipients to "monitor premium placements" so that Marsh obtained "maximum concentration with Tier A and B"– the insurance companies with which Marsh had the most favorable Agreements.  One Marsh executive put it quite plainly in September 2003:  "We need to place our business in 2004 with those that . . . pay us the most."

238.   The increased revenues Marsh gained from its relationship with its stable of preferred insurance companies, including MetLife, was explained by Marsh in a July 2000 memorandum

entitled "BUSINESS DEVELOPMENT STRATEGIES," describing one of the insurance companies with which Marsh had an Agreement: They have gotten the 'lions [sic] share' of our Environmental business PLUS they get an unfair 'competitive advantage['] as our preferred [sic] [insurance company]."

239.    Internally, Marsh rewards employees who maximize its Contingent Commission revenue by steering clients to insurance companies with which it has Contingent Commission Agreements.  One Marsh employee was elevated to vice president, in part because he renewed a client's business "by moving" that client to an insurance company with which Marsh had a Contingent Commission Agreement (noting "Neighborhood Health Partnership Estimated Revenue – $390,000.").  Among his "[f]inancial success[es]" the soon-to-be vice president "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [Contingent Commission insurance company]–Increased revenue from $120,000 to $360,000 (estimated)."  In critiquing himself on a 2003 self appraisal form, the now vice president stated:

> Renewed large account with [Contingent Commission insurance company] to demonstrate our willingness to continue our relationship.  ***Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership***.

Other employees were similarly praised in performance evaluations for increasing Marsh's Contingent Commission income from insurance companies "***by achieving budgeted tiering goals***."

240.    Further support for Marsh's scheme to generate the highest Contingent Commissions is a report from Marsh's Los Angeles office describing that in late 2003 brokers in Marsh's Los Angeles office were ordered to temporarily stop selling personal coverage lines from AIG because doing so could reduce commission payments to Marsh.  One broker said "[t]he whole department couldn't believe it. We kept saying, 'If this ever gets out, [the company would] be in so much trouble.'"  The brokers said that they were told that Marsh did not want to exceed an annual cap on policies with AIG in states with a high risk of earthquakes, hurricanes or other costly disasters

- 60 -

because exceeding the limit could reduce Contingent Commissions that Marsh expected to receive from AIG.

241.    Similarly, other Broker Defendants went to great lengths to instruct their employees to recommend those policies and terms that would generate the highest Contingent Commissions. Contingent Commission incentives offered by insurance carriers to Willis have become more important to Willis' profitability, causing more focus and concerns about potential for meeting the required volume necessary to qualify for contingent payments.

242.    Both Willis and Wells Fargo ran financial reports to determine volumes of business sold for individual carriers.  The purpose of these reports were for Willis and Wells Fargo to analyze where they could get "the most bang for the buck" toward the end of the year by steering business toward a carrier where there was the best opportunity for the greatest Contingent Commission. Indeed, Wells Fargo issued directives to its employees emphasizing particular carriers and was considered a "premier provider" with certain insurers.  Additionally, Willis hosted weekly or bi-weekly conference calls, attended by managers of each outlying Willis office, where corporate accounting updated Willis' financial positions with respect to individual carriers and informed the field of which carriers to favor.

243.    Willis and Wells Fargo also held monthly customer service representative meetings at each local office.  Since the customer representatives dealt directly with the insureds and the carriers, they were informed by marketing about the brokers' proximity to receiving override payments, so they could help facilitate the placement of policies with specific carriers, in order to meet the threshold target.

244.    USI also dictated to its brokers which insurance companies' policies they were to sell. For instance, USI employees were told not to move business from certain carriers, including

defendant Hartford, because the commissions were higher.  Furthermore, at monthly department meetings, USI employees were told to "stick with the higher commission carriers."

245.    Aon also steered clients to certain insurers.  As reported in the New York Times, by a person close to the N.Y.A.G.'s investigation into Aon, investigators have found documentation of brokers steering business to insurers that paid Aon incentives.  In fact, the Chicago Tribune reported a specific instance of steering involving ISMIE Mutual Insurance Co., Illinois' largest medical malpractice insurer and a client of Aon's reinsurance business.  During the mid-1990s, Aon brokers began directing their clients away from ISMIE to competing firms.  ISMIE's chief operating officer met with representatives of Aon's reinsurance brokerage and threatened to fire Aon as its reinsurance broker unless Aon brokers stopped taking their clients to ISMIE competitors.  Aon insurance brokers were subsequently told to stop redirecting their clients away from ISMIE.

246.    HUB also exerted pressure on its regional brokers to steer clients to preferred insurers in order to maximize the company's Contingent Commissions.  According to a former HUB employee who worked as a business manager for three HUB offices, HUB would send monthly statements to the local managers stating the level of commitment HUB had made to certain insurers, and detailing how much business the local manager had given to that insurer to date, and that HUB needed to fulfill its commitment.  According to this former employee, "business is driven to specific carriers because of commitments made on contingent arrangements."  HUB's vice-president of marketing, John Curran, was responsible for entering into such Agreements with carriers such as Chubb, St. Paul Travelers, and Hartford, and ensuring that HUB maximized its Contingent Commissions with the insurers.  As Curran explained in an insurance industry journal entitled Rough Notes, "[w]e work with insurance companies to develop a business plan that will help us both accomplish our objectives."  According to the former HUB employee, "[i]f John Curran calls and

says what have you got to give to Chubb – [some people] may place a piece of business with Chubb because John asked them to."

247.    Gallagher also provided its brokers a list of approved insurers from which they could place insurance, including Hartford and AIG.

248.    A former Brown employee acknowledged that steering took place with specific insurers such as Hartford which provided end of year bonuses and kickbacks based on volumes of business placed.  Moreover, Brown put pressure on carriers so that it could earn more contingent commissions and volume based agreements.  In fact, Brown management would hand out documents to personnel specifically identifying the names of carriers Brown had volume agreements ranked according to the volume agreements and fees the company would receive.

249.    And, ULR steers more than 90% of its business to CIGNA, MetLife, Prudential, UnumProvident and their subsidiaries and/or affiliates.  For example, MetLife and ULR have entered into "Preferred Broker Compensation Plans," in which ULR can secure a 50% increase in its overrides if it meets a "New Business threshold."  To meet this threshold, the broker must place one of every three accounts that MetLife prices "competitively."  Not surprisingly, MetLife receives approximately 50% of ULR's business.  In 2003 alone, MetLife paid ULR over $8.5 million in overrides.

250.    The Insurer Defendants realize that the Broker Defendants steer them business only because they have agreed to pay the Broker Defendants for the business.  Accordingly UnumProvident, "to play with (ULR), we need the overrides."

251.    Consequently, the Insurer Defendants have directed brokers to steer business in their direction through special incentive programs.  For example, Hartford encourages brokers to produce more business by designating them "platinum broker," "gold broker" or "high impact broker."  Such designations result in "more preferential treatment" and "better contingency contracts" (*i.e.*, higher

override payments and other monetary and non-monetary remuneration at the expense of the insured).

252.    CIGNA encourages brokers to sell disability insurance to its clients by awarding the brokers twice as much Contingent Commission credit: "Our Short Term Disability programs can only be purchased in connection with our Long Term Disability insured program.  That means you earn two Coverage Credits on each new . . . Disability sale."

253.    In an effort to maximize the business it receives through steering, at its February 2004 New Orleans National Sales Conference MetLife introduced the "Broker Producer Bonus System," which is a computer program designed to help producers calculate the threshold amounts needed to qualify for bonuses.

254.    In addition to steering clients to carriers that pay them the highest overrides and away from carriers that refuse to pay overrides or submit false bids, the Broker Defendants steer Class Members toward certain types of plans that permit Defendants to more easily conceal compensation received from or paid by Insurer Defendants.

255.    For example, ULR encourages Class Members to place their employee benefit plans with "non-participating" insurance carriers ("non-par"), versus "participating" insurance carriers ("par") that pay dividends to their policyholders.  The former do not report the specific components that are included in the pricing of the policyholder's premium such as compensation paid to ULR Defendants, while the latter must provide such information.  To maximize their undisclosed fees, Broker Defendants steer Class Members toward non-participating plans.

256.    The Broker Defendants have been able to ensure others' participation in the conspiracy by leveraging the Agreements for greater amounts of Contingent Commissions and market share.  On November 7, 2003, a Marsh executive described his experience with the President of ACE as follows:  "I made it clear that if ACE wants us to meet significant premium growth targets

- 64 -

then ACE will have to pay 'above market' for such [a] stretch . . . ."  Similarly, a former AIG employee noted that a large majority of AIG's accounts were controlled by Marsh and Aon and that "those accounts are pretty complex and mean so much to the company that they would do anything to keep them."

257.    The Connecticut AG Complaint against Marsh and ACE includes another example of Marsh's influence over the Insurer Defendants.  It describes how one insurance company found itself shut out by Marsh and found it necessary to use override agreements simply to get business: "We are now being heavily penalized by Marsh for not having the [PSA] agreement signed.  We are being systematically excluded from . . . placements that we would otherwise like the chance to write." Another insurance executive noted: "With Marsh if we don't have an override we should not call on them . . . they flat out told us if we want to write business we need to have an override end of story."

258.    Finally, some of the Broker Defendants control the competitive process by demanding higher Contingent Commissions on renewal.   For example, ULR advised UnumProvident that it would "need to comp[ensate] them [ULR] not to shop enforce [sic] accounts[]."

259.    As a corollary, the Insurer Defendants are able to garner huge profits by conspiring with the Broker Defendants for their clients' business.   For example, MetLife received $565.6 million in premiums for policies placed in 2003 by ULR.  That same year, Prudential and UnumProvident received $214.3 million and $101.6 million, respectively, in business from ULR.

        **(2)    "Low-Hanging Fruit"**

260.    One of the most egregious steering practices in which Defendants engage is known as "low-hanging fruit."   Insurer Defendants commonly obtain additional business by "flipping" (providing) existing clients with which they have direct insurance contracts (*i.e.*, who are purchasing insurance without a broker) to the Broker Defendants with the understanding that the brokers will

- 65 -

steer other accounts to the insurance carriers. Broker Defendants then are able to earn Contingent Commissions and other undisclosed compensation from the Insurer Defendants on the "flipped" clients.

261. Defendants' "low-hanging fruit" steering practices are exemplified by CIGNA's "flipping" Honeywell to the ULR Defendants. CIGNA was already Honeywell's insurance carrier, but later designated ULR the broker of record. ULR did not replace any prior broker. Honeywell's employee benefit policies were worth $15 million, with a 1% override that was paid to ULR Defendant, unbeknownst to Honeywell and its employees.

262. Further, Prudential's Quality Business Incentive Award Agreement with ULR provided for low-hanging fruit compensation in the following provision:

> Inforce and new premium consideration for this award will be "net" totals. ***Should the Producer be named broker of record or retained in a consulting capacity by an inforce Prudential account, the value of that account will be included in the (override) award calculation***.

Thus, Prudential contemplated situations where an insured would have an existing policy with Prudential. Prudential subsequently would designate ULR as broker or consultant even though ULR had not placed that insured with Prudential, and Prudential would count that insured's premium toward ULR's override.

263. The other Defendants have also engaged in low-hanging fruit steering arrangements.

**(3)    Defendants' Bid-Rigging Scheme**

264. Defendants also have conspired and engaged in bid-rigging practices to steer Plaintiffs' and Class Members' accounts to certain Insurer Defendants in return for Contingent Commissions.

265. Among other things, bid-rigging enables the Insurer Defendants to keep premium prices high. Through their bid-rigging conspiracy, Defendants were able to, *inter alia*, increase their insureds' premiums at the time of policy renewal to recoup broker fees and achieve higher profit

margins. For example, MetLife and Cigna have increased their renewal premiums by as much as 40%-50% for some accounts. To maintain the business with the incumbent carrier and capitalize on the persistency prong of the override agreements, the Broker Defendants direct non-incumbent insurance carriers to submit quotes that are higher than the quotes they might otherwise have provided.

266.    Intrinsic in Defendants' bid-rigging scheme is the sharing of the details of the Broker Defendants' clients' current rates and policy terms to insurance carriers involved in the manipulation of the bids. The Broker Defendants leak the details of their client's current rates and policy terms to the preferred carrier that the Broker Defendants handpick for bidding out the client's account to ensure the pre-determined preferred insurer wins the business. In doing so, the Broker Defendants share their clients' confidential information, unbeknownst to the clients.

267.    The Insurer Defendants knowingly boycotted certain client accounts by submitting losing, non-competitive bids in certain Requests for Proposals ("RFP"), knowing that their turn to submit the winning bid would come in another RFP. The Insurer Defendants benefited from colluding in the Broker Defendants' bid-rigging scheme because they did not have to compete with one another on price and other terms. Absent such collusion among the Broker Defendants and Insurer Defendants, each Insurer Defendant would have priced their bids more competitively, instead of supporting artificially inflated premiums.

268.    The Broker Defendants also have ignored low bids in favor of the Insurer Defendant with which Broker Defendants have conspired to steer business pursuant to override agreements and other forms of undisclosed remuneration.

269.    ULR's bidding out of Marriott International, Inc.'s employee life and disability insurance in December 2002 is illustrative. ULR sought proposals from certain insurance carriers, including the "finalist," defendant UnumProvident, which pursuant to Defendants' scheme placed

- 67 -

one of the three low bids. Thereafter, Marriott added a condition that rendered the account sufficiently unprofitable for UnumProvident. UnumProvident indicated to ULR Defendants that it would have to withdraw the bid. ULR was loath to see UnumProvident withdraw because another insurance carrier, Aetna, with which ULR did not have an override agreement at the time, would have become a finalist. Accordingly, ULR encouraged UnumProvident to maintain the bid. A UnumProvident employee relayed the arrangement as follows:

> I did speak with [ULR] . . . and confirmed . . . that we would meet their request of the .107 rate . . . under the condition that we could not sell the case at this rate based on our concern about the expected lower volume creating a shortfall for us. He reiterated and assured me that we would not win this business at these rates due to the significant disparity between our offer and Prudential's. He understands that we are doing him a favor and is suggesting that he will reciprocate.

Not surprisingly, UnumProvident landed a large account through ULR shortly thereafter. In February 2003, ULR placed Marriott's employee disability insurance coverage with UnumProvident.

270. A second illustration concerning Massachusetts's Group Insurance Commission ("GIC") 2001 group life procurement demonstrates how the Broker and Insurer Defendants mutually benefited from bid-rigging. Even though the GIC followed a process designed to ensure fairness to all bidders by posting all information related to the procurement and all responses to bidder inquiries on the Commonwealth's procurement website, OFJ provided Unum with information that assisted Unum in preparing its bid, its Best and Final Offer ("BAFO"), and its presentations to GIC, including detailed pricing information on the principal competing bid.

271. Unum's internal communications during the bid process confirm the value of the information from OFJ. For example:

(a) On December 21, 2000, UnumProvident e-mailed the UnumProvident bid team concerning a conversation with Hilb Rogal principals: "[Hilb Rogal] certainly gave us some great information yesterday." Hilb Rogal had disclosed to UnumProvident that "we [UnumProvident] are $1.07M higher on basic life" and $900,000 lower" on optional life, and had

- 68 -

proposed a strategy for what is needed for UnumProvident to win the bid.  No other bidders, UnumProvident was told, were receiving this type of "behind the scenes" information from Hilb Rogal.  Hilb Rogal disclosed to UnumProvident what were supposed to be the secret identities of the finalist bidders, and provided UnumProvident with feedback on the client's impressions of UnumProvident's bid presentation.

       (b)    In the same December 12, 2000 e-mail, UnumProvident wrote that Hilb Rogal provided explicit instructions for the second bid offering: "Per [Hilb Rogal], the [client] is happy with our [supplemental] rates, but they are not satisfied with our basic life rates with the active [employees] at this time.  They made it very clear what we should do: 1)  Drop our basic rates on the actives to at least where Cigna is now (1.05 - per [Hilb Rogal]); 2) Keep the basic rate on RMT as is – we are fine here. 3) If at all possible, lower our optional rates by 1% to 3%.  If nothing else, we need to look long and hard at lowering the base rate to 1.05 or lower.  I know this is a lot, but this will be what it takes to get the business."

       (c)    On December 28, 2000, as the second bid deadline approached, a UnumProvident sales manager e-mailed the UnumProvident bid team that UnumProvident sales personnel "have heard again from the consultant (Hilb Rogal) that we will not write this case at current pricing levels.  Cigna has communicated to [Hilb Rogal] that they will be making an adjustment to their pricing with a focus on the [supplemental] life during this 'BAFO' round. [Hilb Rogal] wants us to get this business.  They have communicated clearly that we are $1,070,000 (only 3 to 4% of total case premium) higher than Cigna on the basic Life Insurance.  [Hilb Rogal] recommends . . .  We need to come in at 1.04/$1,000 which is .01 below in force but over Cigna's current pre-BAFO bid."

       (d)    On December 15, 2000 UnumProvident's sales personnel explained in an e-mail that Hilb Rogal had provided instructions on how to make the computer/website portion of

UnumProvident's presentation most effective, by focusing on UnumProvident's vision for future web capabilities. "This is coming straight from the broker's mou[th] – she really wasn't supposed to be telling me this, but she is trying to give us the edge."

(e)     On January 4, 2001, three UnumProvident sales executives met with three Hilb Rogal principals at the Ritz Carlton in Boston. At least one Hilb Rogal principal was directly involved in the client's life insurance procurement on behalf of Hilb Rogal and had provided UnumProvident information that helped UnumProvident's bid.

(f)     In written materials provided to Hilb Rogal, UnumProvident provided a comparison of Hilb Rogal's "2000 override plan" with UnumProvident's proposal. The comparison showed that UnumProvident' proposal could significantly increase Hilb Rogal's compensation from selling UnumProvident's products.

(g)     On January 8, 2001, Hilb Rogal asked that UnumProvident restructure the proposal to reward renewal of policies in addition to generating new business: "We recommend a reconfiguration of your suggested SPA illustration which will provide ongoing financial consideration for maintenance of the book of business along with an annual bonus that reflects the net new business growth of the book." This reconfiguration would greatly benefit Hilb Rogal because it effectively stretched over five years Hilb Rogal's compensation attributable to the client's premiums, instead of a one-time new sales commission.

(h)     UnumProvident agreed to restructure the proposal to pay compensation for "block management" as well as new sales. Unbeknownst to the client, Hilb Rogal and UnumProvident thus negotiated the proposal at the same time that Hilb Rogal was to be providing the client with objective consulting advice.

272.     As further illustrated by Marsh's "A," "B" and "C" tiered quotes, Defendants' systematic bid-rigging is achieved through multiple levels of manipulation.

273.    **The "A Quote."**  If Marsh had an incumbent carrier for one of its clients, whose insurance policy was up for renewal, Marsh would  solicit what was known as an "A Quote" from that insurer.  If the insurer agreed to make a quote at the targeted premium and policy terms demanded by Marsh, regardless of its ability to quote more favorable terms or premiums, the insurer was guaranteed the policy renewal.

274.    **The "B Quote."**  At the same time, in order to deceive customers into believing that Marsh was obtaining competitive bids and to ensure that the incumbent carrier would get its policy renewed, Marsh would solicit non-incumbent insurers to submit what was known as a "B Quote" (a phone quote which also was known as a "backup quote," "protective quote" or "throwaway quote"), with the understanding that these other insurers would not actually be making competitive bids.  "B Quote" insurers, including MetLife, knew and understood that their turn would come later.  Marsh often provided these other insurers with target quotes to be made, regardless of the insurers' ability to quote a lower premium below the target bid.

275.    For instance, in October 2003, an AIG underwriter stated that with regard to a B Quote he had provided to Marsh:  "This was not a real opportunity.  Incumbent Zurich did what they needed to do at renewal.  We were just there in case they defaulted.  Broker . . . said Zurich came in around $750K & wanted us to quote around $900K."

276.    As ACE explained:  "[I]f we were asked for a 'B' quote for a lead umbrella then they provided us with pricing targets for that 'B' quote.  It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do anything stupid' as respects pricing."

277.    Indeed, in those instances where an insurer provided a B Quote that was too competitive to ensure its loss, Marsh would ask the insurer to submit a higher quote.  According to ACE on one such occasion, the "[o]riginal quote [was] $990,000 . . . .  We were more competitive

than AIG in price and terms. [Marsh] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business."

278.    In instances where the Insurer Defendants were not provided with a specific target B Quote but were nonetheless expected to lose the bidding competition, the insurer would simply look at the expiring policy terms and premium, and provide a quote high enough to ensure that they would not be the winner or that they would make a comfortable profit in the rare instances where such B Quotes were awarded the contract.

279.    In the rare situation where a B Quote inadvertently was awarded a contract in a competitive bid, it likely was because the incumbent insurer was unable or unwilling to meet Marsh's A Quote target price. As further evidence of Marsh's manipulation of the bidding process, since the successful B Quote bidder in such situations had not completed any underwriting analysis (since it had no intention of winning the contract), the insurer would "back fill" the underwriting analysis in its file, *i.e.*, prepare the necessary analysis after the fact.

280.    **The "C Quote."** When there was no incumbent insurance carrier to protect, Marsh would solicit insurers for "C quotes." Although it was understood that real competition was a possibility in such situations, Marsh often still provided premium targets to the insurers.

281.    In conspiring with insurers to rig insurance contract bids and allocate customers, Marsh completely disregarded the interests of the client and the possibility that another insurer may offer a better deal for that client. Instead, Marsh pursued its own self interest in rigging the purported competitive bidding process. For instance, in June 2003, when ACE learned that a Marsh client, Brambles, USA, was unhappy with its incumbent carrier, AIG, Marsh nonetheless wanted AIG to keep the business. ACE stated, "Our rating has a risk at $890,000 and I advised [Marsh] that we could get to $850,000 if needed. [Marsh] gave me a song & dance that game plan is for AIG at

- 72 -

$850,000 and to not commit our ability in writing." As a result, ACE maintained its practice over the following year of providing Marsh with inflated quotes.

282.    Marsh engaged in the collusive bidding on a massive scale. For example, Hartford Financial – which shared office space with Marsh in Lake Mary, Florida and Los Angeles, California – was asked on virtually a daily basis by Marsh employees for inflated quotes, referred to as "throwaway quotes," or "indications" (non-binding proposed prices) for insurance coverage. Hartford underwriters were told to price the quote or indication typically at 25% above the other insurers' quotes. In the Los Angeles offices, Marsh even provided Hartford with a spreadsheet showing the accounts for which it wanted Hartford to provide a losing quote or indication, along with the other insurers' quotes. Hartford provided the inflated quotes.

283.    The other Defendants have also engaged in bid-rigging practices.

E.    WHOLESALE PAYMENTS

284.    In addition to the improper practices described above, Broker Defendants received additional income by improperly placing their clients' business with insurers through related wholesale entities that purport to act as intermediaries between broker and insurer, and receive commissions ("Wholesale Payments") from the insurers for placing the business of the clients of the brokers. As a result of these relationships, the Wholesale Payments are channeled to Defendants in whole or in part.

285.    For example, Willis placed its clients' business through its wholesaler, Stewart Smith, to generate additional commission, even where an intermediary was unnecessary. As described in an email dated April 9, 2004, from James Drinkwater to a regional director: "If we are to sustain and grow world class … we must support them [Stewart Smith and other subsidiaries] so that they can in turn support us in growing our revenues …." He stressed that it was only appropriate to use a non-owned intermediary where "properly authorized and we must have made every effort, used every

- 73 -

resource and relationship to place the business internally …."  Further, "[i]f a business unit fails to comply with this simple protocol … commissions that would have been earned by our Owned Wholesale Entity will be deducted from the business unit concerned."

286.    Similarly, a memorandum dated October 31, 2003, instructed brokers to "[m]aximize a new volume bonus arrangement with Stewart Smith by moving accounts to Stewart Smith that are written net of commission (fee).  Craig will send a list of possible accounts to each CEO."   In addition, the memo instructed that brokers must: "Identify key accounts, both new and renewal, which will maximize income from the utilization of Willis Group resources including Stewart Smith ...."  In this manner, Willis generated additional commissions through its subsidiary wholesaler, unbeknownst to its clients and contrary to its fiduciary obligations.

287.    On April 9, 2004, James Drinkwater - the Managing Director of Willis Global Markets – instructed Randy Pugh in an email, that before a "non-owned intermediary" could be used, he "must have made every effort, used every resource and relationship to place the business internally …."  Further, he warned that if a business unit did not comply with "this simple protocol," "commissions that would have been earned by our Owned Wholesale Entity will be deducted from the business unit concerned."

288.    As set forth in the Willis Assurance of Discontinuance, a December 1, 2003 email from the Director of Marketing in Florida stated that "after negotiating acceptable premiums, we ran this [client account] through Stewart Smith [Willis' wholesaler] for additional income to group of more than $156,000.  Fee Account."  [Willis's wholesaler]  That email also described another account that was "renew[ed] with AIG, via Stewart Smith (versus direct), [generating] additional income to group of $100,000.  Fee account."

289.     Between 2002 and 2004, Stewart Smith paid Willis over $62 million for brokering business originated by Willis through Stewart Smith.  The carriers that sold insurance to Willis' clients with Stewart Smith as an intermediary include: ACE, Hartford and AIG.

290.     While serving the interests of Defendants, the wholesale entities do not serve the interest of Defendants' clients.  Specifically, the Wholesale Payments create similar undisclosed conflicts of interest and economic disincentives as Contingent Commissions for Broker Defendants to fulfill their legal and contractual duties to their clients, including Plaintiffs and Class Members.

## F.     REINSURANCE

291.     The Broker Defendants utilized their improper steering practices to obtain additional fees by tying the purchase of primary insurance with the placement of such coverage with reinsurance carriers through the Broker Defendants' reinsurance broker subsidiaries.  Plaintiffs and the Classes are injured by the improper tying arrangements in that ultimately the cost of the reinsurance Contingent Commissions paid by the Insurer Defendants (both primary and reinsurance) to the Broker Defendant's (through their reinsurance, broker subsidiaries and affiliates) included in the inflated premiums and/or reduced coverages provided to Plaintiffs and the Class Members.

292.     Gallagher utilizes its relationships with its "preferred" carriers to obtain additional fees for its reinsurance subsidiaries.  For example, in a letter dated May 7, 2002, VP of Market Relations for the Brokerage Services Division, Craig Van der Voort stated to Executive VP of Brokerage Services, James Gault, that he would "***try and leverage the specific companies [AIG and Hartford] for more of their reinsurance business***."  (Gallagher Assurance at 9).

293.     Similarly, Willis engaged in improper tying and collection of additional fees through its reinsurer Willis Re.  Specifically, an email dated November 3, 2003 from the head of Willis' Northeast Marketing instructed brokers to: "get Willis Re [reinsurance] involved in any accounts possible." (Willis Assurance at 7).

294.    Willis employee Tony Ainsworth coordinated the effort to leverage Willis' relationship with insurers to generate reinsurance business.  Mr. Ainsworth prepared spreadsheets on a monthly basis to demonstrate Willis' success in this area.

295.    After these illegal activities came to light, Willis scrambled to minimize its documentation of such practices.  In a November 15, 2004 email, Ainsworth stated that management:

> have decided to suspend all e mail and/or written correspondence between Willis Re Fac [Faculative] and Willis Retail/Wholesale effective immediately.  This will mean that we will no longer track [retail] broker / share renewal / leverage business, etc. . . .  ***It does not mean that we will not be working with Retail/Wholesale on accounts but more in a low key manner.  Keep talking to our friends and find out where business is being sent . . . just do it verbally or in person!*** [Willis Assurance].

296.    Aon promised to steer retail business to AIG in return for AIG's commitment to use Aon Re's reinsurance services.  In the fall of 2000, AIG indicated that it was considering handling in-house a particular reinsurance program called CCA.  In a November 27, 2000 email to top Aon executives on both the retail and reinsurance sides of the business, an Aon executive explained: "In return for a commitment of $10,000,000 in new gross premium from ARS US, AIG has agreed to appoint Aon Re for an additional 2.5% placement of the CCA program, which [AIG] has indicated is worth $750,000 in commission for Aon Re."

297.    Similarly, in February 2000, Aon also promised Liberty Mutual Group retail business if Liberty Group used Aon Re for Liberty Mutual Group's reinsurance needs.  Scott Clark (the head of Aon Re's Property Practice Group) attended a meeting with Liberty Mutual executives during the week of February 14, 2000, and later summarized the meeting on an e-mail dated February 23, 2000 as follows:

> I told them we are best qualified to handle their corporate reinsurance program. Reinsurance is extremely important to Aon and without it we just won't grow as well as with it.  I told them if we don't get their reinsurance there is no point in these "love ins."  Needless to say I got their attention, some say I was too strong but we

> have got to stop screwing around with the interdependence message, especially to those that can give us their reinsurance, depend on Aon for production and have mediocre brokers . . . ."

Subsequently, Aon Re obtained Liberty Mutual's reinsurance business. Liberty Mutual depended on Aon for production and apparently did not want to risk losing retail business.

298.     Aon memorialized these arrangements in what became known as "clawbacks." Many of these clawbacks shared a similar pattern: initially, the insurer would express displeasure at Aon Re's brokerage commissions and would threaten to shop around for competitive rates. However, to further their conspiratorial conduct, Aon Re would offer the insurer an incentive by heavily discounting its reinsurance brokerage commissions. To recover the compensation lost by the discount, Aon Re would negotiate a "clawback," allowing it to reduce or eliminate the reinsurance brokerage discounts by steering retail insurance business to the insurer.

299.     Significantly, these "clawback" arrangements remained subject to confidentiality agreements and, as a result, Aon's retail clients were not informed that Aon steered, or had incentives to steer, business to selected insurers to recoup the discounts Aon Re offered to these insurers on the brokerage reinsurance account.

300.     Furthermore, Aon Re provided direct financial incentives for the Broker Defendants steer reinsurance to preferred reinsurers in exchange for Contingent Commissions. For example, Aon Re paid an additional bonus to its brokers "as an incentive for having placed business with Kemper last year." According to the Aon AG Complaint, "Kemper paid Aon Re reinsurance contingent commissions of $557,934.50 in 1997, $570,000 in 1998 and $2.5 million in 1999."

## G.     INVESTIGATIONS INTO DEFENDANTS' PRACTICES

### (1)     Government Investigations into Defendants' Practices

301.     A large number of state attorneys general, and federal and state regulators have commenced investigations concerning the Defendants' practices identified above. Settlement

agreements or assurances of discontinuances have been entered into by the New York Attorney General, together with the Superintendent of Insurance of New York as well as various other state attorneys generals including Connecticut and Minnesota, with three Broker Defendants: Marsh, Aon, and Willis. Spitzer, along with the Director of Illinois Division of Insurance and other state agencies similarly entered into a Stipulation and Consent Order with a fourth Broker Defendant - Defendant Arthur J. Gallagher & Co. Finally, the Massachusetts Attorney General entered into a settlement with Hilb and UnumProvident for undisclosed payments of Contingent Commissions. Each settlement agreement or assurance of discontinuance agreed to a prohibition of receiving contingent compensation from insurers and required, among other things, that each Broker Defendant provide full disclosure of all forms of compensation received from insurers. Cigna also agreed to settle allegations by Connecticut that it concealed Contingent Commissions.

302. Further, state insurance departments have launched investigations and/or filed suit. For example, California Insurance Commissioner John Garamendi filed an action to enjoin ULR, MetLife, Cigna, Prudential, UnumProvident and Hartford from violating certain provisions of the California Insurance Code.

303. Subpoenas have been issued to almost every other defendant including, Ace, AIG, Aon, BB&T, Brown & Brown, Cigna, Gallagher, Hartford, Hilb Rogal, HUB, Marsh, MetLife, UnumProvident, USI, Wells Fargo, and Willis. Numerous state Attorney Generals, including Connecticut, Florida, California, Illinois, New York, North Carolina, Massachusetts, Minnesota, Missouri and West Virginia have subpoenaed Defendants concerning their Contingent Commission Agreements and/or bid-rigging practices.

304. On November 16, 2004, the Senate Governmental Affairs subcommittee held a hearing to address the issue of illegal broker fees. At the hearing, Spitzer, Garamendi, and Blumenthal testified about their investigations and findings. In addition, Senate Banking Committee

Chairman Richard Shelby (R-Ala.) stated that he plans to hold hearings on issues uncovered by the insurance broking investigations.

### (e)  Guilty Pleas of Defendants' Employees

305.    Several of Defendants' employees have pled guilty to criminal charges.

306.    On October 13, 2004, Karen Radke, a manager at American Home, a division of AIG, entered into a cooperation and plea agreement with the State, wherein she agreed to plead guilty to the Scheme to Defraud and admitted she "participated in a scheme with individuals at Marsh & McLennan . . . . [to] allow[] Marsh to control the market and to protect incumbent insurance carriers when their business was up for renewal."  She admitted that "Bill Gilman, Ed McNenny, and others at Marsh periodically instructed [her] and others at AIG to submit specific quotes for insurance rates that [she] believed: a. were higher than those of the incumbent carriers, b. were designed to ensure that the incumbent carriers would win certain business, and c. resulted in clients being tricked and deceived by a deceptive bidding process."

307.    On January 19, 2005, Carolos Coello, an underwriter at AIG, entered into a cooperation and plea agreement with New York, wherein he agreed to plead guilty to the crime of Scheme to Defraud in the Second Degree.  On January 25, 2005, John Mohs, an Assistant Manager of AIG's Underwriting Unit, entered into a similar cooperation and plea agreement, wherein he also agreed to plead guilty to the Scheme to Defraud in the First Degree.

308.    On February 15, 2005, the N.Y.A.G.'s office announced that Joshua Bewlay, a former Marsh executive, pled guilty to a felony count of a scheme to defraud and admitted to engaging in a bid-rigging scheme.  Bewlay's plea agreement states, in relevant part:

> From approximately 1998 through 2003, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property . . . by false and fraudulent pretenses, representations promises, to wit, noncompetitive quotes from insurance carriers that Marsh conveyed to Marsh clients . . . in that Mr. Bewlay and others at Marsh regularly instructed insurance carriers to submit noncompetitive quotes, that were

presented to clients as competitive, thus ensuring that the client would select the carrier, typically the incumbent, that Marsh had pre-determined should win the business.

309.    And, on February 24, 2005, Marsh managing director Kathryn Winter pled guilty to a felony charge of scheming to defraud.  She similarly admitted that she "participated in a scheme with individuals at various insurance companies" where the "primary goal of th[e] scheme was to maximize Marsh's profits by controlling the market, and protecting incumbent insurance carriers when their business was up for renewal."

**(2)    Suspensions, Terminations and Resignations of Defendants' Employees**

310.    Numerous employees of both the Broker Defendants and Insurer Defendants have either been fired or have resigned from their positions.

311.    On October 20, 2004, Marsh suspended four employees whose names surfaced as a result of the investigations into the company's Contingent Commissions and bid-rigging practices. The four employees include William Gilman, executive director of marketing at Marsh Global Broking and a managing director of Marsh; Greg Doherty, a senior vice president in Marsh Global Broking's excess casualty division; Edward McNenney, a brokerage executive; and Samantha Gilman, Mr. Gilman's daughter.  William Gilman, Doherty, McNenney, and Glenn Boshardt, a Marsh executive, were ultimately dismissed from Marsh.

312.    On October 25, 2004, Marsh's Chairman and Chief Executive Officer, Jeffrey Greenberg resigned.  Michael G. Cherkasky replaced Mr. Greenberg as Chairman and Chief Executive Officer.

313.    On November 8, 2004, Roger E. Egan, President and Chief Operating Officer of Marsh Inc., Marsh's risk and insurance services subsidiary, Christopher M. Treanor, Marsh Inc.'s Chairman and Chief Executive Officer of Global Placement; and William L. Rosoff, Senior Vice President and General Counsel of Marsh, were asked to step down from their positions.

### (3) Defendants Discontinue the Use of Contingent Commission Agreements

314.    As a result of the governmental investigations into Defendants' compensation practices, several Defendants including, *inter alia*, Marsh, Aon, Gallagher, UnumProvident, Willis, Liberty Mutual, AIG and ACE have discontinued the use of Contingent Commission Agreements and instituted other reforms designed to avoid conflicts of interests in the brokerage industry.  For example, as part of its settlement with Spitzer, Marsh agreed to a prohibition of receiving contingent compensation from insurance carriers.  Marsh also agreed to provide clients with a comprehensive disclosure of all forms of compensation received from insurers and to adopt and implement company-wide, written standards of conduct for the placement of insurance.

315.    Likewise, as part of their settlement agreement and/or assurances of discontinuance with various state attorney generals, Aon, Willis and Gallagher agreed to prohibition of accepting or requesting of any insured any Contingent Compensation.

316.    And, pursuant to its settlement with the California Commissioner of Insurance, on November 18, 2004, ULR agreed to cease accepting commission payments from insurers and fully disclose to its clients any remuneration it receives.

317.    On March 30, 2005, CIGNA announced that it is "sorting out" its relationship with brokers and its compensation arrangements with them, but has set no date to complete the review.

318.    And, in its June 24, 2005 Prospectus, MetLife discussed how the investigations into Contingent Commissions may dramatically affect the way it conducts business:

> One possible result of [the AG] investigations and attendant lawsuits is that many insurance industry practices and customs may change, including, but not limited to, the manner in which insurance is marketed and distributed through independent brokers and agents. Our business strategy contemplates that we will rely heavily on both intermediaries and our internal sales force to market and distribute insurance products. We cannot predict how industry regulation with respect to the use of intermediaries may change. Such changes, however, could adversely affect our ability to implement our business strategy, which could materially affect our growth and profitability.

319.     Although certain Defendants have discontinued the use of Contingent Commissions, many others continue to use Contingent Commissions.  For example, BB&T and HUB recently stated that they will continue to pay and accept Contingent Commissions.  Hilb Rogal recently stated that they will "not renounce overrides or contingent commissions," and Haack continues to accept them.

## H.     CONSPIRACY ALLEGATIONS

320.     Broker and Insurer Defendants have engaged in a common course of conduct and conspiracy to manipulate the market for insurance products, generating enormous profits for themselves at the expense of Class Members.  Defendants' conduct creates a conflict of interest and is clearly at odds with the Defendants' representations regarding the services they will provide as well as the duties inherent in the relationship that exists between Class Members and Defendants.

321.     Although Defendants have created the illusion of a competitive market for insurance, the selection, pricing and placement of the insurance products at issue in this litigation were, in fact, the result of Defendants' collusion.

322.     The common scheme and conspiracy involves all of the Broker Defendants and the Insurer Defendants, as well as other brokers and insurers who have undertaken the wrongful conduct set forth herein and other entities that have facilitated the conspiracy.

323.     The purpose and effect of the conspiracy is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.  As a result of the conspiracy, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy.  The Broker Defendants, in turn, profited from the conspiracy

through the receipt of Contingent Commissions, overrides, communications fees, and other compensation.

324.    The actions of the Defendants were all part of the same conspiracy to increase revenues and to suppress or eliminate competition.  Each Defendant understood the nature of this conspiracy, understood its role in facilitating the objectives of the conspiracy, and agreed, whether implicitly or expressly, to participate in the conspiracy.  In addition, each enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of Plaintiffs and the Class.

325.    Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

326.    Each Defendant and member of the conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

327.    In furtherance of the conspiracy, Defendants and other members of the conspiracy have agreed to implement and use the same or similar devices and fraudulent tactics against their clients, including Plaintiffs and Class Members.

328.    The same pattern and cause of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among all Defendants and co-conspirators, including:

(a)    similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct;

(b)    similar agreements between the Broker Defendants and their clients which include either no language or vague, misleading, and incomplete language purporting to disclose compensation, steering, and bid-rigging arrangements between and among the Broker Defendants and the Insurer Defendants;

(c)    similar agreements regarding Contingent Commissions and other payments between and among the Broker Defendants and the Insurer Defendants;

(d)     similar practices regarding the reporting of their arrangements;

(e)     similar agreements regarding Wholesale Payments between and among Defendants;

(f)     similar tactics for steering customers to the Insurer Defendants and for placement of the Insurer Defendants products;

(g)     similar tactics for coercing submission of false bids, client steering, allocation of markets and customers, and stabilizing, raising or maintaining premium prices above competitive levels;

(h)     similar tactics for boycotting or refusing to deal with insurers who refused to participate in the conspiracy;

(i)     similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct;

(j)     similar agreements regarding Contingent Commissions and other payments between and among the Broker Defendants and the Insurer Defendants;

(k)     similar plans and methods for the Insurer Defendants to recapture the undisclosed or inadequately disclosed compensation paid to the Broker Defendants from Plaintiffs and Class Members;

(l)     similar plans and methods for concealing the compensation and fees from Plaintiffs and Class Members (and their agent employers), including the underreporting of such compensation on Reports on Form 5500 and other certification requirements under ERISA;

(m)     the retention by former employees of the Insurer Defendants and/or manipulation of Insurer Defendants' employees by the Broker Defendants and vice versa; and

(n)     similar arrangements for tying primary employee benefit coverage to the purchase of reinsurance by the Insurer Defendants through the Broker Defendants.

- 84 -

329.    Defendants would not have undertaken the practices alleged herein absent an agreement among all Defendants.  Paying brokers significant additional commissions and fees is not in the individual best interests of the Insurer Defendants unless the other Insurer Defendants also agreed to participate in the scheme.

330.    The conspiracy has been conducted, implemented and facilitated through various mechanisms including direct communications among Defendants, sharing of information between Defendants and movement of employees among Defendants as well as through other means such as industry trade groups such as the Council of Insurance Agents & Brokers ("The Council") and its predecessors the National Association of Casualty and Surety Agents ("NASCA") and the National Association of Insurance Brokers ("NAIB"), The American Insurance Association ("AIA"), and the Reinsurance Association of America ("RAA").

331.    The Council, founded in 1913 to represent larger metropolitan agencies, represents the top tier of commercial insurance brokers in the United States in both property/casualty and the benefits sectors. The association's roots have always been in larger commercial agents and brokers. In fact, only the top one percent of all agents and brokers qualify.  The Council's members place 80 percent - well over $90 billion - of all U.S. insurance products and services protecting business, industry, government and the public-at-large and they administer billion of dollars in employee benefits.

332.    Professional networking is at the very heart of The Council.  It is a major part of who The Council is and what it does.  The Council orchestrates the industry's most important market meetings - the number one expectation of members.

333.    The Council of Insurance Company Executives, a standing Committee of The Council, is comprised of more than 65 of the top commercial insurers.  Collectively, CICE members

are responsible for writing more than three-quarters of the nation's commercial business insurance premiums.

334.    The Council of Insurance Company Executives and The Council of Employee Benefits Executives co-sponsor the Employee Benefits Leadership Forum at the Greenbrier, an employee benefits marketing meeting.  The conference at The Greenbrier brings together key insurance brokers who handle benefits lines with the leading insurance carriers in the country to discuss critical issues in the benefits sector.

335.    In addition to the industry meetings at The Greenbrier, The Council also facilitates many other forums including meetings of employee benefit executives, employee benefits executive roundtables, regional meetings relating to employee benefits, Chief Financial Officers workshops and conferences where CFO's of the major brokerage firms focus on the fundamental and strategic issues facing their business, Executive Liaison Committees, e-mail exchanges, market surveys, the sharing of operating results and financial analyses, insurance company sponsorships, peer-to-peer networking, as well as teleconferences between brokers and insurers. The Council operates in a strategic alliance with the American Insurance Association ("AIA") and the Reinsurance Association of America.  ("RAA").

336.    As a result of Defendants' conspiracy, Plaintiffs and Class Members have made payments for insurance and other "services" beyond what those payments would have been absent the conspiracy.  In addition, Plaintiffs and Class Members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

337.    The Broker Defendants and the Insurer Defendants are also engaged in a number of separate but parallel conspiracies, each involving a Broker Defendant and the insurance companies with which such Broker Defendant had Contingent Commission arrangements.

338.    At a minimum, three broker-centered conspiracies exist, including the following:

- A ULR-centered conspiracy consisting of defendant ULR and the insurance companies with which it had Contingent Commission arrangements, including defendants UnumProvident, CIGNA, Prudential, MetLife and Hartford and others (the "ULR-centered Broker Conspiracy").

- A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which it had Contingent Commission arrangements, including defendant MetLife, Cigna, AIG, ACE, Hartford and others (the "Marsh-centered Broker Conspiracy").

- An Aon-centered conspiracy consisting of Aon and the insurance companies with which it had Contingent Commission arrangements, including defendant MetLife, ACE, AIG, Cigna, Hartford, Metlife, UnumProvident and others (the "AON-centered Broker Conspiracy").

339.    The purpose and effect of the conspiracies is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.  As a result of the conspiracies, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms, and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy.

340.    Each Defendant and member of the broker-centered conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

341.    Each Defendant and member of the broker-centered conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

342.    As a result of Defendants' conspiracies, Plaintiffs and Class Members have made payments for insurance and other "services" beyond what those payments would have been absent the conspiracy.  In addition, Plaintiffs and Class Members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

## I.    ENTERPRISE

343.    Plaintiffs, Class Members and Defendants are "persons" within the meaning of 18 U.S.C. §1961(3).

### (1)    The Employee Benefits Insurance Enterprise

344.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of persons and entities associated-in- fact, hereinafter referred to in this Complaint as "The Employee Benefits Insurance Enterprise":

(a)    Defendants;

(b)    wholesale entities, whether affiliated with Defendants or not, which receive Wholesale Payments and transmit those payments in whole or in part to Defendants;

(c)    other insurers that pay Contingent Commissions, Wholesale Payments, and other improper fees and compensation;

(d)    other brokers, intermediaries, agents, reinsurers and other insurance entities that received or have received undisclosed compensation;

(e)    other entities that engage or have engaged in steering practices, "low-hanging fruit" and/or bid rigging;

(f)    other insurance brokerage and insurance industry groups, such as The Council, the AIA and the RAP, Integrated Benefits Institution and others as described above.

345.    The Employee Benefits Insurance Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

346.    Defendants have directed and controlled the ongoing organization necessary to implement their profit-making scheme and illicit business practices, for example, through numerous meetings and other communications described herein.

- 88 -

347.     The enterprise functions by providing insurance consultation, advice and related services as well as insurance products.  Many of these services and products are legitimate and non-fraudulent.  Normally, the activities of the enterprise involve recommendations and the provision of insurance products which best meet the needs of the insured.  However, the Defendants through the enterprise have engaged in a pattern of racketeering activity which involves a fraudulent scheme to increase premium revenue for the Insurer Defendants through steering and bid-rigging arrangements, and additional revenue for the Broker Defendants from inadequately disclosed overrides, communication fees, commissions, charges and other remuneration.

348.     Through the Employee Benefits Insurance Enterprise, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

349.     While Defendants participate in and are members of the Employee Benefits Insurance Enterprise, they also have an existence separate and distinct from the enterprise.

350.     To establish and maintain the system of Contingent Commissions, Communication Fees, other undisclosed compensations and Wholesale Payments and to conceal the system and the inherent conflicts of interest it creates, Defendants were required to participate in the conduct of an to exercise control over the Employee Benefits Insurance Enterprise.

351.     Defendants have substantially participated in the conduct of and have exercised control and operated the affairs of the Employee Benefits Insurance Enterprise in at the least the following ways:

(a)     by entering into Contingent Commission arrangements and Wholesale Payment arrangements with the expectation and understanding that both the brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

(b)     by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

(c)     by sharing and disseminating information about their practices and about Plaintiffs and Class Members, including confidential personal and proprietary information;

(d)     by formalizing relationships among participants in the Employee Benefits Insurance Enterprise for the payment of undisclosed compensation;

(e)     by uniformly recommending insurance products of the Insurer Defendants in order to maximize Contingent Commissions, Communication Fees and Wholesale Payments;

(f)     by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

(g)     by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

(h)     by submitting false or misleading information to plaintiffs and Class Members regarding the existence and nature of compensation paid by Insurer Defendants to ULR Defendants;

(i)     by engaging in "low-hanging fruit" practices;

(j)     by meeting to discuss the Broker Defendants' employee benefits brokering practices and Insurer Defendants' participation in those practices and to collude regarding the level of compensation contained in the Agreements; and

- 90 -

(k)      by developing and implementing responses to reporting requirements that conceal Defendants' scheme.

352.    The Employee Benefits Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

**(2)      The Broker-centered Employee Benefits Enterprises**

353.    Each Broker Defendant and the insurers with which each had Contingent Commission agreements constitute a group of persons and entities associated-in-fact, referred to collectively in this Complaint as the "Broker-centered Employee Benefits Enterprises." At a minimum, three such enterprises exist:

(a)      ULR and the insurers, including the Insurer Defendants, with which ULR had Contingent Commission Agreements;

(b)      Marsh and the insurers, including the Insurer Defendants, with which Marsh had Contingent Commission Agreements;

(c)      Aon and the insurers, including the Insurer Defendants, with which Aon had Contingent Commission Agreements;

354.    Through each of the Broker-centered Employee Benefits Enterprises, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

355.    While Defendants participate in and are members of the Broker-centered Employee Benefits Enterprises, they also have an existence separate and distinct from the enterprise.

- 91 -

356.    In order to establish and maintain the system of Contingent Commissions and Wholesale Payments, while concealing the system and the inherent conflicts of interest it creates, Defendants were required to participate in the conduct of an to exercise control over the Broker-centered Employee Benefits Enterprises.

357.    Defendants have substantially participated in the conduct of and have exercised control over and operated the affairs of the Broker-centered Employee Benefits Enterprises in at the least the following ways:

(a)    by entering into Contingent Commission arrangements and Wholesale Payment arrangements with the expectation and understanding that both the brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

(b)    by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

(c)    by sharing and disseminating information about their practices and about Plaintiffs and Class Members, including confidential personal and proprietary information;

(d)    by formalizing relationships among participants in the Employee Benefits Insurance Enterprise for the payment of undisclosed compensation;

(e)    by uniformly recommending insurance products of the Insurer Defendants in order to maximize Contingent Commissions, Communication Fees and Wholesale Payments;

(f)    by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

(g)    by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

- 92 -

(h)     by submitting false or misleading information to plaintiffs and Class Members regarding the existence and nature of compensation paid by Insurer Defendants to ULR Defendants;

(i)     by engaging in "low-hanging fruit" practices;

(j)     by meeting to discuss the Broker Defendants' employee benefits brokering practices and Insurer Defendants' participation in those practices and to collude regarding the level of compensation contained in the Agreements; and

(k)     by developing and implementing responses to reporting requirements that conceal Defendants' scheme.

358.    The Broker-centered Employee Benefits Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

## J.     RACKETEERING ACTIVITY

### (1)     Predicate Acts

359.    Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud), 18 U.S.C. §1343 (relating to wire fraud) or 18 U.S.C. §1954.  As set forth below, Defendants have engaged in and continue to engage in conduct violating each of those laws in order to effectuate their scheme.

360.    In addition, to make their scheme effective, each of the Defendants sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. §2, which conduct is also indictable under 18 U.S.C. §§1341,1343 and 1954.

361.    To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial

interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including, but not limited to, agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters, false information intended to be included in filings with the Internal Revenue Service and Department of Labor, and employee benefit descriptions that constituted the fruits of Defendants' wrongful conduct.

362. To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including, but not limited to, agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters, false information intended to be included in filings with the Internal Revenue Service and Department of Labor, and employee benefit descriptions that constituted the fruits of Defendants' wrongful conduct.

363. The matters and things sent by Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

(a) materials containing false and fraudulent misrepresentations that the Broker Defendants would represent their clients' interests in the placement of insurance on behalf of Plaintiffs;

(b) materials that concealed or failed to disclose the existence and effect of the Contingent Commissions, Commercial Fees, other undisclosed monetary and non-monetary compensation and the Wholesale Payments, including the conflict of interests that Defendants had created between their legal and contractual obligations to their clients and the economic disincentives to honor those obligations from the unlawful payments and as part of the conspiracy;

(c)     virtually uniform misleading materials intended to induce clients to accept more expensive and lesser coverage from the Insurer Defendants than might be otherwise available in order to maximize premium revenue and to maximize Contingent Commissions, Communication Fees, other compensation and/or Wholesale Payments to the Broker Defendants;

(d)     materials uniformly intended to encourage and induce plaintiffs and Class Members to purchase optional or "supplemental" coverage from Insurer Defendants as part of the employee benefit plan;

(e)     materials intended to discourage clients from the aggressive pursuit of claims;

(f)     invoices and payments related to Defendants' improper scheme; and

(g)     information regarding compensation to the Broker Defendants listed on Forms 5500.

364.     As an example of Defendants' fraudulent use of the wires on May 30, 2002, David MacLean of MetLife wrote to Cox stating: "Enclosed is Universal Life's 2001 override calculation in support of the wire transfer of $2,815,982.50.  Please accept our sincere gratitude for your role in our success."

365.     Defendants' corporate headquarters have communicated by United States mail and by facsimile with various regional offices and subsidiaries, divisions and other insurance entities in furtherance of their schemes.

366.     Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and Class Members and assuring Insurer Defendants of the placement of business and enabling Broker Defendants to collect Contingent Commissions, Communication Fees and Wholesale Payments.  Specifically these misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

(a)     the Broker Defendants holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clientele;

(b)     the Broker Defendants' representations that they work for their clients and not the insurance companies;

(c)     failure to disclose Defendants' conflicts of interest;

(d)     failure to disclose that an integral part of the Broker Defendants' business philosophy is to promote the interest of insurance companies in order to maximize revenue from Contingent Commission agreements. Therefore, the Broker Defendants steer business to favored insurers from whom they receive higher fees, and away from insurers who refuse to engage in the anticompetitive conduct;

(e)     failure to disclose the nature of the services the Broker Defendants provide to warrant their compensation fees and commissions;

(f)     failure to disclose that the Broker Defendants are directing their clients to Insurer Defendants based not on their merit, but rather on the kickbacks and Contingent Commissions they are able to structure;

(g)     failure to accurately disclose Broker Defendants' compensation on Forms 5500; and

(h)     contrivance, falsification, and/or manipulation of insurance bids to create the illusion of a competitive bidding process.

367.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and Class Members relied on the misrepresentations and omissions. Plaintiffs and the Classes rely upon Defendants'

misrepresentations and omissions by retaining and continuing to retain the Broker Defendants and by purchasing Defendants' insurance products at higher rates than Plaintiffs would have paid absent Defendants' fraud.

368. As a result, Plaintiffs and Class Members have been injured in their business or property by Defendants' overt acts of mail and wire fraud and by their aiding and abetting each others' acts of mail and wire fraud in furtherance of the conspiracy.

369. Defendants have also repeatedly violated 18 U.S.C. §1954 by accepting and/or paying undisclosed compensation with the intent of influencing the actions, decisions and/or conduct of the Broker Defendants with respect to the purchase of insurance by employers and employees, the administration of such employee insurance policies and/or the renewal of such policies. The Broker Defendants act as agents for employers and their employees who are covered under an employee welfare benefit plan and/or provide benefit services to such plans. The Broker Defendants provide advice to employers concerning matters and/or questions concerning employee benefit plans including, but not limited to, formation of such plans. The Broker Defendants' position as advisor and broker allowed them to exercise influence over matters concerning employee benefit plans by advising and/or persuading employers to purchase and/or renew policies from the Insurer Defendants. The Broker Defendants' acceptance and the participating insurers' payment of undisclosed compensation influenced the Broker Defendants' actions, decisions and/or conduct with respect to such employee benefit plans. The sale and/or renewal of group insurance policies are matters concerning an employee benefit plan. Additionally, the Broker Defendants and the Insurer Defendants failed to disclose to the plan administrators of such employee benefit plans and to the employee participants the payment of additional compensation. The failure to disclose additional compensation was a matter concerning an employee benefit because the plan administrator and/or participants are legally entitled to such disclosures. The Broker Defendants accepted and the Insurer

Defendants paid monies and/or things of value in violation of 18 U.S.C. §1954 on multiple occasions.  Further, the Broker Defendants and the Insurer Defendants failed to disclose to the employee benefit plan administrators that the Contingent Commissions were passed through to the employers and their employees.

### (2)    Pattern of Racketeering Activity

370.    Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity (*i.e.*, indictable violations of 18 U.S.C. §§1341,1343 and 1954 as described above) within the past ten years.

371.    In fact, each Defendant has committed or aided and abetted in the commission of thousands of acts of racketeering activity.

372.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs and Class Members.

373.    The multiple acts of racketeering activity, which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5).

### (3)    RICO Violations

374.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

375.     Through the pattern of racketeering activity described above, Defendants have conducted or participated in the conduct of the affairs of the enterprises and, accordingly, have violated §1962(c).

376.     Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

377.     Defendants' conspiracy to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business by abandoning their duties to Plaintiffs and the Classes, and to conceal their fraudulent scheme as described above accordingly violates 18 U.S.C. §1962(d).

## K.     EFFECTS OF DEFENDANTS' MISCONDUCT

378.     Because Defendants failed to adequately disclose their payment and/or acceptance of Contingent Commissions, Communication Fees and other kickbacks, Plaintiffs and the Classes were not aware of their existence, operation or effect on the insurance market.

379.     Moreover, as a result of Defendants' scheme and common course of misconduct, Plaintiffs and Class Members have and continue to suffer injuries in their business or property.  The Employer Plaintiffs and Employer Classes pay excessive premiums for the basic insurance coverage contained in the employee benefit plan, and undisclosed fees and other charges embedded in the premiums of the insurance products, pay for non-existent services and are not reimbursed for money improperly collected. The Employee Plaintiffs and Employee Classes pay greater basic insurance co-pays, pay more for supplemental insurance, pay for non-existent services and/or receive inferior insurance coverage than they would have in the absence of the improper conduct described herein. Defendants' fraudulent scheme and common course of conduct constitutes an ongoing threat to Plaintiffs and Class Members and will continue to cause economic losses and threaten their ability to obtain appropriate insurance coverage at a fair price unless enjoined by this Court.

380.     By engaging in the course of conduct set forth above, Defendants have breached and continue to breach their contractual, fiduciary and other duties to Plaintiffs and Class Members by omitting and failing to disclose numerous material facts as alleged above, including that they acted in coordination with others in the insurance brokerage industry, despite a duty to do so.

381.     Moreover, the Broker Defendants have breached and continue to breach their obligations, fiduciary and otherwise, to represent the best interests of their clients, including Plaintiffs and Class Members.

382.     The Broker Defendants have profited enormously by inducing clients to use their insurance brokerage services, by fraudulently misrepresenting how they formulate their insurance brokerage advice and by failing to disclose the existence and operation of the Contingent Commissions and Communication Fees paid.  Likewise, the Insurer Defendants have profited enormously by receiving the business of the Broker Defendants' clients through Defendants' collective fraudulent acts.

## L.     THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

383.     Defendants' fraudulent and unlawful scheme to steer business, place insurance and pay/obtain kickbacks, Contingent Commissions, Communication Fees, and other undisclosed compensation creates an ongoing problem that will continue to cause Plaintiffs and Class Members economic losses and jeopardize the qualified status of their benefit plan contributions.

384.     A monetary judgment will only compensate Plaintiffs and Class Members for past losses.  A monetary judgment will not cure the inherent and irreconcilable conflict of interest between Defendants' payment and/or receipt of kickbacks, overrides, Communication Fees and other undisclosed compensation on the one hand and the legal and contractual duties undertaken by Defendants as set forth above, nor will it correct the anticompetitive effects of Defendants' bid-rigging and market allocation.

385.    Further, because a substantial number, if not a majority, of the insurance brokers and carriers are involved in this scheme, the entire employee benefits insurance market has been manipulated and is no longer competitive.  Thus, a monetary judgment will not restore the fundamental competitive nature of the market nor cure future manipulations of the market as a result of Defendants' fraudulent scheme and common course of action.

386.    No individual client of any defendant has an adequate remedy, either administrative or at law, to recapture future losses associated with Defendants' fraudulent conduct and breaches of fiduciary and other duties set forth above.  The cost of pursuing such claims on an ongoing basis exceeds the amount at issue.

387.    Even a class action, such as this, is a significant undertaking that cannot be pursued on a regular or ongoing basis.

388.    Because of the need for multiple lawsuits to redress repeated and ongoing wrongs, Plaintiffs and Class Members have no adequate remedy at law and would suffer irreparable harm in the absence of injunctive relief.

## M.    FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

389.    Defendants affirmatively and fraudulently concealed their unlawful scheme, conspiracy and course of conduct from Plaintiffs and the Classes.

390.    For example, the Broker Defendants structured the Contingent Commissions and other forms of compensation so as to make it impossible for Plaintiffs and Class Members to discover the extent of compensation received by the Broker Defendants or the material disincentive that compensation creates to the Broker Defendants to fulfill their legal and contractual duties.

391.    Defendants also have engaged in an elaborate series of affirmative acts, including bid-rigging, to create the illusion of a competitive market.

392.     In addition, Defendants have agreed amongst themselves to conceal the overrides, Communication Fees, and other Contingent Commissions paid to the Broker Defendants by the Insurer Defendants and ultimately recouped from Plaintiffs and the Classes in the form of increased premium rates on the Insurer Defendants' insurance products.

393.     Defendants did not disclose their practices in any of their policies or sales and marketing materials provided to Plaintiffs and the Classes.

394.     Defendants also acted to ensure Plaintiffs and Class Members could not learn of their unlawful scheme, conspiracy and course of conduct from other informational sources.  For example, Defendants uniformly trained their sales force and other representatives not to disclose their acceptance of compensation or other fraudulent practices as described herein.

395.     Defendants also engaged in a systematic effort to conceal from governmental agencies and on public records the amount and nature of compensation paid to the Broker Defendants by the Insurer Defendants.

396.     Further, Defendants are in sole possession of the truthful and accurate information concerning the components of the premiums and policy rates.  And, Defendants have uniformly refused to provide accurate policy information to Plaintiffs and Class Members upon request, including information about whether overrides and communications are built into the price of the plan.

397.     As a result of the foregoing, Plaintiffs and Class Members could not reasonably discover from the Defendants or any other source the deceptive and anti-competitive practices and Plaintiffs did not do so until just recently.  For the reasons alleged above, the vast majority of Class Members still do not know that they have been and continue to be injured by Defendants' conduct.

398.     Defendants' conduct is continuing in nature.  Defendants decided to engage in and conceal the scheme, conspiracy and course of misconduct alleged herein including, *inter alia*, the

override and communications fee agreements, steering practices, and bid-rigging, over a decade ago. Continuously thereafter, Defendants have continued to engage in and conceal their fraudulent scheme to pay improper overrides and other fees and recoup them from Plaintiffs and Class Members.

399.    There is a substantial nexus between the fraudulent and anti-competitive conduct accruing within two years of filing suit and the misconduct prior to that time.  The acts involve the same type of illicit practices and are recurring, continuous events.

400.    The statute of limitations applicable to any claims which Plaintiffs or other Class Members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein has been tolled as a result of Defendants' fraudulent concealment.  In addition, Plaintiffs and the Classes did not and could not have discovered their causes of action until the time alleged below, thereby tolling any applicable statute of limitations.

## CLASS ACTION ALLEGATIONS

**A.    Class Definitions**

401.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B), b(2), and (b)(3), on behalf of the following Classes:

*The Employee Classes*

All employees in the United States receiving employee benefits from a plan governed by ERISA, who, at any time from August 26, 1994 and the date of class certification, have (a) paid in full or in part for an insurance product acquired from one or more of the Insurer Defendants with the indirect help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates and/or (b) have paid for supplemental insurance coverage from one or more of the Insurer Defendants with the direct or indirect help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates ("Employee Class").

and

All employees in the United States receiving employee benefits from a plan not governed by ERISA, including, but not limited to, government employees and/or employees of religious organizations, who, at any time from August 26, 1994 and the

- 103 -

date of class certification, have (a) paid in full or in part for an insurance product acquired from one or more of the Insurer Defendants with the indirect help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates and/or (b) have paid for supplemental insurance coverage from one or more of the Insurer Defendants with the indirect help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates ("Non-ERISA Employee Subclass").

### The Employer Classes

All employers in the United States providing employee benefits through a plan governed by ERISA, that, at any time from August 26, 1994 and the date of class certification, have paid in full or in part for an insurance product acquired from the Insurer Defendants or any of their subsidiaries or affiliates with the direct help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates ("Employer Class").

and

All employers in the United States providing employee benefits through a plan not governed by ERISA, including, but not limited to, governmental and/or religious employers, that, at any time from August 26, 1994 and the date of class certification have paid in full or in part for an insurance product acquired from the Insurer Defendants with the direct help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates ("Non-ERISA Employer Subclass").

Excluded from all Classes are Defendants and their officers, affiliates, subsidiaries, directors and employees.

402.    The Classes are so numerous that joinder of their members is impracticable.

403.    The exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery.

404.    The Classes are ascertainable in that the names and addresses of all Class Members can be identified in business records maintained by the Defendants.

405.    There are numerous questions of law and fact that are common to the claims of all Class Members as set forth above, including:

(a)     whether Defendants entered into a contract, combination or conspiracy to manipulate the price and other terms of insurance contract bids submitted to Plaintiffs and Class members and to allocate the market for the sale of insurance;

(b)     whether Defendants' contract, combination or conspiracy had the purpose and effect of reducing and unreasonably restraining competition in the sale of insurance;

(c)     the identity of the participants to the contract, combination or conspiracy;

(d)     the duration and extent of the contract, combination or conspiracy alleged in the Complaint;

(e)     the mechanisms used to accomplish the contract, combination or conspiracy;

(f)     whether Defendants' conduct violated §1 of the Sherman Act;

(g)     the effect upon and the extent of injuries sustained by Plaintiffs and Class Members;

(h)     the appropriate type and/or measure of antitrust damages;

(i)     whether injunctive relief is necessary to restrain future antitrust violations;

(j)     whether the Broker Defendants contracted to receive Contingent Commissions from insurers based on the volume of business the Broker Defendants placed with those insurers;

(k)     whether the Contingent Commissions created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(l)     whether the Broker Defendants directed their subsidiaries and affiliates to engage in the conduct alleged in this Complaint;

(m)     whether the Broker Defendants fraudulently concealed or failed to disclose the Contingent Commissions and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

- 105 -

(n)      whether Defendants' conduct breached their fiduciary duties to their clients;

(o)      whether Defendants engaged in mail and/or wire fraud;

(p)      whether Defendants engaged in a pattern of racketeering activity;

(q)      whether the Enterprises alleged herein are enterprises within the meaning of 18 U.S.C. §1961(4);

(r)      whether Defendants conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(s)      whether Defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(t)      whether Defendants' overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to Plaintiffs' and the Class Members' business or property;

(u)      whether Plaintiffs and the Classes are entitled to injunctive, declaratory, and/or other equitable relief;

(v)      whether plaintiffs and the Classes are entitled to an award of attorneys' fees and expenses against Defendants;

(w)      whether Defendants violated RICO and state laws; and

(x)      whether Defendants fully disclosed the nature and extent of Contingent Commissions relating to the products and services provided.

## B.      Rule 23(a)

406.     The claims of the representative Plaintiffs are typical of those of the Classes they represent.

407.     Their claims originate from the same illegal, fraudulent conspiracy on the part of Defendants and Defendants' acts in furtherance of that conspiracy, including Defendants' own

fraudulent conduct, as well as conduct by Defendants that aided and abetted the fraudulent conduct of others. Thus, if brought and prosecuted individually, the claims of each Class Member would require proof of the same material and substantive facts.

408. Plaintiffs and Class Members also will seek the same relief. All Class Members, like Plaintiffs, sustained antitrust injury as a result of Defendants' conspiracy, contract or combination in restraint of trade. Plaintiffs and Class Members were damaged as a result of purchasing insurance directly from the Insurer Defendants or their co-conspirators at prices that were artificially inflated by the market allocation and bid-rigging scheme. Plaintiffs and Class Members also were the victims of one or more of the illegal practices of one or more of the Defendants set forth above, including the false representations that Defendants would act in Plaintiffs' and Class Members' best interests in procuring insurance, concealing and failing to disclose the existence, extent and effect of the Contingent Commissions and the conflict of interests that Defendants created for themselves through the receipt of those Contingent Commissions and their steering and bid-rigging activities.

409. The representative Plaintiffs will fairly and adequately protect the interests of the Classes and have no interest adverse to or which directly and irrevocably conflict with the interests of other members of the Classes.

410. The representative Plaintiffs are willing and prepared to serve the Court and proposed Classes in a representative capacity with all of the obligations and duties material thereto.

411. The interests of the named Plaintiffs are co-extensive with and not antagonistic to those of the absent Class Members.

412. The named Plaintiffs have retained the services of counsel who are experienced in complex insurance litigation and antitrust class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent the named Plaintiffs and all absent Class members.

## C.      Rules 23(b)(1), 23(b)(2) and 23(b)(3)

413.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B). The prosecution of separate actions by individual members of the Classes that would, as a practical matter, be dispositive of the interests of other members of the Classes who are not parties to the action or could substantially impair or impede their ability to protect their interests.

414.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for the parties opposing the Classes.   Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the Classes.

415.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants have acted or refused to act on grounds generally applicable to the Classes, making final declaratory or injunctive relief appropriate.

416.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the Classes predominate over any questions affecting only individual members.

417.    Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint in that:

(a)      individual claims by the Class members will be impracticable as the costs of pursuit would far exceed what any one Plaintiff or Class members has at stake;

(b)      as a result, very little litigation has been commenced over the controversies alleged in this Complaint and individual members are unlikely to have interest in prosecuting and controlling separate individual actions;

(c)    the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d)    the proposed class action is manageable.

## COUNT I

### Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c)
### All Plaintiffs Against all Defendants

418.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

419.    This cause of action is brought pursuant to 18 U.S.C. §1964(c)

420.    As set forth above, in violation of 18 U.S.C. §1962(d), Defendants have conspired to violate 18 U.S.C. §1962(c).

421.    As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs and Class Members have been injured by, among other things, paying more for insurance and other "services" in excess of the amounts they would have paid in the absence of the conspiracy.

422.    Accordingly, Defendants are liable to Plaintiffs and the Classes for three times their actual damages as proven at trial plus interest and attorneys' fees.

## ALTERNATIVE COUNT I

### Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c) Against All Defendants involved in Broker-Centered Conspiracies

423.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

424.    This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(d) by the following Plaintiffs against the following Defendants:

- ULR's clients (employers and the employees for whose benefit they acted) against the Defendants involved in the ULR-centered conspiracy;

- Marsh's clients against the Defendants involved in the Marsh-centered conspiracy; and

- Aon's clients against the Defendants involved in the Aon-centered conspiracy.

425.     As set forth above, in violation of 18 U.S.C. §1962(d), Defendants in each Employee Benefits Centered Conspiracy have conspired to violate 18 U.S.C. §1962(c).

426.     As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs and Class Members have been injured by, among other things, paying more for insurance and other "services" than they would have paid in the absence of the conspiracy.

427.     Accordingly, Defendants in each of the Employee Benefits Insurance Broker-Centered Enterprises are liable to Plaintiffs and the Classes for three times their actual damages as proven at trial plus interest and attorneys' fees.

## COUNT II

### Violation of 18 U.S.C. §1962(c)
### All Plaintiffs Against all Defendants

428.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

429.     This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c)

430.     As set forth above, in violation of 1962(c), Defendants have conducted or participated in the conduct of the affairs of the Employee Benefits Insurance Enterprise through a pattern of racketeering activity.

431.     As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, plaintiffs and members of the Class have been injured in their business or property by,

among other things, paying more for insurance and other "services" than they would have paid absent Defendants' illegal conduct.

432.     Accordingly, Defendants are liable to Plaintiffs and the Classes for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## ALTERNATIVE COUNT II

**(Violation of 18 U.S.C. §1962(c) Against all Defendants in the Employee Benefits Insurance Broker-Centered Enterprises)**

433.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

434.     This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c) by the following Plaintiffs against the following Defendants:

- ULR's clients (employers and the employees on whose behalf they acted) against Defendants associated-in-fact in the ULR-centered Enterprise;

- Marsh's clients against Defendants associated-in-fact in the Marsh-centered Enterprise;

- Aon's clients against Defendants associated-in-fact in the Aon-centered Enterprise.

435.     As set forth above, in violation of 1962(c), Defendants in each of the Employee Benefits Insurance Broker-Centered Enterprises have conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity.

436.     As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs and Class Members have been injured in their business or property by, among other things, paying more for insurance and other "services" than they would have paid absent Defendants' illegal conduct.

437.     Accordingly, Defendants in each of the Employee Benefits Insurance Broker-Centered Enterprises are liable to Plaintiffs and the Classes for three times their actual damages as proven at trial, plus interest and attorneys' fees.

- 111 -

**COUNT III**

**Injunctive and Declaratory Relief under RICO by
All Plaintiffs against all Defendants**

438.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

439.     This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

440.     As set forth in Plaintiffs' First and Second Claims for Relief and in this Amended Complaint, Defendants have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and unless enjoined, will continue to do so in the future.

441.     As set forth above, Plaintiffs and the Classes have no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

442.     Accordingly, Plaintiffs and the Classes are entitled to declaratory relief declaring the illegal and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining Defendants from further violations of 18 U.S.C. §§1962(c) and (d).

**ALTERNATIVE COUNT III**

**Injunctive and Declaratory Relief under RICO against Defendants
in the Employee Benefits Insurance Broker-Centered Enterprises**

443.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

444.     This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

445.     As set forth in Plaintiffs' First and Second Claims for Relief and in this Amended Complaint, Defendants in the Employee Benefits Insurance Broker-Centered Enterprises and

Employee Benefits Insurance Broker-Centered Conspiracies have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and unless enjoined, will continue to do so in the future.

446.     As set forth above, Plaintiffs and the Classes have no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

447.     Accordingly, the following Plaintiffs and the Classes are entitled to declaratory relief declaring the illegal and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining the following Defendants from further violations of 18 U.S.C. §§1962(c) and (d):

- ULR's customers against Defendants associated-in-fact in the ULR-centered Enterprise and involved in the ULR-centered conspiracy;

- Marsh's customers against Defendants associated-in-fact in the Marsh-centered Enterprise and involved in the Marsh-centered conspiracy;

- Aon's customers against Defendants associated-in-fact in the Aon-centered Enterprise and involved in the Aon-centered conspiracy;

## COUNT IV

### Violation of the Sherman Act, 15 U.S.C. Section 1,
### All Plaintiffs Against All Defendants

448.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

449.     Defendants and their co-conspirators have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

450.     Specifically, Defendants have entered into agreements, the purpose and effect of which were to suppress or eliminate competition through bid-rigging and market allocation, and to allocate markets and customers, which had the effect of inflating premiums above competitive levels.

451.    Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contract, combination or conspiracy.  Defendants implemented the unlawful scheme by the following acts, among others:

(a)     Agreeing to steer insurance business to Insurer Defendants and away from non-conspiring insurers in exchange for undisclosed fees, commissions and other kickbacks from the Insurer Defendants;

(b)     Agreeing, through the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

(c)     Agreeing to engage in activities that give the appearance of competition where none existed;

(d)     Agreeing to allocate insurance customers among the Insurer Defendants, denying such customers – such as Plaintiffs and Class Members – the benefits of free and open competition; and

(e)     Agreeing not to deal with insurers who refuse to participate in the unlawful schemes and conspiracies alleged in subsections (a)-(d) above.

452.    Defendants' activities as described above do not constitute the business of insurance as regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, the acts of the Broker Defendants both in establishing and then enforcing Contingent Commission agreements and other profit sharing arrangements in the insurance industry, including refusing to deal with insurers who do not participate in the anti-competitive conduct alleged herein, constitute coercion or boycott within the meaning of the McCarran-Ferguson Act.  15 U.S.C. §1012. In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants

participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

453. The unlawful conspiracy alleged herein constitutes a per se violation of Section 1 of the Sherman Act and/or unreasonable restraint of trade under a rule of reason analysis.

454. Various persons, not named as Defendants, participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of that conspiracy.

455. The aforesaid combination and conspiracy had the following effects, among others:

(a)    restraining and suppressing competition among the Insurer Defendants and their co-conspirators;

(b)    inflating premiums for insurance paid by Plaintiffs and Class Members to supra-competitive levels;

(c)    depriving Plaintiffs and Class Members of the benefits of free and open competition in the purchase of insurance; and

(d)    depriving Plaintiffs and Class Members of information concerning insurers who refused to participate in the unlawful schemes and conspiracies alleged herein, and effectively preventing Plaintiffs and Class Members from purchasing insurance products from those insurers.

456. As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Amended Complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than those prices and terms that would have been available in a competitive market.

## COUNT V

### Violation of Section 1 of the Sherman Act,
### Against Defendant Participants in the ULR-centered Conspiracy

457. Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

458.     This claim is brought by the Plaintiffs and Class Members who purchased insurance products through ULR, against the ULR and the Insurer Defendant participants in the ULR-centered Broker Conspiracy.

459.     Each Defendant in the ULR-centered Broker Conspiracy has, with its co-conspirators, engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

460.     Specifically, Defendants entered into Agreements with their co-conspirators, the purpose and effect of which were to suppress or eliminate competition by rigging bids and allocating markets and customers, which inflated prices for insurance products in the United States above competitive levels.

461.     Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Defendants implemented the unlawful schemes by the following acts, among others:

(a)     Agreeing to steer business to the Insurer Defendant participants in the conspiracy and away from non-conspirator insurers in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

(b)     Agreeing, though the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

(c)     Agreeing to engage in activities that give the appearance of competition where none existed;

(d)     Agreeing to allocate insurance customers among the conspiring Insurer Defendants, denying such customers – such as Plaintiffs and Class Members – the benefits of free and open competition; and

(e)     Agreeing not to deal with insurers who refuse to participate in the unlawful schemes and conspiracies alleged in subsections (a)-(d), above.

462.     Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, the acts of the ULR Defendants in establishing and enforcing Contingent Commission arrangements in the insurance industry, including steering customers away from and refusing to deal with insurers who do not participate in the anticompetitive conduct alleged herein, constitutes coercion or boycott within the meaning of the McCarran-Ferguson Act, 15 U.S.C. §1012.   In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants that participated in the ULR-centered Broker Conspiracy participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

463.     The aforesaid combinations and conspiracies each had the following effects, among others:

(a)     restraining and suppressing competition among the Insurer Defendants and their co-conspirators;

(b)     inflating insurance premiums paid by Plaintiffs and Class Members above competitive levels;

(c)     depriving Plaintiffs and Class Members of the benefits of free and open competition in the purchase of insurance; and

(d)     depriving Plaintiffs and Class Members of information concerning insurers who refused to participate in the unlawful schemes and enterprise conspiracies alleged herein, and

effectively preventing Plaintiffs and Class Members from purchasing insurance products from those insurers.

464.     As a direct and proximate result of the ULR-centered contracts, combinations or conspiracies alleged in this Amended Complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

465.     The unlawful conspiracies alleged herein constitute a *per se* violation of Section 1 of the Sherman Act and/or unreasonable restraint of trade under a rule of reason analysis.

### COUNT VI

### Violation of Section 1 of the Sherman Act,
### Against Defendant Participants in the Marsh-centered Conspiracy

466.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

467.     This claim is brought by the Plaintiffs and Class Members who purchased insurance products through Marsh, against Marsh and the Insurer Defendant participants in the Marsh-centered Broker Conspiracy.

468.     Each Defendant in the Marsh-centered Broker Conspiracy has, with its co-conspirators, engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

469.     Specifically, Defendants entered into Agreements with their co-conspirators, the purpose and effect of which were to suppress or eliminate competition by rigging bids and allocating markets and customers, which inflated prices for insurance products in the United States above competitive levels.

470.     Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies. Defendants implemented the unlawful schemes by the following acts, among others:

(a)      Agreeing to steer business to the Insurer Defendant participants in the conspiracy and away from non-conspirator insurers in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

(b)      Agreeing, though the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

(c)      Agreeing to engage in activities that give the appearance of competition where none existed;

(d)      Agreeing to allocate insurance customers among the conspiring Insurer Defendants, denying such customers – such as Plaintiffs and Class Members – the benefits of free and open competition; and

(e)      Agreeing not to deal with insurers who refuse to participate in the unlawful schemes and conspiracies alleged in subsections (a)-(d), above.

471.     Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, the acts of Marsh in establishing and enforcing Contingent Commission arrangements in the insurance industry, including steering customers away from and refusing to deal with insurers who do not participate in the anticompetitive conduct alleged herein, constitutes coercion or boycott within the meaning of the McCarran-Ferguson Act.  In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants that participated in the Marsh-centered Broker Conspiracy participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

472.     The aforesaid combinations and conspiracies each had the following effects, among others:

(a)     restraining and suppressing competition among the Insurer Defendants and their co-conspirators;

(b)     inflating insurance premiums paid by Plaintiffs and Class Members above competitive levels;

(c)     depriving Plaintiffs and Class Members of the benefits of free and open competition in the purchase of insurance; and

(d)     depriving Plaintiffs and Class Members of information concerning insurers who refused to participate in the unlawful schemes and enterprise conspiracies alleged herein, and effectively preventing Plaintiffs and Class Members from purchasing insurance products from those insurers.

473.     As a direct and proximate result of the Marsh-centered contracts, combinations or conspiracies alleged in this Amended Complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

474.     The unlawful conspiracies alleged herein constitute a per se violation of Section 1 of the Sherman Act and/or unreasonable restraint of trade under a rule of reason analysis.

## COUNT VII

### Violation of Section 1 of the Sherman Act,
### Against Defendant Participants in the Aon-centered Conspiracy

475.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

476.     This claim is brought by the Plaintiffs and Class Members who purchased insurance products through Aon, against Aon and the Insurer Defendant participants in the Aon-centered Broker Conspiracy.

477.    Each Defendant in the Aon-centered Broker Conspiracy has, with its co-conspirators, engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

478.    Specifically, Defendants entered into Agreements with their co-conspirators, the purpose and effect of which were to suppress or eliminate competition by rigging bids and allocating markets and customers, which inflated prices for insurance products in the United States above competitive levels.

479.    Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Defendants implemented the unlawful schemes by the following acts, among others:

(a)    Agreeing to steer business to the Insurer Defendant participants in the conspiracy and away from non-conspirator insurers in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

(b)    Agreeing, though the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

(c)    Agreeing to engage in activities that give the appearance of competition where none existed;

(d)    Agreeing to allocate insurance customers among the conspiring Insurer Defendants, denying such customers – such as Plaintiffs and Class Members – the benefits of free and open competition; and

(e)    Agreeing not to deal with insurers who refuse to participate in the unlawful schemes and conspiracies alleged in subsections (a)-(d), above.

480.    Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder

risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, the acts of Aon in establishing and enforcing Contingent Commission arrangements in the insurance industry, including steering customers away from and refusing to deal with insurers who do not participate in the anticompetitive conduct alleged herein, constitutes coercion or boycott within the meaning of the McCarran-Ferguson Act. In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants that participated in the Aon-centered Broker Conspiracy participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

481. The aforesaid combinations and conspiracies each had the following effects, among others:

(a) restraining and suppressing competition among the Insurer Defendants and their co-conspirators;

(b) inflating insurance premiums paid by Plaintiffs and Class Members above competitive levels;

(c) depriving Plaintiffs and Class Members of the benefits of free and open competition in the purchase of insurance; and

(d) depriving Plaintiffs and Class Members of information concerning insurers who refused to participate in the unlawful schemes and enterprise conspiracies alleged herein, and effectively preventing Plaintiffs and Class Members from purchasing insurance products from those insurers.

482. As a direct and proximate result of the ULR-centered contracts, combinations or conspiracies alleged in this Amended Complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

483.    The unlawful conspiracies alleged herein constitute a per se violation of Section 1 of the Sherman Act and/or unreasonable restraint of trade under a rule of reason analysis.

## COUNT VIII

### Violation of State Antitrust Laws
### All Plaintiffs Against All Broker Defendants

484.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

485.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562, *et seq.*

486.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§44-1401, *et seq.*

487.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ark. Code Ann. §§4-75-309, *et seq.* and Ark. Code Ann. §§4-75-201, *et seq.*

488.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700, 16720,, *et seq.* and Cal. Bus. & Prof. Code §§17000, *et seq.*

489.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colo. Rev. Stat. §§6-4-101, *et seq.*

490.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §§35-26, *et seq.*

491.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503, *et seq.*

492.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Dela. Code Ann. tit. 6, §§2103, *et seq.*

493.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Fla. Stat. §§501.201, *et seq.*

494.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ga. Code Ann. §§16-10-22, *et seq.* and Ga. Code Ann. §§13-8-2, *et seq.*

495.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Haw. Rev. Stat. §§480-1, *et seq.*

496.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101, *et seq.*

497.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. §§10/1, *et seq.*

498.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ind. Code Ann. §§24-1-2-1, *et seq.*

499.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1, *et seq.*

500.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§50-101, *et seq.*

501.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ky. Rev. Stat. §§367.175, *et seq.*, and relief can be granted in accordance with Ky. Rev. Stat. §446.070.

502.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of La. Rev. Stat. §§51:137, *et seq.*

503.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§1101, *et seq.*

504.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Md. Code Ann. Title 11, §§11-201, *et seq.*

505.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mass. Ann. Laws ch. 92 §§1, *et seq.*

506.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws Ann. §§445.773, *et seq.*

507.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§325D.52, *et seq.*

508.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§75-21-1, *et seq.*

509.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Stat. Ann. §§416.011, *et seq.*

510.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mont. Code Ann. §§30-14-101, *et seq.*

511.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. §§59-801, *et seq.*

512.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A, *et seq.*

513.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.H. Rev. Stat. Ann. §§356:1, *et seq.*

514.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.J. Stat. Ann. §§56:9-1, *et seq.*

515.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. Ann. §§57-1-1, *et seq.*

516.    By reason of the foregoing, Defendants have entered into agreements in violation of N.Y. Gen. Bus. Law §340; N.Y. Ins. Law §2316(a).

517.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §§75-1, *et seq.*

518.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §§51-08.1-01, *et seq.*

519.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code Ann. §§1331.01, *et seq.*

520.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Okla. Stat. tit. 79 §§203(A), *et seq.*

521.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ore. Rev. Stat. §§646.705, *et seq.*

522.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§6-36-1, *et seq.*

523.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.C. Code §§39-3-10, *et seq.*

524.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws Ann. §§37-1, *et seq.*

525.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§47-25-101, *et seq.*

526.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tex. Bus. & Com. Code Ann. §§15.01, *et seq.*

527.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911, *et seq.*

528.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. 9 §§2453, *et seq.*

529.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Va. Code §§59-1-9.1, *et seq.*

530.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wash. Rev. Code §§19.86.010, *et seq.*

531.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W.V. Code §§47-18-1, *et seq.*

532.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§133.01, *et seq.*

533.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wy. Stat. Ann. §§40-4-101, *et seq.*

## COUNT IX

### Pursuant to ERISA Sections 1109 and 502(a)(2) ERISA Employer Subclass and ERISA Employee Subclass Against Insurer Defendants

534.     Plaintiffs incorporate by reference all of the allegations above as if fully set forth herein.

535.     Employer Plaintiffs in the ERISA Employer Subclass are "fiduciaries" within the meaning of ERISA, 29 U.S.C. § 1002(21) and therefore have standing to assert the claim alleged herein.  Employee Plaintiffs in the ERISA Employee Subclass are "participants" in ERISA governed plans, and therefore have standing to assert the claims alleged herein.

536.     The Insurer Defendants are fiduciaries with respect to Plaintiffs within the meaning of 29 U.S.C. 1002(21)(A) by virtue of their exercise of discretionary authority, control or responsibility over the management of the Plan, and/or management or disposition of plan assets, and/or the administration of the plan.  The employee benefit plans' assets include group insurance policies that the Insurer Defendants issue for the purpose of providing insurance benefits to employees.  The premiums collected from employee participants and employer sponsors are also assets of the plans.

The Insurer Defendants retain and exercise authority to determine whether a participant is entitled to a benefit under the plans and the amount of the benefits payable to the participants.  The Insurer Defendants also pay the benefits owed to participants under the plans.  The Insurer Defendants also assume duties associated with plan administration, such as providing notice and disclosure of information required under ERISA.

537.    Pursuant to 29 U.S.C. §1104, the Insurer Defendants are obligated to act solely in the interest of Plaintiffs and the Class, as employee benefit plans' participants and beneficiaries, for the exclusive purpose of providing benefits to them, and to defray reasonable expenses of administering the plan.

538.    The Insurer Defendants breached their fiduciary under ERISA §§404 and 406, 29 U.S.C. §§104 AND 1106 duties by, among other things: (i) paying kickbacks and other non-disclosed or inadequately disclosed payments to the Broker Defendants, (ii) knowing and falsely certifying the amount of compensation paid to a party in interest, such that the plan's Form 5500 filings (Schedules A and C) did not accurately reflect the total compensation paid to parties in interest, (iii) causing and/or allowing the plan to engage the services of a party in interest; (iv) receiving consideration for its own personal account from a party in interest that dealt with the plan; and (v) acting contrary to the interests of plan participants and falsely communicating information to the plan participants about the plan.

539.    The Insurer Defendants built the kickbacks and other payments to brokers into the cost of the policies and resulted in higher premium costs to plaintiffs and Class Members.  These fees are not reasonable expenses related to services needed for administering the plan.

540.    The Insurer Defendants concealed or failed to disclose compensation that they paid to parties in interest to Plaintiffs and the Class, as well as to governmental agencies as alleged herein, even though the information was subject to disclosure under ERISA's reporting requirements.

541.    The Insurer Defendants encouraged and compensated the Broker Defendants for attempting to influence claims-loss ratios, claims filing, and renewal of policies.  Such compensation agreements resulted in actions adverse to the interest of Plaintiffs and the Class.  The override agreements described herein created a system of incentives for the Broker Defendants that harmed Plaintiffs and the Class by denying the full benefit of their employee benefit plan.

542.    As detailed above, the Insurer Defendants also engaged in the practice of "low-hanging" fruit, bid-rigging, and other anti-competitive conduct.  These practices placed the financial interest of the Insurer Defendants ahead of the interests of the employee participants and beneficiaries, such as Plaintiffs and the Class.  As ERISA fiduciaries, the Insurer Defendants were obligated to refrain from the conduct that was harmful to their interests.

543.    The Insurer Defendants profited as a result of their breaches of fiduciary duty and scheme with the Broker Defendants to overcharge expenses paid by Plaintiffs and Class Members.  The Insurer Defendants received business that they would not otherwise have received in the absence of the Agreements.  The conduct of the Insurer Defendants violated the sole interest and exclusive purpose duties of 29 U.S.C. §1104.  The Insurer Defendants engaged in deceptive conduct to overcharge Plaintiffs and the Class.  Such conduct is inconsistent with the duty of loyalty imposed under ERISA.

544.    As a result of Insurer Defendants' breaches of fiduciary duty imposed by ERISA, the Insurer Defendants were enriched at the expense of the ERISA plans and Plaintiffs and Class Members are entitled to equitable relief in the form of restitution and/or disgorgement of illegal profits pursuant to 29 U.S.C. §1132(a)(3).  Plaintiffs request that the Court impose a constructive trust on the amounts the Insurer Defendants collected pursuant to their fraudulent scheme.

545.    Plaintiffs are entitled to recover attorneys' fees pursuant to 29 U.S.C. §1132(g).

546.     Insurer Defendants are liable to make good to the Plan the losses suffered by the Plan on account of Defendants' fiduciary breaches.

### COUNT X

**Pursuant to ERISA Section 502(a)(3) ERISA Employer Subclass and
ERISA Employee Subclass Against Insurer Defendants**

547.     Plaintiffs incorporate by reference all of the allegations above as if fully set forth herein.

548.     As set forth more fully above, the Insurer Defendants have violated their fiduciary obligations under ERISA by, among other things, causing Plaintiffs and other Class Members in both the ERISA Employer Subclass and in the ERISA Employee subclass to pay excessive premiums for inferior insurance products, falsely certifying that the amount of compensation paid to a party in interest, such that the plan's Form 5500 filings (Schedules A and C) did not accurately reflect the total compensation paid to parties in interest, causing and/or allowing the plan to engage the services of a party in interest, receiving consideration for its own personal account from a party in interest that dealt with the plan and acting contrary to the interests of plan participants and falsely communicating information to the plan participants about the plan.

549.     Accordingly, Plaintiffs and other Class Members in both the ERISA Employer Subclass and the ERISA Employee Subclass are entitled to relief to enjoin the Insurer Defendants' conduct that is in violation of ERISA, and to obtain other appropriate equitable relief to redress such violations.

### COUNT XI

**Violation of State Antitrust Laws
Non-ERISA Employee Subclass and Non-ERISA Employer
Subclass Against Insurer Defendants**

550.     Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

551.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562, *et seq.*

552.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Revised Stat. §§44-1401, *et seq.*

553.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ark. Code Ann. §§4-75-309, *et seq.* and Ark. Code Ann. §§4-75-201, *et seq.*

554.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700, *et seq.*, 16720, *et seq.* and Cal. Bus. & Prof. Code §§17000, *et seq.*

555.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colo. Rev. Stat. §§6-4-101, *et seq.*

556.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §§35-26, *et seq.*

557.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503, *et seq.*

558.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Dela. Code Ann. tit. 6, §§2103, *et seq.*

559.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Fla. Stat. §§501.201, *et seq.*

560.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ga. Code Ann. §§16-10-22, *et seq.* and Georgia Code Ann. §§13-8-2, *et seq.*

561.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Haw. Rev. Stat. §§480-1, *et seq.*

562.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101, *et seq.*

563.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. §§10/1, *et seq.*

564.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ind. Code Ann. §§24-1-2-1, *et seq.*

565.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1, *et seq.*

566.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§50-101, *et seq.*

567.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ky. Rev. Stat. §§367.175, *et seq.*, and relief can be granted in accordance with Ky. Rev. Stat. §446.070.

568.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of La. Rev. Stat. §§51:137, *et seq.*

569.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§1101, *et seq.*

570.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Md. Code Ann. Title 11, §§11-201, *et seq.*

571.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mass. Ann. Laws ch. 92 §§1, *et seq.*

572.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws Ann. §§445.773, *et seq.*

573.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§325D.52, *et seq.*

574.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§75-21-1, *et seq.*

575.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Stat. Ann. §§416.011, *et seq.*

576.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mont. Code Ann. §§30-14-101, *et seq.*

577.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. §§59-801, *et seq.*

578.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A, *et seq.*

579.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.H. Rev. Stat. Ann. §§356:1, *et seq.*

580.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.J. Stat. Ann. §§56:9-1, *et seq.*

581.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. Ann. §§57-1-1, *et seq.*

582.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §340; N.Y. Ins. Law §2316(a).

583.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §§75-1, *et seq.*

584.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §§51-08.1-01, *et seq.*

585. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §§1331.01, *et seq.*

586. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Okla. Stat. tit. 79 §§203(A), *et seq.*

587. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ore. Rev. Stat. §§646.705, *et seq.*

588. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§6-36-1, *et seq.*

589. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.C. Code §§39-3-10, *et seq.*

590. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws Ann. §§37-1, *et seq.*

591. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§47-25-101, *et seq.*

592. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tex. Bus. & Com. Code Ann. §§15.01, *et seq.*

593. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911, *et seq.*

594. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. 9 §§2453, *et seq.*

595. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Va. Code §§59-1-9.l, *et seq.*

596. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wash. Rev. Code §§19.86.010, *et seq.*

597.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W.V. Code §§47-18-1, *et seq.*

598.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§133.01, *et seq.*

599.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wy. Stat. Ann. §§40-4-101, *et seq.*

## COUNT XII

### Common Law Breach of Fiduciary Duty;
### All Plaintiffs Against the Broker Defendants

600.     Plaintiffs repeat and re-allege the allegations contained above as if fully stated herein.

601.     Broker Defendants represent that they are highly skilled and independent insurance brokerage experts and possess the special knowledge and expertise necessary to interpret and understand the complex and sophisticated business risks and employee benefits needs faced by their clients and to determine which corresponding insurance products and insurance companies best fit their clients' needs.  Such representations are made through advertisements, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mail and interstate wires.

602.     The Broker Defendants encourage their clients (employers and the employees for whose benefit they are acting) to take advantage of this specialized knowledge and expertise in procuring insurance coverage.  Consequently, , Plaintiffs and Class Members reposed confidence and trust in the Broker Defendants, authorized the Broker Defendants to act on their behalf in the negotiation, procurement and renewal of their insurance coverage, and relied on the Broker Defendants' superior expertise in risk management and the procurement of insurance.  The Broker Defendants not only accepted but solicited that confidence and trust through virtually uniform misrepresentations in their publicly available materials and communications.

603.     Further, the Broker Defendants are insurance brokers characterized by elements of public interest which subjects the Broker Defendants to more stringent standards of conduct.  The Broker Defendants, in inducing Plaintiffs and Class Members to purchase certain policies, hold themselves out as confidants of Plaintiffs and Class Members, thereby encouraging Plaintiffs and Class Members to reveal confidential, personal and proprietary information, including financial and medical information.  This confidential and proprietary information includes that contained in financial statements, tax returns, medical records, driving records, claims history and numerous other documents and related business information.

604.     Based on the conduct and representations described above, the Broker Defendants are common law fiduciaries to Plaintiffs and Class Members, and therefore owe their clients, including Plaintiffs and Class Members: (a) a duty of loyalty to act in the best interests of their clients and to always put their clients' interests ahead of their own; (b) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Broker Defendants – including the duty to disclose the sources and amounts of all income they receive in or as a result of any transaction involving their clients, of which Defendants have sole knowledge; (c) a duty of care in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (d) a duty to provide impartial advice in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants – including to find the best coverage at the lowest price; and (f) a duty of good faith and fair dealing.

605.     In addition to their duties derived from their relationship of trust and confidence, the Broker Defendants have an independent duty to disclose information to Plaintiffs and Class Members because Plaintiffs and the Classes have no other independent means of ascertaining such

facts. The Broker Defendants have sole knowledge of the source and amount of all income paid and received, including the overrides, Communication Fees and others.

606. The Broker Defendants were aware that Plaintiffs and Class Members have no access to the foregoing information and, therefore, could not evaluate the accuracy of the information provided to them. The Broker Defendants intentionally concealed this information and capitalized on their sole possession of material facts by providing Plaintiffs and Class Members with false, misleading and incomplete information in connection with their insurance plans.

607. The Broker Defendants have breached those duties by acting in their own pecuniary interests in disregard of the interests of Plaintiffs and the Classes as set forth above.

608. The Broker Defendants have also breached those duties by concealing and failing to disclose that they were being paid on both sides of the transaction and had engaged in illegal bid-rigging, steering, "low-hanging fruit" practices and other illicit Agreements.

609. Plaintiffs and Class Members have been damaged by the Broker Defendants' breach of their fiduciary duties, *inter alia*, by (a) paying excessive premiums for basic and supplemental insurance, and undisclosed fees and another charges embedded in the premiums of the insurance products; (b) receiving insurance that was more expensive, provided less in benefits, and/or was otherwise inferior to other available insurance products; (c) not being reimbursed for money improperly collected; and (d) not receiving the full benefits of their employment compensation. The Employer Plaintiffs and the Classes have suffered substantial damages. The Employee Plaintiffs and the Employee Classes have been injured in fact by: (a) not being made aware of the Defendants' undisclosed compensation arrangements and afforded access to a competitive marketplace;(b) paying excessive premiums for basic and supplemental insurance, and undisclosed fees and other charges embedded in the premiums of the insurance products; (c) receiving insurance that was more expensive, provided less in benefits, and/or was otherwise inferior to other available

insurance products; (d) not being reimbursed for money improperly collected by insurers to pay kickbacks to brokers; and (e) not receiving the full benefits of their employment compensation. The Employer Plaintiffs and the Employer Classes have been injured in fact by: (a) paying excessive premiums for the basic insurance coverage contained in the employee benefit plan, including undisclosed fees and other charges embedded in the premiums of the insurance products; (b) not being reimbursed for money improperly collected; and (c) not receiving the value of their employee benefit packages offered to recruit and retain qualified employees.

610. The Broker Defendants are accordingly liable for breach of fiduciary duty to Plaintiffs and the Classes for the damages suffered by Plaintiffs and Class Members in an amount to be proved at trial.

611. Plaintiffs and Class Members are further entitled to an accounting by the Broker Defendants with respect to all compensation paid or received by the Broker Defendants.

### COUNT XIII

**Aiding and Abetting Breach of Fiduciary Duty**
**Non-ERISA Employee Subclass and Non-ERISA Employer Subclass**
**Against Insurer Defendants**

612. Plaintiffs repeat and re-allege the allegations contained above as if fully stated herein.

613. As alleged above, a fiduciary relationship existed between the Broker Defendants and their employer clients as well with as the employees on whose behalf the Broker Defendants undertook to procure insurance.

614. The Broker Defendants breached their fiduciary duties by acting in their own pecuniary interests and in disregard of the best interests of Plaintiffs and Class Members by concealing and failing to disclose that they were being paid on both sides of the transaction and had engaged in illegal bid-rigging, steering, "low-hanging fruit" practices and other illicit Agreements.

- 138 -

615.     The Insurer Defendants knowingly substantially participated in that breach by, among other things, entering into undisclosed Contingent Commissions and Communication Fee Agreements with the Broker Defendants and surreptitiously increasing Plaintiffs and Class Members' premium rates to cover the commissions and fees paid; encouraging the Broker Defendants to steer Plaintiffs and the Classes' business to them by offering the Broker Defendants commissions, bonuses and other benefits based on the volume, persistency and profitability of business placed with the Insurer Defendants; engaging in "low-hanging fruit" practices; submitting "throw away" bids to enable the Broker Defendants to maximize their compensation and lock in renewal business at above market rates; concealing the commissions and other compensation paid to the Broker Defendants on governmental forms and in representations to Plaintiffs and the Classes.

616.     In so doing, the Insurer Defendants not only acted in concert with and substantially assisted the Broker Defendants breach of their fiduciary duties, but also breached their independent fiduciary duties to Plaintiffs and the Class Members as more particularly alleged.

617.     Non-ERISA Plaintiffs and the Non-ERISA Employer and Employee Subclasses have been damaged by the Insurer Defendants aiding and abetting of the Broker Defendants' breach of their fiduciary duties.

618.     Accordingly, the Insurer Defendants are liable to both the Non-ERISA Plaintiffs, Non-ERISA Employer Subclass and the Non-ERISA Employee Subclass for damages in an amount to be proven at trial.

## COUNT XIV

### Unjust Enrichment
### All Plaintiffs Against All Broker Defendants

619.     Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

620.     The Broker Defendants have benefited from their unlawful acts by receiving hundreds of millions of dollars in Contingent Commissions and other improper payments.  These payments

have been received by the Broker Defendants at the expense of Plaintiffs and other Class Members under circumstances where it would be inequitable for the Broker Defendants to be permitted to retain the payments.

621.    As a result of the relationships between the parties and the facts as stated above, a constructive trust should be established over the monies paid by Plaintiffs and other Class Members in the form of payments to the Broker Defendants.

622.    Plaintiffs and other Class Members have conferred a benefit on the Broker Defendants, and Broker Defendants had knowledge of this benefit and have voluntarily accepted and retained the benefit conferred on them.

623.    Broker Defendants will be unjustly enriched if they are allowed to retain such funds, and therefore, a constructive trust should be imposed on all monies wrongfully obtained by the Broker Defendants.

624.    Plaintiffs and Class Members have no adequate remedy at law.

625.    Plaintiffs and Class Members are entitled to the establishment of a constructive trust consisting of the benefit conferred upon the Broker Defendants in the form of their Contingent Commission payments and other improper payments received, from which Plaintiffs and Class Members may make claims for restitution on a *pro rata* basis.

626.    By reason of the foregoing, Plaintiffs and Class Members have been irreparably harmed and are entitled to imposition of a constructive trust as set forth above.

## COUNT XV

### Unjust Enrichment
### Non-ERISA Employer Subclass and Non-ERISA Employee
### Subclass Against Insurer Defendants

627.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

628.     Insurer Defendants have benefited from their unlawful acts by receiving excessive premium revenue.  These payments have been received by Insurer Defendants at the expense of Plaintiffs and Class Members under circumstances where it would be inequitable for the Insurer Defendants to be permitted to retain the benefit.

629.     As a result of the relationships between the parties and the facts as stated above, a constructive trust should be established over the monies paid by Plaintiffs and other Class Members in the form of policy premiums, paid to the Insurer Defendants to the extent the total of those premium dollars were obtained or secured by means of Defendants' scheme and common course of conduct.

630.     Plaintiffs and other Class Members have conferred a benefit on the Insurer Defendants and Insurer Defendants had knowledge of this benefit and have voluntarily accepted and retained the benefit conferred on them.

631.     Insurer Defendants will be unjustly enriched if they are allowed to retain such funds, and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Insurer Defendants.

632.     Plaintiffs and Class Members have no adequate remedy at law.

633.     Non-ERISA Employer Subclass Plaintiffs and Non-ERISA Employee Subclass Plaintiffs are entitled to the establishment of a constructive trust consisting of the benefit inequitably conferred upon the Insurer Defendants in the form of their excessive premium revenue, from which Plaintiffs and other Sub-Class Members may make claims for restitution on a *pro rata* basis.

634.     By reason of the foregoing, Plaintiffs and Class Members have been irreparably harmed and are entitled to imposition of a constructive trust as set forth above.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs David Boros, Cynthia C. Brandes, Alicia A. Pombo, MaryAnn Waxman and Richard H. Kimball, on behalf of themselves and other similarly situated employees, and the City of Danbury, Connecticut; Fire District of Sun City West; Connecticut Spring & Stamp Company; Golden Gate Bridge, Highway and Transportation District demand judgment against Defendants as follows:

A.      Certification of the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representative of the Classes, and designating their counsel as counsel for the Classes;

B.      A declaration that Defendants have committed the violations alleged herein;

C.      On Count I, against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses. On the Alternative Count I, against Defendants in each Employee Benefits Insurance Broker-centered Conspiracy, jointly and severally, in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

D.      On Count II, against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses. On the Alternative Count II, against the Defendants in each Employee Benefits Insurance Broker-centered Conspiracy, jointly and severally, in amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

E.      On Count III, for a declaratory judgment declaring the anticompetitive and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d) and granting

injunctive relief enjoining Defendants from further violations of 18 U.S.C. §§1962(c) and (d).  On

the Alternative Count III, for a declaratory judgment declaring the anticompetitive and conspiratorial

conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d) and granting injunctive

relief enjoining Defendants in each Employee Benefits Insurance Broker-Centered Conspiracy from

further violations of 18 U.S.C. §§1962(c) and (d);

      F.      On Count IV, against Defendants jointly and severally in an amount equal to treble

the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus

interest and attorneys' fees and expenses;

      G.      On Count V, against Defendants in the ULR-centered Employee Benefits Insurance

Conspiracy, jointly and severally, in an amount equal to treble the amount of damages suffered by

Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

      H.      On Count VI, against Defendants in the Marsh-centered Employee Benefits Insurance

Conspiracy, jointly and severally, in an amount equal to treble the amount of damages suffered by

Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

      I.      On Count VII, against Defendants in the AON-centered Employee Benefits Insurance

Conspiracy, jointly and severally, in an amount equal to treble the amount of damages suffered by

Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

      J.      On Count VIII; against Broker Defendants  jointly and severally, a judgment for

damages sustained by Plaintiffs and other Class Members, and for any additional damages,

injunctive relief, penalties, special or punitive damages, and other monetary relief provided by

applicable law, including treble damages and attorneys' fees;

      K.      On Count IX, in favor of the ERISA Employer Class Plaintiffs and the ERISA

Employee Class Plaintiffs, and against the Insurer Defendants jointly and severally, to make good to

the ERISA Plans any losses suffered by the Plans on account of Defendants' wrongful conduct, plus such other equitable and remedial relief as this Court may deem appropriate;

L.      On Count X, in favor of the ERISA Employer Class and the ERISA Employee Class , and against the Insurer Defendants jointly and severally, to enjoin any act or practice that violates ERISA and to obtain other appropriate relief to redress such violations;

M.      On Count XI, in favor of the Non-ERISA Employee Subclass and Non-ERISA Employer Subclass as against Defendants jointly and severally, a judgment for damages sustained by Plaintiffs and other Class Members, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

N.      On Count XII, as against the Broker Defendants, jointly and severally, in the amount of damages suffered by Plaintiffs and Class Members as proved by trial plus interest;

O.      On Count XIII, in favor of the Non-ERISA Employee Subclass and Non-ERISA Employer Subclass as against the Insurer Defendants jointly and severally, in the amount of damages suffered by Plaintiffs and other members of the Subclasses as proven at trial plus interest;

P.      On Count XIV, as against the Broker Defendants, jointly and severally, for disgorgement of Defendants' unjust enrichment and/or imposing a constructive trust upon Defendants' ill-gotten monies, freezing Defendants' assets, and requiring Defendants to pay restitution to plaintiffs and the Class and to restore to the Class all funds acquired by means of any act or practice declared by this Court to be unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

Q.      On Count XV, in favor of the Non-ERISA Employee Subclass and Non-ERISA Employer Subclass as against the Insurer Defendants, jointly and severally for disgorgement of Defendants' unjust enrichment and/or imposing a constructive trust upon Defendants' ill-gotten monies, freezing Defendants' assets, and requiring Defendants to pay restitution to plaintiffs and the

Class and to restore to the Class all funds acquired by means of any act or practice declared by this Court to be unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

R.     An injunction preventing Defendants from engaging in future anticompetitive practices;

S.     Costs of this action, including reasonable attorneys' fees and expenses; and

T.     Any such other and further relief as this Court deems just and proper.

# JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

DATED:  August 1, 2005

MILBERG WEISS BERSHAD
  & SCHULMAN LLP
EDITH M. KALLAS
JOSEPH P. GUGLIELMO
J. DOUGLAS RICHARDS
MICHAEL M. BUCHMAN
ELIZABETH ROSENBERG
LILI R. SABO


_____/S/ EDITH M. KALLAS_____

One Pennsylvania Plaza
New York, NY  10119
Telephone:  212/594-5300
212/868-1229 (fax)


MILLER FAUCHER AND CAFFERTY LLP
BRYAN C. CLOBES
ELLEN MERIWETHER
MICHAEL S. TARRINGER
MELODY FORRESTER
TIMOTHY FRASER


_____/S/ BRYAN C. CLOBES_____

One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA  19103
Telephone:  215/864-2800
215/864-2810 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
THEODORE J. PINTAR
BONNY E. SWEENEY
JAMES D. MCNAMARA
MARY LYNNE CALKINS
RACHEL L. JENSEN


_____ /S/ JOHN J. STOIA, JR. _____


401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
ELAINE A. RYAN
PATRICIA N. HURD


_____ /S/ ANDREW S. FRIEDMAN _____


2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)

DRUBNER HARTLEY & O'CONNOR
JAMES E. HARTLEY, JR.
GARY O'CONNOR
CHARLES HELLMAN
500 Chase Parkway, 4th Floor
Waterbury, CT 06708
Telephone: 203/753-9291
203/753-6373 (fax)

WHATLEY DRAKE, LLC
JOE R. WHATLEY, JR.
CHARLENE FORD
RICHARD ROUCO
2323 Second Avenue North
Birmingham, AL  35203
Telephone:  205/328-9576
205/328-9669 (fax)

THE FURTH FIRM LLP
FREDERICK P. FURTH
MICHAEL P. LEHMANN
THOMAS P. DOVE
JULIO J. RAMOS
JON T. KING
225 Bush Street, 15th Floor
San Francisco, CA  94104
Telephone:  415/433-2070
415/982-2076 (fax)

FOOTE, MEYERS, MIELKE & FLOWERS
ROBERT M. FOOTE
416 South Second Street
Geneva, IL  60134
Telephone:  630/232-6333
630/845-8982 (fax)

LEVIN, FISHBEIN, SEDRAN & BERMAN
HOWARD J. SEDRAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106
Telephone:  215/592-1500
215/592-4663 (fax)

FINE KAPLAN & BLACK
ROBERTA D. LIEBENBERG
1845 Walnut Street
Philadelphia, PA  19103
Telephone:  215/567-6566
215/568-5872 (fax)

THE FURTH FIRM, LLP
MICHAEL P. LEHMAN
THOMAS P. DOVE
JULIO J. RAMOS
JON T. KING
225 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone: 415/433-2070
415/982-2076 (fax)

GRAY, WEISS AND WHITE
MARK K. GRAY
1200 PNC Plaza
Louisville, KY 40202
Telephone: 502/585-2060
502/581-1933 (fax)

HANZMAN & CRIDEN, P.A.
MICHAEL E. CRIDEN
KEVIN B. LOVE
220 Alhambra Circle, Suite 400
Coral Gables, FL 33134
Telephone: 305/357-9000
305/357-9050 (fax)

MEREDITH COHEN GREENFOGEL
  & SKIRNICK, P.C.
STEVEN J. GREENFOGEL
DANIEL B. ALLANOFF
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Telephone: 215/564-5182
215/569-0958 (fax)

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
MARY JANE EDELSTEIN FAIT
ADAM J. LEVITT
656 West Randolph Street
Suite 500 West
Chicago, IL 60661
Telephone: 312/466-9200
312/466-9292 (fax)

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
FRED TAYLOR ISQUITH
270 Madison Avenue, 10th Floor
New York, NY  10016
Telephone:  212/545-4600
212/545-4653 (fax)

ZWERLING, SCHACHTER &
  ZWERLING, LLP
ROBERT S. SCHACHTER
STEPHEN L. BRODSKY
JUSTIN M. TARSHIS
41 Madison Avenue
New York, NY  10010
Telephone:  212/223-3900
212/371-5969 (fax)

ALEXANDER, HAWES & AUDET, LLP
WILLIAM M. AUDET
300 Montgomery Street, Ste. 400
San Francisco, CA  94104
Telephone:  415/982-1776
415/576-1776 (fax)

BEELER, SCHAD & DIAMOND, P.C.
LAWRENCE W. SCHAD
JAMES SHEDDEN
MICHAEL S. HILICKI
TONY H. KIM
332 South Michigan Avenue, Suite 1000
Chicago, IL  60604
Telephone:  312/939-6280
312/939-4661 (fax)

CHAVEZ LAW FIRM, P.C.
KATHLEEN C. CHAVEZ
P.O. Box 772
Geneva, IL  60134
Telephone:  630/232-4480
630/232-8265 (fax)

CHIMICLES & TIKELLIS LLP
NICHOLAS E. CHIMICLES
MICHAEL D. GOTTSCH
361 West Lancaster Avenue
Haverford, PA  19041
Telephone:  610/642-8500
610/649-3633 (fax)

COHN, LIFLAND, PEARLMAN,
  HERRMANN & KNOPF
PETER S. PEARLMAN
Park 80 Plaza West One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

COOPER & KIRKHAM, P.C.
JOSEF D. COOPER
655 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  415/788-3030
415/882-7040 (fax)

LARRY D. DRURY, LTD.
LARRY D. DRURY
Two North LaSalle Street
Suite 700
Chicago, IL  60602
Telephone:  312/346-7950

FINKELSTEIN, THOMPSON
  & LOUGHRAN
BURTON H. FINKELSTEIN
L. KENDALL SATTERFIELD
HALLEY F. ASCHER
1050 30th Street, N.W.
Washington, D.C.  20007
Telephone:  202/337-8000
202/337-8090 (fax)

HANSON BRIDGES MARCUS VLAHOS
  RUDY LLP
DAVID J. MILLER
333 Market Street, 23rd Floor
San Francisco, CA  94105
Telephone:  415/777-3200
415/541-9366 (fax)

JANSSEN, MALLOY, NEEDHAM,
  MORRISON, REINHOLTSEN &
  CROWLEY, LLP
W. TIMOTHY NEEDHAM
730 Fifth Street, Post Office Drawer 1288
Eureka, CA  95502
Telephone:  707/445-2071
707/445-8305 (fax)

KLAFTER & OLSEN LLP
JEFFREY A. KLAFTER, ESQ.
1311 Mamaroneck Avenue, Suite 220
White Plains, NY  10602
Telephone:  914/997-5656
914/997-2444 (fax)

LITE DEPALMA GREENBERG
  & RIVAS, LLC
ALLYN Z. LITE
BRUCE D. GREENBERG
MICHAEL E. PATUNAS
Two Gateway Center, 12th Floor
Newark, NJ  07102
Telephone:  973/623-3000
973/623-0858 (fax)

JEFFREY J. LOWE, P.C.
JEFFREY J. LOWE
8235 Forsyth Blvd., Ste. 1100
St. Louis, MO  63105
Telephone:  314/721-3668
314/678-3401 (fax)

MAGER WHITE & GOLDSTEIN, LLP
JAYNE ARNOLD GOLDSTEIN
2825 University Drive, Suite 350
Coral Springs, FL  33065
Telephone:  954/341-0844
954/341-0855 (fax)

LAW OFFICES OF RANDY R. RENICK
RANDY R. RENICK
128 North Fair Oaks Avenue, Ste. 204
Pasadena, CA  91103
Telephone:  626/585-9600

SAVERI & SAVERI, INC.
GUIDO SAVERI
R. ALEXANDER SAVERI
GEOFFREY C. RUSHING
CADIO ZIRPOLI
One Eleven Pine, Suite 1700
San Francisco, CA  94111-5619
Telephone:  415/217-6810
415/217-6813 (fax)

LAW OFFICES OF FRANCIS O. SCARPULLA
FRANCIS O. SCARPULLA
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:  415/788-7210
415/788-0707 (fax)

SPARKMAN-ZUMMACH, P.C.
MARTIN W. ZUMMACH
P.O. Box 266
Southaven, MS  38671
Telephone:  662/349-6900
662/349-6800 (fax)

Attorneys for Plaintiffs

H:\NrPortbl\DOCS\JGUGLIELMO\300328_1.DOC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

——————————————————————x

| | | |
|---|---|---|
| **IN RE: INSURANCE BROKERAGE** | : | Civil Nos. 04-5184, 05-5743, 05-1064, 05- |
| **ANTITRUST LITIGATION** | : | 1079, 05-1167, 05-1168, 05-1169, 05-1214 |
| | : | (FSH) |
| **APPLIES TO ALL ACTIONS** | : | |
| | : | MDL No. 1663 |
| | : | |
| | : | Hon. Faith S. Hochberg |
| | : | |
| | : | Civil No. 04-5184 |
| | : | |

——————————————————————x

**EMPLOYEE BENEFIT PLAINTIFFS' RICO CASE**
**STATEMENT PURSUANT TO LOCAL RULE 16.1(B)(4)**

Plaintiffs MaryAnn Waxman, Cynthia C. Brandes, Alicia A. Pombo, David Boros, and

Dr. Richard H. Kimball (the "Employee Plaintiffs") and City of Danbury, Connecticut, Fire

District of Sun City West, Connecticut Spring & Stamp Company, and Golden Gate Bridge

Highway and Transportation District (the "Employer Plaintiffs") (the Employee Plaintiffs and

Employer Plaintiffs are referred to together as "Plaintiffs"), by and through their attorneys,

submit this Amended RICO Case Statement pursuant to Order No. 4, dated June 1, 2005, under

Local Civil Rule 16.1(b)(4).[1]

1. **State whether the alleged unlawful conduct is in violation of 18 U.S.C. § 1962(a), (b), (c) and/or (d).**

Plaintiffs assert violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).  There is no

alleged violation of 18 U.S.C. § 1962(a) or 18 U.S.C. § 1962(b).

2. **List each defendant and state the alleged misconduct and basis of liability of each defendant.**

### Broker Defendants

Aon Corporation

Aon Consulting, Inc.

Aon Brokers Services, Inc.

Aon Risk Services Companies, Inc.

Aon Risk Services Companies, Inc. U.S.

Aon Group Inc.

Aon Services Group, Inc.

---

[1] Pursuant to Order No. 1, dated March 11, 2005, Plaintiffs previously submitted a Joint RICO statement, which addressed both commercial insurance allegations and employee benefit allegations.  This Amended RICO case statement pertains only to the employee benefit allegations.

Aon Re Inc.[2]

Arthur J. Gallagher & Co.

Gallagher Benefit Services, Inc.[3]

BB&T Corporation

BB&T Insurance Services, Inc.[4]

Brown & Brown, Inc.

Brown & Brown Insurance Benefits, Inc.[5]

Hilb, Rogal & Hobbs Company

Frank F. Haack & Associates

O'Neill, Finnegan & Jordan Insurance Agency, Inc.[6]

HUB International Limited

Talbot Financial Corporation[7]

Marsh & McLennan Companies, Inc.

Marsh Inc.

---

[2] Aon Corporation, Aon Consulting Inc., Aon Broker Services, Inc., Aon Risk Services Companies, Inc., Aon Risk Services Companies, Inc. U.S., Aon Group, Inc., Aon Services Group, Inc., and Aon Re, Inc. are referred to collectively herein as "Aon."

[3] Defendants Arthur J. Gallagher & Co. and Gallagher Benefits Services, Inc. are referred to collectively herein as "Gallagher."

[4] Defendants BB&T Corporation and BB&T Insurance Services, Inc. are referred to collectively herein as "BB&T."

[5] Defendants Brown & Brown, Inc. and Brown & Brown Insurance Benefits, Inc. are referred to collectively herein as "Brown & Brown."

[6] Defendants Hilb, Rogal & Hobbs Company, Frank F. Haack & Associates, and O'Neill, Finnegan & Jordan Insurance Agency, Inc. are referred to collectively herein as "HRH."

[7] Defendants HUB International Limited and Talbot Financial are referred to collectively herein as "HUB."

Marsh USA, Inc.

Mercer, Inc.

Mercer Human Resources Consulting, Inc.

Seabury & Smith, Inc.[8]

Universal Life Resources

ULR Insurance Services, Inc.

Benefits Commerce, Inc.

Douglas P. Cox[9]

USI Holdings Corporation

USI Consulting Group

USI Insurance Services Corporation[10]

Wells Fargo & Company

Acordia, Inc.[11]

Willis Group Holdings Limited

Willis North America, Inc.[12]

---

[8] Defendants Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA, Inc., Mercer, Inc., Mercer Human Resources Consulting, Inc. and Seabury & Smith are referred to collectively herein as "Marsh."

[9] Universal Life Resources, ULR Insurance Services, Inc., Benefits Commerce, Inc., and Douglas P. Cox are referred to collectively herein as "ULR."

[10] Defendants USI Holdings Corporation, USI Consulting Group, and USI Insurance Services Corporation are referred to collectively herein as "USI."

[11] Defendants Wells Fargo & Company and Acordia, Inc. are referred to collectively herein as "Acordia."

[12] Defendants Willis Group Holdings Limited and Willis North America, Inc. are referred to collectively herein as "Willis."

**Insurer Defendants**

ACE Limited

ACE USA

Insurance Company of North America[13]

American International Group, Inc.

AIG Life Insurance Company

American Home Assurance Co.[14]

Connecticut General Life Insurance Company

Life Insurance Company of North America[15]

Hartford Financial Services Group, Inc.

Hartford Life & Accident Insurance Company

Hartford Life Group Insurance Company

Hartford Life Insurance Company[16]

Metropolitan Life, Inc.

Metropolitan Life Insurance Company

Paragon Life Insurance Company[17]

---

[13] Defendants ACE Limited, ACE USA, and Insurance Company of North America are referred to collectively herein as "ACE."

[14] Defendants American International Group, Inc., AIG Life Insurance Company, and American Home Assurance Co. are referred to collectively herein as "AIG."

[15] Defendants Connecticut General Life Insurance Company, and Life Insurance Company of North America are referred to collectively herein as "CIGNA."

[16] Defendants Hartford Financial Services Group, Inc., Hartford Life & Accident Insurance Company, Harford Life Group Insurance Company, and Hartford Life Insurance Company are referred to collectively herein as "Hartford."

Prudential Financial, Inc.

Prudential Insurance Company of America[18]

UnumProvident Corporation

Provident Life and Accident Insurance Company

Unum Life Insurance Company of America[19]

**Misconduct and Basis of Liability of Each Defendant**

Defendants have engaged in a conspiracy, described herein in Section 14, to increase premium revenues for the insurers and contingent commissions from communication fees, overrides and other improper compensation and remuneration for the brokers through kickbacks in return for steering of customers and bid rigging.

Defendants have implemented and executed their scheme through a pattern of racketeering comprised of repeated predicate acts of mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343, and violations of 18 U.S.C. § 1954.

Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) 18 U.S.C. §1343 (relating to wire fraud) and 18 U.S.C. § 1954 (relating to receipt and payment of monies). As set forth below, defendants have engaged in and continue to engage in conduct violating each of those laws in order to effectuate their scheme.

---

[17] Defendants Metropolitan Life, Inc., Metropolitan Life Insurance Company, and Paragon Life Insurance Company are referred to collectively herein as "MetLife."

[18] Defendants Prudential Financial, Inc. and Prudential Insurance Company of America are referred to collectively herein as "Prudential."

[19] Defendants UnumProvident Corporation, Provident Life and Accident Insurance Company, and Unum Life Insurance Company of America are referred to collectively herein as "Unum."

## PREDICATE ACTS

In order to carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters, false information intended to be included in filings with the Internal Revenue Service, and employee-benefit descriptions.

In order to carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including but not limited to agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters, false information intended to be included in filings with the Internal Revenue Service, and employee-benefit descriptions.

Defendants' predicate acts of racketeering also include the receipt and payment of monies and other things of value in violation of 18 U.S.C. § 1954. The undisclosed compensation described throughout this RICO Case Statement was influenced and/or was paid by the Insurer Defendants with the intent to influence the actions, decisions and/or conduct of the Broker

Defendants with respect to the purchase, renewal and administration of employee welfare benefits.

Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and class members and assuring Insurer Defendants of the placement of insurance and enabling Broker Defendants to collect undisclosed fees and other remuneration.

These misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

a.    the Broker Defendants holding themselves out as trusted advisors that can help clients (both employers and employees) assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clientele;

b.    the Broker Defendants' representations that they work for their clients and not the insurance companies;

c.    the failure to disclose Defendants' conflicts of interest;

d.    the failure to disclose that an integral part of the Broker Defendants' business philosophy is to promote the interest of insurance companies in order to maximize revenue from contingent commissions, overrides, communication fees and other administrative charges.  Therefore, the Broker Defendants steer business to favored insurance companies from whom they receive higher fees, commissions and overrides and away from insurers who refuse to engage in anti-competitive conduct;

e.    the failure to disclose the nature of the services the Broker Defendants provide in order to warrant their commissions, overrides, communication fees and other administrative charges;

f.    the failure to disclose to employers sponsoring employee benefits plans and to employee participants the payment of additional undisclosed compensation and that the undisclosed payments were passed through to the employers and their employees;

g.    the failure to disclose to United States Government officials the undisclosed fees, commissions and other remuneration received by the Benefits Broker Defendants and paid or given by the Benefits Insurer

Defendants as required by the Department of Labor and the IRS rules and regulations;

h.     the failure to disclose that the Broker Defendants are directing their clients to insurance companies based not on their merit, but rather on the web of kickbacks, overrides, communication fees and other undisclosed commissions, compensation and/or fees they are able to structure; and

i.     contriving, falsifying and/or manipulating insurance bids to create the illusion of a competitive bidding process.

Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and plaintiffs and class members relied on the misrepresentations and omissions as set forth above.

### CONSPIRACY

Defendants have not undertaken these practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy, as detailed herein in Section 14, which includes not only the defendants and their affiliates but industry trade associations and other entities.

### ENTERPRISE

*See* answer to Section 6

### RICO LIABILITY

Each defendant satisfies the definition of "person" within the meaning of 18 U.S.C. § 1961(c) and each continues to pose a threat to plaintiffs, the class members and others. Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) by committing or aiding and abetting in the commission of at least two acts of racketeering activity (*i.e.*, indictable violations of 18 U.S.C. §§ 1341, 1343 and 1954) within the past ten years. In fact, each defendant has committed or aided and abetted the commission of thousands of acts of racketeering activity. Defendants have participated in or conducted the

affairs of the enterprises, described herein in Section 6, through this pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). Plaintiffs have been injured in their business and property by defendants' RICO violations. Accordingly, plaintiffs and class members are entitled to recover the damages they have sustained. Plaintiffs and class members are also entitled to declaratory and injunctive relief.

**3.     List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

Additional wrongdoers not named as defendants include Karen Radke, Jean-Baptiste Tateossian, Carlos Coello and James Mohs of AIG; Patricia Abrams of ACE; John Keenan and Edward Coughlin of Zurich American Insurance Company; and Robert Stearns, Joshua Bewlay and Kathryn Winter of Marsh. These ten individuals have pleaded guilty to criminal charges for their involvement in a bid-rigging scheme.

Additional wrongdoers not named as defendants include officers and employees of the named defendants, as well as other insurance brokers and insurance companies not named as defendants who assisted in carrying out the wrongful conduct alleged in the complaint. Other wrongdoers. Other wrongdoers, co-conspirators and aiders and abettors will be identified during the course of discovery.

**4.     List the alleged victims and state how each victim was allegedly injured.**

The Plaintiffs and Class members are victims of defendants' pattern of racketeering activity, overt acts and fraudulent scheme.

The Employee Plaintiffs and Employee Subclass purchased or acquired insurance through the Insurer Defendants as part of an employee benefits plan with help, assistance or involvement of the Broker Defendants. The Employer Plaintiffs and Employer Subclass

members, retained the services of the Defendants who sold insurance or provided advice

regarding the procurement or renewal of the insurance for the benefit plans they sponsored in a

continuous and uninterrupted flow in interstate commerce.  As a direct and proximate result of

the Defendants' scheme, Plaintiffs and class members have been, and continue to be injured in

their business and property in several respects: (i) paying excessive premiums and undisclosed

fees and charges for the insurance products and services notwithstanding that the Broker

Defendants undertook to negotiate on their behalf for the best possible terms, including

premiums, coverage and benefits; (ii) receiving insurance that was more expensive and/or

inferior to other available policies, which they accepted based on recommendations by the

Broker Defendants that were influenced by conflicts of interest; (iii) not being reimbursed for

money improperly collected; (iv) the Employee Subclass not receiving the full benefits of their

employment compensation; and/or (v) the Employee Subclass foregoing other employment

based on representations regarding the pricing, terms, and/or conditions of the employee benefits

plan.  In the absence of the Defendants' violations of 18 U.S.C. §1962(c) and (d), these costs and

expenses would have been substantially reduced.

**5.      Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.  A description of the pattern of racketeering shall include the following information:**

> **a.      List the alleged predicate acts and the specific statutes which are allegedly violated;**

Defendants have engaged in numerous predicate acts of mail and wire fraud.  In carrying

out these overt acts and fraudulent schemes described throughout this RICO Case Statement,

defendants have violated federal laws including mail and wire fraud, 18 U.S.C. §§ 1341 and

1343.  Additionally, the Defendants violated 18 U.S.C. § 1954.  These predicate acts constitute a

pattern of racketeering through which defendants have violated 18 U.S.C. § 1962(c) and (d).

10

**b./c.** **Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts; If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, provide the "circumstances constituting fraud or mistake [which] shall be stated with particularity." Fed. R. Civ. P. 9(b). Identify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;**

The participants in the predicate acts include all defendants as well as various other wrongdoers not named as defendants, as set forth in Section 2.

The facts and circumstances surrounding the predicate acts evidence a fraudulent scheme constituting a pattern of racketeering. The object of the fraudulent scheme has been to and is to increase the insurers' premium revenues by the Broker Defendants steering clients to the insurers in return for kickbacks which increase the Broker Defendants' revenues beyond what clients would otherwise be willing to pay for such services. Therefore, the kickbacks were undisclosed by the defendants and were passed on to plaintiffs and class members without their knowledge.

## Mail and Wire Fraud

Defendants have violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by sending materials by the postal service, by commercial interstate carrier, by wire or other interstate electronic media for the purpose of executing or attempting to executed a scheme to defraud or obtain money by false pretenses, representations or promises.

Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and class members and assuring Insurer Defendants of the placement of business and enabling the Broker Defendants to collect undisclosed commissions and fees.

These misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

11

      a.      the Broker Defendants holding themselves out as trusted advisors that can help clients (both employers and employees) assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clientele;

      b.      the Broker Defendants' representations that they work for their clients and not the insurance companies;

      c.      the failure to disclose Defendants' conflicts of interest;

      d.      the failure to disclose that an integral part of the Broker Defendants' business philosophy is to promote the interest of insurance companies in order to maximize revenue from contingent commissions, overrides, communication fees and other administrative charges. Therefore, the Broker Defendants steer business to favored insurance companies from whom they receive higher fees, commissions and overrides;

      e.      the failure to disclose the nature of the services the Broker Defendants provide in order to warrant their commissions, overrides, communication fees and other administrative charges;

      f.      the failure to disclose to employers sponsoring employee benefits plans and to employee participants the payment of additional undisclosed compensation and that the undisclosed payments were passed through to the employers and their employees;

      g.      the failure to disclose to United States Government officials the undisclosed fees, commissions and other remuneration received by the Broker Defendants and paid or given by the Insurer Defendants as required by the Department of Labor and the IRS rules and regulations;

      h.      the failure to disclose that the Broker Defendants are directing their clients to insurance companies based not on their merit, but rather on the web of kickbacks, overrides, communication fees and other undisclosed commissions, compensation and/or fees they are able to structure; and

      i.      contriving, falsifying and/or manipulating insurance bids to create the illusion of a competitive bidding process.

In order to carry out or attempt to carry out the above described schemes to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be

delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to contingent commission agreements, correspondence, policy materials, insurance binders, fee schedules, commission schedules, payments from clients, brokers and insurers, claims, responses to claims, and coverage letters.

In order to carry out or attempt to carry out the above described schemes to defraud or obtain money by means of false pretenses, representations or promises, defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including but not limited to contingent commissions agreements, correspondence, policy materials, insurance binders, fee schedules, commission schedules, payments from clients, brokers and insurers, claims, responses to claims, and coverage letters.

The matters and things sent by the Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

a.    materials containing false and fraudulent misrepresentations that the Broker Defendants would represent their clients' interests in the placement of insurance on behalf of plaintiffs;

b.    materials that concealed or failed to disclose the existence and effect of the kickbacks, overrides, communication fees and other undisclosed commissions, compensation and/or fees, including the conflict of interests that Defendants had created between their legal and contractual obligations to their clients and the economic disincentives to honor those obligations;

c.    virtually uniform misleading materials intended to induce clients to select and pay for more expensive and lesser coverage than might be otherwise available from Insurer Defendants in order to maximize premium revenue and the kickbacks, overrides, communication fees and other undisclosed commissions, compensation and/or fees to the Broker Defendants;

d.    materials uniformly intended to encourage and induce plaintiffs and Class Members to purchase optional or "supplemental" coverage from the Insurer Defendants as part of the employee benefit plans;

     e.        materials intended to discourage clients from aggressive pursuit of claims;

     f.        materials containing false information which the Defendants intended to be included in Form 5500 filings with the Internal Revenue Service and Department of Labor; and

     g.        invoices and payments related to the Defendants' improper scheme.

Other matter and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by defendants include information or communications in furtherance of or necessary to effectuate the schemes.

### Violations of 18 U.S.C. 1954

Additionally, Defendants' predicate acts of racketeering also include the receipt and payment of monies and other things in violation of 18 U.S.C. § 1954. The undisclosed compensation described throughout this Amended RICO Case Statement was accepted by the Broker Defendants because of or with the intent to be influenced and/or was paid by the Insurer Defendants with the intent to influence the actions, decisions and/or conduct of the Broker Defendants with respect to the purchase, renewal and administration of employee welfare benefits. The Broker Defendants and the Insurer Defendants deliberately failed to disclose to the employers sponsoring employee benefit plans and to the employee participants the payment of additional compensation and other remuneration. The failure to disclose additional compensation and all forms of remuneration was a matter concerning an employee benefit plan because the plan administrator and/or participants are legally entitled to such disclosure.

### Examples of Predicate Acts

The alleged predicate acts occur on a regular and on-going basis. The following are some examples of predicate acts. Specific details regarding more precise dates, times, places and identities of other parties participating many of the predicate acts will be provided after further investigation and discovery.

**Examples of Predicate Acts By The Broker Defendants**

Throughout the Class Period, the Broker Defendants regularly disseminated by mail and wire information containing materially false and misleading representations and omissions regarding the nature of the services that they offer and the manner in which they are compensated for their services. In these materials, the Broker Defendants have repeatedly represented that they will act in the best interests of their clients and their employees in providing unbiased advice and assistance in the selection of insurance products and services relating thereto, including claims administration. These materials represent that the Broker Defendants will provide expert brokering advice and will act as fiduciaries of their clients and their employees in placing insurance on the best terms possible and at the best price available. The Broker Defendants have also represented that they will fully disclose the manner in which they are compensated for their services. Such representations are materially false and misleading because they fail to disclose the clear conflict of interest created as a result of the improper contingent compensation agreements the Broker Defendants have entered into with the Insurer Defendants and that they have conspired with the Insurer Defendants for the purposes of eliminating competition and increasing their profits and revenues by raising or maintaining premiums charged to (or by reducing the benefits or coverage received by) plaintiffs and members of the class.

**Marsh**

In a document created to instruct employees on how to respond to client questions, Marsh has written: "Our guiding principle is to consider our client's best interest in all placements. We are our clients' advocates and we represent them in negotiations. We don't represent the [insurance companies]."   This purported "guiding principle" has figured prominently in Marsh's marketing materials.

Similarly, Mercer has stated on its website: "We work with our clients as partners and with each other as a team. Our advice and solutions are shaped by each other's unique needs and business context, and are designed to ensure that clients get the best return on their HR spending. We balance employer and employee advocacy in providing objective, expert guidance."

Marsh has also posted a website (http://www.msa.marsh.com) to describe its contingent commission agreements (referred to as MSAs) that was itself materially false and misleading. The website asserted that MSA's compensate Marsh for services provided to insurers, allegedly including "streamlined access to clients," "intellectual capital," "product development," "development and provision of technology" and "administrative and information services." All of these "services," however, are services Marsh is already fiduciarily obligated to provide to its clients.

The foregoing statements and other statements issued by Marsh were materially false and misleading, as they failed to disclose that the true purpose of Marsh's contingent commission agreements was to steer clients to those insurers who paid Marsh the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**Aon**

Aon has stated on its website: "one of our core values is always maintaining a client focus . . . By truly listening to our clients and working with them as a partner, we can best develop solutions that work seamlessly with their business." Further, Aon's publicly disseminated Aon's Code of Ethics states: "Satisfied clients are the key to Aon's success. Earn our clients' continued loyalty every day by treating them fairly, delivering the products and services they want and exceeding their expectations."

16

As late as September 2004, Aon's website stated that it "believes a foundation of trust between broker and client must be supported by disclosure and transparency. Disclosure of agreements and relationships with insurers is an important part of this relationship." Http://www.aon.com/about/csu/csu_faq.jsp. However, Aon consistently misled its clients about the true nature of its compensation agreements and in many cases provided no disclosure whatsoever to its clients about the role incentives played in its placement decisions.

The foregoing statements and other statements issued by Aon were materially false and misleading, as they failed to disclose that the true purpose of Aon's contingent commission agreements was to steer clients to those insurers who paid Aon the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**ULR**

ULR has stated on its website that ULR provides its "client and prospective clients the 'best in class' consulting information." Further, ULR's website has described that "[t]he services we offer are unique and highly specialized" and that it canvases a broad array of insurance companies in order to provide superior yet economical insurance coverage. Similarly, ULR's website has claimed: "Our focus is to assist clients in the design, implementation and management of Group Life and Accident Insurance programs to achieve cost efficiencies and plan improvements."

The foregoing statements and other statements issued by ULR were materially misleading, as they failed to disclose that the true purpose of ULR's contingent commission agreements was to steer clients to those insurers who paid ULR the most money and failed to

disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**Willis**

Willis has included on its website (http://**www.willis.com**) a client bill of rights, which misleadingly stated:  "Willis represents the *client's best interests* through our client advocacy model.  Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs.  Willis' customized recommendations and solutions will be driven by what is in the client's best interests.  This is the centerpiece of the value Willis provides its clients."

The foregoing statements and other statements issued by Willis were materially false and misleading, as they failed to disclose that the true purpose of Willis' contingent commission agreements was to steer clients to those insurers who paid Willis the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**Gallagher**

Gallagher has included on its website a document entitled "Client Commitment," which misleadingly states:  "*We always recommend that which is in the client's best interest, even if it diminishes our revenues*."  [Emphasis added.]

The foregoing statement and other statements issued by Gallagher were materially false and misleading, as they failed to disclose that the true purpose of Gallagher's contingent commission agreements was to steer clients to those insurers who paid Gallagher the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**Acordia/Wells Fargo**

Acordia has included on its website (http://www.acordia.com) a description of its purported promise to provide open an honest advice to its clients:

> Acordia's Commitment:
>
> Acordia's core values center around *doing what is ethical and what is right for the* customer. *If it is right for the customer it is right for Acordia*. We are leaders during periods of change. We maintain the highest standards with our customers and believe in taking the steps to follow these values:
>
> 1. *Value and reward open, honest, and two-way communication*.
>
> 2. Be accountable for and proud of your conduct and decisions.
>
> 3. *Do what's right for the customer*.
>
> 4. Talk and act with the customer in mind.
>
> 5. Exceed the expectations of customers.

*Id.* [Emphasis added]. Acordia's has also stated on its website that it will "[m]ak[e] insurance placements in the best interest of our customers."

Acordia's website has also included a description of its contingent commission agreements with insurers that are materially false and misleading. The website states that Acordia "[p]rovid[es] our customers with full disclosure on the revenue, including contingent commissions we earn at the beginning of our relationship and at the time of policy renewal."

The foregoing statements and other statements issued by Acordia were materially false and misleading, as they failed to disclose that the true purpose of Acordia's contingent commission agreements was to steer clients to those insurers who paid Acordia the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

19

**Brown & Brown**

Brown & Brown has described itself on its website (http://www.bbinsurance.com) as "an independent insurance intermediary organization that provides a variety of insurance products and services to corporate, institutional, professional and individual clients."  Brown & Brown has represented that its services include "the efficient management of risk and its related costs, meeting the business insurance needs of companies ranging from small retail establishments to multinational corporations."

The foregoing statements and other statements issued by Brown & Brown were materially false and misleading, as they failed to disclose that the true purpose of Brown & Brown's  contingent commission agreements was to steer clients to those insurers who paid Brown & Brown the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**HUB**

Hub has stated on its website (http://www.hubinternational.com):

> Our Commitment
>
> Hub International is dedicated to maintaining and upholding the highest standards of ethical conduct and integrity in all of our dealings with you, our client. We want to be your trusted risk advisor, and as such, we need to earn your confidence. So we are making a promise.

Additionally, with  respect  to  the  receipt  of  contingent  commissions,  Hub  has  stated  on  its website:  "We are open and honest as to how we are paid for placing your insurance."  *Id.*

The foregoing statements and other statements issued by HUB were materially false and misleading, as they failed to disclose that the true purpose of HUB's contingent commission agreements was to steer clients to those insurers who paid HUB the most money and failed to

disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**USI**

USI has represented on its website (www.usi.biz) that "USI clients enjoy convenient access to a broad spectrum of flexible, cost-effective products and strategically enhanced services for insurance, risk management, financial management, employee benefits and asset management programs tailored to their unique needs."

Further, regarding its health and welfare services, USI has represented on its website that: "[Its] mission is to provide [its clients] with solutions that offer a sensible way to contain costs without sacrificing quality. We have experience creating the best group plan for your company. We have experts in both first dollar and self-funded plans. By turning over the complex task of choosing the correct benefit plans for your organization, we will be able to provide the highest quality service to you and your employees at competitive cost."

The foregoing statements and other statements issued by USI were materially false and misleading, as they failed to disclose that the true purpose of USI's contingent commission agreements was to steer clients to those insurers who paid USI the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**HRH**

HRH has stated on its website (**http://www.hrh.com**):

> At HRH, we provide customized and innovative insurance and risk management solutions for businesses, associates and individuals. We offer our clients specialist knowledge in a wide range of industries and products, competitive pricing, unparalleled service, and access to the best carriers in the industry.

21

The foregoing statements and other statements issued by HRH were materially false and misleading, as they failed to disclose that the true purpose of HRH's contingent commission agreements was to steer clients to those insurers who paid HRH the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

**BB&T**

BB&T has stated on its website (http://www.bbandt.com) that its mission is "Helping our Clients achieve economic success and financial security" and its purpose is "providing excellent service to our clients, as our Clients are our source of revenues."

The foregoing statements and other statements issued by BB&T were materially misleading, as they failed to disclose that the true purpose of BB&T's contingent commission agreements was to steer clients to those insurers who paid BB&T the most money and failed to disclose the other improper conducted complained of in this action, such as the use of bid-rigging or fictitious quotes for insurance products.

### Examples of Predicate Acts Directed to Plaintiffs

Marsh has sent numerous communications to the Golden Gate Bridge District ("Golden Gate") regarding the brokerage services Marsh provided in connection with Golden Gate's employee benefit plans. These were typically directed to Joseph Wire, Golden Gate's current Auditor-Controller, or his predecessor, John Quigley. These included annual letters from Mercer regarding renewal of Golden Gate's employee benefit plan insurance, such as those transmitted on June 4, 1998, June 5, 2000, June 2001, and June 5, 2002. Marsh also transmitted to Golden Gate annual summaries of employee benefit plan insurance, such as those transmitted in

22

September 1994, September 1995, October 1996, September 1997, July 1998, October 1999, and October 2000.

These communications failed to adequately disclose the compensation agreements that Marsh had with various insurers for the payment of contingent commissions. Moreover, these transmittals failed to adequately disclose that the undisclosed compensation agreements destroy any objectivity that Marsh may have had in advising its clients and constitute a breach of Marsh's fiduciary duties. These transmittals also failed to disclose that Marsh was steering customers to insurers who have agreed to pay contingent commissions. Furthermore, these communications failed to disclose that Marsh engaged in bid-rigging with insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

Aon has sent to the City of Danbury ("Danbury") numerous communications regarding the brokerage services it provided in connection with Danbury's employee benefit plans, including a response to a Request for Qualification provided by Aon Consulting in December of 2001, and a Letter of Understanding dated January 17, 2002, signed by Aon Consulting Inc. Vice President, Steven A. Ribeiro. For example, Aon's RFQ response stated that Aon would perform an analysis in order to "uncover areas for improvement in [Danbury's] current programs whether they are financial, benefit structure, service or some combination of the three." Similarly, the Letter of Understanding stated that Aon's services would include review of current and proposed benefit program and financial arrangements in order to identify "cost efficiencies" and "obtain lower cost of coverage." These communications failed to adequately disclose the compensation agreements that Aon had with insurers for the payment of contingent commissions. These communications further failed to disclose that the undisclosed compensation agreements destroy any objectivity that Aon has in advising its clients and constitute a breach of Aon's fiduciary

23

duties.  The communications also failed to disclose that Aon was steering customers to insurers who have agreed to pay contingent commissions.  Furthermore, the communications failed to disclose that Aon engaged in bid-rigging with insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

Marsh has sent Fire District of Sun City West ("Fire District") numerous communications regarding the brokerage services it provided in connection with Fire District's employee benefit plans, including a July 8, 2004 letter regarding Engagement of Employee Benefits Services, signed by Marsh USA, Inc. Vice President, Suzanne O'Neil, and Employee Benefit Renewal Presentations dated April 28, 2003 and April 28, 2004.  The July 8, 2004 employees benefit engagement letter outlines the consulting and placement services Marsh will provide, including, "prepar[ing] an analysis comparing current costs, plan designs, administration costs, network discounts and network accessibility," and identify[ing] and negotiate[ing]on your behalf with insurers and other benefit program providers."  Additionally, in connection with the April 28, 2004 Employee Benefits Insurance Renewal presentation, a Ms. O'Neil sent a letter to Fire District's administrative manager stating that Marsh was "pleased with the offers" that Fire District's incumbent insurers had made and stated that "we have also gone to the market for alternate bids from various other carriers."  These communications failed to adequately disclose the compensation agreements that Marsh had with insurers for the payment of contingent commissions.  These communications, further failed to disclose that the undisclosed compensation agreements destroy any objectivity that Marsh has in advising its clients and constitute a breach of Marsh's fiduciary duties.  The communications also failed to disclose that Marsh was steering customers to insurers who have agreed to pay contingent commissions.  Furthermore, the communications failed to disclose that Marsh engaged in bid-rigging with

insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

Marsh has likewise sent to Connecticut Spring & Stamp Company ("Connecticut Spring") communications regarding the brokerage services it provided in connection with Connecticut Spring's employee benefit plans. For example, on February 23, 1999, a Marsh representative sent a letter to a Connecticut Spring representative outlining an "action plan" for Connecticut Spring's employee benefit plans. The letter provided benchmarking information regarding terms and costs of plans offered in the manufacturing industry and indicated that Marsh would obtain competitive bidding for the insurance offered by Connecticut Spring. These communications failed to adequately disclose the compensation agreements that Marsh had with insurers for the payment of contingent commissions. These communications also failed to disclose that the undisclosed compensation agreements destroy any objectivity that Marsh has in advising its clients and constitute a breach of Marsh's fiduciary duties. The communications also failed to disclose that Marsh was steering customers to insurers who have agreed to pay contingent commissions. Furthermore, the communications failed to disclose that Marsh engaged in bid-rigging with insurers to allocate customers and create the illusion of an open and competitive insurance bid selection process.

     **d.    State whether there has been a criminal conviction in regard to the predicate acts;**

To date, there have been ten criminal convictions in connection with the allegations in the complaints in the following proceedings:

     a.    *People v. Patricia Abrams* (N.Y. County Supreme Court) (felony complaint against former ACE executive resulting in guilty plea entered on or about October 14, 2004);

b. *People v. Karen Radke* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about October 14, 2004);

c. *People v. Jean-Baptiste Tateossian* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about October 14, 2004);

d. *People v. John Keenan* (N.Y. County Supreme Court) (felony complaint against former Zurich American Insurance Company executive resulting in guilty plea entered on or about November 16, 2004);

e. *People v. Edward Coughlin* (N.Y. County Supreme Court) (felony complaint against former Zurich American Insurance Company executive resulting in guilty plea entered on or about November 16, 2004);

f. *People v. Robert Stearns* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about January 4, 2005);

g. *People v. Carlos Coello* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about January 19, 2005);

h. *People v. John Mohs* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about January 25, 2005);

i. *People v. Joshua M. Bewlay* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about February 14, 2005); and

j. *People v. Kathryn Winter* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about February 18, 2005).

**e.     State whether civil litigation has resulted in a judgment in regard to the predicate acts;**

There have been settlements by state authorities with some of the defendants that have

resulted in consent decrees but no judgments have been entered.

**f.     Describe how the predicate acts form a "pattern of racketeering activity"; and**

Defendants' predicate acts form a "pattern of racketeering activity" by committing at least two acts of racketeering activity within the past ten years. Each predicate act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including plaintiffs and members of the class. The predicate acts of racketeering activity were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

> g. **State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail.**

The predicate acts of mail fraud and wire fraud were part of a common plan to increase the Insurer Defendants' revenues by directing clients to the insurers and to increase the Broker Defendants' revenues beyond what clients would willingly pay for such services and to allow increased revenues without clients learning fully of the detriment to their interests.

In the conspiracy, defined herein in Section 14, the predicate acts evidence a recurring and systematic means by which the Defendants have induced plaintiffs and class members to pay excessive premiums and undisclosed fees and charges for insurance products and services, to receive insurance that was more expensive and/or inferior to other available policies, to not being reimbursed for money improperly collected, to not receiving the full benefits of their employment compensation, and/or foregoing other employment based on representations regarding the pricing, terms, and/or conditions of the employee-benefits plan.

**6. State whether the existence of an "enterprise" is alleged within the meaning of 18 U.S.C. § 1961(4). If so, for each such enterprise, provide the following information:**

> a. **State the names of the individuals, partnerships, corporations, associations or other legal entities, which allegedly constitute the enterprise.**

**The Employee Benefits Insurance Enterprise**

Based upon Plaintiffs' current knowledge, the following persons constitute a group of persons and entities associated in fact, hereinafter referred to in this action as "The Employee Benefits Insurance Enterprise":  (1) Defendants; (2) wholesale entities, whether affiliated with Defendants or not, which receive Wholesale Payments and transmit those payments in whole or in part to Defendants; (3) other insurers that pay Contingent Fees, Wholesale Payments, and other improper fees and compensation;  (4) other brokers, intermediaries, agents and other insurance entities that received or have received undisclosed compensation; (5) other entities that engage or have engaged in steering practices and/or bid rigging; (6) other insurance brokerage and insurance industry groups, such as the Council of Insurance Agents and Brokers, the American Insurance Association and Reinsurance Association of America.

The Employee Benefits Insurance Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

### The Broker-Centered Employee Benefits Insurance Enterprises

Alternatively, each Defendant Broker and the insurers with which each had contingent commission and fee agreements constitute a group of persons and entities associated in fact, referred to collectively in this action as the "Broker-Centered Commercial Insurance Enterprises".  At a minimum, three such enterprises exist:

(1)     ULR and the insurers, including the Defendant Insurers, with which ULR had contingent commission and fee agreements;

(2)     Marsh and the insurers, including the Defendant Insurers, with which Marsh had contingent commission and fee agreements; and

(3)     Aon and the insurers, including the Defendant Insurers, with which Aon had contingent commission and fee agreements.

28

**b.     Describe the structure, purpose, function and course of conduct of the enterprise;**

**The Employee Benefits Insurance Enterprise**

Through the Employee Benefits Insurance Enterprise, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

While Defendants participate in and are members of the Employee Benefits Insurance Enterprise, they also have an existence separate and distinct from the enterprise.

In order to establish and maintain the system of Contingent Fees and Wholesale Payments, while concealing the system and the inherent conflicts of interest it creates, Defendants were required to participate in the conduct of an to exercise control over the Employee Benefits Insurance Enterprise.

Defendants have substantially participated in the conduct of and have exercised controlled and operated the affairs of the Employee Benefits Insurance Enterprise in at the least the following ways:

(a)     by entering into contingent commission agreements and wholesale payment agreements with the expectation and understanding that both the brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

(b)     by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

      (c)     by sharing and disseminating information about their practices and about plaintiffs and Class Members, including confidential and proprietary information;

      (d)     by formalizing relationships among participants in the Employee Benefits Insurance Enterprise for the payment of undisclosed compensation;

      (e)     by uniformly recommending insurance products of the Insurer Defendants in order to maximize the value of Contingent Fees and Wholesale Payments;

      (f)     by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

      (g)     by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

      (h)     by developing and implementing responses to reporting requirements that conceal Defendants' scheme;

      (i)     by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Broker Defendants;

      (j)     by engaging in bid-rigging; and

      (k)     by meeting to discuss the Broker Defendants' employee benefits brokering practices and the Insurer Defendants' participation in those practices and to collude regarding the level of compensation contained in the Agreements.

The Employee Benefits Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

**The Broker-Centered Employee Benefits Insurance Enterprises**

Through each of the Broker-Centered Commercial Insurance Enterprises, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

While Defendants participate in and are members of the Broker-Centered Employee Benefits Insurance Enterprises, they also have an existence separate and distinct from the enterprise.

In order to establish and maintain the system of Contingent Fees and Wholesale Payments, while concealing the system and the inherent conflicts of interest it creates, Defendants were required to participate in the conduct of an to exercise control over the Broker-Centered Employee Benefits Insurance Enterprises.

Defendants have substantially participated in the conduct of and have exercised controlled and operated the affairs of the Broker-Centered Employee Benefits Insurance Enterprises in at least the following ways:

(a) by entering into contingent commission agreements and wholesale payment agreements with the expectation and understanding that both the brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

(b) by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

31

(c)     by sharing and disseminating information about their practices and about plaintiffs and Class Members, including confidential and proprietary information;

(d)     by formalizing relationships among participants in the Broker-Centered Employee Benefits Insurance Enterprises for the payment of undisclosed compensation;

(e)     by uniformly recommending insurance products of the Defendant Insurers in order to maximize the value of Contingent Fees and Wholesale Payments;

(f)     by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

(g)     by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

(h)     by developing and implementing responses to reporting requirements that conceal Defendants' scheme;

(i)     by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Broker Defendants;

(j)     by engaging in bid-rigging; and

(k)     by meeting to discuss the Broker Defendants' employee benefits brokering practices and the Insurer Defendants' participation in those practices and to collude regarding the level of compensation contained in the Agreements..

The Broker-Centered Employee Benefits Insurance Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

   **c.     State whether any defendants are employees, officers or directors of the alleged enterprise;**

Defendants are not employees, officers or directors of the enterprises.

> **d.    State whether any defendants are associated with the alleged enterprise;**

Defendants are associated with the enterprises and participate and control the affairs of

the enterprises.  Defendants' control and participation in the enterprise is necessary for the

successful operation of defendants' scheme.  While defendants participate in and are members of

the enterprises, defendants also have an existence separate and distinct from the enterprises.

> **e.    State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and**

Defendants are members of the enterprises but have an existence separate and distinct

from the enterprises.

> **f.    If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

Defendants are perpetrators of the racketeering activity.

**7.    State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The enterprises have an ascertainable structure separate and apart from the pattern of

racketeering activity in which the defendants have engaged.

**8.    Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

The enterprises function by providing insurance consultation, advice and related services

as well as insurance products.  Many of these services and products are legitimate and non-

fraudulent.  Normally the activities of the enterprise involve recommendations and the provision

of insurance products which best meet the needs of the insured.  The Defendants, through the

enterprise described in Section 6 above, have engaged in a pattern of racketeering activity which

involves a fraudulent scheme to increase premium revenue for the insurers and additional revenue for the brokers from inadequately disclosed communication fees, overrides, commissions, charges and other compensation through steering of customers, bid-rigging and the flipping of clients for insurers to brokers.

9. **Described what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

By steering customers, engaging in bid-rigging and customer allocation, the Broker Defendants benefit by reaping increased communication fees, commissions and other undisclosed or inadequately disclosed revenue. The Insurance Defendants benefit by placing their products (including optional supplemental insurance coverage) with the Broker Defendants' clients at above-market rates.

10. **Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

The activities of the enterprises are national in scope. The enterprises have a substantial impact upon the economy and upon interstate commerce. The enterprises were carried out through mail, wire and other facilities of interstate commerce.

11. **If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

Plaintiffs do not allege a violation of 18 U.S.C. § 1962(a).

a. **State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

Not applicable.

b. **Describe the use or investment of such income.**

Not applicable.

12. **If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Plaintiffs do not allege a violation of 18 U.S.C. § 1962(b).

13. **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

    a. **State who is employed by or associated with the enterprise; and**

See response to Section 6(a) above.

    b. **State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

The same entity is not both the liable person and the enterprise under § 1962(c).

    c. **Describe specifically how the defendant(s) participated in the operation or management of the enterprise.**

Defendants have substantially participated in the operation or management of the

enterprise as follows:

        a. by entering into contingent commission agreements and wholesale payment arrangements with the expectation and understanding that both brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

        b. by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

        c. by sharing and disseminating information about their practices and about plaintiffs and Class Members, including confidential and proprietary information;

        d. by formalizing relationships among participants in the enterprise described in Section 6 above for the payment of kickbacks and undisclosed compensation;

        e. by uniformly recommending insurance products to employers and their employees so as to maximize the amount of kickbacks, overrides, undisclosed commissions, communication fees and other undisclosed compensation and fees;

        f. by having the Broker Defendants perform administrative functions for insurers';

        g. by steering employers and their employees to the insurers who have agreed to pay the kickbacks and undisclosed compensation;

h.        by submitting false bids or misleading information to employers and employees regarding the existence and nature of compensation paid by insurers to the Broker Defendants;

i.        by engaging in bid-rigging;

j.        by sharing management and employees between and among the Employee Benefits Broker Defendants and the insurers; and

k.        by meeting to discuss the Broker Defendants employee-benefits brokering practices and insurers' participation in and compensation from the contingency agreements.

**14.    If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

Plaintiffs hereby offer the following descriptions of the alleged conspiracies.

### The Employee Benefits Insurance Conspiracy

Defendants have engaged in a common course of conduct and conspiracy to manipulate the market for insurance products generating enormous profits for themselves at the expense of Class Members. Defendants' conduct creates a conflict of interest clearly at odds with the Defendants' representations regarding the services they will provide as well as the duties inherent in the relationship which exists between Class Members and Defendants

Although Defendants have created the illusion of a competitive market for insurance, the selection, pricing and placement of the insurance products at issue in this litigation were, in fact, the result of Defendants' collusion.

The common scheme and conspiracy involves all of the Broker Defendants and the Insurer Defendants as well as other brokers and insurers who have undertaken the wrongful conduct set forth herein as well as other entities which have facilitated the conspiracy.

The purpose and effect of the conspiracy is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, inter

36

alia, allocating customers, dividing territories, bid-rigging and tying. As a result of the conspiracy, Defendant Insurers did not have to compete for insurance business on the basis of price or other terms and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy. The Broker Defendants, in turn, profited from the conspiracy through the receipt of contingent commissions, overrides, communications fees, wholesale payments and other compensation.

The actions of the Defendants were all part of the same conspiracy to increase revenues and to suppress or eliminate competition. Each Defendant was aware of the general nature of this scheme and its role in facilitating the objectives of the conspiracy. Each enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of Plaintiffs and the Class.

Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

Each Defendant and member of the conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

In furtherance of the conspiracy, Defendants and other members of the conspiracy have agreed to implement and use the same or similar devices and fraudulent tactics against their clients, including Plaintiffs and members of the Class.

The same pattern and cause of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among all Defendants and co-conspirators, including:

> a.      similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct;
>
> b.      similar agreements between the Broker Defendants and their clients which include either no language or vague, misleading, and incomplete language purporting to disclose compensation, steering, and bid-rigging arrangements between and among the Broker Defendants and the Insurer Defendants;

c. similar agreements regarding Contingent Commissions and other payments between and among the Broker Defendants and the Insurer Defendants;

d. similar practices regarding the reporting of their arrangements;

e. similar agreements regarding Wholesale Payments between and among Defendants;

f. similar tactics for steering customers to the Insurer Defendants and for placement of the Insurer Defendants products;

g. similar tactics for coercing submission of false bids, client steering, allocation of markets and customers, and stabilizing, raising or maintaining premium prices above competitive levels;

h. similar tactics for boycotting or refusing to deal with insurers who refused to participate in the conspiracy;

i. similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct;

j. similar agreements regarding Contingent Commissions and other payments between and among the Broker Defendants and the Insurer Defendants;

k. similar plans and methods for the Insurer Defendants to recapture the undisclosed or inadequately disclosed compensation paid to the Broker Defendants from Plaintiffs and Class Members;

l. similar plans and methods for concealing the compensation and fees from Plaintiffs and Class Members (and their agent employers), including the underreporting of such compensation on Reports on Form 5500 and other certification requirements under ERISA;

m. the retention by former employees of the Insurer Defendants and/or manipulation of Insurer Defendants' employees by the Broker Defendants and vice versa; and

n. similar arrangements for tying primary employee benefit coverage to the purchase of reinsurance by the Insurer Defendants through the Broker Defendants.

Defendants would not have undertaken the practices alleged herein absent an agreement

among all Defendants. Paying brokers significant additional commissions and fees is not in the

best individual interest of the Insurer Defendants. The Insurer Defendants would agree to pay such fees only with a corresponding agreement of increased premium revenue and the participation of other insurers.

The conspiracy has been conducted, implemented and facilitated through various mechanisms including direct communications among Defendants, sharing of information between Defendants and movement of employees among Defendants as well as through other means such as industry trade groups such as the Council of Insurance Agents and Brokers ("the Council") and its predecessors the National Association of Insurance Brokers ("NAIB"), the National Association of Casualty and Surety Executives (NASCE) and the National Association of Casualty and Surety Agents ("NASCA") as well as the American Insurance Association ("AIA") and the Reinsurance Association of America ("RAA").

The Council, founded in 1913 to represent larger metropolitan agencies, represents the top tier of commercial insurance brokers in the United States in both property/casualty and the benefits sectors. The association's roots have always been in larger commercial agents and brokers. In fact, only the top one percent of all agents and brokers qualify. The Council's members place 80 percent – well over $90 billion – of all U.S. insurance products and services protecting business, industry, government and the public-at-large and they administer billion of dollars in employee benefits.

Professional networking is at the very heart of The Council. It is a major part of who The Council is and what it does. The Council orchestrates the industry's most important market meetings – the number one expectation of members.

The Council of Insurance Company Executives, a standing Committee of The Council, is comprised of more than 65 of the top commercial insurers. Collectively, CICE members are

responsible for writing more than three-quarters of the nation's commercial business insurance premiums.

The Council of Insurance Company Executives and The Council of Employee Benefits Executives co-sponsor the Employee Benefits Leadership Forum at the Greenbrier, an employee benefits marketing meeting. The conference at The Greenbrier brings together key insurance brokers who handle benefits lines with the leading insurance carriers in the country to discuss critical issues in the benefits sector.

In addition to the industry meetings at The Greenbrier, The Council also facilitates many other forums including meetings of employee benefit executives, employee benefits executive roundtables, regional meetings relating to employee benefits, Chief Financial Officers workshops and conferences where CFO's of the major brokerage firms focus on the fundamental and strategic issues facing their business, Executive Liaison Committees, email exchanges, market surveys, the sharing of operating results and financial analyses, insurance company sponsorships, peer-to-peer networking, as well as teleconferences between brokers and insurers. The Council operates in a strategic alliance with the American Insurance Association ("AIA") and the Reinsurance Association of America. ("RAA").

As a result of Defendants' conspiracy, Plaintiffs and members of the Class have made payments for insurance and other "services" beyond what those payments would have been absent the conspiracy. In addition, plaintiffs and Class members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

**The Broker-Centered Employee Benefits Insurance Conspiracy**

In the alternative, the Broker Defendants and the Defendant Insurers are engaged in a number of separate but parallel conspiracies, each involving a Defendant Broker and the insurance companies with which each had contingent commission agreements.

At a minimum, three broker-centered conspiracies exist, including the following:

(a)     A ULR-centered conspiracy consisting of ULR and the insurance companies with which ULR had contingent commission agreements, including, without limitation, defendants UnumProvident, CIGNA, Prudential, MetLife, and Hartford;

(b)     A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which Marsh had contingent commission agreements, including, for example, defendant MetLife; and

(c)     An Aon-centered conspiracy consisting of Aon and the insurance companies with which Aon had contingent commission agreements, including, for example, MetLife.

The purpose and effect of the conspiracies is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.  As a result of the conspiracies, Defendant Insurers did not have to compete for insurance business on the basis of price or other terms, and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy.

Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

Each Defendant and member of the conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

As a result of Defendants' conspiracy, Plaintiffs and members of the Class have made payments for insurance and other "services" beyond what those payments would have been absent the conspiracy. In addition, plaintiffs and Class members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

**15.     Describe the alleged injury to business or property.**

Plaintiffs and class members have been injured in their business and property by (i) paying excessive premiums and undisclosed fees and charges for the insurance products and services notwithstanding that the Broker Defendants undertook to negotiate on their behalf for the best possible terms; (ii) receiving insurance that was more expensive and/or inferior to other available policies, which they accepted based on recommendations by the Broker Defendants that were influenced by conflicts of interest; (iii) not being reimbursed for money improperly collected; (iv) the Employee Subclass not receiving the full benefits of their employment compensation; and/or (v) the Employee Subclass foregoing other employment based on representations regarding the pricing, terms, and/or conditions of the employee benefits plan.

**16.     Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

The predicate acts with respect to the enterprise described in Section 6 above caused the cost of the benefits to increase and the value of their benefits to decrease, thereby injuring plaintiffs and class members in their business and property.

**17.     List the damages sustained by reason of the violation of § 1962, indicating the amount for which each defendant is allegedly liable.**

Plaintiffs and class members seek compensatory damages for the losses they have sustained as a result of defendants' scheme, for three times their actual damages. Plaintiffs and class members also seek declaratory and injunctive relief.

**18.** **List all other Federal causes of action, if any, and provide the relevant statute numbers.**

The following additional Federal claims have been alleged in the actions currently pending before the Court:

        a.        Sherman Act, 15 U.S.C. § 1; and

        b.        Employee Retirement Income Security Act, 29 U.S.C. § 1132.

**19.** **List all pendent state claims, if any.**

The pendent state claims include claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment. Additionally, defendants are alleged to have engaged in unfair competition in violation of the state statutes listed below:

Alaska Sta. §§45.50.562 *et seq.*

Arizona Revised Stat. §§44-1401 *et seq.*

Arkansas Stat. Ann. §4-75-309 *et seq.*, §§4-75-201 *et seq.*

Cal. Bus. Prof. Code §§16700 *et seq.*, §§17000 *et seq.*

Colorado Rev. Stat. §§6-4-101 *et seq.*

Connecticut Gen. Stat. §§35-26 *et seq.*

D.C. Code Ann. §§28-4503 *et seq.*

Delaware Code Ann. Tit. 6, §§2103 *et seq.*

Florida Stat. §§501-201 *et seq.*

Georgia Code Ann. §§16-10-22 *et seq*, §§ 13-8-2 *et seq.*

Hawaii Rev. Stat. §§480-1 *et seq.*

Idaho Code §§48-101 *et seq.*

740 Illinois Comp. Stat. §§10/1 *et seq.*

Indiana Code Ann. §§24-1-2-1 *et seq.*

Iowa Code §§553.1 *et seq.*

Kansas Stat. Ann. §§50-101 *et seq.*

Kentucky Rev. Stat. §446.070

Louisiana Rev. Stat. §§55:137 *et seq.*

Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

Maryland Code Ann. Title 11, §§11-201 *et seq.*

Massachusetts Ann. Laws ch. 92 §§1 *et seq.*

Michigan Comp. Laws. Ann. §§445.773 *et seq.*

Minnesota Stat. §§325D.52 *et seq.*

Mississippi Code Ann. §§75-21-1 *et seq.*

Missouri Stat. Ann. §§416.011 *et seq.*

Montana Code Ann. §§30-14-101 *et seq.*

Nebraska Rev. Stat. §§59-801 *et seq.*

Nev. Rev. Stat. Ann. §§598A *et seq.*

New Hampshire Rev. Stat. Ann. §§356:1 *et seq.*

New Jersey Stat. Ann. §§56:9-1 *et seq.*

New Mexico Stat. Ann. §§57-1-1 *et seq.*

New York Gen. Bus. Law §§340 *et seq.*

North Carolina Gen. Stat. §§75-1 *et seq.*

North Dakota Cent. Code §§51-08.1-01 *et seq.*

Ohio Rev. Code §§1331.01 *et seq.*

Oklahoma Stat. tit. 79 §§203(A) *et seq.*

Oregon Rev. Stat. §§646.705 *et seq.*

Rhode Island Gen. Laws §§6-36-1 *et seq.*

South Carolina Code §§39-3-10 *et seq.*

South Dakota Codified Laws Ann. §§37-1 *et seq.*

Tennessee Code Ann. §§47-25-101 *et seq.*

Texas Bus. & Com. Code §§15.01 *et seq.*

Utah Code Ann. §§76-10-911 *et seq.*

Vermont Stat. Ann. 9 §§2453 *et seq.*

Virginia Code §§59-1-9.12 *et seq.*

Washington Rev. Code §§19.86.010 *et seq.*

West Virginia §§47-18-1 *et seq.*

Wisconsin Stat. §§133.01 *et seq.*

Wyoming Stat. §§40-4-101 *et seq.*

**20.    Provide any additional information that you feel would be helpful to the Court in processing your RICO claim.**

Although plaintiffs are already in possession of substantial information supporting their claims, they believe that a significant volume of additional relevant evidence supporting their claims will be included in the discovery defendants are scheduled to begin producing forthwith. Therefore, plaintiffs reserve the right to amend this statement in order to provide the court with additional information uncovered during discovery that will assist in the processing of the RICO claims asserted in this action.

Dated: August 1, 2005

**MILBERG WEISS BERSHAD**
**& SCHULMAN, LLP**

_____/s/ Edith M. Kallas_____
Edith M. Kallas
Joseph P. Guglielmo
J. Douglas Richards
Michael M. Buchman
Elizabeth Rosenberg
Lili R. Sabo
One Pennsylvania Plaza
New York, NY  10119-0165
Tel.:  212-594-5300
Fax:  212-868-1229

**MILLER FAUCHER AND CAFFERTY LLP**

_____/s/ Bryan C. Clobes_____
Bryan C. Clobes
Ellen Meriwether
Michael S. Tarringer
Melody Forrester
Timothy Fraser
One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA  19103
Tel.:  215-864-2800
Fax:  215-864-2810

_Plaintiffs' Co-Lead Counsel_

**BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.**

_____*/s/ Andrew S. Friedman*_____
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Hurd
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Tel.: 602-274-1100
Fax: 602-274-1199

**LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS, LLP**

_*/s/ John J. Stoia, Jr.*_____
John J. Stoia, Jr.
Theodore J. Pintar
Bonny E. Sweeney
James D. McNamara
Mary Lynne Calkins
Rachel L. Jensen
Amelia F. Burroughs
401 B. Street, Suite 1600
San Diego, CA 92101
Tel.: 619-231-1058
Fax: 619-231-7423

**FOOTE, MEYERS, MIELKE & FLOWERS**
Robert M. Foote
416 South Second Street
Geneva, IL 60134
Tel.: 630-232-6333

**LEVIN, FISHBEIN, SEDRAN & BERMAN**
Howard J. Sedran
510 Walnut Street - Suite 500
Philadelphia, PA 19106
Tel.: 215-592-1500
Fax: 215-592-4663

**DRUBNER HARTLEY & O'CONNOR**
James E. Hartley, Jr.
Gary O'Connor
Charles S. Hellman
500 Chase Parkway, 4th Floor
Waterbury, CT 06708
Tel.: 203-753-9291
Fax: 203-753-6373

**FINE KAPLAN & BLACK**
Roberta D. Liebenberg
1845 Walnut Street
Philadelphia, PA 19103
Tel.: 215-567-6566
Fax: 215-568-5872

**THE FURTH FIRM, LLP**
Michael P. Lehman
Thomas P. Dove
Julio J. Ramos
Jon T. King
225 Bush Street, Suite 1500
San Francisco, CA 94104
Tel.: 415-433-2070
Fax: 415-982-2076

**GRAY, WEISS AND WHITE**
Mark K. Gray
1200 PNC Plaza
Louisville, KY 40202
Tel.: 502-585-2060

**HANZMAN & CRIDEN, P.A.**
Michael E. Criden
Kevin B. Love
220 Alhambra Circle, Suite 400
Coral Gables, FL 33134
Tel.: 305-357-9000
Fax: 305-357-9050

**LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS, LLP**
Samuel H. Rudman
200 Broadhollow Road, Suite 406
Melville, NY 11747
Tel.: 631-367-7100
Fax: 631-367-1173

**MEREDITH COHEN GREENFOGEL
   & SKIRNICK, P.C.**
Steven J. Greenfogel
Daniel B. Allanoff
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Tel.: 215-564-5182
Fax: 215-569-0958

**WHATLEY DRAKE, LLC**
Joe R. Whatley, Jr.
Charlene Ford
Richard Rouco
Richard Frankowski
2323 Second Avenue North
Birmingham, AL 35203
Tel.: 205-328-9576
Fax: 205-328-9669

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLC**
Mary Jane Edelstein Fait
Adam J. Levitt
656 West Randolph Street
Suite 500 West
Chicago, IL 60661
Tel.: 312-466-9200
Fax: 312-466-9292

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLC**
Fred Taylor Isquith
270 Madison Avenue, 10th Floor
New York, NY 10016
Tel.: 212-545-4600
Fax: 212-545-4653

**ZWERLING, SCHACHTER &**
    **ZWERLING, LLP**
Robert S. Schachter
Stephen L. Brodsky
Justin M. Tarshis
41 Madison Avenue
New York, NY 10010
Tel.: 212-223-3900
Fax: 212-371-5969

**ALEXANDER, HAWES & AUDET, LLP**
William M. Audet
300 Montgomery Street, Ste. 400
San Francisco, CA 94104
Tel.: 415-982-1776

**BEELER, SCHAD & DIAMOND, P.C.**
Lawrence W. Schad
James Shedden
Michael S. Hilicki
Tony H. Kim
332 South Michigan Avenue, Suite 1000
Chicago, IL 60604
Tel.: 312-939-6280
Fax: 312-939-4661

**CHAVEZ LAW FIRM, P.C.**
Kathleen C. Chavez
P.O. Box 772
Geneva, IL 60134
Tel.: 630-232-4480
Fax: 630-232-8265

**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles
Michael D. Gottsch
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
Fax: 610-649-3633

50

**COHN, LIFLAND, PEARLMAN,
  HERRMANN & KNOPF**
Peter S. Pearlman
Park 80 Plaza West One
Saddle Brook, NJ  07663
Tel.:  201-845-9600
Fax:  201-845-9423

**COOPER & KIRKHAM, P.C.**
Josef D. Cooper
655 Montgomery Street, 17th Floor
San Francisco, CA 94111
Tel.:  415-788-3030
Fax:  415-882-7040

**LARRY D. DRURY, LTD.**
Larry D. Drury
Two North LaSalle Street
Suite 700
Chicago, IL 60602
Tel.:  312-346-7950

**FINKELSTEIN, THOMPSON
  & LOUGHRAN**
Burton H. Finkelstein
L. Kendall Satterfield
Halley F. Ascher
1050 30th Street, N.W.
Washington, D.C.  20007
Tel.:  202-337-8000
Fax:  202-337-8090

**HANSON BRIDGES MARCUS VLAHOS
  RUDY LLP**
David J. Miller
333 Market Street, 23rd Floor
San Francisco, CA 94105
Tel.:  415-777-3200
Fax:  415-541-9366

**JANSSEN, MALLOY, NEEDHAM,
  MORRISON, REINHOLTSEN &
  CROWLEY, LLP**
W. Timothy Needham
730 Fifth Street, Post Office Drawer 1288
Eureka, CA 95502
Tel.: 707-445-2071
Fax: 707-445-8305

**KLAFTER & OLSEN LLP**
Jeffrey A. Klafter, Esq.
1311 Mamaroneck Avenue, Suite 220
White Plains, NY 10602
Tel.: 914-997-5656
Fax: 914-997-2444

**LITE DEPALMA GREENBERG
  & RIVAS, LLC**
Allyn Z. Lite
Bruce D. Greenberg
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel.: 973-623-3000
Fax: 973-623-0858

**JEFFREY LOWE, P.C.**
Jeff Lowe
8235 Forsyth Blvd., Ste. 1100
St. Louis, MO 63105
Tel.: 314-721-3668

**MAGER WHITE & GOLDSTEIN, LLP**
Jayne Arnold Goldstein
2825 University Drive, Suite 350
Coral Springs, FL 33065
Tel.: 954-341-0844
Fax: 954-341-0855

**LAW OFFICES OF RANDY R. RENICK**
Randy R. Renick
128 North Fair Oaks Avenue, Ste. 204
Pasadena, CA 91103
Tel.: 626-585-9600

**SAVERI & SAVERI, INC.**
Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
One Eleven Pine, Suite 1700
San Francisco, CA 94111-5619
Tel.: 415-217-6810
Fax: 415-217-6813

**LAW OFFICES OF FRANCIS O. SCARPULLA**
Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel.: 415-788-7210
Fax: 415-788-0707

**SPARKMAN-ZUMMACH, P.C.**
Martin W. Zummach
P.O. Box 266
Southaven, MS 38671
Tel.: 662-349-6900
Fax: 662-349-6800

*Attorneys for Plaintiffs*

# WILLKIE FARR & GALLAGHER LLP

CHRISTOPHER J. ST. JEANOS

212 728 8730

cstjeanos@willkie.com

787 Seventh Avenue

New York, NY 10019-6099

Tel: 212 728 8000

Fax: 212 728 8111

August 5, 2005

**VIA FEDEX**

Joseph P. Guglielmo
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
49th Floor
New York, New York 10119

Re:     **Marsh & McLennan Companies MDL Rolling Document Production**

Dear Joe:

Under cover of a copy of this letter, and in compliance with the Court's Joint Discovery Plan and Scheduling Order, dated July 26, 2005 (the "Order") and our subsequent agreement regarding the production of documents, Marsh & McLennan has transmitted to CaseCentral an electronic load file consisting of approximately 4.44 million pages encompassing documents bates numbered Marsh_MDL 000000001 - Marsh_MDL 004443915.

All documents produced under the Order shall be treated by all parties in accordance with the terms, as proposed by Defendants, of the Proposed Discovery Confidentiality Order ("Confidentiality Order") jointly submitted to the Court on June 27, 2005. Defendants' version of the Confidentiality Order shall apply until such time as the Court enters a final confidentiality order.

Very truly yours,

Christopher J. St. Jeanos

cc:     CaseCentral
          All Counsel

## Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

One Financial Center
Boston, Massachusetts 02111

William M. Cowan

617 542 6000
617 542 2241 *fax*

*Direct dial  617-348-3903*
**wcowan@mintz.com**

August 4, 2005

**Via Hand Delivery**



The Honorable Chief Justice William Young
UNITED STATES DISTRICT COURT
  for the District of Massachusetts,
One Courthouse Way
Boston, MA  02210

RE:    Natale v. Pfizer Inc./Kwaak v. Pfizer Inc.: Civ. A. Nos. 05-10590/05-10591

Dear Judge Young:

Pursuant to the Court's July 28, 2005 Order of Certification and Memorandum and
Certification, Defendant Pfizer Inc. today is filing an Application for Leave to Appeal with the
First Circuit Court of Appeals.  Pfizer Inc. hereby provides notice of the same, along with a copy
of the Application,  pursuant to the Court's Order.

Very truly yours,

William M. Cowan

CC:    David Pastor, Esq.
Kenneth Quat, Esq.
Thomas Smart, Esq.
Richard DeSevo, Esq.

*Boston  Washington  Reston  New York  Stamford  Los Angeles  London*